IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| VISTEON CORPORATION, et al.,[1] ) | Case No. 09-11786 (CSS) |
| ) | |
| ) | Jointly Administered |
| Debtors. ) | |
| ) | <u>Hearing date</u>: October 7, 2009 at 10:00 a.m. ET |
| ) | <u>Objection deadline</u>: September 30, 2009 at 4:00 p.m. ET |

## MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING IMPLEMENTATION OF THE AMENDED INCENTIVE PROGRAM

The above-captioned debtors and debtors in possession (collectively, "Visteon" or the "Debtors") file this motion (the "Motion") for the entry of an order, substantially in the form attached hereto as **Exhibit A**, (a) approving and authorizing the Debtors' proposed amended incentive program and (b) authorizing the Debtors to make payments to certain employees under such amended incentive program. In support of this Motion, the Debtors respectfully state as follows:[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Visteon Corporation (9512); ARS, Inc. (3590); Fairlane Holdings, Inc. (8091); GCM/Visteon Automotive Leasing Systems, LLC (4060); GCM/Visteon Automotive Systems, LLC (7103); Infinitive Speech Systems Corp. (7099); MIG-Visteon Automotive Systems, LLC (5828); SunGlas, LLC (0711); The Visteon Fund (6029); Tyler Road Investments, LLC (9284); VC Aviation Services, LLC (2712); VC Regional Assembly & Manufacturing, LLC (3058); Visteon AC Holdings Corp. (9371); Visteon Asia Holdings, Inc. (0050); Visteon Automotive Holdings, LLC (8898); Visteon Caribbean, Inc. (7397); Visteon Climate Control Systems Limited (1946); Visteon Domestic Holdings, LLC (5664); Visteon Electronics Corporation (9060); Visteon European Holdings Corporation (5152); Visteon Financial Corporation (9834); Visteon Global Technologies, Inc. (9322); Visteon Global Treasury, Inc. (5591); Visteon Holdings, LLC (8897); Visteon International Business Development, Inc. (1875); Visteon International Holdings, Inc. (4928); Visteon LA Holdings Corp. (9369); Visteon Remanufacturing Incorporated (3237); Visteon Systems, LLC (1903); Visteon Technologies, LLC (5291). The location of the Debtors' corporate headquarters and the service address for all the Debtors is: One Village Center Drive, Van Buren Township, Michigan 48111.

[2] In further support of this Motion, the Debtors submit the *Declaration of William G. Quigley, III, Chief Financial Officer and Executive Vice President of Visteon Corporation, in Support of the Motion of the Debtors for Entry of an Order Authorizing Implementation of the Amended Incentive Program* (the "Quigley Declaration"), attached hereto as **Exhibit B**, and the *Declaration of Douglas J. Friske, Managing Principal of Towers Perrin, in Support of the Motion of the Debtors for Entry of an Order Authorizing Implementation of the Amended Incentive Program* ("Friske Declaration"), attached hereto as **Exhibit C**.

## Preliminary Statement

1. On June 29, 2009, Visteon filed a motion requesting authority to implement an incentive program designed to motivate certain key employees to achieve superlative results by offering them an opportunity, which they currently do not have, to earn compensation approaching competitive market levels.[3] Certain parties filed written objections.[4] They argued that the proposed plan was "too rich", that the proposed metrics should be different, or that the incentive program was a "pay to stay" plan. Debtors deferred presenting their motion to discuss these concerns with its major stakeholders and to seek consensus. These discussions have been extensive, lengthy, and largely successful. Accordingly, the Debtors are withdrawing their originally-proposed plan and, with this motion, submitting for the Court's approval a substantially revised plan. The revised plan submitted with this motion now has the complete support of Visteon's *ad hoc* committee of term lenders and the official committee of unsecured creditors. Their support ratifies the reasonable exercise of the Debtors' business judgment in developing this incentive plan. In addition, the amended plan reduces dramatically the total potential cost of the incentive plan and modifies the performance targets to accommodate questions regarding whether they provided adequate incentives to key employees.

---

[3] *Motion of the Debtors For Entry of an Order Implementing the Visteon Incentive Program* [Docket No. 451].

