## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| VISTEON CORPORATION, et al.,[1] | ) Case No. 09-11786 (CSS) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) **Hearing Date: October 7, 2009 at 10 a.m. ET** |
| | ) **Objection Date: September 30, 2009 at 4 p.m. ET** |

## DEBTORS' MOTION TO EXTEND THEIR EXCLUSIVE
## PERIODS TO FILE AND SOLICIT VOTES FOR THEIR CHAPTER 11 PLAN

The above-captioned debtors and debtors in possession (collectively, "Visteon" or the

"Debtors") hereby file this motion for entry of an order, substantially in the form attached hereto

as **Exhibit A**, extending the Debtors' exclusive periods to file a chapter 11 plan of reorganization

and to solicit votes for that plan (the "Exclusive Periods"), through and including February 22,

2010 and April 23, 2010, respectively. In support of this motion, the Debtors state as follows:

### Preliminary Statement

1.      The Debtors' post-petition performance has exceeded all expectations, alleviating

the near-term need for debtor-in-possession financing, and demonstrating the strength of the

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Visteon Corporation (9512); ARS, Inc. (3590); Fairlane Holdings, Inc. (8091); GCM/Visteon Automotive Leasing Systems, LLC (4060); GCM/Visteon Automotive Systems, LLC (7103); Infinitive Speech Systems Corp. (7099); MIG-Visteon Automotive Systems, LLC (5828); SunGlas, LLC (0711); The Visteon Fund (6029); Tyler Road Investments, LLC (9284); VC Aviation Services, LLC (2712); VC Regional Assembly & Manufacturing, LLC (3058); Visteon AC Holdings Corp. (9371); Visteon Asia Holdings, Inc. (0050); Visteon Automotive Holdings, LLC (8898); Visteon Caribbean, Inc. (7397); Visteon Climate Control Systems Limited (1946); Visteon Domestic Holdings, LLC (5664); Visteon Electronics Corporation (9060); Visteon European Holdings Corporation (5152); Visteon Financial Corporation (9834); Visteon Global Technologies, Inc. (9322); Visteon Global Treasury, Inc. (5591); Visteon Holdings, LLC (8897); Visteon International Business Development, Inc. (1875); Visteon International Holdings, Inc. (4928); Visteon LA Holdings Corp. (9369); Visteon Remanufacturing Incorporated (3237); Visteon Systems, LLC (1903); Visteon Technologies, LLC (5291). The location of the Debtors' corporate headquarters and the service address for all the Debtors is: One Village Center Drive, Van Buren Township, Michigan 48111.

Debtors' worldwide franchise. Since filing their chapter 11 petitions on May 28, 2009, the Debtors have executed several key objectives, all of which have helped lay the groundwork for a successful reorganization of their businesses. Drawing on these early accomplishments, and with the support of the ad hoc committee of term loan lenders, the Debtors seek an extension of their exclusive periods to file a considered and consensual plan and to solicit votes on the plan. While the size and complexity of these chapter 11 cases should be cause enough, the Debtors' substantial progress to date certainly warrants an extension of their exclusive periods.

2. **First**, the Debtors stabilized their complex global operations by obtaining and implementing critical relief approved by this Court in the early days of these chapter 11 cases. Among other things, the Debtors obtained authority to:

- honor their employees' prepetition wages and benefits, as well as a postpetition non-insider severance program, all of which helped maintain employee morale;

- fund their valuable foreign operations;

- maintain their cash management system; and

- honor claims of critical suppliers and foreign vendors, allowing the Debtors to manage their downstream supply base and maintain liquidity.

3. To implement this relief, the Debtors entered into a consensual cash collateral stipulation with Ford Motor Company, which 15 days prior to the commencement of these cases had taken assignment of the Debtors' asset-backed working capital facility to help ensure the Debtors' smooth transition into chapter 11. The Debtors also negotiated a complex cash collateral stipulation with their term loan lenders, resulting in a final order being entered by the Court on July 16, 2009. Indeed, as of August 31, 2009, not only had the Debtors secured authority to use cash collateral and to provide adequate protection to their prepetition lenders, but

2

their cash position had increased by $132 million since filing for chapter 11, substantially outperforming prepetition cash forecasts. Given the tumultuous state of the automotive sector and economy in general, this success is largely attributable to the Debtors' extraordinary efforts to husband their resources during the early stages of these cases. For instance, the Debtors have had substantial success in connection with their supply chain and foreign operations.

4. **Second**, the Debtors' management team and advisors worked diligently to supplement their liquidity needs in the event vehicle production volumes persisted at historical lows. These initial efforts focused on supplementing the Debtors' cash collateral authority with a customer "club" debtor-in-possession facility. Given the unique interests of each of the Debtors' customers and the complexity of the multi-faceted customer negotiations, as well as the Debtors' cash flow performance, the Debtors determined that a customer "club" debtor-in-possession facility was not the only path available to provide incremental liquidity and to right-size their businesses. Moreover, the Debtors' cash performance has allowed them to avoid simply acquiescing to unfavorable financing terms and other conditions, as has often been required of debtors in the current wave of chapter 11 filings. Ultimately, the Debtors leveraged off of their extensive customer negotiations by transitioning such discussions to individualized customer deals, where they determined appropriate, specifically designed to enhance the Debtors' liquidity without having to borrow to do so. Thus, rather than adding a layer to their capital structure with new customer lenders, the Debtors have meaningfully advanced discussions regarding substantial customer commitments in the form of non-refundable surcharges, enhanced payment terms, engineering, design, and development cost reimbursements, funding for operational consolidation, and asset sale and plant wind-down proceeds. Indeed, contemporaneously with this motion, the Debtors also are seeking approval of

