# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| VISTEON CORPORATION, et al.,[1] | ) Case No. 09-11786 (CSS) |
| | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) Related Docket Nos. 994, 1035, 1036, 1051 |

## DEBTORS' OMNIBUS RESPONSE TO OBJECTIONS TO THE MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING THE IMPLEMENTATION OF THE AMENDED INCENTIVE PROGRAM

The above-captioned debtors and debtors in possession (collectively, "Visteon" or the "Debtors") file this response to the objections (each an "Objection") of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW")[2] and the United States Trustee (the "U.S. Trustee")[3] to the Motion of the Debtors For Entry of an

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Visteon Corporation (9512); ARS, Inc. (3590); Fairlane Holdings, Inc. (8091); GCM/Visteon Automotive Leasing Systems, LLC (4060); GCM/Visteon Automotive Systems, LLC (7103); Infinitive Speech Systems Corp. (7099); MIG-Visteon Automotive Systems, LLC (5828); SunGlas, LLC (0711); The Visteon Fund (6029); Tyler Road Investments, LLC (9284); VC Aviation Services, LLC (2712); VC Regional Assembly & Manufacturing, LLC (3058); Visteon AC Holdings Corp. (9371); Visteon Asia Holdings, Inc. (0050); Visteon Automotive Holdings, LLC (8898); Visteon Caribbean, Inc. (7397); Visteon Climate Control Systems Limited (1946); Visteon Domestic Holdings, LLC (5664); Visteon Electronics Corporation (9060); Visteon European Holdings Corporation (5152); Visteon Financial Corporation (9834); Visteon Global Technologies, Inc. (9322); Visteon Global Treasury, Inc. (5591); Visteon Holdings, LLC (8897); Visteon International Business Development, Inc. (1875); Visteon International Holdings, Inc. (4928); Visteon LA Holdings Corp. (9369); Visteon Remanufacturing Incorporated (3237); Visteon Systems, LLC (1903); Visteon Technologies, LLC (5291). The location of the Debtors' corporate headquarters and the service address for all the Debtors is: One Village Center Drive, Van Buren Township, Michigan 48111.

[2] See UAW's Objection to Motion of Debtors for Entry of an Order Authorizing Implementation of the Amended Incentive Program [Docket No. 1035] (the "UAW Objection"). The International Union of Electronic, Electrical, Salaried, Machine, and Furniture Workers-Communication Workers of America ("IUE-CWA") also filed a joinder to the UAW Objection, see Joinder of the IUE-CWA to the Objection of the UAW to Debtors' Motion for Entry of an Order Authorizing the Implementation of the Visteon Amended Incentive Program [Docket No. 1036]. The assertions of the IUE-CWA were duplicative of the UAW's assertions and thus are not expressly addressed in this response.

[3] United States Trustee's Objection to Debtors' Motion for Entry of an Order Authorizing the Implementation of the Amended Incentive Program [Docket No. 1051] (the "U.S. Trustee Objection").

*Order Implementing the Amended Incentive Program* [Docket No. 994] (the "Motion").[4] As discussed in greater detail below, the Objections lack merit and should be overruled.

**Preliminary Statement**

1. After extensive negotiations with the key stakeholders truly interested in Visteon's going-forward financial performance and reorganization efforts, Visteon has presented an amended incentive program with the full support of both its ad hoc committee of term loan lenders (the "Term Lenders") and its official unsecured creditors committee (the "Committee"). Two parties with minimal or no economic stake in the future of the Visteon enterprise and potential recoveries under a plan of reorganization—the UAW and the U.S. Trustee—have objected to the key employee incentive plan (the "KEIP") component of the amended incentive program.[5] The objectors each urge this Court to strike down the KEIP because it allegedly is covered by and runs afoul of sections 503(c)(1) and (c)(3) of the Bankruptcy Code. The KEIP clearly does not violate the Bankruptcy Code and the Objections should thus be overruled.

2. First, the KEIP's chapter 11 emergence milestone and financial performance metric both require significant process and operational achievements, do not have a primary purpose of retention, and therefore do not violate section 503(c)(1) of Bankruptcy Code. Emergence from chapter 11 is a substantial achievement in this economic environment, which is recognized by the UAW as "one of the worst economic crises in [the auto sector's] history."

