# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VISTEON CORPORATION, et al.,[1] | ) | Case No. 09-11786 (CSS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Hearing Date: November 12, 2009 at 2:00 p.m. ET** |
| | ) | **Objection Deadline: November 5, 2009 at 4:00 p.m. ET** |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER
## (A) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SUPERPRIORITY, PRIMING POSTPETITION FINANCING; (B) GRANTING PRIMING AND OTHER LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (C) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (D) AUTHORIZING THE USE OF CASH COLLATERAL; AND (E) MODIFYING THE AUTOMATIC STAY

The above-captioned debtors and debtors in possession (collectively, "Visteon" or the "Debtors"), file this motion (this "Motion") for the entry of a final order (the "DIP Order"), substantially in the form attached hereto as **Exhibit A**, (a) authorizing the Debtors to obtain postpetition financing on a priming first priority lien and superpriority administrative claim basis (the "DIP Facility"); (b) granting priming and other liens and superpriority administrative expense claims; (c) authorizing the continued use of cash collateral under the Term Loan

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Visteon Corporation (9512); ARS, Inc. (3590); Fairlane Holdings, Inc. (8091); GCM/Visteon Automotive Leasing Systems, LLC (4060); GCM/Visteon Automotive Systems, LLC (7103); Infinitive Speech Systems Corp. (7099); MIG-Visteon Automotive Systems, LLC (5828); SunGlas, LLC (0711); The Visteon Fund (6029); Tyler Road Investments, LLC (9284); VC Aviation Services, LLC (2712); VC Regional Assembly & Manufacturing, LLC (3058); Visteon AC Holdings Corp. (9371); Visteon Asia Holdings, Inc. (0050); Visteon Automotive Holdings, LLC (8898); Visteon Caribbean, Inc. (7397); Visteon Climate Control Systems Limited (1946); Visteon Domestic Holdings, LLC (5664); Visteon Electronics Corporation (9060); Visteon European Holdings Corporation (5152); Visteon Financial Corporation (9834); Visteon Global Technologies, Inc. (9322); Visteon Global Treasury, Inc. (5591); Visteon Holdings, LLC (8897); Visteon International Business Development, Inc. (1875); Visteon International Holdings, Inc. (4928); Visteon LA Holdings Corp. (9369); Visteon Remanufacturing Incorporated (3237); Visteon Systems, LLC (1903); Visteon Technologies, LLC (5291). The location of the Debtors' corporate headquarters and the service address for all the Debtors is: One Village Center Drive, Van Buren Township, Michigan 48111.

Adequate Protection Stipulation (as such term is defined herein); (d) granting adequate protection for the diminution in value to the Prepetition Term Lenders (as defined herein) for the priming of their existing liens and use of cash collateral; and (e) modifying the automatic stay. In support of this Motion, the Debtors respectfully state as follows.[2]

## Jurisdiction

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules").

## Preliminary Statement

4. The Debtors have spent the first four and half months of these cases right-sizing their operational footprint, enhancing their liquidity through numerous cash management initiatives and customer negotiations, and developing their going forward business plan to lay the

---

[2] In further support of this Motion, the Debtors submit contemporaneously herewith the *Declaration of William G. Quigley, III, Chief Financial Officer and Executive Vice President of Visteon Corporation, in Support of the Debtors' Motion For Entry Of An Order (A) Authorizing the Debtors to Obtain Senior Superpriority, Priming Postpetition Financing; (B) Granting Priming and Other Liens and Superpriority Administrative Expense Claims; (C) Authorizing the Use of Cash Collateral; (D) Granting Adequate Protection to Prepetition Secured Parties; and (E) Modifying the Automatic Stay* (the "Quigley Declaration"), attached hereto as **Exhibit C** and the *Declaration of Todd R. Snyder, Managing Director of Rothschild, Inc., in Support of the Debtors' Motion For Entry Of An Order (A) Authorizing the Debtors to Obtain Senior Superpriority, Priming Postpetition Financing; (B) Granting Priming and Other Liens and Superpriority Administrative Expense Claims; (C) Authorizing the Use of Cash Collateral; (D) Granting Adequate Protection to Prepetition Secured Parties; and (E) Modifying the Automatic Stay* (the "Snyder Declaration"), attached hereto as **Exhibit D.**

2

groundwork for their emergence from chapter 11. Since filing these cases, the Debtors' cash position and earnings have substantially exceeded forecasts—a testament to the successful stewardship of the estates during an unprecedented downturn of the global automotive industry.

5. At the outset of these cases, the Debtors' term lenders did not express interest in providing additional financing. The Debtors thus focused on negotiating a "club" DIP facility with their largest North American OEM customers to ensure sufficient liquidity to supply their customers with parts and fund these cases. Given the complexity of contracting a DIP agreement satisfactory to these natural competitors—and unnatural lenders—as well as the Debtors' improved cash flow performance, the Debtors ultimately determined that a customer "club" DIP facility was not a viable solution to supplement their liquidity. Instead, the Debtors used the momentum of the customer DIP discussions to negotiate and execute individualized accommodation agreements with their customer base—one of which has already been approved by the Court and two of which are pending and will be heard along with this Motion. The Debtors' strong performance inside chapter 11 rekindled the interest of the term lenders in providing additional financing as needed. As the Debtors shift their focus toward emerging from chapter 11 as a well positioned tier 1 supplier, locking in a liquidity injection now—when the Debtors are in a relative position of strength—makes good business sense. This is especially true given that a seasonal upturn in vehicle production is expected to result in the estates' use— as opposed to accumulation—of cash in the upcoming months.

6. To that end, the Debtors now respectfully present their proposed DIP Facility, which has been extensively negotiated with a subset of the ad hoc committee of term lenders and which provides substantial benefits to the Debtors' estates. In sum, the budget-based DIP Facility provides the Debtors with immediate cash availability of $75 million and an option to

3

draw an additional $75 million in the event that additional liquidity is needed to operate their business and complete their restructuring initiatives. The DIP Facility is the chapter 11 functional equivalent of a "covenant-lite" loan containing no financial covenants, such as EBITDA or cash flow performance thresholds. Instead, it requires only compliance with a DIP budget with a 10% variance range on net cash flow. There is no roll-up of prepetition debt and there are no case control features—which are not uncommon when new money is lent to a chapter 11 debtor. The DIP Facility also provides flexibility on debt baskets and asset sales for mandatory pay-downs, thus allowing the Debtors a high degree of flexibility to run their international enterprise, complete their operational restructuring, and smartly grow the business. Finally, the credit terms of the DIP Facility have been and continue to be vetted by the Debtors' financial advisors in the credit markets. Snyder Decl. ¶ 13; Quigley Decl. ¶ 12.

7.      Importantly, the prepetition term lenders hold first-priority security interests in, inter alia, 65% of the stock of the Debtors' first-tier foreign subsidiaries. As such, they were in a unique position to offer the Debtors this DIP Facility, which features a self-priming first priority lien on the term lenders' priority collateral.[3] This permits the Debtors to avoid time consuming and uncertain priming litigation that might have arisen had a different lender offered a priming DIP in exchange for providing the term lenders with adequate protection. In fact, given the difficulties inherent in priming, the Debtors' investment banker was unable to find a potential lender willing to lend to the Debtors on similar terms under a non-priming construct. Id. Under the proposed priming DIP Facility, the term lenders are given adequate protection for the priming of their existing liens in the form of superpriority claims and liens on certain

---

[3]    The proposed priming liens conform with the terms of the Intercreditor Agreement (as defined herein).

4

unencumbered collateral only to the extent of any diminution in the value of such collateral and limited to U.S.-based assets to avoid triggering tax liabilities—preserving the Debtors' ability to set off net operating losses against future income.[4]

8.      The proposed DIP Facility provides the Debtors with more than just cash and credit support they anticipate needing to operate their business. Of almost equal importance is the confidence that such financing will reinforce in the Debtors' suppliers, customers, and employees.      The stabilizing effect provided by the infusion of new money will serve the interests of the estates by helping to dispel any misperceptions over Visteon's viability as a going-concern as Visteon completes a comprehensive restructuring. Indeed, the willingness of representatives of the term lender group to provide this DIP Facility signals the strong support of a key participant in the future of the Visteon enterprise and a vote of confidence in the stewardship of the restructuring to date.

9.      Thus, the Debtors' ability to have this flexible and favorable DIP Facility in hand at this juncture in these cases is advantageous to the estates.      No better offers have been procured, and history teaches that it would be highly imprudent to delay given that potential financing, if any, could turn out to be much less desirable when the financing need is exigent. Indeed, if the Debtors wait until they are in a less advantageous bargaining position, they would likely end up with a more expensive DIP loan riddled with onerous terms. Furthermore, if the credit markets seize up once more, the Debtors would have recklessly passed on an opportunity to enhance their liquidity and stabilize their operations.

---

[4]    Thus, under the DIP Facility and Prepetition Term Lenders adequate protection package, the remaining 35.0% of the stock of the Debtors' first-tier foreign subsidiaries would remain unencumbered.

5

10. For all of the foregoing reasons, as outlined more fully herein, the Debtors respectfully submit, that this Court should approve the proposed DIP Facility.[5]

## **Background**

11. On May 28, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On June 8, 2009, the United States Trustee for the District of Delaware (the "United States Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 178].

