# Exhibit B

## DIP Agreement

*(Not Executed - In Draft Form)*

# SENIOR SECURED SUPER PRIORITY PRIMING DEBTOR IN POSSESSION CREDIT AND GUARANTY AGREEMENT

dated as of November [___], 2009

among

**VISTEON CORPORATION,**
as a debtor and debtor in possession,

**CERTAIN SUBSIDIARIES,**
each as a debtor and debtor in possession and as Guarantors,

**VARIOUS LENDERS,**

**WILMINGTON TRUST COMPANY,**
as Administrative Agent

---

**$150,000,000 Senior Secured Super Priority Priming
Debtor in Possession Credit Facility**

---

## TABLE OF CONTENTS

SECTION 1.    DEFINITIONS AND INTERPRETATION........................................................3

    1.1    Definitions .........................................................................................................3
    1.2    Accounting Terms ............................................................................................24
    1.3    Interpretation, etc............................................................................................25
    1.4    Joint Preparation .............................................................................................25

SECTION 2.    LOANS..............................................................................................................25

    2.1    Loans and Borrowing Mechanics ...................................................................25
    2.2    Pro Rata Shares................................................................................................26
    2.3    Use of Proceeds ...............................................................................................26
    2.4    Evidence of Liabilities; Register; Lenders' Books and Records; Notes .............26
    2.5    Interest on Loans .............................................................................................27
    2.6    Default Interest ...............................................................................................28
    2.7    Payments of Other Amounts............................................................................28
    2.8    Voluntary Prepayments; Reduction or Termination of the Commitments..........28
    2.9    Mandatory Prepayments ..................................................................................29
    2.10    Continuation Options.......................................................................................29
    2.11    General Provisions Regarding Payments .........................................................29
    2.12    Ratable Sharing................................................................................................30
    2.13    Increased Costs; Capital Adequacy .................................................................31
    2.14    Taxes; Withholding, etc....................................................................................32
    2.15    Indemnity.........................................................................................................35
    2.16    Measures to Mitigate .......................................................................................35
    2.17    Release.............................................................................................................36
    2.18    Replacement of Lenders ..................................................................................36

SECTION 3.    CONDITIONS PRECEDENT.........................................................................37

    3.1    Closing Date ....................................................................................................37
    3.2    Conditions Precedent to Each Credit Extension...............................................39

SECTION 4.    REPRESENTATIONS AND WARRANTIES .............................................40

    4.1    No Default .......................................................................................................40
    4.2    Organization and Good Standing .....................................................................40
    4.3    Authorization...................................................................................................40
    4.4    No Conflicts or Consents.................................................................................40
    4.5    Enforceable Obligations ..................................................................................41
    4.6    Current Financial Statements...........................................................................41
    4.7    Other Obligations and Restrictions..................................................................41
    4.8    Full Disclosure................................................................................................41
    4.9    Litigation .........................................................................................................42
    4.10    Labor Disputes.................................................................................................42
    4.11    ERISA Plans and Liabilities ............................................................................42
    4.12    Environmental and Other Laws........................................................................43
    4.13    Names and Places of Business.........................................................................44

| 4.14 | Subsidiaries | 44 |
|------|--------------|----|
| 4.15 | Licenses | 44 |
| 4.16 | Government Regulation | 44 |
| 4.17 | Taxes | 44 |
| 4.18 | Title to Properties | 45 |
| 4.19 | No Defaults | 45 |
| 4.20 | Margin Stock | 45 |
| 4.21 | Insurance | 45 |
| 4.22 | Perfection of Security Interest | 45 |

| SECTION 5. | AFFIRMATIVE COVENANTS | 45 |
|------------|-----------------------|----|
| 5.1 | Payment and Performance | 45 |
| 5.2 | Books, Financial Statements and Reports | 45 |
| 5.3 | Other Information and Inspections | 47 |
| 5.4 | Notice of Material Events and Change of Name | 47 |
| 5.5 | Maintenance of Properties; Insurance | 48 |
| 5.6 | Maintenance of Existence and Qualifications | 48 |
| 5.7 | Payment of Taxes, etc. | 48 |
| 5.8 | Performance on Borrower's Behalf | 49 |
| 5.9 | Compliance with Agreements and Law | 49 |
| 5.10 | Environmental Matters | 49 |
| 5.11 | Intentionally Deleted | 49 |
| 5.12 | Agreement to Deliver Guaranty and Security Documents; Perfection and Protection of Security Interests and Liens | 49 |
| 5.13 | Bank Accounts; Offset | 52 |
| 5.14 | Non-Consolidation | 52 |
| 5.15 | Stock of First-Tier Foreign Subsidiaries | 53 |
| 5.16 | Post-Closing Requirements | 53 |

| SECTION 6. | NEGATIVE COVENANTS | 53 |
|------------|--------------------|----|
| 6.1 | Indebtedness | 53 |
| 6.2 | Limitation on Liens and Negative Pledges; Equitable Lien | 55 |
| 6.3 | Swap Agreements | 59 |
| 6.4 | Subsidiaries; Mergers; Capital Stock Transactions | 59 |
| 6.5 | Limitation on Sales of Property | 60 |
| 6.6 | Limitation on Dividends and Redemptions | 61 |
| 6.7 | Limitation on Investments, Capital Expenditures, and Deposit Accounts | 62 |
| 6.8 | Transactions with Affiliates | 62 |
| 6.9 | Conduct of Business | 62 |
| 6.10 | Fiscal Year | 62 |
| 6.11 | Budget | 62 |
| 6.12 | Amendments to Organizational Documents | 63 |
| 6.13 | Prepetition Indebtedness | 63 |
| 6.14 | Bankruptcy Case | 63 |

6.15    Business of VIHI and Foreign Stock Holding Companies ...................................63

SECTION 7.    PRIORITY AND COLLATERAL SECURITY; GUARANTY ....................64

7.1    Priority and Collateral Security ............................................................................64
7.2    Guaranty ...............................................................................................................66

SECTION 8.    EVENTS OF DEFAULT .........................................................................69

8.1    Events of Default ..................................................................................................69
8.2    Remedies ..............................................................................................................73
8.3    Distribution of Collateral Proceeds .....................................................................74

SECTION 9.    AGENTS ................................................................................................74

9.1    Appointment of Agents ........................................................................................74
9.2    Powers and Duties ................................................................................................75
9.3    General Immunity .................................................................................................75
9.4    Agents Entitled to Act as Lender ..........................................................................76
9.5    Lenders' Representations, Warranties and Acknowledgment ..............................76
9.6    Right to Indemnity ...............................................................................................77
9.7    Successor Agents ..................................................................................................77
9.8    Security Documents and Guaranty .......................................................................78

SECTION 10.    MISCELLANEOUS ...............................................................................79

10.1    Notices .................................................................................................................79
10.2    Expenses ..............................................................................................................79
10.3    Indemnity, WAIVER OF PUNITIVE DAMAGES .............................................80
10.4    Amendments and Waivers; Consents ...................................................................82
10.5    Successors and Assigns; Participations ................................................................83
10.6    Independence of Covenants ..................................................................................86
10.7    Survival of Representations, Warranties and Agreements; Termination .............86
10.8    No Waiver; Remedies Cumulative .......................................................................87
10.9    Marshalling; Payments Set Aside .........................................................................87
10.10    Severability ..........................................................................................................87
10.11    Obligations Several; Independent Nature of Lenders' Rights ..............................87
10.12    Headings ...............................................................................................................87
10.13    APPLICABLE LAW ............................................................................................87
10.14    CONSENT TO EXCLUSIVE JURISDICTION .................................................88
10.15    WAIVER OF JURY TRIAL ................................................................................88
10.16    Confidentiality ......................................................................................................89
10.17    Usury Savings Clause ...........................................................................................90
10.18    Counterparts .........................................................................................................90
10.19    Effectiveness ........................................................................................................90
10.20    USA Patriot Act Notice .......................................................................................90
10.21    Order .....................................................................................................................91

A/73173405.11

**APPENDICES:**  A   Commitments
                 B   Notice Addresses

**SCHEDULES:**  4.7    Other Obligations and Restrictions
                4.9    Litigation
                4.11   ERISA Plans and Liabilities
                4.13   Names and Places of Business
                4.14   Subsidiaries
                4.17   Taxes
                4.19   Defaults
                4.21   Insurance
                6.1(g)  Outstanding Indebtedness
                6.1(h)  Indebtedness of Certain Foreign Subsidiaries
                6.1(q)  Guarantee Obligations in respect of Joint Ventures
                6.5(e)  Specified Assets
                6.5(m) Dispositions in connection with accommodation agreements
                6.7    Investments

**EXHIBITS:**  A   Funding Notice
                B   Note
                C   Compliance Certificate
                D   Assignment Agreement
                E   Certificate Regarding Non Bank Status
                F   Closing Date Certificate
                G   Counterpart Agreement

A/73173405.11

# SENIOR SECURED SUPER PRIORITY PRIMING DEBTOR IN POSSESSION CREDIT AND GUARANTY AGREEMENT

This **SENIOR SECURED SUPER PRIORITY PRIMING DEBTOR IN POSSESSION CREDIT AND GUARANTY AGREEMENT**, dated as of November [__], 2009, is entered into by and among **VISTEON CORPORATION**, a Delaware corporation, as a debtor and a debtor in possession ("**BORROWER**"), and certain Subsidiaries of Borrower, who are also debtors and debtors in possession, as Guarantors, the Lenders (as defined below) party hereto from time to time, **WILMINGTON TRUST COMPANY** ("**Wilmington**"), as Administrative Agent for such Lenders (together with its permitted successor in such capacity, "**Administrative Agent**").

## RECITALS:

**WHEREAS,** capitalized terms used in these Recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

**WHEREAS,** on May 28, 2009 (the "**Petition Date**"), the Borrower and each of the Guarantors filed a petition under Chapter 11 of the Bankruptcy Code (the "**Case**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

**WHEREAS,** the Borrower and each of the Guarantors has continued to operate its business as a debtor and debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS,** before the Petition Date, Borrower entered into that certain Credit Agreement, dated as of August 14, 2006 (as amended, restated, supplemented or otherwise modified from time to time, the "**Prepetition ABL Credit Agreement**"), among Borrower and certain of its Subsidiaries, as borrowers (in such capacity, the "**Prepetition ABL Borrowers**"), the lenders from time to time party thereto (the "**Prepetition ABL Lenders**"), and JPMorgan Chase Bank, N.A., as administrative agent for the Prepetition ABL Lender (in such capacity, the "**Prepetition ABL Agent**"), pursuant to which the ABL Lender extended credit to the Prepetition ABL Borrower on the terms set forth therein;

**WHEREAS,** before the Petition Date, Borrower entered into that certain Amended and Restated Credit Agreement, dated as of April 10, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "**Prepetition Term Loan Agreement**", and together with the Prepetition ABL Credit Agreement, the "**Prepetition Credit Agreements**"), among Borrower, as borrower (in such capacity, the "**Prepetition Term Borrower**", and together with the Prepetition ABL Borrowers, the "**Prepetition Borrower**"), the lenders from time to time party thereto (the "**Prepetition Term Lenders**", and together with the Prepetition ABL Lenders, the "**Prepetition Lenders**",), and Wilmington Trust Company (as successor to JPMorgan Chase Bank, NA), as administrative agent for the Prepetition Term Lenders (in such capacity, the "**Prepetition Term Agent**"), pursuant to which the Term Lenders extended credit to the Prepetition Term Borrower on the terms set forth therein;

**WHEREAS,** before the Petition Date, Prepetition ABL Borrower entered into that certain Pledge and Security Agreement dated as of August 14, 2006 (as amended, restated,

supplemented or otherwise modified from time to time), among Prepetition ABL Borrowers and the Prepetition ABL Agent (the "**Prepetition ABL Security Documents**");

