Member pending or, to the knowledge of the Borrower, threatened; (b) hours worked by and payment made to employees of each Group Member have not been in violation of the Fair Labor Standards Act or any other applicable requirement of law dealing with such matters; and (c) all payments due from any Group Member on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant Group Member.

**4.11    ERISA Plans and Liabilities.** Except as set forth on Schedule 4.11 or arising from the Case, (i) neither a Reportable Event nor a failure to meet the minimum funding standards under the Pension Funding Rules has occurred during the five-year period prior to the date on which this representation is made or deemed made with respect to any Single Employer Plan or, to the knowledge of the Borrower, with respect to any Multiemployer Plan, and each Plan has complied except where the failure to have complied could not reasonably be expected to have a Material Adverse Effect with the applicable provisions of ERISA and the Code; (ii) no termination of a Single Employer Plan has occurred, and (iii) no Lien in favor of the PBGC or a Plan has arisen, during such five-year period. Except as disclosed in the Borrower's Form 10-K for the year ended December 31, 2008, as of December 31, 2008, the present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Plan allocable to such accrued benefits by a material amount. Neither the Borrower nor any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan that has resulted or could reasonably be expected to result in a liability under ERISA that could reasonably be expected to have Material Adverse Effect, and neither the Borrower nor any Commonly Controlled Entity would become subject to any liability under ERISA if the Borrower or any such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made or deemed made except as could not reasonably be expected to have a Material Adverse Effect. As of the Closing Date, to the knowledge of the Borrower, no such Multiemployer Plan is in Reorganization or Insolvent.

**4.12    Environmental and Other Laws.** Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

> (i)    the facilities and properties owned, leased or operated by any Group Member (the "**Properties**") do not contain, and have not previously contained, any Hazardous Materials in amounts or concentrations or under circumstances that constitute or constituted a violation of, or could reasonably be expected to result in liability under, any Environmental Law;

> (ii)    no Group Member has received or is aware of any notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Properties or the business operated by any Group Member (the "**Business**"), nor does the Borrower have knowledge or reason to believe that any such notice will be received or is being threatened;

(iii) Hazardous Materials have not been transported or disposed of from the Properties in violation of, or in a manner or to a location that could reasonably be expected to result in liability under, any Environmental Law, nor have any Hazardous Materials been generated, treated, stored or disposed of at, on or under any of the Properties in violation of, or in a manner that could give rise to liability under, any applicable Environmental Law;

(iv) no judicial proceeding or governmental or administrative action is pending or, to the knowledge of Borrower, threatened, under any Environmental Law to which any Group Member is or will be named as a party with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to the Properties or the Business;

(v) there has been no Release or to the knowledge of Borrower threat of Release of Hazardous Materials at or from the Properties, or arising from or related to the operations of any Group Member in connection with the Properties or otherwise in connection with the Business, in violation of or in amounts or in a manner that could reasonably be expected to result in liability under Environmental Laws;

(vi) the Properties and all operations at the Properties are in compliance, and have in the last five years been in compliance, with all applicable Environmental Laws, and there is no contamination at, under or about the Properties or violation of any Environmental Law with respect to the Properties or the Business; and

(vii) no Group Member has assumed any liability of any other Person under Environmental Laws.

**4.13 Names and Places of Business.** Except as otherwise indicated in <u>Schedule 4.13</u>, the chief executive office and principal place of business of each Credit Party are (and for the five years preceding the Closing Date have been) located at the address of such Credit Party set out in Appendix B.

**4.14 Subsidiaries.** As of the Closing Date, (a) <u>Schedule 4.14</u> sets forth the name and jurisdiction of incorporation of each Subsidiary and, as to each such Subsidiary, the percentage of each class of Capital Stock owned by any Credit Party and (b) there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to any Capital Stock of the Borrower or any Subsidiary, except as created by the Loan Documents.

**4.15 Licenses.** Except as could not reasonably be expected to have a Material Adverse Effect, each Group Member possesses all licenses, permits, franchises, patents, copyrights, trademarks

and trade names, and other intellectual property (or otherwise possesses the right to use such intellectual property and does not infringe the rights of any Person in any respect that could reasonably be expected to have a Material Adverse Effect) which are necessary to carry out its business as presently conducted and material to the business of the Credit Parties, taken as a whole.

**4.16    Government Regulation.**  No Credit Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

**4.17    Taxes.**  Each Group Member has filed all United States federal income tax returns and all other material tax returns that are required to have been filed  (after giving effect to any extension periods) by it and have paid all taxes due and payable pursuant to such returns or pursuant to any assessment received by any Group Member and all other penalties or charges (other than any the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the relevant Group Member) except to the extent that the failure to file such tax returns or pay such taxes, fees or other charges could not reasonably be expected to have a Material Adverse Effect.  No Group Member has given or been requested to give a waiver of the statute of limitations relating to the payment of any federal or other taxes, except as listed in Schedule 4.17

**4.18    Title to Properties.**  Each Group Member has title in fee simple to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold interest in, all its other property, and none of such property is subject to any Lien except as permitted by Section 6.2.

**4.19    No Defaults.**  Except as set forth on Schedule 4.19 or stayed by the automatic stay of the Bankruptcy Court, no Group Member is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its Contractual Obligations, except where such default could not reasonably be expected to have a Material Adverse Effect.

**4.20    Margin Stock.**  No Group Member is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No part of the proceeds of the Loans made to such Credit Party will be used to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U or X of such Board of Governors.

**4.21    Insurance.**  Except as set forth on Schedule 4.21, the Properties of the Credit Parties are insured with insurance companies, in such amounts, with such deductibles and covering such risks in compliance with the provisions of Section 5.5.

**4.22    Perfection of Security Interest.**  On the date of the making of any Loan, the Final Order shall have been entered and shall not have been amended, stayed, vacated or rescinded in any manner adverse to the Lenders, without the Required Lenders' reasonable consent.  Except to the extent set forth in the Final Order, the Cash Collateral Orders or the Intercreditor Agreement, the Collateral and the Administrative Agent's rights with respect to the Collateral are not subject to

any setoff, claims, withholdings, or other defenses. The Credit Parties are the owners of the Collateral, free from any Lien other than Liens imposed under the Final Order, this Agreement and the Loan Documents and Permitted Liens.

## SECTION 5. AFFIRMATIVE COVENANTS

Each Credit Party covenants and agrees that so long as any Commitment is in effect and until payment in full of all Obligations(other than unasserted contingent indemnification obligations not due and payable), each Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 5.

**5.1    Payment and Performance.**  Borrower will pay all amounts due under the Loan Documents in accordance with the terms thereof and will observe, perform and comply with every covenant, term and condition expressed or implied in the Loan Documents. Borrower will cause each of its respective Subsidiaries to observe, perform and comply with every term, covenant and condition in any Loan Document to which such Subsidiary is a party or is otherwise bound.

**5.2    Books, Financial Statements and Reports.**  (a)    Borrower, acting through or on behalf of the Credit Parties, will at all times maintain full and accurate books of account and records, will maintain its Fiscal Year, and will furnish to each Lender at Borrower's reasonable expenses all statements and reports required to be delivered to the Prepetition ABL Agent, Prepetition ABL Lenders, Prepetition Term Agent and/or Prepetition Term Lenders under any Cash Collateral Order, all to be consistent with the timing and reporting requirements set forth in such Cash Collateral Orders, including without limitation, following statements and reports to each Lender:

(i)    On each Thursday following the Closing Date, a rolling 13 week forecast by line item of net cash flow (including cash receipts and cash disbursements), expenditures (accounts payable) and Collateral Base (each a "**Thirteen Week Forecast**"), which Thirteen Week Forecast shall be subject to the reasonable consent of the Required Lenders (such approval not to be required if the net cash flow, expenditures (accounts payable) and Collateral Base for such Thirteen Week Forecast are unchanged from the comparable projected amounts for period in the initial Budget).

(ii)    On each Thursday following the Closing Date, a report, for the week ending on the preceding Friday, of actual net cash flow (including cash receipts and cash disbursements), expenditures (accounts payable) and an updated weekly Collateral Base, in each case comparing the Group Members' actual performance to the Budget and to most recent the Thirteen Week Forecast, in a form reasonably satisfactory to the Required Lenders, and a certification from an Authorized Officer, certifying that the reports fairly present the financial condition and results of operations of the Group Members for such period (each an "**Actual Cash Flows and Collateral Base Report**").

(iii)    On each Business Day, a report, as of the close of the immediately preceding Business Day, stating the Credit Parties' actual cash balances.

(iv)     On each Tuesday, a reasonably detailed explanation for any Variance in the Actual Cash Flows and Collateral Base Report from the Budget and the most recent Thirteen Week Forecast which was delivered to the Lenders on the previous Thursday, in a form reasonably satisfactory to the Required Lenders (each, a "**Budget Variance Report**").

(v)     On the first Business Day after the 15th day of each month, for the Group Members, a report (consistent with the report required under the Term Loan Cash Collateral Order) of the preliminary monthly results for the immediately preceding month.

(vi)     On the 30th day of each month (if a Business Day, otherwise extended to the next Business Day), a report (a) identifying the customers (if any) that have executed Accommodation Agreements (as defined in the ABL Cash Collateral Order), the value in dollars of the financial accommodations received from each customer pursuant to the Accommodation Agreement, and the amount of accounts receivable due from each customer, and (b) providing an update regarding the operations of the Group Members, including, without limitation, material information regarding relationships with carriers, suppliers and vendors after the Petition Date.

(vii)     On the 30th day after the close of each month (if a Business Day, otherwise extended to the next Business Day), a report identifying the Group Members' inventory, in the form used by the Group Members prior to the Petition Date showing production and non-production inventory, adjusted for reserves as calculated in the Group Members' ordinary course; provided, however, that for any month that is the close of a fiscal quarter such report will be provided by the 60th day after the close of the month.

(viii)     On the 30th day after the close of each month (if a Business Day, otherwise extended to the next Business Day), a report reflecting the age of the Group Members' accounts receivable listed by account debtor as of the close of the prior month; provided, however, that for any month that is the close of a fiscal quarter such report will be provided by the 60th day after the close of the month.

(ix)     On the 30th day after the close of each month (if a Business Day, otherwise extended to the next Business Day), an accounts payable aging report by vendor identifying post-Petition payables accrued at the time of the close of the prior month; provided, however, that for any month that is the close of a fiscal quarter such report will be provided by the 60th day after the close of the month.

(x)     On the 30th day after the close of each month (if a Business Day, otherwise extended to the next Business Day), internal basis (i.e., not GAAP-compliant) financial statements for the prior month in the format provided by the Debtors pursuant to the Prepetition ABL Credit Agreement prior to the Petition Date; provided, however, that for any month that is the close of a fiscal quarter such financial statements will be provided by the 60th day after the close of the month.

(b)     Further, Borrower shall furnish to the Administrative Agent (to be made available by the Administrative Agent to each Lender):

(i)     within 90 days after the end of each fiscal year of the Borrower (or such shorter period as the U.S. Securities and Exchange Commission may specify for the filing of annual reports on Form 10-K), a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and of cash flows for such year, setting forth in each case in comparative form the figures for the previous year by PricewaterhouseCoopers LLP or other independent certified public accountants of nationally recognized standing; and

(ii)     within 45 days after the end of each of the first three quarterly periods of each fiscal year of the Borrower (or such shorter period as the U.S. Securities and Exchange Commission may specify for the filing of quarterly reports on Form 10-Q), the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures for the previous year, certified by an Authorized Officer as being fairly stated in all material respects (subject to normal year-end audit adjustments and the absence of footnote disclosure).

(c)     All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP applied (except as approved by such accountants or officer, as the case may be, and disclosed in reasonable detail therein) consistently throughout the periods reflected therein and with prior periods. Information required to be delivered pursuant to Section 5.2(b) shall be deemed to have been delivered to the Administrative Agent on the date on which the Borrower provides written notice to the Administrative Agent that such information has been posted on the Borrower's website on the Internet at http://www.visteon.com or is available via the EDGAR system of the U.S. Securities and Exchange Commission on the Internet (to the extent such information has been posted or is available as described in such notice). Information required to be delivered pursuant to this Section 5.2 may also be delivered by electronic communication pursuant to procedures approved by the Administrative Agent pursuant to Section 10.2.

(d)     Borrower shall furnish to the Administrative Agent and each Lender, concurrently with the delivery of the financial statements referred to in Section 5.1(b), (x) a Compliance Certificate executed by an Authorized Officer stating that, to the best of such Authorized Officer's knowledge, that such Authorized Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate and (y) to the extent not previously disclosed to the Administrative Agent, (A) a description of any change in the jurisdiction of organization of any Credit Party, (B) an updated list of Subsidiaries of the Borrower, and (C) a list of any Intellectual Property acquired by any Credit Party (other than intellectual property rights acquired in the ordinary course of business such as rights in respect of software programs) since the date of the most recent report delivered pursuant to this clause (d) (or, in the case of the first such report so delivered, since the Closing Date).

