# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| VISTEON CORPORATION, et al.,[1] | Case No. 09-11786 (CSS) |
| Debtors. | Jointly Administered |
| | **Hearing date: February 18, 2010 at 10:00 a.m. ET**<br>**Objection deadline: February 10, 2010 at 4:00 p.m. ET** |

## MOTION FOR ENTRY OF AN ORDER CONFIRMING THE DEBTORS' AUTHORITY TO IMPLEMENT THEIR ORDINARY COURSE ANNUAL INCENTIVE PLAN

The above-captioned debtors and debtors in possession (collectively, "Visteon" or the "Debtors") file this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, confirming their authority to implement, in the ordinary course, their annual incentive plan (the "2010 Annual Incentive Plan"). In support of this Motion, the Debtors respectfully state as follows:[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Visteon Corporation (9512); ARS, Inc. (3590); Fairlane Holdings, Inc. (8091); GCM/Visteon Automotive Leasing Systems, LLC (4060); GCM/Visteon Automotive Systems, LLC (7103); Infinitive Speech Systems Corp. (7099); MIG-Visteon Automotive Systems, LLC (5828); SunGlas, LLC (0711); The Visteon Fund (6029); Tyler Road Investments, LLC (9284); VC Aviation Services, LLC (2712); VC Regional Assembly & Manufacturing, LLC (3058); Visteon AC Holdings Corp. (9371); Visteon Asia Holdings, Inc. (0050); Visteon Automotive Holdings, LLC (8898); Visteon Caribbean, Inc. (7397); Visteon Climate Control Systems Limited (1946); Visteon Domestic Holdings, LLC (5664); Visteon Electronics Corporation (9060); Visteon European Holdings Corporation (5152); Visteon Financial Corporation (9834); Visteon Global Technologies, Inc. (9322); Visteon Global Treasury, Inc. (5591); Visteon Holdings, LLC (8897); Visteon International Business Development, Inc. (1875); Visteon International Holdings, Inc. (4928); Visteon LA Holdings Corp. (9369); Visteon Remanufacturing Incorporated (3237); Visteon Systems, LLC (1903); Visteon Technologies, LLC (5291). The location of the Debtors' corporate headquarters and the service address for all the Debtors is: One Village Center Drive, Van Buren Township, Michigan 48111.

[2] In further support of this Motion, the Debtors submit the *Declaration of William G. Quigley, III, Chief Financial Officer and Executive Vice President of Visteon Corporation, in Support of the Motion for Entry of an Order Confirming the Debtors' Authority to Implement Their Ordinary Course Annual Incentive Plan* (the "Quigley Declaration"), attached hereto as **Exhibit B**, and the *Declaration of John Sinkular in Support of the Motion for Entry of an Order Confirming the Debtors' Authority to Implement Their Ordinary Course Annual Incentive Plan* ("Sinkular Declaration"), attached hereto as **Exhibit C**.

**Preliminary Statement**

1.    Previously in this case, Visteon sought approval of a key employee incentive plan (the "KEIP").[3]    The KEIP proposed to award the Debtors' insider employees incentive compensation based on the achievement of an EBITDA metric for the last six months of 2009 and the Debtors' successful emergence from chapter 11.[4]    While the Debtors garnered support of the KEIP from both the unsecured creditors' committee and the *ad hoc* committee of term lenders, this Court, after conducting an evidentiary hearing, denied the KEIP's EBITDA metric without prejudice and emergence milestone with prejudice.    In so ruling, the Court acknowledged the genuine value of incentive plans and provided guidance as to its view of the appropriate construction and timing of such plans.[5]    The Debtors have heard the Court clearly and have designed the 2010 Annual Incentive Plan to fully comport with this Court's direction.

2.    The 2010 Annual Incentive Plan has been established in the ordinary course—with only a financial performance metric—and is also timely presented to this Court, as the plan's performance period is in the early stages of its annual cycle (unlike the KEIP, which was brought before this Court near the end of the 2009 fiscal year).

3.    Indeed, the 2010 Annual Incentive Plan is entirely consistent with both Visteon's historical compensation practices and industry practice.    Thus, the 2010 Annual Incentive Plan satisfies the two-step "horizontal" and "vertical" test articulated by the Third Circuit and followed by this Court to qualify as an ordinary course program.    See In re Nellson

---

[3]    See *Motion of the Debtors for Entry of an Order Authorizing Implementation of an Amended Incentive Program* [Docket No. 1116].

