UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------x
In re:                                 :   Chapter 11
                                       :   Case No. 09-11786 (CSS)
VISTEON CORPORATION, et al.,           :   (Jointly Administered)
                                       :
            Debtors.                   :   **Hearing Date: March 16, 2010 @ 10:00 a.m.**
                                       :   **Objection Deadline: March 9, 2010 @ 4:00 p.m.**
                                       :
---------------------------------------------------x   Related Docket Nos. 2407, 2475, 2476, 2481 & 2482

**IUE-CWA'S OMNIBUS REPLY TO OPPOSITION TO MOTION PURSUANT
TO RULE 8005 FOR STAY, PENDING APPEAL, OF THE ORDER UNDER
11 U.S.C. §§ 105, 363(b)(1), AND 1108 AUTHORIZING DEBTORS TO AMEND
OR TERMINATE CERTAIN POST-EMPLOYMENT HEALTH CARE BENEFITS
AND LIFE INSURANCE BENEFITS FOR CERTAIN EMPLOYEES AND RETIREES
AND THEIR SURVIVING SPOUSES, SPOUSES, DOMESTIC PARTNERS, AND
DEPENDENTS FOR STAY OF THIS COURT'S ORDER AUTHORIZING DEBTORS
TO AMEND OR TERMINATE CERTAIN POST-EMPLOYMENT BENEFITS**

**PRELIMINARY STATEMENT**

1. The IUE-CWA, Industrial Division of Communication Workers of America, AFL-CIO, CLC ("IUE-CWA") submits this Omnibus Reply to the Opposition to its Motion for a Stay ("Stay Motion", Docket No. 2407), pending appeal of this Court's Order under 11 U.S.C. §§ 1105, 363(b)(1) and 1108 Authorizing Debtors To Amend Or Terminate Post-Employment Health Care And Life Insurance Benefits For Certain Employees and Retirees and Their Surviving Spouses, Spouses, Domestic Partners, and Dependents ("Retirees") entered on December 22, 2009 (the "Order"). (Docket No. 1491) Opposition papers were filed by the Debtors ("Debtors' Opp." Docket Nos. 2475 and 2476), the Official Committee of Unsecured Creditors ("Committee Opp." Docket No. 2481) and the Prepetition Term Agent ("Term Agent's Opp." Docket No. 2482) (collectively "the Opponents"). A Statement in Support of the Stay Motion was filed by the City of Connersville, Indiana (Docket No. 2480). The opponents to the Stay Motion argue that IUE-CWA has not satisfied any of the factors required for a stay.

2. Contrary to the Opponents' arguments that the Stay Motion was filed too late, IUE-CWA acted as quickly as possible upon the information provided by the Debtors regarding its plans for retiree benefits. The Order did not terminate the retiree health care ("Benefits"), but merely "authorized" the amendment or termination of those Benefits. (Docket No. 1491). Debtors did not send notices to the Retirees until January 29, 2010 (the "Notice") about the benefit plans ("Plans") which would be made available to them and the costs of those Plans, (Debtors' Opp., ¶ 15). The next hearing date after the Notice was February 18, 2010 and a motion to be heard for that date would have to have been filed on February 1, 2010. IUE-CWA moved expeditiously to obtain detailed information from Visteon about the Plans. Counsel for the IUE-CWA contacted Visteon's counsel on February 1, 2010, requesting information about the Plans; Visteon did not provide full information until February 5, 2010. (Ex. JJ). Thereafter, without delay, IUE-CWA obtained specific financial and medical information and signed declarations from 12 Retirees and filed its motion to be heard on the next available hearing date.

3. IUE-CWA could not make the specific showing of irreparable harm required by the Third Circuit in *Adams v. Freedom Forge Corp.,* 204 F.3d 475 (3d Cir. 2000), without the detailed information, <u>solely in possession of the Debtors</u>, regarding the costs which would be imposed on the Retirees. If a motion for a stay was filed without the Retiree declarations showing that the Retirees would not be able to afford the Plans, the Opponents might have been able to argue persuasively that IUE-CWA had shown only speculative, but not actual, irreparable harm.

**I.     IUE-CWA HAS A LIKELIHOOD OF SUCCESS ON THE MERITS**

4. The Opponents argue that IUE-CWA has not shown a likelihood of success on the merits, because this Court has already ruled that the Benefits are not vested and therefore may be terminated without proceeding under 11 U.S.C. § 1114. IUE-CWA recognizes and appreciates that this Court heard testimony and carefully considered all arguments made regarding the vesting of Benefits and that this Court is sensitive to the impact of the termination of Benefits. IUE-CWA respectfully argues that the decision in *In re Delphi Corp.,* No. 05-44481, 2009 WL 637315 (Bankr. S.D.N.Y. Mar. 10, 2009), which was adopted by this Court, was not appropriately applied by this Court in this case. Judge Drain clearly stated that the serious burden to show that retiree benefits are not vested is on the debtors, not on the retirees: "before a bankruptcy court should permit a debtor to modify or terminate a health or welfare plan under Section 363(b) [i.e. without the necessity of a §1114 hearing] on the theory that it has the right to do so under applicable non-bankruptcy law, <u>the debtor must make a significant showing that it, in fact, has such a unilateral right and that the benefits are not vested</u>." *Id.* at *7. (Emphasis added). Moreover, Judge Drain found this burden to be so serious, that he ordered the formation of a § 1114 committee to determine whether the health benefits in that case were vested.