[4] See *Objection to the Motion of the Debtors for Entry of an Order Authorizing the Implementation of the Visteon Incentive Program* [Docket No. 523; *General Motors Corporation's Objection to (A) Motion of the Debtors for Entry of an Order Authorizing the Implementation of the Visteon Incentive Program and (B) Motion of the Debtors for Entry of an Order Authorizing the Debtors to Implement Severance and Non-Insider Retention Programs* [Docket No. 517]; *Objection of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America to Debtors' Motion for an Order Authorizing the Implementation of the Visteon Incentive Program and Debtors' Motion for Entry of an Order Authorizing the Debtors to Implement Severance and Non-Insider Retention Programs* [Docket No. 513]; *Objection of the Official Committee of Unsecured Creditors to: (A) Debtors' Motion for an Order Authorizing the Debtors to Implement Severance and Non-Insider Retention Programs* [Docket No. 528]; *and (B) Debtors' Motion for an Order Authorizing the Implementation of the Visteon Incentive Program*; and *United States Trustee's Objection to Debtors' Motion for Entry of an Order Authorizing the Implementation of the Visteon Incentive Program* [Docket No. 535].

2. The amended incentive program is comprised of a key employee incentive plan (the "KEIP") for the Debtors' 12 board-elected officers,[5] and a long-term incentive plan (the "LTIP") covering 83 management employees but excluding the KEIP participants. The KEIP is targeted to ensure that the eligible employees maintain focus on directing Visteon toward emergence from chapter 11—an important incentive in auto supplier cases where new business wins are particularly challenging so long as the company is operating in bankruptcy—and on enhancing the Debtors' financial results. Each of these goals ultimately benefits the Debtors' estates and creditors. Importantly, *no* employee will be paid a KEIP bonus unless Visteon achieves a challenging, adjusted EBITDA target during the performance period and/or successfully emerges from chapter 11 bankruptcy, even if he or she remains in the Debtors' employ through reorganization, emergence and beyond. The long-term incentive program separately provides important management employees with incentives to achieve new business wins and reduce administrative and engineering costs, both of which are crucial components of the Debtors' long-term business plan and successful reorganization. If the incentive goals are all satisfied, the program's cost at target would be only $8.7 million, with a potential *maximum* cost of only $11.4 million.

## Jurisdiction

3. This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

4. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[5] As the Debtors fully explained in the *Debtors' Renewed and Modified Motion for Entry of an Order Authorizing Implementation of Non-Insider Severance and Retention Programs* [Docket No. 648], which was granted without objection on July 28, 2009 [Docket No. 691], Visteon has 13 board-elected officers. One of them is employed and compensated by a non-debtor affiliate, Visteon Engineering Services, and as such, is not subject to any severance, retention, or incentive benefits of any debtor entity and is likewise excluded here. Each of the 12 board-elected officers under the proposed KEIP is an "insider" within the meaning of section 101(31) of the Bankruptcy Code and shall not be included in the LTIP described herein.

3

K&E 15569916.

5. The statutory bases for the relief requested herein are Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

### Relief Requested

6. By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A**, (a) approving and authorizing the amended incentive program (the "Amended Incentive Program") discussed herein and (b) authorizing the Debtors to make payments under the Amended Incentive Program.

### Background

7. On May 28, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases. On June 8, 2009, the United States Trustee for the District of Delaware (the "United States Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 178]. These cases are jointly administered.

8. As described in the *Declaration of William G. Quigley, III, Chief Financial Officer and Executive Vice President of Visteon Corporation in Support of First Day Pleadings* [Docket No. 20], Visteon is a leading global supplier of climate, interiors, lighting, electronics, and other automotive systems, modules, and components to original equipment manufacturers ("OEMs") as well as the automotive aftermarket. Visteon has three main product lines—electronics, climate, and interior systems for automobile manufacturers. In addition, Visteon has a significant lighting division that operates as a subset of the electronics product group. As a

"Tier 1" automotive supplier, Visteon sits at the apex of the automotive parts supply chain, providing complex automotive systems to almost every major automobile manufacturer in the world. In 2008, the Debtors and their non-debtor affiliates recorded total sales of approximately $9.54 billion. For the first quarter of 2009, the Debtors and their non-debtor affiliates recorded total sales of approximately $1.35 billion reflecting the precipitous drop in OEM vehicle production thus far in 2009. As of the Petition Date, the Debtors and their non-debtor affiliates had approximately $4.58 billion in total assets and approximately $5.32 billion in total liabilities.