3

an accommodation agreement with General Motors, providing them with substantial liquidity enhancement, permitting them to exit unprofitable programs while receiving significant consideration, and remedying the unfavorable economics of programs vital to their reorganization. Moreover, outside of the United States, certain of the Debtors' French and Spanish non-Debtor subsidiaries obtained accommodations from certain customers in Europe, providing substantial incremental liquidity and stability to these entities' operations.

5. ***Third***, with an eye towards future business, the Debtors have worked diligently to preserve their valuable customer relationships. For instance, the Debtors sold their equity interests in Halla Climate Systems Alabama Corp. to Halla Climate Control Corporation, a Korean entity in which the Debtors own 70% of the equity, at the request and in support of the Debtors' relationship with Hyundai–Kia Motors. Hyundai–Kia Motors is one of the Debtors' largest and most important customers, and generated approximately 100% of Halla Climate Systems Alabama Corp.'s total sales volume. This transaction permitted the Debtors to further buttress their cash position with approximately $37 million from sale proceeds and $26 million from intercompany loan repayment. Since executing this transaction, Hyundai–Kia Motors has reinforced its commitment to the Visteon enterprise, acknowledging its importance in supporting Hyundai–Kia Motors' rapid international expansion. Visteon expects that this relationship will continue to prosper and be mutually beneficial, including by way of continued new business awards to Visteon's non-Debtor affiliates. Indeed, through August 31, 2009, Hyundai–Kia Motors had awarded certain of the Debtors' affiliates in excess of $160 million of incremental new business.

6. ***Fourth***, the Debtors have continued to execute on their operational restructuring initiatives predating the commencement of these chapter 11 cases, including the sale of non-core

4

assets, rejection of contracts, and reduction of legacy liabilities. For instance, on June 26, 2009, the Debtors moved to terminate or modify their post-employment health and insurance benefits, which, if approved, would reduce the Debtors' liabilities by approximately $310 million. Based on these continued restructuring actions, the Debtors have presented their refined business plan to key constituents including the term loan lenders, Official Committee of Unsecured Creditors, and Ford Motor Company. This business plan will serve as the platform upon which the Debtors expect to develop a confirmable plan of reorganization.

7.     *Fifth*, even with all of their efforts devoted toward achieving other key objectives, the Debtors also have presented a plan term sheet to their term loan lenders and initiated plan formulation discussions. Recently, the parties' professionals met for an in-person working session on the plan term sheet. The Debtors envision using the plan term sheet as the basis for a plan of reorganization, which the Debtors intend to deliver in the near term. Considering the volume and importance of the Debtors' accomplishments to date, the Debtors have earned the support of the ad hoc committee of term loan lenders for extension of the Debtors' exclusivity periods.[2]

## Jurisdiction

8.     This Court has jurisdiction pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

---

[2]    The ad hoc committee of term lenders supports the Debtors' request to maintain exclusivity and has worked with the Debtors to incorporate certain milestones in the proposed order. In particular, these milestones are: (a) the Debtors must file a chapter 11 plan and an accompanying disclosure statement on or before November 2, 2009, (b) the Court's hearing on approval of the disclosure statement must occur on or before December 15, 2009, and (c) the Court's hearing on confirmation of the chapter 11 plan must commence on or before February 15, 2010. If the Debtors are unable to meet one of the foregoing milestones, the Debtors may still seek to maintain exclusivity by filing a motion within five business days after the passing of such milestone date to be heard at the Court's next available hearing.

5

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     The statutory bases for the relief requested herein is section 1121(d) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and rule 9006-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules").

## Background

11.     On May 28, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On June 8, 2009, the United States Trustee for the District of Delaware (the "U.S. Trustee" appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code [Docket No. 178].

12.     Visteon is a leading global supplier of climate, interiors, lighting, electronics, and other automotive systems, modules, and components to original equipment manufacturers ("OEM") as well as the automotive aftermarket.  Visteon has three main product lines— electronics, climate, and interior systems for automobile manufacturers.  In addition, Visteon has a significant lighting division that operates as a subset of the electronics product group.  As a "Tier 1" automotive supplier, Visteon sits at the apex of the automotive parts supply chain, providing complex automotive systems to almost every major automobile manufacturer in the world.  In 2008, the Debtors and their non-debtor affiliates recorded total sales of approximately $9.54 billion.  For the first half of 2009, the Debtors and their non-Debtor affiliates recorded total sales of approximately $2.92 billion, reflecting the precipitous drop in OEM vehicle production in 2009, thus far.  As of June 30, 2009, the Debtors and their non-Debtor affiliates had approximately $4.65 billion in total assets and approximately $5.37 billion in total liabilities.

6

13.     Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to these chapter 11 cases is contained in the *Declaration of William G. Quigley, III, Chief Financial Officer and Executive Vice President of Visteon Corporation, In Support of First Day Pleadings* [Docket No. 20].