---

[4] In support of the Motion, the Debtors submitted the *Declaration of William G. Quigley, III, Chief Financial Officer and Executive Vice President of Visteon Corporation, in Support of the Motion of the Debtors for Entry of an Order Authorizing Implementation of the Amended Incentive Program* (the "Quigley Declaration"), attached to the Motion as **Exhibit B,** and the *Declaration of Douglas J. Friske, Managing Principal of Towers Perrin, in Support of the Motion of the Debtors for Entry of an Order Authorizing Implementation of the Amended Incentive Program* ("Friske Declaration"), attached to the Motion as **Exhibit C**.

[5] There are no objections, including from the UAW and U.S. Trustee, to Visteon's long-term incentive program.

UAW Objection ¶ 27. Given the spate of automotive industry debtors who have failed to reorganize, a plan emergence milestone—under which any payments would be made by a reorganized entity no longer operating under the restrictions of the Bankruptcy Code (including section 503(c) itself)—is clearly incentivizing.[6] Emergence from chapter 11 through confirmation of a plan of reorganization is hardly pre-ordained. Indeed, since Visteon's chapter 11 filing, the demands on Visteon's management team have been greater than ever. The KEIP participants have been working tirelessly to develop and execute Visteon's exit business plan, preserve critical customer relationships, and build consensus around a plan of reorganization to emerge from chapter 11 bankruptcy.

3. The financial performance metric also has incentivized and continues to incentivize superlative performance by the KEIP participants. The adjusted EBITDA target under the KEIP is more than <u>28 times greater</u> than the company's adjusted EBITDA in the second half of 2008. The UAW and U.S. Trustee attempt to rebut the incentivizing nature of the financial metric on the basis that the performance period for the metric is close to completion. Of course, the financial performance metric at issue has been in place—subject to the protective Motion—since early in the performance period. Visteon should not be punished for seeking consensus among its stakeholders—precisely what chapter 11 is designed to foster—nor for its solid financial performance to date for the second half of 2009. The KEIP participants have worked diligently over the course of these cases to achieve a financial performance metric established more than three months ago. The Debtors' estates have experienced a tangible

---

[6] Indeed, the plan emergence metric under the KEIP is designed to prevent the fate of other distressed automotive suppliers, such as Meridian Automotive Systems, Inc., Advanced Accessory Holdings Corp., Uni Boring, and Metalforming Technologies, Inc., all of which are in the process of liquidating or have liquidated. In re Meridian Auto. Sys., Inc., No. 09-12806 (MFW) (Bankr. D. Del. Aug. 7, 2009); In re Advanced Accessory Holding Corp., No. 09-60110 (MBM) (Bankr. E.D. Mich. June 26, 2009); In re Metaldyne, Corp., No. 09-13412 (MG) (Bankr. S.D.N.Y. May 27, 2009).

postpetition benefit as a result of the KEIP participants' stewardship of the estates. Indeed, Visteon has managed to increase its cash by approximately $132 million since the filing of these cases. This Court should thus reject the argument that partial postpetition completion of an incentive plan metric transforms that plan into a retention plan, just as Judge Gross did when presented with the same line of argument in Global Home Products. See In re Global Homes Prods., LLC, 369 B.R. 778, 785 (Bankr. D. Del. 2007).

4. Second, section 503(c)(3) of the Bankruptcy Code is not applicable because the KEIP is largely an ordinary course program. Companies in every industry, automotive included, implement incentive plans as a matter of course to spur strong financial performance for the benefit of stakeholders. Nevertheless, even if the KEIP were viewed as outside the ordinary course, the many reasons that establish the KEIP as truly incentivizing make clear that the program is amply justified by the facts and circumstances of these cases. Given the difficulties inherent to automotive supplier bankruptcies and the general malaise afflicting the industry, court ratification of an incentive program already supported by those creditors most interested in the success of these cases makes eminent sense.