12. Visteon is a leading global supplier of climate, interiors, lighting, electronics, and other automotive systems, modules, and components to original equipment manufacturers ("OEM") as well as the automotive aftermarket. Visteon has three main product lines— electronics, climate, and interior systems for automobile manufacturers. In addition, Visteon has a significant lighting division that operates as a subset of the electronics product group. As a "Tier 1" automotive supplier, Visteon sits at the apex of the automotive parts supply chain, providing complex automotive systems to almost every major automobile manufacturer in the world. In 2008, the Debtors and their non-debtor affiliates recorded total sales of approximately $9.54 billion. For the first quarter of 2009, the Debtors and their non-debtor affiliates recorded total revenue of approximately $1.35 billion reflecting the precipitous drop in OEM vehicle

---

[5] Prior to the filing the Motion, the Debtors shared the material terms of the DIP Agreement with Ford Motor Company ("Ford"), in its capacity as sole ABL Lender, and the Committee. The Debtors expect to continue to discuss the terms of the DIP Agreement with Ford and the Committee.

K&E 15770383.

production in 2009, thus far. As of the Petition Date, the Debtors and their non-debtor affiliates had approximately $4.58 billion in total assets and approximately $5.32 billion in total liabilities.

13.     Additional information regarding the Debtors' business, capital structure, and the circumstances leading to these chapter 11 cases is contained in the *Declaration of William G. Quigley, III, Chief Financial Officer and Executive Vice President of Visteon Corporation, In Support of First Day Pleadings* [Docket No. 20] (the "First Day Declaration").

## The Debtors' Prepetition Secured Indebtedness

14.     As of the Petition Date, the Debtors were parties to the following agreements:

(a)     The Amended and Restated Credit Agreement dated as of April 10, 2007 (as amended by that certain Successor Agent Agreement and Amendment dated as of April 15, 2009, and as further amended, supplemented, and in effect from time to time, collectively, "Prepetition Term Loan Agreement"), in the original principal amount of $1,500,000,000, among Visteon Corporation, as borrower (the "Prepetition Borrower"), the several lenders from time to time party thereto ("Prepetition Term Lenders") and Wilmington Trust FSB, as administrative agent for the Prepetition Term Lenders and as the successor to JPMorgan Chase Bank, N.A. (in such capacity, the "Prepetition Term Agent");

(b)     the Guarantee and Collateral Agreement dated as of June 13, 2006, as amended as of April 10, 2007 pursuant to which certain subsidiaries of the Prepetition Borrower (the "Prepetition Guarantors" and with the Prepetition Borrower, the Debtors) guaranteed the obligations of the Prepetition Borrower under the Prepetition Term Loan Agreement and the Prepetition Borrower and Prepetition Guarantors granted security interests in certain of their assets (as amended and in effect from time to time, the "Guarantee and Collateral Agreement"), and together with all other security agreements, pledge agreements, fixture filings, mortgages, deeds of trust, control agreements, and all other collateral and ancillary documentation executed or delivered in connection with the Prepetition Term Loan Agreement, the "Prepetition Term Loan "; and the Prepetition Term Security Documents together with the Prepetition Term Loan Agreement, any amendment, supplement, or other modification of any of the foregoing, or any related agreement, instrument, or other document executed or delivered in connection therewith to which any of the Prepetition Borrower or any Prepetition Guarantor is a party, collectively, the "Prepetition Term Loan Documents";

(c)     the Credit Agreement dated as of August 14, 2006 (as amended, restated, or otherwise modified from time to time, the "Prepetition ABL Credit Agreement")

7

between the Prepetition Borrower, certain Prepetition Guarantors, Ford (the "ABL Lender"), as assignee and sole lender, and Ford CCA, LLC solely as collateral guarantor of certain outstanding letters of credit (Ford CCA, LLC, but only to the extent of its guarantees, collectively with Ford, "Prepetition ABL Lenders") and the Bank of New York Mellon ("Prepetition ABL Agent") as administrative agent for the Prepetition ABL Lenders and successor to JPMorgan Chase Bank, N.A., in such capacity as administrative agent and as letter of credit issuing bank; and

(d)     the Intercreditor Agreement, dated as of June 13, 2006 (as amended and in effect from time to time, the "Intercreditor Agreement"), among the Prepetition ABL Agent, the Prepetition Term Agent, Visteon Corporation and specified subsidiaries and affiliates of Visteon Corporation.

15.     The Debtors' prepetition secured credit facilities are more fully described in the First Day Declaration, the *Seventh Supplemental Interim Order (I) Authorizing The Use Of Cash Collateral Under 11 U.S.C. § 363, (II) Granting Adequate Protection Under 11 U.S.C. §§ 361, 362 And 363 And (III) Scheduling A Final Hearing Under Bankruptcy Rule 4001(B)* [Docket No. 1161] (the "ABL Cash Collateral Order") and the *Stipulation, Agreement, And Final Order On Consent (I) Authorizing Use Of Prepetition Term Loan Priority Collateral And Term Loan Cash Collateral Under 11 U.S.C. § 361; And (II) Granting Adequate Protection Under 11 U.S.C. §§ 361, 362 and 363* [Docket No. 608] (the "Term Loan Adequate Protection Stipulation").

16.     Prior to the Petition Date, the Debtors granted to the Prepetition Term Agent, for the benefit of itself and the Prepetition Term Lenders, security interests in and liens on (the "Prepetition Liens"), among other things, substantially all of their existing and after-acquired assets (collectively, the "Collateral") to secure obligations under the Prepetition Term Loan. The Debtors also granted to the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Lenders, security interests in and liens on substantially all of the Collateral in existence prior to the Petition Date to secure the obligations under the Prepetition ABL Credit Agreement. The priority between the Prepetition ABL Agent and Prepetition ABL Lenders, on

8

the one hand, and the Prepetition Term Agent and Prepetition Term Lenders, on the other hand, as to the Collateral is established pursuant to the Intercreditor Agreement.

17.    The prepetition priority collateral of the Prepetition Term Loan Agent and the Prepetition Term Lenders is defined as "Term Loan Priority Collateral" in the Intercreditor Agreement and includes: (a) the Intellectual Property (as defined in the Intercreditor Agreement, and in accordance with such definition, including all proceeds therefrom) owned, used, or licensed by the Debtors who are obligors under the Prepetition Term Loan Documents, provided that Term Loan Priority Collateral does not include computer programs embedded in goods and any supporting information to the extent included in "goods" under Section 9-102(44) of the Uniform Commercial Code (as in effect in the State of New York); (b) all obligations under any indebtedness owed to any Debtor who is an obligor under the Prepetition Term Loan Documents by any Foreign Subsidiary (as defined in the Intercreditor Agreement); (c) the shares of Pledged Stock[6] of (i) any Foreign Subsidiary, (ii) Visteon International Holdings, Inc., (iii) any other Foreign Stock Holding Company (as defined in the Intercreditor Agreement), (iv) Halla Climate Control Corporation, and (d) all Foreign Investments (as defined in the Intercreditor Agreement); (e) to the extent evidencing or governing any of the items referred to in clause (a) above, all Supporting Obligations (as defined in the Uniform Commercial Code as in effect in the State of

---

6    "Pledged Stock" is defined in the Guarantee and Collateral Agreement as the shares of Capital Stock listed on Schedule 2 to the Guarantee and Collateral Agreement, together with any other shares, stock certificates, options, interests or rights of any nature whatsoever in respect of the Capital Stock of any Person that may be issued or granted to, or held by, any Loan Party while the Guarantee and Collateral Agreement is in effect; provided that in no event shall more than 65% of the total outstanding Foreign Subsidiary Voting Stock of any Foreign Subsidiary directly owned by a Loan Party be required to be pledged to secure the Prepetition Term Obligations or constitute "Pledged Stock"; and provided further that the Capital Stock of the TMD Entities shall not be required to be pledged under the Guarantee and Collateral Agreement or constitute "Pledged Stock."

9

New York); subject to certain conditions specified in the Term Loan Adequate Protection Stipulation.

18.     As provided in the Intercreditor Agreement and ABL Cash Collateral Order, "ABL Priority Collateral" consists of substantially all Collateral, including assets of the same type as such prepetition collateral arising on or after the Petition Date to secure adequate protection claims of the ABL Agent and ABL Lenders, that is not Term Loan Priority Collateral. The Prepetition Term Agent holds a valid, binding, perfected, enforceable, priority lien on ABL Priority Collateral, which, pursuant to the terms of the Intercreditor Agreement, is junior to the Prepetition ABL Agent's lien on ABL Priority Collateral.

### Consensual Use of Cash Collateral

19.     As part of the first day relief granted by the Court, and with the consent of Ford, as sole lender under the Prepetition ABL Credit Agreement, the Debtors received interim authority to continue using cash collateral securing the Prepetition ABL Credit Agreement to fund their operations.[7] Ford has continued to consent to such use, and the Court has extended the Debtors' authority to use its cash collateral in a series of seven supplemental interim orders. The most recent order provides for the Debtors' continued use of cash collateral through November 12, 2009.[8] The Debtors expect to seek a further consensual extension on use of cash collateral at the November 12, 2009 omnibus hearing.

---

[7]     See *Interim Order (I) Authorizing The Use Of Cash Collateral Under 11 U.S.C. § 363, (II) Granting Adequate Protection Under 11 U.S.C. §§ 361, 362 And 363 And (III) Scheduling A Final Hearing Under Bankruptcy Rule 4001(B)* [Docket No. 93].

[8]     *Seventh Supplemental Interim Order (I) Authorizing The Use Of Cash Collateral Under 11 U.S.C. § 363, (II) Granting Adequate Protection Under 11 U.S.C. §§ 361, 362 And 363 And (III) Scheduling A Final Hearing Under Bankruptcy Rule 4001(B)* [Docket No. 1161].

K&E 15770383.