WHEREAS, before the Petition Date, Prepetition Term Borrower and certain subsidiaries of Prepetition Term Borrower (the "**Prepetition Term Guarantors**") entered into that certain Guarantee and Collateral Agreement, dated as of June 13, 2006 (as amended, restated, supplemented or otherwise modified from time to time, the "**Prepetition Term Security Documents**", and together with the Prepetition ABL Security Documents, the "**Prepetition Security Documents**");

WHEREAS, as of the Petition Date, the Prepetition Lenders under the Prepetition Credit Agreements are owed approximately $1,500,000,000 in obligations incurred directly by the Prepetition Borrowers (plus all accrued and unpaid interest thereon, unpaid fees, costs and expenses in respect thereof,) (collectively, the "**Prepetition Lender Debt**");

WHEREAS, the Borrower has requested that the Lenders referred to herein provide financing to the Borrower consisting of a multiple-draw term loan (the "**Facility**") in the principal amount of $150,000,000, with an initial advance thereunder of at least $75,000,000 (the "**Initial Term Advance**") and one additional advance thereunder of up to the remainder of $150,000,000 after the Initial Term Advance is made, pursuant to the terms of this Agreement, and advanced to the Borrower pursuant to Sections 364(c) and (d) of the Bankruptcy Code in order to provide working capital for the Borrower, to fund capital expenditures and for other general corporate purposes in accordance with the Budget (as defined below);

WHEREAS, the Lenders have indicated their willingness to provide the Facility to the Borrower, all on terms and conditions set forth herein and in the other Loan Documents and in accordance with Sections 364(c) and (d) of the Bankruptcy Code, so long as:

(A)     such postpetition credit obligations are (i) subject in priority only to certain Liens and the Carve Out as hereinafter provided, (ii) except for Excluded Collateral, secured by Liens on all property, rights and interests, real and personal, tangible and intangible, of the Borrower and the Guarantors, whether now owned or hereafter acquired, and (iii) given superpriority administrative claim status (subject to the Carve Out) as provided in the Final Order, and

(B)     the Prepetition Term Lenders receive certain adequate protection as set forth in the Final Order for use of cash collateral, the diminution in value of the Prepetition Term Loan Priority Collateral from and after the date of the entry of the Final Order and the priming of their prepetition Liens, in each case securing, to the extent of such diminution, the obligations of the Prepetition Borrower and the Prepetition Guarantors in respect of the Prepetition Term Loan Agreement; and

WHEREAS, the Borrower and the Guarantors have agreed to provide such collateral security, superpriority claims and adequate protection subject to the approval of the Bankruptcy Court;

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

# SECTION 1. DEFINITIONS AND INTERPRETATION

**1.1    Definitions.**    The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"**ABL Cash Collateral Order**" means that certain Amended Seventh Supplemental Interim Order (I) Authorizing the Use of Cash Collateral Under 11 U.S.C. § 363; (II) Granting Adequate Protection Under 11 U.S.C. §§ 361, 362 and 363 and (III) Scheduling a Final Hearing Under Bankruptcy Rule 4001(B), as the same be amended, restated, replaced or supplemented from time to time.

"**Accommodation Agreements**" as defined in the ABL Cash Collateral Order.

"**Act**" as defined in Section 10.20.

"**Actual Cash Flows and Collateral Base Report**" as defined in Section 5.2(ii).

"**Administrative Agent**" as defined in the preamble hereto.

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with") of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the Capital Stock having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise. Notwithstanding the foregoing, none of the Administrative Agent, the Lenders, nor any of their respective Affiliates, shall be considered Affiliates of any Credit Party for purposes of this Agreement.

"**Agreement**" means this Senior Secured Super Priority Priming Debtor in Possession Credit and Guaranty Agreement, as it may be amended, supplemented or otherwise modified from time to time.

"**Applicable Margin**" means, with respect to the Loans, 6.50% per annum.

"**Asset Sale**" means any Disposition of property or series of related Dispositions (excluding Dispositions permitted under Section 6.5 (other than clauses (e), (i), and (n) thereof) of property that yields gross proceeds to any Credit Party (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-cash proceeds) in excess of $2,500,000.

"**Assignment Agreement**" means an Assignment and Assumption Agreement substantially in the form of Exhibit D, with such amendments or modifications as may be approved by Administrative Agent and the Borrower.

"**Authorized Officer**" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president or one of

its vice presidents (or the equivalent thereof), manager of a limited liability company, and such Person's chief financial officer, treasurer, assistant treasurer, secretary or assistant secretary.

"**Avoidance Actions**" means avoidance actions of the Credit Parties under Chapter 5 or Section 724(a) of the Bankruptcy Code (and proceeds thereof).

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy" from time to time in effect.

"**Bankruptcy Court**" as defined in the recitals hereto.

"**Beneficiary**" means each of Administrative Agent and each Lender, and collectively, the "**Beneficiaries**".

"**Borrower**" as defined in the preamble hereto.

"**Borrowing Date**": any Business Day specified by the Borrower as a date on which the Borrower requests the Lenders to make Loans hereunder.

"**Budget**" as defined in Section 3.1(e), which reference shall include any amendment thereto made with the consent of the Required Lenders and filed with the Bankruptcy Court.

"**Budget Variance Report**" as defined in Section 5.2(iv).

"**Business**" as defined in Section 4.12(ii).

"**Business Day**" means (i) any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close and (ii) as used in the definitions of "Base Eurodollar Rate" and "Monthly Payment Date," the term "Business Day" shall mean any day which is a Business Day described in clause (i) and which is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"**Capital Expenditures**" means, for any period, with respect to any Person, the aggregate of all expenditures by such Person and its Subsidiaries for the acquisition or leasing (pursuant to a capital lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) that should be capitalized under GAAP on a consolidated balance sheet of such Person and its Subsidiaries. Notwithstanding the foregoing, Capital Expenditures shall not include, without duplication: (a) the consideration for any Permitted Investments; (b) capital expenditures recorded as result of the consummation of any sale-leaseback transaction permitted hereunder; (c) capital expenditures in respect of the purchase price of equipment to the extent the consideration therefor consists of any combination of (i) equipment traded in at the time of such purchase pursuant to a Disposition permitted under Section 6.5(a) and (ii) the proceeds of a concurrent Disposition pursuant to Section 6.5(a) of equipment, in each case, in the ordinary course of business; (d) interest capitalized in respect of capital expenditures and (e) expenditures that are

4

accounted for as capital expenditures of such Person and that actually are paid for by a third party (excluding any Group Member and for which no Group Member has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to such third party or any other Person (whether before, during or after such period).

"**Capital Lease Obligations**" means, as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**Carve Out**" means, at any time of determination, (a) allowed administrative expenses payable pursuant to 28 U.S.C. § 1930, (b) Chapter 7 trustee fees up to $25,000, and (c) Priority Professional Expenses.

"**Carve Out Trigger Notice**" as defined in the Final Order.

"**Case**" as defined in the recitals hereto.

"**Cash Collateral Orders**" means, collectively, the Term Loan Cash Collateral Order and the ABL Cash Collateral Order.

"**Cash Equivalents**" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition or, with respect to any Foreign Subsidiary, an equivalent obligation of the government of the country in which such Foreign Subsidiary transacts business, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits or overnight bank deposits having maturities of twelve months or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States or any state thereof having combined capital and surplus of not less than $250,000,000, and, with respect to any Foreign Subsidiary, time deposits, certificates of deposits, overnight bank deposits or bankers acceptances in the currency of any country in which such Foreign Subsidiary transacts business having maturities of twelve months or less from the date of acquisition issued by any commercial bank organized in the United States having capital and surplus in excess of $100,000,000 or, with respect to any Foreign Subsidiary, a commercial bank organized under the laws of another country in which such Foreign Subsidiary transacts business having total assets in excess of $100,000,000 (or its foreign currency equivalent); (c) commercial paper of an issuer rated at least A-1 (or the equivalent thereof) by S&P or P-1 (or the equivalent thereof) by Moody's, or carrying an

equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within twelve months from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of twelve months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; (g) deposits available for withdrawal on demand with commercial banks organized in the United States having capital and surplus in excess of $100,000,000 or, with respect to any Foreign Subsidiary, a commercial bank organized under the laws of any other country in which such Foreign Subsidiary transacts business having total assets in excess of $100,000,000 (or its foreign currency equivalent); (h) money market mutual or similar funds that invest exclusively in assets satisfying the requirements of clauses (a) through (g) of this definition; or (i) money market funds that (x) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended, (y) are rated AAA by S&P and Aaa by Moody's and (z) have portfolio assets of at least $5,000,000,000.

"**Change in Law**" shall mean the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"**Change of Control**" means (i) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act) shall become, or obtain rights (whether by means of warrants, options or otherwise) to become, the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act), directly or indirectly, of more than 50% of the outstanding common stock of the Borrower, or (ii) the board of directors of the Borrower shall cease to consist of a majority of Continuing Directors.

"**Closing Date**" means the date on which the first Loan is made.

"**Closing Date Certificate**" means a Closing Date Certificate substantially in the form of Exhibit F.

"**Code**": the Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" means, collectively, all of the real, personal and mixed property (including Capital Stock) in which Liens are purported to be created pursuant to the Security Documents and/or the Final Orders as security for the Obligations, but excluding the Excluded Collateral.

6

"**Collateral Base**" as defined in the ABL Cash Collateral Order.

"**Commitment**" means, as to each Lender, its obligation to make Term Loans to the Borrower pursuant to Section 2.1 in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Appendix A under the caption "Term Loan Commitments", as such amount may be adjusted from time to time in accordance with this Agreement.

"**Commitment Expiration Date**" means the earliest of (a) the date of borrowing of the Subsequent Term Loan, (b) the date occurring 20 calendar days prior to the Maturity Date, and (c) the date the Commitment is terminated pursuant to Section 8.1.

"**Commonly Controlled Entity**": an entity, whether or not incorporated, that is under common control with the Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes the Borrower and that is treated as a single employer under Section 414 of the Code.

"**Compliance Certificate**" means a Compliance Certificate substantially in the form of Exhibit C.

"**Consolidated**" refers to the consolidation of Borrower or any other Credit Party, in accordance with GAAP, with its consolidated subsidiaries in accordance with GAAP. References herein to a Person's Consolidated financial statements, financial position, financial condition, liabilities, etc. refer to the consolidated financial statements, financial position, financial condition, liabilities, etc. of such Person and its consolidated subsidiaries in accordance with GAAP.

"**Continuing Directors**" means the directors of the Borrower on the Closing Date and each other director, if, in each case, such other director's nomination for election to the board of directors of the Borrower is recommended by the committee of the board of directors designated to make such recommendations; provided that such committee has been appointed by at least 51% of the then Continuing Directors.

"**Contractual Obligation**" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its property is bound.

"**Counterpart Agreement**" means a Counterpart Agreement substantially in the form of Exhibit G delivered by a Credit Party pursuant to Section 5.12.

"**Credit Extension**" means the making of a Loan.

"**Creditors' Committee**" means the Official Unsecured Creditors' Committee which has been appointed by the United States Trustee in relation to the Case.

"**Credit Party**" means Borrower and each Guarantor.

7

**"Current Financial Statements"** means (i) the audited Consolidated financial statements of the Borrower for the year ended December 31, 2008, as reflected in its Form 10-K filed with respect to the same period; (ii) the interim, unaudited Consolidated financial statements of the Borrower for the fiscal quarter ended June 30, 2009, as reflected in the Borrower's Form 10-Q filed with respect to the same period; and (iii) the unaudited, management-prepared Consolidated financial statements for the fiscal quarter ended September 30, 2009.

**"Default"** means an Event of Default or a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

**"Disposition"**: with respect to any property, any sale, lease, sale and leaseback, assignment, conveyance, or other transfer thereof. The terms "Dispose" and "Disposed of" shall have correlative meanings.

**"Distribution"** means (i) any dividend or other distribution made by a Credit Party on or in respect of any Capital Stock issued by Credit Party, or (ii) any payment made by a Credit Party to purchase, redeem, acquire or retire any Capital Stock in such Credit Party.