**5.3    Other Information and Inspections.**  Each Credit Party will furnish to Administrative Agent and each Lender any reasonably available information which Administrative Agent or any Lender may from time to time reasonably request in writing concerning any covenant, provision or condition of the Loan Documents or any matter in connection with the Credit Parties' businesses and operations.    Each Credit Party will permit representatives appointed by Administrative Agent (including independent accountants, financial advisors, auditors, agents, attorneys, appraisers and any other Persons) to visit and inspect during normal business hours any of such Credit Party's property, including its books of account, other books and records, and any facilities or other business assets, and to make extra copies therefrom and photocopies and photographs thereof, and to write down and record any information such representatives obtain (provided each such person shall maintain the confidentiality of any such information in accordance with the Loan Documents), and each Credit Party shall permit Administrative Agent or its representatives to investigate and verify the accuracy of the information furnished to Administrative Agent or any Lender in connection with the Loan Documents and to discuss all such matters with its officers, employees and representatives (so long as senior management of the Borrower is notified of any such discussion and is permitted to be present).

**5.4    Notice of Material Events and Change of Name.**  Borrower will promptly notify Administrative Agent and each Lender in writing, stating that such notice is being given pursuant to this Agreement, of:

(a)    the occurrence of any Default or Event of Default;

(b)    any (i) material default or material event of default under any Contractual Obligation of any Group Member or (ii) litigation, investigation or proceeding that may exist at any time between any Group Member and any Governmental Authority, that in either case, if adversely determined could reasonably be expected to have a Material Adverse Effect;

(c)    any litigation or proceeding affecting any Group Member (i) that could reasonably be expected to have a Material Adverse Effect or (ii) which relates to any Loan Document;

(d)    the following events (except to the extent such events are disclosed on Schedule 4.11 or such events occurred prior to the date hereof and were disclosed to each Lender or the Administrative Agent), as soon as possible and in any event within 30 days after the Borrower knows or has reason to know thereof: (i) the occurrence of any Reportable Event with respect to any Single Employer Plan, a failure to make any required contribution to a Plan, the creation of any Lien in favor of the PBGC or a Plan or any withdrawal from, or the termination, Reorganization or Insolvency of, any Multiemployer Plan or (ii) the institution of proceedings or the taking of any other action by the PBGC or the Borrower or any Commonly Controlled Entity or any Multiemployer Plan with respect to the withdrawal from, or the termination, Reorganization or Insolvency of, any Plan, in each case, that could reasonably be expected to have a Material Adverse Effect; and

(e)     any development or event that has had or could reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section 5.4 shall be accompanied by a statement of an Authorized Officer setting forth details of the occurrence referred to therein and stating what action the relevant Group Member proposes to take with respect thereto.

**5.5     Maintenance of Properties; Insurance.**  (a) Except where the failure to do so could not reasonably be expected to have a Material Adverse Effect, keep all property necessary in the business of the Group Members, taken as a whole, in good working order and condition, ordinary wear and tear, casualty and condemnation excepted and (b) maintain with financially sound and reputable insurance companies insurance on all its property in at least such amounts and against at least such risks (but including in any event public liability, product liability and business interruption) as are usually insured against in the same general area by companies engaged in the same or a similar business.

**5.6     Maintenance of Existence and Qualifications.**  Each Credit Party will maintain and preserve its existence and its rights and franchises in full force and effect and will qualify to do business in all states or jurisdictions (a) where Collateral is located and (b) where required by applicable Law, except in each case as otherwise permitted by Section 6.4 or 6.5 and except, in each case where the failure so to qualify could not reasonably be expected to  have a Material Adverse Effect.

**5.7     Payment of Taxes, etc.**  Each Group Member will (a) timely file (subject to extensions) all required tax returns and (b) timely pay all postpetition taxes, assessments, and other governmental charges or levies imposed upon it or upon its income, profits or property, and such other taxes, assessments and other governmental charges and levies as may be approved by the Bankruptcy Court..  Each Group Member may, however, delay paying or discharging any of the foregoing (i) so long as it is in good faith contesting the validity thereof by appropriate proceedings and has set aside on its books adequate reserves therefor in accordance with GAAP or (ii) where the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

**5.8     Payments of Insurance Premiums on Borrower's Behalf.**  If any Credit Party fails to pay any insurance premiums it is required to pay under any Loan Document, Administrative Agent with the consent of the Required Lenders may pay the same.  Borrower shall promptly reimburse Administrative Agent for any such payments and each amount paid by Administrative Agent shall constitute an Obligation owed hereunder which is due and payable on the date such amount is paid by Administrative Agent.

**5.9     Compliance with Agreements and Law.**  Each Credit Party will perform all material postpetition or other material obligations it is required by any order from the Bankruptcy Court to perform under the terms of each mortgage, deed of trust, security agreement, lease, franchise, agreement, contract or other instrument or obligation to which it is a party or by which it or any of its properties is bound.  Each Credit Party will conduct its business and affairs in material compliance with all Laws applicable thereto except to the extent that failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

**5.10    Environmental Matters**.

(a)    Except to the extent the failure to do so could not in the aggregate reasonably be expected to result in a Material Adverse Effect, each Credit Party shall comply in all material respects with, and ensure compliance in all material respects by all tenants and subtenants, if any, with, all applicable Environmental Laws, and obtain and comply in all material respects with and maintain, and use commercially reasonable efforts to ensure that all tenants and subtenants obtain and comply in all material respects with and maintain, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws.

(b)    Except to the extent the failure to do so could not in the aggregate reasonably be expected to result in a Material Adverse Effect, each Credit Party shall conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under Environmental Laws and promptly comply in all material respects with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws.

**5.11    Intentionally Deleted**.

**5.12    Agreement to Deliver Guaranty and Security Documents; Perfection and Protection of Security Interests and Liens**.

(a)    Borrower will from time to time upon the reasonable request of the Administrative Agent, deliver, and will cause each other Credit Party from time to time to deliver, to the Administrative Agent any mortgages, and corporate authority documentation relating thereto, and other documents, completed and executed (and acknowledged when required) by the Credit Parties in form and substance reasonably satisfactory to the Administrative Agent, and take all such actions as may reasonably be requested by the Administrative Agent, which Administrative Agent reasonably requests for the purpose of perfecting, confirming, or protecting any Liens or other rights in Collateral securing any Obligations. Each Credit Party hereby authorizes the Administrative Agent to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral describing the Collateral as "all assets".

(b)    With respect to any property acquired after the Closing Date by any Credit Party as to which the Administrative Agent, for the benefit of the Lenders, does not have a perfected Lien to which it is entitled under the Final Order, promptly (i) execute and deliver to the Administrative Agent amendments to the Security Documents or such other documents as the Administrative Agent reasonably deems necessary to grant to the Administrative Agent, for the benefit of the Lenders, a security interest in such property and (ii) take all commercially reasonable actions necessary to grant to the Administrative Agent, for the benefit of the Lenders, a perfected security interest in such property with the priority specified in the Final Order; provided, however, that the applicable Credit Party

51

shall not be required to take such action to the extent that such property acquired after the Closing Date constitutes "Post-Petition L/C Collateral" as defined in the L/C Order.

(c)     Subject to the Intercreditor Agreement and the Final Order, with respect to any new Subsidiary which constitutes Collateral (other than an Excluded Foreign Subsidiary or an Excluded Entity) created or acquired after the Closing Date by any Group Member (which, for the purposes of this paragraph (c), shall include any existing Subsidiary that ceases to be an Excluded Foreign Subsidiary) and with respect to any Excluded Entity that becomes a Wholly Owned Subsidiary of any Group Member after the Closing Date, promptly (i) execute and deliver to the Administrative Agent such amendments to the Security Documents as the Administrative Agent reasonably requests and deems necessary to grant to the Administrative Agent, for the benefit of the Lenders, a perfected security interest in the Capital Stock of such new Subsidiary or such Wholly Owned Subsidiary that is owned by any Group Member with the priority set forth in the Final Order, (ii) deliver to the Administrative Agent the certificates representing such Capital Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the relevant Group Member, (iii) cause such new Subsidiary or such Wholly Owned Subsidiary (other than the Securitization Subsidiary) (A) to execute a Counterpart Agreement and become a party to the applicable Security Documents, (B) to take such actions necessary to grant to the Administrative Agent for the benefit of the Lenders a perfected security interest in the Collateral described in the Security Documents with respect to such new Subsidiary or such Wholly Owned Subsidiary with the priority specified in the Final Order, including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Security Documents or by law or as may be requested by the Administrative Agent and (C) to deliver to the Administrative Agent a certificate of such Subsidiary or such Wholly Owned Subsidiary, substantially in the form of Exhibit C, with appropriate insertions and attachments, and (iv) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(d)     With respect to any new Excluded Foreign Subsidiary created or acquired after the Closing Date by any Group Member (other than by any Group Member that is an Excluded Foreign Subsidiary), use its commercially reasonable efforts to promptly (i) execute and deliver to the Administrative Agent such amendments to the Security Documents as the Administrative Agent requests and deems necessary to grant to the Administrative Agent, for the benefit of the Lenders, a perfected first priority security interest in the Capital Stock of such new Subsidiary that is owned by any such Group Member (provided that in no event shall more than 65% of the total outstanding voting Capital Stock of any such new Subsidiary be required to be so pledged), (ii) deliver to the Administrative Agent the certificates representing such Capital Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the

relevant Group Member, and take such other action as may be necessary to perfect the Administrative Agent's security interest therein, and (iii) if reasonably requested by the Administrative Agent, deliver to the Administrative Agent customary legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(e)     With respect to any Foreign Subsidiary which is not a Wholly Owned Foreign Subsidiary and which becomes a Wholly Owned Foreign Subsidiary after the Closing Date (it being understood that the Capital Stock of such Wholly Owned Foreign Subsidiary shall be held by VIHI or a Foreign Stock Holding Company), promptly (i) execute and deliver to the Administrative Agent such amendments to the Security Documents as the Administrative Agent deems necessary to grant to the Administrative Agent, for the benefit of the Lenders, a perfected first priority security interest in the Capital Stock of such new Subsidiary that is owned by any such Group Member (provided that in no event shall more than 65% of the total outstanding voting Capital Stock of any such new Subsidiary be required to be so pledged), (ii) deliver to the Administrative Agent the certificates representing such Capital Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the relevant Group Member, and take such other action as may be necessary or, in the opinion of the Administrative Agent, desirable to perfect the Administrative Agent's security interest therein, and (iii) if reasonably requested by the Administrative Agent, deliver to the Administrative Agent customary legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(f)     With respect to any material Intellectual Property registered with the U.S. Patent and Trademark Office or the U.S. Copyright Office after the Closing Date, promptly (i) execute and deliver to the Administrative Agent such amendments to the Security Documents or such other documents as the Administrative Agent reasonably requests and deems necessary to grant to the Administrative Agent, for the benefit of the Lenders, a security interest in such property and (ii) take all commercially reasonable actions necessary to grant to the Administrative Agent, for the benefit of the Lenders, a perfected first priority security interest in such property, including filings with the U.S. Patent and Trademark Office or the U.S. Copyright Office, as applicable, and any other filings required by law, in each case, as may be reasonably requested by the Administrative Agent.

(g)     Borrower shall deliver, within sixty (60) days of the Closing Date, favorable legal opinions addressed to Lenders and the Administrative Agent, dated as of the Closing Date, in form and substance reasonably satisfactory to Administrative Agent and Lenders, from local counsel for Credit Parties with respect to foreign local pledge agreements.

**5.13   Bank Accounts; Offset.**   Subject to priorities set forth in the Final Order and the Cash Collateral Orders, to the Intercreditor Agreement and to the Carve Out, and without intending to

affect any cash management or cash collateral arrangements established under the Cash Collateral Orders, to secure the repayment of the Obligations, each Credit Party hereby grants to each Lender a security interest, a lien, and a right of offset, to extent the following constitutes Collateral , and each of which shall be upon and against (a) any and all moneys, securities or other property (and the proceeds therefrom) of such Credit Party now or hereafter held or received by or in transit to any Lender from or for the account of such Credit Party, whether for safekeeping, custody, pledge, transmission, collection or otherwise, (b) any and all deposit accounts and deposits (general or special, time or demand, provisional or final, but excluding any payroll, tax or trust accounts) therein of such Credit Party with any Lender, and (c) any other credits and claims of such Credit Party at any time existing against any Lender, including claims under certificates of deposit. Subject to Section 8 and the Intercreditor Agreement, at any time and from time to time after the occurrence of any Event of Default under Section 8.1(a) or upon the acceleration of the Obligations, each Lender is hereby authorized to foreclose upon, or to offset against the Obligations (with such notice as may be required by applicable law or this Agreement)[1], any and all items hereinabove referred to. The remedies of foreclosure and offset are separate and cumulative, and either may be exercised independently of the other without regard to procedures or restrictions applicable to the other.

**5.14   Non-Consolidation.**   Unless otherwise consented to by Administrative Agent and Required Lenders, Borrower will and will cause each of its Subsidiaries to: (a) maintain entity records and books of account separate from those of any other entity which is an Affiliate of such entity; (b) not commingle its funds or assets with those of any other entity which is an Affiliate of such entity; and (c) provide that its board of directors or other analogous governing body will hold all appropriate meetings (or with respect to any Subsidiary of Borrower execute appropriate written consents) to authorize and approve such entity's actions, which meetings (or, if applicable consents) will be separate from those of other entities.

**5.15   Stock of First-Tier Foreign Subsidiaries.** Cause the Capital Stock of each Foreign Subsidiary directly owned by Borrower or a Domestic Subsidiary now existing or hereafter created or acquired to be held by VIHI or a Foreign Stock Holding Company at all times.