[4]    Any term used in this Motion that is used in title 11 of the United States Code, §§101-1532 (the "Bankruptcy Code"), or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

[5]    See Transcript of Proceedings, October 7, 2009, attached hereto as **Exhibit D** ("Hr'g Tr.").

2

_Nutraceutical, Inc._, 369 B.R. 787, 797 (Bankr. D. Del. 2007) (citing _In re Roth Am., Inc._, 975 F.2d 949, 952 (3d Cir. 1992)). Since its inception Visteon has, in the ordinary course of its business, implemented a broad-based annual incentive plan to motivate and reward employees by giving them market-based opportunities to increase their compensation if Visteon achieved or exceeded certain financial and operational goals. Consistent with this practice, Visteon, in consultation with its board of directors and its outside compensation consultants at Towers Watson & Company, has developed the 2010 Annual Incentive Plan.

4. In particular, the 2010 Annual Incentive Plan would compensate approximately 1,300 Visteon employees for achievement of a challenging adjusted EBITDA targets in March of 2011.[6] Thus, unlike the previously presented KEIP, the 2010 Annual Incentive Plan incentivizes employees only for the achievement of a financial performance target—a direct barometer for the success of Visteon's business. Moreover, the performance period under the 2010 Annual Incentive Plan commenced just over one month ago and is an entire year in length. In previously ruling on the KEIP, the Court advised that "a broader and longer view would be more appropriate" and invited the Debtors to "come back on these facts with a different plan," Hr'g Tr. at 159:16-19, 160:7-8.

5. In order to ensure that the performance metric is fully incentivizing, the Debtors have developed the 2010 Annual Incentive Plan in conjunction with the start of the new year on a virtually clean financial performance slate. This is also entirely consistent with Visteon's prepetition practices. Moreover, in developing the 2010 Annual Incentive Plan, Visteon presented the plan's metric and compensation opportunities to representatives of the unsecured

---

[6] While the Debtors fully expect to have exited from bankruptcy prior to any payments being made under the 2010 Annual Incentive Plan in March of 2011, the Debtors have filed this Motion out of an abundance of caution and to assure their employees that their hard work and achievement of challenging, value-enhancing goals will be rewarded. The 2010 Annual Incentive Plan also includes 636 employees of non-debtor entities. These non-debtors entities would make payment to their employees themselves upon achievement of the targets under the 2010 Annual Incentive Plan.

3

creditors' committee and the *ad hoc* committee of term lenders and, after discussion with the unsecured creditors' committee, the Debtors have adjusted the 2010 Annual Incentive Plan's EBITDA metric to require a *higher* EBITDA target than the Debtors originally proposed—making the 2010 Annual Incentive Plan metric that much more difficult to achieve. Prior to the hearing on the Motion, the Debtors expect to continue to engage the unsecured creditors' committee, the *ad hoc* committee of term lenders, and other constituents in discussions in an effort to gain their support of the 2010 Annual Incentive Plan.[7]

6. Given its incentivizing nature, to the extent the broad-based 2010 Annual Incentive Plan also applies to insider employees, it is not subject to section 503(c)(1) of the Bankruptcy Code. Accordingly, Visteon now seeks confirmation from the Court of its authority to implement the 2010 Annual Incentive Plan and thus make its employees aware of the goals and incentives for which to strive in 2010.

### Jurisdiction

7. This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

8. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[7] The Debtors recognize that the implementation of the annual incentive opportunities proposed in this Motion comes at a time (a) when they have made clear Visteon's need to terminate three of their substantially underfunded defined benefit pension plans (absent a substantial equity capital infusion from junior creditors) and (b) shortly after this Court authorized their termination of unvested retiree health care and life-insurance benefits. Any argument that the establishment of incentive compensation opportunities cannot be reconciled with the Debtors' business needs to reduce their legacy costs is misguided. Active employees' pursuit of financial performance goals are designed to ensure that Visteon will be a sustainable enterprise for the future. Visteon's active employees should not be foreclosed from working toward achievement of financial goals to ensure Visteon's viability as a going-concern just because the future Visteon enterprise cannot manage to maintain its substantial prepetition employee and retiree related liabilities—just as it clearly cannot sustain servicing approximately $862 million in prepetition unsecured bond debt and will likely have to equitize a significant portion of its secured debt absent a substantial junior capital infusion given the company's debt capacity limitations. *See* e.g., In re Chemtura Corp., No. 09-11233 (Bankr. D. Del. Jul. 28, 2009, Nov. 30, 2009) (authorizing the debtors to implement a key employee incentive plan and management incentive plan where certain other unvested post-employment benefits were later terminated by the debtors).