5. Here, IUE-CWA presented evidence (i) that the employees contributed to the costs of their Benefits by foregoing wage increases; (ii) that the plan documents which allowed Visteon to terminate retiree benefits were subject to collective bargaining agreements; and (iii) that in the last collective bargaining agreements, the Closure Agreements and Releases, did not provide authority for the Debtors to terminate Benefits. These facts demonstrate that Debtors cannot meet the "significant showing" required by *Delphi Corp.*

3

6. The Opponents argue that IUE-CWA's position, that Benefits are vested, was not supported either by any evidence of misrepresentation by Visteon, regarding provision of Benefits for life or evidence of detrimental reliance on that misrepresentation by the employees. (Debtors' Opp., ¶ 31). The Declaration of Michael Lostutter, dated July 30, 2009 ("Lostutter Decl."), disputes this argument, albeit in layman's terms:

> We arrived at the negotiated agreement that our active members would pay one penny out of every quarterly COLA increase and the company would provide retiree health benefits. In other words, every calendar quarter each member gave up a 1 cent raise in their hourly pay.
> …
> Our active members have paid part of their wages back to the company since 1978 in order to fund this guaranteed program. We wanted to pay for the benefit because, as a quid pro quo, our retirees were getting health insurance and our actives knew that when they retired they would receive the health benefits they had been paying for.
> …
> There is no doubt in my mind that we believed the only way the company would be able to change this benefit was through collective bargaining.
> …
> I believed that we paid through the nose for this benefit. This benefit was bought and paid for on the backs of the workers until they closed the plant. When our members retired they counted on having this plan. It wasn't like we were rolling the dice, this guaranteed health benefit was understood to be part of the retirement package through the corporation, whether you took regular retirement or 30 and out.

(Stay Motion, Ex. Q, ¶¶ 5-10).

7. Thus, Visteon represented to employees that if they would give up part of their wage increases, they would receive retiree medical benefits. The employees agreed to give up those increases, reasonably believing that they would receive Benefits for life. Visteon now, having reaped the benefits of that agreement by paying lower wage increases, is reneging on its promise to the clear detriment of the Retirees by depriving the Retirees of the bargained for

4

benefits. The Debtors minimize the contribution employees made to their Benefits by claiming, without a financial showing, that the foregone wage increases amounted to a "fraction of those costs" (Debtors' Opp., ¶ 28, n. 5).

Futher, the argument is not relevant. What is important is that it was the bargained for agreement of the parties. It is undisputed that the employees agreed to forego wage increases in order to obtain retiree medical benefits for themselves and others. By eliminating retiree health benefits when employees seek to enjoy the fruits of their contribution, Visteon has obtained the advantages of paying lower wage increases without providing the "quid pro quo" the employees were led to believe would be available to them.

## II. THE RETIREES WILL BE IRREPARABLY HARMED IF VISTEON ENDS ITS CONTRIBUTION TO RETIREE MEDICAL BENEFITS

8. The Opponents dismiss the Retiree declarations showing the serious injury they will suffer if they are required to pay for their health insurance, as inadequate because 60% of the IUE-CWA retirees were eligible to enroll in Medicare as of August 2009. (Debtors' Opp., ¶ 36). A Medicare eligible retiree with a family could be required by Debtors to pay up to $1,640.00 per month for health benefits. (Stay Motion, Ex. S). Carolyn Spurlock is not Medicare eligible, although her husband is on Medicare. (Stay Motion, Ex. EE). They would be required to pay $858.62 for medical benefits, or 16% of their income. For retirees on a fixed income, this additional cost will be prohibitive.

9. Debtors concede that approximately 840 Retirees, who are not eligible for Medicare, will be required to pay for their health insurance at the rates provided by Visteon. Twelve of these Retirees have submitted declarations showing that they will be unable to afford the medical benefits to be provided by Visteon. (Stay Motion, Exs. T - EE). In addition, 13 Retirees have completed questionnaires since the Stay Motion was prepared, showing the

specific harm they will suffer if the Visteon cost of benefits are imposed on them. (Ex. KK). For example, Scott Moore's total income is $2250.00 per month and he would be required to pay $1,408.78, or 63% of his income for health benefits for himself and his wife, who has been diagnosed with Stage 4 lung cancer and lesions on her brain and spine. Linda Darlene Roberts submits a declaration stating that she and her husband would be required to pay 65% of their total income for health benefits. She has been diagnosed with multiple meloma and leukemia. (Ex. LL).

10. In addition, according to Debtors, only 569 of the 6,500 Visteon Retirees who now have health benefits have elected to continue coverage through one of the options made available by Visteon as of March 8, 2010, with a deadline for such election of March 10, 2010. (Declaration of Shirah Metzigian ("Metzigian Decl."), dated March 9, 2010, ¶ 18). More than 91% of the Visteon Retirees have decided that they cannot afford the coverage offered by Visteon. The Debtors have not provided specific information about the number of IUE-CWA Retirees who have elected to continue coverage through one of the options made available by Visteon, but there is no reason to believe that the percentage of IUE-CWA retirees who elected not to purchase coverage is not similar to the overall population.