**Terms of the Amended Incentive Program**

9. As set forth above, the Amended Incentive Program consists of two components: the KEIP and the LTIP. The LTIP is a continuation of the Debtors' prepetition incentive program (except its application to "insiders"), whereas the KEIP is a newly proposed plan.[6] Quigley 9/17/09 Decl. ¶ 5.

A. **The Key Employee Incentive Plan**

10. To both reduce the overall cost of the KEIP and identify those employees who will directly impact the achievement of the KEIP metrics, the Debtors have narrowed the number of employees eligible for awards under the KEIP to a total of twelve, each of whom is a board-elected officer. Id. at ¶ 7. The Debtors have also substantially reduced the incentive opportunity for these employees from the originally-proposed KEIP. Under the originally-proposed KEIP, target awards ranged from 60 percent to 250 percent of a participant's base salary, with a target aggregate payout of $19.8 million and a *maximum* aggregate payout of approximately $30.1 million. Quigley 6/29/09 Decl. ¶ 12. Under the amended KEIP, target awards range from 50 percent to 125 percent of a participant's base salary, with a target aggregate payout of

---

[6] The Debtors are not seeking authority to pay any amount under their 2009 annual incentive plan.

approximately $5.4 million and a *maximum* aggregate payout of approximately $8.1 million. Quigley 9/17/09 Decl. ¶ 8. No payment will be made to any employee on account of the Financial Performance Metric (defined below) before March 2010, and no payment will be made on account of the Milestone Metric (defined below) before the effective date of the Debtors' plan of reorganization.[7]

11. The potential payouts under the KEIP are more than reasonable and well within the range of payouts relative to competitive benchmarks. Friske 9/17/09 Decl. ¶ 14. To ensure that the awards were competitive and market-based, the Debtors, with the assistance of Towers, Perrin, Forster & Crosby, Inc. ("Towers Perrin"), performed appropriate due diligence and analyzed the targeted award opportunities for the Debtors' insider employees—the KEIP participants—in comparison with senior management compensation in publicly disclosed incentive plans of similarly situated companies from a design perspective and also reviewed the amounts relative to survey benchmarks. Friske 6/29/09 Decl. ¶ 14.

12. Based on these data and the Debtors' prepetition compensation structure, Towers Perrin determined that compensation levels for the KEIP participants were, on average, significantly below the market median. Id. at ¶ 21. The amended KEIP will provide these employees with the opportunity to achieve greater, more competitive compensation levels, although even with the maximum payouts under the KEIP, the compensation levels still will be below market levels. Friske 9/17/09 Decl. ¶ 18. The originally-proposed incentive program was within well-established market parameters and, with an overall reduction the number of

---

[7] The Debtors agree to give the Committee three business days advance notice of award calculations prior to making any distribution to employees under the KEIP. The Debtors do not, however, need affirmation of the award calculations prior to making distributions to employees.

participants and incentive opportunities, the Amended Incentive Program is clearly within market parameters. Id.

13. Awards under the KEIP are based on the achievement of two equally weighted metrics: (a) the Debtors' emergence from chapter 11 bankruptcy (the "Milestone Metric") and (b) achievement of adjusted EBITDA of $112.6 million[8] for the period July 1 to December 31, 2009 (the "Financial Performance Metric"). Quigley 9/17/09 Decl. ¶ 9. The Milestone Metric and Financial Performance Metric are tailored to incentivize and reward progress toward a successful emergence from chapter 11 and achievement of financial performance measures linked to the implementation of the Debtors' long-term business plan. Unless they accomplish these value-enhancing metrics, the KEIP participants will not receive any award, regardless of how long they may continue in the Debtors' employ. Thus, there are no retentive features of the KEIP. Id.