**Relief Requested**

14.     The Debtors seek entry of an order extending the Debtors' exclusive right to file a chapter 11 plan by 150 days through and including February 22, 2010, and, correspondingly, to solicit votes for the plan through and including April 23, 2010, without prejudice to the Debtors' right to seek additional extensions of their Exclusive Periods.[3]

**Basis for Relief**

A.      **Extension of the Exclusive Periods**

15.     The principal goal of chapter 11 is the successful rehabilitation of a debtor's business, which serves to, among other things, increase the pool of assets available for distribution to creditors. NLRB v. Bildisco & Bildisco, 465 U.S. 513, 527 (1984); United States v. Whiting Pools, Inc., 462 U.S. 198, 203 (1983); see also H.R. REP. NO. 95-595, at 220 (1977), as reprinted in 1978 U.S.C.C.A.N. 6179, 6180 (hereinafter "House Report"). The interwoven provisions of chapter 11 reflect Congressional intent that the principal means of successful rehabilitation should be a considered and consensual plan. See, e.g., Gaines v. Perkins (In re Perkins), 71 B.R. 294, 297 (W.D. Tenn. 1987). Such plans reduce the administrative burden imposed upon the bankruptcy court, avoid lengthy and costly litigation, and increase the overall distribution to creditors. See Chaim J. Fortgang & Thomas Moers Mayer, Valuation in

---

3     The Debtors have filed this motion prior to the expiration of the period prescribed by section 1121(d) of the Bankruptcy Code. Accordingly, Local Bankruptcy Rule 9006-2 provides an automatic bridge of the Exclusive Periods until the Court has an opportunity to act on this motion.

7

Bankruptcy, 32 UCLA L. REV. 1061, 1106-1107 (1985). To promote balanced and successful reorganizations under chapter 11, Congress gave the debtor the exclusive right for a reasonable period of time to propose a plan. Section 1121(b) of the Bankruptcy Code establishes an initial period of 120 days after the order for relief during which only the debtor may file a plan. 11 U.S.C. § 1121(b). If the debtor files a plan within the 120 day period, section 1121(c)(3) extends the exclusivity period to 180 days after the order for relief to permit the debtor to seek acceptances of such plan. 11 U.S.C. § 1121(c)(3).

16. Here, the Debtors' periods of exclusivity to file a chapter 11 plan and solicit acceptances of that plan are presently set to expire on September 25, 2009 and November 24, 2009, respectively. However, section 1121(d) permits the bankruptcy court to extend these exclusivity periods "for cause." 11 U.S.C. § 1121(d). Section 1121(d) of the Bankruptcy Code authorizes a bankruptcy court to extend the exclusivity periods by as much as 18 months (to file a plan) and 20 months (to solicit votes) for cause, based upon the relevant facts and circumstances, and debtors in possession are frequently granted such extensions in light of the particular circumstances of a case, in order to provide adequate opportunity to develop a plan of reorganization. See, e.g., In re Sun-Times Media Group, Inc., No. 09-11092 (CSS) (Bankr. D. Del. July 13, 2009) (granting a 90-day extension following the initial 120-day period); In re EZ Lube, LLC, No. 08-13256 (CSS) (Bankr. D. Del. May 8, 2009) (granting a 120-day extension following the initial 120-day period); In re Tropicana Entm't, No. 08-10856 (KJC) (Bankr. D. Del. Aug. 8, 2008) (granting a 130-day extension following the initial 120-day period); In re The Flinkote Co. & Flinkote Mines Ltd., No. 04-11300 (JKF) (Bankr. D. Del. June 17, 2008) (granting the twelfth extension of the debtors' exclusivity periods); In re Dura Auto. Sys., Inc., No. 06-11202 (KJC) (Bankr. D. Del. Mar. 19, 2008) (further extending exclusive filing periods,

8

428 days after the original filing deadline, by 213 days, for a total of 548 days); In re Sea Containers Ltd., No. 06-10542 (KJC) (Bankr. D. Del. Feb. 25, 2008) (granting an extension, more than one year after initial extension, by 120 days, for a total of 429 days).

17. Courts examine a number of factors to determine whether a debtor has had an adequate opportunity to develop, negotiate, and propose a chapter 11 plan and thus whether there is "cause" for extension of the debtor's exclusive periods. These factors include the following:

    a.    the size and complexity of the case;

    b.    the necessity of sufficient time to negotiate and prepare adequate information;

    c.    the existence of good faith progress;

    d.    whether the debtor is paying its debts as they become due;

    e.    whether the debtor has demonstrated reasonable prospects for filing a viable plan;

    f.    whether the debtor has made progress negotiating with creditors;

    g.    whether creditors are prejudiced by the extension;

    h.    the length of time a case had been pending;

    i.    whether the debtor is seeking an extension to pressure creditors; and

    j.    whether or not unresolved contingencies exist.

See In re R.G. Pharm., Inc., 374 B.R. 484, 487 (Bankr. D. Conn. 2007); In re Friedman's Inc., 336 B.R. 884, 888 (Bankr. D. Ga. 2005); In re Cent. Jersey Airport Servs., LLC, 282 B.R. 176, 183 (Bankr. D.N.J. 2002).