## Argument

**I. Section 503(c)(1) of the Bankruptcy Code Does Not Apply to the KEIP.**

5. The KEIP is an incentive (not retention) plan, making section 503(c)(1) of the Bankruptcy Code inapplicable in these circumstances. Indeed, section 503(c)(1) applies only to true, "pay-to-stay" retention plans, not to plans, like the KEIP, that provide incentive compensation to employees for contributions to maximizing the value of the debtors' businesses. See, e.g., 11 U.S.C. § 503(c)(1); Global Home Prods., 369 B.R. at 785 (holding that section 503(c) "was not intended to foreclose a chapter 11 debtor from reasonably compensating employees, including 'insiders,' for their contribution to the debtors' reorganization," and that

4

plans that have an ancillary retentive effect are not retention plans subject to section 503(c)(1))(emphasis omitted); In re Nellson Nutraceutical, Inc., 369 B.R. 787, 802 (Bankr. D. Del. 2007) (finding that section 503(c)(1) applies only to retention programs with "the <u>primary</u> purpose of inducing [an employee] to remain with the debtor's business.") (emphasis in original).

### A. The Milestone Metric is Not Retentive.

6. Section 503(c)(1) of the Bankruptcy Code is not applicable to the emergence metric (the "Milestone Metric"). First, because any payment made on account of the Milestone Metric will be made by the reorganized Visteon enterprise no longer subject to the Bankruptcy Code, section 503(c)(1) does not govern.[7] Second, contrary to the UAW and U.S. Trustee's assertions, the fact that the Milestone Metric does not have an expiration date does not convert it into a retention plan. See UAW Objection ¶ 16; U.S. Trustee Objection ¶ 20. The KEIP participants (the "Key Employees") are not rewarded for merely staying with the company until the effective date of a plan of reorganization, but rather awarded for their efforts in the developing, filing, confirming, and consummating a plan of reorganization. Each of the Key Employees is critical to the accomplishment of these milestones and the KEIP appropriately recognizes that the Key Employees should be rewarded upon completion of a process over which they had a commanding influence. As this Court well knows, confirming a plan of reorganization and emerging from bankruptcy are not simple nor easy nor self-executing tasks.

---

[7] See In re Journal Register Co., 407 B.R. 520, 536 (Bankr. S.D.N.Y. 2009) (finding that section 503(c)(1) does not apply where incentive payments on account of emergence where made subsequent to confirmation of a plan of reorganization). The Debtors seek approval of the Milestone Metric by the Motion, instead of through confirmation of a plan of reorganization, because the KEIP participants need to be incentivized now to develop, negotiate, file, and confirm a plan of reorganization.

It requires a great deal of time, attention, and energy to persuade impaired creditors to equitize their debts and forgo other, more direct, means to monetize their claims.

7.  It is common sense to reward individuals for a job well done, even if there is no deadline to complete performance. Indeed, Courts have approved incentive plans with a plan filing, plan confirmation, and/or emergence metric, without requiring completion by a certain date. See, e.g., In re Midway Games Inc., No. 09-10465 (KG) (Bankr. D. Del. Apr. 22, 2009) (approving an incentive program with both a plan filing and plan confirmation metric); In re Nortel Networks Inc., No. 09-10138 (KG) (Bankr D. Del. Mar. 20, 2009) (approving an incentive program with a plan confirmation metric); In re Apex Silver Mines Limited, No. 09-10182 (JMP) (Bankr. D. Del. Feb. 18, 2009) (approving an incentive program with an emergence metric); In re WCI Cmtys., Inc., No. 08-11643 (KJC) (Bankr. D. Del. Feb. 4, 2009) (same); In re DURA Auto. Sys., Inc., No. 06-11202 (KJC) (Bankr. D. Del. Nov. 1, 2007) (approving an incentive program with a plan filing metric); In re Calpine Corporation, No. 05-60200 (BRL) (Bankr. S.D.N.Y. May 15, 2006) (approving an incentive bonus upon emergence from bankruptcy tied to certain performance metrics).[8]