20.    The Term Loan Adequate Protection Stipulation also provides the Debtors with the ability to use certain of the Prepetition Term Lenders' cash collateral in exchange for certain forms of adequate protection.[9]

### The Debtors Liquidity Needs

21.    On an almost perpetual basis, the Debtors have, with the assistance of their financial advisors, exhaustively analyzed the Debtors' near-term liquidity position to determine what is necessary to maintain business operations during these chapter 11 cases.[10]  Snyder Decl. ¶ 17, Quigley Decl. ¶ 6.   In undertaking this analysis, the Debtors and their advisors regularly review a thorough examination of the Debtors' operating cash flows and the impact of the current economic outlook on the Debtors' near-term financial performance and goals for emergence from chapter 11.  Id.  While the Debtors currently have nearly $240 million of available cash, the Debtors are certain to use cash on hand in upcoming months as seasonal vehicle production cycles ramp up.  Snyder Decl. ¶ 16, Quigley Decl. ¶ 7.

22.    The DIP Facility will ensure that the Debtors have access to the necessary liquidity to operate in an industry sector still undergoing paradigmatic change and plagued by the same uncertainty that changed the national and world economic outlook.  The DIP Facility alleviates this uncertainty by providing immediate cash availability of $75 million, with the

---

9    See *Stipulation, Agreement, And Final Order On Consent (I) Authorizing Use Of Prepetition Term Loan Priority Collateral And Term Loan Cash Collateral Under 11 U.S.C. § 361; And (II) Granting Adequate Protection Under 11 U.S.C. §§ 361, 362 and 363* [Docket No. 608] (the "Term Loan Adequate Protection Stipulation").

10   The facts and circumstances relating to the Debtors' liquidity needs and efforts to obtain the best possible terms for the DIP Facility are discussed at length in the Snyder Declaration.

option to access an additional $75 million only if the Debtors need it.[11] Snyder Decl. ¶ 18, Quigley Decl. ¶ 7. If the Debtors determine that they do not need such additional liquidity, they can forgo the option and avoid paying the one percent unused fee on the additional $75 million. The Debtors initially proposed a standby revolving debtor-in-possession ("DIP") facility, however, given the DIP Lenders' limitations as a non-traditional lender, they were unable to provide a revolving line of credit. The Debtors believe that the entire liquidity package offered by the DIP Facility, with a $75 million upfront draw and an option to draw an additional $75 million, is an opportunity not worth foregoing. Thus, it is important for the Debtors to take advantage of this flexible liquidity opportunity as they focus on completing their restructuring and emerging from chapter 11. Id.

23. Furthermore, the availability of the financing will send a signal to the Debtors' suppliers, employees, and customers that the Debtors remain a strong going-concern enterprise committed to honoring their obligations to these stakeholders—a needed signal as the Debtors execute their North American restructuring plan. Snyder Decl. ¶ 19, Quigley Decl. ¶ 8. The confidence of these parties and their continued cooperation with the Debtors are vital to the Debtors' ability to develop and consummate a plan of reorganization. Id. Thus, it is beneficial to the Debtors to enter into the DIP Facility at this juncture in these cases.

## The Debtors' Efforts to Obtain Postpetition Financing

24. Entry into the DIP Facility with a subset of the Prepetition Term Lenders (the "DIP Lenders") represents not only a natural agreement, but also the Debtors' best available

---

[11] The Debtors may exercise the option to draw upon the additional $75 million in their sole discretion, provided that the have not filed a plan of reorganization to which the Prepetition Term Lenders do not consent, at the time of exercising such option.

12

option for obtaining additional liquidity to operate and execute a going-concern reorganization of their enterprise. Snyder Decl. ¶ 7, Quigley Decl. ¶ 10.

25. As stated above, during the first months of these cases, the Debtors focused their efforts on obtaining a customer "club" debtor-in-possession ("DIP") facility. Snyder Decl. ¶ 6, Quigley Decl. ¶ 9. During those multi-customer discussions—and indeed prior to the Petition Date—the Debtors' financial advisor, Rothschild, Inc. ("Rothschild"), solicited indications of interest with respect to postpetition financing from five financial institutions as an alternative to customer financing. Id. None of the financial institutions contacted—including the Prepetition Term Lenders—expressed interest in providing postpetition financing on terms as favorable as the proposed customer DIP facility. The multi-faceted customer DIP negotiations were complicated given that the proposed lenders were all competitors with competing interests. Ultimately, in September, the customer DIP negotiations reached a stalemate. Id.

26. In early October, as part of the discussions concerning the Debtors' going-concern value and liquidity position, the Debtors began negotiations with the Prepetition Term Lenders over the DIP Facility. Snyder Decl. ¶ 7, Quigley Decl. ¶ 10. The Prepetition Term Lenders were natural candidates to provide DIP financing given their exclusive right to consent to the priming of the Prepetition Liens on the Term Loan Priority Collateral securing the DIP Facility—which helps avoid potentially costly and protracted adequate protection disputes. Id.

27. On October 9, 2009, the DIP Lenders presented the Debtors with a preliminary term sheet outlining the terms of a proposed DIP Facility. Over the last few weeks, the Debtors, with the assistance of their advisors, have engaged in substantial, arm's-length negotiations with the DIP Lenders to secure the best terms possible for the Debtors' estates. Snyder Decl. ¶ 8, Quigley Decl. ¶ 10. During the negotiations, the DIP Lenders made several key concessions,

13

including agreeing that financing would not be conditioned on achievement of any case milestones, that the DIP Facility would not be secured by liens on or claims to the proceeds of any avoidance actions under sections 544, 545, 547, or 553 of the Bankruptcy Code, there would be no roll-up of prepetition debt, and that the currently unencumbered 35.0% of stock in the Debtors' first-tier foreign subsidiaries would remain unencumbered. Snyder Decl. ¶ 8, Quigley Decl. ¶ 11. No other party was willing to provide the same concessions without an ability to prime the Debtors' prepetition lenders.

28. Concurrent with finalizing the terms of the DIP Facility, the Debtors and Rothschild marketed the proposed DIP Facility to various financial institutions, none of which was willing to offer postepetition financing on terms as favorable as those offered by the DIP Lenders. Snyder Decl. ¶ 13, Quigley Decl. ¶ 12. The Debtors and Rothschild also believe that any outside lender willing to provide DIP financing would require such financing to be on a priming basis. Given the size of the Debtors' postpetition financing needs, the Debtors' lack of hard unencumbered assets, and the competitive terms of the DIP Facility, it simply would not be economical for an outside lender to pursue a priming fight. Id. While the Debtors and Rothschild have not found a better alternative to the DIP Facility as of the filing of this Motion, they will continue to solicit indications of interest from potential lenders up to the time this Motion is heard by the Court and will thoroughly evaluate and consider any favorable proposals. Id.

29. The Debtors and Rothschild have also compared the terms of the proposed DIP Facility with other recent DIP financings obtained by automotive companies in bankruptcy. In particular, Rothschild evaluated the Debtors' DIP Facility with DIP financings in the chapter 11 cases of Accuride, Cooper-Standard, JL French Automotive Castings, Lear, Metaldyne, Hayes

14

Lemmerz, and Mark IV Industries. As shown in the table below, the Debtors' DIP Facility compares favorably to those cases. Snyder Decl. ¶ 14, Quigley Decl. ¶ 12.

| TERM | MEDIAN OF COMPARABLE DIP FACILITIES | DEBTORS' DIP FACILITY |
|---|---|---|
| Facility Size | $90 million | $150 million |
| Interest Rate | LIBOR + 6.0% | LIBOR + 6.5% |
| LIBOR Floor | 3.0% | 3.0% |
| Closing Fee | 4.0% | 3.0% |
| Backend Fee | 1.0% | 0.0% |
| Unused Fee | 1.0% | 1.0% |
| All-in Cost | 18.5% | 17.7% |

30.     As such, the DIP Facility provides the Debtors and their estates with the most advantageous terms available under the circumstances. Obtaining the DIP Facility from the DIP Lenders, a subset of the Prepetition Term Lenders, also allows the Debtors to avoid the costs and risks associated with non-consensual priming litigation. For the foregoing reasons, and with no better options for a liquidity enhancement, the Debtors have determined that the proposed DIP Facility is appropriate under the circumstances, addresses the Debtors' working capital and liquidity needs, and provides assurances to the Debtors' employees, suppliers, and customers.