**"Dollars"** and the sign **"$"** mean the lawful money of the United States of America.

**"Domestic Subsidiary"**: any Subsidiary of the Borrower organized under the laws of any jurisdiction within the United States.

**"Effective Rate"** means, at any time of determination, the per annum rate equal to the Eurodollar Rate plus the Applicable Margin; provided that in no event shall the Effective Rate exceed the Highest Lawful Rate.

**"Eligible Assignee"** means (x) any Lender or any Affiliate of any Lender, and (y) any Related Fund or any commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act); provided, that none of the following shall be considered Eligible Assignees: (i) any Credit Party or any Affiliate of any Credit Party, (ii)any Person other than a Person described in clause (x) or (y) unless consented to in writing by the Borrower, and (iii) any natural Person.

**"Environmental Laws"** means any and all past, present, current or future foreign or domestic, federal or state (or any subdivision of any of them) statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other requirements of Governmental Authorities relating to (i) environmental matters, including those relating to air, water, surface water, groundwater, soil, or any other environmental media, any Hazardous Materials Activity, natural resources, animals or plants, flora or fauna, ecosystems, or any other living species and their habitat, including those that are endangered, threatened, or otherwise protected by Law; (ii) the generation, use, storage, transportation or disposal of Hazardous Materials; or (iii) occupational safety and health, industrial hygiene, land use or the protection of human, plant or animal health or welfare, in any manner applicable to Borrower or any of its Subsidiaries or any of their respective properties.

8

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto, together with all rules and regulations promulgated with respect thereto.

"**Eurocurrency Reserve Requirements**" means, for any day as applied to a Loan, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day (including basic, supplemental, marginal and emergency reserves) under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) maintained by a member bank of the Federal Reserve System.

"**Eurodollar Base Rate**" means, with respect to each day during each Interest Period pertaining to a Loan, the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such Interest Period appearing on Page 3750 of the Telerate screen as of 11:00 A.M., London time, two Business Days prior to the beginning of such Interest Period. In the event that such rate does not appear on Page 3750 of the Telerate screen (or otherwise on such screen), the "Eurodollar Base Rate" shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be selected by the Administrative Agent or, in the absence of such availability, by reference to the rate at which the Administrative Agent is offered Dollar deposits at or about 11:00 A.M., New York City time, two Business Days prior to the beginning of such Interest Period in the interbank eurodollar market where its eurodollar and foreign currency and exchange operations are then being conducted for delivery on the first day of such Interest Period for the number of days comprised therein.

"**Eurodollar Rate**": with respect to each day during each Interest Period pertaining to a Loan, a rate per annum determined for such day in accordance with the following formula (rounded upward to the nearest 1/100th of 1%):

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

; provided, however, that, notwithstanding the foregoing, in no event shall the Eurodollar Rate be less than 3.00% per annum.

"**Event of Default**" as defined in Section 8.1.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Collateral**" means, with respect to Excluded Foreign Subsidiaries, any portion of the voting Capital Stock issued by such Excluded Foreign Subsidiaries in excess of 65% of the issued and outstanding voting stock of such Excluded Foreign Subsidiary.

"**Excluded Entities**": Atlantic Automotive Components, LLC and AutoNeural Systems, LLC, any other Subsidiary created after the Closing Date in connection with the establishment of a Joint Venture with any Person (other than a Group Member).

9

"**Excluded Foreign Subsidiary**": any Foreign Subsidiary in respect of which either (a) the pledge of more than 65% of the voting Capital Stock of such Subsidiary as Collateral or (b) the guaranteeing by such Subsidiary of the Obligations, would, in the good faith judgment of the Borrower, result in adverse tax consequences to the Borrower or its Subsidiaries.

"**Facility**" as defined in the recitals hereto.

"**Fee Letter**" as defined in Section 2.7.

"**Final Order**" as defined in Section 3.1(k).

"**Fiscal Year**" means the fiscal year of Borrower and its Subsidiaries ending on December 31 of each calendar year.

"**Foreign Stock Holding Company**" means any Domestic Subsidiary or any Foreign Subsidiary (provided that such Foreign Subsidiary shall be considered a Domestic Subsidiary for purposes of the Guarantee and Collateral Agreement and Section 5.15 of this Agreement) of the Borrower created or acquired to hold the Capital Stock of first-tier Foreign Subsidiaries. It is understood and agreed that each such Subsidiary shall be a passive holding company (with the only assets of such Subsidiary being the Capital Stock of first-tier Foreign Subsidiaries) and each such Subsidiary shall be subject to the requirements of Section 6.15. It is further understood and agreed that Foreign Stock Holding Companies shall not be Excluded Foreign Subsidiaries for purposes of this Agreement.

"**Foreign Subsidiary**" means any Subsidiary of the Borrower that is not a Domestic Subsidiary.

"**Funding Notice**" means a notice substantially in the form of Exhibit A.

"**GAAP**" means generally accepted accounting principles in the United States as in effect from time to time.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"**Governmental Authorization**" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Group Members**": the collective reference to the Borrower and its Subsidiaries.

"**Guarantee Obligation**" as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing Person that guarantees or in effect guarantees, or which is given to induce the creation of a separate obligation by another Person (including any bank under any letter of credit) that guarantees or in effect guarantees, any Indebtedness, leases, dividends or other

10

obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection or standard contractual indemnities, in each case in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"**Guaranteed Obligations**" as defined in Section 7.2(a).

"**Guarantor**" means each present and future Subsidiary of Borrower that is a party to this Agreement on the Closing Date.

"**Guaranty**" means the guaranty of each Guarantor set forth in Section 7.2.

"**Halla Climate Control**" means Halla Climate Control Corporation, a Korean corporation.

"**Hazardous Materials**" means any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products or any hazardous or toxic substances, materials or wastes, defined as such in or under any Environmental Law, including asbestos, polychlorinated biphenyls and urea-formaldehyde insulation.

"**Hazardous Materials Activity**" means any past, current, or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under

such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

"**Indebtedness**" of any Person at any date, means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables and accrued expenses, in each case in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, (g) the liquidation value of all mandatorily redeemable preferred Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, and (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor. The amount of Indebtedness of any Person for purposes of clause (i) shall be deemed to be equal to the lesser of (x) the aggregate unpaid amount of such Indebtedness and (y) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**Indemnified Liabilities**" as defined in Section 10.3.

"**Indemnitee**" as defined in Section 10.3.

"**Ineligible Professional Expenses**" means (i) after the first business day following delivery by the Administrative Agent, Prepetition Term Agent or Prepetition ABL Agent of the Carve Out Trigger Notice, any success, transaction or completion fee or any other similar fee of any Person retained by the Creditors' Committee, and (ii) at all times, fees or expenses incurred by any Persons, including a Creditors' Committee or any Debtor in: (a) preventing, hindering or delaying the Administrative Agent's enforcement or realization upon any of the Collateral once an Event of Default has occurred (it being understood that litigation to determine if an Event of Default has occurred during a Remedies Notice Period shall not constitute such prevention, hindrance or delay), (b) using or seeking to use cash collateral not in compliance with the Budget and the Final Order or Term Loan Cash Collateral Order, or selling any other Collateral (except as otherwise provided for in the Final Order or in this Agreement), in each case without the Required Lenders' consent, (c) incurring Indebtedness not permitted herein and (d) objecting to or contesting in any manner, or in raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of the Obligations or the obligations arising under the Prepetition Term Loan Agreement or security interests with respect

12

thereto or any other rights or interests of the Administrative Agent, Lenders, Prepetition Term Agent or the Prepetition Term Lenders, or in asserting any claims or causes of action, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against the Administrative Agent, Lenders, Prepetition Term Agent or the Prepetition Term Lenders.

"**Initial Term Loan**" means the Loan made from the Lenders to Borrower on the Closing Date in the aggregate principal amount of at least $75,000,000.

"**Insolvency**": with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"**Insolvent**": pertaining to a condition of Insolvency.

"**Intercreditor Agreement**" means the Intercreditor Agreement dated as of June 13, 2006 among, the Borrower, certain Guarantors, the Prepetition ABL Agent, the Prepetition Term Agent and any other Persons from time to time parties thereto, as amended.

"**Interest Payment Date**" means as to any Loan, (a) the last day of such Interest Period, and (b) the date of any repayment or prepayment made in respect thereof.

"**Interest Period**" means, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Loan and ending one or three months thereafter, as selected by the Borrower in its notice of borrowing or continuation, as the case may be, given with respect thereto; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Loan and ending one or three months thereafter, as selected by the Borrower by irrevocable notice to the Administrative Agent not later than 11:00 A.M., New York City time, on the date that is three Business Days prior to the last day of the then current Interest Period with respect thereto; provided that, all of the foregoing provisions relating to Interest Periods are subject to the following:

(i) if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii) the Borrower may not select an Interest Period under the Facility that would extend beyond the date final payment is due on the Term Loans; and

(iii) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month.

"**Investment**" means any advance, loan, extension of credit (including, without limitation, by way of guaranty) or capital contribution to, or purchase any Capital Stock, bonds,

notes, debentures or other debt securities of, or any assets constituting a business unit of, any Person.

"**Joint Venture**" means any Person a portion (but not all) of the Capital Stock of which is owned by a Group Member but which is not a Wholly Owned Subsidiary and which is engaged in a business which is similar to or complementary with the business of the Group Member as permitted under Section 6.9 of this Agreement.

"**Law**" means any statute, law, regulation, ordinance, rule, treaty, judgment, order, decree, or other governmental restriction of the United States or any state, province or political subdivision thereof or of any foreign country or any department, province or other political subdivision thereof, in each case applicable to or binding upon such Person or any of its properties or to which such Person or any of its property is subject.

"**Lender**" means (a) at any time on or prior to the Closing Date, any Lender that has a Term Loan Commitment at such time and (b) at any time after the Closing Date, any Lender that holds Term Loans at such time, and each Eligible Assignee that becomes a party hereto pursuant to an Assignment Agreement or pursuant to an instrument of accession agreement in form and substance satisfactory to the Administrative Agent.

"**Liabilities**" means, as to any Person, all indebtedness, liabilities and obligations of such Person, whether matured or unmatured, liquidated or unliquidated, primary or secondary, direct or indirect, absolute, fixed or contingent, and whether or not required to be considered pursuant to GAAP.

"**Lien**": any mortgage, pledge, hypothecation, assignment, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"**Loan**" means any Term Loan or advance under the Facility.

"**Loan Document**" means any of this Agreement, the Notes (if any), the Security Documents, the Fee Letter and all other certificates, documents, instruments or agreements executed and delivered by a Credit Party for the benefit of Administrative Agent or any Lender in connection herewith.

"**Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of such Lender's Term Loans plus such Lender's Term Loan Commitment or if the Term Loan Commitments have been terminated, the outstanding amount of such Lender's Term Loans.

"**Margin Stock**" as defined in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, property, operations or financial condition of the Borrower and its Subsidiaries taken as a whole;

14

(b) the ability of the Credit Parties, taken as a whole, to fully and timely perform when due their, Obligations; (c) the legality, validity, binding effect or enforceability against the Credit Parties, taken as a whole, of a Loan Document to which it is, or they are, as the case may be, a party; or (d) the rights or remedies of the Administrative Agent, any Lender or any Secured Party under any Loan Document; provided that this shall exclude the commencement of the Case and events that would typically result from the commencement of the Case.

"**Maturity Date**" means the earliest to occur of: (i) May [___], 2010; provided, however, that so long as no Default or Event of Default has occurred and is continuing at such time, the Borrower shall have the option to extent the Maturity Date to August [___], 2010 without the consent of the Administrative Agent or Lenders, (ii) the effective date of the Borrower's Plan of Reorganization, (iii) the date on which Borrower has consummated, pursuant to Section 363 of the Bankruptcy Code and a final order of the Bankruptcy Court, a sale or sales of all or substantially all of Borrower's assets; and (iv) the date of termination of the Lenders' obligations to make Loans or permit existing Loans to remain outstanding pursuant to Section 8.1.