**5.16   Post-Closing Requirements.** (a) Within 30 days of the Closing Date (or such later date as may be agreed to by the Administrative Agent from time to time), each Credit Party shall (i) use its commercially reasonable efforts to execute and deliver to the Administrative Agent such security documents as the Administrative Agent reasonably deems necessary to grant (under the laws of the applicable Uncertificated Foreign Jurisdictions) to the Administrative Agent, for the benefit of the Lenders, a perfected first priority security interest (to the extent "first priority" liens are possible under the laws of such Uncertificated Foreign Jurisdiction) in the Capital Stock of the Credit Parties directly-owned Foreign Subsidiaries to the extent required by Section 5.11 (and subject to the limitations set forth therein and the other Loan Documents) (other than Excluded Foreign Subsidiaries) organized under the laws of an Uncertificated Foreign Jurisdiction, (ii) take such other actions necessary to grant (under the laws of the applicable Uncertificated Foreign Jurisdiction) to the Administrative Agent, for the benefit of the Lenders, a perfected first priority security interest in the Capital Stock of such Foreign Subsidiaries, (iii) deliver to the Administrative Agent all other customary certificates and supporting

---

[1] remedies requires 5 business days notice

documentation as may be reasonably requested by the Administrative Agent, and (iv) if requested by the Administrative Agent, deliver to the Administrative Agent customary legal opinions relating to the matters described above, which opinions shall be in form and substance, and from local counsel in such jurisdiction, reasonably satisfactory to the Administrative Agent.

## SECTION 6. NEGATIVE COVENANTS

Each Credit Party covenants and agrees that, so long as any Commitment is in effect and until payment in full of all Obligations (other than unasserted contingent indemnification obligations not due and payable), such Credit Party shall perform, and shall cause each of its Subsidiaries, to the extent required below, to perform, all covenants in this Section 6.

**6.1    Indebtedness.**  From and after the date hereof, no Credit Party nor any of its Subsidiaries will in any manner incur, owe or be liable for Indebtedness except:

(a)    the Obligations.

(b)    Indebtedness of any Credit Party (other than VIHI or any Foreign Stock Holding Company) or its Subsidiaries under the Prepetition ABL Credit Agreement (and any replacement thereof); provided that the aggregate amount of principal and letter of credit exposure constituting Indebtedness outstanding under the Prepetition ABL Credit Agreement shall not exceed $145,000,000 in the aggregate at any time;

(c)    Indebtedness under the Prepetition Term Loan Agreement (and any replacement thereof); provided that the aggregate amount of principal constituting Indebtedness outstanding under the Prepetition Term Loan shall not exceed $1,500,000,000 in the aggregate at any time;

(d)    unsecured Indebtedness of any Credit Party owed (i) to any other Credit Party or (ii) to any Subsidiary which is not a Credit Party, which in the case of this clause (ii) is in accordance with arrangements currently in effect and approved by the Bankruptcy Court;

(e)    Indebtedness of any Foreign Subsidiary owed to any other Foreign Subsidiary;

(f)    Guarantee Obligations incurred in the ordinary course of business by the Borrower and its Subsidiaries in an aggregate amount, together with any Guarantee Obligations outstanding under clause (p) of the definition of "Permitted Investments", not to exceed $30,000,000 at any one time outstanding;

(g)    Indebtedness outstanding on the Closing Date and listed on Schedule 6.1(g) and any refinancings, refundings, renewals or extensions thereof (without shortening the maturity of, or increasing the principal amount of any such Indebtedness);

(h)    Indebtedness of any Foreign Subsidiaries (other than Halla Climate Control and its Subsidiaries) outstanding under any of the credit facilities listed on Schedule 6.1(h) as of the Closing Date up to an aggregate amount under all such credit

facilities as set forth on Schedule 6.1(h) (the "Schedule 6.1(h) Aggregate Amount") and any refinancings, refundings, renewals, reallocations or extensions thereof; provided that any new credit facility refinancing or replacing any such Indebtedness does not cause the aggregate amount available under all such credit facilities to exceed the Schedule 6.1(h) Aggregate Amount;

(i)     Indebtedness under letters of credit issued on behalf of any Group Members in an aggregate amount not to exceed $60,000,000 at any one time outstanding, which letters of credits may be cash collateralized in an amount not to exceed 105% of the face amount of such letters of credit;

(j)     Indebtedness of Foreign Subsidiaries in an aggregate outstanding principal amount not to exceed $75,000,000 at any one time outstanding; provided, that the Indebtedness described by this Section 6.1(j) and in Section 6.1(t) shall not, in the aggregate, exceed $100,000,000;

(k)     Indebtedness of the Borrower in respect of 2010 Notes, the 2014 Notes and the 2016 Notes;

(l)     Indebtedness of Halla Climate Control and its Subsidiaries in an amount not to exceed, when combined with all other outstanding Indebtedness of Halla Climate Control and its Subsidiaries, $250,000,000 at any one time outstanding; provided, that to the extent such Indebtedness is denominated in a currency other than US Dollars, the US Dollar equivalent thereof for purposes of determining compliance with this Section 6.1(l) shall be determined (1) with respect to such Indebtedness incurred on or prior to the Closing Date, on the Closing Date, and (2) with respect to such Indebtedness incurred after the Closing Date, on the date such Indebtedness is incurred;

(m)     Indebtedness incurred in the ordinary course of business in connection with cash pooling, netting and cash management arrangements consisting of overdrafts or similar arrangements; provided that any such Indebtedness does not consist of Indebtedness for borrowed money and is owed to the financial institutions providing such arrangements and such Indebtedness is extinguished in accordance with customary practices with respect thereto;

(n)     Capital Lease Obligations and purchase money Indebtedness of the Borrower or any of its Domestic Subsidiaries related to property located in the United States in an aggregate amount not to exceed $15,000,000 at any one time outstanding;

(o)     Indebtedness in respect of Swap Agreements permitted under Section 6.3;

(p)     Indebtedness arising out of the issuance of surety, stay, customs or appeal bonds, performance bonds and performance bonds and performance and completion guarantees, in each case incurred in the ordinary course of business;

(q)     Guarantee Obligations (i) in respect of the Indebtedness of Joint Ventures and listed on Schedule 6.1(q), and (ii) of the Indebtedness of Joint Ventures in an

aggregate principal amount, when taken together with the Indebtedness permitted in Section 6.1(u) shall not exceed $20,000,000 (or the equivalent thereof) at any one time outstanding; provided, that the existence of any Guarantee Obligations in respect of Indebtedness permitted by Section 6.1(u) shall not be additive to the amount of Indebtedness permitted under this Section 6.1(q) or Section 6.1(u);;

(r)     Indebtedness consisting of the financing of insurance premiums in the ordinary course of business with the providers of such insurance or their Affiliates; and

(s)     Intentionally Deleted;

(t)     Indebtedness of Foreign Subsidiaries and any Securitization Subsidiary under factoring programs and Permitted Receivables Financings incurred after the Closing Date in an aggregate amount not to exceed $80,000,000 at any one time outstanding; provided that such Indebtedness is not subject to any Guarantee Obligation or Lien issued or created by the Credit Parties (other than any Securitization Subsidiary); provided, that the Indebtedness described in this Section 6.1(t) and in Section 6.1(j) shall not, in the aggregate, exceed $100,000,000;

(u)     Indebtedness of Joint Ventures which are Subsidiaries of the Borrower (other than Halla Climate Control and its Subsidiaries), provided that the aggregate principal of such Indebtedness, when taken together with the Indebtedness permitted in Section 6.1(q) shall not exceed $20,000,000 (or the equivalent thereof) at any one time outstanding; provided, that the existence of any Guarantee Obligations in respect of such Indebtedness shall not be additive to the amount of Indebtedness permitted under this Section 6.1(u) or Section 6.1(q);

(v)     Indebtedness consisting of take or pay obligations under supply agreements entered into in the ordinary course of business consistent with past practice; and

(w)     additional Indebtedness not otherwise permitted hereunder not exceeding an aggregate principal amount of $5,000,000 at any one time outstanding.

**6.2     Limitation on Liens and Negative Pledges; Equitable Lien.**

(a)     No Credit Party nor any of its Subsidiaries will create, assume or permit to exist any Lien upon any of the properties or assets which it now owns or hereafter acquires, except the following:

(i)     Liens for taxes, assessments or governmental charges not yet due or that are being contested in good faith by appropriate proceedings, provided that adequate reserves with respect thereto are maintained on the books of the Borrower or its Subsidiaries, as the case may be, in conformity with GAAP;

(ii)     carriers', warehousemen's, mechanics', materialmen's, repairmen's, landlord's or other like Liens arising in the ordinary course of business

that are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings;

(iii)    pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(iv)    deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(v)    easements, rights-of-way, covenants, conditions, restrictions and other similar encumbrances or minor title or survey defects incurred in the ordinary course of business that, in the aggregate, are not substantial in amount and that do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower or any of its Subsidiaries;

(vi)    Liens in existence on the Closing Date and any modification, replacement, renewal or extension thereof, securing Indebtedness permitted by Section 6.1(a), provided that no such Lien is spread to cover any additional property (other than the proceeds or products thereof and accessions thereto) after the Closing Date and that the amount of Indebtedness secured thereby is not increased;

(vii)    Liens securing Indebtedness of the Borrower or any other Subsidiary incurred pursuant to Section 6.1(n) to finance the acquisition, repair, replacement, construction or improvement of fixed or capital assets, provided that (i) such Liens shall be created substantially simultaneously with or within 180 days of such acquisition, repair, replacement, construction or improvement of such fixed or capital assets, (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness (and the proceeds and products thereof and accessions thereto) and (iii) the amount of Indebtedness secured thereby is not increased;

(viii)    Liens created pursuant to the Security Documents;

(ix)    (i) leases, licenses, subleases or sublicenses granted to other Persons in the ordinary course of business which do not (A) interfere in any material respect with the business of any Borrower or any Subsidiary or (B) secure any Indebtedness or (ii) the rights reserved or vested in any Person by the terms of any lease, license, franchise, grant or permit held by any Borrower or any of its Subsidiaries or by a statutory provision, to terminate any such lease, license, franchise, grant or permit, or to require annual or periodic payments as a condition to the continuance thereof;

(x) Subject to the Intercreditor Agreement and the Final Order, Liens to secure Indebtedness permitted under Section 6.1(b) and (c);

(xi) Liens on assets of Foreign Subsidiaries securing Indebtedness of such Foreign Subsidiaries permitted by Section 6.1(h); provided that the aggregate outstanding principal amount of such Indebtedness secured by such Liens shall not exceed the secured Indebtedness set forth on Schedule 6.1(h) as of the Closing Date;

(xii) Liens securing Indebtedness of the Borrower or any Subsidiary incurred pursuant to Sections 6.1(i) and/or (j); provided that no Lien may be granted on the Collateral to secure such Indebtedness and the aggregate fair market value of the assets subject to such Liens shall not exceed 100% (105% in the case of Section 6.1(i)) of the amount of any such Indebtedness so secured;

(xiii) Liens on assets of Halla Climate Control and its Subsidiaries securing Indebtedness permitted by Section 6.1(l); and

(xiv) Liens securing judgments, decrees or attachments not constituting an Event of Default under Section 8.1(k) so long as such Liens are released or satisfied within 60 days after entry thereof (upon the issuance of an appeal bond or otherwise);

(xv) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(xvi) Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection, or (ii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(xvii) Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Subsidiary, in each case after the Closing Date (other than Liens on the equity interests of any Person that becomes a Subsidiary) and any modifications, replacements, renewals or extensions thereof; provided that (i) such Lien was not created in contemplation of such acquisition or such Person becoming a Subsidiary, (ii) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and accessions thereto), and (iii) the Indebtedness secured thereby (or, as applicable, any modifications, replacements, renewals or extension thereof) is permitted under Section 6.1;

A/73173405.16

(xviii) Liens arising from precautionary Uniform Commercial Code financing statement filings (or similar filings) regarding leases entered into by any Borrower or any of its Subsidiaries in the ordinary course of business;

(xix) Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by any Borrower or any of its Subsidiaries in the ordinary course of business and not prohibited by this Agreement; provided that such Liens only cover the property subject to such arrangements;

(xx) Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of any Borrower or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and its Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers or suppliers of any Borrower or any Subsidiary in the ordinary course of business;

(xxi) ground leases in respect of real property on which facilities owned or leased by Borrower or any of its Subsidiaries are located;

(xxii) Liens arising by operation of law under Article 2 of the Uniform Commercial Code in favor of a reclaiming seller of goods or buyer of goods;

(xxiii) security given to a public or private utility or any Governmental Authority as required in the ordinary course of business;

(xxiv) pledges or deposits of cash and Cash Equivalents securing deductibles, self-insurance, co-payment, co-insurance, retentions and similar obligations to providers of insurance on the ordinary course of business;

(xxv) Liens on securities which are subject to repurchase agreements as contemplated in the definition of "Cash Equivalents";

(xxvi) Liens on goods and the proceeds thereof and title documents relating thereto to secure drawings under letters of credit permitted under Section 6.1(i) used to finance the purchase of such goods;

(xxvii) Liens on (i) incurred premiums, dividends and rebates which may become payable under insurance policies and loss payments which reduce the incurred premiums on such insurance policies and (ii) rights which may arise under State insurance guarantee funds relating to any such insurance policy, in each case to secure Indebtedness permitted under Section 6.1(r);

(xxviii) Liens on Receivables, any Related Security and the Other Securitization Assets of any Foreign Subsidiary or any Securitization Subsidiary to the

extent that such Receivables, Related Security or Other Securitization Assets are subject to the relevant factoring programs and any Permitted Receivables Financing permitted hereunder;

(xxix) Liens not otherwise permitted by this Section so long as the aggregate outstanding principal amount of the obligations secured thereby shall not exceed $5,000,000 at any time; and

(xxx) Liens and deposits of cash or Cash Equivalents made by the Borrower or its Subsidiaries in connection with any Swap Agreement permitted hereunder, in an aggregate amount not to exceed $25,000,000.