4

9.    The statutory base for the relief requested herein is section 363(c) of the Bankruptcy Code.

## Relief Requested

10.    By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A**, confirming their authority to implement, in the ordinary course, their 2010 Annual Incentive Plan.[8]

## Background

11.    On May 28, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases. On June 8, 2009, the Office of the United States Trustee for the District of Delaware (the "United States Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 178]. These cases are jointly administered.

12.    Since its inception, Visteon has offered its employees incentive based compensation on an annual basis, including a broad-based annual incentive plan. Quigley Declaration ¶ 4. In 2000, Visteon formally memorialized its incentive compensation practices

---

[8]    The Debtors' proposed plan of reorganization provides that reorganized Visteon may honor certain incentive bonus plans that are not addressed in this Motion, including the Debtors' long-term incentive programs whose metrics have been, or may be, achieved. Whether reorganized Visteon may or may not honor such compensation programs is not an issue presented under this Motion regarding the 2010 Annual Incentive Plan. Such issues will be subject to the voting and confirmation requirements of the Bankruptcy Code and need not be ratified in connection with a motion seeking confirmation of a debtor's authority to implement an ordinary course incentive program. See In re Journal Register Co., 407 B.R. 520, 536 (Bankr. S.D.N.Y. 2009) (applying confirmation standards to incentive plan to be honored by reorganized entity under debtor's plan of reorganization and finding section 503(c) inapplicable); In re Dana Corp. (Dana II), 358 B.R. 567 (Bankr. S.D.N.Y. 2006) ("to the extent that [certain post-emergence payments are] subject to further review and must be passed upon as a provision in a disclosure statement and plan of reorganization, the Court cannot ... guarantee that the payment will be ultimately approved"). Moreover, as the Debtors explore potential alternative plan of reorganization structures, the ultimate compensation programs that may be honored by reorganized Visteon remains to be seen.

5

by adopting the 2000 Incentive Plan, dated June 28, 2000, which was amended by the 2004 Incentive Plan, dated May 12, 2004. Id. The 2004 Incentive Plan has provided the framework for Visteon's yearly implementation of annual incentive plans. The annual incentive plan is the Debtors' only broad-based incentive compensation program and is a key tool by which the Debtors drive operational and financial performance throughout their employee base. Id.

13. In the past, Visteon has used a variety of metrics under its annual incentive plans to motivate employees to achieve or surpass Visteon's business objectives. Id. ¶ 6. Every annual incentive plan implemented by Visteon has included a financial performance metric, such as profit before taxes, return on assets, earnings before interest expense and income taxes, excluding restructuring expenses and non-cash asset impairments ("EBIT-R"), and free cash flow metrics. Id. The company has selected these metrics at the start of each year to reflect its business realities and key objectives. Id. Historically, the performance metrics under Visteon's annual incentive plans have been difficult to achieve and payouts have generally been below 100% target levels.[9] Id. ¶ 7.

## The 2010 Annual Incentive Plan

14. In developing the 2010 Annual Incentive Plan, and consistent with their past practices, the Debtors' senior management team engaged in a deliberative process with the Organization and Compensation Committee of Visteon's board of directors (the "Compensation Committee") to determine the appropriate compensation levels and metrics to motivate their employees to accomplish specific financial performance objectives and maximize the value of

---

[9] Although the Debtors anticipate the free cash flow and quality performance metrics under their 2009 annual incentive plan will be achieved upon the final closing of the 2009 fiscal year, in their best business judgment, the Debtors have decided not to make payments on account of the 2009 annual incentive plan in March of 2010; nor do the Debtors expect, at this time, such payouts to be made pursuant to a plan of reorganization, as the Debtors have not accounted for such payouts in the financial projections included in their proposed plan of reorganization. Thus, under current circumstances, there will be no annual incentive opportunity for the Debtors' employees for 2009.

the corporate enterprise. Id. ¶ 9. To ensure that the award opportunities under the 2010 Annual Incentive Plan are market-based, the Debtors, with the assistance of their compensation consultant, Towers Watson & Company ("Towers Watson"), also performed due diligence and analyzed the targeted award opportunities for the Debtors' employees in comparison to incentive opportunities offered by other automotive suppliers, low margin industrial manufacturing companies, and comparably sized companies participating in Tower Watson's survey database. Sinkular Declaration ¶¶ 8-13. Moreover, the Debtors engaged in discussions with representatives of the Committee over the appropriate performance metrics under the 2010 Annual Incentive Plan. These discussions resulted in significant *increases* to the performance target to better align employee incentives with creditors' interests in these cases.