11. Contrary to the arguments of the Debtors, IUE-CWA is not required to show the harm to every individual retiree. Rather, irreparable harm to a group of individuals can be shown if they are in similar circumstances and are treated similarly by the Debtors. As the Third Circuit stated in *Adams*: "when a court infers a risk of harm to all individuals although only a few testify, it is reasoning inductively … the daily work of fact-finders." 204 F.3d at 487. IUE-CWA has met this burden. The Opponents have not disputed that families, such as the Snedigars and Ladys, coping with serious medical conditions, who would be required to pay

6

respectively 86% and 65% of their income for health benefits, would be irreparably harmed by Visteon's discontinuation of its contribution to Benefits. (Stay Motion, Exs. BB and CC). Here, the Retirees, all of whom receive pension benefits, are all facing the financial obligation of paying the entire cost of their health benefits. This Court may infer that all of the Retirees will be irreparably harmed by the termination of Visteon's contribution to their health benefits.

### III. OTHER PARTIES WILL NOT BE SUBSTANTIALLY INJURED IF VISTEON'S CONTRIBUTION TO RETIREE HEALTH BENEFITS IS CONTINUED

12. According to the Debtors, the cost of continuing the coverage for the 2,100 IUE-CWA retirees is $1.1 million per month. (Debtors' Opp., ¶ 40). Even on an annual basis, these health benefit costs will amount to less than 3% of the Debtors' adjusted EBITDA of $454 million. This minor increase in the Debtors' costs pending appeal will not disrupt this bankruptcy proceeding. The IUE-CWA makes this motion on behalf of its Retirees; it is not representing all Visteon retirees. Thus, the costs and difficulties of continuing coverage for any other groups of retirees are not relevant here.

13. The Opponents make much of the work Debtors have done to arrange for alternative health benefit plans for the retirees. According to the Debtors, Visteon began the process to replace retiree health benefits shortly after it filed its motion for authority to terminate retiree health benefits. (Debtors' Opp., ¶ 42). The Debtors assert that a stay would require a temporary disruption in coverage because "of the substantial lead time required to initiate any changes to health care options". (Debtors' Opp., ¶ 44). It is difficult to understand why a plan of health benefits currently being provided could not simply be continued. However, even if Visteon cannot continue the current plan of benefits after April 1, 2010, this Court has the discretion to fashion an appropriate order which could provide that Visteon continue its financial responsibility for the IUE-CWA retiree health benefit plans it has

7

developed. IUE-CWA does not seek an order which would result in any disruption of retiree medical benefits. But, there is no reason Visteon cannot be directed to continue to pay for retiree health benefits after April 1, 2010.

## IV. THE PUBLIC INTEREST FAVORS GRANTING THE MOTION

14. The City of Connersville, Indiana, ("the City") submitted a Statement in Support of the Stay Motion. (Docket No. 2480). Connersville is the city in which 1,700 of the IUE-CWA retirees worked. The City argues that "where, as here, the allocation of hardship to former Visteon employees results in disproportionately greater hardship to communities heavily populated with present and former Visteon employees, the City believes that the court must take steps to limit the Debtors' ability to entirely and suddenly eliminate Benefits so critical to the individuals and families dependent on them, **at least** pending resolution of issues raised by the IUE-CWA on appeal." (Docket No. 2480 at 2-3, emphasis in original).

15. The Opponents assert that granting a stay would interfere with the ability of the Debtors to emerge from bankruptcy. As stated above, the cost of continuing health benefits for the IUE-CWA retirees for a short time while the appeal is pending is minimal for Visteon. While it is clear that other creditors and the Term Lenders would prefer to minimize costs to the estate so that their own interests will be enhanced, there is no evidence that the Debtors' emergence from bankruptcy would be endangered if it incurs an additional $2-3 million in costs.

## **CONCLUSION**

For all of the foregoing reasons, the motion of IUE-CWA for a stay of the Order under 11 U.S.C. §§ 1105, 363(b)(1) and 1108 Authorizing Debtors To Amend Or Terminate Post-Employment Health Care And Life Insurance Benefits For Certain Employees and Retirees and Their Surviving Spouses, Spouses, Domestic Partners, and Dependents entered on December 22, 2009 should be granted.

Dated: March 12, 2010

Respectfully submitted,

KENNEDY, JENNIK & MURRAY, P.C.
Attorneys for IUE-CWA


*/s/ Susan M. Jennik*
Susan M. Jennik, Esq.
113 University Place, 7th Floor
New York, New York 10003
(212) 358-1500


And


COOCH AND TAYLOR, P.A.


*/s/ Susan E. Kaufman*
Susan E. Kaufman (DSB # 3381)
The Brandywine Building
1000 West Street, 10th Floor
Wilmington, DE 19801
(302) 984-3820
(302) 984-3939 Fax
skaufman@coochtaylor.com