### 1. The Milestone Metric

14. The Milestone Metric recognizes the realities of the automotive supply industry where an expeditious exit from chapter 11 is especially important due to the difficulties the Debtors will face in winning new business and retaining existing business while in bankruptcy. Id. at ¶ 10. Indeed, approximately 20 percent of the Debtors' business rolls off each year. Id. An extended stay in bankruptcy could have a highly negative impact on the Debtors' business and their creditors' eventual recoveries by impairing the Debtors' ability to replace business which naturally rolls off while in chapter 11. To avoid these negative effects that only will degrade the value of the Debtors' estates, the Debtors have tailored the Milestone Metric to

---

[8] Achievement of $112.6 million in adjusted EBITDA during the performance period will result in payment of target level awards to KEIP participants. This amount is net of the $2.7 million payout under the Financial Performance Metric at target. Achievement of $212.6 million in adjusted EBITDA during the performance period will result in payment of maximum level awards to KEIP participants. This amount is net of the $5.4 million payout under the Financial Performance Metric at maximum.

7

incentivize the eligible employees to take all actions necessary for the Debtors to emerge from chapter 11 swiftly. Id.

### 2. The Financial Performance Metric

15. Given the economic climate in which the Debtors operate and the turmoil in the automotive industry as a whole, the achievement of the Financial Performance Metric undoubtedly poses a significant challenge to the eligible employees. Id. at ¶ 11. Indeed, achieving the Financial Performance Metric will require achievement of 28 times the adjusted EBITDA for the same period in 2008. Id. The Debtors' adjusted EBITDA is dependent upon the Debtors' customers' actual and projected global vehicle production levels. The Debtors receive only short notice of changes to customer production, requiring the Debtors to work quickly to mitigate operating income and cash flow erosion. In light of the recent unpredictability in customer production volumes, the ability of eligible employees timely and cost-effectively to respond to fluctuating production volumes will greatly affect whether the Debtors achieve the Financial Performance Metric. Id.

16. Further, the Financial Performance Metric requires the implementation of significant operational initiatives to improve adjusted EBITDA. Each eligible employee is responsible for or engaged in activities designed to transition certain operations and eliminate certain administrative overhead and other infrastructure support costs that will be necessary to reach the Financial Performance Metric. Id. at ¶ 12. Absent a sustained effort by eligible employees, these goals cannot be realized and the Financial Performance Metric cannot be attained.

17. Importantly, the Financial Performance Metric is self-funded to the extent of $2.7 million at target and $5.4 million at the maximum payout opportunities; meaning that the adjusted EBITDA target under the Financial Performance Metric has been increased to ensure

8

that adjusted EBITDA after KEIP awards are made will be equal to or greater than adjusted EBITDA without any payment under the KEIP.

18. Because payments under the amended KEIP are made only upon the Debtors achieving a challenging adjusted EBITDA target and emergence from chapter 11, it is well-tailored to motivate participating employees to drive a quick emergence from chapter 11 and improve the financial health of the company. Id. at ¶ 13. By so linking the participating employees' incentive opportunities to enhanced value for the Debtors' estates, the KEIP successfully and fairly aligns the interests of the Debtors, their employees, and their creditors. Aligning the interests of the KEIP participants with those of the major stakeholders in these cases is also important as the Debtors embark upon on an iterative plan of reorganization process. Indeed, the KEIP is supported by certain of the Debtors' major creditor constituents—Visteon's *ad hoc* committee of term loan lenders and the Committee.

### B. The Long Term Incentive Plan

19. Under the Amended Incentive Program, approximately 83 employees are eligible to receive LTIP awards. No participant in the KEIP is eligible to receive any payment under the LTIP.[9] Id. at ¶ 14. Under the LTIP presently administered by the Debtors, the Debtors make annual awards based on the achievement of certain performance metrics established by Visteon's board of directors across three-year performance cycles. Each three-year period contains separate annual performance targets which build on prior years' performance. The Debtors are seeking to pay approximately $1.8 million for the achievement of the 2007 and 2008 metrics[10] and up to approximately $1.5 million if Visteon achieves a 21.9 percent reduction in

---

[9] The Debtors reserve the right to assume the LTIP through a plan of reorganization with respect to the KEIP participants.

[10] The $1.8 million payment relates to the achievement of: (a) 6 targeted restructuring goals in 2007 and 7 targeted restructuring goals in 2008; (b) incremental consolidated new business wins totaling $750 million in 2007; and (c) improvement in total administrative staff and engineering staff cost by 10.6 percent in 2008.