18. Not all factors are relevant to every case and courts tend to use a relevant subset of the above factors to determine whether cause exists to grant an exclusivity extension in a particular chapter 11 case. See e.g., In re Express One Int'l, 194 B.R. 98, 100 (Bankr. E.D. Tex.

DOCS_DE:153336.1

1996) (identifying four of the factors as relevant in determining whether "cause" exists to extend exclusivity); In re United Press Int'l, Inc., 60 B.R. 265, 269 (Bankr. D.D.C. 1986) (finding that the debtor showed "cause" to extend exclusivity based upon three of the factors).

**B.      Cause Exists Here to Extend the Exclusive Periods**

19.     Here, cause exists to extend the Exclusive Periods by 150 days considering the size and complexity of these chapter 11 cases, as well as the impact of the current economic climate, the Debtors' progress to date towards achieving rehabilitation, and the work still to be completed to develop and implement a plan of reorganization.

      **1.      The Size and Complexity of the Chapter 11 Cases Warrant Extension of the Exclusive Periods**

20.     Both Congress and the courts have recognized that the size and complexity of a debtor's case alone may constitute cause for the extension of a debtor's exclusive period to file a plan and the period to solicit acceptances of such a plan. H.R. REP. NO. 95-595, at 231, 232, & 406, as reprinted in 1978 U.S.C.C.A.N. 5787, 6191, 6362. Indeed, the size and complexity of a chapter 11 case is the basis upon which courts most commonly grant extensions. See, e.g., Express One Int'l, 194 B.R. at 100; In re Texaco, Inc., 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987) ("The large size of the debtor and the consequent difficulty in formulating a plan of reorganization for a huge debtor with a complex financial structure are important factors which generally constitute cause for extending the exclusive periods.").

21.     Here, the Debtors and their non-Debtor affiliates comprise one of the world's largest suppliers of climate, interiors, lighting, electronics, and other automotive systems, modules, and components to OEMs, as well as the automotive aftermarket, requiring complex organizational structures, systems, and processes sprawling across the globe. To support operations, the Debtors employ approximately 30,000 people worldwide. Visteon Corporation is

10

the direct parent of 19 domestic subsidiaries alone, many of which have subsidiaries of their own. For example, Visteon International Holdings, Inc., one of Visteon Corporation's wholly-owned subsidiaries, holds a direct interest in 43 foreign subsidiaries and four domestic subsidiaries, many of which also have subsidiaries of their own.

22. For fiscal year 2008, the 30 Debtors in these cases, together with approximately 100 non-Debtor affiliates, recorded total sales of approximately $9.54 billion. For the first half of fiscal year 2009, the Debtors and their non-Debtor affiliates recorded total sales of approximately $2.92 billion, reflecting the global reduction in demand for automobiles. As of June 30, 2009, the Debtors and their non-Debtor affiliates had approximately $4.65 billion in total assets and approximately $5.37 billion in total liabilities.

23. Moreover, the Debtors have a complex capital structure in which Ford Motor Company ("Ford"), one of the Debtors' most significant customers, is also the Debtors' asset-backed revolving credit facility lender. While Ford generally has a first priority lien on the Debtors' cash collateral, the Debtors' term loan secured lenders ("Term Lenders") hold security interests in the Debtors' intellectual property and certain foreign equity interests that generate cash streams to which the Term Lenders have rights. Also, Ford and the Term Lenders each hold second priority liens on each other's collateral. As a result, obtaining use of these lenders' cash collateral was complicated and required the Debtors to delicately navigate intertwining negotiations.

24. Sensibly, developing and obtaining consensus for a plan of reorganization for large and complex chapter 11 cases such as these, involving Debtors having operations of notable size and strategically, logistically, and financially complex operations, will require substantial time and effort to ensure that constituents receive the greatest value possible through

the chapter 11 process. Accordingly, based on the complexity of these cases alone, cause exists to extend the Exclusive Periods.

2.   **The Debtors Have Made Significant Progress in These Cases, Including in Negotiations with Their Key Creditors**

25.   In considering an extension of a debtor's exclusive periods, courts often assess a debtor's progress towards rehabilitation. See, e.g., In re Amko Plastics, Inc., 197 B.R. 74, 77 (Bankr. S.D. Ohio 1996). Since the Petition Date, the Debtors have concentrated on resolving a myriad of critical issues relating to these cases and have made substantial progress toward emergence. Below, the Debtors address some of these efforts, which favor an extension of the Exclusive Periods.

26.   *The Debtors Have Smoothly Transitioned into Chapter 11.*   In connection with filing their chapter 11 petitions, the Debtors filed 18 "first day" motions and five "second day" motions to transition operations into chapter 11 as smoothly as possible. All such motions have been approved on a final basis and were necessary to stabilize the Debtors' multi-billion dollar operations. For instance, the Debtors have devoted considerable time to maintaining the morale and strength of their employee base through various initiatives, including, on day one, obtaining authority to pay prepetition wages, salaries, and benefits to their employees and temporary workers.[4] Further, the Debtors worked closely with counsel to obtain the Court's approval of severance and non-insider retention programs.[5] In these difficult economic times, such programs were necessary to reward the loyalty and productivity of thousands of employees and temporary workers, and maintain employee morale.

---

[4]   See Docket No. 80.

[5]   See Docket No. 432.