8.  Moreover, it is entirely appropriate to provide incentives to senior management to encourage performance above and beyond a debtor's fiduciary duties. In re Nobex Corp., No. 05-20050 (MFW), 2006 WL 4063024, at *3 (Bankr. D. Del. Jan. 19, 2006) (approving an incentive plan that required its participants to "act above and beyond the level required by their

---

[8] The UAW wrongly relies upon In re Midway Games Inc. and WCI Communities. UAW Objection ¶¶ 15, 16. While the incentive plan approved in WCI Communities had a sliding scale that reduced bonuses as the effective date of a plan was delayed, 25% of the award was to be rewarded upon emergence at any time. See WCI Communities, Inc., No. 08-11643 (KJC) (Bankr. D. Del. Feb. 4, 2009). Second, the plan filing metric approved in Midway Games could be achieved simply by filing a plan of reorganization acceptable to the debtors' lender or by providing full recovery to the lender. Presumably these features were to ensure that a filed plan would be a confirmable one. See In re Midway Games Inc., No. 09-10465 (KG) (Bankr. D. Del. Apr. 22, 2009). In that sense, Midway Games fully supports approval of the Milestone Metric here, because implicit in this metric is the condition that the plan be acceptable to the Debtors' stakeholders.

normal fiduciary duties"). In fact, it is incumbent upon the Debtors, as fiduciaries to their creditors, to motivate their senior managers to perform at the highest level and thus maximize estate value by improving an ongoing business or by developing, confirming, and consummating a complex chapter 11 plan of reorganization, which ultimately depends upon accomplishing a formidable set of tasks.

### B. The Financial Performance Metric Rewards Improved Performance, Not Retention.

9. Like the Milestone Metric, the targeted goal of achievement of $112.6 in adjusted EBITDA for the second half of 2009 (the "Financial Performance Metric") incentivizes performance, not retention. The adjusted EBITDA target on which the Financial Performance Metric is based represents a more than $108 million improvement over the Debtors' operating performance from the last two quarters of 2008. The success or failure of the Key Employees to effectively respond to vehicle production volume changes and realize operational cost savings directly determines whether or not the Debtors achieve the Financial Performance Metric.

10. The UAW and U.S. Trustee argue that the Debtors' strong financial performance in the second half of 2009 thus far makes achievement of the Financial Performance Metric retentive in nature because the participants will not have to "stretch" to meet the target going-forward. UAW Objection ¶¶ 4, 20-22; U.S. Trustee Objection ¶ 17. Their attempt to punish the Key Employees for achieving results benefiting the estates over the course of these cases should fail. The UAW's and U.S. Trustee's exact argument was raised, and rejected, by Judge Gross in Global Home Products. 369 B.R. at 785-87. There, the debtors sought approval of a management incentive plan based on EBITDAR and cash flow metrics during the debtors' 2007 fiscal year. Id. at 780. The union there objected to the incentive plan on the basis that since

more than half of the performance period had already passed when the debtors' motion was filed, there could be no going-forward incentive. Id. at 786-87. In response the Court held:

> [T]he Plan's beneficiaries relied upon Debtors' historical practice of providing performance bonuses and that Debtors told the beneficiaries that they would ask the Court to approve the Plans. Thus, the beneficiaries were <u>performing</u> in response to a financial incentive and not merely to remain with Debtors.

Id. at 787 (emphasis in original).

11. Similarly, Judge Carey approved an incentive plan in In re DURA Automotive Systems, Inc., No. 06-11202 (KJC) (Bankr. D. Del. 2007), based on three separate metrics, each of which had been partially or fully achieved at the time of approval: (a) delivery of a five-year business plan; (b) filing a chapter 11 plan of reorganization; and (c) confirmation of a chapter 11 plan of reorganization, subject to certain EBITDA targets.[9] In approving these metrics after their achievement, Judge Carey recognized that the debtors' employees had been working with the reasonable belief that the metrics would be approved and their exemplary efforts rewarded. In other words, the employees were <u>incentivized</u> to deliver excellent performance, not merely to stay in the debtors' employ.