## Relief Requested

31.     By this Motion, the Debtors respectfully request that the Court grant the following relief as provided for in the DIP Order:

(a)     authorization for the Debtors to obtain a secured superpriority priming senior multi-draw term loan facility in the amount of $150 million, with immediate availability of at least $75 million upon closing of that certain Senior Secured Super Priority Priming Debtor in Possession Credit and Guaranty Agreement (as

15

may be amended, supplemented, restated, or otherwise modified from time to time, the "DIP Agreement.") At the Debtors' discretion, subject to the Debtors not having filed a plan of reorganization that is not in substance satisfactory to the Required Lenders (as defined in the DIP Agreement), the remainder of the DIP Facility may be drawn upon in one additional draw at any time before twenty days prior to the Maturity Date (as defined in the DIP Agreement);

(b)     authorization to enter into and execute the DIP Agreement, substantially in the form attached hereto as **Exhibit B** and incorporated by reference herein, together with any other agreements, documents or instruments related thereto, as each of the same may be amended, supplemented, or modified from time to time by the Debtors and the DIP Lenders, including that certain fee letter to the Lenders dated as of October 28, 2009, executed by Visteon Corporation, as Borrower, and the Guarantors under the DIP Agreement, attached hereto as **Exhibit E** (the "Lender Fee Letter") and that certain fee letter to the DIP Agent dated as of October 28, 2009, executed by Visteon Corporation, as Borrower, and the Guarantors under the DIP Agreement, attached hereto as **Exhibit F** (the "Agent Fee Letter");[12]

(c)     authorization to grant the DIP Lenders, pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority administrative claim with respect of all loans made and obligations incurred by the Debtors on or after the Petition Date pursuant to the DIP Agreement (the "DIP Obligations"), subject only to the Carve Out;

(d)     authority to grant the DIP Lenders pursuant to sections 364(c)(2), (c)(3), and 364(d) of the Bankruptcy Code, as further security for the obligations arising under the DIP Facility, a first-priority and fully perfected security interest and priming lien (subject to pre-existing validly perfected liens having priority over the liens securing the Prepetition Term Loan and Prepetition ABL Credit Agreement) on: (i) presently owned and hereafter acquired assets of the Borrower[13] and Guarantors of a type constituting Term Loan Priority Collateral and (ii) certain unencumbered assets (including, without limitation, the assets of Visteon Electronic Corporation ("VEC"), but excluding currently unencumbered stock of first tier foreign subsidiaries), (iii) a second priority perfected security interest pursuant to section 364(c)(3) and section 364(d) of the Bankruptcy Code (subject to pre-existing validly perfected liens having priority over the liens securing the Prepetition Credit Facilities) in all presently owned and hereafter acquired assets of the Borrower and Guarantors of a type constituting ABL

---

[12]   To the extent there are modifications to the DIP Agreement prior to the hearing on the Motion, the Debtors will file a blackline showing any changes between such amended DIP Agreement and the DIP Agreement filed as **Exhibit B** to this Motion.

[13]   Capitalized terms used in this Motion but not defined herein shall have the meanings ascribed to them in the DIP Order and/or DIP Agreement.

Priority Collateral, and which such liens shall be senior in right of priority to those granted to secure the Term Loan Agreement, (iv) proceeds of any avoidance actions brought pursuant to section 549 of the Bankruptcy Code to recover any post-petition transfer of collateral, and (v) the Borrower's and any Guarantor's rights under section 506(c) of the Bankruptcy Code and the proceeds thereof. All capital stock and other equity interests in the Borrower's domestic subsidiaries and 65.0% of the capital stock and equity interests in first tier foreign subsidiaries will be pledged by the Borrower and Guarantors to secure the DIP Facility on a first priority basis (in a manner consistent with the security for the Term Loan Agreement);

(e)     approval of the form and manner of adequate protection to be provided to the DIP Lenders and the Prepetition Term Lenders pursuant to sections 361(a) and 363(c) of the Bankruptcy Code;

(f)     authority to use cash collateral within the meaning of section 361 of the Bankruptcy Code pursuant to the Term Loan Adequate Protection Stipulation; and

(g)     authority to modify the automatic stay to the extent necessary to effectuate the provisions of the DIP Order.

## Concise Statement of the Material Terms
## Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2(i)

32.     Subject to the Court's approval, the Debtors' have negotiated and reached an agreement to enter into the DIP Agreement that provides for a $150 million DIP Facility—with a $75 million initial draw and option to draw an additional $75 million—on a superpriority administrative claim and first priority priming lien basis. Accordingly, the DIP Obligations will be afforded superpriority claim status pursuant to section 364(c)(1) and secured by: (a) a first priority priming lien on (i) all Term Loan Priority Collateral; (ii) certain unencumbered assets; (b) a second priority lien on all ABL Priority Collateral; (c) proceeds of avoidance actions under section 549 of the Bankruptcy Code; and (d) the Debtors rights under section 506(c) of the Bankruptcy Code; with such security being subject only to valid, perfected, and non-avoidable liens which have priority over the liens securing the Prepetition Term Loan and Prepetition Credit Agreement and the Carve-Out. The Prepetition Term Lenders have consented to the

17

granting of priming liens as provided herein, subject to the terms and conditions of the DIP Agreement and the DIP Order, which provides the Prepetition Term Lenders with adequate protection to the extent of the diminution in value of their collateral.

33.     In accordance with Bankruptcy Rule 4001 and Local Bankruptcy Rule 4001-2, the material provisions of the DIP Agreement and the proposed DIP Order are summarized below:[14]

| Summary of DIP Agreement and DIP Order | |
|---|---|
| **Borrower**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | Visteon Corporation. See DIP Agmt., Preamble. |
| **Guarantors**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | All other debtors and debtor in possession in these cases. **See DIP Agmt., Preamble.** |
| **DIP Lenders**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | Such members of the Prepetition Term Lenders ad hoc steering committee (including their approved funds) who may agree to participate, and their successors and assigns. See **DIP Agmt., Preamble.** |
| **DIP Agent**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | Wilmington Trust Company. See **DIP Agmt., Preamble.** |
| **Type, Amount, and Fund Availability**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | The DIP Facility is a secured super priority priming senior multi draw term loan facility in the amount of $150,000,000. All Loans shall be made by Lenders simultaneously and proportionately to their respective applicable Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested hereunder nor shall any Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder. See **DIP Agmt., Preamble.** |
| **Use of Proceeds**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | The DIP Facility shall be exclusively to provide (a) working capital for the Borrower in accordance with the Budget; (b) to fund capital expenditures in accordance with the Budget, (c) and for other general corporate purposes in accordance with the Budget. The DIP Facility proceeds may not be used in any manner that causes or might cause the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the |

---

[14] This summary is qualified in its entirety by the provisions of the DIP Agreement and the DIP Order. Capitalized terms used in this summary, but not otherwise defined herein shall have the meanings set forth in the DIP Agreement and/or DIP Order. To the extent there are any conflicts between this summary and the DIP Agreement, the terms of the DIP Agreement shall govern. Moreover, to the extent there are any conflicts between the DIP Agreement and the DIP Order, the terms of the DIP Order shall govern.

| | Federal Reserve System or any other regulation thereof or to violate the Exchange Act. See DIP Agmt., §2.3. |
|---|---|
| **Borrowing Mechanisms**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | A portion of the DIP Facility in the amount of at least $75,000,000 shall be drawn on the Closing Date, and the remainder may be drawn in one additional advance at any time prior to 20 days before the Maturity Date, subject to a ten day notice period. See DIP Agmt., §2.1(a). |
| **Interest Rate**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | Borrowings under the DIP Facility shall be at the annual rate equal to the Eurodollar Rate plus the Applicable Margin of 6.50% per annum., for interest periods of one or three months. The Eurodollar Rate will be subject to a floor of 3.00% per annum.<br><br>Interest on Eurodollar Rate Loans shall be payable in arrears at the end of each applicable interest period. All interest on Eurodollar Rate Loans shall be based on a 360-day year and actual days elapsed. See DIP Agmt., Definitions, §2.5(a)-(c). |
| **Default Interest**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | 2.00% per annum above the then applicable rate. See DIP Agmt., §2.6. |
| **Ticking Fee**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | 1.00% per annum on the unused portion of the DIP Facility, payable monthly in arrears. See DIP Agmt., §2.7(b). |
| **Commitment Fee**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | The Borrower and each Guarantor agrees, jointly and severally, to pay each Lender on the Closing Date a commitment fee equal to 3.00% of its Pro Rata Share of the amount by which the Term Loan Commitment exceeds the initial draw under the DIP Facility. See Lender Fee Letter. |
| **Maturity Date**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | The Maturity Date of the DIP Agreement shall be the earliest to occur of: (i) May [    ], 2010; provided, however, that so long as no Default or Event of Default has occurred and is continuing at such time, the Borrower shall have the option to extent the Maturity Date to August [    ], 2010 without the consent of the Administrative Agent or Lenders, (ii) the effective date of the Borrower's Plan of Reorganization, (iii) the date on which Borrower has consummated, pursuant to Section 363 of the Bankruptcy Code and a final order of the Bankruptcy Court, a sale or sales of all or substantially all of Borrower's assets; and (iv) the date of termination of the Lenders' obligations to make Loans or permit existing Loans to remain outstanding pursuant to Section 8.1. See DIP Agmt., § 1.1. |
| **Carve Out**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | The term "Carve Out" means, at any time of determination, (a) allowed administrative expenses payable pursuant to 28 U.S.C. § 1930, (b) Chapter 7 trustee fees up to $25,000, and (c) Priority Professional Expenses. "Priority Professional Expenses" means allowed (whenever such fees, costs and expenses may be allowed) and unpaid fees, costs and expenses of professionals retained in the Case pursuant to Sections 327, 328, 363 and 1103 of the Bankruptcy Code consisting of any attorneys, accountants, financial advisors, consultants and other Persons and firms retained by Borrower or the Creditors' Committee; provided, however, that (i) the term "Priority Professional Expenses" shall not include any Ineligible Professional Expenses, and (ii) the amount of Priority Professional Expenses shall not exceed the Professional Expense Cap. "Professional Expense Cap" means all unpaid fees, costs and expenses incurred by Professional Persons retained in the Case pursuant to Sections 327, 328, 363 and 1103 of the Bankruptcy Code (i) at any time before or on the first Business Day following delivery by the Administrative Agent, the Prepetition Term Agent or the Prepetition ABL Agent of |