"**Moody's**" means Moody's Investor Services, Inc., or its successor.

"**Multiemployer Plan**" means a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"**NAIC**" means The National Association of Insurance Commissioners, and any successor thereto.

"**Net Cash Proceeds**": in connection with any Asset Sale or any Recovery Event, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received), net of attorneys' fees, accountants' fees, investment banking fees, amounts required to be applied to the repayment of Indebtedness secured by a Lien that is senior to the Obligations and expressly permitted hereunder on any asset that is the subject of such Asset Sale or Recovery Event (other than any Lien pursuant to a Security Document), [pension or OPEB liability paid or reserved with respect to any such assets], and other customary fees and expenses actually incurred in connection therewith and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements) and any reserve established in accordance with GAAP with respect to liabilities associated with such Asset Sale (provided that "Net Cash Proceeds" shall include any such amounts received upon the reversal of any such reserve).

"**Non-Excluded Taxes**" as defined in Section 2.14(a).

"**Non-US Lender**" as defined in Section 2.14(d).

"**Note**" means a promissory note in the form of Exhibit B evidencing one or more Loans, as such note may be amended, supplemented or otherwise modified from time to time.

"**Obligation Category**" as defined in Section 2.12.

"**Obligations**" means the unpaid principal of and interest on (including interest accruing after the maturity of the Loans) the Loans and all other obligations and liabilities of the Borrower to the Administrative Agent or to any Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement or any other Loan Document, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by the Borrower pursuant hereto) or otherwise.

"**Order**" means the Final Order.

"**Organizational Documents**" means (i) with respect to any corporation, its certificate or articles of incorporation or organization, as amended, and its by-laws, as amended, (ii) with respect to any limited partnership, its certificate of limited partnership, as amended, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as amended, and (iv) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended. In the event any term or condition of this Agreement or any other Loan Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"**Other Taxes**" means any and all present or future stamp, registration, recording, filing, transfer, documentary, excise or property Taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to or in connection with, any Loan Document.

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Funding Rules**" means the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Single Employer Plans and set forth in, with respect to plan years ending prior to the effective date as to such Single Employer Plan of the Pension Protection Act of 2006, Section 412 of the Code and Section 302 of ERISA each as in effect prior to the Pension Protection Act of 2006 and, thereafter, Sections 412 and 430 of the Code and Sections 302 and 303 of ERISA.

"**Permitted Investments**" means:

(a)     extensions of trade credit granted in the ordinary course of business

(b)     investments in Cash Equivalents in the ordinary course of business in connection with the cash management activities of the Borrower and its Subsidiaries;

(c)     Guaranteed Obligations permitted by Section 6.1;

(d)     loans and advances to employees of any Group Member in the ordinary course of business (including for travel, entertainment and relocation expenses) in an aggregate amount for all Group Members not to exceed $1,000,000 at any one time outstanding;

(e)     so long as no Default or Event of Default would result therefrom, intercompany Investments among the Credit Parties;

(f)     (i) so long as consistent with orders of the Bankruptcy Court, and so long as no Default or Event of Default would result therefrom, intercompany Investments by Subsidiaries which are not Credit Parties in Credit Parties and (ii) intercompany Investments by Subsidiaries which are not Credit Parties in other Subsidiaries which are not Credit Parties;

(g)     (i) intercompany Investments among Foreign Subsidiaries in accordance Sections 6.1(j) and (t) and (ii) between the Securitization Subsidiary and Foreign Subsidiaries;

(h)     intercompany loans from Credit Parties to Subsidiaries which are not Credit Parties in an aggregate outstanding amount not to exceed the sum (such sum, the "**Non-Credit Party Intercompany Debt Basket**") of (i) $65,000,000, and (ii) intercompany loans or cash dividends from Subsidiaries which are not Credit Parties received by Credit Parties after the Closing Date and repayment in cash by Subsidiaries which are not Credit Parties of intercompany loans owing to any Credit Party (it being understood that such intercompany loans may not be repaid or prepaid to the extent that such prepayment would cause the Investment Basket to be a negative amount);

(i)     Investments in an aggregate outstanding amount (including assumed Indebtedness) not to exceed $10,000,000;

(j)     Investments resulting from (i) the write-off of intercompany loans in connection with the permitted liquidation of any Subsidiary, and/or (ii) as reasonably required by orders of the Bankruptcy Court.

(k)     Investments existing as of the Closing Date as set forth on Schedule 6.7 and any modification, replacement, renewal or extension thereof provided that the original amount of such Investments are not increased except as otherwise permitted by Section 6.7;

(l)     Investments resulting from entering into Swap Agreements permitted by Section 6.3;

(m)     Investments in the ordinary course of business consisting of endorsements of instruments for collection or deposit;

(n)     Investments received in connection with the bankruptcy or reorganization of any Person or in settlement of obligations of, or disputes with, any Person arising in the ordinary course of business and upon foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(o)     advances of payroll payments to employees in the ordinary course of business consistent with orders of the Bankruptcy Court;

17

(p)     Guarantees by any Borrower or any Subsidiary of leases, contracts, or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business; provided that the aggregate amount of the Guarantee Obligations in respect thereof, together with any outstanding Guarantee Obligations outstanding under Section 6.1(f), shall not exceed $30,000,000 at any time;

(q)     Investments arising out of the receipt by the Borrower or any of its Subsidiaries of promissory notes and non-cash consideration for the Disposition of assets permitted under Section 6.5, provided that the non-cash consideration for any such Disposition shall not exceed 20% of the total consideration therefor;

(r)     Investments the consideration for which consists of the issuance of newly issued shares of the Borrower;

(s)     Capital Expenditures permitted under Section 6.7;

(t)     Investments in assets useful in the business of the Borrower and its Subsidiaries made by the Borrower or any of its Subsidiaries with proceeds of any Asset Sale which is not required to be paid to Lenders in accordance with Section 2.9; and

(u)     Guarantee Obligations permitted under 6.1;

(v)     the acquisition of additional Capital Stock (or contributions to) of Joint Ventures (other than Halla Climate Control Corporation) pursuant to terms reasonably satisfactory to the Administrative Agent in an amount not to exceed $10,000,000 in the aggregate after the Closing Date;

(w)     Investments consisting of the retained interest (including, without limitation, subordinated Indebtedness) of sellers of Receivables in connection with any Permitted Receivables Financing;

(x)     (i) Investments received in connection with the sale, transfer or other disposition of Receivables, any Related Security and any Other Securitization Assets by the Securitization Subsidiary and (ii) the purchase or other acquisition by, or transfer to the Securitization Subsidiary of Receivables, any Related Security and any Other Securitization Assets, in each case in connection with the origination, servicing or collection of such Receivables, Related Security or Other Securitization Assets; and

(y)     (i) Investments resulting from the write-down, write-off or forgiveness of Indebtedness owed to any Group Member to the extent approved by the Bankruptcy Court prior to the Closing Date and (ii) Investments resulting from the write-down, write-off or forgiveness of Indebtedness owed to any Group Member in amount not exceeding $33,000,000.

"**Permitted Liens**" means the Permitted Prior Liens and other Liens permitted by Section 6.2 or otherwise approved in writing by the Required Lenders.

"**Permitted Prior Liens**" means (i) valid, properly perfected and otherwise unavoidable Liens existing as of the Petition Date and having, as of the Petition Date, priority

over the Liens securing the Prepetition Lender Debt, and (ii) with respect to Prepetition ABL Priority Collateral, the Liens of the Prepetition ABL Agent.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"**Petition Date**" as defined in the recitals hereto.

"**Plan**" means at a particular time, any employee benefit plan that is covered by ERISA and in respect of which the Borrower or a Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"**Plan of Reorganization**" shall mean a plan of reorganization filed in the Case.

"**Post-Default Rate**" as defined in Section 2.6.

"**Prepetition ABL Agent**" as defined in the recitals hereto.

"**Prepetition ABL Priority Collateral**" shall have the meaning attributed to such term in the Intercreditor Agreement.

"**Prepetition Borrower**" as defined in the recitals hereto.

"**Prepetition Credit Agreements**" as defined in the recitals hereto.

"**Prepetition Lender Debt**" as defined in the recitals hereto.

"**Prepetition Lenders**" as defined in the recitals hereto.

"**Prepetition Term Agent**" as defined in the recitals hereto.

"**Prepetition Term Loan Priority Collateral**" shall have the meaning attributed to such term in the Intercreditor Agreement.

"**Principal Office**" means, for Administrative Agent, its "Principal Office" as set forth on Appendix B, or such other office as such Person may from time to time designate in writing to Borrower, Administrative Agent and each Lender.

"**Priority Professional Expenses**" means allowed (whenever such fees, costs and expenses may be allowed) and unpaid fees, costs and expenses of professionals retained in the Case pursuant to Sections 327, 328, 363 and 1103 of the Bankruptcy Code consisting of any attorneys, accountants, financial advisors, consultants and other Persons and firms retained by Borrower or the Creditors' Committee; provided, however, that (i) the term "Priority

19

Professional Expenses" shall not include any Ineligible Professional Expenses, and (ii) the amount of Priority Professional Expenses shall not exceed the Professional Expense Cap.

"**Professional Expense Cap**" means all unpaid fees, costs and expenses incurred by Professional Persons retained in the Case pursuant to Sections 327, 328, 363 and 1103 of the Bankruptcy Code (i) at any time before or on the first Business Day following delivery by the Administrative Agent, the Prepetition Term Agent or the Prepetition ABL Agent of a Carve Out Trigger Notice (which may only be delivered after the Termination Date referred to in the Final Order) and (ii) after the first Business Day following delivery of such Carve Out Trigger Notice, not exceeding in the case of this clause (ii) $15,000,000 in the aggregate, all to the extent allowed at any time.

"**Professional Fees**" means, to the extent allowed at any time, whether by interim order of the Bankruptcy Court, procedural order of the Bankruptcy Court, or otherwise, all unpaid fees and expenses incurred by Professional Persons.

"**Professional Persons**" means, collectively, persons or firms retained by the debtors in the Case pursuant to section 327, 328, or 363 and 1103 of the Bankruptcy Code by the debtors in the Case and by the Creditors' Committee.

"**Properties**" as defined in Section 4.12 (ii).

"**Pro Rata Share**" means, with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the aggregate Loan Exposure of all Lenders represented by such Lender's Loan Exposure at such time. If the commitment of each Lender to make Loans has been terminated pursuant to Section 8.1, or if the Term Loan Commitments have expired, then the Pro Rata Share of each Lender shall be determined based on such Lender's Pro Rata Share of the outstanding principal balance of the Loans at such time. The initial Pro Rata Shares of each Lender in respect of each of the Facility is set forth opposite the name of such Lender on Appendix A.

"**Receivables**": any indebtedness and other obligations owed to the Borrower or any relevant Subsidiary, or in which such party has a security interest or other interest, or any right of the Borrower or such Subsidiary to payment from or on behalf of an obligor, whether constituting an account, chattel paper, instrument or general intangible, arising in connection with the sale or lease of goods or the rendering of services by the Borrower or such Subsidiary, including, without limitation, the obligation to pay any finance charges, fees and other charges with respect thereto.

"**Recovery Event**": any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of any Group Member.

"**Register**" as defined in Section 2.4(b).

"**Related Fund**" shall mean, with respect to any Lender that is a fund or commingled investment vehicle that invests in bank loans, any other fund that invests in bank

loans and is managed or advised by the same investment advisor or fund manager as such Lender or by an Affiliate of such investment advisor or fund manager.