(b) No Credit Party nor any of its Subsidiaries shall enter into any agreement prohibiting the creation or assumption of any Lien in favor of Beneficiaries upon any of its properties or assets, whether now owned or hereafter acquired, other than (a) applicable law, (b) this Agreement and the other Loan Documents, (c) any agreements governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby), (d) the Cash Collateral Orders, (e) the documentation governing any letter of credit facility and/or any Swap Agreement, in each case permitted hereunder, including, without limitation, with respect to any cash collateral provided in connection therewith, (f) any agreement with respect to Indebtedness of a Foreign Subsidiary permitted pursuant to this Agreement so long as such prohibitions or limitations are only with respect to the properties and revenues of such Foreign Subsidiary or any Subsidiary of a Foreign Subsidiary, (g) any arrangement or agreement arising in connection with a Disposition permitted under this Agreement so long as such restrictions apply only to the asset to be Disposed of pending completion of such Disposition, (h) any agreement with respect to the Indebtedness of any Person existing at the time such Person becomes a Subsidiary after the Closing Date so long as such prohibitions or limitations are only with respect to the properties and revenues of such Subsidiary, and (i) customary restrictions in leases, subleases, licenses and sublicenses.

**6.3    Swap Agreements.**  No Credit Party nor any of its Subsidiaries will enter into any Swap Agreement, except (a) Swap Agreements entered into to hedge or mitigate risks (and not for speculative purposes) of the Borrower or any Subsidiary (other than those in respect of Capital Stock), including, but not limited to, foreign exchange rate and commodity hedges and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower or any Subsidiary.

**6.4    Subsidiaries; Mergers; Capital Stock Transactions**.  No Credit Party nor any of its Subsidiaries will enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its property or business, except that:

(a) No Credit Party shall create or own any Subsidiary other than those listed in Schedule 4.14.

(b) so long as no Default has occurred and is continuing, or would result therefrom, any Subsidiary of the Borrower may be merged or consolidated with or into the Borrower (provided that the Borrower shall be the continuing or surviving corporation) or with or into any Guarantor (provided that the Guarantor shall be the continuing or surviving corporation) and any Guarantor may be merged or consolidated with or into another Guarantor;

(c) so long as no Default has occurred and is continuing, or would result therefrom, any Subsidiary of the Borrower may Dispose of any or all of its assets (i) to the Borrower or any Guarantor (upon voluntary liquidation or otherwise), (ii) to a Subsidiary that is not a Guarantor if the Subsidiary making the Disposition is not a Guarantor; provided that any such Disposition by a Wholly Owned Subsidiary must be to a Wholly Owned Subsidiary, or (iii) pursuant to a Disposition permitted by Section 6.5;

(d) to the extent applicable, any Investment expressly permitted by Section 6.7 may be structured as a merger, consolidation or amalgamation;

(e) any Subsidiary may be dissolved or liquidated so long as any Dispositions in connection with any such liquidation or dissolution are permitted under Section 6.4(c); and

(f) No Credit Party shall issue Capital Stock other than upon exercise of options and warrants to acquire common stock.

**6.5** **Limitation on Sales of Property.** No Credit Party will sell, transfer, lease, exchange or dispose of any of its assets or properties or any interest therein (including any stock or other equity interests in any of its Subsidiaries) except:

(a) the Disposition (including the abandonment of intellectual property) of obsolete, uneconomic, negligible or worn out property in the ordinary course of business;

(b) the sale of inventory in the ordinary course of business;

(c) the Disposition of any property or asset pursuant to any order of the Bankruptcy Court approving de minimis sales of assets, the sale of which shall not materially impair or diminish the value of the Collateral or any Credit Party's financial condition, business or operations;

(d) the sale or issuance of any Subsidiary's Capital Stock to the Borrower or any Guarantor;

(e) the sale by the Borrower or its Subsidiaries of the Specified Assets;

(f)     Dispositions of Cash Equivalents in the ordinary course of business in connection with the cash management activities of the Borrower and its Subsidiaries;

(g)     Dispositions of accounts receivable in connection with compromise, write down or collection thereof in the ordinary course of business and consistent with past practice;

(h)     leases, subleases, licenses or sublicenses of property in the ordinary course of business and which do not materially interfere with the business of the Borrower and its Subsidiaries;

(i)     transfer of property subject to a Recovery Event (i) upon receipt of Net Cash Proceeds of such Recovery Event or (ii) to a Governmental Authority as a result of condemnation;

(j)     Dispositions of Capital Stock to qualify directors where required by applicable requirements of Law or to satisfy other requirements of applicable requirements of Law with respect to the ownership of Capital Stock of Foreign Subsidiaries;

(k)     Dispositions of the Capital Stock of any Joint Venture to the extent required by the terms of customary buy/sell type arrangements entered into in connection with the formation of such Joint Venture, but only to the extent triggered by the actions of a third party under such Joint Venture, and not stayed by the automatic stay;

(l)     Dispositions of assets to effect Investments permitted under Section 6.7;

(m)    Dispositions of assets in connection with the accommodation agreements set forth on Schedule 6.5(m) and such other accommodation agreements the terms of which have been disclosed to and approved by the Required Lenders.

(n)     Dispositions of assets the fair market value of such assets do not, in the aggregate, exceed $5,000,000.

Neither Borrower nor any of Borrower's Subsidiaries will sell, transfer or otherwise dispose of Capital Stock of any of Borrower's Subsidiaries. No Credit Party will discount, sell, pledge or assign any notes payable to it or future income except to the extent expressly permitted under the Loan Documents.

**6.6     Limitation on Dividends and Redemptions.**

(a)     No Credit Party will declare or make any Distribution in respect of any class of its Capital Stock, nor will any Credit Party directly or indirectly declare or make any Distribution in respect of any Capital Stock of any other Credit Party (in each case, whether such Capital Stock is now or hereafter issued, outstanding or created), or cause or permit any reduction or retirement of the Capital Stock of any Credit Party, provided that each of Borrower's Subsidiaries may make Distributions to its equity holders or to Borrower in the ordinary course of business and as permitted by order of the Bankruptcy Court. Borrower shall not

issue any Capital Stock other than upon exercise of options and warrants to acquire common stock, and no other Credit Party shall make any such issuance to holders of such Credit Party's Capital Stock.

(b)     No Credit Party shall, nor shall it permit any of its Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of Borrower to (i) pay dividends or make any other Distributions on any of such Subsidiary's Capital Stock owned by Borrower or any other Subsidiary of Borrower, (ii) repay or prepay any Indebtedness owed by such Subsidiary to Borrower or any other Subsidiary of Borrower, (iii) make loans or advances to Borrower or any other Subsidiary of Borrower, or (iv) transfer any of its property or assets to Borrower or any other Subsidiary of Borrower other than restrictions on such transfer or property or assets except (1) by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses, joint operating agreements, joint venture agreements and similar agreements entered into in the ordinary course of business, (2) that are or were created by virtue of any transfer of, agreement to transfer or option or right with respect to any property, assets or Capital Stock not otherwise prohibited under this Agreement, and (3) such restrictions which exist as of the Closing Date, (4) for restrictions existing under the Loan Documents.

**6.7     Limitation on Investments, Capital Expenditures, and Deposit Accounts.**  No Credit Party will make any Investment other than (a) Permitted Investments, (b) Investments by a Credit Party in another Credit Party, (c) normal and prudent extensions of credit to customers buying goods and services in the ordinary course of business, and (d) endorsements of negotiable instruments in the ordinary course of business.  The Credit Parties will not make capital expenditures other than Capital Expenditures in accordance with the Budget.  Excluding any accounts created in connection with the establishment and/or maintain of any letter of credit facility permitted by the Loan Documents and otherwise as set forth in the Cash Collateral Orders, no Credit Party shall open any new deposit, commodity or security account other than the accounts existing on the Closing Date and any such accounts required to be created by the Loan Documents unless it shall have given the Administrative Agent ten (10) days prior written notice thereof and shall have taken all action deemed necessary or desirable by the Administrative Agent to cause its security interest (subject to the Intercreditor Agreement) therein to be perfected with the priority required under the Final Order.

**6.8     Transactions with Affiliates.**  No Credit Party nor any of its Subsidiaries will enter into any transaction, including any purchase, sale, lease or exchange of property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate (other than the Borrower or any Subsidiary Guarantor) unless such transaction is (a) otherwise permitted under this Agreement, (b) in the ordinary course of business of the relevant Group Member, and (c) upon fair and reasonable terms no less favorable to the relevant Group Member than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate.

**6.9     Conduct of Business.** From and after the Closing Date, no Credit Party shall, nor shall it permit any of its Subsidiaries to, engage in any business other than the businesses engaged in by such Credit Party on the Closing Date or that are reasonable extensions thereof or reasonably related, supportive, complementary or ancillary thereto.

**6.10     Fiscal Year.** No Credit Party shall, nor shall it permit any of its Subsidiaries to, change its Fiscal Year end from December 31, or change the Borrower's, or any of its Subsidiaries', method of determining fiscal quarters.

**6.11     Budget.** Borrower will not allow the payment of any expenses or disbursements other than those reflected in the Budget; provided that as shown in the Budget Variance Reports, and as reported and measured weekly thereafter at the times set forth in Section 5.2, the Group Members' actual cumulative net cash flow for the two (2) full weekly periods preceding and inclusive of the weekly period being considered, divided by two (2), shall not be less than 85% of the cumulative net cash flow set forth on the Budget for the two (2) full weekly periods immediately preceding the weekly period being considered, divided by two (2) (the "**Variance**").

**6.12     Amendments to Organizational Documents.** Borrower will not and will not permit any of its Subsidiaries to, enter into or permit any modification adverse to Lenders of, or waive any material right or obligation of any Person under its Organizational Documents.

**6.13     Prepetition Indebtedness.** No Credit Party shall pay or discharge, or cause to be paid or discharged, any Indebtedness of such Credit Party incurred before the Petition Date other than payments:

      (a)     approved by the Bankruptcy Court and in accordance with the Budget;

      (b)     required to be made pursuant to an order of the Bankruptcy Court in the Case for adequate protection pursuant to the Bankruptcy Code on account of Permitted Liens or on account of other Liens primed pursuant to the Final Order by the Liens securing the Obligations, or

      (c)     as required in a Plan of Reorganization, on or after the effective date of the Plan of Reorganization.

**6.14     Bankruptcy Case.** None of the Credit Parties shall, and none shall permit any of their respective Subsidiaries to, seek, consent or suffer to exist without the Required Lenders' consent (i) any modification, stay, vacation or amendment to the Final Order and (ii) a priority claim for any administrative expense against any Borrower or any Guarantor (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expense of the kind specified in Section 503(b), 506(c) or 507(b) of the Bankruptcy Code) equal or superior to the priority claim of the Administrative Agent and the Lenders in respect of the Obligations other than the Carve Out.

**6.15     Business of VIHI and Foreign Stock Holding Companies.** Permit VIHI or any other Foreign Stock Holding Company to (a) engage at any time in any business or business activity other than (i) ownership and acquisition of Capital Stock in Halla Climate Control and other Foreign Subsidiaries and Investments permitted by Section 6.7, (ii) performance of its

obligations under and in connection with the Loan Documents, (iii) actions required to maintain its existence and (iv) activities incidental to its maintenance and continuance and to the foregoing activities; (b) incur any Indebtedness (other than Indebtedness permitted by the Loan Documents); or (c) sell, Dispose of, grant a Lien on or otherwise transfer the Capital Stock of Halla Climate Control or any other Foreign Subsidiary except as permitted by Section 6.2, 6.5 or 6.6.

**6.16    Business of Securitization Subsidiary**. Permit the Securitization Subsidiary to (a) engage at any time in any business or business activity other than (i) the origination, collection and servicing of Receivables and activities necessary, related or incidental thereto, (ii) actions required to maintain its existence and (iii) activities incidental to its maintenance and continuance and to the foregoing activities; or (b) incur any Indebtedness or sell, dispose of, grant a Lien on or otherwise transfer any of its assets except as permitted hereunder.