15. The 2010 Annual Incentive Plan is designed to motivate and incentivize a broad base of Visteon's employees to deliver results that exceed Visteon's 2010 business plan. Quigley Declaration ¶ 11. Approximately 1,300 of the Debtors' employees will be eligible to participate in the 2010 Annual Incentive Plan. Id. ¶ 10. Individual award opportunities under the 2010 Annual Incentive Plan are generally the same as they were for 2009, except as adjusted for promotions, demotions, or other changes to a participant's job classification. The Debtors expect that payments under the 2010 Annual Incentive Plan would be made by reorganized Visteon given the Debtors' efforts to exit bankruptcy prior to any payments being made in March of 2011. Id. ¶ 11.

16. Awards under the 2010 Annual Incentive Plan are based on achieving a challenging adjusted EBITDA target.[10] Id. Award opportunities for eligible employees are tied

---

[10] For purposes of the 2010 Annual Incentive Plan, adjusted EBITDA shall be calculated as earnings before interest, taxes, depreciation, amortization, asset impairments, non-operating gains and losses, net unreimbursed restructuring expenses, and reorganization related professional fees.

to the level of adjusted EBITDA achieved in 2010. The payout opportunities and approximate aggregate award pools are set forth in the chart below:[11]

| Payout Percentage | 25% | 50% | 75% | 100% | 125% | 150% |
|---|---|---|---|---|---|---|
| Performance Targets (in millions) | $328 | $353 | $378 | $428 | $478 | $528 |
| Range of Opportunities (as percentage of base salary) | 2% - 28.75% | 4% - 57.5% | 6% - 86.25% | 8% - 115% | 10% - 143.75% | 12% - 172.5% |
| Aggregate Award Pool (in millions) | $5.9 | $11.8 | $17.7 | $23.6 | $29.5 | $35.4 |
| Award Pool for Insiders (in millions) | $1.0 | $2.0 | $2.9 | $3.9 | $4.9 | $5.9 |

17.    The structure and potential payout opportunities under the 2010 Annual Incentive Plan are both reasonable and market based. Sinkular Declaration ¶¶ 9, 10. Towers Watson compared the structure of the 2010 Annual Incentive Plan with annual incentive plans of similarly situated companies in the automotive industry and found that the key elements of the 2010 Annual Incentive Plan's design are common in the automotive industry, including (a) the broad-based nature of the incentive program and (b) the use of an earnings-based metric, e.g., an adjusted EBITDA metric. Id.

18.    Towers Watson also analyzed the reasonableness of the 2010 Annual Incentive Plan's award opportunities for all eligible participants. To assess the reasonableness of the proposed award opportunities for insiders, Towers Watson gathered and analyzed external market compensation data from automobile suppliers and low margin industrial manufacturing companies. Additionally, Towers Watson reviewed general industry data in assessing target

---

[11]    Award opportunities and aggregate payout amounts in between the stated performance targets are determined by linear interpolation, i.e., award opportunities are measured by a linear slope on which each point has a corresponding EBITDA level and percentage payout opportunity.

compensation. With respect to non-insiders, Towers Watson reviewed the target annual incentive opportunities provided under the 2010 Annual Incentive Plan, by employee responsibility and salary level, relative to target incentive opportunities as provided at similarly sized general industry companies. Id. ¶ 8.

19. Based on such analyses, Towers Watson concluded that insider participants' base salary and the potential target opportunity under the 2010 Annual Incentive Plan are, on average, competitive with the 50th percentile of market salaries and target annual incentive opportunities. Id. ¶ 11. Additionally, the target annual incentive opportunities for non-insider employees are at or below market median levels, on average. Id.

20. In addition to the 2010 Annual Incentive Plan, the Debtors' management employees have historically been eligible for long-term incentive awards, as is standard in the automotive industry. Id. ¶ 6. At this time, long-term incentive awards on account of 2010 performance are not available to any of the Debtors' employees. Without this historical opportunity, these employees have total direct compensation below market median levels. Id. ¶ 11.