9

K&E 15569916.

administrative and engineering costs and obtains $1.0 billion in new business wins and gross re-wins in 2009. Id. The success of these initiatives will result in significant operational cost savings and increased earnings—both of which are key to the Debtors' long-term vitality and ability to successfully emerge from chapter 11.

20. Non-insider payments on account of achievement of the 2007 and 2008 performance metrics under the LTIP will not be made until the effective date of the Debtors' chapter 11 plan. Payments on account of the 2009 performance metrics under the LTIP would not be made until March 2010.[11] Id.

### Basis for Relief

I. **IMPLEMENTING THE AMENDED INCENTIVE PROGRAM IS AN EXERCISE OF THE DEBTORS' SOUND BUSINESS JUDGMENT AND IS AUTHORIZED BY SECTION 363(b) OF THE BANKRUPTCY CODE**

21. The Debtors' implementation of the Amended Incentive Program is a sound exercise of their business judgment and should be approved. Section 363(b)(1) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1) Uses of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a "sound business purpose" for such uses. See, e.g., In re Martin, 91 F.3d 389, 395 (3d. Cir. 1996) ("[U]nder normal circumstances the [bankruptcy] court would defer to the trustee's [or debtor-in-possession's] judgment so long as there is a legitimate business justification."); Computer Sales Int'l, Inc. v. Fed. Mogul Global (In re Fed. Mogul Global,

---

[11] The Debtors agree to give the Committee three business days advance notice of award calculations prior to making any distribution to employees under the LTIP. The Debtors do not, however, need affirmation of the award calculations prior to making distributions to employees. To the extent the Debtors have not already emerged from chapter 11 when the 2010 targets are established, the Debtors also agree that they will seek Court approval to implement any incentive programs based on achievements in 2010 and shall consult with the Committee prior to establishing the incentive metrics under any proposed incentive program.

10

K&E 15569916.

Inc.), 293 B.R. 124, 126 (D. Del. 2003) ("[I]n the Third Circuit, a court should approve a debtor's use of assets outside the ordinary course of business if the debtor can demonstrate a sound business justification for the proposed transaction."); The Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999) (approving a key employee retention program on the basis that debtors showed a "sound business purpose" justifying such approval). Once a debtor has articulated a valid business purpose for use of the property, a presumption arises that the debtor's decision is made on an informed basis, in good faith, and in the honest belief that the action is in the best interest of the company. See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992).

22. The business judgment rule protects a debtor's management's decisions from judicial second-guessing. See Official Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a debtor's management decisions" and courts will generally not entertain objections to the debtor's conduct after a reasonable basis is set forth). Once the debtor articulates a valid business justification for a particular form of relief, the Court reviews the debtor's request under the "business judgment rule." The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." Integrated Res., 147 B.R. at 656 (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

23. The implementation of the Amended Incentive Program is a proper exercise of the Debtors' business judgment and is in the best interests of the Debtors, their estates, and their

stakeholders. The Debtors have structured the Amended Incentive Program carefully to balance the Debtors' need to incentivize their key management employees and to provide them with appropriate, market-competitive compensation with the need to ensure that the Debtors' estates receive enhanced value in exchange for incentive payments—the result benefiting all parties in interest. Quigley 9/17/09 Decl. ¶ 18.

24. The KEIP aligns the interests of the eligible employees with those of the Debtors' stakeholders. Because payments under the KEIP will only be made if the key employees drive the Debtors to maximize enterprise value or achieve the Milestone Metric, the KEIP is calibrated to incentivize and motivate its participants to enhance profitability of the Debtors' estates. Quigley 9/17/09 Decl. ¶ 13. Based upon the Debtors' historical EBITDA performance and the current turmoil in the automotive industry, achievement of the Financial Performance Metric under the KEIP will result in both strengthened business performance and significant cost savings. Quigley 9/17/09 Decl. ¶ 11-13. Finally, payment levels under the KEIP are reasonable and were determined based on a thorough analysis of benchmarks performed by Towers Perrin. Friske 9/17/09 Decl. ¶ 18.