12

27. Also, the Debtors received authority to honor prepetition obligations owed to certain foreign affiliates pursuant to a cash pooling system in Europe and programs in Europe and Mexico under which certain of the Debtors serve as a counterparty to sales transactions and manage customer relationships on behalf of local interests.[6] Critically, in doing so, the Debtors protected Visteon's significant foreign equity interests, which are pledged in part to Visteon's prepetition secured lenders, and are some of the most valuable assets of the Debtors' estates. Moreover, the Debtors obtained authority to continue critical cash management programs including their netting program, which was implemented to minimize the number and costs of intercompany transactions.[7]

28. The Debtors also have implemented other fundamental measures to ensure the Debtors' relatively seamless transition into chapter 11, and to support other restructuring activities. For instance, early on in these cases, the Debtors established a comprehensive electronic data room, well-utilized by case constituents and critical to facilitating due diligence requirements in connection with financing and asset sale transactions. Further, the Debtors have established strong, and collaborative, communications with the Term Lenders, Ford, the U.S. Trustee, and the Committee, using these parties as a sounding board for decisions from the beginning of these cases. In particular, the Debtors and their professionals have worked with these constituents to ensure that the procedures contained in the Court's first day and second day orders, and the authority granted therein, as well as other mechanisms, have been executed effectively to buoy the value of the Debtors' estates for the benefit of all constituencies. The

---

[6] See Docket Nos. 604 and 690.

[7] See Docket No. 84.

DOCS_DE:153336.1

Debtors have been successful in these stabilization efforts; however, such success has been achieved only with the expenditure of substantial time and resources.

29. *The Debtors Have Complied with Their Reporting Requirements.* As a result of the Debtors' size and 30 debtor entities, the Debtors allocated significant time and resources to preparing their schedules of assets and liabilities and their statements of financial affairs (collectively, the "Schedules and Statements"), which were filed on August 26, 2009. Filing the Schedule and Statements was a necessary precursor to developing the plan and disclosure statement. Moreover, the Debtors have spent significant time preparing information to comply with their reporting requirements under Rule 2015.3(d) of the Federal Rules of Bankruptcy Procedure, a demanding task given the Debtors' substantial interests in approximately 40 operating entities. Throughout this process, the Debtors have informed the U.S. Trustee's office of their progress and intend to file their first report in the next several weeks. Finally, the Debtors have been vigilant in timely filing with the Court monthly operating reports consistent with guidelines set forth by the office of the U.S. Trustee.

30. *The Debtors Have Maintained Continuity of Supply.* Early on in these cases, in anticipation of the likely reaction from the Debtors' supplier base as a result of the Debtors' chapter 11 filing, the Debtors sought and received Court approval to pay the prepetition claims of a limited group of critical suppliers in consideration for such suppliers maintaining trade terms that were in existence on or before the Petition Date.[8] The Debtors also established internal procedures for negotiating with suppliers that demanded that the Debtors pay their prepetition claims or shorten trade terms. In fact, during the first approximately 75 days of these cases,

---

[8] See Docket No. 374.

hundreds of suppliers made such demands. Despite this influx of demands, the Debtors were, and continue to be, unwaveringly frugal with the authority granted by the Court to pay prepetition claims and steadfast in maintaining trade terms. Indeed, the Debtors' efforts in stabilizing their supplier base have minimized disruption to their business operations following their chapter 11 filings and improving their cash position, to the benefit of all of their creditors.

31. *The Debtors Have Secured Access to Cash and Maintained Liquidity During These Chapter 11 Cases.* To satisfy their liquidity needs, the Debtors obtained authority from the Court to access cash collateral with the consent of Ford and the Term Lenders. Doing so required the Debtors to work tirelessly with their professionals in negotiating numerous cash collateral stipulations with Ford, the Term Lenders, and the Committee. Specifically, on May 28, 2009, the Debtors filed a motion with the Court seeking an order authorizing the Debtors to provide Ford certain forms of adequate protection in exchange for the consensual use of Ford's cash collateral. The Court has since entered numerous related interim cash collateral orders.[9] Also, on May 29, 2009, Wilmington Trust FSB, as the Term Lenders' administrative agent, filed a motion with the Court seeking adequate protection of the Term Lenders' collateral including intellectual property, equity in certain foreign subsidiaries, and intercompany debt owed by foreign subsidiaries, as well as certain cash flows associated with such collateral. On July 16, 2009, the Court entered a final order in connection with such motion, providing the Debtors with

---

[9] Interim orders authorizing the Debtors' use of Ford's cash collateral and certain of Ford's other prepetition collateral were entered on May 29, 2009 [Docket No. 93], June 19, 2009 [Docket No. 380], July 1, 2009 [Docket No. 481], July 16, 2009 [Docket No. 599], July 28, 2009 [Docket No. 689], August 13, 2009 [Docket No. 792], and September 9, 2009 [Docket No. 952].

authority to use the cash collateral and certain other prepetition collateral of the Term Lenders and granting the Term Lenders adequate protection of such collateral.[10]