12. As recognized by the U.S. Trustee, the KEIP metrics have not materially changed since they were originally presented to the Court—and brought to the attention of the KEIP participants—on June 29, 2009. U.S. Trustee Objection ¶ 4. Indeed, the only significant change is that the Financial Performance Metric was made more difficult. The original incentive motion

---

[9] DURA Automotive Systems, Inc. filed the motion for approval of the incentive plan on May 10, 2007. On June 1, 2007, precisely three months into the EBITDA performance period, Judge Carey approved the EBITDA targets, but denied the other metrics without prejudice. See In re DURA Automotive Systems, Inc., No. 06-11202 (KJC) (Bankr. D. Del. Jun. 1, 2007). Later, on June 28, 2007, Judge Carey approved the delivery of the business plan metric approximately a month after its achievement. See In re DURA Automotive Systems, Inc., No. 06-11202 (KJC) (Bankr. D. Del. Jun. 28, 2007). On October 11, 2009, Judge Carey also approved the plan filing metric after the plan of reorganization had been filed. See In re DURA Automotive Systems, Inc., No. 06-11202 (KJC) (Bankr. D. Del. Oct. 11, 2007).

8

contained an EBITDA less capital expenditures target of negative $77.0 million for the third quarter and $32.0 million for the fourth quarter. These targets equate to adjusted EBITDA of negative $12 million and $75 million for third and fourth quarters of 2009, respectively—or $63.0 million for the last six months of 2009.[10] The Debtors modified the originally proposed financial metric after negotiations with their constituents, who requested the removal of the capital expenditures element. These negotiations also led the Debtors to modify the incentive program to exclude the KEIP participants from the long-term incentive plan entirely and to make the Financial Performance Metric self-funding.[11]

13. The KEIP participants have pursued the goal of improving the Debtors' financial performance since late June and have been operating under the reasonable belief that they would be rewarded if they were able to turn-around the Debtors' financial performance. Thus, any payment under the Financial Performance Metric is not for retentive purposes, but instead its overriding purpose has been to incentivize and reward achievement of an extremely challenging adjusted EBITDA target. To illustrate, the company's EBITDA for the second half of 2008 was approximately $4.0 million on sales of approximately $3.58 billion, while forecasted EBITDA (as of July 2009) for the second half of 2009 is approximately $89.0 million (an increase of over 2,000%) on forecasted sales of approximately $2.96 billion (16% less than the comparable period in 2008). The fact that the Debtors have realized a substantial portion of the target since

---

[10] In order to compare the original EBITDA less capital expenditures metric with the current adjusted EBITDA metric, projected capital expenditures of $46.0 million and $38.0 million in the third and fourth quarters, respectively, and adjustments for the certain benefit programs of $19.0 and $5.0 for the third and fourth quarters, respectively, had to be added to negative $77.0 million and $32.0 million.

[11] The Financial Performance Metric is self-funded to the extent of $2.7 million at target and $5.4 million at the maximum payout opportunities; meaning that the adjusted EBITDA target under the Financial Performance Metric has been increased to ensure that adjusted EBITDA after KEIP awards are made will be equal to or greater than adjusted EBITDA without any payment under the KEIP.

the time the metric was originally put forth is wholly irrelevant to the inquiry of whether the payment is for a retentive purpose or to incentivize exceptional performance, as recognized by other bankruptcy courts in this district. See Global Home Prods., 369 B.R. at 785-87; see also DURA Automotive Systems, Inc., No. 06-11202 (KJC) (Bankr. D. Del. 2007).

## II. The KEIP is Fully Justified by the Facts and Circumstances of These Chapter 11 Cases and Accounts for the Realities of the Automotive Supply Industry.

14. As an initial matter, the KEIP is an ordinary course program making 503(c)(3) inapplicable on its face. Virtually every company—in and outside of bankruptcy—implements performance based compensation programs to motivate employees to meet financial and operational goals of the company. The Debtors themselves had incentive programs available to the Key Employees prior to the commencement of these cases and the KEIP should not be viewed as outside that normal practice. Nellson Nutraceutical, 369 B.R. at 797 (finding that implementation and modification of an incentive program "consistent with the debtors' pre-petition practices" and "common for companies comparable to the debtors" was within the ordinary course exception to section 503(c)(3)).