19

| | |
|---|---|
| | a Carve Out Trigger Notice (which may only be delivered after the Termination Date referred to in the Final Order) and (ii) after the first Business Day following delivery of such Carve Out Trigger Notice, not exceeding in the case of this clause (ii) $15,000,000 in the aggregate, all to the extent allowed at any time. <u>See</u> **DIP Agmt., § 1.1.** |
| **Representations and Warranties** Fed. R. Bankr. P. 4001(c)(1)(B) | The DIP Agreement contains certain representations and warranties made by the Credit Parties that are customary for financing arrangements of this nature. <u>See</u> **DIP Agmt., § 4.** |
| **Security and Superpriority Claim Status for DIP Obligations** Fed. R. Bankr. P. 4001(c)(1)(B)(i) | Subject to the Carve Out (as defined above), all borrowings and all other obligations under the DIP Facility will be entitled to a super priority claim status pursuant to § 364(c)(1) of the Bankruptcy Code (which § 364(c)(1) claim may look to, among things, the proceeds of unencumbered foreign subsidiaries' stock for payment); and will be secured by:<br><br>• a first priority perfected security interest (subject to pre-existing validly perfected liens having priority over the liens securing the Prepetition Credit Facilities) pursuant to § 364(c)(2) and §364(d) of the Bankruptcy Code in all presently owned and hereafter acquired (i) assets of the Borrower and Guarantors of a type constituting Term Loan Priority Collateral; and (ii) certain unencumbered assets (including, without limitation, the assets of VEC, but excluding currently unencumbered stock of first tier foreign subsidiaries);<br><br>• a second priority perfected security interest pursuant to § 364(c)(3) and §364(d) of the Bankruptcy Code (subject to pre-existing validly perfected liens having priority over the liens securing the Prepetition Credit Facilities) in all presently owned and hereafter acquired assets of the Borrower and Guarantors of a type constituting ABL Priority Collateral, and which such liens shall be senior in right of priority to those granted to secure the Term Loan Agreement;<br><br>• proceeds of any avoidance actions brought pursuant to §549 of the Bankruptcy Code to recover any post-petition transfer of collateral; and<br><br>• the Borrower's and any Guarantor's rights under § 506(c) of the Bankruptcy Code and the proceeds thereof.<br><br>All capital stock and other equity interests in the Borrower's domestic subsidiaries and 65% of the capital stock and equity interests in first tier foreign subsidiaries will be pledged by the Borrower and Guarantors to secure the Facility on a first priority basis (in a manner consistent with the security for the Term Loan Agreement). All security shall be granted subject to the Intercreditor Agreement (as defined in the Term Loan Agreement); provided, however, that as between the Term Lenders and the DIP Lenders, the liens securing the Term Loan Agreement shall be junior in all collateral to those of the DIP Lenders. <u>See</u> **DIP Agmt., §7.1.** |
| **Financial Covenants** Fed. R. Bankr. P. 4001(c)(1)(B)(vi) | Under the DIP Agreement, Borrower will not allow (x) the payment of any expenses or disbursements other than those reflected in the Budget; <u>provided</u> as shown in the Budget Variance Reports (as defined in the ABL Cash Collateral Order) provided, and as reported and measured weekly thereafter at the times set forth in Section 5.2, the Group Members' actual cumulative net cash flow for the two (2) full weekly periods preceding and inclusive of the weekly period being considered, divided by two (2), shall not be less than 90% of the cumulative net cash flow set forth on the Budget for the two (2) full weekly periods immediately preceding the weekly period being considered, divided by two (2). <u>See</u> **DIP Agmt., § 6.11.** |

| | |
|---|---|
| **Other Covenants**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | Other affirmative and negative covenants (subject to materiality thresholds and exceptions as mutually agreed) under the DIP Agreement include, but are not limited to: |
| | • Usual and customary financial reporting requirements, including monthly financial statement package, weekly updates and reconciliation to actual performance for rolling 13 week liquidity statements, comparison of actual performance to DIP Budget as part of the weekly financial package, all other financial information and reporting provided in connection with Term Loan Adequate Protection Stipulation (which, for the avoidance of doubt, includes all financial information and reporting provided to the ABL Agent and/or the lender(s) under the ABL Credit Agreement) and such other reports as reasonably requested by Administrative Agent. Borrower will grant access and cooperate with the Administrative Agent's financial advisors and any other consultants engaged from time to time at the direction of the Administrative Agent. |
| | • Maintenance of properties and insurance (consistent with the existing Term Loan Agreement), payment of taxes, compliance with laws, contracts, and permits; preparation of and compliance with DIP Budget; ERISA covenants. |
| | • Limitations on indebtedness, guarantees, liens, negative pledges, investments, loans, mergers, acquisitions, and transactions with affiliates. |
| | • No dividends and distributions by Borrower. |
| | • Limitations on asset sales subject to certain exceptions to be mutually agreed, except those in the ordinary course of business or permitted under the de minimis asset sale order entered by the Bankruptcy Court, without the Majority DIP Lenders' consent. |
| | • The DIP Lenders shall have the right to visit and inspect any of the Borrower's or any Guarantor's properties at reasonable times and upon reasonable notice during normal business hours, including their respective books and records, and to discuss their respective business affairs with the Borrower's management (so long as senior management is permitted to be present at any such meeting) and may contact the Borrower's advisors. **See DIP Agmt., §§ 5 and 6.** |
| **Mandatory Prepayments**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | If the Borrower or any Credit Party shall consummate an Asset Sale of assets constituting Collateral, the Borrower shall make a payment (within two (2) Business Days of receipt) in respect of the Loans, without premium or penalty, in an aggregate amount equal to the Net Cash Proceeds received from such Asset Sale by such Credit Party, subject to the Intercreditor Agreement to the extent such proceeds arise from sales of assets constituting ABL Priority Collateral. Borrower shall make a payment in respect of the Loans, without premium or penalty, in an aggregate amount equal to the gross proceeds received by any Credit Party relating to insurance in respect of casualty to property constituting Collateral (which payment shall be made within two (2) Business Days of receipt thereof); <u>provided</u>, that absent the occurrence and continuance of a Default or an Event of Default, Borrower may notify Administrative Agent that it intends to use such insurance proceeds to replace or repair the Collateral with respect to which the proceeds were received within 180 days after receipt. To the extent that any such proceeds have not been used within such 180 days, then Borrower shall make the payment in any such amount in respect of the Loan. **See DIP Agmt., § 2.9.** |
| **Conditions to Each** | Under the DIP Agreement, the obligation to provide each extension of credit |

| | |
|---|---|
| **Extension of Credit**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | (including the initial extension of credit) shall be subject to the satisfaction of the following conditions:<br><br>• No default or continuing event of default shall have occurred and be continuing after giving effect to the proposed extension of credit;<br><br>• Representations and warranties shall be true and correct in all material respects at the date of each extension of credit except to the extent that such representations and warranties expressly relate to a prior date, in which case they shall be true and correct in all material respects as of such earlier date; and<br><br>• Receipt of a notice of borrowing from the Borrower.<br><br>The request by the Borrower of, and the acceptance by the Borrower of, each extension of credit shall be deemed to be a representation and warranty by the Borrower that the conditions specified above have been satisfied. **See DIP Agmt., § 3.2** |
| **Events of Default**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | The DIP Agreement contains certain usual and customary events of default for facilities of this type, including but not limited to:<br><br>• Failure to pay interest, principal, or fees when due (<u>provided</u>; that there shall be a grace period of 3 business days for interest payments and 10 calendar days for fees);<br><br>• any representation or warranty found to be materially incorrect when made or requested; breach of any affirmative, negative or financial covenant; any post-petition judgment in excess of an amount to be agreed or which would operate to divest the Borrower or any Guarantor of any assets;<br><br>• the Borrower or any Guarantor being enjoined from conducting business; disruption of business operations of the Borrower or any Guarantor for more than a period to be agreed; material damage to or loss of assets;<br><br>• failure to comply with the DIP Budget within agreed variances;<br><br>• conversion of the Case to a case under Chapter 7 of the Bankruptcy Code; the dismissal of the Case;<br><br>• the appointment in the Case of a Chapter 11 trustee or an examiner with enlarged powers (relating to the operation of the business);<br><br>• the grant of any super priority administrative expense claim or any lien which is <u>pari passu</u> with or senior to those of the Administrative Agent and the DIP Lenders; any payment of pre-petition debt (other than pre-petition trade debt and employee claims and payments of prepetition claims already authorized by Bankruptcy Court order);<br><br>• the Bankruptcy Court's entry of an order granting relief from the automatic stay to permit foreclosure of security interests in assets of the Borrower or any Guarantor of a value in excess of an amount to be agreed;<br><br>• any reversal, revocation or modification in a manner adverse to the DIP Lenders without the consent of the Majority DIP Lenders of the Final Order or any other order of the Bankruptcy Court with respect to the Case and affecting the DIP Facility or any obligations under the ABL Credit Agreement or Term Loan Agreement;<br><br>• or the US Dollar equivalent market value of Borrower's ownership interest in |

22

| | |
|---|---|
| | Halla Climate Controlcloses on the KOSPI below $300M for three consecutive trading days; |
| | • and Events of Default similar to those identified in the Term Loan Documents and Prepetition ABL Credit Agreement. See DIP Agmt., § 8.1 |
| **Remedies**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | Under the terms of the DIP Agreement, Upon the occurrence and continuation of an Event of Default, the Administrative Agent upon direction of the Required Lenders shall, provide the Credit Parties, the Creditors' Committee and the United States Trustee with written notice (via email or facsimile) specifying the Event of Default and the basis therefor and informing such parties that the Administrative Agent and the Lenders intend to exercise their remedies under the Final Order, the Security Documents and hereunder five (5) Business Days after the Credit Parties' receipt of such notice (the "Remedies Notice Period"). During such Remedies Notice Period, the Credit Parties and the Creditors' Committee have the right to seek an emergency hearing before the Bankruptcy Court for the sole purpose of determining whether an Event of Default has occurred; provided, that during the Remedies Notice Period, the Credit Parties may use cash collateral in accordance with the terms and provisions of the Budget solely to meet payroll obligations and pay expenses necessary, in the good faith judgment of the Credit Parties, to be paid at such time for the preservation of the debtors in the Case and their estates, and as otherwise agreed by the Administrative Agent and, as applicable, the Prepetition Term Agent and/or Prepetition ABL Agent, in their sole discretion. Unless during such five-Business Day notice period the Bankruptcy Court determines that an Event of Default has not occurred, upon the expiration of such five-day notice |