"**Related Security**": with respect to any Receivable, (a) all of the Borrower's (or the relevant Subsidiary's) interest, in any inventory and goods (including returned or repossessed inventory and goods), and documentation or title evidencing the shipment or storage of any inventory and goods (including returned or repossessed inventory and goods), relating to any sale giving rise to such Receivable, and all insurance contracts with respect thereto; (b) all other security interests or liens and property subject thereto from time to time purporting to secure payment of such Receivable, together with all UCC financing statements or similar filings and security agreements describing any collateral relating thereto; (c) all guaranties, letters of credit, letter of credit rights, supporting obligations, indemnities, insurance and other agreements or arrangements of whatever character from time to time supporting or securing payment of such Receivable or otherwise relating to such Receivable; (d) all service contracts and other contracts, agreements, instruments and other writings associated with such Receivable; (e) all records related to such Receivable or any of the foregoing; (f) all of the Borrower's or relevant Subsidiary's right, title and interest in, to and under the sales agreement and related performance guaranty and the like in respect of such Receivable; and (g) all proceeds of any of the foregoing.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the migration of any Hazardous Material through the air, soil, surface water or groundwater.

"**Released Party**" as defined in Section 2.18.

"**Releasing Party**" as defined in Section 2.18.

"**Remedies Notice Period**" as defined in Section 8.2.

"**Reorganization**": with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"**Reportable Event**": any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived under subsections .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Reg. § 4043.

"**Required Lenders**" means one or more Lenders having or holding Loan Exposure and representing more than fifty percent (50%) or more of the aggregate Loan Exposure of all Lenders.

"**S&P**" means Standard & Poor's Ratings Group, a division of The McGraw Hill Corporation, or its successor.

"**Secured Parties**" means the Persons to whom any Obligations are at any time owed.

21

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Security Documents**" means all security agreements, deeds of trust, mortgages, chattel mortgages, pledges, guaranties, and other security agreements or instruments now, heretofore, or hereafter delivered by any Credit Party to the Administrative Agent granting a lien on any property in connection with this Agreement or any transaction contemplated hereby to secure or guarantee the payment of any part of the Obligations or the performance of any Credit Party's other duties and obligations under the Loan Documents.

"**Single Employer Plan**" means any Plan that is covered by Title IV of ERISA, but that is not a Multiemployer Plan.

"**Specified Assets**" means the assets described on Schedule 6.5(e).

"**Standard Securitization Undertakings**" means representations, warranties, covenants and indemnities entered into by the Borrower or any Subsidiary which are reasonably customary in a securitization or other sales (in connection with financings of) and financings of Receivables and any Related Security, including, without limitation, those relating to the servicing of assets of such securitization or financing; provided that, in no event shall Standard Securitization Undertakings include any guarantee of indebtedness incurred in connection with the such securitization or such financing (other than (i) in the case of Section 6.1(t), guarantees of obligations of participating Foreign Subsidiaries and the Securitization Subsidiary in respect thereof by other Foreign Subsidiaries and the Securitization Subsidiary and (ii) in the case of Section 6.1(f), guarantees of obligations of participating Domestic Subsidiaries in respect thereof by the participating Domestic Subsidiaries).

"**Subsequent Term Loan**" means a Loan from the Lenders to Borrower after the Closing Date in the remaining aggregate principal amount of the unused Term Loan Commitment.

"**Subsidiary**" means, as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having more than 50% of the ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Superpriority Claim**" means a claim against any Borrower or any Guarantor or its respective estate in the Case which is an administrative expense claim having priority over (i) any or all allowed administrative expenses and (ii) unsecured claims now existing or hereafter arising, including, without limitation, administrative expenses of the kind specified in Section 503(b), 506(c) or 507(b) of the Bankruptcy Code.

"**Swap Agreement**" means (a) any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference

22

to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or any of its Subsidiaries shall be a "Swap Agreement" and (b) any agreement with respect to any transactions (together with any related confirmations) which are subject to the terms and conditions of, or are governed by, any master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other similar master agreement.

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomever; on whomever and wherever imposed, levied, collected, withheld or assessed; provided, "Tax on the overall net income" or "income Tax" of a Person shall be construed as a reference to a tax imposed by the jurisdiction in which that Person is organized or in which that Person's applicable principal office (and/or, in the case of a Lender, its lending office) is located or in which that Person (and/or, in the case of a Lender, its lending office) is deemed to be doing business on all or part of the net income, profits or gains (whether worldwide, or only insofar as such income, profits or gains are considered to arise in or to relate to a particular jurisdiction, or otherwise) of that Person (and/or, in the case of a Lender, its applicable lending office).

"**Term Loan**" means, at any time, the sum of (i) the aggregate amount of advances outstanding to Borrower under the Facility.

"**Term Loan Cash Collateral Order**" means that certain First Amended and Supplemental Stipulation, Agreement, and Final Order on Consent (I) Authorizing Use of Prepetition Term Loan Priority Collateral and Term Loan Cash Collateral Under 11 U.S.C. § 361; And (II) Granting Adequate Protection Under 11 U.S.C. §§ 361, 362, and 363, as the same may be amended, restated, replaced or supplemented from time to time.

"**Term Loan Commitment**" means: (a) as to any Lender, the aggregate commitment of such Lender to make Term Loans as set forth on Annex I to the Agreement or in the most recent Assignment Agreement executed by such Lender and (b) as to all Lenders, the aggregate commitment of all Lenders to make Term Loans, which aggregate commitment shall be One Hundred Fifty Million Dollars ($150,000,000) on the Closing Date, but which shall be reduced by Seventy-Five Million Dollars ($75,000,000) if the Subsequent Term Loan is not borrowed on or before the Commitment Expiration Date.

"**Thirteen Week Forecast**" as defined in Section 5.2(i).

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"**Uncertificated Foreign Jurisdiction**": the jurisdiction of organization of a Foreign Subsidiary to the extent the Capital Stock of such Foreign Subsidiary is uncertificated.

"**Variance**" as defined in Section 6.11.

"**VIHI**" means Visteon International Holdings Inc., a Delaware corporation.

"**Wholly Owned Foreign Subsidiary**" means any Wholly Owned Subsidiary of the Borrower which is not a Domestic Subsidiary.

"**Wholly Owned Subsidiary**" means as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares or other de minimis shares held by any Person, each as required by law) is owned by such Person directly and/or through other Wholly Owned Subsidiaries.

**1.2   Accounting Terms.**   Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP; provided that, if either the Borrower notifies the Administrative Agent that Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

**1.3   Interpretation, etc.**   (a) Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.  References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided.  The word "or" is not exclusive.

(b)    As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to any Group Member not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP, (ii) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (iii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iv) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, and (v) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

**1.4   Joint Preparation.**   This Agreement and the other Loan Documents have been reviewed and negotiated by sophisticated parties with access to legal counsel and no rule of construction shall apply hereto or thereto which would require or allow any Loan Document to be construed against any party because of its role in drafting such Loan Document.

24

## SECTION 2. LOANS

**2.1**     **Loans and Borrowing Mechanics.**

    (a)     <u>Loans.</u> Subject to the terms and conditions hereof, (i) on the Closing Date, each Lender agrees to make an Initial Term Loan to the Borrower, and (ii) thereafter, but prior to the Commitment Expiration Date, so long as the conditions set forth in Section 3.2 have been satisfied, within ten (10) days after receipt by the Administrative Agent of written request from the Borrower, each Lender agrees to make a Subsequent Term Loan (the loans referred to in clauses (i) and (ii), the "<u>Term Loans</u>"). Any amount borrowed with respect to the Term Loans and subsequently repaid or prepaid may not be reborrowed.

    (b)     <u>Payment on Maturity Date.</u> The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the aggregate unpaid principal amount of the Term Loans in cash on the Maturity Date.

    (c)     <u>Funding Notice.</u> Borrower shall deliver to Administrative Agent a fully executed Funding Notice as of the Closing Date or not later than 12:00 p.m. (New York City time) ten (10) Business Days prior to borrowing the Subsequent Term Loan. Promptly upon receipt by Administrative Agent of such Funding Notice, Administrative Agent shall notify each Lender of the proposed Subsequent Term Loan. Each Lender shall make its Loan available to Administrative Agent not later than 12:00 p.m. (New York City time) on the date specified in such Funding Notice, by wire transfer of same day funds in Dollars, at Administrative Agent's Principal Office. Upon satisfaction or waiver of the conditions precedent specified herein, Administrative Agent shall make the proceeds of the Loans available to Borrower on such date by causing an amount of same day funds in Dollars equal to the proceeds of all such Loans received by Administrative Agent from Lenders to be credited to such account as may be designated in writing to Administrative Agent by Borrower.

**2.2**     **Pro Rata Shares.** All Loans shall be made by Lenders simultaneously and proportionately to their respective applicable Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make a Loan requested hereunder nor shall any Commitment of any Lender be increased or decreased as a result of a default by any other Lender in such other Lender's obligation to make a Loan requested hereunder.

**2.3**     **Use of Proceeds.** The proceeds of the Loans shall be used in accordance with the Budget, and exclusively (i) to provide working capital for the Borrower, (ii) to fund capital expenditures, and (iii) for other general corporate purposes. No portion of the proceeds of any Credit Extension shall be used in any manner that causes or might cause such Credit Extension or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation thereof or to violate the Exchange Act.

**2.4    Evidence of Liabilities; Register; Lenders' Books and Records; Notes.**

(a)    _Lenders' Evidence of Liabilities_.  Each Lender shall maintain on its internal records an account or accounts evidencing the Liabilities of Borrower to such Lender, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof.  Any such recordation shall be conclusive and binding on Borrower, absent manifest error; provided, failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitments or Borrower's Obligations in respect of any applicable Loans; and provided, further, in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(b)    _Register_.  Administrative Agent shall maintain at its Principal Office a register for the recordation of the names and addresses of Lenders and the Commitments and Loans of each Lender from time to time (the **"Register"**).  The Register shall be available for inspection by Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice.  Administrative Agent shall record in the Register the Commitments and the Loans, and the interest, each repayment or prepayment thereon, and any such recordation shall be conclusive and binding on Borrower and each Lender, absent manifest error; provided, failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitments or Borrower's Obligations in respect of any Loan.

(c)    _Notes_.  If so requested by any Lender by written notice to Borrower (with a copy to Administrative Agent) at least two Business Days prior to the Closing Date, or at any time thereafter, Borrower shall execute and deliver to such Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of such Lender pursuant to Section 10.5) on the Closing Date (or, if such notice is delivered after the Closing Date, within five (5) days after Borrower's receipt of such notice) a Note or Notes to evidence such Lender's Loans.  Any such Note evidencing Loans under the applicable Commitment shall be in substantially the form of Exhibit B.

**2.5    Interest on Loans.**

(a)    Except as otherwise set forth herein, each Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined as of such day for the relevant Interest Period plus the Applicable Margin.

(b)    Interest shall be payable in arrears on each Interest Payment Date, provided that interest accruing pursuant to Section 2.6 shall be payable from time to time on written demand.

(c)    Interest payable on all Loans shall be computed on the basis of a 360-day year for the actual number of days elapsed in the period during which it accrues.  In

computing interest on any Loan, the date of the making of such Loan shall be included, and the date of payment of such Loan shall be excluded.

(d) The Administrative Agent shall as soon as practicable notify Borrower and the relevant Lenders of each determination of a Eurodollar Rate. Any change in the interest rate on a Loan resulting from a change in the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective. The Administrative Agent shall as soon as practicable notify Borrower and the relevant Lenders of the effective date and the amount of each such change in interest rate.

(e) Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on Borrower and the Lenders in the absence of manifest error. The Administrative Agent shall, at the request of Borrower, deliver to Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to paragraph (a) of this Section.

**2.6    Default Interest.**    Upon the occurrence and during the continuance of an Event of Default under Section 8.1(a), the principal amount of all Loans outstanding and, to the extent permitted by applicable law, any past due interest payments on the Loans or any past due fees or other amounts owed hereunder, shall thereafter bear interest payable on demand at a rate that is 2% per annum in excess of the Effective Rate with respect to the Loans (the "**Post-Default Rate**"). Payment of interest at the Post-Default Rate is not, however, a permitted alternative to timely payment, and acceptance of interest at the Post-Default Rate shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Administrative Agent or any Lender.