## SECTION 7.   PRIORITY AND COLLATERAL SECURITY; GUARANTY.

**7.1    Priority and Collateral Security**.

   (a)    **Superpriority Claims and Collateral Security.**

      (i)    Each of the Credit Parties hereby represents, warrants and covenants that, except as otherwise expressly provided in this paragraph, the Obligations, upon the entry of the Final Order:

            (1)    shall at all times constitute a Superpriority Claim in the Case of the Credit Parties having priority, pursuant to Sections 364(c)(1) and 507(b) of the Bankruptcy Code (subject only to the Carve Out), over the other Superpriority Claim granted as adequate protection in respect of the Prepetition Lenders and any other claims of any entity, including without limitation any claims under Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law) 1113 and 1114 of the Bankruptcy Code, and shall at all times be senior to the rights of the Credit Parties, any successor trustee to the extent permitted by law, or any other creditor in the Case;

            (2)    pursuant to Sections 361, 362, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code and the Security Documents, shall at all times be secured by, and each Credit Party hereby grants to Administrative Agent for the benefit of itself and the other Secured Parties, (A) a first priority perfected Lien (subject to Permitted Prior Liens and the Carve Out) on (1) all presently owned and hereafter acquired assets of the Credit Parties and their estates wherever located, and any proceeds and products thereof, including without limitation, accounts, deposit accounts, cash, as-extracted collateral, chattel paper, investment property, letter-of-credit rights, securities accounts, commercial tort claims, investments, instruments, documents, inventory, contract rights, franchise agreements, general intangibles, intellectual property, real property, fixtures, goods, equipment and other fixed assets and proceeds and products of all of the foregoing (including insurance proceeds), provided, however, excluding the Excluded Collateral, (2) proceeds of any avoidance actions brought pursuant to Section 549 of the Bankruptcy

Code to recover any post-petition transfer of collateral, (3) any rights under Section 506(c) of the Bankruptcy Code and the proceeds thereof, (4) any unencumbered assets of the Credit Parties other than the Excluded Collateral and any of the foregoing which constitutes "Post-Petition L/C Collateral" as such term is defined in the L/C Order, and (5) a pledge, for the benefit of the Secured Parties and the Administrative Agent, of one hundred percent (100%) of the Capital Stock or other equity interests of the Domestic Subsidiaries, (6) a pledge, for the benefit of the Secured Parties and the Administrative Agent, of sixty-five percent (65%) of the Capital Stock or other equity interests of the Foreign Subsidiaries that are not Excluded Foreign Subsidiaries, and (B) a Lien on all assets of the Credit Parties securing other Indebtedness (other than the Indebtedness described in Section 6.1(i) of this Agreement), junior only to Permitted Prior Liens and the Carve Out.

    (ii)    Such Superpriority Claim referred to in <u>Section 7.1(a)(i)</u> shall not include Avoidance Actions but shall be subject to the Carve Out. Such Lien shall not extend to Avoidance Actions except proceeds thereof as set forth in <u>Section 7.1(a)(2)(A)(2) and (3)</u>, and shall be subject to the Carve Out, but otherwise shall be senior in priority to the adequate protection Liens securing the obligations in favor of the Prepetition Term Lender under the Prepetition Term Loan Agreement and all other Liens other than Permitted Liens, entitled to priority under applicable nonbankruptcy law.

    (iii)    All amounts expended for Priority Professional Expenses from and after the occurrence of an Event of Default shall reduce the Professional Expense Cap dollar for dollar. The security interests securing the Obligations shall not be subject to Section 551 of the Bankruptcy Code (other than a security interest or lien securing the Prepetition Lender Debt).

(b)    **Collateral Security Perfection**. Each of the Credit Parties agrees to take all action that Administrative Agent or the Required Lenders may reasonably request as a matter of nonbankruptcy law to perfect and protect the Administrative Agent's Liens for the benefit of the Secured Parties, upon the Collateral and for such Liens to obtain the priority therefor contemplated hereby, including, without limitation, executing and delivering such documents and instruments, providing such notices and assents of third parties, obtaining such Governmental Authorizations and providing such other instruments and documents in recordable form as Administrative Agent or any Lender may reasonably request. Each Credit Party hereby irrevocably authorizes the Administrative Agent at any time and from time to time to file in any filing office in any UCC jurisdiction any initial financing statements and amendments thereto (a) indicate the Collateral (i) as all assets of such Credit Party or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of the State of Delaware or such other jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by part 5 of Article 9 of the UCC of the State of Delaware or such other jurisdiction for the sufficiency or filing office

A/73173405.16

acceptance of any financing statement or amendment, including (i) whether such Credit Party is an organization, the type of organization and any organization identification number issued to such Credit Party and, (ii) in the case of a financing statement filed as a fixture filing, a sufficient description of real property to which the Collateral relates. Such Credit Party agrees to furnish any such information to Administrative Agent promptly upon Administrative Agent's request. Notwithstanding the provisions of this Section 7.1(b), the Administrative Agent and the Lenders shall have the benefits of the Final Order as set forth in Section 3.1(l) hereof.

(c)     **No Discharge; Survival of Claims.** Borrower and each Guarantor agree that (i) the Obligations shall not be discharged by the entry of an order confirming a Plan of Reorganization (other than a Plan of Reorganization which includes indefeasible payment of the Obligations in full in cash) (and Borrower and each Guarantor, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waive any such discharge (except to the extent such discharge is a result of payment of the Obligations in full in cash), and (ii) the Superpriority Claim granted to the Administrative Agent and the Secured Parties pursuant to the Final Order and the Liens granted to the Administrative Agent and the Secured Parties pursuant to the Final Order and the Security Documents shall not be affected in any manner by the entry of an order confirming such Plan of Reorganization, in each case unless otherwise agreed to by the Lenders.

(d)     **Guarantees.** The Obligations shall be guaranteed by each Domestic Subsidiary (direct or indirect) of the Borrower that is a debtor in the Case pursuant to the terms of the Guaranty. The Borrower shall notify the Lenders of the acquisition or formation of any new Domestic Subsidiary prior to such acquisition or formation. Borrower shall, at the request of the Required Lenders, promptly, and in any event within ten (10) Business Days of such request, cause each of its newly created Domestic Subsidiaries (other than any Securitization Subsidiary) which is not a Guarantor but which is a debtor in the Case to (i) execute and deliver to each of the Lenders and Administrative Agent a guaranty which is substantially in the form of the Guaranty and which is satisfactory to the Required Lenders in all respects and (ii) execute and deliver to each of the Lenders and Administrative Agent all other documents and instruments, including, without limitation, the items set forth in Section 5.12, corporate authority documents and legal opinions, as the Required Lenders may reasonably request in connection with the delivery of such guaranty.

**7.2     Guaranty.**

(a)     **Guaranty of the Obligations.**

(i)     Subject to the provisions of Section 7.2(b), each of the Guarantors jointly and severally hereby irrevocably and unconditionally guarantee to Administrative Agent for the ratable benefit of the Beneficiaries the due and punctual payment in full of all Obligations when the same shall

become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (collectively, the "**Guaranteed Obligations**").

(ii)     Anything herein or in any other Loan Document to the contrary notwithstanding, the maximum liability of each Guarantor hereunder and under the other Loan Documents shall in no event exceed the amount which can be guaranteed by such Guarantor under applicable federal and state laws relating to the insolvency of debtors (after giving effect to the right of contribution established in Section 7.2(b)).

(iii)    Each Guarantor agrees that the Obligations may at any time and from time to time exceed the amount of the liability of such Guarantor hereunder without impairing the guarantee contained in this Section 7.2 or affecting the rights and remedies of the Administrative Agent or any Lender hereunder.

(iv)    The guarantee contained in this Section 7.2 shall remain in full force and effect until the Obligations have been indefeasibly paid in full in cash.

(v)     No payment made by the Borrower, any of the Guarantors, any other guarantor or any other Person or received or collected by the Administrative Agent or any Lender from the Borrower, any of the Guarantors, any other guarantor or any other Person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of any Guarantor hereunder which shall, notwithstanding any such payment (other than any payment made by such Guarantor in respect of the Obligations or any payment received or collected from such Guarantor in respect of the Obligations), remain liable for the Obligations up to the maximum liability of such Guarantor hereunder until the Obligations have been indefeasibly paid in full in cash.

(b)     **Right of Contribution.**  Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment.  Each Guarantor's right of contribution shall be subject to the terms and conditions of Section 7.2(c).  The provisions of this Section 7.2(b) shall in no respect limit the obligations and liabilities of any Guarantor to the Administrative Agent and the Lenders, and each Guarantor shall remain liable to the Administrative Agent and the Lenders for the full amount guaranteed by such Guarantor hereunder.

(c)     **No Subrogation**.  Notwithstanding any payment made by any Guarantor hereunder or any set-off or application of funds of any Guarantor by the

Administrative Agent or any Lender, no Guarantor shall be entitled to exercise any of its rights, if any, obtained pursuant to being subrogated to any of the rights of the Administrative Agent or any Lender against the Borrower or any other Guarantor or any collateral security or guarantee or right of offset held by the Administrative Agent or any Lender for the payment of the Obligations, nor shall any Guarantor seek or be entitled to seek any contribution or reimbursement from the Borrower or any other Guarantor in respect of payments made by such Guarantor hereunder, until the Obligations (other than contingent indemnification obligations for which no claims has been asserted) have been indefeasibly paid in full in cash. If any amount shall be paid to any Guarantor on account of such subrogation rights at any time when all of the Obligations (other than contingent indemnification obligations for which no claims has been asserted) shall not have been indefeasibly paid in full in cash, such amount shall be held by such Guarantor in trust for the Administrative Agent and the Lenders, segregated from other funds of such Guarantor, and shall, forthwith upon receipt by such Guarantor, be turned over to the Administrative Agent in the exact form received by such Guarantor (duly indorsed by such Guarantor to the Administrative Agent, if required), to be applied against the Obligations.

(d)     **Amendments, etc. with respect to the Obligations**.  Each Guarantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against any Guarantor and without notice to or further assent by any Guarantor, any demand for payment of any of the Obligations made by the Administrative Agent or any Lender may be rescinded by the Administrative Agent or such Lender and any of the Obligations continued, and the Obligations, or the liability of any other Person upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by the Administrative Agent or any Lender, and this Agreement and the other Loan Documents and any other documents executed and delivered in connection therewith may be amended, modified, supplemented or terminated, in whole or in part, as the Administrative Agent (or the Required Lenders or all Lenders, as the case may be) may deem advisable from time to time, and any collateral security, guarantee or right of offset at any time held by the Administrative Agent or any Lender for the payment of the Obligations may be sold, exchanged, waived, surrendered or released. Neither the Administrative Agent nor any Lender shall have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Obligations or for the guarantee contained in this Section 7.2 or any property subject thereto.

(e)     **Guarantee Absolute and Unconditional**.  Each Guarantor waives any and all notice of the creation, renewal, extension or accrual of any of the Obligations and notice of or proof of reliance by the Administrative Agent or any Lender upon the guarantee contained in this Section 7.2 or acceptance of the guarantee contained in this Section 7.2; the Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended,

70

amended or waived, in reliance upon the guarantee contained in this Section 7.2; and all dealings between the Borrower and any of the Guarantors, on the one hand, and the Administrative Agent and the Lenders, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon the guarantee contained in this Section 7.2. Each Guarantor waives but only during the term of this Agreement (except with respect to such rights as are required by applicable law and cannot be waived) diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon the Borrower or any of the Guarantors with respect to the Obligations. Each Guarantor understands and agrees that the guarantee contained in this Section 7.2 shall be construed as a continuing, absolute and unconditional guarantee of payment without regard to (a) the validity or enforceability of this Agreement or any other Loan Document, any of the Obligations or any other collateral security therefor or guarantee or right of offset with respect thereto at any time or from time to time held by the Administrative Agent or any Lender, (b) any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by the Borrower or any other Person against the Administrative Agent or any Lender, or (c) any other circumstance whatsoever (with or without notice to or knowledge of the Borrower or such Guarantor) which constitutes, or might be construed to constitute, an equitable or legal discharge of the Borrower for the Obligations, or of such Guarantor under the guarantee contained in this Section 7.2, in bankruptcy or in any other instance. When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against any Guarantor, the Administrative Agent or any Lender may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as it may have against the Borrower, any other Guarantor or any other Person or against any collateral security or guarantee for the Obligations or any right of offset with respect thereto, and any failure by the Administrative Agent or any Lender to make any such demand, to pursue such other rights or remedies or to collect any payments from the Borrower, any other Guarantor or any other Person or to realize upon any such collateral security or guarantee or to exercise any such right of offset, or any release of the Borrower, any other Guarantor or any other Person or any such collateral security, guarantee or right of offset, shall not relieve any Guarantor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of the Administrative Agent or any Lender against any Guarantor. For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

(f)     **Reinstatement**. The guarantee contained in this Section 7.2 shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by the Administrative Agent or any Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or

any substantial part of its property, or otherwise, all as though such payments had not been made.

(g) **Payments.** Each Guarantor hereby guarantees that payments hereunder will be paid to the Administrative Agent without set-off or counterclaim (other than for the defense of payment or performance) in Dollars at the office of the Administrative Agent.