## The Adjusted EBITDA Metric

21. The Debtors' management selected adjusted EBITDA as the appropriate performance metric because Visteon has always used financial metrics to incentivize employees. The Debtors concluded that adjusted EBITDA, in particular, is the best financial metric in the chapter 11 environment because adjusted EBITDA is a key financial metric underlying the company's strategic business plan and is the foundation for the company's enterprise valuation. Quigley Declaration ¶ 10. The adjusted EBITDA targets under the 2010 Annual Incentive Plan have been refined to exclude the impact of certain one-time bankruptcy events such as non-operating gains and losses, asset impairments, and reorganization-related professional fees.

9

Id. As noted, the Debtors engaged in negotiations with key stakeholders in these cases in determining the appropriate EBITDA targets under the 2010 Annual Incentive Plan. As a result, the EBITDA targets have been significantly *increased* from the targets originally proposed by the Debtors. While the Debtors have not gained the final support of the Committee or Term Lenders as of the filing of this Motion, the Debtors are hopeful that continued discussions with the Committee and Term Lenders, as well as other constituents, will lead to their support the 2010 Annual Incentive Plan as both a means to reward Visteon's employees for their performance as well as achieve value-enhancing financial objectives that will inure to the benefit of these constituents.[12]

22. The Debtors' adjusted EBITDA performance is dependent upon the Debtors' customers' actual and projected global vehicle production levels. Id. The automotive sector remains a troubled industry with uncertain customer production volumes, which requires the Debtors' employees to work quickly to mitigate operating income and cash flow erosion. Id.

23. The ability of eligible employees to timely and cost-effectively respond to fluctuating production volumes will greatly influence whether the Debtors can continue on the positive trajectory that these cases have been following since their outset. Id. The Debtors' employees have proven capable of delivering strong performance despite a deteriorating business climate and the restrictions of operating in chapter 11. The Debtors' senior management team, in particular, has led major restructuring initiatives in these cases and managed to cut costs and improve free cash flow despite lower customer sales volumes and challenging industry conditions generally, without any incentive compensation for their success thus far. It can only be reasonably expected that the dedication and performance of these employees will wane

---

[12] The Debtors also expect to discuss the 2010 Annual Incentive Plan with additional constituents in efforts to fully align the incentives of the 2010 Annual Incentive Plan with the interests of stakeholders in these cases.

without meaningful incentive opportunities. Thus, the 2010 Annual Incentive Plan is necessary to "keep momentum going" as the Debtors' complete restructuring initiatives and work towards confirming a plan of reorganization. See Nellson Nutraceutical, 369 B.R. at 792.

## Basis for Relief

## I. THE 2010 ANNUAL INCENTIVE PLAN IS AN ORDINARY COURSE INCENTIVE PROGRAM WELL WITHIN THE DEBTORS' SOUND BUSINESS JUDGMENT

24. Section 363(c)(1) of the Bankruptcy Code provides as follows:

> If the business of the debtor is authorized to be operated under ... this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

25. The Bankruptcy Code does not define the phrase "ordinary course of business." The Third Circuit (like most other courts) has adopted a two-step inquiry for determining whether a transaction is ordinary course. See Nellson Nutraceutical, 369 B.R. at 797 (citing Roth); Global Home Prods., 369 B.R. 778 (Bankr. D. Del. 2007) (same). Applying the two-step test adopted in Roth, here the question is, first, whether the implementation of the 2010 Annual Incentive Plan is the sort of action commonly undertaken by companies in the Debtors' industry, and second, whether creditors should expect the implementation of the 2010 Annual Incentive Plan. Roth, 975 F.2d at 953. The primary focus of the second inquiry is on the Debtors' prepetition business practices and conduct, as such practices and conduct would form the basis of creditors' expectations. Id.

26. This Court has recognized that actions taken in the ordinary course require a "relatively light evidentiary burden of establishing that [a debtor] made a business judgment in good faith upon a reasonable basis" and that "the court will not disturb a transaction in the

11

ordinary course of business if 'the [debtor] can articulate reasons for [its] conduct (as distinct from a decision made arbitrarily or capriciously).'" Nellson Nutraceutical, 369 B.R. at 796-797, 800 (quoting In re Curlew Valley Assocs., 14 B.R. 506, 513 (Bankr. D. Utah 1981).