25. The Debtors have also determined in their reasonable business judgment that honoring the LTIP, with respect to non-insider employees, is in the best interests of the Debtors, their estates, and all parties-in-interest. The potential costs associated with the LTIP are more than justified by the benefits that are realized by encouraging the eligible employees to attract new business and reduce costs. Further, given that no payments on account of the 2007 and 2008 performance metrics will be made until the Debtors' emergence from chapter 11, the majority of awards under the LTIP are expressly conditioned upon successful emergence— which is alone a challenging metric. Quigley 9/17/09 Decl. ¶ 16.

## II. THE KEIP IS AN INCENTIVE PROGRAM NOT GOVERNED BY SECTION 503(c)(1)

26. By its plain language, section 503(c)(1) of the Bankruptcy Code pertains to retention payments to "insiders." Thus, it is inapplicable to performance-based incentive plans like the Amended Incentive Program that provide compensation to employees who contribute to preserving value and achieving restructuring objectives. Section 503(c)(1) is also inapplicable to the LTIP because the LTIP does not cover "insider" employees. See, e.g., 11 U.S.C. § 503(c)(1); In re Global Homes Prods., LLC, 369 B.R. 778, 787 (Bankr. D. Del. 2007) (holding that section 503(c) "was not intended to foreclose a chapter 11 debtor from reasonably compensating employees, including 'insiders,' for their contribution to the debtors' reorganization," and that plans that have an ancillary retentive effect are not retention plans subject to section 503(c)(1)) (emphasis omitted); In re Nellson Nutraceutical, Inc., 369 B.R. 787, 802 (Bankr. D. Del. 2007) (finding that section 503(c)(1) applies only to retention programs with "the *primary* purpose of inducing [an employee] to remain with the debtor's business." (emphasis in original)). The KEIP's Milestone Metric and Financial Performance Metric are designed to incentivize and reward progress toward prompt emergence from chapter 11 and achievement of financial objectives measured by adjusted EBITDA. The KEIP participants will not receive any award unless these challenging objectives are achieved, regardless of how long they remain in the Debtors' employ.

### A. The KEIP Metrics Are Incentivizing

27. Under the Financial Performance Metric, eligible employees will only receive incentive payments if they reach a challenging adjusted EBITDA target. This target is by no means a "lay-up" given current economic conditions. Quigley 9/17/09 Decl. ¶ 11. Instead, achieving this metric will require the sustained efforts of the eligible employees towards

13

implementing substantial cost reductions and responding quickly to changes in global vehicle production volumes. Id.

28. Courts in this district have recognized that incentive programs which include an EBITDA metric can be an efficient means of maximizing value for a debtor's estate and have therefore approved similar programs. See In re Muzak Holdings, LLC, No. 09-10422 (KJC) (Bankr. D. Del. Apr. 15, 2009) (authorizing key employee incentive plan with payments based, in part, on achieving certain EBITDAR targets); In re BSCV, Inc. (f/k/a Boscov's, Inc.), No. 08-11637 (KG) (Bankr. D. Del. Sept. 5, 2008) (approving senior executive incentive program tied to EBITDA targets); In re TSIC, Inc. (f/k/a Sharper Image Corp.), No. 08-10322 (KG) (Bankr. D. Del. June 25, 2008) (same).

29. Awards tied to the Milestone Metric benefit all parties in interest in these cases by promoting a swift emergence from chapter 11, thereby mitigating bankruptcy's negative effects on the Debtors' business, including likely reductions in new business awards and potential poaching of existing business by competitors. Quigley 9/17/09 Decl. ¶ 10.

30. Further, courts in other recent chapter 11 cases have found that reference to chapter 11 milestones does not transform an incentive plan into a retention program. Rather, these courts have recognized that incorporating chapter 11 milestones into a debtor's incentive plan may be crucial to driving the debtor's prompt emergence from chapter 11 to preserve estate value. See, e.g., In re Midway Games Inc., No. 09-10465 (KG) (Bankr. D. Del. Apr. 22, 2009); In re Nortel Networks, No. 09-10138 (KG) (Bankr D. Del. Mar. 20, 2009); In re WCI Cmtys., Inc., No. 08-11643 (KJC) (Bankr. D. Del. Feb. 4, 2009); In re Lear Corp., No. 09-14326 (ALG) (Bankr. S.D.N.Y. Aug. 28, 2009). Each of the approved incentive plans in those cases provided for award payouts upon the debtors' filing, confirming, or consummating a chapter 11 plan. See, e.g., Midway Games (approving plan under which 100 percent of awards were based on filing