32.     Moreover, as a result of the Debtors' successes in managing their cash position and certain liquidity enhancing events, cash collateral has thus far in these cases proven sufficient to sustain the Debtors' operations and rehabilitation efforts.    Contributing to the Debtors' improved cash position, the Debtors have made sparing use of their authority to pay suppliers' prepetition claims and have aggressively managed trade issues.    Also, the Debtors obtained an approximately $13.0 million cure payment from Chrysler Group LLC ("Chrysler") in connection with matters relating to Chrysler's bankruptcy case.    Additionally, the Debtors' sale of interests in Halla Alabama (defined below) generated approximately $63 million for the Debtors' estates.    Finally, the Debtors worked tirelessly to obtain financial accommodations from key OEM customers, as discussed below.    In total, since the Petition Date through August 31, 2009, the Debtors' cash position increased by $132 million, significantly exceeding cash forecasts.[11]

33.     *The Debtors and Their Non-Debtor Affiliates Have Obtained Significant Accommodations from Key Customers*.    The Debtors have obtained significant financial and operational accommodations from key OEM customers.    The Debtors' recent and ongoing accommodation negotiations with these customers evolved from debtor-in-possession financing

---

[10]  See Docket No. 608.

[11]  Also noteworthy, prior to the Petition Date on March 31, 2009, one of the Debtors' subsidiaries, Visteon UK Ltd., consisting of three manufacturing plants, filed for administration in the United Kingdom with the High Court under the Insolvency Act 1986.  Despite the substantial efforts required of the Debtors to manage the impact from affected employees, related negotiations with union representatives, and the administration process itself, the Debtors succeeded in preventing Visteon UK Ltd.'s insolvency proceedings from disrupting other European operations and increasing the Debtors' need to financially support non-Debtor foreign affiliates.

negotiations, which had been at the forefront of the Debtors' activities for much of these cases prior to the Debtors' reprioritization of their attentions. As background, on May 13, 2009, the Debtors entered into certain transactions, whereby Ford purchased all of the outstanding obligations of the lenders under the Debtors' asset-backed revolving credit facility. In connection therewith, the Debtors began negotiating the terms of a "club" debtor-in-possession financing with Ford and certain other of the Debtors' customers, including General Motors, Chrysler, and Nissan.[12]

34. Consequently, throughout the first approximately 75 days of these cases, the Debtors were engaged in multi-faceted debtor-in-possession financing negotiations with certain of their OEM customers, including Ford. Such negotiations were made extremely complex as, quite unconventionally, potential participants were required to manage dual roles as customers and financiers, necessitating up-front resolution of strategic and operational issues critical to the Debtors' long term planning efforts. Significantly, one such issue related to planning and cost sharing with respect to the wind-down of unprofitable and non-core facilities within the Debtors' U.S. manufacturing operations contemplated in connection with the financing. The Debtors and their advisors worked virtually around the clock to develop the necessary analysis to support related customer negotiations, including to address difficult problems, such as the allocation to customers of overhead costs applicable to multiple, multi-customer production facilities. Nonetheless, while discussions continue with certain customers regarding debtor-in-possession

---

[12] On May 28, 2009, concomitantly with the filing of these chapter 11 cases, the Debtors entered into a commitment letter with Ford, pursuant to which, among other things, Ford agreed, subject to the terms and conditions set forth therein, to provide to the Debtors no less than $125 million of financing under the terms of a senior, super-priority revolving credit facility.

financing, the Debtors have also been aggressively pursuing parallel path activities to provide additional liquidity.

35. Specifically, the Debtors parlayed their "club" debtor-in-possession financing discussions into customer-specific negotiations regarding deals designed to streamline certain operations and enhance the Debtors' liquidity position. Indeed, in mid-September 2009, the Debtors executed an agreement with General Motors for which they are presently seeking Court approval, from which they expect to generate additional liquidity, and which is specifically calibrated to buttress the Debtors' post-emergence operations. Pursuant to the agreement, the Debtors would receive liquidity-enhancing accommodations including $8.0 million in cash surcharge payments, $4.425 million in engineering, design, and development cost reimbursement, and up to $10.0 million to fund the consolidation of Visteon's InterAmerican and Carplastic Mexican facilities—enhancing productivity at the Carplastics facility, which will continue to source General Motors component parts. The Debtors also would receive $8.2 million from General Motors for a cure payment in connection with General Motors' chapter 11 case. Further, the Debtors would obtain significant additional liquidity from the acceleration of certain payment terms, purchase proceeds for certain inventory and Visteon-owned equipment and tooling used exclusively to manufacture for General Motors, and payments relating to the wind-down of unprofitable programs. General Motors also has afforded the Debtors the opportunity to retain favorable business lines, which will play a role in the Debtors' post-emergence business strategy.

36. Moreover, the Debtors and their non-Debtor affiliates worked diligently to obtain accommodations from certain European customers in connection with sustaining certain non-Debtor operations in Europe that do not have access to the Debtors' cash reserves. In July 2009,

18

following extensive negotiations, certain of the Debtors' non-Debtor affiliates succeeded in executing support agreements with these customers, pursuant to which financial accommodations were provided to directly support operations in France and Spain. In general, these support agreements provide these non-Debtor affiliates with liquidity through certain lump sum payments for recovery of invested engineering, design, and development costs, shortened payment terms, and other beneficial commercial arrangements. Consequently, the Debtors have aggressively managed the funding requirements of their operations in France and Spain.

37. The Debtors continue discussions with other customers for accommodations similar to those discussed above, and several of these discussions have progressed into advanced stages with the exchange of legal documentation and detailed business analysis.