15. In any event, even if 503(c)(3) were applicable here, the KEIP is fully justified by "the facts and circumstances" of these cases. The standard for approval under the "facts and circumstances" test of section 503(c)(3) is similar to the business judgment standard for approval under section 363(b)(1) of the Bankruptcy Code. See e.g., Dana II, 358 B.R. at 576-77 (acknowledging the sound business judgment test as the standard for review for key employee incentive programs); In re Nobex Corp., No. 05-20050 (MFW), 2006 WL 4063024, at *3 (Bankr. D. Del. Jan. 19, 2006) (same). Among the factors that courts have examined to determine if incentive programs are appropriate under section 503(c)(3) of the Bankruptcy Code are:

(a) whether the plan is calculated to achieve the desired performance;

(b) whether the cost of the plan is reasonable in the context of a debtor's assets, liabilities and earning potential;

(c) whether the scope of the plan is fair and reasonable;

(d) whether the plan is consistent with industry standards;

(e) whether the debtor performed due diligence in investigating the need for the plan; and

(f) whether the debtor received independent counsel in performing due diligence, creating and authorizing the plan. See e.g., Global Home Prods., 369 B.R. at 786 (citing Dana II, 358 B.R. at 576-77).

16. Courts will balance the foregoing factors—a debtor need not satisfy every factor to demonstrate that its proposed incentive program should be approved. See Global Homes Prods., 369 B.R. at 786 (finding that the debtors' proposed incentive plan was proper under section 503(c)(3) even though, for instance, the debtors did not consult with an outside advisor to structure the program).

17. First, the KEIP unequivocally incentivizes the Key Employees to work to improve the Debtors' financial performance and expeditiously exit bankruptcy. Thus, there is a direct relationship between the KEIP and the results to be obtained as called for by the Dana II factors. The UAW's and U.S. Trustee's assertion that the Key Employees are rewarded simply for remaining employed until the effective date of a plan of reorganization ignores the reality that emergence is not possible without the direction, leadership, and oversight of each of the KEIP participants. It is not beneficial to set a timeline which unfairly penalizes the Key Employees for exogenous factors they may not have control over or which stresses speed over the substantive structure of the plan, the desirability of achieving a fully consensual plan, and the impact of the particulars of a plan on the Debtors' ability to operate as a going-concern in the long-term. Furthermore, the Debtors have already shown they are on track for an expeditious exit from bankruptcy. The Financial Performance Metric also incentivizes the Key Employees to adapt the

Debtors' operations to the current state of the automotive industry. The Key Employees' actions in striving to attain the adjusted EBITDA target will bolster the Debtors' competitiveness at a particularly challenging time for companies in the automotive supply industry. The Term Lenders and the Committee understand that their recovery and the Debtors' reorganization hinge on properly incentivizing the Debtors' senior management. The full support of these parties underscores that the KEIP is calculated to achieve the goals of prompt emergence from chapter 11 and improved financial performance, which the U.S. Trustee and UAW would be hard-pressed to dispute are best for the Debtors' estates and creditors.

18. Second, the cost of the KEIP is reasonable in light of the size of the Debtors' business. The targeted cost of the KEIP is $5.4 million, with a maximum cost of $8.1 million. Moreover, the Financial Performance Metric is self-funded, meaning that the adjusted EBITDA target under the Financial Performance Metric has been increased to ensure that adjusted EBITDA after KEIP awards are made will be equal to or greater than adjusted EBITDA without any payment under the KEIP. Clearly, the benefits to the Debtors' estates and all stakeholders in these chapter 11 cases that will result if the Debtors are successful in achieving the metrics under the KEIP will dwarf cost of the program.