K&E 15770383.

| | |
|---|---|
| | period, (i)(A) the Administrative Agent and the Secured Parties automatically shall have relief from the automatic stay and the Administrative Agent (with the consent of the Required Lenders) may foreclose on all or any portion of the Collateral or otherwise exercise remedies against the Collateral permitted by the Security Documents, and other nonbankruptcy law, including, without limitation, the exercise of rights of setoff and all rights and remedies of a secured party under the UCC, and (B) any right of any of the Credit Parties to use cash collateral shall cease.  **See DIP Agmt., § 8.2** |
| **Indemnification**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(ix) | In addition to the payment of expenses pursuant to Section 10.2, each Credit Party agrees, jointly and severally, to pay, indemnify, and hold each Lender and the Administrative Agent and their respective officers, partners, directors, employees, Affiliates, agents and controlling persons (each, an "Indemnitee") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever relating to or arising out of the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents, and the transactions contemplated thereby, including any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of any Group Member or any of the Properties and the reasonable documented fees and out-of-pocket expenses of legal counsel in connection with claims, actions or proceedings by any Indemnitee against any Credit Party under any Loan Document (all the foregoing in this clause (d), collectively, the "Indemnified Liabilities"), provided, that the Borrower and each other Credit Party shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities (i) have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee, (ii) have resulted from the breach by such Indemnitee in respect of such Indemnitee's obligations under the facility, or (iii) have arisen from a dispute solely between Lenders and not involving the Administrative Agent or the Borrower; provided further that such reimbursement obligations shall be limited to one counsel for the Administrative Agent and one counsel for the Lenders (and, as reasonably determined by the Administrative Agent, one or more local counsel) unless there is a conflict of interest with respect to a particular Indemnitee, in which case such Indemnitee shall be reimbursed for its own counsel..  To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 10.3 may be unenforceable in whole or in part because they are violative of any law or public policy, the applicable Credit Party shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them. Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee.  If any suit, action, proceeding, claim or demand shall be brought or asserted against any Indemnitee (other than the Administrative Agent) with respect to the matters covered by the Borrower's indemnification in this Agreement, (i) such Indemnitee shall promptly notify the Borrower thereof; provided, however, that the failure to promptly provide such notice shall not affect Borrower's indemnification obligations hereunder except to the extent that Borrower was prejudiced by the failure to |

| | |
|---|---|
| | provide prompt notice; and (ii) to the extent not precluded by a conflict of interest or other duties binding on it, such Indemnitee shall work cooperatively with the Borrower with a view toward minimizing the legal and other expenses associated with any defense and any potential settlement or judgment, which cooperation shall include (A) the use of a single counsel selected by such Indemnitee and reasonably acceptable to the Borrower (so long as such Indemnitee, in its reasonable judgment, does not believe that the use of a single counsel is not reasonably practicable or, based on the advice of counsel, disadvantageous from a legal perspective) and (B) regular consultation with the Borrower (and, to the extent a single counsel is not used, its counsel) upon the reasonable request of the Borrower with regard to the management of any litigation and the negotiation of any potential settlement, in order to afford the Borrower (and, to the extent a single counsel is not used, its counsel) reasonable opportunities to participate in the consideration of material decisions with respect thereto. All amounts due under this Section 10.3 shall be payable not later than 30 days after written demand therefor (together with reasonably detailed supporting documentation). |
| | **DIP Agmt., § 10.3.** |
| **Binding of the Estate to Validity of Secured Debt** Fed. R. Bankr. P. 4001(c)(1)(B)(iii) | The DIP Order contains stipulations of the Debtors that the liens and security interests granted to the Prepetition Term Agent (for its benefit and for the benefit of the Prepetition Term Lenders) under and in connection with the Prepetition Term Security Documents and Term Loan Adequate Protection Stipulation (as defined herein) are:<br><br>• valid, binding, perfected, enforceable, first-priority liens on the personal and real property described in the Prepetition Term Security Documents, but subject to subordination in certain instances to the liens of the Prepetition ABL Agent for the benefit of the Prepetition ABL Lenders in accordance with the Intercreditor Agreement, and further limited as to Restricted Assets (as defined in the Intercreditor Agreement) under and pursuant to the Intercreditor Agreement;<br><br>• no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Term Obligations exist, and no portion of the Prepetition Liens or Prepetition Term Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization or subordination (whether equitable or otherwise) under the Bankruptcy Code or applicable nonbankruptcy law;<br><br>• the Debtors and their estates have no offsets, claims, objections, challenges, causes of actions, and/or choses in action, including without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code, against the Prepetition Term Agent or Prepetition Term Lenders or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to the Prepetition Term Loan Documents; and<br><br>• the Debtors have waived, discharged and released any right they may have to challenge any of the Prepetition Term Obligations and the security for these obligations, and to assert any offsets, defenses, claims, objections, challenges, causes of action and /or choses of action against the Prepetition Term Agent, the Prepetition Term Lenders and/or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees. **See DIP Order, § E(6)(c).** |

| | |
|---|---|
| **Waiver/Modification of the Automatic Stay** Fed. R. Bankr. P. 4001(c)(1)(B)(iv) | The DIP Order provides that he automatic stay imposed under Bankruptcy Code section 362(a) shall be modified as necessary to effectuate all of the terms and provisions of the Order, including, without limitation, to: |
| | • permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, and Adequate Protection Superpriority Claims; |
| | • permit the Debtors to perform such acts as the DIP Agent or the Prepetition Term Agent each may request in its sole discretion to assure the perfection and priority of the liens granted herein; |
| | • permit the Debtors to incur all liabilities and obligations to the DIP Agent, DIP Lenders, Prepetition Term Agent, and Prepetition Term Lenders under the DIP Documents, the DIP Facility and the DIP Order; and |
| | • authorize the Debtors to pay, and the DIP Agents, DIP Lenders, Prepetition Term Agent, and Prepetition Term Lenders to retain and apply, payments made in accordance with the terms of the DIP Order.  **See DIP Order ¶ 19.** |
| **Waiver/Modification of Applicable Laws** Fed. R. Bankr. P. 4001(c)(1)(B)(vii) | The DIP Order when entered will be effective to create in favor of the DIP Agent, for the benefit of itself and the DIP Lenders, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interest in and liens on all presently owned and hereafter acquired: |
| | • assets of the Borrower and Guarantors of a type constituting Collateral; |
| | • for the avoidance of doubt, all present and after acquired property (including, but not limited to, any cash) of VEC, and except as provided below, currently unencumbered assets of the Borrower and Guarantors (but excluding currently unencumbered stock of first-tier foreign subsidiaries such that no more than 65% of the capital stock and equity interests in the first-tier foreign subsidiaries shall be subject to the DIP Liens); |
| | • the proceeds of any avoidance action brought pursuant to Section 549 of the Bankruptcy Code to recover any post petition transfer of collateral; and |
| | • the Borrower's and any Guarantor's rights under Section 506(c) of the Bankruptcy Code and the proceeds thereof (collectively, the "DIP Collateral"). |
| | • The DIP Order when entered will be effective to create in favor of the Prepetition Term Agent, for the benefit of itself and the Prepetition Term Lenders, the Adequate Protection Liens (defined below).  **See DIP Order ¶ 12(a).** |
| **Adequate Protection** Fed. R. Bankr. P. 4001(c)(1)(B)(ii) | The DIP Order provides adequate protection of the interests of the Prepetition Term Agent and Prepetition Term Lenders in their collateral against any diminution in value of such interests resulting from the priming of their liens by the DIP Facility, in the form of valid, binding, enforceable, non-avoidable, and automatically perfected replacement security interests in and liens on: |
| | • all of the Debtors' right, title, and interest in, to and under all present and after acquired property and proceeds of the Debtors of the same nature or type as the Collateral, including all cash and cash collateral of the Debtors, whether now existing or later acquired; |
| | • all present and after acquired assets and property of VEC (for purposes of the |

DIP Order and the DIP Documents, all present and after acquired property of VEC shall be Term Loan Priority Collateral;

- proceeds of any avoidance action brought pursuant to Section 549 of the Bankruptcy Code to recover any post petition transfer of collateral, and

- the Borrower's and any Guarantor's rights under Section 506(c) of the Bankruptcy Code and the proceeds thereof (the "Adequate Protection Liens"). **See DIP Order ¶ 12(a).**

The Adequate Protection Liens shall be junior only to: (a) the Carve Out, (b) pre-existing validly perfected liens having priority over the liens securing the obligations under the Prepetition Term Loan Agreement and the Prepetition ABL Agreement, (c) liens in favor of the Prepetition ABL Agent and Prepetition ABL Lenders on all presently owned and hereafter acquired assets of the Borrower and Guarantors of a type constituting ABL Priority Collateral (which includes adequate protection liens on Collateral of such type granted pursuant to the ABL Cash Collateral Order), and (d) DIP Liens. **See DIP Order ¶ 13(b).**

As further adequate protection of the interests of the Prepetition Term Agent and Prepetition Term Lenders in the Collateral against any Diminution in Value of such interests in the Collateral, the Prepetition Term Agent and Prepetition Term Lenders are hereby granted as and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in the Cases and any Successor Cases. See DIP Order 13(a). The adequate protection provided to the Prepetition Term Agent and Prepetition Term Lenders shall also include payments to Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan Lokey"), as financial advisor to the Prepetition Term Agent and certain Prepetition Term Lenders, in accordance with the terms of that certain fee letter dated as of February 18, 2009 and executed by Bingham McCutchen LLP, Houlihan Lokey, and the Borrower, attached hereto as **Exhibit G**. **See DIP Order ¶ 15.**

## Provisions to Be Highlighted Pursuant to Local Bankruptcy Rule 4001-2

34.     Local Bankruptcy Rule 4001-2 requires that certain provisions contained in financing motions be highlighted, and the Debtors provide justification for the inclusion of such highlighted provisions. The Debtors believe the following provisions of the DIP Order must be highlighted pursuant to Local Bankruptcy Rule 4001-2(i), and that such provisions are justified and necessary in the context and circumstances of these cases. Each of the provisions are commonly found in DIP financing agreements of this nature. In addition, the DIP Lenders would not have agreed to provide financing to the Debtors absent such provisions.