**2.7    Payments of Other Amounts**.

(a) Pursuant to those certain letter agreements (collectively, the "**Fee Letter**") dated the Closing Date between Borrower and the Administrative Agent, Borrower has promised to pay (i) to the Administrative Agent, for itself, and (ii) to each Lender, for itself, and in accordance with its Pro Rata Shares, certain amounts at the times agreed upon, and Borrower hereby repeats its promise to pay such amounts.

(b) As additional compensation to the Lenders, Borrower shall pay to Administrative Agent, for the ratable benefit of the Lenders, in arrears, on the first Business Day of each month prior to the Maturity Date and on the Maturity Date, a Fee for Borrower's non-use of available funds in an amount equal to 1.00% per annum (calculated on the basis of a 360-day year for actual days elapsed) multiplied by the difference between (x) the aggregate Term Loan Commitment for all Lenders and (y) the average for the period of the daily closing balances of the aggregate Term Loan outstanding during the period for which such Fee is due.

**2.8    Voluntary Prepayments; Reduction or Termination of the Commitments**.    (a) Borrower may at any time and from time to time prepay the Loans, in whole or in part, without

premium or penalty, upon irrevocable notice delivered to the Administrative Agent no later than 11:00 A.M., New York City time, three Business Days prior thereto, which notice shall specify the date and amount of prepayment; provided, that if a Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, Borrower shall also pay any amounts owing pursuant to Section 2.13. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid. Partial prepayments of Loans shall be in an aggregate principal amount of $1,000,000 or a whole multiple thereof. Any prepayment which is made as a result of any Default or Event of Default shall not constitute an optional prepayment for purposes of this Section 2.8. Any voluntary prepayments shall be subject to the terms of the Intercreditor Agreement.

(b)     Borrower may at any time upon at least five (5) days' prior written notice to Administrative Agent reduce in part, or terminate in full the undrawn portion of the Term Loan Commitment; provided that any such reduction shall be in an amount of not less than $25,000,000 and whole multiples of $5,000,000 (or such lesser amount or shall be equal to the undrawn portion of the Term Loan Commitment).

## 2.9    Mandatory Prepayments.

(a)     If the Borrower or any Credit Party shall consummate an Asset Sale of assets constituting Collateral, the Borrower shall make a payment (within two (2) Business Days of receipt) in respect of the Loans, without premium or penalty, in an aggregate amount equal to the Net Cash Proceeds received from such Asset Sale by such Credit Party, subject to the Intercreditor Agreement to the extent such proceeds arise from sales of assets constituting ABL Priority Collateral.

(b)     Borrower shall make a payment in respect of the Loans, without premium or penalty, in an aggregate amount equal to the gross proceeds received by any Credit Party relating to insurance in respect of casualty to property constituting Collateral (which payment shall be made within two (2) Business Days of receipt thereof); provided, that absent the occurrence and continuance of a Default or an Event of Default, Borrower may notify Administrative Agent that it intends to use such insurance proceeds to replace or repair the Collateral with respect to which the proceeds were received within 180 days after receipt. To the extent that any such proceeds have not been used within such 180 days, then Borrower shall make the payment in any such amount in respect of the Loan.

**2.10    Continuation Options.**  Any Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by Borrower giving irrevocable notice to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1, of the length of the next Interest Period to be applicable to such Loan, Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof. If no such notice is received specifying the length of the next Interest Period, then the next Interest Period shall equal one (1) month. During the continuance of any Default, the Interest Period shall equal one (1) month.

**2.11** **General Provisions Regarding Payments.**

(a)  All payments by Borrower of principal, interest, fees and other Obligations shall be made in Dollars in same day funds, without defense, setoff or counterclaim, free of any restriction or condition, and delivered to Administrative Agent not later than 12:00 p.m. (New York City time) on the date due at Administrative Agent's Principal Office for the account of Lenders; funds received by Administrative Agent after that time on such due date shall be deemed to have been paid by Borrower on the next succeeding Business Day.

(b)  All payments in respect of the principal amount of any Loan shall include all interest accrued on such principal to the date of repayment.

(c)  Administrative Agent shall promptly distribute to each Lender at such address as such Lender shall indicate in writing, such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due with respect thereto, including, without limitation, all fees payable with respect thereto, to the extent received by Administrative Agent, to repay the Facility. As to all payments made when an Event of Default has occurred and is continuing, all payments and proceeds of Collateral shall be applied, subject to the terms of the Intercreditor Agreement, to amounts then due and payable in the following order: first, to fees and Administrative Agent's expenses reimbursable hereunder, second, to interest on the Term Loans, third, to principal payments on the Term Loans, fourth, to all other Obligations, including expenses of Lenders to the extent reimbursable under Section 10.3 until paid in full, fifth, to the extent required by the Cash Collateral Orders, to the Prepetition ABL Agent, Prepetition ABL Lenders, Prepetition Term Agent and Prepetition Term Lenders, and, sixth, to the return of any excess to Borrower;

(d)  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest or fees hereunder.

(e)  Administrative Agent shall deem any payment by or on behalf of Borrower hereunder that is not made in same day funds by 12:00 p.m. (New York City time) to be a non-conforming payment. Any such payment shall not be deemed to have been received by Administrative Agent until the later of (i) the time such funds become available funds, and (ii) the applicable next Business Day. Administrative Agent shall give prompt telephonic notice to Borrower and each applicable Lender (confirmed in writing) if any payment is non-conforming. Any non-conforming payment may constitute or become a Default or Event of Default in accordance with the terms of Section 8.1(a). Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the rate determined

pursuant to Section 2.6 from the date such amount was due and payable until the date such amount is paid in full.

**2.12    Ratable Sharing.**  As used in this section, **"Obligation Category"** means the following groups of Obligations: (a) payments due and owing to Lenders under Sections 5.8, 10.2 or 10.3 hereof or under any similar sections of any other Loan Documents, (b) interest due and payable in respect of the Loans and payment due and owing to Lenders under Section 2.5 and Section 2.6, (c) the outstanding principal amount of the Loans and (d) all other Obligations.  Lenders hereby agree among themselves that if any of them shall, whether by voluntary payment, through the exercise of any right of set-off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Loan Documents or otherwise (other than pursuant to an assignment pursuant to Section 10.5), or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code, receive payment or reduction of a proportion of any Obligations in an Obligation Category that are then due and owing to such Lender hereunder or under the other Loan Documents which is greater than the proportion received by any other Lender in respect of the Obligations in such Obligation Category that are then due and owing to such other Lender, then the Lender receiving such proportionately greater payment shall (a) notify Administrative Agent and each other Lender of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Obligations in such Obligation Category then due and owing to the other Lenders so that all such recoveries of Obligations in any Obligation Category shall be shared by all Lenders in proportion to the aggregate Obligations in such Obligation Category that are then due and owing to all of them; provided, if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest.  Borrower expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, set-off or counterclaim with respect to any and all monies owing by Borrower to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder.

**2.13    Increased Costs; Capital Adequacy.**

(a)    If the adoption of or any change in any requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the Closing Date:

(i)    shall subject any Lender to any tax of any kind whatsoever with respect to this Agreement or any Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Non-Excluded Taxes covered by Section 2.14 and changes in the rate of tax on the overall net income of such Lender);

(ii)    shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or

30

other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender that is not otherwise included in the determination of the Eurodollar Rate; or

(iii)    shall impose on such Lender any other condition (except for Non-Excluded Taxes covered by Section 2.14 and changes in the rate of tax on the overall net income of such Lender);

and the result of any of the foregoing is to increase the cost to such Lender, by an amount that such Lender deems to be material, of making, converting into, continuing or maintaining Loans, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, Borrower shall promptly pay such Lender, upon its written demand (together with reasonably detailed supporting documentation), any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable. If any Lender becomes entitled to claim any additional amounts pursuant to this paragraph, it shall promptly notify Borrower in writing (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b)    If any Lender shall have determined that the adoption of or any change in any requirement of Law regarding capital adequacy or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the Closing Date shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder to a level below that which such Lender or such corporation could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy) by an amount deemed by such Lender to be material, then from time to time, after submission by such Lender to Borrower (with a copy to the Administrative Agent) of a written request therefore (together with reasonably detailed supporting documentation), the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such corporation for such reduction.

(c)    A certificate as to any additional amounts payable pursuant to this Section submitted by any Lender to Borrower (with a copy to the Administrative Agent) shall be conclusive in the absence of manifest error. Notwithstanding anything to the contrary in this Section, Borrower shall not be required to compensate a Lender pursuant to this Section for any amounts incurred more than six months prior to the date that such Lender notifies Borrower of such Lender's intention to claim compensation therefor; provided that, if the circumstances giving rise to such claim have a retroactive effect, then such six-month period shall be extended to include the period of such retroactive effect. The obligations of Borrower pursuant to this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

**2.14    Taxes; Withholding, etc.**

(a)    All payments made by the Borrower under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding (i) net income taxes and franchise taxes (imposed in lieu of net income taxes) imposed on the Administrative Agent or any Lender as a result of a present or former connection between the Administrative Agent or such Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the Administrative Agent or such Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document), including, but not limited to, the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, and (ii) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Borrower is located. If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("**Non-Excluded Taxes**") or Other Taxes are required to be withheld from any amounts payable to the Administrative Agent or any Lender hereunder, the amounts so payable to the Administrative Agent or such Lender shall be increased to the extent necessary to yield to the Administrative Agent or such Lender (after payment of all Non-Excluded Taxes and Other Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement, provided, however, that the Borrower shall not be required to increase any such amounts payable to any Lender with respect to any Non-Excluded Taxes (i) that are attributable to such Lender's failure to comply with the requirements of paragraph (d) or (e) of this Section (other than by reason of any Change in Law having effect after the date such representations or certifications were made), or (ii) that are United States withholding taxes imposed on amounts payable to such Lender at the time such Lender becomes a party to this Agreement, except to the extent that such Lender's assignor (if any) was entitled, at the time of assignment, to receive additional amounts from the Borrower with respect to such Non-Excluded Taxes pursuant to this paragraph.

(b)    In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    Whenever any Non-Excluded Taxes or Other Taxes are payable by the Borrower, as promptly as possible thereafter the Borrower shall send to the Administrative Agent for its own account or for the account of the relevant Lender, as the case may be, a certified copy of an original official receipt received by the Borrower showing payment thereof. If the Borrower fails to pay any Non-Excluded Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to the Administrative Agent the required receipts or other required documentary

evidence, the Borrower shall indemnify the Administrative Agent and the Lenders for any incremental taxes, interest or penalties that may become payable by the Administrative Agent or any Lender as a result of any such failure.

(d)     Each Lender (or Transferee) that is not a "U.S. Person" as defined in Section 7701(a)(30) of the Code (a "**Non-U.S. Lender**") shall deliver to the Borrower and the Administrative Agent (or, in the case of a Participant, to the Lender from which the related participation shall have been purchased) two copies of either U.S. Internal Revenue Service Form W-8BEN or Form W-8ECI, or, in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a statement substantially in the form of Exhibit H and a Form W-8BEN, or any subsequent versions thereof or successors thereto, properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or a reduced rate of, U.S. federal withholding tax on all payments by the Borrower under this Agreement and the other Loan Documents; unless in either such case any Change in Law has occurred prior to the date on which any such delivery would otherwise be required that renders any such form inapplicable or would prevent such Lender from duly completing and delivering any such form with respect to it and such Lender so advises the Borrower and the Administrative Agent, in which case such Lender shall not be required to provide such form described above. Such forms shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement (or, in the case of any Participant, on or before the date such Participant purchases the related participation). In addition, each Non-U.S. Lender shall deliver the appropriate forms promptly upon the obsolescence or invalidity of any form previously delivered by such Non-U.S. Lender. Each Non-U.S. Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrower (or any other form of certification adopted by the U.S. taxing authorities for such purpose). Notwithstanding any other provision of this paragraph, a Non-U.S. Lender shall not be required to deliver any form pursuant to this paragraph that such Non-U.S. Lender is not legally able to deliver.