## SECTION 8. EVENTS OF DEFAULT

**8.1** **Events of Default.** If any one or more of the following conditions or events (each herein called an "**Event of Default**") shall occur and be continuing:

(a) Any Credit Party fails to pay the principal component of any Loan when due and payable, whether at a date for the payment of a fixed installment or as a contingent or other payment becomes due and payable or as a result of acceleration or otherwise;

(b) Any Credit Party fails to pay any Obligation (other than the Obligations described in subsection (a) above) when due and payable, whether at a date for the payment of a fixed installment or as a contingent or other payment becomes due and payable or as a result of acceleration or otherwise, within three (3) Business Days after the same becomes due in the case of interest or ten (10) calendar days thereafter in the case of any other Obligation;

(c) Any "default," or "event of default" or "termination event" occurs under any Loan Document, the Final Order or either of the Cash Collateral Orders, and the same is not remedied within the applicable period of grace (if any) provided in such Loan Document or Final Order or Cash Collateral Orders;

(d) Any Credit Party fails to duly observe, perform or comply with any covenant, agreement or provision of Sections 2.3, 5.2 through 5.7, 5.12 or any part of Section 6;

(e) Any Credit Party fails (other than as referred to in subsections (a), (b), (c) or (d) above) to duly observe, perform or comply with any covenant, agreement, condition or provision of any Loan Document, and such failure remains unremedied for a period of thirty (30) days after the date on which notice of such failure is given by Administrative Agent or the Required Lenders to Borrower;

(f) Any certification, representation or warranty previously, presently or hereafter made in writing by or on behalf of any Credit Party under or in connection with any Loan Document shall prove to have been false or incorrect in any material respect on any date on or as of which made;

(g) except to the extent the following events are disclosed on Schedule 4.11 or such events occurred prior to the date hereof and were disclosed to each Lender or the Administrative Agent: (i) any Person shall engage in any "prohibited transaction"

72

(as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any failure to meet the minimum funding standards under the Pension Funding Rules, whether or not waived, shall exist with respect to any Plan or any Lien in favor of the PBGC or a Plan shall arise on the assets of any Group Member or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Required Lenders, likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA, (v) any Group Member or any Commonly Controlled Entity shall, or in the reasonable opinion of the Required Lenders is likely to, incur any liability in connection with a withdrawal from, or the insolvency or reorganization (within the meaning of Sections 4245 and 4241 of ERISA, respectively) of, a Multiemployer Plan or (vi) any other event or condition shall occur or exist with respect to a Plan; and in each case above, such event or condition, together with all other such events or conditions, if any, could, in the sole judgment of the Required Lenders, reasonably be expected to have a Material Adverse Effect;

(h)     At any time after the execution and delivery thereof, (i) the Guaranty for any reason, other than the satisfaction in full of all Obligations, shall cease to be in full force and effect with respect to any Guarantor (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder, (ii) this Agreement or any Security Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, or the Administrative Agent shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Security Documents with the priority required by the Final Order, in each case for any reason other than the failure of Administrative Agent or any other Secured Party to take any action within its control, or (iii) any Credit Party shall contest the validity or enforceability of any Loan Document in writing or deny in writing that it has any further liability, including with respect to future advances by Lenders, under any Loan Document to which it is a party;

(i)     the Bankruptcy Court shall enter any order (i) amending, supplementing, altering, staying, vacating, rescinding or otherwise modifying the Final Order or any other order with respect to the Case in a manner adverse to the Administrative Agent or Lenders, without the Required Lenders' consent, (ii) appointing a Chapter 11 trustee or an examiner pursuant to Section 1104 of the Bankruptcy Code with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) and 1106(b) of the Bankruptcy Code) in the Case, (iii) dismissing the Case or converting the Case to a Chapter 7 case, or (iv) approving the sale, transfer, lease, exchange, alienation or other disposition of all or substantially all of the assets, properties or Capital Stock or other equity

A/73173405.16

interests of any Credit Party pursuant to Section 363 of the Bankruptcy Code or otherwise, without the consent of the Required Lenders;

(j)    an application shall be filed by any of the Credit Parties for the approval of any other Superpriority Claim in the Case (other than the Carve Out) which is pari passu with or senior to the claims of the Lenders against any of the Credit Parties unless after giving effect to the transactions contemplated by such application, all Obligations (whether contingent or otherwise) shall be paid in full in cash, or there shall arise any such Superpriority Claim;

(k)    there shall remain undischarged for more than thirty (30) days any final postpetition judgment or execution action against any of the Credit Parties, or relief from the automatic stay of Section 362(a) of the Bankruptcy Code shall be granted to any creditor or creditors of any of the Credit Parties, in each case which would operate to divest any Credit Party of assets, having a value in excess of $10,000,000, in the aggregate;

(l)    any of the Credit Parties shall file a motion in the Case (i) except as provided in the Final Order, and Cash Collateral Orders, to use cash collateral of the Lenders under Section 363(c) of the Bankruptcy Code without the Required Lenders' consent, (ii) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, (iii) to sell, transfer, lease, exchange, alienate or otherwise dispose of all or substantially all of the assets, properties or Capital Stock or other equity interest of any Credit Party pursuant to Section 363 of the Bankruptcy Code or otherwise without the consent of the Required Lenders, or (iv) to take any other action or actions adverse to the Lenders or their rights and remedies hereunder or under any of the other Loan Documents or any of the documents evidencing or creating the Secured Parties' interest in any of the Collateral;

(m)    any payment of prepetition debt (other than any prepetition Indebtedness contemplated to be paid pursuant to the Budget, in each case as approved by the Bankruptcy Court and in accordance with the Budget);

(n)    the U.S. dollar equivalent market value of Borrower's ownership interest in Halla Climate Control closes on the KOSPI below $300,000,000 for three (3) consecutive trading days;

(o)    a Change of Control;

(p)    any of the Credit Parties shall (i) default in the payment when due of any principal of or interest on any postpetition Indebtedness or any event of default specified in any note, agreement, indenture or other document evidencing or securing any such Indebtedness shall occur if the effect of such event of default is to cause, or (with the giving of notice or the lapse of time or both) to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause such Indebtedness to become due, or to be prepaid in full prior

A/73173405.16

to its stated maturity, or (ii) default in the payment when due of any principal of or interest on any prepetition Indebtedness or any other event of default specified in any note, agreement, indenture or other document evidencing or securing any such Indebtedness shall occur if, by order of the Bankruptcy Court issued with respect to such prepetition Indebtedness, the default thereunder entitles the holder thereof to relief from the automatic stay of Section 362 of the Bankruptcy Code, in each case in an aggregate amount in excess of $10,000,000; and

(q)     any of the Credit Parties shall enter into any agreement to, or shall consummate any transaction to, sell, transfer, lease, exchange or otherwise dispose of all or substantially all of its assets, properties, Capital Stock or other equity interests (other than as expressly permitted pursuant to clauses (a) through (d) of Section 6.4 hereunder) pursuant to Section 363 of the Bankruptcy Code that does not result in the payment in full in cash of the Obligations;

**THEN,** at the request of (or with the consent of) Required Lenders, upon notice to Borrower by Administrative Agent, (A) the Commitments, if any, shall immediately terminate and (B) all Obligations, including the unpaid principal amount of and accrued interest on the Loans, shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by each Credit Party.

**8.2      Remedies.**    Upon the occurrence and continuation of an Event of Default, the Administrative Agent upon direction of the Required Lenders shall, provide the Credit Parties, the Creditors' Committee and the United States Trustee with written notice (via email or facsimile) specifying the Event of Default and the basis therefor and informing such parties that the Administrative Agent and the Lenders intend to exercise their remedies under the Final Order, the Security Documents and hereunder five (5) Business Days after the Credit Parties' receipt of such notice (the "**Remedies Notice Period**"). During such Remedies Notice Period, the Credit Parties and the Creditors' Committee have the right to seek an emergency hearing before the Bankruptcy Court for the sole purpose of determining whether an Event of Default has occurred; provided, that during the Remedies Notice Period, the Credit Parties may use cash collateral in accordance with the terms and provisions of the Budget solely to meet payroll obligations and pay expenses necessary, in the good faith judgment of the Credit Parties, to be paid at such time for the preservation of the debtors in the Case and their estates, and as otherwise agreed by the Administrative Agent and, as applicable, the Prepetition Term Agent and/or Prepetition ABL Agent, in their sole discretion. _Unless during such five-Business Day notice period the Bankruptcy Court determines that an Event of Default has not occurred, upon the expiration of such five-day notice period, (i)(A) the Administrative Agent and the Secured Parties automatically shall have relief from the automatic stay and the Administrative Agent (with the consent of the Required Lenders) may foreclose on all or any portion of the Collateral or otherwise exercise remedies against the Collateral permitted by the Security Documents, and other nonbankruptcy law, including, without limitation, the exercise of rights of setoff and all rights and remedies of a secured party under the UCC, and (B) any right of any of the Credit Parties to use cash collateral shall cease.

**8.3      Distribution of Collateral Proceeds.**    In the event that, following the occurrence or during the continuance of any Default or Event of Default, Administrative Agent or any Secured

Party, as the case may be, receives any monies in connection with the enforcement of any the Security Documents, or otherwise with respect to the realization upon any of the Collateral, such monies shall be distributed for application as follows, in each case, subject to Carve Out and the priorities set forth in the Intercreditor Agreement so that the obligations of Credit Parties under the ABL Credit Agreement shall first be paid or provision for payment thereof shall be made from proceeds of Prepetition ABL Priority Collateral, and otherwise to be applied first to the Obligations:

(a)     First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent and amounts payable under Section 2.14) payable to the Administrative Agent in its capacity as such;

(b)     Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to Lenders (including fees, charges and disbursements of counsel to the respective Lenders and amounts payable under Sections 2.12 and 2.13), ratably among them in proportion to the amounts described in this clause (b) payable to them;

(c)     Third, to payment of accrued and unpaid interest on the Loans and the other Obligations, ratably among Lenders in proportion to the respective amounts described in this clause (c) payable to them;

(d)     Fourth, to payment of unpaid principal of the Loans and the other Obligations, ratably among Lenders in proportion to the respective amounts described in this clause Fourth held by them;

(e)     Fifth, to payment of the obligations of Borrower under the Prepetition Term Loan Agreement; and

(f)     Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Credit Parties or as otherwise required by Law.

## SECTION 9.  AGENTS

**9.1     Appointment of Agents.**  Wilmington is hereby appointed Administrative Agent hereunder and under the other Loan Documents and each Lender hereby authorizes Wilmington, as Administrative Agent, to act as its agent in accordance with the terms hereof and the other Loan Documents. Each Agent hereby agrees to act upon the express conditions contained herein and the other Loan Documents, as applicable. The provisions of this Section 9 are solely for the benefit of the Administrative Agent and Lenders and no Credit Party shall have any rights as a third party beneficiary of any of the provisions thereof. In performing its functions and duties hereunder, the Administrative Agent shall act solely as an agent of Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for any Group Member or any Credit Party.

**9.2     Powers and Duties.**  Each Lender irrevocably authorizes the Administrative Agent to take such action on such Lender's behalf and to exercise such powers, rights and remedies

hereunder and under the other Loan Documents as are specifically delegated or granted to the Administrative Agent by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto. The Administrative Agent shall have only those duties and responsibilities that are expressly specified herein and the other Loan Documents. The Administrative Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees. The Administrative Agent shall not have, by reason hereof or any of the other Loan Documents, a fiduciary relationship in respect of any Lender; and nothing herein or any of the other Loan Documents, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent any obligations in respect hereof or any of the other Loan Documents except as expressly set forth herein or therein.

**9.3     General Immunity**.

(a)     <u>No Responsibility for Certain Matters</u>.  The Administrative Agent shall not be responsible to any Lender for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Loan Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by the Administrative Agent to Lenders or by or on behalf of any Credit Party to the Administrative Agent or any Lender in connection with the Loan Documents and the transactions contemplated thereby or for the financial condition or business affairs of any Credit Party or any other Person liable for the payment of any Obligations, nor shall the Administrative Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Loan Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Event of Default or Default or to make any disclosures with respect to the foregoing.  Anything contained herein to the contrary notwithstanding, the Administrative Agent shall not have any liability arising from confirmations of the amount of outstanding Loans or the component amounts thereof.

(b)     <u>Exculpatory Provisions</u>.  **None of the Administrative Agent nor any of its officers, partners, directors, employees or agents shall be liable to any Lender or any Credit Party for any action taken or omitted by the Administrative Agent under or in connection with any of the Loan Documents except to the extent caused by the Administrative Agent's or any of officers', directors', employees' or agents' gross negligence or willful misconduct.**  The Administrative Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Loan Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until the Administrative Agent shall have received instructions in respect thereof from Required Lenders (or such other Lenders as may be required to give such instructions under Section 10.4) and, upon receipt of such instructions from Required Lenders (or such other Lenders, as the case may be), the Administrative

77

Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions. Without prejudice to the generality of the foregoing, (i) the Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for Borrower and its Subsidiaries), accountants, experts and other professional advisors selected by it; and (ii) no Lender shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or (where so instructed) refraining from acting hereunder or any of the other Loan Documents in accordance with the instructions of Required Lenders (or such other Lenders as may be required to give such instructions under Section 10.4).

**9.4    Agents Entitled to Act as Lender.** The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, the Administrative Agent in its individual capacity as a Lender hereunder, if applicable. With respect to its participation in the Loans, if any, the Administrative Agent shall have the same rights and powers hereunder as any other Lender and may exercise the same as if it were not performing the duties and functions delegated to it hereunder, and, to the extent the Administrative Agent is a Lender, the term "Lender" shall, unless the context clearly otherwise indicates, include the Administrative Agent in its individual capacity. The Administrative Agent and its Affiliates may accept deposits from, lend money to, own securities of, and generally engage in any kind of banking, trust, financial advisory or other business with any Credit Party or any of its Affiliates as if it were not performing the duties specified herein, and may accept fees and other consideration from the Credit Parties for services in connection herewith and otherwise without having to account for the same to Lenders.

**9.5    Lenders' Representations, Warranties and Acknowledgment.**

(a)    Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of Borrower and its Subsidiaries in connection with Credit Extensions hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of Borrower and its Subsidiaries. The Administrative Agent shall have no duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and the Administrative Agent shall have no responsibility with respect to the accuracy of or the completeness of any information provided to Lenders.

(b)    Each Lender, by delivering its signature page to this Agreement and funding its Loan on the Closing Date, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document

required to be approved by the Administrative Agent, Required Lenders or Lenders, as applicable on the Closing Date.