27.     It is common for companies to provide their employees with incentive award opportunities on an annual basis. In fact, virtually every company in the automotive industry, including those in distress, has annual incentive compensation programs. Sinkular Declaration ¶ 6. Furthermore, for the Debtors' insider employees, target total direct compensation levels for 2010 (the sum of an employee's base salary and potential target opportunity under the 2010 Annual Incentive Plan) are, on average, below the 50th percentile of market target compensation benchmarks. Id. ¶ 15. The Debtors' proposed 2010 Annual Incentive Plan therefore satisfies the first prong of the ordinary course test.

28.     With respect to the second prong, the Debtors have adopted an annual incentive plan every year since Visteon's formation. Quigley Declaration ¶ 4. In each of those years, the Debtors established a performance metric, consistent with their business, and incentive opportunities as a percentage of participants' base salary. Id. ¶ 5. The incentive opportunities under the 2010 Annual Incentive Plan, as a percentage of a participant's base salary, have not been changed from the 2009 annual incentive plan, which was implemented by the company prepetition, except as adjusted for promotions, demotions, or other changes to a participant's job classification.[13]

29.     Historically, Visteon's annual incentive plans have had a variety of performance metrics, including product quality, profit before tax, return on assets, EBIT-R, and free cash

---

[13]  As noted above, although the Debtors anticipate the performance metrics under their 2009 annual incentive plan will be achieved upon the final closing of the 2009 fiscal year, in their best business judgment, the Debtors have decided not to make payments on account of the 2009 annual incentive plan in March of 2010; nor do the Debtors expect, at this time, such payouts to be made pursuant to a plan of reorganization, as the Debtors have not accounted for such payouts in the financial projections included in their proposed plan of reorganization.

flow. Id. ¶ 6. The adjusted EBITDA metric is akin to financial performance metrics that Visteon has used in the past and is the best proxy for a company's financial performance while operating in chapter 11. In addition, the 2010 Annual Incentive Plan mirrors the design features of Visteon's previous annual incentive plans. Id. ¶¶ 5,9,10. Each annual incentive plan was a broad-based incentive plan that measured certain financial performance metrics on a company-wide basis.

30. Thus, like the ordinary course incentive plans approved in Dana II and Nellson Nutraceutical, the 2010 Annual Incentive Plan is fully consistent with the company's own prepetition practices as well as practices commonly undertaken by companies in the automotive industry. Sinkular Declaration ¶ 14. In Dana II, the debtors argued that court approval was not necessary for a short-term annual bonus program for 2006. The court agreed that the debtors' annual incentive plan was within the ordinary course of business because it "has been a common component of compensation plans at Dana for the past fifty years and does not differ significantly from Dana's prepetition practice." Dana II, 358 B.R. at 567. Based on the Debtors' prepetition practices, creditors here should reasonably have expected the Debtors to honor the 2010 Annual Incentive Plan.

31. The 2010 Annual Incentive Plan thus passes the light evidentiary burden required of ordinary course transactions and the Debtors' authority to implement the program should be confirmed by this Court. Nellson Nutraceutical, 369 B.R. at 796-797, 800 (quoting Curlew Valley Assocs., 14 B.R. at 513.

## II. THE 2010 ANNUAL INCENTIVE PLAN IS INCENTIVIZING AND THUS NOT GOVERNED BY SECTION 503(c)(1) OF THE BANKRUPTCY CODE

32. As this Court recognized in Nellson Nutraceutical, the Bankruptcy Code confers upon a debtor the authority to implement an ordinary compensation program without court

involvement. This authority is subject to one exception provided for in section 503(c)(1) of the Bankruptcy Code. By its plain language, section 503(c)(1) of the Bankruptcy Code pertains to *retention* payments to insiders. Thus, it is inapplicable to performance-based incentive plans like the 2010 Annual Incentive Plan that provide compensation to employees, including insiders, on account of their contribution to enhancing the company's value through the achievement of financial and operational goals. See Nellson Nutraceutical, 369 B.R. at 803 (finding that section 503(c)(1) applies only to retention programs with "the primary purpose of inducing [an employee] to remain with the [d]ebtor's business."). Section 503(c)(1) is also inapplicable to the vast majority of participants in the 2010 Annual Incentive Plan because only 12 participants are insiders.