K&E 15569916.

and confirming chapter 11 plan of reorganization); Nortel Networks (approving plan under which 50 percent of awards were based on debtors' attaining operational milestones and 50 percent on confirming chapter 11 plan); WCI Cmtys. (approving plan under which almost 50 percent of awards were based on debtors' consummating chapter 11 plan); In re Lear Corp. (approving a plan where 25 percent of awards were based on the debtors' confirmation of a plan of reorganization and 25 percent of awards were based on the debtors' emergence from chapter 11). In these cases, the courts expressly found that the respective milestone-based plan was an incentive plan and not a retention plan subject to section 503(c)(1). See, e.g., Transcript of Record at 152, In re Midway Games Inc., No. 09-10465 (KG) (Bankr. D. Del. Apr. 23, 2009); Transcript of Omnibus Hearing at 26:16-23, In re Nortel Networks, No. 09-10138 (KG) (Bankr D. Del. Mar. 20, 2009); Transcript of Record at 60, In re WCI Cmtys., Inc., No. 08-11643 (KJC) (Bankr. D. Del. Feb. 4, 2009).

31. In particular, the WCI Communities court found that the current economic landscape makes financial performance uncertain, making "the [milestone awards] that much more important to drive management." See Transcript of Record at 60:16-17, In re WCI Cmtys., Inc., No. 08-11643 (KJC) (Bankr. D. Del. Feb. 4, 2009). Indeed, the WCI Communities court found the milestone-based incentive plan especially justified in circumstances similar to those faced by the Debtors where an extended chapter 11 case would significantly drain value from the estates, finding that:

> the Debtor here has made a decision that . . . the downward trend is going to continue, and that a plan needs to be confirmed, or a 363 sale arranged[,] before whatever value that is remaining evaporates ... And that argument[,] it seems to me[,] makes a lot of sense.

Id. at 59:8-15.

15

32. Thus, both the Financial Performance Metric and the Milestone Metric will incentivize and reward achievement of performance, not retention, and therefore are not governed by section 503(c)(1) of the Bankruptcy Code.

### III. THE AMENDED INCENTIVE PROGRAM IS JUSTIFIED BY THE FACTS AND CIRCUMSTANCES AND SATISFIES SECTION 503(c)(3)

33. The Amended Incentive Program is fully justified by the facts and circumstances of these chapter 11 cases and, therefore, satisfies the requirements of section 503(c)(3) of the Bankruptcy Code. Further, the oft-cited factors set forth by the court in In re Dana Corp. support approval of the Amended Incentive Program. See 358 B.R. 567, 576–77 (Bankr. S.D.N.Y. 2006).[12]

34. First, the Amended Incentive Program is calculated to achieve the desired performance—specifically, improved financial performance and a prompt emergence from chapter 11 allowing the Debtors' business to remain viable and competitive. Second, the cost of the Amended Incentive Program is reasonable, market-based and, in the context of the size and earning potential of the Debtors, de minimis. Further, the scope of the Amended Incentive Program is fair and reasonable and includes those employees who make significant contributions to the Debtors' operational and restructuring activities. The Amended Incentive Program also is consistent with industry standards, as evidenced by the Debtors' and Towers Perrin's extensive due diligence efforts. Lastly, the Amended Incentive Program is supported by the Debtors' certain key constituents—namely, Visteon's *ad hoc* committee of term loan lenders and the

---

[12] The Dana court set forth six factors to consider in determining whether an incentive plan is appropriate: (a) whether the plan is calculated to achieve the desired performance; (b) whether the cost of the plan is reasonable in the context of a debtor's assets, liabilities and earning potential; (c) whether the scope of the plan is fair and reasonable or discriminates unfairly among employees; (d) whether the plan is consistent with industry standards; (e) whether the debtor performed due diligence in investigating the need for the plan; and (f) whether the debtor received independent counsel in performing due diligence, creating and authorizing the plan. Id.

Committee. These parties' full support provides significant indication that the Amended Incentive Program is justified by the facts and circumstances here.