38. *The Debtors Have Delivered A Business Plan to Key Constituents.* Leveraging information gleaned from customer negotiations for planning purposes, the Debtors substantially developed their business plan to serve as a platform for emergence. Moreover, the Debtors' business plan was further shaped, in part, by certain key restructuring initiatives. For instance, the Debtors devoted considerable time to the sale of Visteon Domestic Holdings, LLC's 80% equity interest in Halla Climate Systems Alabama Corp. ("Halla Alabama") to Halla Climate Control Corporation ("Halla Korea"), which sale was approved by the Bankruptcy Court on July 16, 2009 and closed July 31, 2009. This transaction generated approximately $37 million in sale proceeds and approximately $26 million in full satisfaction of Visteon Corporation's intercompany loan to Halla Alabama. The sale was the culmination of extensive preparation by the Debtors and negotiations between the Debtors, Halla Alabama, and Halla Korea within a compressed time frame to minimize any disruption to Hyundai–Kia Motors ("Hyundai"), one of the Debtors' largest and most important customers and virtually the only customer of Halla

19

Alabama. Pursued at the request of Hyundai, closing this transaction was critical to maintaining the Debtors' relationship with Hyundai in the long-term. Since executing this transaction, Hyundai has reinforced its commitment to the Visteon enterprise, praising their strong alliance and indicating that the parties' relationship will continue to prosper and be mutually beneficial. Indeed, through August 31, 2009, Hyundai–Kia Motors had awarded certain of the Debtors' affiliates in excess of $160 million of incremental new business. In sum, the Debtors have used their customer negotiations as a basis for developing their post-emergence strategy as reflected in the Debtors' business plan, delivered to key constituents in mid-August 2009.

39.    *The Debtors Have Implemented Other Key Restructuring Initiatives.*    In conjunction with developing their business plan and continuing prepetition restructuring activities, the Debtors' have implemented initiatives to streamline operations and reduce their overall cost basis. Prepetition, from January 2006 to August 2008, the Debtors achieved significant cost reductions—they closed, divested, or right-sized 30 of their non-core and underperforming facilities, and reduced administrative and engineering costs by 20% and 25%, respectively, in part by shifting administrative and engineering overhead to low cost countries. Since the Petition Date, the Debtors have undertaken numerous additional steps towards revitalizing their balance sheet. A number of these initiatives are discussed below.

40.    First, early in these chapter 11 cases, the Debtors established procedures for the sale of *de minimis* non-core assets, which the Court approved on July 16, 2009.[13] As of August 31, 2009, the Debtors had sold approximately $893,000 in aggregate of superfluous assets and

---

[13]  See Docket No. 601.

continue to analyze opportunities to generate cash from redundant, obsolete, or otherwise unneeded assets.

41. Second, the Debtors have expended significant energies analyzing and preparing a motion for termination and/or modification of post-employment health and insurance benefits. Such motion was filed on June 26, 2009.[14] The Debtors estimate that without termination and/or modification of post-employment health and insurance benefits, their projected balance sheet liability for these benefits will be $310 million, with a projected cash cost of $31 million in 2009 alone. Addressing these costs would make the Debtors a more competitive business and would increase the likelihood of a successful organization. The Debtors have also spent significant time considering various strategic alternatives to address the Debtors' other legacy obligations, such as pension liabilities. For example, the Debtors have regular meetings with the Pension Benefit Guaranty Corporation and other stakeholders to maintain an open dialogue. Consistent with their efforts to maintain the status quo on pension matters pending a decision as to that option for treatment of the pension plans that is in the best interests of the creditors and the Debtors' bankruptcy estates, the Debtors decided not to make minimum funding contributions to two pension plans on September 15, 2009 that were due on that date.

42. Third, relationships among the Debtors and between the Debtors and third-parties are governed by thousands of executory contracts and 13 leases of unexpired real property. The Debtors have spent significant time analyzing these contracts and leases. Indeed, in connection with those efforts, the Debtors have worked closely with their advisors to identify contracts for rejection, to analyze associated damages and other legal effects, and to seek court approval of

---

[14] See Docket No. 424.

contract and lease rejections where appropriate.[15]  To date, the Debtors have rejected more than

ten executory contracts and unexpired leases of real property that burden the Debtors' estates,

resulting in a savings of approximately $10.0 million per annum.  Further, the Debtors have

engaged contract counterparties in various negotiations to obtain favorable economic outcomes

for the bankruptcy estates.  Despite the Debtors' substantial efforts to address unfavorable

executory contracts and unexpired leases early in these cases, there is still much work to be done

given the sheer number of contracts to assess in light of the Debtors' current and post-emergence

needs.  This critical work will continue over the coming weeks.

**3.      The Debtors Require Sufficient Time to Negotiate a Plan and Disclosure Statement.**

43.      To summarize, in the first approximately 120 days of these cases, the Debtors

have accomplished vital milestones to stabilize their businesses operationally and financially,

and to establish a business plan as a groundwork for discussions with key constituents.