19. Third, the scope of the KEIP is fair and reasonable. The KEIP only applies to those Key Employees that are necessary to achievement of the KEIP metrics. In addition, achievement of the KEIP metrics will have a positive impact on all of the constituents of these cases—especially other employees, who more than any other constituency will stand to benefit if

the Debtors are able to emerge from bankruptcy as a financially strong, going-concern enterprise.[12]

20.  Fourth, as demonstrated above and in the Friske Declaration, the structure of the KEIP and the overall compensation package of its participants is well within industry standards. See Friske 9/17/09 Decl. ¶ 18-21. The UAW and U.S. Trustee assert the KEIP is inappropriate for a company in the automotive industry—an industry "which is suffering one of the worst economic crises in its history." UAW Objection ¶ 27; see also U.S. Trustee Objection ¶ 25. However, it is precisely in these trying times that a properly-developed incentive program, like the KEIP, is essential. Indeed, without the adoption of the KEIP, the overall compensation opportunity for its participants would be significantly below the market median. Friske 9/17/09 Decl. ¶ 21. Given the fragile state of the automotive industry and the economy at large, it is more important than ever for the Debtors' employees, who have endured considerable and repeated compensation reductions during the Debtors' ongoing restructuring efforts, to have competitive compensation opportunities available to them.

21.  Fifth, to ensure that the target KEIP awards are competitive and market-based, the Debtors, with the assistance of Towers, Perrin, Forster & Crosby, Inc. ("Towers Perrin"), performed considerable due diligence and analyzed competitive compensation data for the Key

---

[12] As this Court is aware, the Debtors have sought termination or significant modification of certain plans and programs providing for post-employment health care and life insurance benefits for their employees (the "OPEB Plans"). See *Certain Debtors' Motion for Order Authorizing Them to Amend or Terminate Post-Employment Health Care and Life Insurance Benefits for Certain Employees and Retirees and Their Surviving Spouses, Spouses, Domestic Partners, and Dependents* [Docket No. 424]. The OPEB Plans represent enormous fixed liabilities—the projected SFAS 106 balance sheet liability relating to the OPEB Plans is projected to be $310 million by the end of 2009, payments under the KEIP, which total $8.1 million at a maximum, are only payable upon the KEIP participants' achievement of certain goals critical to the Debtors' successful reorganization and long-term viability. Any linkage between the OPEB Plans and the KEIP is a false one. The only true common denominator between the Debtors' actions with respect to the OPEB Plans and KEIP is that both initiatives are designed to facilitate the Debtors' reorganization efforts. Appeals to emotion cannot refute this business reality.

Employees. Friske 6/29/09 Decl. ¶ 14. Furthermore, each of the Key Employees were chosen to participate in the KEIP after a careful evaluation process based on whether such employee's role is critical to accomplish the KEIP metrics.[13]

22. <u>Lastly</u>, Towers Perrin served as an objective, independent advisor on the structure of the KEIP. The UAW alleges that Towers Perrin was in no position to render an independent opinion with respect to the KEIP because it has received substantial fees, approximately $9.0 million, since 2005. UAW Objection ¶ 29. However, the vast majority of these fees were on account of actuarial work performed by a separate group located in a different office of Towers Perrin. The employees of Towers Perrin involved in the development and consultation with respect to the KEIP had no knowledge of the nature or the scope of this work or material contact with the employees performing the actuarial work.

23. Therefore, the KEIP is not only justified and reasonable under the circumstances, but also critical to the successful outcome of these cases and the long-term viability of the Debtors' business. The Debtors accordingly request the Court overrule the Objections and approve the Amended Incentive Program in its entirety.

---

[13] There is no authority for the UAW's assertion that each participant in an incentive program must be shown to have—on their own initiative—achievement of some portion of a financial target. <u>See</u> UAW Objection ¶ 22.

Dated: October 5, 2009

PACHULSKI STANG ZIEHL & JONES LLP

/s/ [signature] #5265

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, DE 19899-8705
Telephone:   (302) 652-4100
Facsimile:    (302) 652-4400
E-mail:         ljones@pszjlaw.com
                   joneill@pszjlaw.com
                   tcairns@pszjlaw.com

- and -

**KIRKLAND & ELLIS LLP**
James H. M. Sprayregen, P.C. (IL 6190206)
Marc Kieselstein, P.C. (IL 6199255)
James J. Mazza, Jr. (IL 6275474)
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:    (312) 862-2200

*Attorneys for the Debtors and Debtors in Possession*