K&E 15770383.

35.     Local Bankruptcy Rule 4001-2(i)(C).  Waiver of Section 506(c) Rights.  The DIP

Order provides that effective upon the entry of the DIP Order, no costs or expenses of

administration which have been or may be incurred in the cases at any time shall be charged

against the DIP Agent, DIP Lenders, Prepetition Term Agent or Prepetition Term Lenders, or

any of their respective claims, the DIP Collateral or the Collateral pursuant to section 105

or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent, as applicable,

of the affected DIP Agent, DIP Lender, Prepetition Agent or Prepetition Term Lenders, and no

such consent shall be implied, directly or indirectly, from any action, inaction, or acquiescence

by any such agents or lenders.  See DIP Order ¶ 36.

36.     Section 506(c) of the Bankruptcy Code allows the estate to surcharge the

collateral of a secured creditor to pay the reasonable and necessary costs and expenses of

preserving or disposing of such creditor's collateral to the extent of any benefit received.  See

11 U.S.C. § 506(c).  In connection with the provision of DIP financing, lenders commonly

request a waiver of a debtor's ability to surcharge such lender's collateral.  Bankruptcy courts in

this district have authorized similar section 506(c) waivers in other instances.  See, e.g., In re

Source Interlink Cos., No. 09-11424 (KG) (Bankr. D. Del. May 28, 2009); In re Ez Lube LLC,

No. 08-13256 (CSS) (Bankr. D. Del. Jan 14, 2009); In re CMC (f/k/a Cone Mills Corp.), No.

03-12944 (MFW) (Bankr. D. Del. Nov. 25, 2003) (approving 506(c) waiver as part of debtor-in-

possession financing where debtor was selling all or substantially all of its assets under section

363); In re Pillowtex Corp., No. 03-12339 (PJW) (Bankr. D. Del. Sept. 25, 2003) (same).

37.     Local Bankruptcy Rule 4001-2(i)(D).  Granting of Liens on Avoidance Actions.

The DIP Order grants the DIP Lenders continuing, valid, binding, enforceable, non-avoidable,

and automatically and properly perfected postpetition security interests in and liens on, among

28

other things, the proceeds of any avoidance action brought pursuant to section 549 of the Bankruptcy Code to recover any post petition transfer of collateral. See DIP Order ¶ 6. Furthermore, as adequate protection of the interests of the Prepetition Term Lenders against any diminution in value of their interests in collateral resulting from the priming of their liens by the DIP Facility, the DIP Order provides that the Debtors shall grant the Prepetition Term Lenders continuing valid, binding, enforceable, non-avoidable and automatically perfected replacement security interests in and liens on the proceeds of any avoidance action brought pursuant to section 549 of the Bankruptcy Code to recover any post petition transfer of collateral. See DIP Order at ¶ 12.a. However, the DIP Facility is not secured by the proceeds of any avoidance actions under sections 544, 545, 547, or 553 of the Bankruptcy Code nor will the Prepetition Term Lenders receive any security from the proceeds of any avoidance actions under sections 544, 545, 547, or 553 of the Bankruptcy Code as adequate protection.

38.     Local Bankruptcy Rule 4001-2(i)(G). Granting of Priming Liens: As described in the DIP Order, the DIP Facility contemplates the priming of the Prepetition Liens and all other liens of the Prepetition Term Agent and the Prepetition Term Lenders on the collateral securing the DIP Facility, and the priming of all liens of the Prepetition ABL Agent and the Prepetition ABL Lenders (including any liens granted under the Term Loan Adequate Protection Stipulation and the ABL Cash Collateral Order) with respect to the Term Loan Priority Collateral. See DIP Order ¶ F.a. Notably, the priming of the Prepetition Liens is consensual and the Prepetition Term Lenders are receiving adequate protection for the priming of their pre-existing liens. Therefore, Local Bankruptcy Rule 4001-2(i)(G), which requires disclosure of only non-consensual priming liens, is inapplicable.

29

## Basis for Relief

**I.     The Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to Sections 364(c) and 364(d)(1) of the Bankruptcy Code.**

39.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).   In addition, section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by "priming" liens, provides that the Court, after notice and a hearing, may:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if —
>
> (A)     the [debtor] is unable to obtain credit otherwise; and
>
> (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

40.     In evaluating proposed postpetition financing under sections 364(c) and (d) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

(a)     unencumbered credit or alternative financing without superpriority status is available to the debtor;

(b)     the credit transactions are necessary to preserve assets of the estate;

(c)     the terms of the credit agreement are fair, reasonable, and adequate;

(d)     the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and its creditors; and

(e) the proposed financing agreement adequately protects prepetition secured creditors.

See, e.g., In re Aqua Assoc., 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); In re Crouse Group, Inc., 71 B.R. 544 (Bankr. E.D. Pa. 1987) (same); Bland v. Farmworker Creditors, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

41. For the reasons discussed below, the Debtors satisfy the standards required to access postpetition financing on a secured superpriority and priming lien basis under sections 364(c) and 364(d) of the Bankruptcy Code.

## A. The Debtors Cannot Obtain Financing On More Favorable Terms.

42. As described above, the Debtors have not been able to obtain postpetition financing on an unsecured basis; or, indeed, without agreeing to more burdensome terms and unfavorable pricing. A debtor need only demonstrate by a good faith effort that credit was not available without the protections afforded to potential lenders by sections 364(c) or 364(d) of the Bankruptcy Code. See Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders).

43. Indeed, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an

31

exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also In re Garland Corp., 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (authorizing secured credit under section 364(c)(2), after notice and a hearing, upon showing that unsecured credit was unobtainable); In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D. Colo. 1981) (finding refusal of two national banks to grant unsecured loans was sufficient to support conclusion that requirements of section 364 requirement had been met); Ames, 115 B.R. at 37-39 (holding that debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

44.     Before approaching the DIP Lenders, the Debtors explored a variety of financing options that ultimately did not come to fruition.  Snyder Decl. ¶ 6, Quigley Decl. ¶ 9.   In addition, while negotiating the DIP Facility, the Debtors and Rothschild attempted to identify other sources of postpetition financing to determine if they could obtain such financing on better terms.  None of the potential financing sources that was contacted expressed interest in providing postpetition financing on terms as favorable as those of the proposed DIP Facility on a non-priming basis, much less on an unsecured, administrative expense, or junior secured basis. Snyder Decl. ¶ 7, Quigley Decl. ¶ 12.

**B.     The DIP Facility Is Necessary To Preserve the Assets of the Debtors' Estates During the Pendency of the Chapter 11 Cases.**

45.     As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets.  See Burtch v. Ganz (In re Mushroom Transp. Co.), 382 F.3d 325, 339 (3d Cir. 2004).  As noted above, the Debtors will benefit from access to working capital in the form of postpetition financing during the rest of their chapter 11 cases.  The Debtors believe

32

it is prudent to enter into the DIP Agreement now to provide an extra liquidity cushion, rather than wait and risk losing an opportunity to obtain financing on favorable terms.  Snyder Decl. ¶ 19, Quigley Decl. ¶ 17.

46.    The Debtors' inability to access financing when needed and thereby generate revenues to adequately support their business could severely jeopardize their ability to consummate their restructuring plans. Id.  Approval and implementation of the DIP Facility, in contrast, will enable continued functioning of the Debtors' operations in the ordinary course of business and permit the Debtors to effectuate their restructuring strategy for the benefit of all stakeholders. Id.

### C.    The Terms of the DIP Facility Are Fair, Reasonable, and Appropriate Given the Circumstances.

47.    In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.), 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds). The appropriateness of a proposed financing facility should also be considered in light of current market conditions. See Transcript of Record at 740:4-6, In re Lyondell Chem. Co., No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of prepetition secured debt] reasonable here and now.").

48.    The DIP Agreement was negotiated in good faith and at arm's-length between the Debtors and the DIP Lenders, culminating in a carefully-crafted agreement designed to permit

33

the continued operation of the Debtors' business in the ordinary course and allow the Debtors to focus on emerging from chapter 11. Snyder Decl. ¶ 8, Quigley Decl. ¶ 11. As noted above, the DIP Lenders made notable concessions regarding the terms the DIP Facility, including agreeing that financing would not be conditioned on achievement of any case milestones, that the DIP Facility be secured by the proceeds of any avoidance actions under sections 544, 545, 547, or 553 of the Bankruptcy Code, and that and that the currently unencumbered 35% of stock in the Debtors' first-tier foreign subsidiaries would remain unencumbered. Id. The DIP Lenders have not asked for a roll-up of their prepetition debt and thus are not taking a defensive position in these cases—a testament to the DIP Lenders' support of Visteon's business going forward. Snyder Decl. ¶ 9, Quigley Decl. ¶ 5.