(e)     A Lender that is entitled to an exemption from or reduction of non-U.S. withholding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law or reasonably requested by the Borrower, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate, provided that such Lender is legally entitled to complete, execute and deliver such documentation and in such Lender's judgment such completion, execution or submission would not materially prejudice the legal position of such Lender.

(f)     If the Administrative Agent or any Lender determines, in its sole discretion, that it has received a refund of any Non-Excluded Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.14, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.14 with respect to the Non-Excluded Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that the Borrower, upon the written request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.

(g)     The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

**2.15     Indemnity.** Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense (but excluding in any event loss of anticipated profit) that such Lender may sustain or incur as a consequence of (a) default by Borrower in making a borrowing of, or continuation of Loans after Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) default by the Borrower in making any prepayment of Loans after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Loans on a day that is not the last day of an Interest Period with respect thereto. Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed or continued, for the period from the date of such prepayment or of such failure to borrow or continue to the last day of such Interest Period (or, in the case of a failure to borrow or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) over (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market. A certificate as to any amounts payable pursuant to this Section submitted to Borrower by any Lender shall be conclusive in the absence of manifest error. This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

**2.16     Measures to Mitigate.** Each Lender agrees that, as promptly as practicable after the officer of such Lender responsible for administering its Loans becomes aware of the occurrence of an event or the existence of a condition that would cause such Lender to become entitled to receive payments under Section 2.13 or 2.14, it will, to the extent not inconsistent with the

34

internal policies of such Lender and any applicable legal or regulatory restrictions, use reasonable efforts to (a) make, fund or maintain its Credit Extensions through another office of such Lender, or (b) take such other measures as such Lender may deem reasonable, if as a result thereof the circumstances which would cause the additional amounts which would otherwise be required to be paid to such Lender pursuant to Section 2.13 or 2.14 would be materially reduced and if, as determined by such Lender in its sole discretion, the making, issuing, funding or maintaining of such Commitments or Loans through such other office or in accordance with such other measures, as the case may be, would not otherwise adversely affect such Commitments or Loans or the interests of such Lender; provided, such Lender will not be obligated to utilize such other office pursuant to this Section 2.16 unless Borrower (i) agrees to pay all incremental expenses incurred by such Lender as a result of utilizing such other office as described in clause (a) above and (ii) increase the amount payable to such Lender as provided in Section 2.14 and indemnifies each Credit Party as provided in Section 2.14 for all Taxes imposed on such Lender in excess of such Taxes relating to, arising out of, or in connection with any Loan Document or any payment or transaction contemplated hereby or thereby in excess of such Taxes imposed on such Lender prior to the event or the existence of a condition described in this section. A certificate as to the amount of any such expenses payable by Borrower pursuant to this Section 2.16 (setting forth in reasonable detail the basis for requesting such amount) submitted by such Lender to Borrower (with a copy to Administrative Agent) that be conclusive absent manifest error.

**2.17** **Release**. Each Credit Party hereby acknowledges effective upon entry of the Final Order, that no Credit Party has any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Credit Parties' liability to repay the Administrative Agent or any Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from Administrative Agent or any Lender. Each Credit Party, each in their own right and with respect to the other Credit Parties, on behalf of their bankruptcy estates, and on behalf of all their successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "**Releasing Parties**"), hereby fully, finally and forever releases and discharges each of the Administrative Agent and Lenders and all of such Administrative Agent's and Lenders' past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "**Released Parties**") of and from any and all past and present actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Final Order and the transactions contemplated hereby, and all other agreements, certificates,

35

instruments and other documents and statements (whether written or oral) related to any of the foregoing.

**2.18** **Replacement of Lenders**. The Borrower shall be permitted to replace any Lender that (a) requests reimbursement for amounts owing pursuant to Section 2.13 or 2.14), or (b) defaults in its obligation to make Loans hereunder (a "Defaulting Lender"), with a replacement financial institution; provided that (i) such replacement does not conflict with any requirement of law, (ii) no Event of Default shall have occurred and be continuing at the time of such replacement, (iii) prior to any such replacement, such Lender shall have taken no action under Section 2.16 so as to eliminate the continued need for payment of amounts owing pursuant to Section 2.13 or 2.14, (iv) the replacement financial institution shall purchase, at par, all Loans and other amounts owing to such replaced Lender on or prior to the date of replacement, (v) to the extent the Borrower is making a replacement pursuant to clause (b) above, the replacement financial institution shall consent to the requested amendment, (vi) the Borrower shall be liable to such replaced Lender (other than a Defaulting Lender) under Section 2.15 if any Eurodollar Loan owing to such replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto, (vii) the replacement financial institution shall be reasonably satisfactory to the Administrative Agent, (viii) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 10.5, (ix) until such time as such replacement shall be consummated, the Borrower shall pay all additional amounts (if any) required pursuant to Section 2.13 or 2.14, as the case may be, and (x) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender.

## SECTION 3. CONDITIONS PRECEDENT

**3.1** **Closing Date.** The Closing Date shall occur on the date that the following conditions are satisfied:

(a) <u>Loan Documents</u>. Administrative Agent shall have received counterparts of each Loan Document required by the Administrative Agent and the Lenders to be delivered on or before the Closing Date, originally executed and delivered by each applicable Credit Party and in numbers sufficient for Administrative Agent and each Lender.

(b) <u>Organizational Documents; Incumbency</u>. Administrative Agent shall have received (i) copies of each Organizational Document executed and delivered by each Credit Party, as applicable, and, to the extent applicable, certified as of a recent date by the appropriate governmental official; (ii) signature and incumbency certificates of the officers of such Person executing the Loan Documents to which it is a party; (iii) resolutions of the Board of Directors or similar governing body of each Credit Party approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party or by which it or its assets may be bound, certified as of the Closing Date by its secretary or an assistant secretary as being in full force and effect without modification or amendment; and (iv) a good standing certificate from the applicable Governmental Authority of each Credit

Party's jurisdiction of incorporation, organization or formation, each dated a recent date prior to the Closing Date.

(c)   Governmental Authorizations and Consents.   Each Credit Party shall have obtained all Governmental Authorizations and all consents of other Persons, in each case that are necessary or advisable to be obtained on or before the Closing Date in connection with the transactions contemplated by the Loan Documents and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to Lenders. Administrative Agent shall have received consent of the Required Lenders (for purposes of this Section 3.1(c), as such term is defined in the Prepetition Term Loan Agreement) as may be required pursuant to the Prepetition Term Loan Agreement for the provision of the financing hereunder and the granting of priming liens on the Collateral. All applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on the transactions contemplated by the Loan Documents or the financing thereof and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with respect to any of the foregoing shall be pending, and the time for any applicable agency to take action to set aside its consent on its own motion shall have expired.

(d)   Validity of Liens.   Upon entry of the Final Order, the Final Order shall be effective to create in favor of the Administrative Agent a legal, valid and enforceable first (except for (x) Permitted Prior Liens entitled to priority under applicable law and (y) the Carve Out) perfected security interest in and lien upon the Collateral. Provision acceptable to the Administrative Agent shall have been made for completion of perfection steps deemed necessary or desirable to perfect upon the Capital Stock of Foreign Subsidiaries other than Excluded Collateral (which Administrative Agent agrees may be completed post closing).

(e)   Budget.   Lenders shall have received from Borrower the budget for the 13-week period commencing on the Closing Date (collectively, the "**Budget**"), prepared on a weekly basis for each such period, which Budget shall be in form, detail and substance satisfactory to Administrative Agent and Lenders, and is the "Budget", as such term is defined in the Cash Collateral Orders.

(f)   Evidence of Insurance.   Administrative Agent shall have received a certificate from Borrower's insurance broker or other evidence reasonably satisfactory to it that all insurance required to be maintained pursuant to Section 5.5 is in full force and effect and that the Administrative Agent has been named as additional insured and loss payee thereunder as its interests may appear and to the extent required under Section 5.5.

(g)   Opinion of Counsel.   Administrative Agent shall have received a favorable legal opinion addressed to Lenders and the Administrative Agent, dated as of the Closing Date, in form and substance reasonably satisfactory to Administrative Agent and Lenders, from Kirkland & Ellis LLP, counsel for Credit Parties.

37

(h)   Closing Date Certificate.  Borrower shall have delivered to Administrative Agent an originally executed Closing Date Certificate.

(i)   No Material Adverse Change.   There shall have occurred no material adverse change in (i) the business, condition, operations or assets of the Group Members (taken as a whole) since the Petition Date (other than commencement of the Case), (ii) the ability of Borrower or any Guarantors to perform, when due, their respective obligations under the Loan Documents, or (iii) the ability of the Administrative Agent or Lenders to enforce the Loan Documents and the obligations of the Borrower and Guarantors thereunder.

(j)   Completion of Proceedings.  All partnership, corporate and other proceedings taken or to be taken in connection with the transactions contemplated hereby shall be reasonably satisfactory in form and substance to Lenders, Administrative Agent, and Administrative Agent shall have received all such counterpart originals or certified copies of such documents as Administrative Agent may reasonably request.   Each Lender, by delivering its signature page to this Agreement and funding a Loan on the Closing Date, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by Administrative Agent and Lenders, as applicable on the Closing Date.

(k)   Final Order.  The Bankruptcy Court shall have entered a final order, in form and substance satisfactory to the Administrative Agent, each Lender and Borrower, authorizing and approving this Agreement pursuant to Section 364(c) and (d) of the Bankruptcy Code and Bankruptcy Rule 4001, finding that the Lenders are extending credit to the Borrower in good faith pursuant to Section 364(e) of the Bankruptcy Code and waiving the provisions of Section 506(c) of the Bankruptcy Code, authorizing and approving the granting of superpriority claims status and the Liens contemplated hereby, modifying the automatic stay to permit the creation and perfection of the Liens on the Collateral, providing for the remedies set forth in this Agreement and enforcement contemplated in this Agreement, and providing for adequate protection in favor of the Prepetition Term Lenders, and containing such other terms as may be acceptable to the Administrative Agent and Lenders and Borrower, and such order shall be in full force and effect and shall not have been amended, modified, stayed, or reversed (the "**Final Order**").

(l)   Payment of Fees.  Receipt by the Administrative Agent, for the benefit of the Lenders and the Administrative Agent, of all reasonable fees and expenses payable on or prior to the Closing Date in connection with the transactions contemplated hereby, including those fees contemplated in Section 2.7 of this Agreement, including without limitation, the Fee Letter.

**3.2   Conditions Precedent to Each Credit Extension.**  The obligation of each Lender to make any Loan, on any date on which a Credit Extension is made, including the Closing Date, are subject to the satisfaction, or waiver in accordance with Section 10.4, of the following conditions precedent:

A/73173405.11

(a) Administrative Agent shall have received a fully executed and delivered Funding Notice;

(b) as of such Borrowing Date, the representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects on and as of that Borrowing Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date;

(c) as of such Borrowing Date, no Event of Default or Default shall have occurred and be continuing; and

(d) the debtors in the Case shall not have filed a Plan of Reorganization that is not in substance satisfactory to the Required Lenders;

The request by Borrower of, and the acceptance by Borrower of, each Credit Extension shall be deemed to be a representation and warranty by Borrower that the conditions specified above have been satisfied.

## SECTION 4. REPRESENTATIONS AND WARRANTIES

In order to induce the Lenders to enter into this Agreement and to make each Credit Extension to be made thereby, each Credit Party represents and warrants to Administrative Agent and each Lender, on the Closing Date and on each Borrowing Date, that the following statements are true and correct:

**4.1** **No Default.** No event has occurred and is continuing which constitutes a Default.

**4.2** **Organization and Good Standing.** Each Credit Party is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization, having all powers required to carry on its business and enter into and carry out the transactions contemplated hereby. Each Credit Party is duly qualified, in good standing, and authorized to do business in all other jurisdictions within the United States wherein the character of the properties owned or held by it or the nature of the business transacted by it makes such qualification necessary except to the extent where the failure to be so qualified as in good standing would not reasonably be expected to have a Material Adverse Effect. Each Credit Party is duly qualified as a foreign corporation or other organization and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification, except to the extent that all failures to be duly qualified and in good standing could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

**4.3** **Authorization.** Subject to the Final Order, each Credit Party has duly taken all action necessary to authorize the execution and delivery by it of the Loan Documents to which it is a party and to authorize the consummation of the transactions contemplated thereby and the performance of its obligations thereunder. Borrower is duly authorized to borrow funds hereunder.