**9.6**     **Right to Indemnity.** Each Lender, in proportion to its Pro Rata Share, severally agrees to indemnify the Administrative Agent, to the extent that the Administrative Agent shall not have been reimbursed by any Credit Party, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Administrative Agent in exercising its powers, rights and remedies or performing its duties hereunder or under the other Loan Documents or otherwise in its capacity as the Administrative Agent in any way relating to or arising out of this Agreement or the other Loan Documents, **INCLUDING ANY OF THE FOREGOING CAUSED, IN WHOLE OR IN PART, BY THE NEGLIGENCE OF THE ADMINISTRATIVE AGENT OR IMPOSED, IN WHOLE OR IN PART, UNDER ANY LAW PROVIDING FOR STRICT LIABILITY**, provided, no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's gross negligence or willful misconduct. If any indemnity furnished to the Administrative Agent for any purpose shall, in the opinion of the Administrative Agent, be insufficient or become impaired, the Administrative Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, in no event shall this sentence require any Lender to indemnify the Administrative Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's Pro Rata Share thereof; and provided, further, this sentence shall not be deemed to require any Lender to indemnify the Administrative Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

**9.7**     **Successor Agents**. Administrative Agent may resign at any time by giving thirty (30) days' prior written notice thereof to Lenders and Borrower, and Administrative Agent may be removed at any time with or without cause by an instrument or concurrent instruments in writing delivered to Borrower and Administrative Agent and signed by Required Lenders. Upon any such notice of resignation or any such removal, Required Lenders shall have the right, upon five Business Days' notice to Borrower, to appoint a successor Administrative Agent (subject to the Borrower consent unless an Event of Default has occurred and is continuing). Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, that successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Administrative Agent and the retiring or removed Administrative Agent shall promptly transfer to such successor Administrative Agent all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Administrative Agent under the Loan Documents, whereupon such retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder.

**9.8**     **Security Documents and Guaranty**.

(a)     Agents under Security Documents and Guaranty.  Each Lender hereby further authorizes Administrative Agent on behalf of and for the benefit of Lenders, to be the agent for and representative of Lenders with respect to the Guaranty.  Each Lender hereby further authorizes the Administrative Agent on behalf of and for the benefit of Lenders, to be the agent for and representative of Lenders with respect to the Collateral and the Security Documents.  Subject to Section 10.4, without further written consent or authorization from Secured Parties, the Administrative Agent may execute any documents or instruments necessary to release any Lien encumbering any item of Collateral that is the subject of an asset sale permitted under Section 6.5 or to which Required Lenders (or such other Lenders and other Persons as may be required to give such consent under Section 10.4) have otherwise consented.  Subject to Section 10.4, without further written consent or authorization from Lenders, the Administrative Agent may execute any documents or instruments necessary to release any Guarantor from the Guaranty pursuant to Section 7.2 or with respect to which Required Lenders (or such other Lenders or other Persons as may be required to give such consent under Section 10.4) have otherwise consented.

(b)     Right to Realize on Collateral and Enforce Guaranty.  Anything contained in any of the Loan Documents to the contrary notwithstanding, Borrower, Administrative Agent, and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Administrative Agent (and only at the request or consent of the Required Lenders), as applicable, in each case on behalf of Lenders in accordance with the terms hereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Administrative Agent, and (ii) in the event of a foreclosure by the Administrative Agent (which shall be only at the request or consent of the Required Lenders) on any of the Collateral pursuant to a public or private sale, the Administrative Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and the Administrative Agent, as agent for and representative of Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent at such sale.

## SECTION 10.  MISCELLANEOUS

**10.1   Notices.**   Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given to a Credit Party or Administrative Agent shall be sent to such Person's address as set forth on Appendix B or in the other relevant Loan Document, and in the case of any Lender, the address as indicated on Appendix B or otherwise indicated to Administrative Agent and Borrower in writing.  Each notice hereunder shall be in writing and may be personally served, e-mailed or sent by telefacsimile or United

States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of telefacsimile or e-mail confirmation, or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed.

**10.2    Expenses.** Borrower agrees (a) to pay or reimburse the Administrative Agent for all its reasonable documented out-of-pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including the reasonable documented fees and disbursements of one counsel to the Administrative Agent (and such other conflicts, local and foreign local counsel as shall be reasonably required by the Administrative Agent), one financial advisor, appraisers, accountants, agents and consultants to the Administrative Agent, and filing and recording fees and expenses, with statements with respect to the foregoing to be submitted to the Borrower prior to the Closing Date (in the case of amounts to be paid on the Closing Date) and from time to time thereafter on a monthly basis or such other periodic basis as the Administrative Agent shall deem appropriate, (b) to pay or reimburse each Lender and the Administrative Agent for its reasonable documented out-of-pocket costs-and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any such other documents, including the fees and reasonable documented out-of-pocket disbursements of counsel (including the allocated fees and expenses of in-house counsel) to each Lender and of counsel to the Administrative Agent, financial advisors, appraisers, accountants, agents and consultants to the Administrative Agent, (c) to pay, indemnify, and hold each Lender and the Administrative Agent harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other taxes, if any, that may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents. Statements payable by Borrower pursuant to this Section 10.2 shall be submitted to [_____] (Telephone No. _____) (Telecopy No. _____) (Email address:_____), at the address of Borrower set forth in Section 10.1, or to such other Person or address as may be hereafter designated by Borrower in a written notice to the Administrative Agent. The agreements in this Section 10.2 shall survive repayment of the Loans and all other amounts payable hereunder. Notwithstanding the foregoing, any indemnification provided under this Section 10.2 shall be without duplication of any amounts under Sections 2.15, 10.3 or otherwise.

**10.3    Indemnity, WAIVER OF PUNITIVE DAMAGES.**

(a)    In addition to the payment of expenses pursuant to Section 10.2, each Credit Party agrees, jointly and severally, to pay, indemnify, and hold each Lender and the Administrative Agent and their respective officers, partners, directors, employees, Affiliates, agents and controlling persons (each, an "**Indemnitee**") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature

whatsoever relating to or arising out of the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents, and the transactions contemplated thereby, including any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of any Group Member or any of the Properties and the reasonable documented fees and out-of-pocket expenses of legal counsel in connection with claims, actions or proceedings by any Indemnitee against any Credit Party under any Loan Document (all the foregoing in this clause (a), collectively, the "**Indemnified Liabilities**"), provided, that the Borrower and each other Credit Party shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities (i) have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee, (ii) have resulted from the breach by such Indemnitee in respect of such Indemnitee's obligations under the facility, or (iii) have arisen from a dispute solely between Lenders and not involving the Administrative Agent or the Borrower; provided further that such reimbursement obligations shall be limited to one counsel for the Administrative Agent and one counsel for the Lenders (and, as reasonably determined by the Administrative Agent, one or more local counsel) unless there is a conflict of interest with respect to a particular Indemnitee, in which case such Indemnitee shall be reimbursed for its own counsel. To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 10.3 may be unenforceable in whole or in part because they are violative of any law or public policy, the applicable Credit Party shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them. Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee. If any suit, action, proceeding, claim or demand shall be brought or asserted against any Indemnitee (other than the Administrative Agent) with respect to the matters covered by the Borrower's indemnification in this Agreement, (i) such Indemnitee shall promptly notify the Borrower thereof; provided, however, that the failure to promptly provide such notice shall not affect Borrower's indemnification obligations hereunder except to the extent that Borrower was prejudiced by the failure to provide prompt notice; and (ii) to the extent not precluded by a conflict of interest or other duties binding on it, such Indemnitee shall work cooperatively with the Borrower with a view toward minimizing the legal and other expenses associated with any defense and any potential settlement or judgment, which cooperation shall include (A) the use of a single counsel selected by such Indemnitee and reasonably acceptable to the Borrower (so long as such Indemnitee, in its reasonable judgment, does not believe that the use of a single

counsel is not reasonably practicable or, based on the advice of counsel, disadvantageous from a legal perspective) and (B) regular consultation with the Borrower (and, to the extent a single counsel is not used, its counsel) upon the reasonable request of the Borrower with regard to the management of any litigation and the negotiation of any potential settlement, in order to afford the Borrower (and, to the extent a single counsel is not used, its counsel) reasonable opportunities to participate in the consideration of material decisions with respect thereto. All amounts due under this Section 10.3 shall be payable not later than 30 days after written demand therefor (together with reasonably detailed supporting documentation).

(b)     **TO THE EXTENT PERMITTED BY APPLICABLE LAW, NO PARTY HERETO SHALL ASSERT, AND EACH HEREBY WAIVES, ANY CLAIM AGAINST THE ADMINISTRATIVE AGENT, ANY LENDER, ANY CREDIT PARTY OR ANY OF THEIR RESPECTIVE AFFILIATES, SUBSIDIARIES, DIRECTORS, EMPLOYEES, ATTORNEYS OR AGENTS, ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) (WHETHER OR NOT THE CLAIM THEREFOR IS BASED ON CONTRACT, TORT OR DUTY IMPOSED BY ANY APPLICABLE LEGAL REQUIREMENT) ARISING OUT OF, IN CONNECTION WITH, ARISING OUT OF, AS A RESULT OF, OR IN ANY WAY RELATED TO, THIS AGREEMENT OR ANY LOAN DOCUMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, ANY LOAN OR THE USE OF THE PROCEEDS THEREOF OR ANY ACT OR OMISSION OR EVENT FROM TIME TO TIME OCCURRING IN CONNECTION THEREWITH, AND EACH PARTY HERETO HEREBY WAIVES, RELEASES AND AGREES NOT TO SUE UPON ANY SUCH CLAIM OR ANY SUCH DAMAGES, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOR EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY GIVES THIS WAIVER FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 10.3 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR TO ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER.**

**10.4     Amendments and Waivers; Consents**.

(a) <u>Required Lenders' Consent; Notice to Creditors' Committee</u>. Subject to Sections 10.4(b), 10.4(c), 10.4(d) and 10.4(e), no amendment, modification, termination or waiver of any provision of the Loan Documents, or consent to any departure by any Credit Party therefrom, shall in any event be effective without the written concurrence of the Required Lenders. In addition, any amendment, modification or supplement of or to the Loan Documents shall require advance notice to the Creditors' Committee and the United States Trustee.

(b) <u>Affected Lenders' Consent</u>. Without the written consent of each Lender that would be directly affected thereby, no amendment, modification, termination, or consent shall be effective if the effect thereof would:

    (i) extend the scheduled final maturity of any Loan or Note, or grant any forbearance or similar accommodation that would preclude such Lender from being able to enforce repayment of its Loan at scheduled final maturity;

    (ii) reduce the rate of interest on any Loan (other than any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 2.6 or waiver of any Event of Default or Default) or any fee payable hereunder or under the Fee Letter;

    (iii) reduce the principal amount of such Lender's Loan;

    (iv) amend, modify, terminate or waive any provision of this Section 10.4(b) or Section 10.4(a), 10.4(c), or 10.4(d);

    (v) amend the definition of "Required Lenders" or "Pro Rata Share"; or

    (vi) release all or substantially all of the Collateral (other than assets sales permitted by Section 6.5 and use of cash collateral pursuant to the Cash Collateral Orders) or all or substantially all of the Guarantors from the Guaranty except as expressly provided in the Loan Documents.

(c) <u>Other Consents</u>. No amendment, modification, termination or waiver of any provision of the Loan Documents, or consent to any departure by any Credit Party therefrom, shall:

    (i) increase any Commitment of such Lender over the amount thereof then in effect without the consent of such Lender; <u>provided</u>, no amendment, modification or waiver of any condition precedent, covenant, Default or Event of Default shall be deemed to constitute an increase in any Commitment of any Lender; or

    (ii) amend, modify, terminate or waive any provision of Section 9 as the same applies to Administrative Agent, or any other provision hereof as the same applies to the rights or obligations of Administrative Agent, in each case without the consent of Administrative Agent.

A/73173405.16

(d)     Execution of Amendments, etc.  Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this Section 10.4 shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by a Credit Party, on such Credit Party.

**10.5    Successors and Assigns; Participations**.

(a)     Generally.  This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Administrative Agent and Lenders.  No Credit Party's rights or obligations hereunder nor any interest therein may be assigned or delegated by any Credit Party without the prior written consent of all Lenders.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, Affiliates and Indemnitees of each of the Administrative Agent and Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Register.  Borrower, Administrative Agent and Lenders shall deem and treat the Persons listed as Lenders in the Register as the holders and owners of the corresponding Commitments and Loans listed therein for all purposes hereof, and no assignment or transfer of any such Commitment or Loan shall be effective, in each case, unless and until an Assignment Agreement effecting the assignment or transfer thereof shall have been delivered to and accepted by Administrative Agent and recorded in the Register as provided in Section 10.5(e) and the Administrative Agent shall accept and record any assignment complying with Sections 10.5(c) and 10.5(d).  Prior to such recordation, all amounts owed with respect to the applicable Commitment or Loan shall be owed to the Lender listed in the Register as the owner thereof, and any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Commitments or Loans.

(c)     Right to Assign.  Each Lender shall have the right at any time to sell, assign or transfer all or a portion of its rights and obligations under this Agreement, including, without limitation, all or a portion of its Commitment or Loans owing to it or other Obligation (provided, however, that each such assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any Loan and any related Commitments):

(i)     to any Person meeting the criteria of clause (x) or (y) of the definition of the term of "Eligible Assignee" upon the giving of notice to Borrower and Administrative Agent; and

(ii)    to any other Person, with the consent of the Borrower so long as no Event of Default has occurred and is continuing, such consent not to be unreasonably withheld or delayed. Each such assignment pursuant to this Section 10.5(c) (or, in the case of Related Funds simultaneously purchasing such assigned interests, then aggregate Loan amounts purchased by such Related Funds) shall be in an aggregate amount of not less than $2,000,000 (or such lesser amount as may be agreed to by Administrative Agent or as shall constitute the aggregate amount of the Commitments and Loans of the assigning Lender) with respect to the assignment of the Commitments and/or Loans.