33. As this Court observed when the Debtors presented the KEIP for approval, "performance related bonuses for management, as a general matter, are a good idea ... if the targets and the goal are sufficiently difficult ...." Hr'g Tr. at 160:1-4. Under the 2010 Annual Incentive Plan, eligible employees will only receive incentive payments if they meet the challenging EBITDA targets. Achieving these metrics will require substantial efforts from Visteon's employees given current economic conditions and expected original equipment manufacturer production volumes in 2010. Quigley Declaration ¶ 11. Specifically, achieving the EBITDA targets will require the sustained efforts of Visteon's employees to implement substantial manufacturing cost reductions and productivity improvements to offset anticipated customer price reductions and material and manufacturing overhead cost increases as well as to continue to respond quickly to changes in global vehicle production volumes.[14] Id. ¶ 12. The

---

[14] Both the Committee and the Term Lenders fully supported the adjusted EBITDA metric under the KEIP. In support of the KEIP, counsel to the Committee stated, "[t]o understand whether or not targets and incentives are properly drawn in a particular program, you have to delve deeply into the company, into the program itself .... We've delved into it in this case and we feel very comfortable with the EBITDA target." Hr'g Tr. 154:7-18.

K&E 16108253.24

company expects that customer price reductions, divestitures, and restructuring actions completed in 2009, along with foreign currency movements, will likely reduce adjusted EBITDA in 2010 by approximately $180 million. Id. Accordingly, Visteon's employees must implement significant manufacturing cost reductions and productivity improvements in 2010 just to break even, let alone achieve the target adjusted EBITDA of $428 million under the 2010 Annual Incentive Plan. Id.

34. Importantly, the 2010 Annual Incentive Plan covers a performance period from January 1, 2010 to December 31, 2010—a performance period that is just over a month in progress as of the filing of this Motion and that will likely survive the Debtors' emergence from bankruptcy. Thus, while the Court found that approval of the KEIP's adjusted EBITDA metric was a "close call" given that half of the performance period had passed and only three months of the period remained, Hr'g Tr. at 159:13, here the 2010 Annual Incentive Plan is essentially at the beginning of a 12 month period. The adjusted EBITDA metric is incentivizing both because of the effort required to achieve it and because no part of it can be said to be pre-ordained given only one month of the performance period has passed as of the filing of this Motion. As a result, the 2010 Annual Incentive Plan can only incentivize the Debtors' employees to improve the company's financial health and business performance.

35. Thus, the 2010 Annual Incentive Plan comports with this Court's view that an incentive plan with "a broader and longer view would be more appropriate for setting forth something that may actually motivate getting across the goal line." Hr'g Tr. at 159:16-19. Because the 2010 Annual Incentive Plan will incentivize and reward achievement of performance, not retention, the plan is not governed by section 503(c)(1) of the Bankruptcy Code.

15

**III.    THE 2010 ANNUAL INCENTIVE PLAN IS JUSTIFIED BY THE FACTS AND CIRCUMSTANCES AND SATISFIES SECTION 503(c)(3) OF THE BANKRUPTCY CODE**

36.     Even though it need not do so as an ordinary course program, the 2010 Annual Incentive Plan also satisfies section 503(c)(3) of the Bankruptcy Code. Nellson Nutraceutical, 369 B.R. at 791 ("section 503(c)(3) is specifically limited to transactions outside of the ordinary course of business …"). Courts, including this one, have looked to the factors laid out by Judge Lifland in Dana II for guidance to evaluate a proposed incentive program under section 503(c)(3) of the Bankruptcy Code.[15]

37.     First, the 2010 Annual Incentive Plan is calculated to achieve the desired performance—specifically, improved financial performance measured by adjusted EBITDA. As described above, the adjusted EBITDA metric is based on an aggressive business plan, which requires the participants of the plan to implement significant manufacturing cost reductions and productivity improvements in 2010 just to break even, let alone reach target adjusted EBITDA of $428 million. Quigley Declaration ¶ 13.

38.     Second, as explained above, the cost of the 2010 Annual Incentive Plan is reasonable and well justified given its benefits. The estimated cost of the 2010 Annual Incentive Plan with respect to the 2010 performance period is $23.6 million at target and $35.4 million at maximum. Id. ¶ 4. Insider employees are eligible to receive a maximum of approximately $5.9 million under the 2010 Annual Incentive Plan. These amounts are reasonable given the size of

---

[15] The Dana II court set forth six discretionary guiding factors to consider in determining whether an incentive plan is appropriate under section 503(c)(3) of the Bankruptcy Code:  (a) whether the plan is calculated to achieve the desired performance; (b) whether the cost of the plan is reasonable in the context of a debtor's assets, liabilities and earning potential; (c) whether the scope of the plan is fair and reasonable or discriminates unfairly among employees; (d) whether the plan is consistent with industry standards; (e) whether the debtor performed due diligence in investigating the need for the plan; and (f) whether the debtor received independent counsel in performing due diligence, creating and authorizing the plan. Dana II, 358 B.R. at 576-77.

the Debtors' business and the value that achievement of the performance targets would bring to these estates.