### A. The Amended Incentive Program is Calculated to Achieve the Desired Performance

35. The Amended Incentive Program is designed to incentivize the eligible employees to achieve the Debtors' twin goals of a prompt emergence from chapter 11 and improved operating earnings. Absent realization of the Debtors' restructuring and operational goals, eligible employees are not entitled to receive any awards under the Amended Incentive Program.

### B. The Amended Incentive Program Is Reasonable and Based on Considerable Due Diligence

36. To ensure that the target KEIP awards were competitive and market-based, the Debtors, with the assistance of Towers Perrin, performed considerable due diligence and analyzed competitive compensation data for the twelve executive positions of the Debtors covered under the KEIP. Friske 6/29/09 Decl. ¶ 14. External market compensation data was gathered from a primary survey source, encompassing a large and diverse database of compensation information.. Id. Towers Perrin and the Debtors determined that compensation levels for the KEIP participants were, on average, below the market median. Id. at ¶ 21. The KEIP will allow these employees the opportunity to achieve competitive compensation levels, although they will still fall below market levels. Friske 9/17/09 Decl. ¶ 18.

37. Any concerns regarding the total amount potentially payable under the originally proposed incentive program has been addressed by decreasing the total potential payout by nearly $69 million under the Amended Incentive Program. Quigley 9/17/09 Decl. ¶ 18. The benefits to the Debtors' estates and all stakeholders in these chapter 11 cases that will result if the Debtors are successful in achieving the metrics under the Amended Incentive Program will far exceed the cost of the program. Id.

### C. The Amended Incentive Program Is Supported by the Key Stakeholders in the Debtors' Cases

38. Further, and perhaps most importantly, the Amended Incentive Program is fully supported by key parties in interest in the Debtors' cases. See, e.g., Transcript of Record at 26:9-10, In re Nortel Networks, No. 09-10138 (KG) (Bankr. D. Del. Mar. 20, 2009) (approving incentive plan where prepetition secured lender, whose "money is being used to pay these programs . . . is in full support.").

39. Here, similar to the circumstances in Nortel Networks, the Debtors' major creditor constituents—Visteon's *ad hoc* committee of term loan lenders and the Committee—support the Amended Incentive Program. These constituents recognize the importance of establishing and obtaining approval of the Amended Incentive Program now to ensure that the eligible employees are maximally motivated to achieve a swift exit from chapter 11 and enhance value for the Debtors, their estates, and creditors. The support of these parties clearly indicates that the Amended Incentive Program offers considerable benefits for the Debtors' estates, fairly aligns the interests of the Debtors, their employees, and their creditors, and further underscores that the Amended Incentive Program is fully justified by the facts and circumstances of these cases as required by section 503(c)(3). Accordingly, the Debtors believe that the Court should approve the Amended Incentive Program.

### Notice

40. Notice of this motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) counsel to the ad hoc group of lenders for the Debtors' senior secured term loan facility; (c) counsel for the administrative agent for the Debtors' senior secured term loan facility; (d) counsel for the administrative agent for the Debtors' revolving senior secured credit facility; (e) the indenture trustee for each of the Debtors' outstanding unsecured bond issuances; (f) the Committee;

18

(g) known holders of liens against the Debtors; and (h) those parties requesting notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

41. No prior motion for the relief requested herein has been made to this or any other court.

K&E 15569916.

42. WHEREFORE, the Debtors respectfully request that the Court: (i) approve an order, substantially in the form attached hereto as **Exhibit A**, authorizing the implementation of the Amended Incentive Program and (ii) grant such other and further relief to the Debtors as the Court may deem proper.

Dated: September 17, 2009

**PACHULSKI STANG ZIEHL & JONES LLP**

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, DE 19899-8705
Telephone:   (302) 652-4100
Facsimile:    (302) 652-4400
E-mail:          ljones@pszjlaw.com
                   joneill@pszjlaw.com
                   tcairns@pszjlaw.com

- and -

**KIRKLAND & ELLIS LLP**
James H. M. Sprayregen, P.C. (IL 6190206)
Marc Kieselstein, P.C. (IL 6199255)
James J. Mazza, Jr. (IL 6275474)
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:    (312) 862-2200

*Attorneys for the Debtors and Debtors in Possession*

20

K&E 15569916.