Moreover, on September 9, 2009, the Debtors delivered a plan term sheet to the Term Lenders

and met with the Term Lenders' advisors to initiate discussions with respect to the ultimate plan

structure and discuss the path to a consensual plan.  The plan term sheet lays out the general

structure for a "stand-alone" plan of reorganization under which the Debtors' prepetition secured

term debt would convert to a combination of new common stock and secured debt in a

reorganized enterprise.  Discussions have continued with the Term Lenders since the initial

meeting and the Debtors expect to deliver a preliminary plan of reorganization to the Term

Lenders in the near term, and to other constituents soon thereafter.  The Debtors anticipate

---

[15]  The Debtors have also obtained Court approval of procedures for rejecting executory contracts and unexpired leases of personal and non-residential real property on an expedited basis. [Docket No. 596].

finalizing the chapter 11 plan in the upcoming months. Without an extension, however, the Debtors will be forced to file a plan and disclosure statement prematurely and proceed with solicitation without full input from their key creditors. A hasty filing of a plan or solicitation process could be detrimental for all parties-in-interest, as it will reduce the likelihood of a consensual plan. Accordingly, to build on the Debtors' successes since the Petition Date, the Debtors need more time to negotiate, formulate and build consensus around a comprehensive plan of reorganization. Therefore, cause exists here for an extension of the Exclusive Periods.

4. **The Requested Extensions of the Exclusive Periods are Proper and Will Not Prejudice Creditors.**

44.     During these cases, the Debtors have been stewards of their fiduciary obligations, including preserving the value of their creditors' collateral, evidencing the Debtors' proper motive in seeking an extension of the Exclusive Periods. Also, since the Petition Date, the Debtors have, whenever possible, actively cooperated with all creditor constituencies to resolve disagreements and move these cases forward expeditiously. Indeed, most of the disputes in these cases have been resolved through negotiation rather than a Court-imposed solution, a truly notable feat in cases of comparable size.

45.     Simply put, the Debtors are seeking an extension of the Exclusive Periods not to pressure their creditors or to delay administration of these cases, but to work toward developing a consensual plan. Moreover, such extension will afford the Debtors and all other parties in interest an opportunity to develop fully the grounds upon which comprehensive negotiations toward a confirmable plan of reorganization can be based. Also, as this is only the first requested extension of exclusivity in these cases, the Debtors' creditors will not be prejudiced by a reasonable delay. Indeed, the Term Lenders have indicated their support for the requested extensions in connection with the Debtors' agreement to reach certain milestones. Finally, all

parties in interest will be best served by a consensual, Debtor-proposed chapter 11 plan, the development of which will be made possible with the extension of exclusivity.

5. **The Debtors are Making Required Postpetition Payments and Effectively Managing Their Business**

46. Additionally, the Debtors are performing their postpetition obligations and effectively managing their businesses. Throughout these cases, the Debtors have had sufficient liquidity to pay—and have paid—their obligations in the ordinary course of business. Further, as noted above, the Debtors' cash balances continue to exceed prepetition forecasted amounts for reasons previously discussed. Thus, with the Debtors' continued authority to use cash collateral, the Debtors have sufficient liquidity to pay their postpetition bills as they come due, including making adequate protection cash payments to Ford's and the Term Lenders' professional advisors for fees and expenses. In sum, as a result of prudent business decisions and conscientious cash management, the Debtors project that they have sufficient resources to meet all postpetition payment obligations.

6. **The Reorganization Cases Have Been Pending for Only a Few Short Months**

47. These chapter 11 cases were filed less than four months ago and this is the Debtors' first request for an extension of the Exclusive Periods. As noted above, although the Debtors have accomplished a great deal since the Petition Date, the Debtors must still complete many steps before they can propose a viable plan of reorganization. For example, the Debtors continue to have discussions with the Term Lenders regarding the structure of a plan, as well as negotiations with their customers regarding the shape of the business going forward, which will impact the treatment of their assets, and the assumption or rejection of contracts and leases. The Debtors also have not yet completed their analysis of the universe of claims against them for their recovery analysis. Thus, given their prior accomplishments and the time necessary to

24

complete critical planning tasks in large and complex cases such as these, an extension of the Debtors' Exclusive Periods is warranted.

## **Notice**

48.    Notice of this motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) counsel to the ad hoc group of lenders for the Debtors' senior secured term loan facility; (c) counsel for the administrative agent for the Debtors' senior secured term loan facility; (d) counsel for the administrative agent for the Debtors' revolving senior secured credit facility (e) the indenture trustee for each of the Debtors' outstanding unsecured bond issuances; (f) the Committee; and (g) those persons who have requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

49.    No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court enter the order, substantially in the form annexed hereto as **Exhibit A.**

Dated: September 21, 2009

**PACHULSKI STANG ZIEHL & JONES LLP**

/s/ Mark M. Billion #5263
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Telephone:     (302) 652-4100
Facsimile:      (302) 652-4400
E-mail:          ljones@pszjlaw.com
                    joneill@pszjlaw.com
                    tcairns@pszjlaw.com

- and -

**KIRKLAND & ELLIS LLP**
James H. M. Sprayregen, P.C. (IL 6190206)
Marc Kieselstein, P.C. (IL 6199255)
James J. Mazza, Jr. (IL 6275474)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
E-mail:          james.sprayregen@kirkland.com
                    marc.kieselstein@kirkland.com
                    james.mazza@kirkland.com

*Attorneys for the Debtors and Debtors in Possession*

DOCS_DE:153336.1