49.     Furthermore, the structure of the DIP Facility provides needed flexibility given the current uncertainties in the automotive industry and input cost fluctuations. The DIP Facility provides the Debtors with immediate liquidity in the amount of $75 million, with the option (subject to the condition that the Debtors have not filed a plan of reorganization that is not in substance satisfactory to the Required Lenders (as defined in the DIP Agreement)) of accessing an additional $75 million if needed. Snyder Decl. ¶ 18, Quigley Decl. ¶ 7. The one percent fee assessed on this unused portion of the DIP Facility is reasonable given the flexibility it affords to the Debtors, and if the Debtors determine they will not need access to additional liquidity, they can forfeit their right to draw upon the remaining $75 million and avoid paying any fee on such amount.

50.     The reasonableness of the DIP Facility is further demonstrated by the paucity of more favorable alternatives available to the Debtors. Additionally, as noted above, the Debtors and Rothschild compared the terms of the proposed DIP Facility with other recent DIP

34

financings obtained by automotive companies in bankruptcy and confirmed that the DIP Facility compares favorably to those cases. Snyder Decl. ¶ 14, Quigley Decl. ¶ 12.

**D.      Entry Into the DIP Agreement Reflects the Debtors' Sound Business Judgment.**

51.      A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. See, e.g., Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); Ames, 115 B.R. at 38 (financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

52.      Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money. See, e.g., Group of Inst. Investors v. Chicago, Mil., St. P. & Pac. R.R. Co., 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to the business judgment of the debtor); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court"). Further, one court has stated that a "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

53.      Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary

35

and capricious. In re Curlew Valley Assocs., 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); Trans World Airlines, 163 B.R. at 974 (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor). Courts generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." Curlew Valley, 14 B.R. at 513-14 (footnotes omitted).

54.     In light of the foregoing, the Debtors believe that they have demonstrated that entering into the DIP Facility reflects a sound and reasonable exercise of business judgment, is in the best interests of all stakeholders and is necessary to preserve the going-concern value of the Debtors' assets.

## II.    The Debtors Should be Authorized to Provide Adequate Protection to the Prepetition Term Lenders.

55.     Section 364(d)(1)(B) of the Bankruptcy Code requires that adequate protection be provided where the liens of secured creditors are being primed to secure the obligations under a DIP financing facility. Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens, and other forms of relief. 11 U.S.C. § 361.

56.     According to the legislative history, a finding of adequate protection is "left to case-by-case interpretation and development. It is expected that the courts will apply the concept in light of facts of each case and general equitable principals." H.R. REP. NO. 95-595, at 339 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6295; In re Nashua Trust Co., 73 B.R. 423, 430-31 (Bankr. D.N.J. 1987). The purpose is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. See Resolution Trust Corp. v.

36

Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 564 (3d. Cir. 1994); Save Power Ltd. v. Pursuit Athletic Footwear, Inc. (In re Pursuit Athletic Footwear, Inc.), 193 B.R. 713, 716 (Bankr. D. Del. 1996); In re Planned Sys., Inc., 78 B.R. 852, 861-62 (Bankr. S.D. Ohio 1987).

57.    The DIP Order provides adequate protection of the interests of the Prepetition Term Agent and Prepetition Term Lenders in their collateral against any diminution in value of such interests resulting from the priming of their liens by the DIP Facility, in the form of valid, binding, enforceable, non-avoidable, and automatically perfected replacement security interests in and liens on:

> (a) all of the Debtors' right, title, and interest in, to and under all present and after acquired property and proceeds of the Debtors of the same nature or type as the Collateral, including all cash and cash collateral of the Debtors, whether now existing or later acquired, (b) all present and after acquired assets and property of VEC (for purposes of this Order and the DIP Documents, all present and after acquired property of VEC shall be Term Loan Priority Collateral), (c) proceeds of any avoidance action brought pursuant to Section 549 of the Bankruptcy Code to recover any post petition transfer of collateral, and (d) the Borrower's and any Guarantor's rights under Section 506(c) of the Bankruptcy Code and the proceeds thereof (the "Adequate Protection Liens"). See DIP Order ¶ 12(a).

58.    The Adequate Protection Liens shall be junior only to: (a) the Carve Out, (b) pre-existing validly perfected liens having priority over the liens securing the obligations under the Prepetition Term Loan Agreement and the Prepetition ABL Credit Agreement, (c) liens in favor of the Prepetition ABL Agent and Prepetition ABL Lenders on all presently owned and hereafter acquired assets of the Borrower and Guarantors of a type constituting ABL Priority Collateral (which includes adequate protection liens on Collateral of such type granted pursuant to the ABL Cash Collateral Order), and (d) DIP Liens.

37

59.     As further adequate protection of the interests of the Prepetition Term Agent and Prepetition Term Lenders in the Collateral against any diminution in value of such interests in the Collateral, the Debtors will grant Prepetition Term Agent and Prepetition Term Lenders an allowed superpriority administrative expense claim in these cases, to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code.  Lastly, the adequate protection provided to the Prepetition Term Agent and Prepetition Term Lenders shall also include continued payments of the Adequate Protection Payments (as defined in the Term Loan Adequate Protection Stipulation, and which shall include payments to Houlihan Lokey, as financial advisor to the Prepetition Term Agent and certain Prepetition Term Lenders, to be made in accordance with that certain fee letter dated as of February 18, 2009 and executed by Bingham McCutchen LLP, Houlihan Lokey, and the Borrower, attached hereto as **Exhibit G**), and a guarantee from VEC as to all obligations under the Prepetition Term Loan Agreement.

60.     The Debtors believe that such adequate protection is fair and reasonable.  In reliance upon such adequate protection, the Prepetition Term Lenders have consented to the priming of their Prepetition Liens.  The consent of the Prepetition Term Lenders permits the Debtors to avoid potentially time consuming and unpredictable priming litigation.  See Swedeland Dev., 16 F.3d at 564 (requiring a substantial evidentiary foundation to be laid in connection with the debtors' request to grant a priming lien and finding there was not adequate protection of a prepetition lenders' interest in collateral where there was a projected increase in the value of such collateral).  The Prepetition Term Lenders' consent to the priming of their Prepetition Liens thus permits the Debtors to save considerable resources, not to mention avoid a delay, in obtaining postpetition financing.  And importantly, the proposed adequate protection shall only be provided to the extent there is a diminution in value to the Prepetition Term

Lenders' interest in Term Loan Priority Collateral. Accordingly, based upon the foregoing, the Debtors respectfully request that the Court authorize the Debtors to provide the above described adequate protection to the Prepetition Term Lenders in accordance with the terms set forth in the DIP Order and DIP Agreement.

## III. The Debtors Are Authorized to Continue to Use Cash Collateral In Accordance with Orders Entered by this Court.

61. The DIP Order contemplates the Debtors' continued use of Term Loan Cash Collateral and Term Loan Priority Collateral in accordance with the Term Loan Adequate Protection Stipulation, subject to certain modifications discussed in the DIP Order. In accordance with the Term Loan Adequate Protection Stipulation, the Debtors will continue to provide adequate protection to the Prepetition Term Lenders and Ford, as sole ABL Lender, in exchange for the use of cash collateral. Additionally, because the DIP Facility primes the Prepetition Term Lenders' interest in the Term Loan Priority Collateral only, the liens are fully compliant with the Intercreditor Agreement. Thus, the Debtors will adequately protect these creditors' interest in their cash collateral against any diminution in value pursuant to section 363(e) of the Bankruptcy Code.

## IV. Modification of the Automatic Stay is Warranted.

62. The proposed DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Lenders to exercise certain rights and remedies as provided for in the DIP Agreement without further order of or application to the Court. Stay modification provisions of this sort are ordinary and usual features of DIP financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.

39

## Notice

63.     Notice of this motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) counsel to the ad hoc group of lenders for the Debtors' senior secured term loan facility; (c) counsel for the administrative agent for the Debtors' senior secured term loan facility; (d) counsel for the administrative agent for the Debtors' revolving senior secured credit facility (e) the indenture trustee for each of the Debtors' outstanding unsecured bond issuances; (f) the Committees; (g) parties known to the Debtors that have asserted liens and/or filed UCC financing statements with respect to any property of the Debtors; and (h) those persons who have requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

64.     No prior request for the relief sought herein has been made to this or any other court.

K&E 15770383.

WHEREFORE, the Debtors respectfully request entry of the Interim DIP Order, substantially in the form attached hereto as **Exhibit A**, (a) approving the Debtors' postpetition financing, (b) authorizing the Debtors' use of cash collateral, (c) granting priming and other liens and providing superpriority administrative expense status, (d) granting adequate protection to prepetition secured parties, (e) modifying the automatic stay, and (g) granting such other relief as is just and proper.

Dated: October 28, 2009

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Telephone:     (302) 652-4100
Facsimile:     (302) 652-4400
E-mail:ljones@pszjlaw.com
              joneill@pszjlaw.com
              tcairns@pszjlaw.com

- and -

**KIRKLAND & ELLIS LLP**
James H. M. Sprayregen, P.C. (IL 6190206)
Marc Kieselstein, P.C. (IL 6199255)
James J. Mazza, Jr. (IL 6275474)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
E-mail:james.sprayregen@kirkland.com
              marc.kieselstein@kirkland.com
              james.mazza@kirkland.com

*Attorneys for the Debtors and Debtors in Possession*