39

**4.4     No Conflicts or Consents.**  Subject to entry of the Final Order, the execution and delivery by the various Credit Parties of the Loan Documents to which each is a party, the performance by each of its obligations under such Loan Documents, and the consummation of the transactions contemplated by the various Loan Documents, do not (a) violate with any provision of (i) any Law, except to the extent that all such violations could not reasonably be expected to have a Material Adverse Effect or as could not reasonably be expected to materially adversely affect the interests of the Administrative Agent or the Lenders, (ii) the Organizational Documents of any Credit Party, or (iii) any agreement entered into post-petition, judgment, license, order or permit applicable to or binding upon any Credit Party except to the extent such violations could not reasonably be expected to have a Material Adverse Effect, (b) result in the acceleration of any Indebtedness owed by any Credit Party, or (c) result in or require the creation of any Lien upon any assets or properties of any Credit Party, except in each case as expressly contemplated in the Loan Documents and, except in the case of clauses (a)(iii), (b) and (c) of this Section 4.4, such conflicts, results or requirements as arise in connection with the filing, prosecution and resolution of the Case.  Except for the entry of the Final Order, and except as expressly contemplated in the Loan Documents, no consent, approval, authorization or order of, and no notice to or filing with, any Governmental Authority or third party is required in connection with the execution, delivery or performance by any Credit Party of any Loan Document or to consummate any transactions contemplated hereby or thereby.

**4.5     Enforceable Obligations.**  This Agreement is, and the other Loan Documents when duly executed and delivered will be, upon entry of the Final Order, legal, valid and binding obligations of each Credit Party which is a party hereto or thereto, enforceable in accordance with their terms except as such enforcement may be limited by bankruptcy, insolvency or similar Laws of general application relating to the enforcement of creditors' rights and by general principles of equity.

**4.6     Current Financial Statements.**  Borrower has heretofore delivered to each Lender true, correct and complete copies of the Current Financial Statements.  Subject to normal year-end adjustments and the absence of footnotes, the Current Financial Statements fairly present in all material respects Borrower's Consolidated financial position at the date thereof and were prepared in accordance with GAAP (except as approved by the Credit Parties' accountants and disclosed therein).

**4.7     Other Obligations and Restrictions.**  As of the date hereof, no Credit Party has any outstanding Liabilities of any kind which is, in the aggregate, material to any Credit Party or material with respect to Borrower's Consolidated financial condition and not reflected in the Current Financial Statements or disclosed in Schedule 4.7.  As of the Closing Date, except as shown in the Current Financial Statements or disclosed in Schedule 4.7, no Credit Party is subject to or restricted by any franchise, contract, deed, charter restriction, or other instrument or restriction which is materially likely to cause a Material Adverse Effect.

**4.8     Full Disclosure.**  As of the date of delivery, no certificate, statement or other information delivered herewith or heretofore by any Credit Party to any Lender in connection with the negotiation of this Agreement or in connection with any transaction contemplated hereby contains as of the date of such certificates, statement or information was so furnished, and taken as a whole) any untrue statement of a material fact omits to state any material fact known to any

Credit Party (other than industry-wide risks normally associated with the types of businesses conducted by the Credit Parties) necessary to make the statements contained herein or therein not materially misleading in the light of the circumstances under which such statements are made as of the date made or deemed made. The projections and forward-looking financial information contained in the materials referenced above are based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made, it being acknowledged and agreed by the Lenders that (a) such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount, (b) the financial and business projections furnished to the Administrative Agent or the Lenders are subject to significant uncertainties and contingencies, which may be beyond the control of the Borrower and its Subsidiaries, (c) no assurances are given by any of the Borrower or its Subsidiaries that the results forecasted in the projections will be realized and (d) the actual results may differ from the forecasted results in such projections and such differences may be material. There is no fact known to any Credit Party (other than industry-wide risks normally associated with the types of businesses conducted by the Credit Parties) that has not been disclosed to each Lender which is materially likely to cause a Material Adverse Effect.

**4.9    Litigation.** Except as disclosed in the Current Financial Statements or in <u>Schedule 4.9</u> and except for the Case:    there are no actions, suits or legal, equitable, arbitrative or administrative proceedings pending, or to the knowledge of any Credit Party threatened, against any Group Member before any Governmental Authority (i) which if adversely decided could cause a Material Adverse Effect or (ii) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby.

**4.10    Labor Disputes .** Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect: (a) there are no strikes or other labor disputes against any Group Member pending or, to the knowledge of the Borrower, threatened; (b) hours worked by and payment made to employees of each Group Member have not been in violation of the Fair Labor Standards Act or any other applicable requirement of law dealing with such matters; and (c) all payments due from any Group Member on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant Group Member.

**4.11    ERISA Plans and Liabilities.** Except as set forth on <u>Schedule 4.11</u> or arising from the Case, (i) neither a Reportable Event nor a failure to meet the minimum funding standards under the Pension Funding Rules has occurred during the five-year period prior to the date on which this representation is made or deemed made with respect to any Single Employer Plan or, to the knowledge of the Borrower, with respect to any Multiemployer Plan, and each Plan has complied except where the failure to have complied could not reasonably be expected to have a Material Adverse Effect with the applicable provisions of ERISA and the Code; (ii) no termination of a Single Employer Plan has occurred, and (iii) no Lien in favor of the PBGC or a Plan has arisen, during such five-year period. Except as disclosed in the Borrower's Form 10-K for the year ended December 31, 2008, as of December 31, 2008, the present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Plan allocable to such accrued benefits by a material amount. Neither the Borrower nor any Commonly Controlled Entity has had a complete

41

or partial withdrawal from any Multiemployer Plan that has resulted or could reasonably be expected to result in a liability under ERISA that could reasonably be expected to have Material Adverse Effect, and neither the Borrower nor any Commonly Controlled Entity would become subject to any liability under ERISA if the Borrower or any such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made or deemed made except as could not reasonably be expected to have a Material Adverse Effect. As of the Closing Date, to the knowledge of the Borrower, no such Multiemployer Plan is in Reorganization or Insolvent.

**4.12    Environmental and Other Laws.** Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

     (i)    the facilities and properties owned, leased or operated by any Group Member (the "**Properties**") do not contain, and have not previously contained, any Hazardous Materials in amounts or concentrations or under circumstances that constitute or constituted a violation of, or could reasonably be expected to result in liability under, any Environmental Law;

     (ii)    no Group Member has received or is aware of any notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Properties or the business operated by any Group Member (the "**Business**"), nor does the Borrower have knowledge or reason to believe that any such notice will be received or is being threatened;

     (iii)    Hazardous Materials have not been transported or disposed of from the Properties in violation of, or in a manner or to a location that could reasonably be expected to result in liability under, any Environmental Law, nor have any Hazardous Materials been generated, treated, stored or disposed of at, on or under any of the Properties in violation of, or in a manner that could give rise to liability under, any applicable Environmental Law;

     (iv)    no judicial proceeding or governmental or administrative action is pending or, to the knowledge of Borrower, threatened, under any Environmental Law to which any Group Member is or will be named as a party with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to the Properties or the Business;

     (v)    there has been no Release or to the knowledge of Borrower threat of Release of Hazardous Materials at or from the Properties, or arising from or related to the operations of any Group Member in connection with the Properties or otherwise in connection with the Business, in violation of or

in amounts or in a manner that could reasonably be expected to result in liability under Environmental Laws;

(vi)     the Properties and all operations at the Properties are in compliance, and have in the last five years been in compliance, with all applicable Environmental Laws, and there is no contamination at, under or about the Properties or violation of any Environmental Law with respect to the Properties or the Business; and

(vii)    no Group Member has assumed any liability of any other Person under Environmental Laws.

**4.13    Names and Places of Business.** Except as otherwise indicated in <u>Schedule 4.13</u>, the chief executive office and principal place of business of each Credit Party are (and for the five years preceding the Closing Date have been) located at the address of such Credit Party set out in Appendix B.

**4.14    Subsidiaries.** As of the Closing Date, (a) <u>Schedule 4.14</u> sets forth the name and jurisdiction of incorporation of each Subsidiary and, as to each such Subsidiary, the percentage of each class of Capital Stock owned by any Credit Party and (b) there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to any Capital Stock of the Borrower or any Subsidiary, except as created by the Loan Documents.

**4.15    Licenses.** Except as could not reasonably be expected to have a Material Adverse Effect, each Group Member possesses all licenses, permits, franchises, patents, copyrights, trademarks and trade names, and other intellectual property (or otherwise possesses the right to use such intellectual property and does not infringe the rights of any Person in any respect that could reasonably be expected to have a Material Adverse Effect) which are necessary to carry out its business as presently conducted and material to the business of the Credit Parties, taken as a whole.

**4.16    Government Regulation.** No Credit Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

**4.17    Taxes.** Each Group Member has filed all United States federal income tax returns and all other material tax returns that are required to have been filed  (after giving effect to any extension periods) by it and have paid all taxes due and payable pursuant to such returns or pursuant to any assessment received by any Group Member and all other penalties or charges (other than any the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the relevant Group Member) except to the extent that the failure to file such tax returns or pay such taxes, fees or other charges could not reasonably be expected to have a Material Adverse Effect. No Group Member has given or been requested to give a waiver

43

of the statute of limitations relating to the payment of any federal or other taxes, except as listed in Schedule 4.17

**4.18   Title to Properties.** Each Group Member has title in fee simple to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold interest in, all its other property, and none of such property is subject to any Lien except as permitted by Section 6.2.

**4.19   No Defaults.** Except as set forth on Schedule 4.19 or stayed by the automatic stay of the Bankruptcy Court, no Group Member is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its Contractual Obligations, except where such default could not reasonably be expected to have a Material Adverse Effect.

**4.20   Margin Stock.** No Group Member is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock. No part of the proceeds of the Loans made to such Credit Party will be used to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U or X of such Board of Governors.

**4.21   Insurance.** Except as set forth on Schedule 4.21, the Properties of the Credit Parties are insured with insurance companies, in such amounts, with such deductibles and covering such risks in compliance with the provisions of Section 5.5.

**4.22   Perfection of Security Interest.** On the date of the making of any Loan, the Final Order shall have been entered and shall not have been amended, stayed, vacated or rescinded in any manner adverse to the Lenders, without the Required Lenders' reasonable consent. Except to the extent set forth in the Final Order, the Cash Collateral Orders or the Intercreditor Agreement, the Collateral and the Administrative Agent's rights with respect to the Collateral are not subject to any setoff, claims, withholdings, or other defenses. The Credit Parties are the owners of the Collateral, free from any Lien other than Liens imposed under the Final Order, this Agreement and the Loan Documents and Permitted Liens.

## SECTION 5. AFFIRMATIVE COVENANTS

Each Credit Party covenants and agrees that so long as any Commitment is in effect and until payment in full of all Obligations(other than unasserted contingent indemnification obligations not due and payable), each Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 5.

**5.1   Payment and Performance.** Borrower will pay all amounts due under the Loan Documents in accordance with the terms thereof and will observe, perform and comply with every covenant, term and condition expressed or implied in the Loan Documents. Borrower will cause each of its respective Subsidiaries to observe, perform and comply with every term, covenant and condition in any Loan Document to which such Subsidiary is a party or is otherwise bound.

**5.2   Books, Financial Statements and Reports.** Borrower, acting through or on behalf of the Credit Parties, will at all times maintain full and accurate books of account and records, will