(d)     Mechanics.  The assigning Lender and the assignee thereof shall execute and deliver to Administrative Agent an Assignment Agreement, together with (i) a processing and recordation fee of $3,500 (except that only one fee shall be payable in the case of contemporaneous assignments to Related Funds), and (ii) such forms, certificates or other evidence, if any, with respect to United States federal income tax withholding matters as the assignee under such Assignment Agreement may be required to deliver to Administrative Agent pursuant to the terms hereof.

(e)     Notice of Assignment.  Upon its receipt of a duly executed and completed Assignment Agreement, together with the processing and recordation fee referred to in Section 10.5(d) (and any forms, certificates or other evidence required by this Agreement in connection therewith), Administrative Agent shall record the information contained in such Assignment Agreement in the Register, shall give prompt notice thereof to Borrower and shall maintain a copy of such Assignment Agreement.

(f)     Representations and Warranties of Assignee.  Each Lender, upon execution and delivery hereof or upon executing and delivering an Assignment Agreement, as the case may be, represents and warrants as of the Closing Date or as of the applicable Effective Date (as defined in the applicable Assignment Agreement) that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making of or investing in commitments or loans such as the applicable Commitments or Loans, as the case may be; and (iii) it will make or invest in, as the case may be, its Commitments or Loans for its own account in the ordinary course of its business and without a view to distribution of such Commitments or Loans within the meaning of the Securities Act or the Exchange Act or other United securities Laws (it being understood that, subject to the provisions of this Section 10.5, the disposition of such Commitments or Loans or any interests therein shall at all times remain within its exclusive control).

(g) <u>Effect of Assignment</u>. Subject to the terms and conditions of this Section 10.5, as of the "Effective Date" specified in the applicable Assignment Agreement: (i) the assignee thereunder shall have the rights and obligations of a "Lender" hereunder to the extent such rights and obligations hereunder have been assigned to it pursuant to such Assignment Agreement and shall thereafter be a party hereto and a "Lender" for all purposes hereof; (ii) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned thereby pursuant to such Assignment Agreement, relinquish its rights (other than any rights which survive the termination hereof under Section 10.7) and be released from its obligations hereunder (and, in the case of an Assignment Agreement covering all or the remaining portion of an assigning Lender's rights and obligations hereunder, such Lender shall cease to be a party hereto; <u>provided</u>, anything contained in any of the Loan Documents to the contrary notwithstanding, such assigning Lender shall continue to be entitled to the benefit of all indemnities hereunder as specified herein with respect to matters arising out of the prior involvement of such assigning Lender as a Lender hereunder); (iii) the Commitments shall be modified to reflect the applicable Commitment of such assignee and any Commitment of such assigning Lender, if any; and (iv) if any such assignment occurs after the issuance of any Note hereunder, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender its applicable Notes to Administrative Agent for cancellation, and thereupon Borrower shall issue and deliver new Notes, if so requested by the assignee and/or assigning Lender, to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect the new Commitments and/or outstanding Loans of the assignee and/or the assigning Lender.

(h) <u>Participations</u>. Each Lender shall have the right at any time to sell one or more participations to any Person (other than Borrower, any of its Subsidiaries or any of its Affiliates) in all or any part of its Commitments, Loans or in any other Obligation. The holder of any such participation, other than an Affiliate of the Lender granting such participation, shall not be entitled to require such Lender to take or omit to take any action hereunder except with respect to any amendment, modification or waiver that would require the consent of all affected Lenders under Section 10.4(b). Each Borrower agrees that each participant shall be entitled to the benefits of Sections 2.13 and 2.14 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (c) of this Section; <u>provided</u>, (i) a participant shall not be entitled to receive any greater payment under Section 2.13 and 2.14 than the applicable Lender would have been entitled to receive with respect to the participation sold to such participant, unless the sale of the participation to such participant is made with Borrower's prior written consent and (ii) a participant that would be a Non-US Lender if it were a Lender shall not be entitled to the benefits of Section 2.14 unless Borrower is notified of the participation sold to such participant and such participant agrees, for the benefit of Borrower, to comply with Section 2.14 as though it were a Lender.

A/73173405.16

(i)     Certain Other Assignments.  In addition to any other assignment permitted pursuant to this Section 10.5, (i) any Lender may assign and/or pledge all or any portion of its Loans, the other Obligations owed by or to such Lender, and its Notes, if any, to secure obligations of such Lender to any Person, including any Federal Reserve Bank as collateral security pursuant to Regulation A of the Board of Governors of the Federal Reserve System and any operating circular issued by such Federal Reserve Bank; provided, no Lender, as among Borrower and such Lender, shall be relieved of any of its obligations hereunder as a result of any such assignment and pledge, and provided, further, in no event shall the applicable Federal Reserve Bank or trustee be considered to be a "Lender" or be entitled to require the assigning Lender to take or omit to take any action hereunder.

**10.6    Independence of Covenants.**  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

**10.7    Survival of Representations, Warranties and Agreements; Termination.**

(a)     All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of any Credit Extension. Notwithstanding anything herein or implied by law to the contrary, the agreements of each Credit Party set forth in Sections 2.13, 2.14, 2.15, 10.2, 10.3 and 10.20 and the agreements of Lenders set forth in Sections 2.12, 9.3, 9.6 and 10.16 shall survive the payment of the Loans and the termination hereof.

(b)     At any time when no Obligations are then owing, the Borrower may elect in a written notice delivered to Administrative Agent to terminate this Agreement. Upon the proper receipt by Administrative Agent of such a notice at such a time, then this Agreement and all Security Documents shall thereupon be terminated, except to the extent provided otherwise in Section 10.7(a) of this Agreement or in any similar provision of any Security Document that expressly provides for the survival of specified provisions thereof.  At the request and expense of Borrower, the Administrative Agent shall prepare and execute all necessary instruments to reflect and effect such termination and the release of the Collateral.  The Administrative Agent is hereby authorized to execute all such instruments on behalf of all Lenders, without the joinder of or further action by any Lender.

**10.8    No Waiver; Remedies Cumulative.**  No failure or delay on the part of the Administrative Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Loan Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.  The rights, powers and remedies given to the Administrative Agent and each Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or ·in any of the other Loan

Documents. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

**10.9  Marshalling; Payments Set Aside.** Neither the Administrative Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Credit Party or any other Person or against or in payment of any or all of the Obligations. To the extent that any Credit Party makes a payment or payments to the Administrative Agent or Lenders (or to the Administrative Agent, on behalf of Lenders), or the Administrative Agent or Lenders enforce any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**10.10  Severability.** In case any provision in or obligation hereunder or any Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**10.11  Obligations Several; Independent Nature of Lenders' Rights.** The obligations of Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitment of any other Lender hereunder. Nothing contained herein or in any other Loan Document, and no action taken by Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a joint venture or any other kind of entity. The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

**10.12  Headings.** Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

**10.13  APPLICABLE LAW.  EXCEPT TO THE EXTENT THAT THE LAW OF ANOTHER JURISDICTION IS EXPRESSLY ELECTED IN A LOAN DOCUMENT, THE LOAN DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE BANKRUPTCY CODE AND THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF (OTHER THAN THE NEW YORK GENERAL OBLIGATIONS LAW §5-1401 AND §5-1402) AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA (INCLUDING THE BANKRUPTCY CODE).**

**10.14 CONSENT TO EXCLUSIVE JURISDICTION.** ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO OR ANY OTHER LOAN DOCUMENT, OR ANY OF THE OBLIGATIONS, SHALL BE BROUGHT IN THE BANKRUPTCY COURT OR (SUBJECT TO THE ENTRY OF AN APPROPRIATE ORDER BY THE BANKRUPTCY COURT) IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK. BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH PARTY HERETO, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (a) ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (b) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (c) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 10.1; (d) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (c) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (e) AGREES ADMINISTRATIVE AGENT, LENDERS AND CREDIT PARTIES RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY PARTY IN THE COURTS OF ANY OTHER JURISDICTION.

**10.15 WAIVER OF JURY TRIAL.** EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER LOAN DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 10.15 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS

A/73173405.16

**HERETO OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

**10.16 Confidentiality.**

    (a)    Each Lender and Administrative Agent agrees that it will take all reasonable steps to keep confidential any proprietary information regarding each Credit Party and its business identified as confidential by such Credit Party and obtained by such Lender pursuant to the requirements hereof, it being understood and agreed by such Credit Party that, in any event, a Lender may make (i) disclosures of such information to Affiliates of such Lender and to their agents and advisors (and to other persons authorized by a Lender or Agent to organize, present or disseminate such information in connection with disclosures otherwise made in accordance with this Section 10.16) (provided, such counterparties and advisors are advised of an agree to be bound by the provisions of this Section 10.16), (ii) disclosures of such information reasonably required by any bona fide or potential assignee, transferee or participant in connection with the contemplated assignment, transfer or participation by such Lender of any Loans or any participations therein or by any direct or indirect contractual counterparties (or the professional advisors thereto) in Swap Agreements (provided, such counterparties and advisors are advised of and agree to be bound by the provisions of this Section 10.16), (iii) disclosure to any rating agency when required by it, provided that, prior to any disclosure, such rating agency shall undertake in writing to preserve the confidentiality of any confidential information relating to the Credit Parties received by it from Administrative Agent or any Lender, and (iv) disclosures required or requested by any Governmental Authority or representative thereof or by the NAIC or pursuant to legal or judicial process; provided, unless specifically prohibited by applicable law or court order, each Lender shall make reasonable efforts to notify such Credit Party of any request by any Governmental Authority or representative thereof (other than any such request in connection with any examination of the financial condition or other routine examination of such Lender by such governmental agency) for disclosure of any such non-public information prior to disclosure of such information.

    (b)    Administrative Agent, Lenders, and Credit Parties shall consult with each other before issuing any press releases or otherwise making any public statements with respect to this Agreement and the transactions contemplated hereby; provided, however, that if any Credit Party has made a commercially reasonable effort to contact Administrative Agent and Lenders regarding a disclosure and has been unable to arrange the consultation referred to above prior to a public disclosure deadline established by Law or by the rules of any stock exchange where Borrower's securities trade, then the public disclosure may be made without such consultation to the extent required by such Law or by such rules. No such Person shall issue any such press release or make any public statement without the

agreement of the other parties, except as may be required by applicable Law or the rules of any stock exchange where Borrower's securities trade.

**10.17   Usury Savings Clause.**   Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under applicable law, shall not exceed the Highest Lawful Rate.   If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, Borrower shall pay to Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect.   Notwithstanding the foregoing, it is the intention of Lenders and Borrower to conform strictly to any applicable usury laws.   Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to Borrower.

**10.18   Counterparts.**   This Agreement may be separately executed in any number of counterparts and by the different parties hereto in separate counterparts, all of which when so executed shall be deemed to constitute one and the same Agreement.   Delivery by electronic transmission of an executed counterpart of a signature page to this Agreement shall be as effective as delivery of a manually executed counterpart hereof.

**10.19   Effectiveness.**   This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by Borrower and Administrative Agent of written or telephonic notification of such execution and authorization of delivery thereof.

**10.20   USA Patriot Act Notice.**   Each Lender that is subject to the Act (as hereinafter defined) and Administrative Agent (for itself and not on behalf of any Lender) hereby notifies Borrower and each other Credit Party that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Act**"), it is required to obtain, verify and record information that identifies Borrower and the other Credit Parties, which information includes the name and address of such Persons and other information that will allow such Lender or Administrative Agent, as applicable, to identify such Persons in accordance with the Act.

**10.21   Order.**   In the event of any inconsistency between the terms and conditions of any of the Loan Documents and the Final Order, the provisions of the Final Order shall govern and control.

*[Remainder of page intentionally left blank.]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**VISTEON CORPORATION,**
as a Borrower

GUARANTORS TO BE COMPLETED

By:_____
    Name:
    Title:

**ADMINISTRATIVE AGENT:**

**WILMINGTON TRUST FSB,**
in its capacity as Administrative Agent

By:_____
     Authorized Signatory

**LENDERS:**

**SANKATY CREDIT OPPORTUNITIES IV, L.P.**

By:_____
Name:
Title:

**SANKATY DIP OPPORTUNITIES, L.P.**

By:_____
Name:
Title:

**TENNENBAUM OPPORTUNITIES PARTNERS V, LP**
**TENNENBAUM DIP OPPORTUNITY FUND, LLC**

On behalf of each of the above entities:

By: TENNENBAUM CAPITAL PARTNERS, LLC
Its: Investment Manager

By: _____
Name: Howard M. Levkowitz
Title: Managing Partner

**MASON CAPITAL, LTD.**

By: MASON CAPITAL MANAGEMENT LLC, its investment manager

By: _____
Name: John C. Grizzetti
Title: Chief Financial Officer

**MASON CAPITAL, LP**

By: MASON CAPITAL MANAGEMENT LLC, its
investment manager

By: _____
Name: John C. Grizzetti
Title: Chief Financial Officer

**GUGGENHEIM PORTFOLIO COMPANY X,
LLC**

By: MASON CAPITAL MANAGEMENT LLC, its
investment manager

By: _____
Name: John C. Grizzetti
Title: Chief Financial Officer