39.     Third, the scope of the 2010 Annual Incentive Plan is fair and reasonable given its broad-based nature. The 2010 Annual Incentive Plan, unlike the KEIP, applies to more than 1,300 of the Debtors' salaried and management employees.

40.     Fourth, the 2010 Annual Incentive Plan is also consistent with industry standards, as evidenced by the Debtors' and Towers Watson's due diligence efforts and comparison to competitive benchmarks. Sinkular Declaration ¶¶ 6, 10, 16.

41.     At the hearing on the KEIP, the Court noted that the relevant industry standard should be "something narrower than all companies of [comparative] revenue size" and considerations should be made for the impact of chapter 11 bankruptcy on incentive compensation and performance metrics. Hr'g. Tr. 160:21-24.   Consistent with the Court's direction, in assessing the reasonableness of the award opportunities proposed under the 2010 Annual Incentive Plan, Towers Watson analyzed compensation data for management employees eligible for awards under the 2010 Annual Incentive Plan in comparison with competitive compensation data from automotive suppliers and low margin industrial manufacturing companies participating in Towers Watson's survey database, which includes chapter 11 debtors. Sinkular Declaration ¶ 15. Overall, the groups were of a similar size to Visteon in terms of annual revenue. Id.   Towers Watson found that compensation levels for the Debtors' insider employees, are, on average below the 50th percentile of market target total direct compensation benchmarks (which includes base salary, target annual and target long-term incentive

17

opportunities) for automotive supplier and low margin industrial manufacturing companies, as well as comparably sized general industry companies.[16] Id.

42.    Lastly, consistent with past practice, the Debtors closely consulted with their board of directors and Compensation Committee in formulating the 2010 Annual Incentive Plan and received the outside independent market advice from Towers Watson to ensure the plans met the company's historic goals of incentivizing a broad employee base with market-based compensation opportunities. Quigley Declaration ¶ 9; Sinkular Declaration ¶¶ 4, 8-12.

43.    Thus, although not necessary for the Debtors to establish here, the 2010 Annual Incentive Plan fulfills the Dana II factors.

## Notice

44.    Notice of this motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the U.S. Trustee; (b) counsel to the Term Lenders; (c) counsel for the administrative agent for the Debtors' senior secured term loan facility; (d) counsel for the administrative agent for the Debtors' revolving senior secured credit facility; (e) the indenture trustee for each of the Debtors' outstanding unsecured bond issuances; (f) the Committee; and (g) those parties requesting notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

45.    No prior motion for the relief requested herein has been made to this or any other court.

---

[16] While Towers Watson surveyed companies in bankruptcy for purposes of its analyses, it did not rely solely on compensation data from companies in bankruptcy given that court filings alone do not allow for a full appreciation of the compensation available and there simply are not enough companies in bankruptcy to derive a reliable sample to compare against incentive opportunities under the 2010 Annual Incentive Plan. Additionally, the 2010 Annual Incentive Plan is better compared to companies not in bankruptcy since it is an ordinary course plan, rather than a bankruptcy incentive plan.

WHEREFORE, the Debtors respectfully request that the Court: (a) approve an order, substantially in the form attached hereto as **Exhibit A**, confirming their authority to implement, in the ordinary course, their 2010 Annual Incentive Plan, and (b) grant such other and further relief to the Debtors as the Court may deem proper.

Dated:  February 2, 2010

**PACHULSKI STANG ZIEHL & JONES LLP**

/s/ Mark M. Billion
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Mark M. Billion (DE Bar No. 5362)
919 North Market Street, 17th Floor
Wilmington, DE  19899-8705
Telephone:      (302) 652-4100
Facsimile:      (302) 652-4400
E-mail:         ljones@pszjlaw.com
                joneill@pszjlaw.com
                mbillion@pszjlaw.com

- and -

**KIRKLAND & ELLIS LLP**
James H. M. Sprayregen, P.C. (IL 6190206)
Marc Kieselstein, P.C. (IL 6199255)
James J. Mazza, Jr. (IL 6275474)
300 North LaSalle
Chicago, Illinois  60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Attorneys for the Debtors and Debtors in Possession*