# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) ) | Chapter 11 |
| VISTEON CORPORATION, et al.,[1] | ) ) ) | Case No. 09-11786 (CSS) |
|  | ) ) | Jointly Administered |
| Debtors. | ) ) |  |

---

## DEBTORS' FOURTH AMENDED DISCLOSURE STATEMENT FOR THE FOURTH AMENDED JOINT PLAN OF REORGANIZATION OF VISTEON CORPORATION AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

---

**PACHULSKI STANG ZIEHL & JONES LLP**
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Telephone:          (302) 652-4100

**KIRKLAND & ELLIS LLP**
James H. M. Sprayregen, P.C. (IL 6190206)
James J. Mazza, Jr. (IL 6275474)
Sienna R. Singer (IL 6287154)
300 North LaSalle
Chicago, Illinois 60654
Telephone:          (312) 862-2000

Marc Kieselstein, P.C. (IL 6199255)
Brian S. Lennon (NY 4215083)
601 Lexington Avenue
New York, New York 10022-4611
Telephone:          (212) 446-4800

*Attorneys for the Debtors and Debtors in Possession*
Dated: June 28, 2010

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Visteon Corporation (9512); ARS, Inc. (3590); Fairlane Holdings, Inc. (8091); GCM/Visteon Automotive Leasing Systems, LLC (4060); GCM/Visteon Automotive Systems, LLC (7103); Infinitive Speech Systems Corp. (7099); MIG-Visteon Automotive Systems, LLC (5828); SunGlas, LLC (0711); The Visteon Fund (6029); Tyler Road Investments, LLC (9284); VC Aviation Services, LLC (2712); VC Regional Assembly & Manufacturing, LLC (3058); Visteon AC Holdings Corp. (9371); Visteon Asia Holdings, Inc. (0050); Visteon Automotive Holdings, LLC (8898); Visteon Caribbean, Inc. (7397); Visteon Climate Control Systems Limited (1946); Visteon Domestic Holdings, LLC (5664); Visteon Electronics Corporation (9060); Visteon European Holdings Corporation (5152); Visteon Financial Corporation (9834); Visteon Global Technologies, Inc. (9322); Visteon Global Treasury, Inc. (5591); Visteon Holdings, LLC (8897); Visteon International Business Development, Inc. (1875); Visteon International Holdings, Inc. (4928); Visteon LA Holdings Corp. (9369); Visteon Remanufacturing Incorporated (3237); Visteon Systems, LLC (1903); Visteon Technologies, LLC (5291). The location of the Debtors' corporate headquarters and the service address for all the Debtors is: One Village Center Drive, Van Buren Township, Michigan 48111.

## TABLE OF CONTENTS

**ARTICLE I. INTRODUCTION**................................................................**4**
    A.    Rules of Interpretation ................................................4

**ARTICLE II. OVERVIEW OF THE PLAN**............................................**5**
    A.    General Structure of the Plan.......................................5
    B.    Treatment of Claims and Interests ...............................9
    C.    Treatment of Claims and Interests Under the Plan ..............10
    D.    Liquidation and Valuation Analyses.............................16
    E.    Certain Factors to Be Considered Prior to Voting...............16

**ARTICLE III. VOTING AND RIGHTS OFFERING SUBSCRIPTION
PROCEDURES**.......................................................................**18**
    A.    Vote Required for Acceptance by a Class .......................18
    B.    Classes Not Entitled to Vote ....................................18
    C.    Solicitation Procedures .........................................19
    D.    Voting Procedures...............................................20
    E.    Rights Offering Subscription Procedures .......................21
    F.    Confirmation Hearing ...........................................22
    G.    Confirmation and Consummation of the Plan .....................22

**ARTICLE IV. GENERAL INFORMATION** .........................................**22**
    A.    Overview of the Debtors' History and Industry .................22
    B.    Visteon's Products and Services.................................23
    C.    Visteon's Customers ............................................25
    D.    Visteon's Corporate Structure...................................26
    E.    Visteon's Competition ..........................................27
    F.    Executive Officers of the Debtors...............................27
    G.    Employees......................................................28
    H.    Benefit Plans ..................................................28
    I.    The Debtors' Prepetition Capital Structure......................33

**ARTICLE V. THE CHAPTER 11 CASES** ...........................................**36**
    A.    Events Leading to the Commencement of the Chapter 11 Cases .........36
    B.    Stabilization of Operations ....................................37
    C.    Appointment of Committees.......................................42
    D.    Operational Restructuring Activity, Liquidity Enhancements, and
        Business Plan Development and Implementation....................43
    E.    Postpetition Financing .........................................48
    F.    Addressing Legacy Liabilities ..................................50
    G.    Analyzing Executory Contracts and Unexpired Leases...............52
    H.    Employee Incentive, Severance, and Retention Programs ...........52
    I.    Analysis and Resolution of Claims...............................54
    J.    Negotiations Relating to the Development of the Plan.............62
    K.    Alternative Plan Proposals......................................64

**ARTICLE VI. PLAN SUMMARY**................................................................**65**

    A.      Overview of Chapter 11 ...............................................................65

    B.      Overall Structure of the Plan......................................................67

    C.      Administrative and Priority Claims ...........................................70

    D.      Sub Plans....................................................................................72

    E.      Classification of Claims and Interests.......................................72

    F.      Treatment of Classes of Claims and Interests...........................73

    G.      Special Provision Governing Unimpaired Claims .................81

    H.      Provisions for Implementation of the Plan ...............................81

    I.       Rights Offering ..........................................................................88

    J.       Entitlement to Funding of Cash Amount Recoveries ..............91

    K.      Treatment of Executory Contracts and Unexpired Leases ......92

    L.      Procedures for Resolving Disputed Claims and Interests.......96

    M.     Provisions Governing Distributions...........................................98

    N.      Effect of Confirmation of the Plan...........................................106

    O.      Conditions Precedent to Consummation of the Plan ...............110

    P.      Retention of Jurisdiction ...........................................................111

    Q.      Miscellaneous Provisions..........................................................114

**ARTICLE VII. SECURITIES LAW MATTERS**.....................................**119**

    A.      Securities Law Matters Under the Rights Offering Sub Plan ..............119

    B.      Securities Law Matters Under the Claims Conversion Sub Plan ........120

    C.      Section 1145 of the Bankruptcy Code ......................................120

    D.      Section 4(2) of the Securities Act/Regulation D.......................121

    E.      Resales of New Common Stock/Rule 144 and Rule 144A...............121

**ARTICLE VIII. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN** ...............................................................................**124**

    A.      The Confirmation Hearing.........................................................124

    B.      Confirmation Standards .............................................................124

    C.      Liquidation Analyses .................................................................126

    D.      Valuation Analysis.....................................................................126

    E.      Financial Feasibility...................................................................134

    F.      Acceptance by Impaired Classes ..............................................134

    G.      Confirmation Without Acceptance By All Impaired Classes ..............134

**ARTICLE IX. PLAN-RELATED RISK FACTORS AND ALTERNATIVES  TO CONFIRMATION AND CONSUMMATION OF THE PLAN**.............................**136**

    A.      General........................................................................................136

    B.      Certain Bankruptcy Law Considerations..................................136

    C.      Risk Factors That May Affect the Value  of the Securities to Be Issued Under the Plan.........................................................139

    D.      Risk Factors That Could Negatively Impact the Debtors' Business...................141

    E.      Risks Associated with Forward Looking Statements ..........................150

    F.      Disclosure Statement Disclaimer..............................................151

    G.      Liquidation Under Chapter 7 .....................................................153

K&E 17065163.9

**ARTICLE X. CERTAIN FEDERAL INCOME TAX CONSEQUENCES** ..........................154

    A.    Consequences to Holders of Allowed Class E Term  Loan Facility Claims, Class F 7.00% Senior Notes Claims  and 8.25% Senior Notes Claims, and Class G 12.25% Senior Notes Claims...............................................................155

    B.    Certain United States Federal Income  Tax Consequences to the Reorganized Debtors............................................................................158

**ARTICLE XI. RECOMMENDATION** ..................................................................161

K&E 17065163.9

## EXHIBITS

**Exhibit A**      Fourth Amended Joint Plan of Reorganization of Visteon Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the United States Bankruptcy Code

**Exhibit B**      Approved Disclosure Statement Order, Without Exhibits, Except <u>Exhibit 5</u> Thereto [Docket No. 3491]

**Exhibit C**      The Reorganized Debtors' Financial Projections

**Exhibit D**      Liquidation Analyses

**Exhibit E**      Term Loan Lender Proposal, Dated April 16, 2010

**Exhibit F**      Term Loan Lender Proposal, Dated May 7, 2010

K&E 17065163.9

# DISCLAIMER

THE DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE DEBTORS' PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. THE INFORMATION INCLUDED IN THE DISCLOSURE STATEMENT IS PROVIDED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN. THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS WHICH ARE ATTACHED TO, OR INCORPORATED BY REFERENCE IN, THE DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH INFORMATION AND DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THE DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION INCORPORATED IN THE DISCLOSURE STATEMENT BY REFERENCE, THE PLAN OR THE OTHER DOCUMENTS AND FINANCIAL INFORMATION, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT HAVE BEEN MADE AS OF THE DATE OF THE DISCLOSURE STATEMENT UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THE DISCLOSURE STATEMENT SHOULD NOT ASSUME AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH IN THE DISCLOSURE STATEMENT SINCE THE DATE OF THE DISCLOSURE STATEMENT. EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THE DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT IN THEIR ENTIRETY BEFORE CASTING A BALLOT. THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY ENTITIES DESIRING ANY SUCH ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO ONE IS AUTHORIZED TO PROVIDE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THE DISCLOSURE STATEMENT. NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT AND THE DOCUMENTS ATTACHED TO THE DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN WHICH ARE OTHER THAN AS SET FORTH, OR INCONSISTENT WITH, THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO THE DISCLOSURE STATEMENT, AND THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR OTHER ACTIONS, THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT

K&E 17065163.9

BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN THE CONTEXT OF SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

THE SECURITIES DESCRIBED IN THE DISCLOSURE STATEMENT TO BE ISSUED PURSUANT TO THE PLAN WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT, AS AMENDED, OR ANY SIMILAR FEDERAL, STATE, OR LOCAL LAW, GENERALLY IN RELIANCE ON THE EXEMPTIONS SET FORTH IN SECTION 4(2) OF THE SECURITIES ACT AND/OR SECTION 1145 OF THE BANKRUPTCY CODE.

THE FINANCIAL INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE INTO THE DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, EXCEPT AS SPECIFICALLY INDICATED OTHERWISE.

THE FINANCIAL PROJECTIONS, ATTACHED HERETO AS **EXHIBIT C** AND DESCRIBED IN THE DISCLOSURE STATEMENT, HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT TOGETHER WITH THEIR ADVISORS. THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND THEIR ADVISORS, MAY NOT ULTIMATELY BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

PLEASE REFER TO ARTICLE IX OF THE DISCLOSURE STATEMENT, ENTITLED "PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN" FOR A DISCUSSION OF CERTAIN FACTORS THAT A CREDITOR VOTING ON THE PLAN SHOULD CONSIDER.

FOR A VOTE ON THE PLAN TO BE COUNTED, THE BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY KURTZMAN CARSON CONSULTANTS, LLC, THE DEBTORS' CLAIMS AND SOLICITATION AGENT ("KCC") NO LATER THAN 5:00 P.M. PREVAILING PACIFIC TIME, ON JULY 30, 2010. SUCH BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION

K&E 17065163.9

PROCEDURES DESCRIBED IN FURTHER DETAIL IN ARTICLE III OF THE DISCLOSURE STATEMENT. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL NOT BE COUNTED UNLESS OTHERWISE DETERMINED BY THE DEBTORS IN THEIR SOLE AND ABSOLUTE DISCRETION.

THE CONFIRMATION HEARING WILL COMMENCE ON SEPTEMBER 28, 2010 AT 9:30 A.M. PREVAILING EASTERN TIME (OR POSSIBLY AUGUST 25, 2010 AT 2:30 P.M. PREVAILING EASTERN TIME IF UNSECURED CREDITOR AND INTEREST CLASSES ACCEPT THE PLAN), BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, WILMINGTON, DELAWARE 19801. THE DEBTORS MAY CONTINUE THE CONFIRMATION HEARING FROM TIME TO TIME WITHOUT FURTHER NOTICE OTHER THAN AN ADJOURNMENT ANNOUNCED IN OPEN COURT OR A NOTICE OF ADJOURNMENT FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE MASTER SERVICE LIST AND THE ENTITIES WHO HAVE FILED AN OBJECTION TO THE PLAN, WITHOUT FURTHER NOTICE TO PARTIES IN INTEREST. THE BANKRUPTCY COURT, IN ITS DISCRETION AND BEFORE THE CONFIRMATION HEARING, MAY PUT IN PLACE ADDITIONAL PROCEDURES GOVERNING THE CONFIRMATION HEARING. THE PLAN MAY BE MODIFIED, IF NECESSARY, PRIOR TO, DURING, OR AS A RESULT OF THE CONFIRMATION HEARING, WITHOUT FURTHER NOTICE TO PARTIES IN INTEREST.

THE PLAN OBJECTION DEADLINE IS JULY 30, 2010, AT 5:00 P.M. PREVAILING EASTERN TIME. ALL PLAN OBJECTIONS MUST BE FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE DEBTORS AND CERTAIN OTHER PARTIES IN INTEREST IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER SO THAT THEY ARE RECEIVED ON OR BEFORE THE PLAN OBJECTION DEADLINE.

K&E 17065163.9

# ARTICLE I.
## INTRODUCTION

On May 28, 2009, (the "<u>Petition Date</u>"), the above captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>," and with their non-Debtor affiliates, "<u>Visteon</u>") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "<u>Chapter 11 Cases</u>"). On May 29, 2009, the Bankruptcy Court entered an order jointly administering the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) under the lead case: Visteon Corporation; Case No. 09-11786. The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee has been appointed in the Chapter 11 Cases. On June 8, 2009, the United States Trustee for the District of Delaware (the "<u>United States Trustee</u>") appointed an official committee of unsecured creditors (the "<u>Creditors' Committee</u>") pursuant to section 1102 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>") [Docket No. 178].

The Debtors filed a plan of reorganization and accompanying disclosure statement with the Bankruptcy Court on December 17, 2009 [Docket Nos. 1475, 1476], a first amended plan of reorganization and accompanying disclosure statement with the Bankruptcy Court on March 15, 2010 [Docket Nos. 2544, 2545], a second amended plan of reorganization and accompanying disclosure statement with the Bankruptcy Court on May 7, 2010 [Docket Nos. 3011, 3012], and a third amended plan of reorganization and accompanying disclosure statement with the Bankruptcy Court on May 24, 2010 [Docket Nos. 3191, 3192]. The Debtors submit this fourth amended disclosure statement (the "<u>Disclosure Statement</u>") pursuant to section 1125 of the Bankruptcy Code for purposes of soliciting votes to accept or reject the *Fourth Amended Joint Plan of Reorganization of Visteon Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "<u>Plan</u>"), a copy of which is attached to the Disclosure Statement as **Exhibit A**.[2]

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operations and financial history, their reasons for seeking protection under chapter 11, and significant events that have occurred during the Chapter 11 Cases. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of Confirmation of the Plan, certain risk factors associated with the Plan and the securities to be issued under the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the requirements for Confirmation of the Plan and the voting procedures that holders of Claims and Interests entitled to vote on the Plan must follow for their votes to be counted.

## A.    Rules of Interpretation

The following rules for interpretation and construction shall apply to the Disclosure Statement: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the

---

2    Capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meanings ascribed to such terms in Article I.A of the Plan.

masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference in the Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference in the Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references in the Disclosure Statement to Articles are references to Articles of the Disclosure Statement; (6) unless otherwise specified, all references in the Disclosure Statement to exhibits are references to exhibits to the Disclosure Statement; (7) the words "herein," "hereof," and "hereto" refer to the Disclosure Statement in its entirety rather than to a particular portion of the Disclosure Statement; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Disclosure Statement; (9) unless otherwise set forth in the Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form in the Disclosure Statement that is not otherwise defined in the Disclosure Statement, Plan, or exhibits to the Disclosure Statement Order, but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (11) all references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (l2) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, unless otherwise stated; (13) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to the Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and (14) unless otherwise specified, all references in the Disclosure Statement to monetary figures shall refer to currency of the United States of America.

## ARTICLE II.
## OVERVIEW OF THE PLAN

### A.     General Structure of the Plan

The Plan is comprised of two mutually exclusive sub plans—the Rights Offering Sub Plan and the Claims Conversion Sub Plan (together, the "Sub Plans"). The Plan Support Agreement has been executed and delivered by holders of more than two-thirds in amount of the 12.25% Senior Notes Claims and two-thirds in aggregate amount of the 7.00% Senior Notes Claims and the 8.25% Senior Notes Claims. The Plan Support Agreement was approved by the Bankruptcy Court on June 17, 2010 [Docket No. 3427]. The Creditors' Committee also supports the Debtors' Plan. Following is a general description of each Sub Plan.

### 1.     The Rights Offering Sub Plan

The Debtors will seek to consummate the Rights Offering Sub Plan in the event the following new capital is raised: (a) $950.0 million through a Rights Offering of New Visteon

Common Stock to holders of 12.25% Senior Notes Claims, 7.00% Senior Notes Claims, and 8.25% Senior Notes Claims (collectively, the "Note Holders"), who qualify as accredited investors, as such term is defined in Rule 501(a) of Regulation D of the Securities Act (the "Eligible Holders"), through a private placement under section 4(2) of the Securities Act; (b) a $300.0 million direct purchase commitment from the Investors; and (c) the Exit Financing Facility (the amount of which may be reduced by any amount of the Term Loan Facility the Debtors are able to successfully reinstate. If the Term Loan Lender Class votes to accept the Plan, the Term Loan Facility Claims will be paid in full in Cash. If the Term Loan Lender Class votes to reject the Plan, the Debtors shall have the option to seek reinstatement of the Term Loan Facility pursuant to section 1124(2) of the Bankruptcy Code, subject to the reasonable consent of the Requisite Investors, and thereafter pay each holder of the Allowed Term Loan Facility Claims its Pro Rata portion of an amount in Cash to be determined by the Debtors (subject to the reasonable consent of the Requisite Investors) (the "Reinstatement Recovery"). Reinstatement of the Term Loan Facility could provide the Estates with significant savings through retroactive application of the non-default, LIBOR plus 3.0% interest rate in lieu of the default interest rate during the pendency of these Chapter 11 Cases. If reinstatement is successful, the Debtors may pay-off all of the reinstated Term Loan Claims in Cash or leave an amount of the Term Loan Facility Claims equal to or less than the amount of the Exit Financing Facility reinstated, which would remain on the Reorganized Debtors' balance sheet and would reduce the amount of the Exit Financing Facility (as projected in the Disclosure Statement) on a dollar-for-dollar basis. The Term Loan Lenders believe reinstatement of the Term Loan Facility (and, therefore, retroactive application of non-default and LIBOR interest) is not legally permissible. The Debtors disagree and believe that potential defaults under the Term Loan Facility would be curable defaults under section 1124(2) of the Bankruptcy Code or are *ipso facto* defaults pursuant to section 365(b)(2) of the Bankruptcy Code. If the Debtors are not successful in reinstating the Term Loan Facility, the Debtors shall satisfy the Term Loan Facility Claims in full in Cash. Under either scenario, the Term Loan Facility Claims would be Unimpaired.

Under the Rights Offering Sub Plan, all Note Holders shall be entitled to receive a Pro Rata distribution of 5.0% of the Distributable Equity, or 4.9% of the Distributable Equity if Class J votes to accept the Plan, and all Eligible Holders shall be entitled to participate in a Rights Offering for the remaining 95.0% of New Visteon Common Stock, or 93.1% of New Visteon Common Stock if Class J votes to accept the Plan.[3] Each Non-Eligible Holder, (i.e., a Note Holder not permitted to participate in a rights offering under section 4(2) of the Securities Act) shall also receive the lesser of (i) its Pro Rata share of $50.0 million in Cash or (ii) 40.0% of the amount of such holder's Allowed Claim in Cash, on account of the value of the Subscription Rights which such Non-Eligible Holder would have been entitled to had such Non-Eligible Holder been an Eligible Holder. Holders of the 12.25% Senior Notes Claims will receive additional consideration on account of guarantees from Visteon Corporation's wholly-owned domestic operating subsidiaries (the "Domestic Subsidiary Guarantees") in the form of their Pro Rata share of warrants to purchase New Visteon Common Stock on terms described in the

---

[3] Under the Rights Offering Sub Plan, Note Holders shall receive 4.9% of New Visteon Common Stock if Class J votes to accept the Plan or 5.0% of New Visteon Common Stock if Class J votes to reject the Plan. The 4.9% or 5.0% of New Visteon Common Stock distributed to the Note Holders shall be subject to dilution from the Management Equity Incentive Program, and if applicable, the Old Equity Warrants and the 93.1% or 95.0% of New Visteon Common Stock offered through the Rights Offering shall be subject to dilution from the Guaranty Equity Amount and the Management Equity Incentive Program, and if applicable, the Old Equity Warrants.

warrant agreement attached as Exhibit B to the Plan (the "Warrant Agreement"). The Cash Recovery Backstop Investors, a subset of the Investors, shall fund the aggregate Cash Amount provided to Non-Eligible Holders and, therefore, such Cash distribution will have no impact on the Debtors' Cash availability. The Equity Commitment Agreement entered into by the Debtors and Investors in connection with the Rights Offering Sub Plan provides that any shares of New Visteon Common Stock that are not purchased through the Rights Offering, or distributed to holders of the 12.25% Senior Notes Claims, as described above, shall be purchased by the Investors subject to the terms and conditions of the Equity Commitment Agreement. The Equity Commitment Agreement was approved by the Bankruptcy Court on June 17, 2010 [Docket No. 3427].[4]

Holders of General Unsecured Claims against the Debtor Entity Visteon International Holdings, Inc. ("VIHI") will be paid in full in Cash due to VIHI's interest in valuable foreign stock holding companies and position in the Debtors' corporate structure, which makes direct Claims against VIHI structurally superior to other General Unsecured Claims.[5] Each remaining holder of a General Unsecured Claim will receive a Cash recovery equal to the lesser of (x) such holder's Pro Rata share of $141.0 million in Cash or (y) 50.0% recovery of the amount of such holder's Allowed Class H Claim.

Allowed Class J Interests are not entitled to receive a distribution and shall be deemed automatically cancelled under the Rights Offering Sub Plan, provided, however, if Class J votes to accept the Plan, each holder of an Allowed Class J Interest shall receive its Pro Rata portion of 2.0% of the Distributable Equity and Old Equity Warrants to purchase shares of New Visteon Common Stock at an exercise price of $58.80 per share. **Thus, only if Class J Interests accept the Plan as a Class will Class J Interests receive a distribution.** The Rights Offering Sub Plan also contemplates Reorganized Visteon's entry into a new $300.0 million working capital facility, which is projected to be undrawn upon emergence from chapter 11.

2.    The Claims Conversion Sub Plan

The Plan shall "toggle" from the Rights Offering Sub Plan to the Claims Conversion Sub Plan in the event sufficient capital is not raised under the Rights Offering Sub Plan to satisfy the Term Loan Facility Claims in full in Cash. Under the Claims Conversion Sub Plan, Reorganized Visteon shall issue New Visteon Common Stock to the Term Loan Lenders and the Note Holders in the following percentages based on their relative priorities and positions in the Debtors' capital structure: 84.9% to 86.2% the holders of the Term Loan Facility Claims; 6.3% to 6.5% to the holders of the 12.25% Senior Notes Claims; and 7.5% to 8.6% to the holders of the 7.00% Senior Notes Claims and 8.25% Senior Notes Claims. Under the Claims Conversion Sub Plan, holders of General Unsecured Claims will receive the same recovery provided under the Rights Offering Sub Plan—i.e., the lesser of (a) such holder's Pro Rata share of $141.0 million in Cash

---

[4]    On June 21, 2010 and June 22, 2010, the ad hoc equity committee filed a notice of appeal and statement of issues on appeal, respectively [Docket Nos. 3445, 3455].

[5]    The Debtors estimate that there will be a total of $3.4 million in Allowed General Unsecured Claims against VIHI. If however, Allowed General Unsecured Claims against VIHI exceed $20.0 million, then holders of such Claims shall receive their Pro Rata share of $20.0 million in Cash. Article IV.D herein contains a chart which illustrates the structural superiority of Claims against VIHI as compared to other General Unsecured Claims that do not have the Domestic Subsidiary Guarantees.

or (b) 50.0% recovery of the amount of such holder's Allowed Class H Claim. General Unsecured Claims against VIHI also will be paid in Cash in full, subject to a $20.0 million cap.[6]

Under the Claims Conversion Sub Plan, holders of the Term Loan Facility Claims would receive the highest percentage of New Visteon Common Stock based on the first Lien they hold against the Debtors' most valuable assets, including certain Debtor foreign stock holding companies (the "Foreign Stock Holding Companies") and at least 65.0% of the Foreign Stock Holding Companies' equity interests in their foreign subsidiaries. After the Term Loan Facility Claims are satisfied in full (including postpetition default interest and fees),[7] the Note Holders shall receive the remaining shares of New Visteon Common Stock. Holders of 12.25% Senior Notes Claims will receive a higher Pro Rata percentage of New Visteon Common Stock than holders of 7.00% Senior Notes Claims and 8.25% Senior Notes Claims on account of the Domestic Subsidiary Guarantees. Holders of Interests in Class J will not receive a recovery under the Claims Conversion Sub Plan and shall be deemed to reject the Plan if the Debtors pursue Confirmation of the Claims Conversion Sub Plan. The Claims Conversion Sub Plan contemplates Reorganized Visteon's entry into a new $150.0 million working capital facility, which is projected to be undrawn upon emergence from chapter 11.

3. The Plan Support Agreement

The Plan Support Agreement entered into in connection with the Plan by and among the Debtors and the Consenting Note Holders (in sufficient number and holdings to assure their respective Classes' acceptance of the Plan) and approved by the Bankruptcy Court provides that the parties thereto shall support the Plan in all aspects, including the findings of the valuation analysis prepared by the Debtors and their advisors, as described in further detail in Article VIII.D (the "Valuation Analysis").

In certain limited circumstances, the Consenting Note Holders have the right to terminate the Plan Support Agreement and withdraw their support for the Plan. Those termination rights are enumerated in Section 7.1 of the Plan Support Agreement. For example, under Section 7.1(e)(2) of the Plan Support Agreement, the Consenting Note Holders may terminate the Plan Support Agreement and shall not be required to support the Plan if (a) the representations and warranties made by the Debtors in connection with the Equity Commitment Agreement fail to be true and correct so as to be reasonably expected to result in a Material Adverse Effect, as such term is defined in the Equity Commitment Agreement, or (b) the Debtors fail to materially perform or comply with any covenants contained in the Equity Commitment Agreement. The Plan Support Agreement permits the Debtors to commence expedited proceedings in the Bankruptcy Court to determine whether a termination event has actually occurred under the Plan Support Agreement. Furthermore, if the Consenting Note Holders were to terminate the Plan Support Agreement pursuant to Section 7.1(e) thereof after the Debtors have solicited votes on

---

[6] General Unsecured Claims against VIHI shall be satisfied first, up to $20.0 million, under both the Rights Offering Sub Plan and Claims Conversion Sub Plan.

[7] The estimated Allowed amount of the Term Loan Facility Claims is $1.629 billion, including postpetition interest at the default rate. To the extent Class E votes to reject the Plan and the Debtors succeed in reinstating the Term Loan Facility Claims, the Allowed amount of the Term Loan Facility Claims may be calculated at the non-default interest rate in lieu of the default interest rate.

the Plan, the Debtors shall not be required to re-solicit, but the Consenting Note Holders shall be deemed to have rejected the Plan and may also formally object to Confirmation of the Plan.

On the other hand, if the representations and warranties made by the Investors in connection with the Equity Commitment Agreement fail to be true and correct so as to be reasonably expected to prohibit, materially delay or materially and adversely impact the Investors' performance of their obligations under the Equity Commitment Agreement, or the Investors fail to materially perform or comply with any covenants contained in the Equity Commitment Agreement, the Debtors may terminate the Equity Commitment Agreement and proceed with Confirmation of the Claims Conversion Sub Plan. The Debtors may also terminate the Equity Commitment Agreement and proceed with Confirmation of the Claims Conversion Sub Plan if the Investors, together with the proceeds from the Rights Offering, do not deliver the capital contemplated by the Rights Offering Sub Plan. Under the circumstances described above, the Consenting Note Holders would remain bound by the Plan Support Agreement and would thus be required to support Confirmation of the Claims Conversion Sub Plan. Lastly, if the Equity Commitment Agreement fails to close within the timeframe specified in section 10.1(b)(iii) of the Equity Commitment Agreement, the Debtors may terminate the Equity Commitment Agreement and proceed with Confirmation of the Claims Conversion Sub Plan with the Consenting Note Holders' support secured pursuant to the Plan Support Agreement.

The Term Loan Lenders believe the proposed agreements (x) contain no definitive date by which the new capital must be delivered, (y) excuse the Investors from any liability for breach of their commitments, and (z) would likely suspend confirmation in the event the Investors or Note Holders litigate regarding the toggle. The Debtors believe the Term Loan Lenders misinterpret the Equity Commitment Agreement and Plan Support Agreement and disagree with the Term Loan Lenders' assertions. The Bankruptcy Court approved the Plan Support Agreement and Equity Commitment Agreement over all objections on June 17, 2010 [Docket No. 3427].

## B. **Treatment of Claims and Interests**

### 1. Classification

The Plan divides all Claims (except Administrative Claims, Professional Claims, DIP Facility Claims, and Priority Tax Claims) and all Interests into various Classes. Listed below is a summary of the Classes of Claims and Interests under the Plan.

| Class | Claim or Interest |
|-------|-------------------|
| A | ABL Claims |
| B | Secured Tax Claims |
| C | Other Secured Claims |
| D | Other Priority Claims |
| E | Term Loan Facility Claims |
| F | 7.00% Senior Notes Claims and 8.25% Senior Notes Claims |
| G | 12.25% Senior Notes Claims |
| H | General Unsecured Claims |
| I | Intercompany Claims |
| J | Interests in Visteon Corporation |

| Class | Claim or Interest |
|-------|-------------------|
| K | Intercompany Interests |
| L | Section 510(b) Claims |

2.      Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims, Professional Claims, DIP Facility Claims, or Priority Tax Claims. These Claims are therefore excluded from the Classes of Claims set forth in Article III of the Plan.

| Claim | Plan Treatment | Estimated Aggregate Amount of Allowed Claims Under Rights Offering Sub Plan | Estimated Aggregate Amount of Allowed Claims Under Claims Conversion Sub Plan | Projected Recovery Under the Plan |
|-------|----------------|------------------|------------------|------------------|
| **Administrative and Professional Claims** | Paid in full in Cash. | $225.0 million[8] | $105.0 million | 100% |
| **DIP Facility Claims** | Paid in full in Cash, unless otherwise agreed. | $75.0 million | $75.0 million | 100% |
| **Priority Tax Claims** | Paid in full in Cash. | $5.3 million | $5.3 million | 100% |

## C.      Treatment of Claims and Interests Under the Plan

The table below summarizes the Classes of Claims and Interests under the Plan, the treatment of such Classes, the voting rights of such Classes, and the projected recovery, if any, under each Sub Plan for such Classes. To the extent of any inconsistency between the summaries contained in the Disclosure Statement and those set forth in the Plan, the Plan shall govern. These projected recoveries are based upon certain assumptions contained in the Valuation Analysis. As more fully described below, the Debtors' assumed reorganization value of the New Visteon Common Stock was derived from commonly accepted valuation techniques and is not an estimate of the trading value for such securities.

The Debtors have not completed full reconciliation of the Class H General Unsecured Claims and have accordingly developed low and high-end ranges of estimates for the ultimate amount of Allowed General Unsecured Claims, as set forth below. The amount of Allowed

---

8   The estimate of Allowed Administrative Claims and Professional Claims does not include amounts paid by the Debtors in the ordinary course of business during the Chapter 11 Cases. Included within the estimate of Administrative Claims and Professional Claims under the Rights Offering Sub Plan are approximately $120.0 million in fees that would be incurred in connection with the Rights Offering, which include fees to be paid pursuant to the Equity Commitment Agreement together with other professional fees to be paid by the Debtors, $50.0 million in Professional Claims, $25.0 million in Cure payments, and $30.0 million in 503(b)(9) Claims. Included within the estimate of Administrative Claims and Professional Claims under the Claims Conversion Sub Plan are $50.0 million in Professional Claims, $25.0 million in Cure payments, and $30.0 million in 503(b)(9) Claim.

General Unsecured Claims will impact the Cash availability of the Debtors and, in turn, the value of the New Visteon Common Stock to be distributed to the Note Holders under the Rights Offering Sub Plan and the Note Holders and Term Loan Lenders under the Claims Conversion Sub Plan. The range of estimates for the Class H General Unsecured Claims is based upon a number of assumptions, including, the following.

1.    Low-End Claims Estimate

The Debtors' low-end estimate of Allowed Class H General Unsecured Claims assumes, among other things, that: (a) no Claims will be Allowed against the Debtors on account of the Visteon UK Pension Plan (the "VUK Pension Plan"), as such Claims have been withdrawn by the claimants, or the Visteon Engineering Services Pension Plan (the "VES Pension Plan"); (b) no Claims will be Allowed against the Debtors on account of the termination of the Visteon Corporation Supplemental Executive Retirement Plan (the "SERP"), the Visteon Corporation Pension Parity Plan (the "PPP"), and the Visteon Corporation Executive Separation Allowance Plan (the "ESAP"); (c) certain customer Claims, including warranty and services contract Claims, will not ultimately be Allowed based on mutually agreed to contractual amendments or Claim waivers; and (d) contingent litigation Claims will be resolved in amounts at the low-end of possible litigation outcomes.[9]

2.    High-End Claims Estimate

In contrast, the high-end estimates for Allowed Class H General Unsecured Claims assume maximum liability for a number of contingent, unliquidated, and Disputed Claims including (a) Allowed Claims for approximately $30.9 million against the Debtors on account of the termination of the SERP, PPP, and ESAP and (b) certain litigation related Claims will be Allowed at the high-range of possible litigation outcomes (but not at the face amount stated on the relevant Proof of Claim).[10] Neither the high nor the low-end estimates on which the recoveries stated below are based project allowance of any Claims on account of the VUK Pension Plan, the VES Pension Plan, and certain customer contract and warranty Claims.

Holders of Class H General Unsecured Claims are projected to receive a 50.0% recovery on their Claims based on the Debtors' Claims estimate. However, to the extent the amount of Allowed Class H General Unsecured Claims exceeds $282.0 million, a 69.0% increase over the Debtors' high-end Claims projection, holders of Allowed Class H General Unsecured Claims would receive less than a 50.0% recovery on their Claims.

---

9    The VUK Pension Plan and VES Pension Plan are discussed further in Article V.I. The SERP, PPP, and ESAP are discussed further in Article IV.H.

10    The Claims arising from agreements with Ford are discussed further in Article V.F.

| Class | Type of Claim or Equity Interest | Estimated Range of Allowed Claims or Interests | Rights Offering Sub Plan | | Claims Conversion Sub Plan | |
|---|---|---|---|---|---|---|
| | | | Treatment of Claim/Interest | Estimated Range of % Recovery of under the Plan | Treatment of Claim/Interest | Estimated Range of % Recovery of under the Plan[11] |
| A | ABL Claims | $127.15 million | Paid in full in Cash. | 100% | Paid in full in Cash. | 100% |
| B | Secured Tax Claims | $2.5 million | Paid in full in Cash. | 100% | Paid in full in Cash. | 100% |
| C | Other Secured Claims | $2.85 million | Paid in full in Cash. | 100% | Paid in full in Cash. | 100% |
| D | Other Priority Claims | $0.01 million | Paid in full in Cash. | 100% | Paid in full in Cash. | 100% |
| E | Term Loan Facility Claims | $1.629 billion[12] | Paid in full in Cash if Class E accepts the Plan. Subject to the Reinstatement Recovery if Class E rejects the Plan, but if Debtors are unsuccessful in seeking to reinstate, the Term Loan Facility Claims shall be paid in full in Cash. | 100% | Pro Rata share of 85.0% - 86.2% of shares of New Visteon Common Stock. | 100% |

---

11   The estimated Claim recoveries provided in this Disclosure Statement do not account for dilution by the Management Equity Incentive Program.

12   The estimated Allowed amount of the Term Loan Facility Claims includes postpetition interest at the default rate.  To the extent Class E votes to reject the Plan and the Debtors succeed in reinstating the Term Loan Facility Claims, the Allowed amount of the Term Loan Facility Claims may, among other things, be calculated at the non-default interest rate in lieu of the default interest rate, and at the Eurodollar rate since July 13, 2009, instead of the base rate.

K&E 17065163.9

| | | | | | | |
|---|---|---|---|---|---|---|
| F | 7.00% Senior Notes Claims and 8.25% Senior Notes Claims | $668.23 million | For Eligible Holders, (i) Pro Rata Allocation of 4.9% or 5.0% of the Distributable Equity and (ii) Pro Rata Allocation of Subscription Rights.[13]<br><br>For Non-Eligible Holders, (i) Pro Rata Allocation of 4.9% or 5.0% of the Distributable Equity and (ii) the Cash Amount. | 7.9% - 8.2% plus the value of the Subscription Rights (for Eligible Holders)<br><br>48.16% - 48.2% (for Non-Eligible Holders) | Pro Rata share of 7.5% - 8.6% of shares of New Visteon Common Stock. | 21.0% - 25.0% |

---

[13] The Subscription Rights for Eligible Holders in Class F includes an approximate $0.34 per share discount to $0.15 per share premium (if Class J Interests vote to accept the Plan) or $0.41 to $0.91 per share discount (if Class J Interests vote to reject the Plan) at which New Visteon Common Stock may be purchased upon an Eligible Holder's exercise of Subscription Rights at $27.69 per share as compared to the Plan's valuation of the New Visteon Common Stock at $27.54 per share under the high-end Claims estimate and $28.03 per share under the low-end Claims estimate, or $28.10 per share under the high-end Claims estimate and $28.60 per share under the low-end Claims estimate (depending on whether Class J Interests vote to accept the Plan). If Class J votes to reject the Plan, holders of Allowed Class F Claims would receive 5.0%, instead of 4.9%, of the Distributable Equity Value in Reorganized Visteon.

K&E 17065163.9

| | | | | | | |
|---|---|---|---|---|---|---|
| G | 12.25% Senior Note Claims | $202.36 million | For Eligible Holders, (i) Pro Rata Allocation of 4.9% or 5.0% of the Distributable Equity, (ii) Pro Rata Allocation of Subscription Rights, and (iii) Pro Rata portion of the Guaranty Equity Amount.[14]<br><br>For Non-Eligible Holders, (i) Pro Rata Allocation of 4.9% or 5.0% of the Distributable Equity, (ii) the Cash Amount, and (iii) the Pro Rata portion of the Guaranty Equity Amount. | 28.7% - 30.3% plus the value of the Subscription Rights (for Eligible Holders)<br><br>69.5% - 70.3% (for Non-Eligible Holders) | Pro Rata share of 6.3% - 6.5% shares of New Visteon Common Stock. | 58.0% - 62.0% |
| H | General Unsecured Claims | $107.96 million - $166.76 million | The lesser of: (i) the Pro Rata share of $141.0 million or (ii) 50.0% recovery of the amount of such holder's Allowed Class H Claim.[15] | 50.0% | The lesser of: (i) the Pro Rata share of $141.0 million or (ii) 50% recovery of the amount of such holder's Allowed Class H Claim. | 50.0% |
| I | Intercompany Claims | $16.39 billion | No recovery, but may be reinstated in the discretion of the Reorganized Debtors. | N/A | No recovery, but may be reinstated in the discretion of the Reorganized Debtors. | N/A |

---

[14] The Subscription Rights for Eligible Holders in Class G includes an approximate $0.34 per share discount to $0.15 per share premium (if Class J Interests vote to accept the Plan) or $0.41 to $0.91 per share discount (if Class J Interests vote to reject the Plan) at which New Visteon Common Stock may be purchased upon an Eligible Holder's exercise of Subscription Rights at $27.69 per share as compared to the Plan's valuation of the New Visteon Common Stock at $27.54 per share under the high-end Claims estimate and $28.03 per share under the low-end Claims estimate, or $28.10 per share under the high-end Claims estimate and $28.60 per share under the low-end Claims estimate (depending on whether Class J Interests vote to accept the Plan). If Class J votes to reject the Plan, holders of Allowed Class G Claims would receive 5.0%, instead of 4.9%, of the Distributable Equity Value in Reorganized Visteon.

[15] General Unsecured Claims against VIHI shall be satisfied first, up to $20.0 million, under both the Rights Offering Sub Plan and Claims Conversion Sub Plan.

K&E 17065163.9

| | | | | | | |
|---|---|---|---|---|---|---|
| J | Interests in Visteon Corporation[16] | N/A | Cancelled, provided, however, if Class J accepts the Plan, Pro Rata share of (i) 2.0% of the Distributable Equity and (ii) the Old Equity Warrants. | N/A | Cancelled. | 0.0% |
| K | Intercompany Interests | N/A | No recovery, but may be reinstated in the discretion of the Reorganized Debtors. | N/A | No recovery, but may be reinstated in the discretion of the Reorganized Debtors. | N/A |
| L | Section 510(b) Claims | N/A | No recovery. | 0.0% | No recovery. | 0.0% |

The Debtors' Claims and Solicitation Agent has received approximately 3,300 Proofs of Claim totaling approximately $7.9 billion (excluding Intercompany Claims). Approximately 55 Proofs of Claim, totaling approximately $5.9 billion, represent the Term Loan Facility Claims, the 7.00% Senior Notes Claims, the 8.25% Senior Notes Claims, and the 12.25% Senior Notes Claims for which the Debtors have recorded approximately $2.5 billion in aggregate liability. The Debtors believe the Claim amounts in excess of $2.5 billion are duplicative and will ultimately be resolved through the Plan or omnibus objections to Claims. Additionally, Proofs of Claims in the amount of $1.064 billion, which were filed on account of pension termination liabilities will be disallowed because the Pension Plans are to be maintained by the Reorganized Debtors. Lastly, the Debtors believe that approximately 530 Proofs of Claim, totaling approximately $240.0 million, will ultimately be disallowed by the Bankruptcy Court primarily because these Claims appear to be duplicative or unsubstantiated. While the Debtors have not reconciled all filed Proofs of Claim against their books and records, they believe that many of the remaining filed Proofs of Claim are invalid, untimely, duplicative, or overstated, and, therefore, have assumed for purposes of estimating recoveries that such Claims shall be reduced in amount or expunged from the Claims Register. On the other hand, additional Proofs of Claim may be filed after the Bar Date, which could be Allowed by the Bankruptcy Court. Accordingly, the ultimate number and Allowed amount of Claims asserted against the Debtors are not presently known and the final resolution of such Claims could result in a material adjustment to the recoveries and Claim estimates provided above.

---

16  Two percent of the Distributable Equity equates to approximately $27.3 million to $27.7 million in value to be distributed to Class J Interests at the Plan's value, if Class J accepts the Plan. In addition, the Old Equity Warrants also are estimated to be worth approximately $7.2 million based on Black-Scholes calculation.

## D.  Liquidation and Valuation Analyses

The Debtors believe that each of the Sub Plans provides the same or a greater recovery for holders of Allowed Claims and Interests as would be achieved in a liquidation pursuant to chapter 7 of the Bankruptcy Code because of, among other things, the additional Administrative Claims generated by conversion to a chapter 7 case, the administrative costs of liquidation and associated delays in connection with a chapter 7 liquidation, and the negative impact on the market for the Debtors' assets caused by attempting to sell a large number of assets in a short time frame, each of which likely would diminish the value of the Debtors' assets available for distributions.

The Debtors have prepared liquidation analyses, attached hereto as **Exhibit D** and discussed in Article VIII.C (the "Liquidation Analyses"), and a Valuation Analysis to assist holders of Claims and Interests in evaluating each of the Sub Plans.  The Liquidation Analyses were prepared in connection with the filing of the plan of reorganization on March 15, 2010 but have been updated to reflect a later Effective Date and other variables dependent upon timing. The Liquidation Analyses compare the Creditor recoveries to be realized if the Debtors were to be liquidated in a hypothetical case under chapter 7 of the Bankruptcy Code with the distributions to holders of Allowed Claims and Interests under each of the Sub Plans.  The analyses are based upon the value of the Debtors' assets and liabilities as of a certain date, and incorporate various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date.  Further, each analysis is subject to potentially material changes including with respect to economic and business conditions and legal rulings.  Therefore, the actual liquidation value of the Debtors could vary materially from the estimates provided in the Liquidation Analyses, and the actual total enterprise value and reorganization equity value of the Reorganized Debtors could vary materially from the estimates contained in the Valuation Analysis.

## E.  Certain Factors to Be Considered Prior to Voting

There are a variety of factors that all holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  Some of these factors, which are described in more detail in Article IX and Article X, are as follows and may impact recoveries under the Plan:

o       Unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and Disclosure Statement.

o       Article X describes certain significant federal tax consequences of the transactions contemplated by the Plan that may affect the Debtors, including the realization of cancellation of indebtedness income, reduction of net operating loss ("NOL") carryforwards and unrealized built-in losses, and the limitations that may apply to the Debtors' usage of those NOLs and unrealized built-in-losses.  Article X also describes the federal tax consequences of the transactions contemplated by the Plan that may affect holders of Claims and Interests, including the recognition of taxable income by such holders.  Holders of Claims and Interests are urged to

consult with their own tax advisors regarding the federal, state, local, and foreign tax consequences of the Plan.

o     Although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors cannot assure such compliance nor that the Bankruptcy Court will confirm the Plan.

o     The Debtors may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code.

o     Any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Claims.

o     Only if Class J Interests vote as a Class to accept the Plan, and the Debtors pursue Confirmation of the Rights Offering Sub Plan, will Class J Interests receive a distribution under the Plan.

o     If holders of Class E Term Loan Facility Claims vote as a Class to reject the Plan, and the Debtors pursue Confirmation of the Rights Offering Sub Plan, the Term Loan Facility Claims may be subject to the Reinstatement Recovery at the Debtors' discretion and subject to the reasonable consent of the Requisite Investors.

o     The Term Loan Lenders believe reinstatement of the Term Loan Facility is not legally permissible. The Debtors disagree and believe that potential defaults under the Term Loan Facility would be curable defaults under section 1124(2) of the Bankruptcy Code or are *ipso facto* defaults pursuant to section 365(b)(2) of the Bankruptcy Code.

While these factors could affect distributions available to holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Impaired Classes entitled to vote to accept or reject the Plan (the "Voting Classes") or necessarily require a re-solicitation of the votes of holders of Claims in such Voting Classes.

**AS DESCRIBED FURTHER IN ARTICLE VI.M.1.I HEREIN, HOLDERS OF ALLOWED CLAIMS THAT WOULD BE IN VIOLATION OF ANY APPLICABLE LAWS OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL UNIT AS A RESULT OF THE RECEIPT OF SHARES OF NEW VISTEON COMMON STOCK PURSUANT TO THE PLAN SHALL NOT BE ENTITLED TO RECEIVE SUCH SHARES UNLESS AND UNTIL SUCH HOLDERS ARE IN COMPLIANCE WITH ANY SUCH APPLICABLE LAWS OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL UNIT.**

# ARTICLE III.
# VOTING AND RIGHTS OFFERING SUBSCRIPTION PROCEDURES

The following Classes are the only Classes entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status Under Rights Offering Sub Plan | Status Under the Claims Conversion Sub Plan |
|-------|-------------------|---------------------------------------|---------------------------------------------|
| E | Term Loan Facility Claims | Unimpaired | Impaired |
| F | 7.00% Senior Notes Claims and 8.25% Senior Notes Claims | Impaired | Impaired |
| G | 12.25% Senior Notes Claims | Impaired | Impaired |
| H | General Unsecured Claims | Impaired | Impaired |
| J | Interests in Visteon Corporation | Impaired | Impaired |

If your Claim or Interest is not included in these Classes, you are not entitled to vote and you will not receive a Solicitation Package.[17]

## A.    Vote Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a Class of Claims or Interests is determined by calculating the number and the amount of Claims or Interests voting to accept, based on the actual total Allowed Claims or Interests voting on the Plan.  Acceptance by a Class requires more than one-half of the number of total Allowed Claims or Interests in the Class to vote in favor of the Plan and at least two-thirds in dollar amount of the total Allowed Claims or Interests in the Class to vote in favor of the Plan.

## B.    Classes Not Entitled to Vote

Under the Bankruptcy Code, Creditors are not entitled to vote if their contractual rights are Unimpaired by the Plan or if they will receive no distribution of property under the Plan.  All non-voting Classes of Claims or Interests shall receive the same recovery under the Rights Offering Sub Plan and Claims Conversion Sub Plan.  Based on this standard, the following Classes will not be entitled to vote on the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| A | ABL Claims | Unimpaired | Conclusively Presumed to Accept |
| B | Secured Tax Claims | Unimpaired | Conclusively Presumed to Accept |
| C | Other Secured Claims | Unimpaired | Conclusively Presumed to Accept |
| D | Other Priority Claims | Unimpaired | Conclusively Presumed to Accept |
| I | Intercompany Claims | Unimpaired | Conclusively Presumed |

---

[17]  Capitalized terms used in this Article III but not defined in the Disclosure Statement or the Plan shall have the meanings ascribed to them in the Solicitation Procedures attached as Exhibit 5 to the Disclosure Statement Order, to be attached hereto as Exhibit B.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| K | Intercompany Interests | Unimpaired | Conclusively Presumed to Accept |
| L | Section 510(b) Claims | Impaired | Deemed to Reject |

## C. Solicitation Procedures

### 1. Claims and Solicitation Agent

The Debtors retained KCC to, among other things, act as Claims and Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

### 2. Solicitation Package

The following materials shall constitute the Solicitation Package:

o  the *Notice of (A) Approval of Adequacy of Disclosure Statement, (B) Solicitation and Voting Procedures, (C) the Objection and Voting Deadlines, and (D) the Hearing to Confirm the Debtors' Fourth Amended Plan of Reorganization*;

o  the appropriate Ballot(s) and Master Ballots and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope;

o  the Disclosure Statement, as approved by the Bankruptcy Court (with all appendices thereto, including the Plan);

o  the *Order (A) Approving the Adequacy of the Debtors' Fourth Amended Disclosure Statement; (B) Approving Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Plan of Reorganization; (C) Approving the Form of Various Ballots and Notices in Connection Therewith; and (D) Scheduling Certain Dates with Respect Thereto* [Docket No. 3491] (the "Disclosure Statement Order"), which shall be attached hereto as **Exhibit B**, without exhibits except for Exhibit 5 thereto;

o  a letter from the Debtors to the Voting Classes recommending that holders of Claims in such Classes vote to accept the Plan; and

o  any supplemental solicitation materials the Debtors may file with the Bankruptcy Court.

### 3. Distribution of the Solicitation Package and Plan Supplement

Through the Claims and Solicitation Agent and Financial Balloting Group LLC (the "Special Voting Agent"), the Debtors intend to distribute the Solicitation Packages within five Business Days after entry of the Disclosure Statement Order, a date approximately 30 days in advance of the Voting Deadline.

The Solicitation Package will be distributed in accordance with the Solicitation Procedures, which shall be attached as Exhibit 5 to the Disclosure Statement Order. The Solicitation Package (except the Ballots and Master Ballots) may also be obtained from the Claims and Solicitation Agent by: (a) calling the Debtors' restructuring hotline at (866) 967-0260 within the U.S. or Canada or, outside of the U.S. or Canada, by calling (310) 751-2660; (b) visiting the Debtors' restructuring website at: http://www.kccllc.net/visteon; and/or (c) writing to Visteon Corporation, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245. You may also obtain copies of any pleadings filed in these Chapter 11 Cases for free by visiting the Debtors' restructuring website at http://www.kccllc.net/visteon or for a fee via PACER at http://www.deb.uscourts.gov.

Prior to the Confirmation Hearing, the Debtors intend to file a Plan Supplement that includes, among other things, the list of assumed Executory Contracts (with associated Cure Amounts, if any), and a description of retained Causes of Action. As the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Claims and Solicitation Agent by: (a) calling the Debtors' restructuring hotline at (866) 967-0260 within the U.S. or Canada or, outside of the U.S. or Canada, calling (310) 751-2660; (b) visiting the Debtors' restructuring website at: http://www.kccllc.net/visteon; and/or (c) writing to Visteon Corporation, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.

## D.     Voting Procedures

The Voting Record Date was June 25, 2010. The Voting Record Date is the date for determining (1) which holders of Claims or Interests are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the Solicitation Procedures and (2) whether Claims or Interests have been properly assigned or transferred to an assignee pursuant to Bankruptcy Rule 3001(e) such that the assignee can vote as the holder of a Claim. The Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' Creditors and other parties in interest.

Under the Plan, holders of Claims or Interests in the Voting Classes are entitled to vote to accept or reject the Plan. In order for the holder of a Claim or Interest in the Voting Classes to have such holder's Ballot counted as a vote to accept or reject the Plan, such holder's Ballot must be properly completed, executed, and delivered by using the return envelope provided by: (a) first class mail; (b) courier; or (c) personal delivery to Visteon Corporation Balloting Center c/o Kurtzman Carson Consultants LLC 2335 Alaska Avenue, El Segundo, CA 90245, so that such holder's Ballot or the Master Ballot incorporating the vote cast by such Ballot, as applicable, is **actually received** by the Claims and Solicitation Agent prior to 5:00 p.m. prevailing Pacific Time on July 30, 2010 (the "Voting Deadline").

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE IN THEIR SOLE AND ABSOLUTE DISCRETION.

K&E 17065163.9

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM OR INTEREST BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.[18]

EACH HOLDER OF A CLAIM OR INTEREST MUST VOTE ALL OF ITS CLAIMS OR INTERESTS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM OR INTEREST WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM OR INTEREST HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS OR INTEREST, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM OR INTEREST IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.

## E.     **Rights Offering Subscription Procedures**

On or about May 18, 2010, the Debtors delivered an Election Form to each Note Holder to determine which Note Holders will be considered Eligible Holders. The Election Form is due by the Election Form Deadline.

The Debtors will mail a Subscription Form to each Note Holder who completes and returns an Election Form evidencing that it is an Eligible Holder by the Election Form Deadline. The Subscription Form will be mailed with instructions for the proper completion, due execution, and timely delivery of such Subscription Form, as well as instructions for payment. Each Eligible Holder that validly exercises in full its Subscription Rights shall be entitled to elect on the Subscription Form to purchase Rights Offering Shares not otherwise subscribed for pursuant to validly exercised Subscription Rights by indicating the number of such unsubscribed shares such Eligible Holder desires to purchase. To exercise its Subscription Rights and, if applicable, Oversubscription Rights, an Eligible Holder must: (1) return a duly completed Subscription Form to the Rights Offering Agent so that such Subscription Form is actually received by the Rights Offering Agent on or before the Subscription Expiration Date, and (2) pay to the Rights Offering Agent on or before the Subscription Expiration Date the Subscription Price multiplied by the number of shares of New Visteon Common Stock such Eligible Holder has elected to purchase, in accordance with the wire instructions set forth on the Subscription Form.

IF THE RIGHTS OFFERING AGENT FOR ANY REASON DOES NOT RECEIVE ON OR PRIOR TO THE ELECTION FORM DEADLINE BOTH A DULY COMPLETED

---

[18] Holders who return Ballots that do not indicate a vote to accept or reject the Plan may still opt-out of the third party release provisions set forth in the Plan.

SUBSCRIPTION FORM AND IMMEDIATELY AVAILABLE FUNDS AS SET FORTH ABOVE FROM AN ELIGIBLE HOLDER, SUCH ELIGIBLE HOLDER SHALL BE DEEMED TO HAVE RELINQUISHED AND WAIVED ITS RIGHT TO PARTICIPATE IN THE RIGHTS OFFERING. THE DEBTORS SHALL NOT BE OBLIGATED TO HONOR ANY PURPORTED EXERCISE OF SUBSCRIPTION RIGHTS OR OVERSUBSCRIPTION RIGHTS RECEIVED BY THE RIGHTS OFFERING AGENT AFTER THE SUBSCRIPTION EXPIRATION DATE REGARDLESS OF WHEN THE DOCUMENTS RELATING TO SUCH EXERCISE WERE SENT. ONCE THE ELIGIBLE HOLDER HAS VALIDLY EXERCISED ITS SUBSCRIPTION RIGHTS AND, IF APPLICABLE, OVERSUBSCRIPTION RIGHTS, SUCH EXERCISE WILL NOT BE PERMITTED TO BE REVOKED.

## F.     **Confirmation Hearing**

Pursuant to section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing on Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

The Confirmation Hearing will commence on September 28, 2010 at 9:30 a.m. prevailing Eastern Time (or possibily on August 25, 2010 at 2:30 p.m. prevailing Eastern Time if unsecured Creditor and Interest Classes accept the Plan) before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the master service list and the Entities who have filed an objection to the Plan ("Plan Objection"), without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. The Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

The deadline to file Plan Objections is 5:00 p.m. prevailing Eastern Time on July 30, 2010. All Plan Objections must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the Disclosure Statement Order so that they are received on or before the deadline to file Plan Objections.

## G.     **Confirmation and Consummation of the Plan**

The Confirmation Order shall approve all provisions, terms, and conditions of the Plan unless such provisions, terms, or conditions are otherwise satisfied or waived pursuant to the Plan provisions described in Article VI.O.2 herein.

## ARTICLE IV.
## GENERAL INFORMATION

## A.     **Overview of the Debtors' History and Industry**

Visteon Corporation was incorporated in Delaware in January 2000 as a wholly-owned subsidiary of Ford. Subsequently, Ford transferred the assets and liabilities comprising its

automotive components and systems business to Visteon Corporation. Visteon Corporation separated from Ford on June 28, 2000, when all of Visteon Corporation's common stock was distributed by Ford to Ford's shareholders. In 2005, Visteon Corporation negotiated for Ford to reacquire some of the assets spun off to Visteon Corporation in 2000 at their then current fair values. As a result of these negotiations, in September 2005, Visteon Corporation transferred 23 of its North American facilities and certain other related assets and liabilities to Automotive Component Holdings, LLC ("ACH"), an indirect, wholly-owned subsidiary of Visteon Corporation at the time. On October 1, 2005, Visteon Corporation sold ACH to Ford for cash proceeds of approximately $300.0 million, as well as the forgiveness of certain employee and retiree welfare benefit liabilities and the assumption of certain other liabilities (together, the "ACH Transactions").

Through the ACH Transactions, Visteon transformed itself into a leaner company focused on a smaller set of core competencies and with a much improved labor cost position. Through the ACH Transactions, Visteon Corporation ceased leasing, or transferred, 18,000 hourly employees, including those employees covered by an uncompetitive master agreement with the International Union of United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"). Eliminating Visteon's highest cost employees through the ACH Transactions reduced Visteon's average hourly wage from $38.00 per hour in the third quarter of 2005 to $18.00 per hour in the fourth quarter of 2005.

In addition, Ford agreed to place $400.0 million in an escrow account to assist with Visteon's ongoing restructuring efforts, which included, among other things, costs associated with divesting facilities. Ford agreed to reimburse Visteon Corporation for its restructuring costs on a dollar-for-dollar basis up to the first $250.0 million out of the escrow account and to reimburse Visteon Corporation for one half of the next $300.0 million of its restructuring costs. On August 14, 2008, Ford placed another $50.0 million in the escrow account bringing the total amount placed in escrow to $450.0 million. In connection with the ACH Transactions, Visteon Corporation and Ford also entered into an agreement pursuant to which Ford agreed to reimburse Visteon Corporation for certain separation costs, including severance costs, COBRA health continuation and life insurance premiums, certain pension related costs, and costs of outplacement services, for salaried employees leased to ACH from Visteon Corporation who are terminated by Visteon Corporation.

From January 2006 until the fall of 2008, the Debtors undertook an ambitious restructuring initiative to streamline and improve their business operations. However, as discussed in greater detail below, the Debtors have not been immune to the virtual freeze of the credit and capital markets and global economic recession, which has been particularly acute in the automotive sector. Prior to the Petition Date, these conditions resulted in significant operating losses and cash flow usage, and made filing for chapter 11 protection the best option for the Debtors to right-size their capital structure and operating footprint.

## B. Visteon's Products and Services

Visteon has three core product groups—a climate group, an electronics group, which includes a significant lighting subset, and an interior systems group. Visteon also provides various transition services to ACH and other parties in connection with divestiture transactions.

Based on independent market studies and the Debtors' internal estimates, Visteon is a market leader in each of its core product groups. In 2009, Visteon's climate product group had revenue of approximately $2.5 billion. Visteon also sold $2.1 billion in electronic component parts (which includes lighting component parts) and generated $1.9 billion in revenue from its interiors product group in 2009. Visteon employs its design and engineering capabilities to create award winning and market leading products. Visteon has invested considerably in research and development and capital improvements, and has gained industry-wide recognition for its products. Visteon's investments in research and development have produced—and are expected to continue to produce—the innovative products needed by the automotive industry in the 21st century. In recent years, Visteon's significant new products include the Hyundai Genesis Climate Control System, which was featured in the 2009 North American International Auto Show Car of the Year, and the reconfigurable instrument cluster for the 2010 Land Range Rover. Additionally, Visteon has received many awards for outstanding products and manufacturing, including the 2009 Shingo Bronze Medallion for operational excellence, the Best Overall Performance award from Hyundai Motor India, and selection as a PACE award finalist for its two-color, two-shot injection molding manufacturing process.

1.    Climate Product Group

Visteon designs and manufactures fully integrated heating, ventilation, and air conditioning systems, such as air induction and HVAC systems, that help ensure a comfortable interior "climate" for automobiles. Some examples of climate products produced by Visteon are heat exchangers, climate controls, compressors, and fluid transport systems. In addition, using power train cooling technologies, Visteon manufactures cooling functionality and thermal management for vehicles' power train systems. As of December 31, 2009, Visteon produced goods for its climate product group at approximately 27 facilities worldwide.

2.    Electronics Product Group

Visteon also designs and manufactures advanced in-vehicle entertainment, driver information systems, wireless communication, climate control, body and security electronics, and lighting technologies and products, such as headlamps and tail lamps. For in-vehicle driver and passenger entertainment, Visteon offers a wide variety of audio systems and components, such as MACH(R) Voice Link Technology, connectivity solutions for portable devices, and a variety of family entertainment systems. As of December 31, 2009, Visteon produced goods for its electronics product group at approximately 14 facilities worldwide.

3.    Interiors Product Group

Additionally, Visteon produces cockpit modules, instrument panels, a variety of door and console modules, and interior trim components. Visteon designs its cockpit modules around the instrument panels, which offer optional assemblies like ducts, registers, passenger airbag systems, finished panels, and a glove box. As of December 31, 2009, Visteon produced goods for its interiors product group at approximately 27 facilities worldwide.

K&E 17065163.9

4. Services

Visteon's service operations provide various transition services in support of divestiture transactions, principally related to the ACH Transactions. Services to ACH are provided at a rate intended to equal Visteon's cost until such time as the services are no longer required by ACH or the expiration of the related agreement. In addition to services provided to ACH, Visteon has also agreed to provide certain transition services related to other divestiture transactions. These services are subject to agreements with ACH and Ford that the Debtors intend to exit during the Chapter 11 Cases.

C. **Visteon's Customers**

Visteon's customers include most of the world's largest original equipment manufacturers ("OEMs"). Given its historical relationship with Ford, Ford initially accounted for the majority of Visteon's sales. However, over the last few years, Visteon has diversified its customer base. In 2000, Ford accounted for 84% of Visteon's sales. By 2005, that number was reduced to 62%, and in 2009, that number was only 28%. Today, Visteon makes substantial sales to almost every major OEM in the world. In the first quarter of 2009, Visteon sold its products primarily to global automotive OEMs. In addition, Visteon sells certain of its products to other Tier 1 suppliers and the aftermarket (i.e., consumers and business customers) for use as replacement or enhancement parts. The table below depicts OEM sales made as a percentage of total product sales (by dollar amount) in 2009, which OEM sales collectively account for approximately 86% of Visteon's total product sales:

| Customer | Percentage of Total Sales Volume |
|---|---|
| Ford | 28% |
| Hyundai/Kia | 27% |
| Nissan/Renault | 9% |
| PSA Peugeot Citroën | 7% |
| Chrysler | 3% |
| General Motors | 3% |
| Volkswagen | 2% |
| Mazda | 2% |
| BMW | 1% |
| Fiat | 1% |
| Honda | 1% |

K&E 17065163.9

| Customer | Percentage of Total Sales Volume |
| --- | --- |
| Jaguar/Land Rover | 1% |
| Toyota | 1% |

## D.  Visteon's Corporate Structure

Visteon's business is an interconnected, global operation comprised of the 30 Debtors in the Chapter 11 Cases and more than 100 non-Debtor, foreign Affiliates located throughout the world (e.g., Germany, France, Mexico, Brazil, Argentina, Spain, Netherlands, Portugal, Czech Republic, China, and Korea).  Visteon Corporation is the direct parent of 18 domestic Affiliates, including a joint venture that is not a Debtor in the Chapter 11 Cases, Toledo Molding & Die, Inc.  Many of Visteon Corporation's direct subsidiaries have subsidiaries of their own.



The corporate structure chart above depicts the Debtors' corporate structure and demonstrates the structural superiority of certain Claims against the Debtors.  As explained above, the 12.25% Senior Notes Claims have Domestic Subsidiary Guarantees against a number of Visteon entities against which other Creditors do not have Claims.  To provide a recovery on account of the Domestic Subsidiary Guarantees, holders of the 12.25% Senior Notes Claims will receive (1) a Pro Rata portion of warrants to purchase New Visteon Common Stock on terms described in the Warrant Agreement under the Rights Offering Sub Plan and (2) a greater

percentage of New Visteon Common Stock than other Note Holders under the Claims Conversion Sub Plan.

Only the Term Loan Lenders and certain General Unsecured Creditors have Claims against VIHI, the direct parent of over 40 foreign Affiliates. Key assets of VIHI include its 70.0% equity stake in Halla Climate Control Corporation ("Halla Korea"), a publicly traded company in South Korea, and a Chinese joint venture, Yanfeng Visteon Automotive Trim Systems Company Ltd., in which VIHI owns 50.0% of the equity. Visteon European Holdings Corporation, a Debtor in the Chapter 11 Cases, owns a number of European foreign Affiliates and Visteon Automotive Holdings, LLC and Visteon Holdings, LLC, also Debtors in the Chapter 11 Cases, own a number of South American, Central American, and Asian Affiliates. The Term Loan Lenders will receive a 100% recovery on their Claims, either through Cash generated from the Rights Offering and the Exit Financing Facility under the Rights Offering Sub Plan or through New Visteon Common Stock under the Claims Conversion Sub Plan. Thus, under either Sub Plan, holders of Allowed General Unsecured Claims against VIHI shall be entitled to receive distributions from VIHI's assets before any such value is shared with holders of other General Unsecured Claims. Given the estimated value of VIHI's assets, holders of Allowed General Unsecured Claims against VIHI are expected to receive a full recovery on account of such Claims. If however Allowed General Unsecured Claims against VIHI exceed $20.0 million, holders of such Claims shall receive their Pro Rata share of $20.0 million in Cash.

### E.    Visteon's Competition

Visteon's primary competitors vary by product group and region. Overall, Visteon's primary independent competitors include Alpine Electronics, Inc., Automotive Lighting Reutlingen GmbH, Behr GmbH & Co. KG, Continental AG, Delphi Automotive LLP, Denso Corporation, Faurecia Group, Harman International AKG, Hella KGaA, International Automotive Components Group, Johnson Controls, Inc., Koito Manufacturing Co., Ltd., Magna International Inc., Robert Bosch GmbH, and Valéo S.A.

### F.    Executive Officers of the Debtors

The executive management team of the Debtors is composed of highly capable professionals with substantial experience in the automotive industry. The Debtors' executive management team consists of the following individuals:

| Name | Position |
| --- | --- |
| Donald J. Stebbins | Chairman, President and Chief Executive Officer |
| William G. Quigley III | Executive Vice President and Chief Financial Officer |
| Robert C. Pallash | Senior Vice President and President, Global Customer Group |
| Dorothy L. Stephenson | Senior Vice President, Human Resources |
| Julie A. Fream | Vice President, North American Customer Groups Strategy, and Communications |
| Joy M. Greenway | Vice President and President, Climate Products Group |
| Steve Meszaros | Vice President and President, Electronics Product Group |
| Michael K. Sharnas | Vice President and General Counsel |
| James F. Sistek | Vice President and Chief Information Officer |

K&E 17065163.9

## G.    __Employees__

As of the Petition Date, Visteon employed approximately 30,400 employees worldwide, 5,856 of which the Debtors employed, consisting of 5,218 salaried employees and 2,313 hourly employees. Visteon Corporation leased 1,306 of the salaried employees and 1,416 of the hourly employees to ACH. As of the Petition Date, the Debtors had approximately 1,800 employees whose employment was governed by a collective bargaining agreement ("CBA"). As of the date of this Disclosure Statement, one or more of the Debtors is party to the following CBAs: (1) the Agreements between the UAW and the Visteon Corporation, dated June 29, 2000, which cover hourly employees leased to ACH; (2) the Agreements between Visteon Corporation and the UAW Nurse Bargaining Unit, dated March 1, 2008, which cover salaried nurses leased to ACH; and (3) the 2004 Collective Bargaining Agreement between Visteon Corporation Regional Assembly and Manufacturing LLC Bellevue Plant and United Auto Workers Local 1216, which covers certain hourly employees leased to ACH.

## H.    __Benefit Plans__

As of the Petition Date, the Debtors sponsored the following material employee benefit plans, each of which is governed by provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and the Internal Revenue Code:

    1.    Pension Plans

        a.    Single-Employer Pension Plans

Visteon Corporation, Visteon Systems, LLC ("Visteon Systems"), and Visteon Caribbean, Inc. ("Visteon Caribbean"), each sponsor one or more of the Pension Plans. The Pension Plans are covered by the termination insurance program described in Title IV of ERISA. The PBGC is a wholly-owned United States government corporation created by ERISA to administer the mandatory pension plan termination insurance program. The PBGC's principal purpose is to guarantee the payment of certain pension benefits to participants upon termination of a pension plan.[19]

The Visteon Pension Plan ("VPP"), sponsored by Visteon Corporation, accounts for the vast majority of the Debtors' total projected unfunded benefit obligations of approximately $460.0 million on a PBGC termination liability basis. As of January 1, 2009, the VPP provided pension benefits to approximately 3,760 employees and 11,990 retirees and deferred vested plan participants.[20] Participants in the VPP include approximately ten salaried employees represented by the UAW and approximately 1,200 non-union, salaried employees—all of whom are leased to ACH. Under that certain Visteon Salaried Employee Lease Agreement, dated October 1, 2005, by and between Visteon Corporation and ACH (the "Salaried Employee Lease Agreement"), ACH pays Visteon Corporation on a monthly basis an amount that is intended to reflect Visteon Corporation's liability for providing pension benefits to ACH employees. Under this agreement,

---

19   See 29 U.S.C. § 1302.

20   A "deferred vested" plan participant is a plan participant who is no longer actively employed and has a vested right to a pension benefit under the terms of the Plan, but who has not yet started to receive payment of that pension benefit.

ACH's pension-related payment obligation is equal to Visteon Corporation's reported accounting expense attributable to benefits accrued by these leased employees and not the actual cash contributions that are required to satisfy the periodic pension funding obligations with respect to such benefits.

The Debtors estimated that the VPP was underfunded by approximately $383.0 million on a PBGC termination liability basis as of December 31, 2009. As a result of the Worker, Retiree, and Employer Recovery Act ("WRERA"), the only contributions due to the VPP during the Chapter 11 Cases were the catch-up contributions on account of the 2008 plan year, due September 15, 2009, for the VPP itself and for the North Penn Pension Plan, which merged into the VPP on December 31, 2008.[21] In their business judgment, the Debtors decided to forgo making these catch-up contributions. Accordingly, $723,221.00 of the catch-up contributions, in the aggregate, for the VPP and the North Penn Pension Plan for the 2008 plan year remain unpaid. The Debtors will pay this amount plus any interest and any penalties prior to the Effective Date. The Debtors estimate that approximately $268.0 million will be due in contributions for calendar years 2010 through 2015 based on current economic conditions.

Visteon Corporation also sponsors the UAW Visteon Pension Account Plan (the "UAW Plan"), which as of January 1, 2009 provided pension benefits to approximately 1,820 hourly employees and 270 retirees and deferred vested participants who are, or were, represented by the UAW and leased to ACH. Under that certain Visteon Hourly Employee Lease Agreement, dated October 1, 2005, by and between Visteon Corporation and ACH (the "Hourly Employee Lease Agreement"), ACH's pension-related payment obligation with respect to the UAW Plan participants is equal to a portion of Visteon Corporation's reported accounting expense and not the actual funding contributions to the UAW Plan. The Debtors estimated that the UAW Plan was underfunded by $5.0 million on a PBGC termination liability basis as of December 31, 2009. The Debtors also estimate that approximately $5.0 million will be due in contributions for calendar years 2010 through 2015 based on current economic conditions.

Visteon Systems sponsors the Pension Plan of Visteon Systems, LLC Connersville and Bedford Plants (the "Visteon Systems C&B Plan"), which as of January 1, 2009 provided pension benefits to approximately 5,180 retirees and deferred vested participants of the Visteon Systems' C&B Plan who were represented by the International Union of Electrical Workers (the "IUE-CWA"). The Connersville and Bedford plants were shut down on December 31, 2007 and June 30, 2008, respectively. The Visteon Systems C&B Plan is closed, meaning that no active employees are accruing benefits under the plan. The Debtors estimated that the Visteon Systems C&B Plan was underfunded by approximately $120.0 million on a PBGC termination liability basis as of December 31, 2009. As a result of WRERA, the only contribution due to the Visteon Systems C&B Plan during the Chapter 11 Cases was the catch-up contribution on account of the 2008 plan year, due September 15, 2009, in the amount of $730,795.00. The Debtors, in their business judgment, decided to forgo making such contribution. The Debtors will pay this amount plus any interest and any penalties prior to the Effective Date. The Debtors estimate that approximately $57.0 million will be due in contributions for calendar years 2010 through 2015 based on current economic conditions.

---

21   Worker, Retiree, and Employer Recovery Act of 2008, Pub. L. No. 110-458, 122 Stat. 5092.

When an employer ceases operations at a location that results in more than 20% of a pension plan's participants being separated from employment, the PBGC can require the plan sponsor and its "controlled group" members to pay the PBGC an amount, to be held in escrow for up to five years, equal to the percentage of unfunded benefit liabilities that is the same as the percentage of active employees separated as a result of the cessation of operations.[22] In lieu of such payment, when the Connersville and Bedford plants were shutdown, the parties reached an agreement, effective as of January 9, 2009 (the "PBGC Agreement"), requiring: (i) Visteon Systems to make an additional $10.5 million contribution to the Visteon Systems C&B Plan; (ii) Visteon Corporation to provide a $15.0 million letter of credit in favor of the PBGC (the "L/C"); and (iii) Visteon Systems and Visteon Corporation to procure from certain foreign Affiliates— Visteon Portuguesa, Ltd., Cadiz Electronica S.A., and Visteon Hungaria K.F.T—a guarantee of up to $30.0 million for unfunded benefit liabilities upon termination of the Visteon Systems C&B Plan (the "PBGC Guarantee").[23] In accordance with the PBGC Agreement, on September 21, 2009, the PBGC drew from the L/C in an amount equal to the Debtors' $730,795.00 missed funding contribution related to the Visteon Systems C&B Plan. On October 29, 2009, the PBGC drew the remaining balance of $14,269,205.00 from the L/C pursuant to the PBGC Agreement. Because the Plan contemplates maintenance of the Pension Plans, the Debtors reserve any and all rights they may have with respect to the amounts drawn under the L/C.

Lastly, Visteon Caribbean sponsors a pension plan (the "Caribbean Plan") that provides pension benefits to approximately 255 retirees and deferred vested participants, including retirees who were represented by the UAW prior to the shut-down of Visteon's Puerto Rico plant in 2005. The Caribbean Plan is a closed plan. The only required contribution to the Caribbean Plan on account of the 2009 plan year was made on January 15, 2009 in the amount of $0.2 million. The Debtors estimated that the Caribbean Plan was underfunded by approximately $2.0 million on a PBGC termination liability basis as of December 31, 2009, with approximately $2.0 million due in contributions for calendar years 2010 through 2015 based on current economic conditions.

On or about October 9, 2009, the PBGC filed 16 separate Proofs of Claim against the Debtors. In accordance with the *Order Approving Stipulation Permitting Pension Benefit Guaranty Corporation To File Consolidated Claims Under A Single Case Number*, [Docket No. 1024], a single Proof of Claim was deemed to constitute the filing of a Proof of Claim against each and every Debtor in the Chapter 11 Cases. Specifically, the PBGC filed a Claim for each of the Pension Plans for:

> o      the estimated amount of the Pension Plans' unfunded benefit liabilities if the Pension Plans were to terminate ("Unfunded Liability Claims");[24]

---

22   See 29 U.S.C. § 1362(e), 1363.

23   The $10.5 million additional contribution was made to the Visteon Systems C&B Plan on January 16, 2009. The PBGC Guarantee was executed in January 2009.

24   Specifically, the PBGC filed Claims for the unfunded benefit liabilities of the: (a) VPP in the amount of $438.1 million; (b) Systems C&B Plan in the amount of $127.8 million; (c) UAW Plan in the amount of $4.4 million; and (d) Caribbean Plan in the amount of $1.8 million. The PBGC asserted a portion of these amounts is entitled to Administrative Claim or Priority Claim status.

o       the estimated amount of unpaid minimum funding contributions that may be owed to the Pension Plans (the "Funding Claims");[25]

o       the estimated amount of insurance premiums, including termination premiums under 29 U.S.C. 1306(a)(7) ("DRA Premiums"), interest, and penalties that may be owed to PBGC if the Pension Plans were to terminate or be terminated;[26] and

o       the shortfall and waiver amortization charges that may be owed to the Pension Plans, in unliquidated amounts.

As described above, the Plan contemplates maintenance of the Debtors' Pension Plans. Because the Unfunded Liability Claims and DRA Premiums only arise upon termination of the Pension Plans, such Claims will not arise and shall not be entitled to any distribution under the Plan. The Debtors intend to pay the amounts owed on account of the Funding Claims to the applicable Pension Plan prior to the Effective Date in satisfaction of such Funding Claims or reach an agreement with the PBGC whereby the amounts drawn under the L/C shall be used to satisfy the Funding Claims.

b.       Multiemployer Pension Plans

The Debtors withdrew from the Central States, Southeast and Southwest Areas Pension Plan prior to the Petition Date and were assessed total withdrawal liability of approximately $2.3 million, the unpaid amount of which had a present value of approximately $1.2 million as of the Petition Date. In addition, there were three union employees at the Debtors' North Penn plant who participated in another multiemployer pension plan, the Teamsters Pension Trust Fund of Philadelphia and Vicinity. The shutdown of the Debtors' North Penn facility triggered withdrawal liability of approximately $1.1 million. The bulk of this liability is related to prepetition service and is a General Unsecured Claim. The balance of the liability, related to postpetition service will be paid as an Administrative Claim. The Central States, Southeast, and Southwest Areas Pension Plan and the Teamsters Pension Trust Fund of Philadelphia and Vicinity hold Claims against all of the Debtors, including VIHI, on account of the withdrawal liability from the multiemployer plans pursuant to Section 4201 of ERISA. These claimants are entitled to recover from the assets of VIHI before any such value is upstreamed to satisfy other General Unsecured Claims. Therefore, the Central States, Southeast, and Southwest Areas Pension Plan and the Teamsters Pension Trust Fund of Philadelphia and Vicinity will receive a 100% recovery on their Claims under the Plan.

---

[25]    Specifically, the PBGC filed Claims for unpaid minimum funding contributions that may be owed to the: (a) VPP in the amount of $490,943.00; (b) Systems C&B Plan in the amount of $728,974.00; (c) UAW Plan in an unliquidated amount; and (d) Caribbean Plan in an unliquidated amount. The PBGC asserted a portion of these amounts is entitled to Administrative Claim or Priority Claim status.

[26]    Specifically, the PBGC filed Claims for premiums that may be owed to the PBGC in respect of the: (a) VPP in the amount of $59.07 million; (b) Systems C&B Plan in the amount of approximately $19.41 million; (c) UAW Plan in the amount of $8.16 million; and (d) Caribbean Plan in the amount of $990,00.00. The PBGC asserted a portion of these amounts is entitled to Administrative Claim or Priority Claim status.

2. <u>Nonqualified Plans</u>

Visteon Corporation maintains the Visteon Corporation Deferred Compensation Plan, as amended and restated effective January 1, 2009 (the "<u>DCP</u>"), an account balance nonqualified deferred compensation plan covering selected employees of Visteon. The DCP ceased accepting employee deferrals on January 1, 2006. Visteon Corporation also maintains the PPP, a defined benefit nonqualified deferred compensation plan. Under the PPP, participating employees are generally paid the excess of the amount payable under the applicable Pension Plan without application of the limitations of the Internal Revenue Code. Visteon Corporation also sponsors the SERP, which is a defined benefit nonqualified deferred compensation plan that provides supplemental retirement benefits to certain employees of Visteon Corporation and certain of Visteon Corporation's designated Affiliates who participate in the VPP. For employees who participate in the "contributory/non-contributory" component of the SERP, benefits are payable under a final average pay formula, based on years of service and the employee's covered employment classification. For employees who participate in the "cash balance" component of the SERP, benefits are payable based on the excess of what would be payable under the applicable qualified defined benefit plan cash balance and pension equity formulas without limitations of the Internal Revenue Code and with certain other modifications over the sum of the amount actually payable under the VPP plus the amount actually payable to the employee under the PPP. The Debtors also maintain the ESAP. The ESAP is a defined benefit nonqualified deferred compensation plan that provides supplemental retirement benefits to certain eligible senior executives of Visteon who separate employment at age 55 or later. Benefits are payable under the ESAP as a monthly benefit equal to a percentage of base salary, at a maximum of 60.0%, based on the participant's age and service. Lastly, Visteon Corporation maintains the Visteon Corporation Deferred Compensation Plan for Non-Employee Directors, an account balance nonqualified deferred compensation plan for non-employee directors (the "<u>Directors' DCP</u>"), as amended through June 10, 2009. Under the Directors' DCP, non-employee directors may voluntarily defer any cash remuneration they receive for services as a director.

The Debtors will amend the SERP, PPP, and ESAP to eliminate any and all future benefit payments for all participants in those plans. Immediately prior to the Effective Date, the Debtors shall reject the SERP, the PPP, and the ESAP, all as amended. As a result of these actions, the Debtors do not believe that there will be any Allowed General Unsecured Claims on account of approximately $30.9 million in eliminated accrued benefits under the SERP, the PPP, and the ESAP. If General Unsecured Claims are ultimately Allowed on account of eliminated accrued benefits, recoveries for General Unsecured Claims will be diluted as reflected in the high range estimates contained in this Disclosure Statement. The Debtors shall also reject the DCP on or prior to the Effective Date.

Without further action of the New Board, the Reorganized Debtors shall establish a new supplemental executive retirement plan and pension parity plan, each of which shall be substantially in the form contained in the Plan Supplement, and shall provide benefits to eligible employees of the Reorganized Debtors that are at least equal to the benefits accrued by such active employees under the SERP and PPP as of one Business Day prior to the date of any amendment of such plan.

## I.      The Debtors' Prepetition Capital Structure

As of the Petition Date, the Debtors had approximately $2.5 billion of outstanding debt on a consolidated basis, of which: approximately $1.5 billion consisted of loans, interest, and other amounts owed under the Term Loan Facility; approximately $89.0 million consisted of draws on the ABL Facility and interest and other fees with regard thereto; approximately $862.0 million consisted of unsecured U.S. bond debt; and approximately $21.0 million consisted of debt on account of other credit facilities, capital leases for Affiliates, swaps, and other miscellaneous debt obligations.  The Debtors' principal debt obligations, as of the Petition Date, were as follows:

1.      Secured Debt

a.      Term Loan Facility

On April 10, 2007, Visteon Corporation, as borrower, entered into the Term Loan Facility with several banks and the Term Loan Lenders, and Wilmington Trust FSB, as administrative agent for the Term Loan Lenders and successor to JPMorgan Chase Bank, N.A. (together with any security agreements, mortgages, pledge agreements, guaranties, other collateral agreements, certificates, financing statements and related assignments and transfer powers and additional documents and ancillary agreements entered into by Visteon Corporation or any of its subsidiaries in connection therewith, each as amended from time to time, the "Term Loan Documents").

As part of the Term Loan Facility, the Term Loan Lenders agreed, subject to the terms and conditions set forth in the Term Loan Documents, to make certain loans to Visteon Corporation, including a $1.5 billion senior secured term loan.  The obligations of Visteon Corporation under the Term Loan Documents are guaranteed by each of the Debtors and certain non-Debtor Affiliates, except for Visteon Electronics Corporation ("VEC"), AutoNeural Systems, LLC, Toledo Mold & Die, Inc., any subsidiary thereof, and any person with capital stock of Toledo Mold & Die, Inc. as its principal assets.  To secure its obligations under the Term Loan Facility, Visteon Corporation granted to the Term Loan Lenders (i) a first priority Lien on certain assets of Visteon Corporation and of most of Visteon Corporation's domestic subsidiaries, including intellectual property, intercompany debt, capital stock of nearly all domestic subsidiaries of Visteon Corporation and 65.0% of the stock of certain foreign subsidiaries of Visteon Corporation (collectively, the "Term Loan Priority Collateral"), including Halla Korea, in which VIHI holds a 70.0% ownership interest—leaving 5.0% of the value of Halla Korea unencumbered and (ii) a second priority Lien on substantially all other assets of Visteon Corporation and of Visteon Corporation's domestic subsidiaries.

The Term Loan Facility bears interest at either (x) a rate per annum equal to the Eurodollar rate plus 3.00% or (y) a rate per annum equal to the greater of the Prime Rate or the Federal Funds Effective Rate plus 50 bps, plus 2.00%, until the final maturity date of December 13, 2013.  As of the Petition Date, approximately $1.5 billion remained outstanding under the Term Loan Facility.  In accordance with the Term Loan Documents, interest was calculated on a Eurodollar Rate basis through July 12, 2009, and has been accruing on a base rate basis since July 13, 2009.  The default interest rate under the Term Loan Facility is 2.00% above the

applicable rate. The Debtors have not paid interest on the Term Loan Facility during the Chapter 11 Cases.

On May 29, 2009, Wilmington Trust FSB, as administrative agent for the Debtors' Term Loan Lenders, filed a motion with the Bankruptcy Court seeking adequate protection for use of the Term Loan Lenders' cash collateral including, but not limited to, cash collateral related to the Term Loan Priority Collateral [Docket No. 70]. The parties reached a stipulation pursuant to which the Debtors would provide the Term Loan Lenders with adequate protection in exchange for use of the Term Loan Lenders' cash collateral in the form of adequate protection Liens and a superpriority Claim as well as the payment of Professional Fees. The Bankruptcy Court approved the stipulation on July 16, 2009 [Docket No. 598].

b.    The ABL Facility

On August 14, 2006, Visteon Corporation and each of its subsidiaries from time to time party thereto, as borrowers, the Bank of New York Mellon, as administrative agent and successor to JPMorgan Chase Bank, N.A., issuing bank and swingline lender, and the ABL Lender entered into the ABL Facility (together with any security agreements, mortgages, pledge agreements, guarantees, other collateral agreements, certificates, financing statements and related assignments and transfer powers and additional documents and ancillary agreements entered into by Visteon Corporation or any of its subsidiaries in connection therewith, each as amended from time to time, the "ABL Loan Documents"). The ABL Facility is a borrowing-base facility in the aggregate principal amount of $350.0 million that includes a letter of credit subfacility in an amount not to exceed $250.0 million. Visteon Corporation's obligations under the ABL Loan Documents are guaranteed by each of the Debtors, except for VEC, VIHI, AutoNeural Systems, LLC, Toledo Mold & Die, Inc., any subsidiary thereof, and any person with capital stock of Toledo Mold & Die, Inc. as its principal assets. To secure its obligations under the ABL Facility, Visteon Corporation granted to the ABL Lenders (i) a first priority Lien on certain assets of Visteon, its domestic subsidiaries, and a limited number of foreign subsidiaries, and (ii) a second priority Lien on all Term Loan Priority Collateral.

The ABL Facility bears interest at either a rate per annum equal to the Eurodollar rate plus 4.0% or a rate per annum equal to the greatest of (x) the Prime Rate, (y) the Federal Funds Effective Rate plus 1/2 of 1.0%, or (z) the adjusted LIBOR rate for a one month interest period plus 1.0%, until the final maturity date of August 14, 2011.

On May 13, 2009, Ford purchased, assumed, and took an assignment of all of the outstanding loans, obligations, and other interests of the lenders under the ABL Facility. As of the Petition Date, there was approximately $89.0 million outstanding under the ABL Facility and approximately $59.0 million had been issued under various letters of credit. During the Chapter 11 Cases, approximately $38.5 million has been drawn under letters of credit under the ABL Facility.

c.    Prepetition Waivers

Effective March 31, 2009, Visteon Corporation entered into limited waivers to the Term Loan Facility and ABL Facility until May 30, 2009 with respect to a potential default relating to

the inclusion of an explanatory paragraph in the report of Visteon Corporation's independent registered public accounting firm indicating substantial doubt about Visteon Corporation's ability to continue as a going concern.

d.     The Intercreditor Agreement

The ABL Lenders and the Term Loan Lenders are party to that certain Intercreditor Agreement, dated June 13, 2006 (the "Intercreditor Agreement"). The Intercreditor Agreement governs the relative contractual rights of the parties, including their rights to object to the Debtors' use of cash collateral from each facility.

2.     Unsecured Debt

a.     8.25% Senior Notes Due August 1, 2010

On August 3, 2000, Visteon Corporation issued $700.0 million of the 8.25% Senior Notes under an indenture, dated as of June 23, 2000, among itself, as issuer, and Bank One Trust Company, N.A., as trustee. On June 4, 2009, the Law Debenture Trust Company of New York was appointed as the successor trustee. The 8.25% Senior Notes provide for interest payments by Visteon Corporation semi-annually on February 1st and August 1st of each year, commencing on February 1, 2001, at a rate of 8.25% per year. The 8.25% Senior Notes are general unsecured obligations of Visteon Corporation that mature on August 1, 2010. As of the Petition Date, approximately $206.0 million in principal amount remained outstanding under the 8.25% Senior Notes, excluding interest obligations.

b.     7.00% Senior Notes Due March 10, 2014

On March 10, 2004, Visteon Corporation issued $450.0 million of the 7.00% Senior Notes under a supplemental indenture, dated as of March 10, 2004, among itself, as issuer, and J.P. Morgan Trust Company, N.A., as trustee. On June 4, 2009, the Law Debenture Trust Company of New York was appointed as the successor trustee. Visteon Corporation agreed to pay interest semi-annually on March 10th and September 10th of each year, commencing on September 10, 2004, at a rate of 7.00% per year. The 7.00% Senior Notes are general unsecured obligations of Visteon Corporation that mature on March 10, 2014. As of the Petition Date, approximately $450.0 million in principal amount remained outstanding under the 7.00% Senior Notes, excluding interest obligations.

c.     12.25% Senior Notes Due December 31, 2016

On June 18, 2008, Visteon Corporation issued approximately $206.4 million of 12.25% Senior Notes under a second supplemental indenture, dated June 18, 2008, among itself, as issuer, the guarantors party thereto, and The Bank of New York Trust Company, N.A., as trustee. On June 4, 2009, the Law Debenture Trust Company of New York was appointed as the successor trustee. The 12.25% Senior Notes provide for interest payments by Visteon Corporation semi-annually on June 30th and December 31st of each year, commencing on December 31, 2008, at a rate of 12.25% per year. The 12.25% Senior Notes mature on December 31, 2016. The 12.25% Senior Notes are general unsecured obligations of Visteon Corporation that are guaranteed by certain wholly-owned domestic subsidiaries that guarantee

35

debt under the ABL Facility.[27]   As of the Petition Date, approximately $206.4 million in principal amount remained outstanding under the 12.25% Senior Notes, excluding interest obligations.  The holders of the 12.25% Senior Notes Claims are entitled to a greater distribution under the Plan than General Unsecured Creditors, given that the 12.25% Senior Notes Claims may be asserted against each guarantor party to the 12.25% Senior Notes Indenture.   Other unsecured Creditors, including holders of the General Unsecured Claims, do not hold Claims against several of these guarantor Entities.

   3.   Visteon Corporation Common Stock

   Visteon Corporation's common stock was publicly-traded on the New York Stock Exchange ("NYSE") under the symbol VC.  On March 4, 2009, the NYSE notified Visteon Corporation that its common stock would be delisted from the NYSE and that trading in Visteon Corporation's common stock would be suspended effective March 6, 2009.  Since March 6, 2009, Visteon Corporation's common stock has traded on the over-the-counter market, also known as the "Pink Sheets," under the symbol VSTNQ. As of June 24, 2010, Visteon Corporation's common stock traded at a price of $0.70 per share.

## ARTICLE V.
## THE CHAPTER 11 CASES

   The following is a general summary of the Chapter 11 Cases, including certain events preceding the Chapter 11 Cases, the stabilization of the Debtors' operations, and the Debtors' restructuring initiatives implemented since the Petition Date.

## A.   Events Leading to the Commencement of the Chapter 11 Cases

   During 2008 and 2009, the global automotive industry suffered an unprecedented downturn that has significantly strained and materially and adversely affected the operations of OEMs, Tier I automotive suppliers (such as Visteon), and all lower tiered automotive suppliers across the supply chain.  The seasonally adjusted annual rate of automotive sales declined rapidly, dropping over 35.0% from its January 2008 level to 9.5 million in January 2009.  Lower sales volumes continued through 2008, resulting in a 24.0% decrease in U.S. industry-wide automobile sales through November 2009 compared to the same time frame in 2008.  This amount represents the lowest sales levels in nearly three decades.  The severe decline in global automobile sales resulted in numerous automotive suppliers and OEMs receiving going concern opinions and filing for bankruptcy.[28]

---

[27]   The guarantors of the 12.25% Senior Notes are the following wholly-owned domestic subsidiaries of Visteon Corporation: Tyler Road Investments, LLC, Infinitive Speech Systems Corp., MIG-Visteon Automotive Systems, LLC, GCM/Visteon Automotive Systems, LLC, GCM/VIsteon Automotive Leasing Systems, LLC, Fairlane Holdings, Inc., Visteon International Business Development, Inc., Visteon Domestic Holdings, LLC, Visteon Global Technologies, Inc., Visteon Technologies, LLC, ARS, Inc., VC Aviation Services, LLC, SunGlas, LLC, VC Regional Assembly & Manufacturing, LLC, Visteon Financial Corporation, Visteon Remanufacturing Incorporated, Visteon LA Holdings Corp., Oasis Holdings Statutory Trust, and Visteon Systems, LLC.

[28]   On April 30, 2009, Chrysler filed for chapter 11 protection in the United States Bankruptcy Court for the Southern District of New York.  On May 11, 2009, Hayes Lemmerz International, Inc. filed for chapter 11 protection in the United States Bankruptcy Court for the District of Delaware.  On May 27, 2009, Metaldyne Corporation filed for chapter 11 protection in

However, despite the poor economic conditions, in 2008, the Debtors successfully completed a comprehensive multi-year improvement plan that was designed to sell, fix, or close 30 unprofitable or non-core facilities. The Debtors successfully restructured, sold, or exited 38 facilities—exceeding targeted goals and resulting in cumulative gross savings of approximately $500.0 million.

Unfortunately, these actions were simply not enough to off-set the substantial decreases in vehicle sales and production. Indeed, as a result of plummeting sales volumes, in the fourth quarter of 2008, Visteon reported a net loss of $346.0 million on net sales from continuing operations of $1.7 billion.[29] The confluence of the industry downturn and other factors also led Visteon's public accounting firm to include a statement in Visteon Corporation's 2008 annual report on Form 10-K that it had substantial doubt about Visteon's ability to continue as a going concern. This qualified going concern opinion, which numerous suppliers also received from their public accountants upon issuance of their annual reports, would have violated the terms of the ABL Facility and the Term Loan Facility. As noted above, Visteon Corporation was able to negotiate limited waivers under the ABL Facility and the Term Loan Facility. The impending expiration of these waivers on May 30, 2009, along with the Debtors' need to restructure their capital structure and legacy costs, led the Debtors to ultimately file for chapter 11 protection on May 28, 2009.

## B. <u>Stabilization of Operations</u>

Upon commencing the Chapter 11 Cases, the Debtors sought and obtained a number of orders from the Bankruptcy Court to ensure a smooth transition of their operations into chapter 11 and facilitate the administration of the Chapter 11 Cases. Several of these orders are briefly summarized below.

### 1. <u>Administrative Motions</u>

To facilitate a smooth and efficient administration of these Chapter 11 Cases and to reduce the administrative burden associated therewith, the Bankruptcy Court entered the following procedural orders: (a) authorizing the joint administration of the Debtors' Chapter 11 Cases [Docket No. 78] and (b) granting the Debtors an extension of time to file their Schedules [Docket No. 362]. On August 26, 2009, the Debtors filed their Schedules with the Bankruptcy Court.

---

the United States Bankruptcy Court for the Southern District of New York. On June 1, 2009, General Motors Corporation filed for chapter 11 protection in the United States Bankruptcy Court for the Southern District of New York. On July 7, 2009, Lear Corporation filed for chapter 11 protection in the United States Bankruptcy Court for the Southern District of New York. On February 20, 2009, the independent auditors of TRW Automotive Holdings Corp. expressed substantial doubt about the company's ability to continue as a going concern. On March 4, 2009, General Motors Corporation received a qualified going concern opinion from its auditors. Likewise, on March 12, 2009, American Axle & Manufacturing Holdings Inc. received a going concern opinion from its auditors and on March 17, 2009, Lear Corporation received a qualified going concern opinion.

29 Although Visteon reported a 2009 first quarter net income of $2.0 million, such amount included a one-time, non-cash gain of $95.0 million related to the deconsolidation of the net assets associated with Visteon UK Ltd., an entity that filed for administration with the English High Court of Justice under the Insolvency Act of 1986.

2.    Motion for Authority to Use Cash Collateral [Docket No. 18]

On May 28, 2009, the Debtors filed a motion with the Bankruptcy Court seeking an order authorizing them to provide Ford, the sole ABL Lender under the ABL Facility, certain forms of adequate protection in exchange for the consensual use of Ford's cash collateral.    On May 29, 2009, the Bankruptcy Court entered an interim order [Docket No. 93] (the first in a series of such orders) authorizing the Debtors' use of Ford's cash collateral and certain other prepetition collateral.    The cash collateral order also granted adequate protection to Ford for any diminution in the value of its interests in its collateral, whether from the use of the cash collateral or the use, sale, lease, depreciation, or other diminution in value of its collateral, or as a result of the imposition of the automatic stay under section 362(a) of the Bankruptcy Code.    Specifically, subject to certain conditions, adequate protection provided to Ford includes, among other things, a first priority, senior, and perfected Lien on certain post-petition collateral of the same nature as Ford's prepetition collateral, a second priority, junior perfected Lien on Term Loan Priority Collateral, and payment of accrued and unpaid interest and fees owing Ford on prepetition ABL obligations.

On June 19, 2009, the Bankruptcy Court entered a first supplemental interim order authorizing the use of Ford's cash collateral and granting adequate protection on substantially the same terms as those set forth in the interim cash collateral order previously entered [Docket No. 380].    Thereafter, the Debtors sought, and the Bankruptcy Court approved, eleven supplemental interim orders extending the consensual use of ABL cash collateral, generally on a monthly basis and materially consistent with the terms of preceding interim cash collateral orders.[30]

3.    Motion to Continue Using Existing Cash Management System [Docket No. 15]

The Bankruptcy Court authorized the Debtors to continue using their cash management systems and their respective bank accounts, business forms, and investment practices by a Final Order dated July 17, 2009 [Docket No. 605].    The cash management order also approved the Debtors' investment and deposit guidelines and permitted the Debtors to set off both prepetition and postpetition intercompany obligations between Debtors, or between Debtors and non-Debtor Affiliates.

---

[30]    The Bankruptcy Court entered the: (a) second supplemental interim cash collateral order on July 1, 2009 [Docket No. 481]; (b) third supplemental interim cash collateral order on July 16, 2009 [Docket No. 599]; (c) fourth supplemental interim cash collateral order on July 28, 2009 [Docket No. 689]; (d) fifth supplemental interim cash collateral order on August 13, 2009 [Docket No. 792]; (e) sixth supplemental interim cash collateral order on September 9, 2009 [Docket No. 952]; (f) seventh supplemental interim cash collateral order on October 7, 2009, October 21, 2009, and November 12, 2009 [Docket Nos. 1110, 1161, 1242]; (g) eighth supplemental interim cash collateral order on November 12, 2009 [Docket No. 1303]; (h) ninth supplemental interim cash collateral order on December 10, 2009 [Docket No. 1445]; (i) tenth supplemental interim cash collateral order on January 21, 2010 [Docket No. 1710]; (j) eleventh supplemental interim cash collateral order on February 23, 2010 [Docket No. 2368]; (k) twelfth supplemental interim cash collateral order on March 16, 2010 [Docket No. 2567]; (l) thirteenth supplemental interim cash collateral order on April 13, 2010 [Docket No. 2800]; (m) fourteenth supplemental interim cash collateral order on May 12, 2010 [Docket No. 3098];  and (n) fifteenth supplemental interim cash collateral order on  June 17, 2010 [Docket No. 3421].

4.     Motion to Pay Shippers and Lienholder Prepetition Claims [Docket No. 5]

The Bankruptcy Court authorized the Debtors to pay the prepetition Secured Claims of, among other parties, shippers, warehousemen, and lienholders up to $21.3 million.  As of March 9, 2010, the Debtors had paid approximately $10.4 million under this order.

5.     Motion to Continue Funding Foreign Affiliates [Docket No. 10]

As a result of the global practice of the Debtors' business, the Debtors heavily rely on the relationship with their foreign Affiliates.  The Debtors have interests in each of the foreign Affiliates, and such interests are valuable assets of the Debtors' Estates.  Three programs central to the foreign Affiliates' business operations are as follows:  (a) the cash pooling system in Europe (the "European Cash Pool"); (b) the Legal Entity Restructuring Activity program (the "LERA Program"); and (c) the Maquiladora program (the "Maquiladora Program").  The European Cash Pool involves Visteon Corporation and various foreign Affiliates making revolving loans to and, in the case of the foreign Affiliates, borrowing from Visteon Netherlands Holdings B.V., which acts as an internal banker for such transactions among the foreign Affiliates.[31]  Under the LERA Program, VEC, a Debtor, contracts with European customers for the delivery of finished goods while a foreign Affiliate actually delivers the finished goods to such customer.  VEC collects payment directly from the customer, pays the foreign Affiliate its costs plus 5%, and retains the excess as profit.[32]  Visteon also participates in a program similar to LERA with its foreign Affiliates in Mexico, which is called the Maquiladora Program.[33]

On July 28, 2009, the Bankruptcy Court entered a Final Order authorizing the Debtors to continue, in the ordinary course of business, the European Cash Pool, LERA Program, and Maquiladora Program and to honor prepetition obligations under the LERA and Maquiladora Programs up to $92.0 million.  On July 28, 2009, the Bankruptcy Court authorized the Debtors to pay an additional $46.0 million in prepetition Claims of certain foreign Affiliates, for an aggregate amount of $138.0 million [Docket No. 690].  As of March 9, 2010, the Debtors had paid approximately $125.0 million under this Final Order.

Additionally, on October 7, 2009, the Bankruptcy Court approved a motion to provide approximately $38.0 million in capital to foreign Affiliates in Argentina and Poland [Docket No. 1098].  The Debtors have an interest in these foreign Affiliates and without access to additional capital, the Affiliates could have been subject to mandatory insolvency proceedings under Argentine and Polish law.

---

31   The following foreign Affiliates participate in the European Cash Pool: Visteon Netherlands, Cadiz Electronica S.A.U., Visteon Sistemas Interiores Espana S.L.U., Visteon Autopal S.R.O., Visteon Hungary KFT, Visteon Ardennes Industries S.A.S., Visteon Systemes Interieurs S.A.S., Visteon Interior Systems Holding France S.A.S., Visteon Holdings France S.A.S., Visteon Portuguesa Ltd., Visteon Slovakia s.r.o., Visteon Philippines Inc., and Visteon Deutschland GmbH.

32   The following foreign Affiliates participate in LERA Program:  Visteon Portuguesa Ltd., Cadiz Electronica S.A.U., Visteon Sistemas Interiores Espana S.L.U., Visteon Hungary KFT, and Visteon Autopal S.R.O.

33   The following foreign Affiliates participate in the Maquiladora Program: Coclisa S.A. de C.V., Carplastic S.A. de C.V., Altec Electronica Chihuahua, S.A. de C.V., Aeropuerto Sistemas Automotrices S. de R.L. de C.V., Climate Systems Mexicana, S.A. de C.V., Visteon de Mexico S. de R.L., and Grupo Visteon S. de R.L. de C.V.

K&E 17065163.9

6.     <u>Motion to Pay Employee Wages and Benefits [Docket No. 7]</u>

The Debtors obtained authorization from the Bankruptcy Court to pay all prepetition compensation (including all wages, salaries, overtime pay, and vacation pay) to, all prepetition business expenses of, and all prepetition payroll deductions and prepetition withholdings, all prepetition contributions to, and benefits under medical and insurance benefit plans, and postpetition severance benefits for salaried employees leased to ACH. As of March 9, 2010, the Debtors had paid approximately $15.5 million in prepetition Claims under this order.

7.     <u>Motion to Pay Critical Trade Vendors [Docket No. 13]</u>

By interim order granted on May 29, 2009 [Docket No. 102], and Final Order granted on June 19, 2009 [Docket No. 374], the Bankruptcy Court authorized the Debtors to pay prepetition Claims of certain suppliers. Specifically, the Debtors were authorized to pay certain prepetition nonpriority Claims of: (a) certain suppliers of the Debtors that are not party to Executory Contracts; (b) certain financially distressed suppliers; and (c) on a provisional basis, certain suppliers that may seek to discontinue supplying products or providing services in breach of their agreements with the Debtors, and approving procedures related thereto. The Debtors are authorized to pay prepetition Claims of those suppliers that are not party to Executory Contracts and those financially distressed suppliers up to $33.9 million. With respect to suppliers that refuse to perform postpetition obligations pursuant to an Executory Contract unless their prepetition Claims are satisfied, the Debtors are authorized to pay such suppliers' Claims on a provisional basis up to $15.0 million. As of March 9, 2010, the Debtors had paid approximately $28.8 million under this order.

8.     <u>Motion to Pay Foreign Trade Vendors [Docket No. 11]</u>

By interim order granted on May 29, 2009 [Docket No. 82], and Final Order granted on June 19, 2009 [Docket No. 367], the Bankruptcy Court authorized the Debtors to pay prepetition Claims of certain vendors, service providers, regulatory agencies, and governments located in foreign jurisdictions up to $5.1 million. As of March 9, 2010, the Debtors had paid approximately $3.9 million under this order.

9.     <u>Motion to Authorize Maintenance of Customer Programs [Docket No. 8]</u>

By interim order granted on June 3, 2009 [Docket No. 145], and Final Order granted on July 17, 2009 [Docket No. 600], the Bankruptcy Court authorized the Debtors to continue their customer programs, including all obligations to ACH pursuant to a master services agreement, the OEM warranty program, and the aftermarket warranty program up to $92.1 million. As of March 9, 2010, the Debtors had paid approximately $8.6 million under this order.

10.     <u>Motion to Establish Notification and</u>
         <u>Hearing Procedures for Trading in Equity Securities [Docket No. 12]</u>

As of the Petition Date, the Debtors' NOLs and certain other tax attributes were estimated to be approximately $1.95 billion. Under the Internal Revenue Code, NOLs that accumulate prior to emergence from bankruptcy may be used to offset post-emergence taxable income. Under the applicable federal tax laws, however, the Debtors would lose the ability to

utilize a significant portion of their NOLs if an "ownership change" were to occur prior to completion of the Chapter 11 Cases. Consequently, trading in the equity securities of the Debtors could have jeopardized the Debtors' ability to use those NOLs. To protect these valuable NOL carryforwards for future use to offset taxable income, the Debtors sought and obtained an interim order from the Bankruptcy Court on May 29, 2009 [Docket No. 89], and a Final Order on June 19, 2009 [Docket No. 361] restricting trading of their equity securities. In particular, the Debtors sought to institute restrictions on trading by shareholders who own, or would own, at least 6.4 million shares, including options to acquire shares of Visteon Corporation stock during the pendency of the Chapter 11 Cases, so that the Debtors would be able to monitor trading and prevent the loss of their NOLs and other tax attributes.

11.     Motion Determining Adequate Assurance of
        Payment for Future Utility Services [Docket No. 6]

By interim order granted on May 29, 2009 [Docket No. 87], and Final Order granted on June 19, 2009 [Docket No. 376], the Bankruptcy Court established procedures for determining adequate assurance of payment for future utility service in recognition of the severe impact even a brief disruption of utility services would have on the Debtors.

12.     Motion to Pay Prepetition Sales, Use, and Franchise Taxes [Docket No. 4]

On May 29, 2009 [Docket No. 88], the Bankruptcy Court authorized the Debtors to pay up to $6.0 million for prepetition sales, use, franchise, income, property, and other taxes and any tax-related fees charges, and assessments accrued prepetition. As of March 9, 2010, the Debtors had paid approximately $4.4 million under this order.

13.     Applications for Retention of Debtors' Professionals

Throughout the Chapter 11 Cases, the Bankruptcy Court has approved the Debtors' retention of certain Professionals to represent and assist the Debtors in connection with the Chapter 11 Cases. These Professionals include, among others: (a) Kirkland & Ellis LLP as counsel for the Debtors (order granted June 19, 2009) [Docket No. 366]; (b) Pachulski, Stang, Ziehl & Jones LLP as co-counsel for the Debtors (order granted June 19, 2009) [Docket No. 363]; (c) Rothschild, Inc. ("Rothschild"), as financial advisors and investment bankers for the Debtors (order granted July 1, 2009) [Docket No. 474]; (d) Alvarez & Marsal North America, LLC as restructuring advisor to the Debtors (order granted June 19, 2009) [Docket No. 365]; (e) KCC as Claims and Solicitation Agent for the Debtors (order granted May 29, 2009) [Docket No. 79]; (f) Dickinson Wright PLLC as special counsel to the Debtors (order granted July 14, 2009) [Docket No. 546]; (g) Crowell & Moring LLP as special antitrust counsel to the Debtors (order granted July 14, 2009) [Docket No. 545]; (h) Alston & Bird LLP as special litigation counsel to the Debtors (order granted September 9, 2009) [Docket No. 942]; (i) Ernst & Young LLP as risk management service providers to the Debtors (order granted September 2, 2009) [Docket No. 921]; (j) Hammonds LLP as UK counsel (order granted March 16, 2010) [Docket No. 2556]; and (k) Plews Shadley Racher & Bruan LLP as special environmental counsel to the Debtors (order granted April 12, 2010) [Docket No. 2774].

## C.    **Appointment of Committees**

### 1.    The Creditors' Committee

On June 8, 2009, the United States Trustee appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code [Docket No. 178]. On January 8, 2010, the Bankruptcy Court, on its own initiative, entered an order scheduling a status conference for January 21, 2010 regarding whether an official committee of participants in the Debtors' Pension Plans should be appointed [Docket No. 1566]. The Debtors filed a statement in advance of the status conference, which stated the Debtors' opposition to an official committee of pensioners [Docket No. 1649]. The United States Trustee, the ad hoc committee of pensioners, and the IUE-CWA filed statements in support of the appointment of an official committee of pensioners [Docket Nos. 1696, 1699, 1702]. After hearing arguments at the January 21, 2010 status conference, the Bankruptcy Court ordered the United States Trustee to either: (a) appoint one or more participants of the Pension Plans to the Creditors' Committee or (b) pursuant to section 1102 of the Bankruptcy Code, appoint a separate official committee comprised of participants of the Pension Plans [Docket No. 1730] (the "Pension Committee Order"). Pursuant to the Pension Committee Order, on February 1, 2010, the United States Trustee appointed three individuals to the Creditors' Committee to represent participants in the Pension Plans [Docket No. 1779].

On February 3, 2010, the Debtors filed the *Motion of the Debtors for Reconsideration of the Court's Order Appointing Pension Plan Participants to an Official Committee* [Docket No. 1831]. The crux of the Debtors' argument to reconsider the Pension Committee Order was that there is no scenario under which the pensioners would have "a right to payment" from the Debtors and thus the pensioners cannot be considered Creditors of the Estates—a requirement for the appointment of an official committee under section 1102 of the Bankruptcy Code. On May 10, 2010, the Bankruptcy Court entered an order granting the Debtors' motion to reconsider the Pension Committee Order and vacating the Pension Committee Order. *See Order Granting Debtors' Motion for Reconsideration of the Court's Order Appointing Pension Plan Participants to an Official Committee* [Docket No. 3035] (the "Reconsideration Order"). The Debtors have accordingly requested that the United States Trustee reconstitute the Creditors' Committee to exclude the pension participants. In response, the United States Trustee has asked the Bankruptcy Court to schedule a status conference to clarify interpretation of the Reconsideration Order. *See United States Trustee's Request for Status Conference to Clarify Order Granting Debtors' Motion for Reconsideration of the Court's Order Appointing Pension Plan Participants to an Official Committee* [Docket No. 3167]. However, no date for the status conference has been set. Thus, the current members of the Creditors' Committee are: the PBGC; the Law Debenture Trust Company of New York; Freescale Semiconductor; Central States Southeast and Southwest Areas Pension Fund; Siemens Product Lifecycle Management Software, Inc.; Nissan Trading Corp., USA; CQS Directional Opportunities Master Fund, Ltd;[34] Chris A. Hensel, an active employee of Visteon Corporation; Robert Leiss, a former employee of the Debtors' North Penn plant and former president of Local UAW 1695; and Michael Lostutter, the director of the IUE-CWA pension and 401(k) fund.

---

34   CQS Directional Opportunities Master Fund Ltd. was appointed to the Creditors' Committee on November 30, 2009 [Docket No. 1364] after K&S Wiring resigned from the Creditors' Committee on November 6, 2009 [Docket No. 1238].

The Creditors' Committee has retained the following Professionals: (i) KCC as website administration agent (order granted July 16, 2009) [Docket No. 585]; (ii) Ashby & Geddes, P.A. as Delaware counsel (order granted August 11, 2009) [Docket No. 766]; (iii) Brown Rudnick LLP as co-counsel (order granted August 13, 2009) [Docket No. 786]; (iv) FTI Consulting, Inc. as restructuring and financial advisors (order granted September 11, 2009) [Docket No. 967]; and (v) Chanin Capital Partners, LLC as restructuring and financial advisors (order granted September 11, 2009) [Docket No. 966].

2.      Ad Hoc Equity Committee's Request for Appointment of an Examiner

On April 2, 2010, the ad hoc equity committee filed a motion for an order directing the appointment of an examiner in these cases [Docket No. 2720], and a motion to shorten the notice period for hearing the motion on the appointment [Docket No. 2721].  On May 19, 2010, the Bankruptcy Court denied the ad hoc equity committee's motion [Docket No. 3159].

3.      Certain Equity Holders' Request for Appointment of an Official Committee of Equity Holders

On April 16, 2010, certain equity holders filed a motion for an order appointing an official committee of equity holders in these cases [Docket No. 2834], to which the Debtors, the Term Loan Lenders, United States Trustee, and Creditors' Committee filed objections on April 23, 2010 [Docket Nos. 2880, 2868, 2889, 2872].  On May 19, 2010, the Bankruptcy Court denied the equity holders' motion to appoint an official committee of equity holders [Docket No. 3158].

4.      Certain Trade Creditors' Request for Appointment of an Official Committee of Trade Creditors

On June 10, 2010, certain holders of General Unsecured Claims filed a motion for an order appointing an official committee of trade claimants in these cases [Docket No. 3315].  The Debtors believe the request lacks merit and plan to oppose the motion.  The Bankruptcy Court has scheduled the hearing on that motion for July 15, 2010 at 11:00 a.m. prevailing Eastern Time.

**D.      Operational Restructuring Activity, Liquidity Enhancements, and Business Plan Development and Implementation**

Prior to filing the Chapter 11 Cases, the Debtors were in the process of executing a comprehensive three year restructuring plan to ensure their competitiveness in a troubled automotive supplier sector.  Under that restructuring plan, the Debtors sold, restructured, or closed approximately 38 unprofitable facilities, and also significantly reduced overhead and operating costs.  Upon filing for chapter 11, the Debtors continued to execute their restructuring plan by exiting non-core lines of business and preserving their customer relationships for the future.  In particular, during the Chapter 11 Cases, the Debtors entered into a number of agreements designed to enhance their liquidity, right-size their operations, and support future sustainability.  Negotiations over these initiatives originally took place in the context of a proposed debtor-in-possession ("DIP") financing arrangement to be provided by the Debtors' North American customers.  However, given the complexity of negotiating a DIP credit

agreement satisfactory to these natural competitors—and unnatural lenders—as well as the Debtors' improved cash flow performance during the Chapter 11 Cases, the Debtors ultimately determined that a customer "club" DIP facility was not a viable solution to supplement their liquidity. Instead, the Debtors used the momentum of the customer DIP discussions to negotiate and execute individualized asset sales and Accommodation Agreements with their customer base, which did not require the Debtors to take on any additional debt. The following is a description of the key restructuring initiatives undertaken by the Debtors during the Chapter 11 Cases to accomplish the above-mentioned goals.

  1. <u>Halla Alabama Asset Sale</u>

  In July 2009, Visteon Domestic Holdings, LLC sold its 80% equity interest in Halla Climate Systems Alabama Corp. ("<u>Halla Alabama</u>") to Halla Korea, a publicly-traded Korean company in which VIHI holds a 70% equity stake.[35] Halla Korea paid a total of approximately $63.0 million, including $26.0 million in settlement of certain Intercompany Claims, which brought cash into Visteon's U.S. enterprise and enhanced the value of Halla Korea by preserving the key customer relationship with Hyundai/Kia Motors ("<u>Hyundai</u>"). The sale closed on July 31, 2009 [Docket No. 723]. Consummation of the sale to a non-Debtor Entity gave Hyundai the assurances it needed to continue to do business with Halla Alabama going forward. Without the support of Hyundai, which accounts for 100% of Halla Alabama's business, the enterprise value of Halla Alabama would have been lost, which would have diminished the value of VIHI's interest in Halla Korea. The sale also took advantage of synergies that would not have been available to a buyer outside of the Visteon corporate family, e.g., Halla Alabama had already licensed intellectual property from Halla Korea and had a well-established supply chain to meet Hyundai's needs. Moreover, the transaction furthered the consolidation of Visteon's global climate business with Halla Korea, which functions as the hub of Visteon's global climate division. Since executing this transaction, Hyundai has continued its commitment to Visteon.

  2. <u>Connersville Property Sale</u>

  On December 10, 2009, the Bankruptcy Court authorized the Debtors to sell their Connersville, Indiana property, free and clear of all liens, claims, encumbrances, and other interests to the City of Connersville, Indiana [Docket No. 1437]. The Connersville property is located on approximately 186 acres of real property and includes various buildings, facilities, and other improvements, including a manufacturing facility that was used for Visteon Systems' climate business. The Debtors had previously ceased all manufacturing activities at the Connersville facility in 2007 and listed the property for sale in 2008. Due to some potential outstanding environmental liability related to the Connersville property, the Debtors agreed to sell the property to the City of Connersville for the nominal consideration of $500.00 and to pay up to $500,000.00 towards the cost of any statutorily required remediation of the property. In exchange for this consideration the City of Connersville agreed to assume, pay for, and complete any remediation of the property and assume liability for the settlement and resolution of all potential claims against the Debtors on account of obligations imposed on the property. Additionally, the City of Connersville and the Indiana Department of Environmental

---

35 Halla Alabama was a Debtor in the Chapter 11 Cases, but Halla Alabama's case was dismissed upon the closing of the sale to Halla Korea.

Management executed releases and covenants not to sue the Debtors in connection with the Connersville property.

By entering into the purchase and sale agreement with the City of Connersville, the Debtors eliminated annual expenses attributed to property taxes, insurance, utilities, and general maintenance of the Connersville property and avoided significant future costs associated with remediation of the property.

### 3. General Motors Company Accommodation Agreement

On October 7, 2009, the Bankruptcy Court authorized the Debtors and their non-Debtor Affiliate Carplastic, S.A. de C.V. ("Carplastic") to enter into an Accommodation Agreement (the "GM Accommodation Agreement") with General Motors Company ("GM") [Docket No. 1102]. The GM Accommodation Agreement allowed the Debtors to address certain liquidity needs, exit lines of business that no longer fit into the Debtors' strategic business plan, and maintain a business relationship with GM with respect to other promising lines of business. The GM Accommodation Agreement provided for, among other things: (a) an $8.0 million surcharge payment to Visteon Corporation; (b) payment to Visteon Corporation of up to $10.0 million to fund the consolidation of Visteon's InterAmerican and Carplastic facilities in Mexico; (c) payment to Visteon Corporation of $4.425 million to reimburse the Debtors for certain upfront engineering, design, and development support costs; (d) acceleration of payment terms on outstanding GM purchase orders; (e) GM's purchase from Visteon of certain inventory at original cost, and the option to purchase certain equipment and tooling relating to re-sourced component parts at the greater of the net book value of such assets or the orderly liquidation value, for all assets purchased in the last three years; (f) reimbursement of certain costs associated with the wind-down of GM interior and fuel tank component part production; and (g) an $8.2 million cure payment in connection with the assumption and assignment to GM by Motors Liquidation Company of certain purchase orders with the Debtors in GM's chapter 11 case.[36]

In exchange for these benefits, the Debtors agreed to continue to produce and deliver component parts to GM during the term of the Accommodation Agreement as well as provide considerable assistance to GM in resourcing certain unprofitable production to other suppliers. As is customary, the GM Accommodation Agreement also provided GM with an access right to certain Visteon facilities if the Debtors or Carplastic ceased production in violation of the GM Accommodation Agreement.

### 4. Chrysler Accommodation Agreement

On November 12, 2009, the Bankruptcy Court authorized the Debtors and Carplastic to enter into an Accommodation Agreement (the "Chrysler Accommodation Agreement") with Chrysler Group LLC ("Chrysler") [Docket No. 1305], similar in its terms to the GM Accommodation Agreement. Specifically, the Chrysler Accommodation Agreement provided for: (a) a $13.0 million surcharge payment to Visteon Corporation; (b) acceleration of payment

---

[36] While GM assumed and assigned its purchase orders with Visteon in its own chapter 11 case, the Debtors did not assume any purchase orders with GM in the Chapter 11 Cases under the GM Accommodation Agreement.

terms on outstanding Chrysler purchase orders; (c) a cure payment to Visteon Corporation of approximately $13.0 million in connection with the assumption and assignment to Chrysler by Old Carco LLC (f/k/a Chrysler LLC) of certain purchase orders with Debtors in the Old Carco LLC chapter 11 case; and (d) reimbursement of certain Visteon costs associated with Visteon's wind-down of production for certain lines of Chrysler component parts.[37] The Chrysler Accommodation Agreement also contemplated a number of asset sales, including a mandatory purchase by Chrysler (or an acceptable third party) of certain equipment and tooling used at Visteon's Highland Park, Michigan and Saltillo, Mexico facilities at the greater of the net book value of such assets or the orderly liquidation value, for all such assets acquired by Visteon during the previous three years. Chrysler also purchased Visteon's excess inventory relating to re-sourced Chrysler business at 100% of Visteon's actual and documented costs for raw materials and 100% of the purchase order price for finished goods.

In exchange, the Debtors and Carplastic provided Chrysler with commitments for continuity of supply, a customary access and security agreement, and agreements for Visteon's cooperation and assistance in the resourcing of Chrysler component parts to other suppliers.

5.   Nissan North America Asset Sale and Accommodation Agreement

On November 12, 2009, the Bankruptcy Court approved the sale of certain manufacturing facilities and other assets primarily related to the Debtors' module and interior business to Haru Holdings, LLC ("Haru"), an acquisition subsidiary of Nissan North America ("Nissan"), free and clear of all Liens and other interests pursuant to section 363 of the Bankruptcy Code [Docket No. 1298]. Haru paid, or will pay, the Debtors approximately $31.0 million in cash plus the (a) value of certain off-site tooling and inventory dedicated to Nissan production, (b) approximately $2.5 million in wind-down costs; and (c) the amount of certain receivables from Nissan being acquired under the purchase agreement, less the amount of certain payables to Nissan and Nissan Affiliates assumed by Nissan. The Bankruptcy Court also approved certain cure and notice procedures related to the assumption and assignment of Executory Contracts related to the module and interior business and an Accommodation Agreement that essentially served as a back-stop in the event that the Debtors violated the terms of the purchase agreement.

The assets sold to Haru were primarily used for the production and assembly of automobile cockpit module, front end module, and interior parts for Nissan. The majority of these assets were located at the Debtors' LaVergne, Tennessee, Smyrna, Tennessee, Tuscaloosa, Alabama, and Canton, Mississippi plants. The sale was a result of the Debtors' comprehensive strategic review of their operational restructuring strategy, including an evaluation of the profitability and performance of their operating subsidiaries and business divisions. After such review, the Debtors determined that the module and interior business was an unprofitable business segment that should be divested. The sale allowed the Debtors to maximize the module and interior business' contribution to the Debtors' Estates, enhance liquidity, and help ensure that Nissan—an important, long-term customer vital to the Debtors' post-emergence business plan—maintains its continuity of supply.

---

37   While Chrysler assumed and assigned its purchase orders with Visteon in its own chapter 11 case, the Debtors did not assume any purchase orders with Chrysler in the Chapter 11 Cases under the Chrysler Accommodation Agreement.

6.      Ford Motor Company Accommodation Agreement

On December 8, 2009, the Bankruptcy Court approved a motion authorizing the Debtors and Carplastic to enter into an Accommodation Agreement (the "Ford Accommodation Agreement") with Ford and ACH [Docket No. 1422]. Pursuant to the Ford Accommodation Agreement, Ford and ACH have agreed to pay Visteon an exit fee of $8.0 million in two equal installments. Under the Ford Accommodation Agreement, the majority of Ford electronic component parts formerly manufactured at the Debtors' North Penn facility will be re-sourced to Cadiz Electronica S.A., the Carplastic facility will continue to produce the majority of component parts it currently manufactures for Ford, and the Debtors will discontinue Ford production at the Debtors' Springfield, Ohio facility. In connection with the resourcing or transitioning of these Ford and ACH product lines, Ford and ACH have agreed to purchase certain inventory at cost, and have the option to purchase certain equipment and tooling related to the manufacturing of their component parts at the greater of the net book value of such assets or the orderly liquidation value, for all assets purchased in the last three years, or for older tooling or equipment an amount equal to the orderly liquidation value of such assets. Additionally, Ford and ACH agreed to reimburse the costs that the Debtors have, or will, incur in connection with resourcing production lines at their North Penn and Springfield facilities.

7.      Honda Accommodation Agreement

On December 10, 2009, the Bankruptcy Court approved a motion authorizing the Debtors to enter into an Accommodation Agreement (the "Honda Accommodation Agreement") with Honda of America Mfg., Inc. ("Honda"), which provides the Debtors with certain strategic and financial benefits in connection with the resourcing of Honda component parts produced at the Debtors' Highland Park, Michigan facility [Docket No. 1446] in accordance with the Debtors' strategic business plan. As consideration for the Debtors' assistance in the resourcing process and to provide incremental liquidity, Honda will provide the Debtors with a surcharge payment in the approximate amount of $0.2 million, as well as an acceleration of payment terms. In addition, Honda has agreed to purchase equipment dedicated to the production of Honda component parts for approximately $2.0 million, as well as to purchase certain inventory, and to cover the costs that the Debtors will incur in connection with resourcing Honda production lines to other suppliers, including wind-down costs in the approximate amount of $0.8 million and any cure costs required to be paid in connection with the Debtors' assumption and assignment of supply contracts with raw materials or subcomponent suppliers at Honda's request.

8.      Atlantic Automotive Components, LLC Sale

On February 23, 2010, the Bankruptcy Court approved a sale of the Debtors' interest in Atlantic Automotive Components, LLC ("Atlantic") to the joint venture's majority owner [Docket No. 2366]. The component parts produced by Atlantic were resourced to other suppliers pursuant to the Accommodation Agreements entered into with the Debtors' key customers. In consideration for the Debtors' interest in the joint venture, the purchaser: (a) paid $3.1 million in cash; (b) assumed substantially all of the liabilities of Atlantic; (c) released the Debtors from all obligations to Atlantic related to accounts payable for goods delivered or services provided prior to the Petition Date, which obligations are estimated to equal approximately $3.9 million; and (d) agreed to the resourcing of certain Atlantic business to a Visteon facility in Mexico.

K&E 17065163.9

9.     North Penn Plant Closure

On February 28, 2010, the Debtors closed their North Penn plant located in Lansdale, Pennsylvania. Pursuant to this closure, the Debtors entered into a closure agreement with the UAW and its local union 1695 to provide for the early expiration of the CBA governing the North Penn employees on February 28, 2010, instead of the original expiration date of March 13, 2011. On February 23, 2010, the Bankruptcy Court authorized entry into the closure agreement [Docket No. 2365]. The early expiration of the North Penn CBA will generate substantial savings for the Debtors' estates as a result of the discontinuation of post-employment health care benefits provided to North Penn retirees and employees as early as May 31, 2010. The Debtors also rejected the lease of the North Penn property on March 14, 2010 [Docket No. 2455]. As noted above, in connection with the Ford Accommodation Agreement, Ford has or will cover the vast majority of the costs associated with the North Penn plant closure.

10.     Highland Park and Saltillo Plant Sales

On April 13, 2010, the Bankruptcy Court approved the sale of Debtors' Highland Park, Michigan and Saltillo, Mexico facilities to Johnson Controls Interiors LLC and Johnson Controls Automotriz Mexico, S.de R.L. de C.V. (collectively, "Johnson Controls") [Docket No. 2799]. Pursuant to the sale, Johnson Controls assumed a CBA with UAW Local 400 governing the hourly employees working at the Highland Park facility. Pursuant to the Chrysler Accommodation Agreement, Chrysler was given the ability to market and sell the Highland Park and Saltillo plants to a purchaser willing to pay at least a minimum threshold price for the assets and inventory of the plants. Under the purchase agreement governing the sale of the Highland Park and Saltillo plants, Johnson Controls will pay the Debtors $17,086,475.00 in Cash (plus an additional amount related to inventory as of the closing of the plants) and assume certain liabilities of the Debtors related to the plants. Additionally, Chrysler will pay any additional costs to wind down operations at the Highland Park and Saltillo plants to the extent that the proceeds from the sale to Johnson Controls do not cover such costs. Importantly, the sale of the Highland Park and Saltillo facilities permitted the Debtors to fulfill their obligations under the Chrysler Accommodation Agreement and exit the manufacturing of certain unprofitable component part production lines.

E.     **Postpetition Financing**

1.     DIP Financing

As noted above, at the outset of the Chapter 11 Cases, the Debtors focused on negotiating a "club" DIP financing facility with their largest North American OEM customers to ensure sufficient liquidity to supply their customers with parts and fund these cases. The multi-faceted customer DIP negotiations were complicated because the proposed lenders were all competitors with competing interests. Ultimately, in September 2009, the Debtors abandoned these customer DIP negotiations.

In early October 2009, the Debtors began negotiations with a subset of the Term Loan Lenders (the "DIP Facility Lenders") over the terms of a DIP financing arrangement. On October 28, 2009, the Debtors filed a motion for approval of the $150.0 million DIP Facility—

with a $75.0 million initial draw and option to draw an additional $75.0 million—on a superpriority Administrative Claim and first priority priming Lien basis [Docket No. 1200]. Importantly, the Term Loan Lenders and ABL Lender consented to the priming of their prepetition Liens by the DIP Facility in exchange for the adequate protection described below. The Creditors' Committee and the PBGC filed objections to the motion. The Debtors were able to resolve the majority of issues raised by the Creditors' Committee and PBGC through modifications to the terms of the DIP Facility. The Bankruptcy Court approved the DIP Facility, as modified, on November 12, 2009 over ruling the remaining objections of the Creditors' Committee and the PBGC [Docket No. 1297].

As approved, the DIP Facility provides the Debtors with up to $150.0 million in financing on a superpriority Administrative Claim and first priority priming Lien basis. The initial draw of $75.0 million occurred upon the closing of the DIP Facility. The Debtors have an option to draw an additional $75.0 million, subject to the condition that they have not filed a plan of reorganization that does not provide for full payment of obligations under the DIP Facility. Obligations under the DIP Facility are entitled to superpriority Administrative Claim status pursuant to section 364(c)(1) of the Bankruptcy Code and secured by: (a) a first priority priming Lien on all Term Loan Priority Collateral; (b) a second priority Lien on all ABL Priority Collateral; and (c) a first priority lien on proceeds of Avoidance Actions under section 549 of the Bankruptcy Code and the Debtors' rights under section 506(c) of the Bankruptcy Code. The Term Loan Lenders and ABL Lender consented to the granting of priming Liens under the DIP Facility in exchange for adequate protection to the extent of the diminution in value of their collateral—calculated from November 12, 2009, the date of entry of the order approving the DIP Facility—in the form of: (i) junior replacement Liens on Term Loan Priority Collateral; (ii) a junior Lien on the proceeds of Avoidance Actions under section 549 of the Bankruptcy Code and the Debtors' rights under section 506(c) of the Bankruptcy Code; (iii) a first priority Lien on assets of VEC; and (iv) a superpriority Administrative Claim against all the Debtors. The DIP Facility's extended maturity date is August 18, 2010.

2. Other Postpetition Financing

On November 12, 2009, the Bankruptcy Court also approved Visteon's entry the U.S. Bank L/C Facility Documents with U.S. Bank National Association ("U.S. Bank") for an amount of $40.0 million, which replaced the letter of credit facility under the ABL Facility [Docket No. 1296]. Visteon makes reimbursement payments on any payments made by U.S. Bank under the U.S. Bank L/C Facility Documents, plus certain agreed fees, and any unpaid obligations bear interest at a rate per annum equal to the Prime Rate plus 5.00%. Visteon granted U.S. Bank a security interest in certain collateral held in a segregated account under the U.S. Bank L/C Facility Documents. On November 12, 2009, the Bankruptcy Court also approved the Debtors' entry into various Currency Contracts.

Notwithstanding any provision in the Plan to the contrary or section 1141(c) of the Bankruptcy Code, the U.S. Bank L/C Facility Documents and the Currency Contracts, and all rights and obligations of, and Liens held by, the parties thereunder in connection therewith, shall survive and remain in full force and effect on and after the Effective Date in accordance with the terms of the U.S. Bank L/C Facility Documents and the Currency Contracts, respectively, and the Final Orders entered on November 12, 2009 [Docket Nos. 1296 and 1297]. On the Effective

Date, any and all rights and obligations of the Debtors under the U.S. Bank L/C Facility Documents and the Currency Contracts shall vest in, or become the obligations of, the applicable Reorganized Debtors.

## F.    Addressing Legacy Liabilities

In addition to restructuring their capital structure and operational footprint, the Debtors have also analyzed opportunities to reduce their legacy cost structure. As of the Petition Date, the Debtors had substantial liabilities associated with certain post-employment health care and life insurance benefits ("OPEB") provided to their retirees.

### 1.    OPEB

As of June 2009, the Debtors determined that their OPEB liability would be $310.0 million by the end of 2009, with projected cash outlays of $31.0 million in 2009 alone. On June 26, 2009, the Debtors filed a motion for authorization to terminate OPEB for approximately 6,650 retirees or employees and their spouses and dependents [Docket No. 432]. In the motion, the Debtors asserted that they had the unilateral right to terminate the benefits pursuant to relevant plan documents and CBAs. The IUE-CWA, UAW, and certain individual retirees filed objections to the Debtors' motion arguing that active employees and retirees have vested OPEB rights under the terms of the applicable plan documents and CBAs, and thus, the Debtors are not entitled to terminate their obligations to provide OPEB unless and until authorized to do so under section 1114 of the Bankruptcy Code. The Bankruptcy Court granted the OPEB motion on December 22, 2009 in all respects, except as the motion applied to (a) former hourly employees at the North Penn plant who retired during the term of the North Penn CBA, dated April 2, 2005 and (b) current active hourly employees who will retire at the North Penn plant during the term of the North Penn CBA [Docket No. 1491]. On February 23, 2010, the Bankruptcy Court authorized entry into the North Penn closure agreement, which allowed the Debtors to eliminate OPEB for North Penn employees and retirees as early as May 31, 2010 [Docket No. 2365].

The IUE-CWA appealed the Bankruptcy Court's order [Docket No. 1512] and filed a motion on February 26, 2010 seeking stay of the order pending such appeal [Docket No. 2407]. On March 16, 2010, the Bankruptcy Court heard testimony on the motion for a stay, and entered an order denying the stay motion on March 29, 2010 [Docket No. 2691]. The IUE-CWA appealed this denial to the District Court on March 18, 2010. The District Court entered an order denying the appeal, denying the motion for a permanent stay pending appeal, and granting a limited stay until April 30, 2010, requiring the Debtors to reimburse or pay the cost of OPEB for the IUE-CWA retirees not eligible for Medicare during April 2010. On April 1, 2010, the IUE-CWA filed a notice of appeal to the Third Circuit Court of Appeals, a motion to continue the stay beyond April 30, 2010 pending the resolution of the appeal, and a motion to expedite the appeal. The Third Circuit Court of Appeals denied the IUE-CWA's motion to continue the stay beyond April 30, 2010 and granted the motion to expedite the appeal. The Third Circuit heard oral argument on the IUE-CWA's motion on May 28, 2010 and its decision is currently pending.

K&E 17065163.9

2.    Other Legacy Liabilities Related to the Ford Transactions

As a result of the historical transactions with Ford described in Article IV, the Debtors also have certain legacy liabilities relating to, among other things, retiree benefits, warranties, and indemnity obligations.  For example, as part of the 2000 spin-off transaction, Ford and Visteon Corporation entered into that certain Employee Transition Agreement (the "Transition Agreement"), dated April 1, 2000, amended and restated as of December 19, 2003, to govern the assumption or transfer of certain employee and retiree benefits.

Under the Transition Agreement, Visteon Corporation is responsible for reimbursing Ford for certain OPEB and pension costs that Ford provides directly to retirees.  With respect to pension obligations, Ford agreed to provide pension benefits for certain employees for such employees' service with Ford through June 1, 2000.   Visteon Corporation is required to reimburse Ford for pension related amounts as follows: (a) the costs of benefit increases that occur after June 1, 2000, including changes in the benefit accrual rate, but not changes in the benefit accrual rate resulting from promotions by Visteon after June 1, 2000; (b) the effect on projected benefit obligation for any Visteon average merit salary increase which exceeds the average Ford merit increase by one-half percent in a given year, provided that Visteon shall receive credit if the Visteon average merit salary increase is less than the average Ford merit increase by one-half percent in any given year; and (c) for the effect on projected benefit obligation related to the employees covered by Ford's pension plans as a result of Visteon's implementation of any early separation incentive programs or reductions in force, provided that Visteon shall receive a credit if such programs reduce the projected benefit obligation. Pursuant to the Transition Agreement, Visteon Corporation also provides and funds pension benefits for another group of employees, including those whom Visteon Corporation leases to ACH under the Salaried Employee Lease Agreement and Hourly Employee Lease Agreement.  Although ACH pays Visteon Corporation for a portion of these benefits, as mentioned above, ACH's payment obligation is tied to Visteon Corporation's reported accounting expense and not the actual amount of cash funding contribution attributable to the employees assigned to ACH.

With respect to OPEB obligations, the Transition Agreement provides that Visteon Corporation shall pay the costs of OPEB provided to certain employees under Ford's OPEB plans.   Quarterly OPEB reimbursements are determined based upon Ford's average per contract claims cost multiplied by the number of retirees that Visteon is required to reimburse Ford for each month.  Visteon Corporation is also required to pre-fund a VEBA or other tax-advantaged funding vehicle beginning in 2011.

These reimbursement obligations result in a balance sheet liability of approximately $116.0 million and annual cash payments to Ford of approximately $10.0 million.  The Debtors are currently negotiating for a termination of the Transition Agreement with Ford as part of their overall efforts to reduce legacy liabilities and restructure their relationship with Ford.   The Debtors believe that any Claims asserted under the Transition Agreement will be significantly reduced or eliminated through the negotiated termination of the agreement.

K&E 17065163.9

### G.    Analyzing Executory Contracts and Unexpired Leases

The Bankruptcy Code authorizes a debtor, subject to the approval of the Bankruptcy Court, to assume and assign, or reject Executory Contracts and Unexpired Leases.  In conjunction with their overall asset rationalization efforts, the Debtors have engaged in a comprehensive evaluation of their Executory Contracts and Unexpired Leases.

On July 16, 2009, the Debtors sought and received approval of streamlined procedures to reject Executory Contracts and Unexpired Leases that were unnecessary or burdensome to their Estates [Docket No. 596].  During the course of the Chapter 11 Cases, the Debtors and their Professionals have evaluated Executory Contracts and Unexpired Leases in the context of the Debtors' business plan.  For each of these Executory Contracts and Unexpired Leases, the Debtors determined, based on the economics of the specific contract, whether the contract was a candidate for assumption, rejection, or amendment and assumption.

As of the Petition Date, the Debtors were party to 13 Unexpired Leases of non-residential real property.  By order dated September 9, 2009 [Docket No. 944], the Bankruptcy Court extended the time within which the Debtors have to assume or reject Unexpired Leases of non-residential real property pursuant to section 365(d)(4) of the Bankruptcy Code through and including December 24, 2009.

### H.    Employee Incentive, Severance, and Retention Programs

#### 1.    Visteon Incentive Program

Prior to the Petition Date, the Debtors maintained, in the ordinary course of their business the Incentive Program, which is comprised of an annual incentive program and a long term incentive plan, under which the Debtors make awards based on annual performance metrics achieved over a three year performance period (the "Long Term Incentive Plan").  On June 30, 2009, the Debtors filed a motion requesting authority to honor certain components of the Incentive Program and also implement an incentive plan designed to motivate certain key employees to achieve superlative results during the Chapter 11 Cases [Docket No. 451].  Certain parties filed written objections to the motion.  In response, the Debtors adjourned the hearing on the motion and after significant negotiations with the various constituencies in the Chapter 11 Cases, the Debtors proposed an amended incentive program.

Under the amended incentive program, the Debtors sought to implement a key employee incentive plan (the "Key Employee Incentive Plan") for the Debtors' board-elected officers, and honor the Long Term Incentive Plan with respect to non-Insider employees.  On October 7, 2009, the Bankruptcy Court approved the Long Term Incentive Plan, as proposed in the motion, but denied the Key Employee Incentive Plan.  The Bankruptcy Court authorized the Debtors to pay approximately $1.8 million for the achievement of the 2007 and 2008 metrics under the Long Term Incentive Plan and up to approximately $1.5 million if the Debtors achieved a 21.9% reduction in administrative and engineering costs and obtain $1.0 billion in new business wins

and gross re-wins in 2009.[38]   Achievement of these performance metrics has resulted in significant operational cost savings and increased earnings—both of which are key to the Debtors' long-term vitality and ability to successfully emerge from chapter 11.

On February 2, 2010, the Debtors filed a motion to implement their ordinary course annual incentive plan (the "Annual Incentive Plan") [Docket No. 1805].  The Annual Incentive Plan will provide incentive awards to over 1,300 employees, including the Debtors' Insiders, in March of 2011 if a challenging adjusted EBITDA target of $450.0 million is achieved in 2010. The United States Trustee, IUE-CWA, and UAW filed objections to the motion.  On February 18, 2010, the Bankruptcy Court approved the motion over the objections of those parties and held that the Debtors' Annual Incentive Plan is both ordinary course and primarily incentivizing [Docket No. 2349].

Pursuant to the Plan, the Reorganized Debtors intend to honor obligations under the Incentive Program, as amended, which includes the Long Term Incentive Plan and Annual Incentive Plan, as it applies to all participants, including Insiders, and the Key Employee Incentive Plan. The Incentive Program and Key Employee Incentive Plan shall be deemed approved and authorized without further action of the New Board.  Also, on the Effective Date, Reorganized Visteon shall adopt, approve, and authorize change in control agreements with respect to certain of Reorganized Visteon's officers, in the form contained in the Plan Supplement, without further action, order, or approval of the New Board.

2.      Management Equity Incentive Program

Certain of the Debtors' management employees will be entitled to participate in the Management Equity Incentive Program, designed to keep the Reorganized Debtors competitive in attracting and retaining talented and motivated employees upon their emergence from bankruptcy.  The Management Equity Incentive Program shall have an aggregate share reserve of up to 9.55% or 10.00% of New Visteon Common Stock issued under the Rights Offering Sub Plan (depending on whether Class J Interests vote to accept the Plan) and 10.00% under the Claims Conversion Sub Plan, in accordance with the Plan, on a fully diluted basis.   The Management Equity Incentive Program, as set forth in the Plan Supplement, shall be deemed approved and authorized without further action by the New Board.

Under the Rights Offering Sub Plan, restricted stock grants equal to 2.87% or 3.0% (depending on whether Class J Interests vote to accept the Plan) of the New Visteon Common Stock, on a fully-diluted basis, shall be granted to the Management Equity Incentive Program participants on the Effective Date.  Future awards of the New Visteon Common Stock will be granted at such time(s) as the New Board shall determine.  The initial grants under the Rights Offering Sub Plan shall vest as follows: (a) one-sixth on the Effective Date; (b) one-sixth upon the first anniversary of the Effective Date; (c) one-third upon the second anniversary of the Effective Date; and (d) one-third upon the third anniversary of the Effective Date.

---

38   The $1.8 million payment relates to the achievement of: (a) six targeted restructuring goals in 2007 and seven  targeted restructuring goals in 2008; (b) incremental consolidated new business wins totaling $750.0 million in 2007; and (c) improvement in total administrative staff and engineering staff cost by 10.6% in 2008.

Under the Claims Conversion Sub Plan, restricted stock grants equal to 2.5% of the New Visteon Common Stock, on a fully-diluted basis, shall be granted to the Management Equity Incentive Program participants on the Effective Date. Future awards of the New Visteon Common Stock will be granted at such time(s) as the New Board shall determine. The initial grants under the Claims Conversion Sub Plan shall vest as follows: (i) one-third upon the first anniversary of the Effective Date; (ii) one-third upon the second anniversary of the Effective Date; and (iii) one-third upon the third anniversary of the Effective Date.

Based on the Valuation Analysis, the initial restricted stock grants of New Visteon Common Stock under the Rights Offering Sub Plan and Claims Conversion Sub Plan, respectively, would be worth between $40.27 million and $48.00 million after the three-year vesting period. Under both the Rights Offering Sub Plan and Claims Conversion Sub Plan, approximately 22.0% of the initial restricted stock grant will be distributed to the Debtors' Chief Executive Officer, which would equate to an approximate value of $8.87 million to $10.56 million after the three year vesting period. The remaining New Visteon Common Stock that the New Board may allocate to the Management Equity Incentive Program in its discretion would be worth between $93.91 million and $144.00 million after the three-year vesting period. Aurelius Capital Master, Ltd., ACP Master, Ltd., and Aurelius Convergence Master, Ltd. (together, "Aurelius"), each of which are holders of Visteon Corporation's common stock, believe that the Distributable Equity is substantially higher than the Debtors' estimate of $1.405 billion to $1.920 billion and accordingly believe that the 9.55% or 10.0% of New Visteon Common Stock that could be issued under the Management Equity Incentive Program is worth substantially more than $134.2 million to $192.0 million, the value based on the Debtors' Valuation Analysis. The Debtors believe their Valuation Analysis is accurate, and reflects the value of the Management Equity Incentive Program, and dispute Aurelius' valuation conclusions.

3.     Non-Insider Severance and Retention Programs

Prior to the Petition Date, the Debtors provided certain of their employees severance benefits under the Visteon Corporation Transition Program and the Visteon Executive Severance Plan. On July 28, 2009, the Bankruptcy Court authorized the Debtors (a) to provide severance benefits to full-time, salaried, non-Insider employees severed postpetition and (b) implement a non-Insider retention program ("Non-Insider Retention Program") [Docket No. 691]. The Non-Insider Retention Program, as approved, permits the Debtors to pay up to $3.0 million to certain critical employees identified by the Debtors' departmental managers for the significance of their contribution to the Debtors' ongoing operations and reorganization and/or the potential risk of such employees seeking alternative employment.

## I.     Analysis and Resolution of Claims

The Debtors' Schedules provide information pertaining to the Claims against the Estates. On August 26, 2009, the Debtors filed their Schedules with the Bankruptcy Court. Interested parties may review the Schedules at the office of the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801 or online at http://www.kccllc.net/visteon.

1. Claims Bar Date

On September 11, 2009, the Bankruptcy Court entered an order (the "Bar Date Order") [Docket No. 970] requiring all Entities holding or wishing to assert a Claim that arose or is deemed to have arisen prior to the Petition Date against any of the Debtors to submit a Proof of Claim so as to be actually received by KCC, the Debtors' Claims and Solicitation agent, before the applicable Bar Date, and approving the form and manner of the Bar Date notice for all Debtors. The Bar Date Order established: (a) October 15, 2009 at 5:00 p.m. prevailing Pacific Time as the deadline for submitting Proofs of Claims for non-governmental Entities and requests for payment under section 503(b)(9) of the Bankruptcy Code; (b) November 24, 2009 at 5:00 p.m. prevailing Pacific Time as the deadline for submitting Proofs of Claim for governmental Entities, (c) deadlines for filing Claims based on amendments or supplements to the Debtors' Schedules, and (d) deadlines for rejection damages Claims.

KCC had received approximately 3,900 Proofs of Claim in the approximate aggregate amount of $7.9 billion (excluding Intercompany Claims). Based upon a general reconciliation of the Debtors' books and records, the Debtors believe that many of the filed Proofs of Claim are invalid, untimely, duplicative, or overstated, and, have therefore calculated the recoveries under the Plan with the assumption that such Claims will be expunged from the Claims Register.

2. Omnibus Claim Objections

On February 18, 2010, the Bankruptcy Court approved the first and second omnibus claim objections filed by the Debtors [Docket Nos. 2266, 2367]. Through the first omnibus objection, the Debtors expunged duplicate Proofs of Claim totaling approximately $12.7 million. Through the second omnibus objection, the Debtors expunged amended Proofs of Claim totaling approximately $14.0 million.

On March 16, 2010, the Bankruptcy Court approved the Debtors' third and fourth omnibus claim objections [Docket Nos. 2558, 2576]. Through the third omnibus objection, the Debtors expunged duplicate, amended, and no documentation Proofs of Claim, and Proofs of Claim filed on account of equity interests totaling approximately $31.5 million. Through the fourth omnibus objection the Debtors expunged duplicate Proofs of Claim totaling approximately $50.0 million.

On April 13, 2010, the Court approved the Debtors' fifth and sixth omnibus Claim objections [Docket Nos. 2795, 2796]. Through the fifth omnibus objection, the Debtors expunged duplicate, amended, and no documentation Proofs of Claim, Proofs of Claim filed on account of equity interests, and Proofs of Claims filed against a non-Debtor entity totaling approximately $3.8 million. Through the sixth omnibus Claim objection, the Debtors expunged duplicate Proofs of Claim and Proofs of Claims not based on any liability owed by the Debtors totaling approximately $130.8 million.

On May 12, 2010, the Court approved the Debtors' seventh, eighth, ninth, and tenth omnibus Claim objections [Docket Nos. 3125, 3124, 3093, 3091]. Through the seventh omnibus objection, the Debtors seek to expunge duplicate Proofs of Claim totaling approximately $7.2 million. Through the eighth omnibus Claim objection, the Debtors seek to reclassify Proofs of

Claim to be asserted against the proper Debtor Entity. Through the ninth omnibus Claim objection, the Debtors seek to expunge amended Proofs of Claim and Proofs of Claim filed on account of equity interests totaling approximately $7.0 million. Through the tenth omnibus Claim objection, the Debtors seek to reclassify the priority of Proofs of Claim improperly asserted as administrative, secured, or priority status to General Unsecured Claims.

### 3. De Minimis Settlement Procedures

On July 17, 2009, the Bankruptcy Court approved the Debtors' motion seeking approval of certain procedures for settling de minimis Claims [Docket No. 601]. Under the de minimis settlement procedures, the Debtors may settle Claims for $0.5 million or less without further notice or order of the Bankruptcy Court, provided that the Debtors give the Creditors' Committee, and agent to the Term Loan Facility notice within seven Business Days of any Claim settled by one or more of the Debtors. For Claims settled for $0.5 million to $1.5 million the Debtors may settle the Claim only if ten days notice is given to the United States Trustee, Creditors' Committee, and agent to the Term Loan Facility and no objection is received from such parties within those ten days. If no objection is received, the Bankruptcy Court must approve the proposed settlement.

### 4. Settlements

During the pendency of the Chapter 11 Cases, the Debtors have resolved numerous disputes with Creditors through settlements. For instance, the Debtors have resolved each of the adversary complaints filed by or against them through a settlement agreement and have also obtained Bankruptcy Court approval to enter into various other settlements with Creditors during the Chapter 11 Cases. To date, three adversary complaints have been filed in the Chapter 11 Cases. The Debtors have resolved each of these adversary complaints through a consensual settlement agreement. First, on June, 29, 2009, Summit Polymers, Inc. filed an adversary proceeding against Visteon Corporation seeking a declaratory judgment that it was entitled to cash-in-advance payment terms as adequate assurance of the Debtors' future performance.[39] On September 2, 2009, Summit Polymers, Inc. withdrew its adversary proceeding. Second, on June, 29, 2009, Visteon Corporation filed an adversary case against Jabil Circuit, Inc. ("Jabil") seeking the turnover of certain specialized equipment and an injunction to compel Jabil to comply with the automatic stay.[40] On October 13, 2009, the Debtors' adversary proceeding against Jabil was dismissed without prejudice following the Bankruptcy Court's approval of a modified supply agreement between the Debtors and Jabil. Lastly, on June 19, 2009, Calsonic Kansei North America ("Calsonic") filed an adversary case against Visteon Corporation, VC Regional Assembly & Manufacturing LLC, and GCM Visteon Automotive Systems seeking a declaratory judgment that it had a right to setoff certain amounts owed to Visteon Corporation against amounts that VC Regional Assembly & Manufacturing LLC and GCM Visteon Automotive Systems, LLC owed Calsonic.[41] On February 18, 2010, the Bankruptcy Court signed an order authorizing the Debtors to enter into a settlement agreement with Calsonic and dismissing the adversary proceeding [Docket No. 2361]. The settlement allowed Calsonic to execute certain

---

[39] Summit Polymers, Inc. v. Visteon Corp., No. 09-51131 (Bankr. D. Del. June 29, 2009).

[40] Visteon Corp. v. Jabil Circuit, Inc., No. 09-51139 (Bankr. D. Del. June 29, 2009).

[41] Calsonic Kansei North America v. Visteon Corp., No. 09-51069 (Bankr. D. Del. June 19, 2009).

setoffs and obligated the Debtors to pay Calsonic's 503(b)(9) Claim in exchange for Calsonic's agreement to assist the Debtors with the removal of certain tooling equipment.

The Debtors have also sought and received Bankruptcy Court approval for entry into numerous settlements pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure. For example, on February 18, 2010, the Bankruptcy Court approved a settlement between the Debtors and the Charter Township of Van Buren [Docket No. 2244]. Pursuant to this settlement, the Debtors will pay the township $2.2 million in Cash and allow the township a General Unsecured Claim for approximately $9.8 million. This settlement resolved a tax dispute based on the value of the Debtors' headquarters located in the township and prevented potentially protracted and costly litigation with an uncertain outcome. The Debtors expect significant tax benefits going-forward as a result of the settlement.

Also, on February 18, 2010, the Bankruptcy Court approved a settlement agreement between the Debtors and International Business Machines Corporation ("IBM") which provided for beneficial amendments to a ten year outsourcing agreement with IBM under which Visteon outsources most of its information technology needs on a global basis, including mainframe support services, data centers, customer support centers, application development and maintenance, data network management, desktop support, disaster recovery, and web hosting ("IBM Outsourcing Agreement") [Docket No. 2241]. Under the settlement agreement, the Debtors assumed the IBM Outsourcing Agreement and agreed to the payment of cure amounts totaling approximately $11.0 million in connection therewith. The costs under the amended and assumed IBM Outsourcing Agreement are expected to aggregate approximately $37.0 million during the remaining term of the agreement. Expenses incurred under the IBM Outsourcing Agreement were approximately $80.0 million in 2009, $100.0 million in 2008, and $200.0 million in 2007. Thus, the settlement agreement significantly reduced the costs of the agreement going-forward and enhanced the value of the Debtors' Estates.

5.     UK Pension Claims

On March 31, 2009, Visteon UK Limited ("VUK"), a company organized under the laws of England and Wales and an indirect, wholly-owned non-Debtor subsidiary of Visteon Corporation, filed for administration under the United Kingdom Insolvency Act of 1986 with the High Court of Justice, Chancery division in London, England. The United Kingdom ("UK") administration was initiated in response to continuing operating losses of VUK, mounting labor costs, and the related demand on Visteon's cash flows. The effect of VUK's entry into administration was to place the management, affairs, business and property of VUK under the direct control of the certain individuals from KPMG LLP ("KPMG") as joint administrators of VUK.

VUK is the employer in respect of the VUK Pension Plan. As a result of VUK's administration and the VUK Pension Plan's funding liabilities, it is likely that the VUK Pension Plan will enter the Pension Protection Fund (a fund established pursuant to the UK Pensions Act 2004 to pay pension benefits to members of defined benefit pension plans, or "schemes," of employers in respect of which a "qualifying insolvency event" has occurred, as such term is defined in the UK Pensions Act 2004 (the "PPF"). The VUK Pension Plan is currently in a PPF assessment period to determine whether it is eligible to enter the PPF.

On October 15, 2009, the Visteon UK Pension Trustees Limited, in its capacity as trustee of the VUK Pension Plan and on behalf of the beneficiaries of the VUK Pension Plan, and the Board of the PPF, filed Proofs of Claim against each of the Debtors asserting contingent and unliquidated Claims pursuant to the UK Pensions Act 2004 and the UK Pensions Act 1995 for liabilities related to a funding deficiency of the VUK Pension Plan. The Proofs of Claim allege that the VUK Pension Plan had a funding deficiency of approximately $555.0 million as of March 31, 2009.

On June 26, 2009, the UK Pensions Regulator advised KPMG, as administrators of VUK, that it was investigating whether there were grounds for regulatory intervention under section 38 (with respect to contribution notices)[42] and/or section 43 (with respect to financial support directions) of the UK Pensions Act 2004 in relation to the VUK Pension Plan. That investigation is ongoing.[43] The UK Pensions Regulator has also requested certain information from several Visteon entities, including certain Debtors, as part of this investigation. The Debtors have been cooperating with the UK Pensions Regulator and have provided the UK Pensions Regulator with responsive information. The Debtors do not believe that there are grounds which would justify the exercise of the UK Pensions Regulator's "moral hazard" powers with respect to the VUK Pension Plan. The Debtors therefore dispute that any basis exists for the UK Pensions Regulator to seek contribution or financial support from any of the affiliated Visteon Entities outside the UK with respect to these Claims.

Another non-Debtor wholly-owned subsidiary of VIHI located in the UK, Visteon Engineering Services Limited ("VES") sponsors the VES Pension Plan, a defined benefit plan, on account of which the plan's trustee—Visteon Engineering Services Pension Trustees Limited—submitted Proofs of Claim against each of the Debtors asserting contingent and unliquidated claims pursuant to the UK Pensions Act 2004 and the UK Pensions Act 1995 for liabilities related to an alleged funding deficiency of the VES Pension Plan.[44] As the plan sponsor of the VES Pension Plan, VES is obligated to provide pension benefits that had previously accrued to certain of its employees under the VUK Pension Plan. According to the Proofs of Claim filed on account of the VES Pension Plan, the UK Pensions Regulator has advised the trustee for the VES Pension Plan that it has begun investigating funding issues related to the VES Pension Plan. The Proofs of Claim allege that the VES Pension Plan had a funding deficiency of approximately $118.1 million as of March 31, 2009. The Debtors do not believe that there are grounds which would justify the exercise of the UK Pensions Regulator's "moral hazard" powers with respect to the VES Pension Plan and the Debtors dispute that any basis exists for the UK Pensions Regulator to seek a contribution or financial support from any of the affiliated Visteon Entities outside the UK with respect to these Claims.

---

42   A contribution notice is a notice requiring a person to pay into a pension plan an amount of up to the Section 75 Debt (defined below) due. The UK Pensions Regulator has the power to issue such a notice, under section 38 and 38A of the UK Pensions Act 2004, in certain defined situations, although it each case it is subject to a reasonableness test taking into account the factors set out in the statute.

43   As described below, the UK Pensions Regulator has certain statutory "moral hazard" powers to protect the benefits of members of work based pension plans, including by requiring a company to make payments to, or otherwise financially support, such plans.

44   It should be noted that VES also maintains a defined contribution plan to provide benefits to employees for future services. Visteon Engineering Services Pension Trustees Limited has not made a Claim under the defined contribution plan.

The financial support direction provisions of the UK Pensions Act 2004 may require a target company (for example, one of the Debtors) to arrange financial support for an underfunded UK defined benefit pension plan. The UK Pensions Regulator may issue a financial support direction to a target company if the following factors are met: (a) the target company is associated or connected with the employer; (b) the employer is insufficiently resourced or a service company; and (c) it is reasonable under the circumstances to issue a financial support direction. First, a target company may be associated or connected with the employer. In sum, under UK law a company is associated with another company if the same person has control of it, meaning: (i) that the company's directors follow his directions or instructions; or (ii) he can exercise or control one-third or more of the votes in any general meeting of that company or a controlling company. Because VUK and VES are wholly owned companies of VIHI, they likely would be deemed to be controlled by VIHI and Visteon Corporation. Second, an employer is considered to be insufficiently resourced if the value of the employer's resources is less than 50.0% of the amount due from an employer to the pension plans under Section 75 of the U.K. Pensions Act 1995 (the "Section 75 Debt") and an associated company (or more than one company) has resources that are greater than the difference between the employer company's resources and 50.0% of the Section 75 Debt. The Debtors continue to analyze whether VUK and VES were insufficiently resourced and reserve their rights on this issue. An employer is considered to be a "service company" if it is a company within the meaning of section 735(1) of the Companies Act 1985, it is a member of a group of companies, and its turnover is solely or principally derived from amounts charged for the provision of the services of its employees to other members of the group.[45]

With respect to the final prong, the Debtors do not believe the UK Pensions Regulator can satisfy the reasonableness test for issuing a financial support direction. Factors that the UK Pensions Regulator must consider in determining whether issuance of a financial support direction is reasonable include: (a) the relationship between the target company and the employer; (b) the value of any benefits received by the target company from the employer; (c) the target company's connection or involvement with the relevant pension plan, if any; and (d) the financial circumstances of the target company. The Debtors believe that each of these factors weigh against the issuance of a financial support direction and thus, the UK Pensions Regulator does not have legitimate grounds which would justify issuing a financial support direction.[46]

On April 9, 2010, the Debtors filed an objection to the Visteon UK Pension Trustees Limited's Proofs of Claim filed against the Debtors [Docket 2772]. The Creditors' Committee also filed an objection to the VUK pension Claims on May 5, 2010 [Docket No. 2997]. On May 11, 2010, the Visteon UK Pension Trustees Limited, the Creditors' Committee, and the Debtors entered in a stipulation whereby the Visteon UK Pension Trustees Limited agreed to withdraw

---

45    If the UK Pensions Regulator thinks it appropriate to issue a financial support direction, it will issue a warning notice to all those parties it feels may be directly affected by it. The warning notice will subsequently be considered by the Determinations Panel, an independent panel of the UK Pensions Regulator, that will determine whether a financial support direction may be issued. If the Determinations Panel determines a financial support direction may be issued, the target has a 28 day period to appeal to the Pension Regulator Tribunal.

46    If the UK Pensions Regulator issues a financial support direction against one or more of the Visteon Entities and such financial support direction is not complied with, pursuant to section 47 of the UK Pensions Act 2004, the UK Pensions Regulator has the power, subject to a test of reasonableness, to issue a contribution notice for the target entity's failure to comply therewith.

all Claims asserted against the Debtors with prejudice [Docket No. 3078], which the Bankruptcy Court approved on May 12, 2010 [Docket No. 3089].

### 6. Ford Investigation and the Creditors' Committee's 2004 Discovery Motions

The Debtors are in the process of analyzing the potential avoidance of prepetition transfers under sections 362, 510, 542, 543, 547, and 548 of the Bankruptcy Code. During the Chapter 11 Cases, the Creditors' Committee sought to prosecute certain Causes of Action against Ford as the ABL Lender on behalf of the Debtors' Estates, including seeking to avoid Ford's Liens and security interests in certain Estate property. *See Motion of the Official Committee of Unsecured Creditors Requesting Authorization to Prosecute Certain Claims on Behalf of the Debtors' Estates* [Docket No. 988]. Thereafter, the Creditors' Committee and Ford engaged in negotiations and the parties agreed that all Liens and security interests of Ford in certain property, including certain deposit accounts, motor vehicles, commercial tort claims and federally registered copyrights, were avoided under section 544 of the Bankruptcy Code. *See Stipulation on Motion of the Official Committee of Unsecured Creditors Requesting Authorization to Prosecute Certain Claims on Behalf of the Debtors' Estates* [Docket No. 1304].[47] Pursuant to section 551 of the Bankruptcy Code, this property is thus preserved for the benefit of the Debtors' Estates. Both parties reserved their rights with respect to Ford's security interests in certain tax refunds received by the Debtors.

In December, the Creditors' Committee filed several motions for leave to seek discovery pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure. In addition to seeking leave to take discovery from the Debtors, the Creditors' Committee also sought to take discovery from: (a) Ford, the Debtors' largest customer; (b) PricewaterhouseCoopers LLP, the Debtors' auditor; (c) Halla Korea, one of the Debtors' key Affiliates; and (d) Hyundai, another of the Debtors' largest customers [Docket Nos. 1459, 1465, 1503, 1517, 1522]. The Debtors worked cooperatively with the Creditors' Committee to satisfy the document production requests without need for Bankruptcy Court intervention.

Ultimately, in connection with alternative plan structure negotiations with the Creditors' Committee that began in December, the Debtors were able to reach an agreement with the Creditors' Committee to twice continue the hearing on the Creditors' Committee's 2004 motions to conduct discovery of the Debtors and PricewaterhouseCoopers LLP to the omnibus hearing scheduled for February 18, 2010 and March 16, 2010, respectively [Docket Nos. 1635, 1915]. The Creditors' Committee also agreed to withdraw its 2004 motions to conduct discovery of Hyundai and Halla Korea without prejudice [Docket No. 1635].

In the Debtors' judgment, protracted litigation against Ford, PricewaterhouseCoopers LLP, Halla Korea, or Hyundai could delay or prevent the Debtors' emergence from bankruptcy and could put the Debtors' business plan at risk. The Plan includes a condition precedent for a resolution of matters relating to Ford. In the event of such resolution, the Debtors would anticipate providing Ford a release of liability pursuant to the Plan consistent with Federal Rule of Bankruptcy Procedure 9019.

---

47 Avoidance of the ABL Lenders' Liens and security interests in the deposit accounts are subject to the ABL Lender's right to prove that it had a perfected security interests in such accounts as of the Petition Date.

K&E 17065163.9

7.    Maintaining Exclusive Right to File a Plan of Reorganization

Section 1121(b) of the Bankruptcy Code establishes an initial period of 120 days after the Bankruptcy Court enters an order for relief under chapter 11 of the Bankruptcy Code during which only the debtor may file a plan.  Without further order of the Bankruptcy Court, the Debtors' initial exclusivity period to file a plan would have expired on September 25, 2009.  By order dated October 8, 2009, the Bankruptcy Court extended the Debtors' exclusivity periods through and including December 10, 2009 (to file a plan) and through and including February 10, 2010 (to solicit acceptances) [Docket No. 1109].  The order authorizing these extensions reserved the Debtors' right to seek additional extensions of these exclusivity periods.

The Debtors filed a motion on December 9, 2009 requesting an additional extension of their exclusive right to file a plan of reorganization through and including February 18, 2010 [Docket No. 1431].  The scheduled hearing on this motion was set for January 21, 2010.  On January 15, 2010, the Bankruptcy Court approved the *Stipulation Resolving the Debtors' Motion to Extend the Debtors' Exclusive Periods to File a Chapter 11 Plan and to Solicit Votes Thereon* [Docket No. 1634].  The stipulation between the Debtors and the Creditors' Committee extended the Debtors' exclusive periods to file a plan of reorganization through and including February 18, 2010, and correspondingly, to solicit votes for the plan through and including April 22, 2010, and required the Debtors to file a motion seeking a further extension of exclusivity by February 4, 2010.  On February 8, 2010, the Bankruptcy Court approved another stipulation between the Debtors and Creditors' Committee extending the exclusive period for the Debtors to file a plan of reorganization to March 16, 2010 [Docket No. 1915].

On February 17, 2010, the Debtors filed their second motion to extend their exclusive periods [Docket No. 2133].  On March 16, 2010, the Bankruptcy Court approved the motion and extended the Debtors exclusive periods to file and solicit votes for their plan of reorganization to April 30, 2010 and July 30, 2010, respectively [Docket No. 2550].

On March 31, 2010, the Creditors' Committee filed a motion to prematurely terminate the Debtors' exclusive periods [Docket No. 2704], which was subsequently joined by three informal equity holder groups—the ad hoc equity committee, Aurelius, and an equity group led by Cypress Management Master, L.P. [Docket Nos. 2846, 2870, and 2877].  The Creditors' Committee's motion asserted that terminating the Debtors' exclusivity would move the Chapter 11 Cases forward and allow the Creditors' Committee and/or the Note Holders to file an alternative plan of reorganization, which the Creditors' Committee believes is superior to the plan of reorganization filed by the Debtors on March 15, 2010.  On April 7, 2010, the parties agreed to adjourn the Creditors' Committee motion to terminate exclusivity, along with the hearing on the first amended disclosure statement, in an effort to reach consensus on the terms of the current Plan.  However, the Debtors agreed to treat the informal equity holder groups' joinders as separate motions to be heard at the May 12, 2010 omnibus hearing.  On April 28, 2010, the Debtors filed a motion to extend their exclusive periods to file a plan of reorganization and solicit votes thereon to June 29, 2010 and August 28, 2010, respectively.  The three informal equity groups filed objections to the motion [Docket Nos. 2993, 3000, and 3001].  On May 12, 2010, the Bankruptcy Court denied the informal equity groups' motions to terminate the Debtors' exclusive periods and granted the Debtors' motion to extend their exclusive periods [Docket No. 3088].

K&E 17065163.9

**J.** **Negotiations Relating to the Development of the Plan**

1. The December 17, 2009 Plan of Reorganization

On December 17, 2009, the Debtors filed the *Joint Plan of Reorganization of Visteon Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 1475]. Based on the valuation of the Debtors' Estates as of December 17, 2009 and the Term Loan Lenders' secured position in the Debtors' capital and corporate structure, the plan contemplated that the Term Loan Lenders would receive a 100% recovery on their Claims (approximately 96.2% of the equity in Reorganized Visteon) and that the PBGC would receive a 12.0% recovery on its Claims (approximately 3.8% of the equity in Reorganized Visteon). The plan was predicated on the termination of certain of the Debtors' Pension Plans in order to ensure the Term Loan Lenders would consent to equitization of their Secured Claims. As explained above, a substantial portion of the Debtors' enterprise value is attributable to their interests in certain non-Debtor foreign Affiliates, which flows upstream through the Foreign Stock Holding Companies, against which the Term Loan Lenders hold the only Secured Claims. The only other potential Claims against the Foreign Stock Holding Companies would have been the unsecured Claims the PBGC would hold upon termination of the Pension Plans as a result of section 4062(a) of ERISA. Thus, after satisfaction of the Term Loan Facility Claims from the assets of the Foreign Stock Holding Companies, the PBGC would have been entitled to receive any further distributions from the Foreign Stock Holding Companies' assets, including from the Foreign Stock Holding Companies' unencumbered equity interests in their foreign subsidiaries. The remaining assets of the Foreign Stock Holding Companies would not have fully satisfied the PBGC's Claims upon termination of the Pension Plans. Accordingly, the December 17, 2009 plan of reorganization provided for no recovery for holders of general unsecured Claims, including the Note Holders.

At the time of the December plan filing, the Debtors noted that they would be receptive to alternatives that would not result in Pension Plan termination to the extent those alternatives would not render the plan unconfirmable due to feasibility issues, lack of necessary creditor consent, or other factors. Given their debt capacity limitations, the Debtors made clear that absent a substantial junior capital infusion, a plan could not be confirmed without the consent of the Term Loan Lenders, whose Claims would need to be equitized under the circumstances present at that time. As of December 17, 2009, no party had presented the Debtors with any letters of intent, commitment letters, term sheets, or illustrative proposals for a potential new junior capital infusion. And no junior Creditor constituent had agreed to become restricted by signing a non-disclosure agreement or conducted any due diligence other than through the advisors to the Creditors' Committee and the advisors to an ad hoc group of the Note Holders that formed in the autumn of 2009.

2. Post-December 17 Plan Proposals

After the filing of the December 17, 2009 plan, certain Note Holders and their advisors approached the Debtors regarding potential alternative plan proposals that would be more inclusive of unsecured Creditors. In particular, the prospect of no recovery for Note Holders, the freshening of the capital markets, the Debtors' operational success (notwithstanding the pendency of these chapter 11 cases), and signs of a potential rebound in the automotive sector

precipitated major institutions, who hold substantial amounts of the Debtors' 7.00% Senior Notes, 8.25% Senior Notes, and 12.25% Senior Notes to reach out to the Debtors and the Creditors' Committee regarding the possibility of entering into a backstopped rights offering to raise junior capital. On January 15, 2010, the Debtors, Ford, as ABL Lender, the Term Loan Lenders, and the Creditors' Committee reached a "stand still" agreement to allow each of the parties the opportunity to explore whether alternative plan structures may be viable. On January 19, 2010, one of the Note Holders sent the Debtors a proposed plan and rights offering term sheet contemplating a fully backstopped $900.0 million equity commitment. On January 26, 2010, the Debtors and that Note Holder executed a confidentiality agreement to allow the Note Holder to begin to conduct diligence in connection with its proposal.

On February 1, 2010, 30 of the Debtors' Note Holder (including the Note Holder that submitted the term sheets on January 19, 2010) putatively representing a majority in amount of the 7.00% Senior Notes Claims, 8.25% Senior Notes Claims, and 12.25% Senior Notes Claims submitted a plan term sheet premised on a backstopped $950.0 million rights offering along with a signed, but highly conditional, equity commitment letter. On or around February 8, 2010, the Debtors and certain of the Note Holders that had expressed a willingness to backstop a right offering (the "Restricted Backstop Parties") completed several weeks of negotiations and executed confidentiality agreements to enable access to the comprehensive data room maintained by the Debtors. The Debtors' senior management team and their financial advisors have met with the Restricted Backstop Parties and their advisors on several occasions to, among other things, provide them with a comprehensive overview of the Debtors' business plan and facilitate their diligence efforts. While the Debtors fully engaged the Restricted Backstop Parties' diligence efforts for months, the Debtors questioned several potential shortcomings of the alternative plan proposal, including whether the funding would actually materialize, whether the alternative plan would over-leverage the Debtors and result in loss of customer business, whether reinstatement if any unpaid Term Loan Facility debt is legally feasible, and the desirability of the proposed transaction in light of the related costs, fees, and execution risks. Throughout discussions with the Restricted Backstop Parties, the Debtors continued to negotiate with the Term Loan Lenders over amendments to the December 17 plan that would, among other things, provide for maintenance of the Debtors' Pension Plans and a significant recovery for unsecured Creditors.

3.    March 15, 2010 Plan of Reorganization

Due to the conditionality of the Note Holder proposal and the Debtors' long stated intention to move these cases forward with a confirmable plan, on the March 15, 2010, the Debtors filed an amended plan supported by the Term Loan Lenders that would preserve the Debtors' Pension Plans and split the equity of Reorganized Visteon among the Term Loan Lenders, holders of the 7.00% Senior Notes, 8.25% Senior Notes, and 12.25% Senior Notes Claims, and other general unsecured creditors.[48] As explained in greater detail in Article VIII.D hereof, Rothschild, the Debtors' investment banker, updated the Valuation Analysis put forth in the December 17, 2009 plan to take into account, among other things, adjustment of the Debtors' business plan based on 2009 results, projected sales volumes and industry conditions going-

---

[48]   *First Amended Joint Plan of Visteon Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 2544].

forward, maintenance of the Debtors' Pension Plans, and stabilization of the credit markets. Taken together, these factors led to an increase in the distributable equity value of Reorganized Visteon and allowed for improved recoveries for all constituencies under the March 15 plan compared to those recoveries proposed in the Debtors' December 17 plan. Specifically, the Term Loan Lenders would have received their Pro Rata share of 85% of New Visteon Common Stock (a 100% recovery on their Claims); holders of the 12.25% Senior Notes, which are guaranteed by the Domestic Subsidiary Guarantees, would have received their Pro Rata share of approximately 6% of New Visteon Common Stock (a 50.0% recovery on their Claims). General unsecured trade creditors would have received Cash in an amount equal to their Pro Rata share of $23.9 million (a 50.0% recovery on their Claims). All other unsecured Creditors would have received their Pro Rata share of approximately 9.0% of New Visteon Common Stock (a 20.0% recovery on their Claims).

     4.    <u>Development and Negotiation of the Plan</u>

The Debtors' negotiations with the Note Holders and the Creditors' Committee over alternative plan proposals continued after the filing of the March 15 plan. In mid-March the Debtors began to formulate the terms of the current Plan. The Debtors believe that the Plan's "toggle" feature will sufficiently insulate their Estates from certain risks that were associated with both the March 15 plan of reorganization and the rights offering plan structure presented by the Note Holders. The Debtors presented a term sheet of the Plan to counsel for: (a) the Creditors' Committee, (b) Term Loan Lenders, and (c) the Note Holders on March 31, 2010 and convened an in-person meeting with such parties on April 7, 2010 to discuss the terms of the Plan. Through ongoing negotiations since that date, the Debtors were able to finalize terms of the Plan that the Consenting Note Holders and the Creditors' Committee fully support.

The Bankruptcy Court adjourned the May 24, 2010 hearing on the Debtors' third amended disclosure statement [Docket No. 3192] to June 14, 2010 to allow all stakeholders to negotiate regarding a potentially consensual plan. During the adjournment the Debtors considered various proposals, but ultimately determined in their business judgment that the Plan best serves their reorganization goals and the interests of their Creditors and all other stakeholders. Moreover, the Note Holders have agreed to amendment of the Debtors' third amended plan to include a distribution to holders of Equity Interests in Visteon Corporation, if Class J Interests vote as Class to accept the Plan, in an effort to bring consensus to the plan process. In addition, and as a further means to enhance the value of the Estates, the Debtors have amended the Plan to allow them the option to reinstate the Term Loan Facility Claims.

**K.**    **Alternative Plan Proposals**

     1.    <u>Proposals from the Term Loan Lenders</u>

The Debtors have received two proposals from the steering committee of the Term Loan Lenders. The first proposal, made by letter dated April 16, 2010, proposes that the Debtors confirm the Claims Conversion Sub Plan, modified to offer Eligible Holders of Allowed Senior Notes Claims the option to purchase their respective pro rata shares of the equity that would otherwise be distributed to the Term Loan Lenders. The fees payable to the Investors and certain financial advisors under the Equity Commitment Agreement would not be payable under this

proposal and the Term Loan Lenders thus believe the proposal would result in significant fee reductions payable by the Debtors' Estates. A copy of the April 16, 2010 letter is attached to this Disclosure Statement as **Exhibit E**. The Debtors have rejected this proposal and believe the fees associated with the Rights Offering Sub Plan are appropriate given, among other things, the infusion of $1.250 billion in new capital from the Rights Offering, whereas the Claims Conversion Sub Plan would not generate such capital.

The second proposal, made by letter dated May 7, 2010, proposed an alternative plan based on the Rights Offering Sub Plan, whereby the Term Loan Lenders would serve as direct investors and backstop parties for the Rights Offering, without the requirement of any fees, Debtor covenants, conditions for financing or credit approvals. Under this proposal, Allowed Senior Notes Claims would receive 15% of the Distributable Equity (subject to dilution as provided in the Plan), with the Rights Offering otherwise fully available to Eligible Holders of Allowed Senior Notes Claims as provided in the Rights Offering Sub Plan. A copy of the May 7, 2010 letter is attached to this Disclosure Statement as **Exhibit F**.

2.  Proposal from Johnson Controls

On May 7, 2010, the Debtors received an unsolicited preliminary proposal from Johnson Controls, Inc. ("JCI") to purchase certain assets associated with the Debtors' interiors and electronics business. On May 17, 2010, the Debtors sent a letter to JCI seeking additional information regarding the proposal. On May 20, 2010, JCI sent the Debtors a response that answered some of the Debtors' questions but still lacked certain essential information. The response did, however, make clear that JCI would not assume liabilities for employee pension benefits, OPEB, any long-term debt, or any liabilities or Claims that related to conduct or products of the business prior to the closing date of the sale. The Debtors and their advisors analyzed the proposal and concluded that without adjusting for the risks associated with the proposed acquisition, the sale would accelerate certain costs to be paid by the Estates and would not enhance recoveries for Visteon's Creditors. The Creditors' Committee also analyzed the sale proposal and reached an initial determination that the implied recoveries under the proposal would offer less favorable treatment to General Unsecured Creditors than the treatment provided under the Plan.[49] Accordingly, Visteon's board of directors unanimously concluded that Visteon and its stakeholders were best served by moving forward towards confirmation of the Plan. On June 1, 2010, the Debtors sent a letter to JCI informing JCI of their decision.

**ARTICLE VI.**
**PLAN SUMMARY**

A.  **Overview of Chapter 11**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor can reorganize its business for the benefit of itself, its creditors, and interest holders. Chapter 11 also strives to promote equality of treatment for similarly situated

---

[49] See *Objection of the Official Committee of Unsecured Creditors to the Motion for Order Scheduling an Expedited Hearing and Shortening Notice on Motion for Apppointment of an Official Trade Creditors' Committee Pursuant to 11 U.S.C. § 1102(a)(2)* [Docket No. 3334].

creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of a debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a plan of reorganization makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan, and any creditor of or equity holder in the debtor, whether or not such creditor or equity holder is impaired under or has accepted the plan, or receives or retains any property under the plan. Subject to certain limited exceptions, and except as otherwise provided in the plan or the confirmation order itself, a confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the Plan and substitutes for those debts the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual, and equitable rights of the holders of claims or interests in certain classes are to remain unaltered by the reorganization effectuated by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are presumed to accept the plan. Accordingly, a debtor need not solicit votes from the holders of claims or equity interests in such unimpaired classes. A chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed to reject the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes that are receiving a distribution of property under the plan but are not "unimpaired" will be solicited to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims of a debtor's creditors and equity interest holders. In compliance therewith, the Plan divides Claims and Interests into various Classes and sets forth the treatment for each Class. The Debtors believe that the Plan has classified all Claims and Interests in compliance with section 1122 of the Bankruptcy Code, but it is possible that a holder of a Claim or Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the Debtors intend, to the extent permitted by the Bankruptcy Court and the Plan, to make such modifications of the classifications under the Plan to permit Confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class in which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE

K&E 17065163.9

CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, THE PLAN SUPPLEMENT, AND THE EXHIBITS AND DEFINITIONS CONTAINED IN EACH DOCUMENT.

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO IN THE PLAN. THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN.

THE PLAN ITSELF AND THE DOCUMENTS IN THE PLAN CONTROL THE ACTUAL TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON, AMONG OTHER ENTITIES, ALL HOLDERS OF CLAIMS AND INTERESTS, THE REORGANIZED DEBTORS, ALL ENTITIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

## B. <u>Overall Structure of the Plan</u>

The Plan is comprised of two mutually exclusive sub plans—the Rights Offering Sub Plan and the Claims Conversion Sub Plan. Pursuant to the Plan Support Agreement, the Plan has the support of more than two-thirds in amount of the 12.25% Senior Note Claims and two-thirds in aggregate amount of the 7.00% Senior Notes Claims and 8.25% Senior Notes Claims. The Creditors' Committee also supports the Debtors' Plan. Following is a general description of each Sub Plan.

### 1. The Rights Offering Sub Plan

The Debtors will seek to consummate the Rights Offering Sub Plan in the event the following new capital is raised: (a) $950.0 million through a Rights Offering of New Visteon Common Stock to the Eligible Holders through a private placement under section 4(2) of the Securities Act; (b) a $300.0 million direct purchase commitment from the Investors; and (c) the Exit Financing Facility. If the Term Loan Lender Class votes to accept the Plan, the Term Loan Facility Claims will be paid in full in Cash. If the Term Loan Lender Class votes to reject the Plan, the Debtors shall have the option to seek reinstatement of the Term Loan Facility pursuant to section 1124(2) of the Bankruptcy Code, subject to the reasonable consent of the Requisite Investors, and thereafter pay each holder of the Allowed Term Loan Facility Claims its Pro Rata portion of an amount in Cash to be determined by the Debtors (subject to the reasonable consent of the Requisite Investors) (the "<u>Reinstatement Recovery</u>"). Reinstatement of the Term Loan

Facility could provide the Estates with significant savings through retroactive application of the non-default, LIBOR plus 3.0% interest rate in lieu of the default interest rate during the pendency of these Chapter 11 Cases. If reinstatement is successful, the Debtors may pay-off all of the reinstated Term Loan Claims in Cash or leave an amount of the Term Loan Facility Claims equal to or less than the amount of the Exit Financing Facility reinstated, which would remain on the Reorganized Debtors' balance sheet and would reduce the amount of the Exit Financing Facility (as projected in the Disclosure Statement) on a dollar-for-dollar basis. The Term Loan Lenders believe reinstatement of the Term Loan Facility (and, therefore, retroactive application of non-default and LIBOR interest) is not legally permissible. The Debtors disagree and believe that potential defaults under the Term Loan Facility would be curable defaults under section 1124(2) of the Bankruptcy Code or are *ipso facto* defaults pursuant to section 365(b)(2) of the Bankruptcy Code. If the Debtors are not successful in reinstating the Term Loan Facility Claims, the Debtors shall satisfy the Term Loan Facility Claims in full in Cash. Under either scenario, the Term Loan Facility Claims would be Unimpaired.

Under the Rights Offering Sub Plan, all Note Holders shall be entitled to receive a Pro Rata distribution of 5.0% of Distributable Equity, or 4.9% of the Distributable Equity if Class J votes to accept the Plan, and all Eligible Holders shall be entitled to participate in a Rights Offering for the remaining 95.0% of New Visteon Common Stock, or 93.1% of New Visteon Common Stock if Class J votes to accept the Plan.[50] Each Non-Eligible Holder, (i.e., a Note Holder not permitted to participate in a rights offering under section 4(2) of the Securities Act,) shall also receive the lesser of (i) its Pro Rata share of $50.0 million in Cash or (ii) 40.0% of the amount of such holder's Allowed Claim in Cash, on account of the value of the Subscription Rights which such Non-Eligible Holder would have been entitled to had such Non-Eligible Holder been an Eligible Holder. Holders of the 12.25% Senior Notes Claims will receive additional consideration on account of the Domestic Subsidiary Guarantees in the form of their Pro Rata share of warrants to purchase New Visteon Common Stock on terms described in the Warrant Agreement attached as Exhibit B to the Plan. The Cash Recovery Backstop Investors shall fund the aggregate Cash Amount provided to Non-Eligible Holders and, therefore, such Cash distribution will have no impact on the Debtors' Cash availability. The Equity Commitment Agreement entered into by the Debtors and Investors in connection with the Rights Offering Sub Plan provides that any shares of New Visteon Common Stock that are not purchased through the Rights Offering, or distributed to holders of the 12.25% Senior Notes Claims, as described above, shall be purchased by those Investors that are party to the Equity Commitment Agreement, subject to the conditions therein. The Equity Commitment Agreement was approved by the Bankruptcy Court on June 17, 2010 [Docket No. 3427].[51]

Holders of General Unsecured Claims against VIHI will be paid in full in Cash, subject to a $20.0 million cap, given VIHI's interest in valuable foreign stock holding companies and

---

[50] Under the Rights Offering Sub Plan, Note Holders shall receive 4.9% of New Visteon Common Stock if Class J votes to accept the Plan or 5.0% of New Visteon Common Stock if Class J votes to reject the Plan. The 4.9% or 5.0% of New Visteon Common Stock distributed to the Note Holders shall be subject to dilution from the Management Equity Incentive Program, and if applicable, the Old Equity Warrants and the 93.1% or 95.0% of New Visteon Common Stock offered through the Rights Offering shall be subject to dilution from the Guaranty Equity Amount and the Management Equity Incentive Program, and if applicable, the Old Equity Warrants.

[51] On June 21, 2010 and June 22, 2010, the ad hoc equity committee filed a notice of appeal and statement of issues on appeal, respectively [Docket No. 3455].

K&E 17065163.9

position in the Debtors' corporate structure, which makes direct Claims against VIHI structurally superior to other General Unsecured Claims.[52] Each remaining holder of a General Unsecured Claim will receive a Cash recovery equal to the lesser of (x) such holder's Pro Rata portion of $141.0 million in Cash or (y) 50.0% recovery of the amount of such holder's Allowed Class H Claim.

Allowed Class J Interests are not entitled to receive a distribution and would deemed automatically cancelled under the Rights Offering Sub Plan, provided, however, if Class J votes to accept the Plan, each holder of an Allowed Class J Interest shall receive its Pro Rata portion of 2.0% of the Distributable Equity and Old Equity Warrants to purchase shares of New Visteon Common Stock at an exercise price of $58.80 per share. **Thus, only if Class J Interests accept the Plan as a Class will Class J Interests receive a distribution.** The Rights Offering Sub Plan also contemplates Reorganized Visteon's entry into a new $300.0 million working capital facility, which is projected to be undrawn upon emergence from chapter 11.

2.    The Claims Conversion Sub Plan

The Plan shall "toggle" from the Rights Offering Sub Plan to the Claims Conversion Sub Plan in the event sufficient capital is not raised under the Rights Offering Sub Plan to satisfy the Term Loan Facility Claims in full in Cash. Under the Claims Conversion Sub Plan, Reorganized Visteon shall issue New Visteon Common Stock to the Term Loan Lenders and the Note Holders in the following percentages based on their relative priorities and positions in the Debtors' capital structure: 84.9% to 86.2% the holders of the Term Loan Facility Claims; 6.3% to 6.5% to the holders of the 12.25% Senior Notes Claims; and 7.5% to 8.6% to the holders of the 7.00% Senior Notes Claims and 8.25% Senior Notes Claims. Under the Claims Conversion Sub Plan, holders of General Unsecured Claims will receive the same recovery provided under the Rights Offering Sub Plan—i.e., the lesser of (a) such holder's Pro Rata portion of $141.0 million in Cash or (b) 50.0% recovery of the amount of such holder's Allowed Class H Claim. General Unsecured Claims against VIHI also will be paid in Cash in full, subject to a $20.0 million cap.

Under the Claims Conversion Sub Plan, holders of the Term Loan Facility Claims would receive the highest percentage of New Visteon Common Stock based on the first Lien they hold against the Debtors' most valuable assets, including certain Debtor Foreign Stock Holding Companies and at least 65% of the Foreign Stock Holding Companies' equity interests in their foreign subsidiaries. After the Term Loan Facility Claims are satisfied in full (including postpetition default interest and fees),[53] the Note Holders shall receive the remaining shares of New Visteon Common Stock. Holders of 12.25% Senior Notes Claims will receive a higher percentage of New Visteon Common Stock than holders of 7.00% Senior Notes Claims and 8.25% Senior Notes Claims on account of the Domestic Subsidiary Guarantees. Holders of Class J Interests will not receive a recovery under the Claims Conversion Sub Plan and shall be

---

[52]    The Debtors estimate that there will be a total of $3.4 million in Allowed General Unsecured Claims against VIHI. If however, Allowed General Unsecured Claims against VIHI exceed $20.0 million, then holders of such Claims shall receive their Pro Rata share of $20.0 million in Cash.

[53]    The estimated Allowed amount of the Term Loan Facility Claims is $1.629 billion, including postpetition interest at the default rate. To the extent Class E votes to reject the Plan and the Debtors succeed in reinstating the Term Loan Facility Claims, the Allowed amount of the Term Loan Facility Claims may, among other things, be calculated at the non-default interest rate in lieu of the default interest rate, and at the Eurodollar rate since July 13, 2009 instead of the base rate.

deemed to reject the Plan if the Debtors pursue Confirmation of the Claims Conversion Sub Plan. The Claims Conversion Sub Plan contemplates Reorganized Visteon's entry into a new $150.0 million working capital facility, which is projected to be undrawn upon emergence from chapter 11.

The Term Loan Lenders believe the proposed agreements (i) contain no definitive date by which the new capital must be delivered, (ii) excuse the Investors from any liability for breach of their commitments, and (iii) would likely suspend confirmation in the event the Investors or Note Holders litigate regarding the toggle. The Debtors believe the Term Loan Lenders misinterpret the Equity Commitment Agreement and Plan Support Agreement and disagree with the Term Loan Lenders' assertions. The Bankruptcy Court approved the Plan Support Agreement and Equity Commitment Agreement over all objections on June 17, 2010 [Docket No. 3427].

## C.   **Administrative and Priority Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, DIP Facility Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article VI.

### 1.   Administrative Claims

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than of a Professional Claim), including any Allowed Administrative Claim of the Notes Trustee, will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either:  (1) on the Effective Date, as soon as practicable thereafter (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter, or (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date (including any reasonable fees and expenses as provided for in the Equity Commitment Agreement), pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the holders of such Allowed Administrative Claims. For the avoidance of doubt, all reasonable fees and expenses of the Notes Trustee (and its counsel, agents, and advisors) that are provided for under the Notes Indentures shall be paid in full in Cash on the Effective Date, or as soon as practicable thereafter, without a reduction to the recoveries of applicable holders of Allowed Claims.

### a.   Final Fee Applications

All final requests for payment of Claims of a Professional shall be filed no later than 60 days after the Confirmation Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Claims shall be determined by the Bankruptcy Court.

b.    <u>Professional Fee Escrow Account</u>

In accordance with Article VI.C.1.c hereof, on the Confirmation Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the estates of the Debtors or Reorganized Debtors, as applicable. The amount of Professional Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account when such Claims are Allowed by a Final Order. When all Professional Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall revert to the Reorganized Debtors.

c.    <u>Professional Fee Reserve Amount</u>

To receive payment for unbilled fees and expenses incurred through the Confirmation Date, the Professionals shall estimate their Professional Compensation prior to and as of the Confirmation Date and shall deliver such estimate to the Debtors no later than 10 days prior to the Confirmation Date, <u>provided</u>, <u>however</u>, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional. If a Professional does not provide an estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Professional. The total amount so estimated as of the Confirmation Date shall comprise the Professional Fee Reserve Amount.

d.    <u>Post-Confirmation Date Fees and Expenses</u>

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation incurred by the Debtors or Reorganized Debtors, as applicable. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

2.    <u>DIP Facility Claims</u>

Except to the extent that a holder of an Allowed DIP Facility Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed DIP Facility Claim, each such Allowed Claim shall be paid in full in Cash on the Effective Date, or as soon as practicable thereafter, provided such payments shall be distributed to the DIP Facility Administrative Agent on behalf of holders of such Allowed Claims.

3.    <u>Priority Tax Claims</u>

Each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive one of the following treatments on account of such Claim (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, (b) Cash in an amount agreed to by the Debtor or Reorganized Debtor, as applicable, and such holder, <u>provided</u>, <u>however</u>, that such parties may further agree for the payment of such Allowed Priority Tax Claim to occur at a later date, or (c) at the option of the Debtors, Cash in the aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period not more than five years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

**D.**     **<u>Sub Plans</u>**

The Plan contemplates Confirmation and Consummation through either of two mutually exclusive sub plans—the Rights Offering Sub Plan and Claims Conversion Sub Plan.  Except as otherwise provided in Article VI.Q, to the extent that both the Rights Offering and the Exit Financing are consummated, the Debtors will proceed with Consummation of the Rights Offering Sub Plan.  To the extent that either of the Rights Offering or the Exit Financing is not consummated, the Debtors will proceed with Confirmation and/or Consummation, as applicable, of the Claims Conversion Sub Plan, subject to the terms of the each of Plan Support Agreement.

**E.**     **<u>Classification of Claims and Interests</u>**

The Plan constitutes a separate plan of reorganization for each Debtor.  Except for the Claims addressed in Article II, all Claims and Interests are classified in the Classes set forth below pursuant to section 1122 of the Bankruptcy Code.  Classes of Claims and Interests shall be the same under each of the Rights Offering Sub Plan and the Claims Conversion Sub Plan, provided, certain Classes of Claims shall receive different treatment under the Rights Offering Sub Plan than under the Claims Conversion Sub Plan, as specified below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, Professional Claims, DIP Facility Claims, and Priority Tax Claims.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

Below is a chart assigning each Class a letter for purposes of identifying each separate Class.

| Class | Claim or Interest | Status Under Rights Offering Sub Plan | Status Under Claims Conversion Sub Plan | Voting Rights |
|-------|-------------------|---------------------------------------|-----------------------------------------|---------------|
| A | ABL Claims | Unimpaired | Unimpaired | Conclusively Presumed to Accept |
| B | Secured Tax Claims | Unimpaired | Unimpaired | Conclusively Presumed to Accept |
| C | Other Secured Claims | Unimpaired | Unimpaired | Conclusively Presumed to Accept |
| D | Other Priority Claims | Unimpaired | Unimpaired | Conclusively Presumed to Accept |
| E | Term Loan Facility Claims | Unimpaired | Impaired | Entitled to Vote, but Conclusively Presumed to Accept Under the Rights Offering Sub Plan |
| F | 7.00% Senior Notes Claims and 8.25% Senior Notes Claims | Impaired | Impaired | Entitled to Vote |
| G | 12.25% Senior Notes Claims | Impaired | Impaired | Entitled to Vote |
| H | General Unsecured Claims | Impaired | Impaired | Entitled to Vote |
| I | Intercompany Claims | Unimpaired | Unimpaired | Conclusively Presumed to Accept |
| J | Interests in Visteon Corporation | Impaired | Impaired | Entitled to Vote |
| K | Intercompany Interests | Unimpaired | Unimpaired | Conclusively Presumed to Accept |
| L | Section 510(b) Claims | Impaired | Impaired | Deemed to Reject |

## F.  Treatment of Classes of Claims and Interests

1.  Class A — ABL Claims

    a.  *Classification*:  Class A consists of all ABL Claims.

    b.  *Treatment*:  Except to the extent that a holder of an Allowed Class A Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class A Claim, each such holder of an Allowed Class A Claim shall be paid in full in Cash on the Effective Date, or as soon as practicable thereafter.

    c.  *Voting*:  Class A is Unimpaired, and holders of Allowed Class A Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Class A Claims are not entitled to vote to accept or reject the Plan.

2.  Class B — Secured Tax Claims

    a.  *Classification*:  Class B consists of all Secured Tax Claims.

K&E 17065163.9

b. *Treatment*:  Except to the extent that a holder of an Allowed Class B Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class B Claim, each such holder of an Allowed Class B Claim shall receive, at the sole option of the Debtors or the Reorganized Debtors, as applicable:

(i) Cash on the Effective Date, or as soon as practicable thereafter, in an amount equal to such Allowed Class B Claim; or

(ii) commencing on the Effective Date and continuing over a period not exceeding five years from the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Class B Claim, together with interest at the applicable non-default contract rate under non-bankruptcy law, subject to the sole option of the Debtors or the Reorganized Debtors to prepay the entire amount of such Allowed Claim; or

(iii) regular Cash payments in a manner not less favorable than the most favored non-priority unsecured Claim provided for by the Plan.

c. *Voting*:  Class B is Unimpaired, and holders of Allowed Class B Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Class B Claims are not entitled to vote to accept or reject the Plan.

3. Class C — Other Secured Claims

a. Class C consists of all Other Secured Claims.

b. *Treatment*:  Except to the extent that a holder of an Allowed Class C Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class C Claim, each such holder of an Allowed Class C Claim shall, at the sole option of the Debtors or the Reorganized Debtors, as applicable:

(i) have its Allowed Class C Claim reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an Allowed Class C Claim to demand or receive payment of such Allowed Class C Claim prior to the stated maturity of such Allowed Class C Claim from and after the occurrence of a default; or

(ii) receive Cash in an amount equal to such Allowed Class C Claim, including any interest on such Allowed Class C Claim required to

be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Class C Claim becomes an Allowed Class C Claim, or as soon as practicable thereafter; or

(iii)    receive the collateral securing its Allowed Class C Claim and any interest on such Allowed Class C Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code.

c.    *Voting*:  Class C is Unimpaired, and holders of Allowed Class C Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Class C Claims are not entitled to vote to accept or reject the Plan.

4.    <u>Class D — Other Priority Claims</u>

a.    *Classification*:  Class D consists of all Other Priority Claims.

b.    *Treatment*:  Except to the extent that a holder of an Allowed Class D Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class D Claim, each such holder of an Allowed Class D Claim shall be paid in full in Cash on the later of (i) the Effective Date, or as soon as practicable thereafter and (ii) the date such Class D Claim becomes Allowed, or as soon as practicable thereafter.

c.    *Voting*:  Class D is Unimpaired, and holders of Allowed Class D Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Class D Claims are not entitled to vote to accept or reject the Plan.

5.    <u>Class E — Term Loan Facility Claims</u>

a.    *Classification*:  Class E consists of the Term Loan Facility Claims.

b.    *Allowance*:  Subject to the reinstatement of the Allowed Class E Claims by the Debtors, on the Effective Date, the Term Loan Facility Claims shall be Allowed in the aggregate amount of $1,629.34 million, measured as of June 29, 2010, plus, if applicable, any interest accrued on such Allowed Claims between June 30, 2010 and the Effective Date.

c.    *Treatment*:  Holders of Allowed Class E Claim will receive the following treatment under the Rights Offering Sub Plan and the Claims Conversion Sub Plan, respectively:

(i)    <u>*Rights Offering Sub Plan*</u>:  Except to the extent that a holder of an Allowed Class E Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in

exchange for each and every Allowed Class E Claim (A) if Class E votes to accept the Plan pursuant to section 1126(c) of the Bankruptcy Code, each holder of an Allowed Class E Claim shall be paid in full in Cash on the Effective Date, or as soon as practicable thereafter, or (B) if Class E does not vote to accept the Plan pursuant to section 1126(c) of the Bankruptcy Code, the Debtors shall have the option, subject to the reasonable consent of the Requisite Investors, to seek to reinstate the Allowed Class E Claims, and, if successful, to thereafter pay to each holder of an Allowed Class E Claim its Pro Rata portion of an amount of Cash, to be determined by the Debtors (subject to the reasonable consent of the Requisite Investors), on the Effective Date, or as soon as practicable thereafter; provided, in the event the Debtors are unable to successfully reinstate the Allowed Class E Claims, each holder of an Allowed Class E Claim shall be paid in full in Cash on the Effective Date, or as soon as practicable thereafter.

(ii) *Claims Conversion Sub Plan:* Except to the extent that a holder of Allowed Class E Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and Allowed Class E Claim, each such holder of an Allowed Class E Claim shall receive on the Effective Date, or as soon as practicable thereafter, its Pro Rata portion of [85.0]% of the Distributable Equity.

Under either of the Rights Offering Sub Plan or the Claims Conversion Sub Plan, the consideration provided under this Article VI.F.2.b shall be the sole source of recovery for an Allowed Class E Claims, and holders of Class E Claims shall have no recourse against any non-Debtor Affiliates and shall have been deemed to waive any and all claims against any non-Debtor Affiliates.

d. *Voting*: Holders of Allowed Class E Claims are entitled to vote to accept or reject the Plan; provided, however, that if the Debtors proceed to Confirmation with the Rights Offering Sub Plan such holders would be Unimpaired (and conclusively presumed to accept the Plan) in accordance with section 1124 of the Bankruptcy Code.

6. Class F — 7.00% Senior Notes Claims and 8.25% Senior Notes Claims

a. *Classification*: Class F consists of the 7.00% Senior Notes Claims and the 8.25% Senior Notes Claims.

b. *Allowance*: On the Effective Date, the 7.00% Senior Notes Claims shall be Allowed in the aggregate amount of $456.82 million, and the 8.25% Senior Notes Claims shall be Allowed in the aggregate amount of $211.41 million.

c.　*Treatment*:　Holders of Allowed Class F Claims will receive the following treatment under the Rights Offering Sub Plan and the Claims Conversion Sub Plan, respectively:

(i)　*Rights Offering Sub Plan—Non-Eligible Holders*:　Except to the extent that a Non-Eligible Holder of an Allowed Class F Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every applicable Allowed Class F Claim, each such Non-Eligible Holder of an Allowed Class F Claim shall receive on the Effective Date, or as soon as practicable thereafter, (i) the Cash Amount and (ii) its Pro Rata Allocation of 5.0% of the Distributable Equity (or, to the extent that Class J votes to accept the Plan pursuant to section 1126(d) of the Bankruptcy Code, its Pro Rata Allocation of 4.9% of the Distributable Equity).

(ii)　*Rights Offering Sub Plan—Eligible Holders*:　Except to the extent that an Eligible Holder of an Allowed Class F Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every applicable Allowed Class F Claim, each such Eligible Holder of an Allowed Class F Claim shall receive its Pro Rata Allocation of: (A) the Subscription Rights and (B) on the Effective Date, or as soon as practicable thereafter, 5.0% of the Distributable Equity (or, to the extent that Class J votes to accept the Plan pursuant to section 1126(d) of the Bankruptcy Code, its Pro Rata Allocation of 4.9% of the Distributable Equity).

(iii)　*Claims Conversion Sub Plan*:　Except to the extent that a holder of an Allowed Class F Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class F Claim, each such holder of an Allowed Class F Claim shall receive on the Effective Date, or as soon as practicable thereafter, its Pro Rata portion of approximately 9.0% of the Distributable Equity.

d.　*Voting*:　Class F is Impaired and holders of Allowed Class F Claims are entitled to vote to accept or reject the Plan.

7.　Class G — 12.25% Senior Notes Claims

a.　*Classification*:　Class G consists of the 12.25% Senior Notes Claims.

b.　*Allowance*:　On the Effective Date, the 12.25% Senior Notes Claims shall be Allowed in the aggregate amount of $202.36 million.

c.    *Treatment*: Holders of Allowed Class G Claims will receive the following treatment under the Rights Offering Sub Plan and the Claims Conversion Sub Plan, respectively:

(i)    <u>*Rights Offering Sub Plan—Non-Eligible Holders*</u>: Except to the extent that a Non-Eligible Holder of an Allowed Class G Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every applicable Allowed Class G Claim, each such Non-Eligible Holder of an Allowed Class G Claim shall receive on the Effective Date, or as soon as practicable thereafter:

(a)    the Cash Amount;

(b)    its Pro Rata Allocation of 5.0% of the Distributable Equity (or, to the extent that Class J votes to accept the Plan pursuant to section 1126(d) of the Bankruptcy Code, its Pro Rata Allocation of 4.9% of the Distributable Equity); and

(c)    its Pro Rata portion of the Guaranty Equity Amount.

(ii)    <u>*Rights Offering Sub Plan—Eligible Holders*</u>: Except to the extent that an Eligible Holder of an Allowed Class G Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every applicable Allowed Class G Claim, each such Eligible Holder of an Allowed Class G Claim shall receive:

(a)    its Pro Rata Allocation of the Subscription Rights;

(b)    on the Effective Date, or as soon as practicable thereafter, its Pro Rata Allocation of 5.0% of the Distributable Equity (or, to the extent that Class J votes to accept the Plan pursuant to section 1126(d) of the Bankruptcy Code, its Pro Rata Allocation of 4.9% of the Distributable Equity); and

(c)    on the Effective Date, or as soon as practicable thereafter, its Pro Rata portion of the Guaranty Equity Amount, or, if such holder exercises its Guaranty Cash Recovery Option, the Guaranty Cash Amount.

(iii)    <u>*Claims Conversion Sub Plan*</u>: Except to the extent that a holder of an Allowed Class G Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class G Claim, each such holder of an Allowed Class G Claim shall receive on the Effective Date, or as soon as practicable thereafter, its Pro Rata portion of 6.0% of the Distributable Equity.

Under either of the Rights Offering Sub Plan or the Claims Conversion Sub Plan, the consideration provided under this Article VI.F.7.c shall be the sole source of recovery for the Allowed Class G Claims, and holders of Class G Claims shall have no recourse against any non-Debtor Affiliates and shall have been deemed to waive any and all claims against any non-Debtor Affiliates.

d. *Voting*: Class G is Impaired and holders of Allowed Class G Claim are entitled to vote to accept or reject the Plan.

8. Class H — General Unsecured Claims

a. *Classification*: Class H consists of all General Unsecured Claims.

b. *Treatment*: Except to the extent that a holder of an Allowed Class H Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class H Claim, each holder of an Allowed Class H Claim shall receive on the Effective Date, or as soon as practicable thereafter, Cash equal to (i) the lesser of (A) its Pro Rata portion of $20.0 million or (B) 100% of the amount of such holder's Allowed Class H Claim, if such holder's Allowed Class H Claim is held against Visteon International Holdings, Inc. or (ii) if such holder's Allowed Class H Claim is held against any other Debtor, the lesser of (A) its Pro Rata portion of $141.0 million or (B) 50% of the amount of such holder's Allowed Class H Claim.

c. *Voting*: Class H is Impaired and holders of Allowed Class H Claims are entitled to vote to accept or reject the Plan.

9. Class I — Intercompany Claims

a. *Classification*: Class I consists of all Intercompany Claims.

b. *Treatment*: Holders of Allowed Class I Claims shall not receive any distributions on account of such Allowed Class I Claims; provided, however, the Debtors reserve the right to reinstate any or all Allowed Class I Claims on or after the Effective Date (upon consultation with the Requisite Investors).

c. *Voting*: Class I is Unimpaired, and holders of Allowed Class I Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Allowed Class I Claims are not entitled to vote to accept or reject the Plan.

10. Class J — Interests in Visteon Corporation

a. *Classification*: Class J consists of all Interests in Visteon Corporation.

b.    *Treatment*:  Holders of Allowed Class J Interests will receive the following treatment under the Rights Offering Sub Plan and the Claims Conversion Sub Plan, respectively:

(i)    *Rights Offering Sub Plan*:  Allowed Class J Interests are not entitled to receive a distribution and shall be deemed automatically cancelled without further action by the Debtors or Reorganized Debtors and the obligations of the Debtors and Reorganized Debtors thereunder shall be discharged; provided, however, if Class J votes to accept the Plan pursuant to section 1126(d) of the Bankruptcy Code, each holder of an Allowed Class J Interest shall receive, in full and final satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Class J Interest, on the Effective Date, or as soon as practicable thereafter, its Pro Rata portion of (A) the Old Equity Warrants, and (B) 2.0% of the Distributable Equity, except to the extent that a holder of an Allowed Class J Interest agrees to a less favorable treatment.

(ii)    *Claims Conversion Sub Plan*:  On the Effective Date, Allowed Class J Interests shall be deemed automatically cancelled without further action by the Debtors or Reorganized Debtors and the obligations of the Debtors and Reorganized Debtors thereunder shall be discharged.

c.    *Voting*:  Class J is Impaired and holders of Allowed Class J Interests are entitled to vote to accept or reject the Plan; provided, however, that if the Debtors proceed to Confirmation with the Claims Conversion Sub Plan such holders would be deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

11.    Class K — Intercompany Interests

a.    *Classification*:  Class K consists of all Intercompany Interests.

b.    *Treatment*:  Holders of Allowed Class K Interests shall not receive any distributions on account of such Allowed Class K Interests; provided, however, the Debtors reserve the right to reinstate any or all Allowed Class K Interests on or after the Effective Date.

c.    *Voting*:  Class K is Unimpaired, and holders of Allowed Class K Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Allowed Class K Interests are not entitled to vote to accept or reject the Plan.

12.    Class L — Section 510(b) Claims

a.    *Classification*:  Class L consists of all Section 510(b) Claims.

b.     *Treatment*:  Holders of Allowed Class L Claims shall not receive any distributions on account of such Allowed Class L Claims.  On the Effective Date, all Class L Claims shall be discharged.

c.     *Voting*:  Class L is Impaired and holders of Allowed Class L Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Allowed Class L Claims are not entitled to vote to accept or reject the Plan.

## G.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

## H.    Provisions for Implementation of the Plan

### 1.    General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.

### 2.    New Visteon Common Stock

The issuance of the New Visteon Common Stock by Reorganized Visteon, including options for the purchase thereof or other equity awards, if any, providing for the issuance of New Visteon Common Stock, is authorized without the need for any further corporate action or without any further action by the Debtors or Reorganized Visteon, as applicable.  Pursuant to the Plan, the Reorganized Visteon Charter shall authorize the issuance and distribution on or after the Effective Date of shares of New Visteon Common Stock to the Distribution Agent for the benefit of holders of Allowed Claims in each of Classes E, F, and G under the Claims Conversion Sub Plan, and Classes F, G, and, if applicable, J under the Rights Offering Sub Plan (and as required to satisfy the Debtors' obligations under the Equity Commitment Agreement), subject, in either case, to dilution by the Management Equity Incentive Program and, if applicable, the Guaranty Equity Amount and the Old Equity Warrants.  All of the shares of New Visteon Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

### 3.    Registration Exemptions

The offering, issuance, and distribution of any Securities pursuant to the Plan and any and all settlement agreements incorporated therein will be exempt from the registration requirements of section 5 of the Securities Act pursuant to section 1145 of the Bankruptcy Code, section 4(2) of the Securities Act, or any other available exemption from registration under the Securities Act, as applicable.  In addition, under section 1145 of the Bankruptcy Code, if applicable, any

Securities issued pursuant to the Plan and any and all settlement agreements incorporated therein will be freely transferable under the Securities Act by the recipients thereof, subject to (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments, including restrictions contained in the Equity Commitment Agreement, and (b) the restrictions, if any, on the transferability of such Securities and instruments, including restrictions contained in the Equity Commitment Agreement, and (c) any other applicable regulatory approval.

Certain holders of New Visteon Common Stock pursuant to Article VI.F will be entitled to customary registration rights and shall be subject to customary transfer restrictions following a public offering of the New Visteon Common Stock, in accordance with the terms and conditions of a registration rights agreement by and among Reorganized Visteon and such holders. Under the Claims Conversion Sub Plan, Reorganized Visteon shall use its commercially reasonable efforts to obtain approval of the New Visteon Common Stock for listing on the New York Stock Exchange as soon as reasonably practicable. Under the Rights Offering Sub Plan, Reorganized Visteon shall not, until the earlier of the date that (a) is the three  month anniversary of the Effective Date and (b) the Securities and Exchange Commission declares effective a shelf registration statement in connection with the resale of New Visteon Common Stock, list such stock on the New York Stock Exchange, the Nasdaq Stock Market, or any other national securities exchange unless pursuant to a written request of the Requisite Investors, in which case Reorganized Visteon shall use commercially reasonable efforts to list and maintain the listing of the New Visteon Common Stock on the New York Stock Exchange, the Nasdaq Stock Market, or any other national stock exchange as requested by the Requisite Investors.

4.      Subordination

The classification and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and any such rights shall be settled, compromised, and released pursuant to the Plan.

5.      Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

6.     Cancellation of Notes, Instruments, Certificates and Other Documents

On the Effective Date, except to the extent otherwise provided, all notes, instruments, Certificates, and other documents evidencing Claims or Interests shall be cancelled and the obligations of the Debtors or Reorganized Debtors and the non-Debtor Affiliates thereunder or in any way related thereto shall be discharged; provided, however, that notwithstanding Confirmation or the occurrence of the Effective Date, any indenture or agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of (a) allowing holders to receive distributions under the Plan, and (b) allowing and preserving the rights of the ABL Facility Administrative Agent, the DIP Facility Administrative Agent, the Term Loan Facility Administrative Agent, and the Notes Trustee, as applicable, to make distributions on account of Claims as provided in Article VI.M.

7.     Issuance of New Securities; Execution of Plan Documents

Except as otherwise provided in the Plan or the Equity Commitment Agreement, the Reorganized Debtors shall issue on the Effective Date all Securities, notes, instruments, Certificates, and other documents required to be issued pursuant to the Plan.

8.     Acquisition of Assets Held by Oasis Trust

On the Confirmation Date, Visteon Corporation shall exercise its option under that certain Master Lease, dated October 31, 2002, as amended, to acquire from Oasis Trust all of its rights, title, and interests in and to that property located at One Village Center Drive, Van Buren Township, Wayne County, Michigan 48111, in accordance with the terms of such agreement and the Plan, and free and clear of all Liens, Claims, charges, or other encumbrances and stamp tax, transfer tax, and similar taxes pursuant to sections 1123(a)(5)(D), 1141(c), and 1146(a) of the Bankruptcy Code.

9.     Post-Confirmation Property Sales

To the extent the Debtors or Reorganized Debtors, as applicable, purchase or sell any property prior to or including the date that is one year after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, may elect to purchase or sell such property pursuant to sections 363, 1123(a)(5)(D), 1141(c), and 1146(a) of the Bankruptcy Code.

10.    Corporate Action

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors, whether taken prior to or as of the Effective Date, shall be authorized without the need for any further corporate action or without any further action by the Debtors or the Reorganized Debtors, as applicable. Such actions may include, (a) the adoption and filing of the Reorganized Visteon Charter and Reorganized Visteon Bylaws, (b) the appointment of the New Board, (c) the adoption and implementation of the Management Equity Incentive Program, (d) the authorization, issuance and distribution of the New Visteon Common Stock, including, if applicable, pursuant to the Rights Offering, and other Securities to be authorized, issued and

distributed pursuant to the Plan, and (e) and consummation and implementation of the Exit Financing.

11.     Certificate of Incorporation and Bylaws

The certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnerships, or other forms of Entity) of the Debtors (other than Visteon Corporation) shall be amended in a form as may be required to be consistent with the provisions of the Plan, and the Bankruptcy Code.  Under the Claims Conversion Sub Plan, the certificate of incorporation and bylaws of Visteon Corporation shall be amended as may be required to be consistent with the provisions of the Plan, and the Bankruptcy Code, and the form and substance of the Reorganized Visteon Charter and Reorganized Visteon Bylaws shall be included in the Plan Supplement.  Under the Rights Offering Sub Plan, the certificate of incorporation and bylaws of Visteon Corporation shall be as set forth in the Reorganized Visteon Charter and Reorganized Visteon Bylaws.  Under either the Claims Conversion Sub Plan or Rights Offering Sub Plan, the Reorganized Visteon Charter will among other things, (a) authorize the issuance of the shares of New Visteon Common Stock; and (b) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting Equity Securities.

12.     Effectuating Documents, Further Transactions

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

13.     Section 1146(a) Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

14.     Directors and Officers of Reorganized Visteon

On the Effective Date, the term of the current members of the board of directors of Visteon Corporation shall expire, and the New Board shall be appointed.  The existing officers of Visteon Corporation shall serve in their current capacities in Reorganized Visteon.  On and after the Effective Date, each director or officer of Reorganized Visteon shall serve pursuant to the terms of the Reorganized Visteon Charter, the Reorganized Visteon Bylaws, or other constituent

documents, and applicable state corporation law; provided, under the Claims Conversion Sub Plan, subject to the Reorganized Visteon Bylaws relating to the filling of vacancies on the New Board, the members of the New Board as constituted on the Effective Date will continue to serve at least until the first annual meeting of stockholders after the Effective Date, which meeting shall not take place until at least 12 months after the Effective Date; provided further, under the Rights Offering Sub Plan, the members of the New Board as constituted on the Effective Date will continue to serve for a period after the Effective Date as set forth in the Board Selection Term Sheet.

15. <u>Directors and Officers of Reorganized Debtors Other Than Visteon Corporation</u>

Unless otherwise provided in the Debtors' disclosure pursuant to section 1129(a)(5) of the Bankruptcy Code, the officers and directors of each of the Debtors other than Visteon Corporation shall continue to serve in their current capacities after the Effective Date. The classification and composition of the boards of directors of the Reorganized Debtors other than Reorganized Visteon shall be consistent with their respective new certificates of incorporation and bylaws. Each such director or officer shall serve from and after the Effective Date pursuant to the terms of such new certificate of incorporation, bylaws, other constituent documents, and applicable state corporation law. In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of any Person proposed to serve as an officer or director of the Reorganized Debtors other than Reorganized Visteon shall have been disclosed at or before the Confirmation Hearing.

16. <u>Employee Benefits and Incentive Plans</u>

Unless otherwise specified in this Article VI.H.16 and except in connection and not inconsistent with those employee benefit and incentive programs that shall be treated, without further action of the Reorganized Debtors or the New Board, as set forth in the "Management Equity Incentive Program Term Sheet" and the "Employee Benefit and Incentive Programs Term Sheet" attached to the Equity Commitment Agreement, on and after the Effective Date, subject to any Final Order, the Reorganized Debtors shall have the sole discretion to (a) amend, adopt, assume, and/or honor, in the ordinary course of business or as otherwise provided for herein, any contracts, agreements, policies, programs, including the Incentive Program, and plans for, among other things, compensation, pursuant to the terms thereof or hereof, including any incentive plan, as applicable, including health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation benefits, life insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity from and after the Petition Date, and (b) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date.

As of the Effective Date, the Reorganized Debtors shall continue the Pension Plans in accordance with, and subject to, their terms, ERISA, and the Internal Revenue Code, and shall preserve all of their rights thereunder. All Proofs of Claim filed on account of Claims in connection with the termination of the Pension Plans shall be deemed disallowed and expunged as of the Effective Date without any further action of the Debtors or Reorganized Debtors and without any further action, order, or approval of the Bankruptcy Court. Notwithstanding

anything to the contrary in Article VI.H.16, no provision in the Plan or the Confirmation Order, or proceeding within the Chapter 11 Cases, shall in any way be construed as discharging, releasing, or relieving the Debtors, the Reorganized Debtors, or any other party in any capacity, from any liability with respect to the Pension Plans under any law, governmental policy, or regulatory provision, including for breach of fiduciary duty.

On and after the Effective Date, and in accordance with applicable law and administrative requirements, the Reorganized Debtors shall have no liability for OPEB and shall have no obligation to provide or offer OPEB to their employees and retirees and their spouses, surviving spouses, dependents or other beneficiaries. The cessation shall be administered on a "claims incurred" basis, and the Reorganized Debtors shall retain responsibility for all claims incurred but either unfiled or unpaid as of the date of cessation of the OPEB.

17.     Employment Agreement & Change in Control Agreements

Reorganized Visteon shall be authorized to enter into that certain employment agreement with Donald J. Stebbins delivered by the Debtors to the Requisite Parties on the date of the filing of the Plan with the Bankruptcy Court, effective as of the Effective Date, without any further action, order, or approval of the New Board or the Bankruptcy Court, as applicable. Also, on the Effective Date, Reorganized Visteon shall adopt, approve, and authorize change in control agreements with respect to certain of Reorganized Visteon's officers, in the form delivered by the Debtors to the Requisite Parties on the date of the filing of the Plan with the Bankruptcy Court, without further action, order, or approval of the New Board.

18.     Intercompany Account Settlement

The Debtors and the Reorganized Debtors, and their respective Affiliates, will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

19.     Preservation of Rights of Action

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the**

K&E 17065163.9

**Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain the foregoing Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

20.     Restructuring Transactions

On or prior to the Effective Date, the Debtors or the Reorganized Debtors may enter into the following transactions and take any actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Reorganized Debtors, as and to the extent provided therein, with the consent of the Requisite Parties. The Restructuring Transactions may include the VIHI Restructuring (to which the Requisite Investors shall be deemed to have consented by virtue of their execution of the Equity Commitment Agreement, but subject to the terms and conditions thereof), one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions as may be determined by the Debtors or the Reorganized Debtors, as applicable, to be necessary or appropriate. The actions to effect the Restructuring Transactions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and the Equity Commitment Agreement and that satisfy the requirements of applicable law and any other terms to which the relevant entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and the Equity Commitment Agreement and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (d) pledging, granting of liens or security interests over, assuming or guarantying obligations or taking such similar actions as may be necessary to preserve the rights and collateral interests of the secured creditors of the Debtors and their subsidiaries at all times prior to the effectiveness and consummation of the Plan; and (e) all other

actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions.

21. <u>Post-Effective Date Financing</u>

Unless otherwise refinanced in connection with the Exit Financing, notwithstanding any provision in the Plan to the contrary or section 1141(c) of the Bankruptcy Code, the U.S. Bank L/C Facility Documents and the Currency Contracts, and all rights and obligations of, and Liens held by, the parties thereunder in connection therewith, shall survive and remain in full force and effect on and after the Effective Date in accordance with the terms of the U.S. Bank L/C Facility Documents and Currency Contracts, respectively, and the Final Orders entered on November 12, 2009 in connection therewith [Docket Nos. 1296 and 1297]. On the Effective Date, any and all rights and obligations of the Debtors under the U.S. Bank L/C Facility Documents and the Currency Contracts shall vest in, or become the obligations of, the applicable Reorganized Debtors.

22. <u>Corporate Existence</u>

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and without any further notice to or action, order, or approval of the Bankruptcy Court or any other court of competent jurisdiction (other than any requisite filings required under applicable state, provincial, or federal law).

23. <u>Tax Reporting Matters</u>

All parties (including the Reorganized Debtors and holders of Claims and Interests) shall report for all federal income tax purposes in a manner consistent with the Plan.

## I. **Rights Offering**

1. <u>Election Form</u>

In accordance with the terms of the Rights Offering Procedures, the Debtors will deliver an Election Form to each holder of an Allowed Senior Notes Claim to determine which holders will be considered Eligible Holders and which holders will be considered Non-Eligible Holders. To determine that a holder is an Eligible Holder, such holder must, in accordance with the terms set forth in the Election Form, validly complete and return an Election Form by the Election Form Deadline certifying that such holder is an Accredited Investor. To determine that a holder is a Non-Eligible Holder, such holder must, in accordance with the terms set forth in the Election

Form, validly complete and return an Election Form by the Election Form Deadline certifying that such holder is not an Accredited Investor. Only Eligible Holders shall be permitted to participate in the Rights Offering. Only Non-Eligible Holders shall be permitted to receive the Cash Amount.

2.    Issuance of Subscription Rights

Each Eligible Holder shall receive Subscription Rights entitling such holder to purchase up to its Pro Rata Allocation of the Rights Offering Shares. Each Eligible Holder shall have the right, but not the obligation, to participate in the Rights Offering as set forth in the Plan and in the Rights Offering Procedures.

3.    Oversubscription Rights

Each Eligible Holder that validly exercises in full its Subscription Rights shall be entitled to elect on the Subscription Form to purchase Rights Offering Shares not otherwise subscribed for pursuant to validly exercised Subscription Rights by indicating the number of such unsubscribed shares such Eligible Holder desires to purchase, as set forth herein and in the Rights Offering Procedures, and subject to the terms of the Equity Commitment Agreement.

4.    Transfer Restriction

The Subscription Rights and the Oversubscription Rights are not transferable. Any attempted transfer is null and void and the Debtors will not treat any purported transferee as the holder of any Subscription Right or, if applicable, Oversubscription Right. The Subscription Rights and the Oversubscription Rights shall not be listed or quoted on any public or over-the-counter securities exchange or quotation system.

5.    Subscription Period and Mailing

The Rights Offering shall commence for each Eligible Holder upon its receipt of the Subscription Form and shall end on the Subscription Expiration Date, unless extended by Visteon Corporation with the reasonable consent of the Requisite Investors. As soon as practicable after the Election Form Deadline, Eligible Holders will be mailed Subscription Forms together with instructions for the proper completion, due execution, and timely delivery of such Subscription Forms, as well as instructions for payment.

6.    Exercise of Subscription Rights

Except as provided for in the Equity Commitment Agreement, each Eligible Holder may exercise all or any portion of such holder's Subscription Rights and, if applicable, Oversubscription Rights, pursuant to the Subscription Form. To exercise its Subscription Rights and, if applicable, Oversubscription Rights, an Eligible Holder must: (1) return a validly completed Subscription Form to the Rights Offering Agent so that such Subscription Form is actually received by the Rights Offering Agent on or before the Subscription Expiration Date and (2) pay to the Rights Offering Agent on or before the Subscription Expiration Date the Purchase Price multiplied by the number of shares of New Visteon Common Stock such Eligible Holder

has elected to purchase pursuant to its Subscription Rights and its Oversubscription Rights, in accordance with the wire instructions set forth on the Subscription Form.

If the Rights Offering Agent for any reason does not receive on or prior to the Subscription Expiration Date both a validly completed Subscription Form and immediately available funds as set forth Article VI.I.6 from an Eligible Holder, such Eligible Holder shall be deemed to have relinquished and waived its right to participate in the Rights Offering. The Debtors shall not be obligated to honor any purported exercise of Subscription Rights or Oversubscription Rights received by the Rights Offering Agent after the Subscription Expiration Date regardless of when the documents relating to such exercise were sent. Once the Eligible Holder has validly exercised its Subscription Rights and, if applicable, Oversubscription Rights, such exercise will not be permitted to be revoked, rescinded, or modified.

The payments made in accordance with the Rights Offering shall be deposited and held by the Rights Offering Agent in an escrow account. The Rights Offering Agent will maintain such account for the purpose of holding the money for administration of the Rights Offering until the Effective Date or such other later date at the option of the Reorganized Debtors. The Rights Offering Agent shall not use such funds for any other purpose and shall not encumber or permit such funds to be encumbered with any Lien or similar encumbrance. Such funds shall be held in such escrow account and disbursed only in accordance with the procedures described in this Article VI.I, the Rights Offering Procedures, and the Equity Commitment Agreement.

The Debtors may adopt such additional detailed procedures consistent with the provisions of this Article VI.I.6, the Rights Offering Procedures, and the Equity Commitment Agreement to more efficiently administer the exercise of the Subscription Rights, and, if applicable, Oversubscription Rights.

### 7. Direct Commitment

The Investors shall be obligated to consummate the Direct Commitment on the terms and subject to the conditions of the Equity Commitment Agreement.

### 8. Backstop Commitment

The Investors shall be obligated to consummate their Backstop Commitment with respect to unsubscribed Rights Offering Shares on the terms and subject to the conditions set forth in the Equity Commitment Agreement. The Investors shall for the benefit of Reorganized Visteon deliver to Visteon Corporation, in accordance with section 7.7 of the Equity Commitment Agreement, ten Business Days prior to the date scheduled for the Confirmation Hearing funding approval certificates.

### 9. Debtors' Obligations under the Claims Conversion Sub Plan

Notwithstanding any provision in the Plan, the Plan Support Agreement, the Equity Commitment Agreement, or the Rights Offering Procedures to the contrary, the Debtors shall not be obligated under the Claims Conversion Sub Plan to, and shall not, honor any purported exercise of Subscription Rights or Oversubscription Rights or the satisfaction of the Direct Commitment or Backstop Commitment.

10. <u>Issuance of Rights Offering Shares</u>

Under the Rights Offering Sub Plan, Rights Offering Shares purchased by Eligible Holders shall be issued on the Effective Date and distributed on the Effective Date or as soon as practicable thereafter.

If the number of Rights Offering Shares elected for purchase pursuant to Oversubscription Rights exceeds the number of unsubscribed Rights Offering Shares, then such unsubscribed Rights Offering Shares shall be apportioned to Eligible Holders that exercised such Oversubscription Rights (a) first, to the Lead Investors and their Related Purchasers and their respective affiliates, (b) second, to the Co-Investors and their Related Purchasers and their respective affiliates, and (c) last, if any unsubscribed Rights Offering Shares remain unallocated, to the other Eligible Holders exercising their Oversubscription Rights, in each case pro rata relative to the number of such shares each such Eligible Holder elected to purchase pursuant to its Oversubscription Rights and in accordance with section 2.2(e) of the Equity Commitment Agreement.

Any payment made by an Eligible Holder shall be refunded as soon as practicable (i) upon termination of the Equity Commitment Agreement, (ii) if such Eligible Holder has made an overpayment, in an amount equal to such overpayment, or (iii) under the Claims Conversion Sub Plan. Fractional shares of New Visteon Common Stock shall not be issued upon exercise of the Subscription Rights or Oversubscription Rights and no compensation shall be paid in respect of such fractional shares.

## J. **Entitlement to Funding of Cash Amount Recoveries**

1. <u>Entitlement to Cash Amount Recoveries</u>

Under the Rights Offering Sub Plan, a Non-Eligible Holder shall be entitled to receive the Cash Amount only if such Non-Eligible Holder validly completes and returns an Election Form certifying that it is a Non-Eligible Holder in accordance with the terms set forth in the Election Form. If a Non-Eligible Holder does not duly satisfy such requirements, such holder shall be deemed to have relinquished and waived its right to receive the Cash Amount.

2. <u>Source of Cash for Payment of the Cash Amount</u>

Each Cash Recovery Backstop Investor shall deliver to Visteon Corporation on the later of the date that is (a) ten Business Days prior to the date scheduled for the Confirmation Hearing and (b) five Business Days after delivery of the Purchase Notice a funding approval certificate from an officer or a duly authorized agent of such Cash Recovery Backstop Investor certifying that such Cash Recovery Backstop Investor's credit committee (or such similar governing entity that is responsible for approving such matters in accordance with such Cash Recovery Backstop Investor's normal operations) has approved, subject only to the terms and conditions of the Rights Offering Sub Plan in accordance with the Plan, the funding by such Cash Recovery Backstop Investor of its Distributable Commitment Percentage of (i) the aggregate Cash Amount, and (ii) the Purchase Price multiplied by the number of shares of New Visteon Common Stock constituting the Cash Recovery Subscription Equity. On the Effective Date, each Cash Recovery Backstop Investor shall pay the applicable amounts set forth in the

immediately preceding sentence to Visteon Corporation by wire transfer of immediately available funds to an account designated by Visteon Corporation in writing not less than three Business Days prior to the Effective Date.

Notwithstanding any provision in the Plan, the Plan Support Agreements, or the Equity Commitment Agreement to the contrary, neither the Debtors nor the Cash Recovery Backstop Investors shall be obligated under the Claims Conversion Sub Plan to, and shall not, honor any purported entitlement to the Cash Amount.

      3.      Transfer of New Visteon Common Stock as
                  a Consequence of Cash Amount Distributions

Under the Rights Offering Sub Plan, the Distribution Agent shall on the Effective Date issue, and shall deliver, on the Effective Date, or as soon as practicable thereafter, to the Cash Recovery Backstop Investors pro rata relative to their Allotted Portions the Cash Recovery Subscription Equity.

## K.    **Treatment of Executory Contracts and Unexpired Leases**

      1.      Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided herein, each Executory Contract and Unexpired Lease shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease: (1) is listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement; (2) has been previously assumed by the Debtors by Final Order or has been assumed by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; (3) is the subject of a motion to assume or reject pending as of the Effective Date; (4) is an Intercompany Contract, unless such Intercompany Contract previously was rejected by the Debtors pursuant to a Final Order, is the subject of a motion to reject pending on the Effective Date, or is listed on the schedule of "Rejected Executory Contracts and Unexpired Leases" in the Plan Supplement; or (5) is otherwise assumed pursuant to the terms herein.

The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date. Counterparties to Executory Contracts or Unexpired Leases that are deemed rejected as of the Effective Date shall have the right to assert any Claim on account of the rejection of such Executory Contracts or Unexpired Leases, including under section 502(g) of the Bankruptcy Code, subject to compliance with the requirements herein.

Further, the Plan Supplement will contain a schedule of "Rejected Executory Contracts and Unexpired Leases;" provided, however, that any Executory Contract and Unexpired Lease not previously assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court, and not listed in the schedule of "Rejected Executory Contracts and Unexpired Leases" will be rejected on the Effective Date, notwithstanding its exclusion from such schedule.

2. Assumption of Executory Contracts and Unexpired Leases

On the Effective Date, the Reorganized Debtors shall assume all of the Executory Contracts and Unexpired Leases listed on the schedule of "Assumed Executory Contracts and Unexpired leases" in the Plan Supplement and otherwise identified for assumption pursuant to Article VI.J.1. With respect to each such Executory Contract and Unexpired Lease listed on the schedule of "Assumed Executory Contracts and Unexpired Leases" in the Plan Supplement, the Debtors shall have designated a proposed Cure, and the assumption of such Executory Contracts and Unexpired Leases may be conditioned upon the disposition of all issues with respect to such Cure. The Confirmation Order shall constitute an order of the Bankruptcy Court approving any such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

3. Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated hereunder.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

4. Proofs of Claim Based on Executory
Contracts or Unexpired Leases that Have Been Assumed

Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including hereunder, except Proofs of Claim asserting Cures, pursuant to the order approving such assumption, including the Confirmation Order, shall be deemed disallowed and expunged from the Claims Register as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

5. Indemnification Obligations

Each Indemnification Obligation shall be assumed by the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, to the extent such Indemnification Obligation is executory, unless such Indemnification Obligation previously was rejected by the Debtors pursuant to a Bankruptcy Court order or is the subject of a motion to reject pending on the Effective Date. The Reorganized Debtors reserve the right to honor or reaffirm Indemnification Obligations other than those terminated by a prior or subsequent order of the Bankruptcy Court, whether or not executory, in which case such honoring or reaffirmation shall be in complete satisfaction, discharge, and release of any Claim on account of such Indemnification Obligation. Each Indemnification Obligation that is assumed, deemed assumed, honored, or reaffirmed shall remain in full force and effect, shall not be modified, reduced,

discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

6.     <u>Insurance Policies</u>

Each insurance policy shall be assumed by the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, to the extent such insurance policy is executory, unless such insurance policy previously was rejected by the Debtors pursuant to a Bankruptcy Court order, is the subject of a motion to reject pending on the Effective Date, or is included in the schedule of "Rejected Executory Contracts and Unexpired Leases" contained in the Plan Supplement.

7.     <u>Cure of Defaults for Assumed Executory Contracts and Unexpired Leases</u>

With respect to each of the Executory Contracts or Unexpired Leases listed on the schedule of "Assumed Executory Contracts and Unexpired Leases," the Debtors shall have designated a proposed Cure, and the assumption of such Executory Contract or Unexpired Lease shall be conditioned upon the disposition of all issues with respect to Cure. Such Cure shall be satisfied by the Debtors or their assignee, if any, by payment of the Cure in Cash on the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as may be ordered by the Bankruptcy Court or agreed upon by the parties to the applicable Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court. Any provisions or terms of the Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure, or by an agreed-upon waiver of Cure.

Prior to the Confirmation Hearing, the Debtors shall file with the Bankruptcy Court and serve upon counterparties to such Executory Contracts and Unexpired Leases a notice of the proposed assumption that will (a) list the applicable Cure, if any, (b) describe the procedures for filing objections to the proposed assumption or Cure, and (c) explain the process by which related disputes will be resolved by the Bankruptcy Court. Except with respect to Executory Contracts and Unexpired Leases in which the Debtors and the applicable counterparties have stipulated in writing to payment of Cure, all requests for payment of Cure that differ from the amounts proposed by the Debtors must be filed with the Claims and Solicitation Agent on or before the Cure Bar Date. Any request for payment of Cure that is not timely filed shall be disallowed automatically and forever barred, estopped, and enjoined from assertion and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court, and any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors of the amounts listed on the Debtors' proposed Cure schedule, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary; <u>provided</u>, <u>however</u>, that nothing shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court.

K&E 17065163.9

If the Debtors or Reorganized Debtors, as applicable, object to any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues. If there is a dispute regarding such Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption of any Executory Contract or Unexpired Lease and associated Cure will be deemed to have consented to such assumption and Cure. The Debtors or Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease is made.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

8.     Preexisting Obligations to the Debtors
       Under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such contracts or leases. In particular, notwithstanding any nonbankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts.

9.     Claims Based on Rejection of Executory Contracts or Unexpired Leases

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be filed with the Claims and Solicitation Agent no later than 30 days after the later of the Effective Date or the effective date of rejection. Any Proofs of Claim arising from the rejection of the Executory Contracts or Unexpired Leases that are not timely filed shall be disallowed automatically and forever barred, estopped, and enjoined from assertion and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from

the rejection of the Executory Contracts and Unexpired Leases shall be classified as Other General Unsecured Claims against the applicable Debtor counterparty thereto.

10. **Contracts, Intercompany Contracts, and Leases Entered Into After the Petition Date**

Contracts, Intercompany Contracts, and leases entered into after the Petition Date by any Debtor, and any Executory Contracts and Unexpired Leases assumed by any Debtor, may be performed by the applicable Reorganized Debtor in the ordinary course of business.

11. **Reservation of Rights**

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## L. **Procedures for Resolving Disputed Claims and Interests**

1. **Allowance of Claims and Interests**

After the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date, including the Causes of Action retained pursuant to Article VI.H.19, except with respect to any Claim or Interest deemed Allowed under the Plan. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest is deemed Allowed or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest. All settled claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

2. **Claims and Interests Administration Responsibilities**

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority (a) to file, withdraw, or litigate to judgment, objections to Claims or Interests, (b) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, and (c) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

3. **Estimation of Claims and Interests**

Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any

Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

4. Expungement or Adjustment to Paid,
Satisfied, or Superseded Claims and Interests

Any Claim or Interest that has been paid, satisfied, or superseded, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without a claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

5. No Interest

Unless otherwise specifically provided for in the Plan, required under applicable bankruptcy law, or agreed to by the Debtors, the Confirmation Order, or a postpetition agreement in writing between the Debtors and a holder of a Claim, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

6. Disallowance of Claims or Interests

**EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE DEADLINE FOR FILING SUCH PROOFS OF CLAIM SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT ON OR BEFORE THE LATER OF (1) THE CONFIRMATION HEARING AND (2) 45 DAYS AFTER THE APPLICABLE DEADLINE FOR FILING SUCH PROOFS OF CLAIM.**

All Claims of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if (a) the Entity, on the one hand, and the

Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

7.     Amendments to Claims

On or after the Effective Date, except as otherwise provided herein, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such prior authorization is not received, any such new or amended Claim filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

8.     No Distributions Pending Allowance

If an objection to a Claim or Interest or portion thereof is filed prior to the Effective Date, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest or portion thereof, as applicable, unless and until such Disputed Claim becomes an Allowed Claim or Interest.

9.     Distributions After Allowance

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions, if any, shall be made to the holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the holder of such Claim the distribution, if any, to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.

**M.     Provisions Governing Distributions**

1.     Distributions on Account of Claims Allowed as of the Effective Date

a.     Delivery of Distributions in General

Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the relevant parties on the Distribution Date, the Distribution Agent shall make initial distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date, subject to the Reorganized Debtors' right to object to Claims; provided, however, that (i) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (ii) Allowed Priority Tax Claims and Allowed Secured Tax Claims shall be paid in full in Cash on the Distribution Date or in installment payments over a period not more than five years after the Petition Date pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.  To the

extent any Allowed Priority Tax Claim or Allowed Secured Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim, or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

b.        Delivery of Distributions on Account of DIP Facility Claims

The DIP Facility Administrative Agent shall be deemed to be the holder of all DIP Facility Claims, as applicable, for purposes of distributions to be made hereunder, and the Distribution Agent shall make all distributions on account of such DIP Facility Claims to or on behalf of the DIP Facility Administrative Agent.  The DIP Facility Administrative Agent shall hold or direct such distributions for the benefit of the holders of Allowed DIP Facility Claims, as applicable.  The DIP Facility Administrative Agent shall arrange to deliver such distributions to or on behalf of such holders of Allowed DIP Facility Claims; provided, however, the DIP Facility Administrative Agent shall retain all rights as administrative agent under the DIP Facility Credit Agreement in connection with delivery of distributions to DIP Facility Lenders; and provided further, however, that the Debtors' obligations to make distributions in accordance with Article VI.C.2 shall be deemed satisfied upon delivery of distributions to the DIP Facility Administrative Agent.

c.        Delivery of Distributions on Account of ABL Claims

The ABL Facility Administrative Agent shall be deemed to be the holder of the ABL Claim, as applicable, for purposes of distributions to be made hereunder, and the Distribution Agent shall make all distributions on account of such Allowed ABL Claim to or on behalf of the ABL Facility Administrative Agent.  The ABL Facility Administrative Agent shall hold or direct such distributions for the benefit of the holder of the Allowed ABL Claim, as applicable.  The ABL Facility Administrative Agent shall arrange to deliver such distributions to or on behalf of the holder of the Allowed ABL Claim; provided, however, the ABL Facility Administrative Agent shall retain all rights as administrative agent under the ABL Facility Credit Agreement in connection with delivery of distributions to the ABL Lender; and provided further, however, that the Debtors' obligations to make distributions in accordance with Article VI.E shall be deemed satisfied upon delivery of distributions to the ABL Facility Administrative Agent.

d.        Delivery of Distributions on Account of the Term Loan Facility Claims

The Term Loan Facility Administrative Agent shall be deemed to be the holder of the Term Loan Facility Claims, as applicable, for purposes of distributions to be made hereunder, and the Distribution Agent shall make all distributions on account of such Allowed Term Loan Facility Claims to or on behalf of the Term Loan Facility Administrative Agent.  The Term Loan Facility Administrative Agent shall hold or direct such distributions for the benefit of the holders of the Allowed Term Loan Facility Claims, as applicable.   The Term Loan Facility Administrative Agent shall arrange to deliver such distributions to or on behalf of the holders of the Allowed Term Loan Facility Claims; provided, however, the Term Loan Facility Administrative Agent shall retain all rights as administrative agent under the Term Loan Agreement in connection with delivery of distributions to the Term Loan Lenders; and provided further, however, that the Debtors' obligations to make distributions in accordance with Article

VI.F.6 shall be deemed satisfied upon delivery of distributions to the Term Loan Facility Administrative Agent.

e.     Delivery of Distributions on Account of the 7.00% Senior Notes Claims

The Notes Trustee shall be deemed to be the holder of the 7.00% Senior Notes Claims, as applicable, for purposes of distributions to be made hereunder, and the Distribution Agent shall make all distributions on account of such 7.00% Senior Notes Claims to or on behalf of the Notes Trustee.  The Notes Trustee shall hold or direct such distributions for the benefit of the holders of the 7.00% Senior Notes Claims, as applicable.  The Notes Trustee shall arrange to deliver such distributions to or on behalf of the holders of the 7.00% Senior Notes Claims; provided, however, the Notes Trustee shall retain all rights as indenture trustee under the Notes Indentures in connection with delivery of distributions to the holders of the 7.00% Senior Notes; and provided further, however, that the Debtors' obligations to make distributions in accordance with Article VI.F.6 shall be deemed satisfied upon delivery of distributions to the Notes Trustee.

f.     Delivery of Distributions on Account of the 8.25% Senior Notes Claims

The Notes Trustee shall be deemed to be the holder of the 8.25% Senior Notes Claims, as applicable, for purposes of distributions to be made hereunder, and the Distribution Agent shall make all distributions on account of such 8.25% Senior Notes Claims to or on behalf of the Notes Trustee.  The Notes Trustee shall hold or direct such distributions for the benefit of the holders of the 8.25% Senior Notes Claims, as applicable.  The Notes Trustee shall arrange to deliver such distributions to or on behalf of the holders of the 8.25% Senior Notes Claims; provided, however, the Notes Trustee shall retain all rights as indenture trustee under the Notes Indentures in connection with delivery of distributions to the holders of the 8.25% Senior Notes; and provided further, however, that the Debtors' obligations to make distributions in accordance with Article VI.F.6 shall be deemed satisfied upon delivery of distributions to the Notes Trustee.

g.     Delivery of Distributions on Account of the 12.25% Senior Notes Claims

The Notes Trustee shall be deemed to be the holder of the 12.25% Senior Notes Claims, as applicable, for purposes of distributions to be made hereunder, and the Distribution Agent shall make all distributions on account of such 12.25% Senior Notes Claims to or on behalf of the Notes Trustee.  The Notes Trustee shall hold or direct such distributions for the benefit of the holders of the 12.25% Senior Notes Claims, as applicable.  The Notes Trustee shall arrange to deliver such distributions to or on behalf of the holders of the 12.25% Senior Notes Claims; provided, however, the Notes Trustee shall retain all rights as indenture trustee under the Notes Indentures in connection with delivery of distributions to the holders of the 12.25% Senior Notes; and provided further, however, that the Debtors' obligations to make distributions in accordance with Article VI.F.7 shall be deemed satisfied upon delivery of distributions to the Notes Trustee.

h.     Notes Trustee as Claim Holder

Consistent with Bankruptcy Rule 3003(c), the Reorganized Debtors shall recognize a Proof of Claim filed by the Notes Trustee in respect of the 7.00% Senior Notes Claims, 8.25% Senior Notes Claims, and 12.25% Senior Notes Claims.  Accordingly, any Claim, proof of which

is by the registered or beneficial holder of a Claim, may be disallowed as duplicative of a Claim of the Notes Trustee, without need for any further action or Bankruptcy Court order.

i.     Withholding of Shares of New Visteon Common Stock.

**Notwithstanding anything in the Plan to the contrary, Reorganized Visteon shall hold any shares of New Visteon Common Stock to which a Contingent Holder would otherwise be entitled if it were not a Contingent Holder until such time that such holder provides the Distribution Agent written certification that such holder is not in violation of any laws or regulations of any Governmental Unit.  Such Contingent Holder shall not be a shareholder of Reorganized Visteon and shall have no voting rights or other rights of a shareholder of Reorganized Visteon with respect to such withheld shares.  As soon as reasonably practicable upon receipt by the Distribution Agent of a Contingent Holder's written certification that such holder is in compliance with the laws and regulations of the applicable Governmental Units, but not earlier than the Effective Date, Reorganized Visteon shall release such withheld shares of New Visteon Common Stock for distribution to the Contingent Holder.  To the extent that a Contingent Holder fails to provide the Distribution Agent with such certification within 180 days of the Effective Date, Reorganized Visteon shall be permitted as agent for the Contingent Holder to market for sale that portion of the Allowed Claim or Interest underlying such Contingent Holder's withheld shares of New Visteon Common Stock.  The proceeds of any such sale (minus any fees or expenses incurred by Reorganized Visteon in connection with such sale) shall be distributed to such Contingent Holder as soon as such sale can be facilitated, subject to applicable regulatory approval, if any.  Under the Rights Offering Sub Plan, under no circumstance shall a Contingent Holder have a claim for the return of any funds paid in connection with the purchase of Rights Offering Shares, or, if applicable, be released from its obligations under the Equity Commitment Agreement, unless otherwise provided for therein, solely on account of such holder being a Contingent Holder.**

2.     Distributions on Account of Claims Allowed After the Effective Date

a.     Payments and Distributions on Disputed Claims

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the Periodic Distribution Date that is at least 30 days after the Disputed Claim becomes an Allowed Claim; provided, however, that (i) Disputed Claims that are Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (ii) Disputed Claims that are Priority Tax Claims or Secured Tax Claims that become Allowed Priority Tax Claims or Allowed Secured Tax Claims after the Effective Date shall be paid in full in Cash on the Periodic Distribution Date that is at least 30 days after the Disputed Claim becomes an Allowed Claim or over a five-year period as provided in section 1129(a)(9)(C) of the Bankruptcy Code with annual interest provided by applicable non-bankruptcy law.

b.    Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties (i) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (ii) any Entity that holds both an Allowed Claim or Interest and a Disputed Claim shall not receive any distribution on the Allowed Claim or Interest unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Claims or Interests have been Allowed or expunged.  All distributions made pursuant to the Plan on account of a Disputed Claim that is deemed an Allowed Claim or Interest by the Bankruptcy Court shall be made together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the distributed property as if such Allowed Claim or Interest had been an Allowed Claim or Interest on the dates distributions were previously made to holders of Allowed Claims or Interests included in the applicable Class; provided, however, that no interest shall be paid on account to such Allowed Claims or Interests unless required under applicable bankruptcy law.

3.    Delivery of Distributions

a.    Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed and the Distribution Agent shall be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.  Notwithstanding the foregoing, if a Claim or Interest, other than one based on a publicly traded Certificate is transferred less than 20 days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

b.    Distribution Process

The Distribution Agent shall make all distributions required under the Plan, except that distributions to holders of Allowed Claims governed by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement.  Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to holders of Allowed Claims or Interests shall be made to holders of record as of the Distribution Record Date by the Distribution Agent or a Servicer, as appropriate:  (i) to the signatory set forth on any of the Proofs of Claim filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is filed or if the Debtors have been notified in writing of a change of address); (ii) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related Proof of Claim; (iii) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004 if no Proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address; (iv) at the addresses reflected in the Schedules if

no Proof of Claim has been filed and the Distribution Agent has not received a written notice of a change of address; or (v) on any counsel that has appeared in the Chapter 11 Cases on the holder's behalf. The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan.

### c.     Accrual of Dividends and Other Rights

For purposes of determining the accrual of dividends or other rights after the Effective Date, New Visteon Common Stock shall be deemed distributed as of the Effective Date regardless of the date on which it is actually issued, dated, authenticated, or distributed; *provided however*, the Reorganized Debtors shall not pay any such dividends or distribute such other rights, if any, until after distributions of New Visteon Common Stock actually take place.

### d.     Compliance Matters

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

### e.     Foreign Currency Exchange Rate

Except as otherwise provided in the Plan or a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate as of Thursday, May 28, 2009 as quoted at 4:00 p.m. (EDT), mid-range spot rate of exchange for the applicable currency as published in *The Wall Street Journal, National Edition*, on Friday, May 29, 2009.

### f.     Fractional, De Minimis, Undeliverable, and Unclaimed Distributions

#### (i)     Fractional Distributions

Notwithstanding any other provision of the Plan to the contrary, payments of fractions of shares of New Visteon Common Stock shall not be made and shall be deemed to be zero, and the Distribution Agent shall not be required to make distributions or payments of fractions of dollars. Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

Neither the Distribution Agent nor any Servicer shall have any obligation to make a distribution on account of an Allowed Claim or Interest if (i) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date in question is or has an economic value less than $250,000.00, or (ii) the amount to be distributed to the specific holder of an Allowed Claim on the particular Periodic Distribution Date does not constitute a final distribution to such holder.

(iii)     Undeliverable Distributions

If any distribution to a holder of an Allowed Claim or Interest is returned to a Distribution Agent as undeliverable, no further distributions shall be made to such holder unless and until such Distribution Agent is notified in writing of such holder's then-current address, at which time all currently due missed distributions shall be made to such holder on the next Periodic Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is cancelled pursuant to Article VI.M.3.f(iv), and shall not be supplemented with any interest, dividends, or other accruals of any kind.

(iv)     Reversion

Any distribution under the Plan that is an Unclaimed Distribution for a period of six months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the Reorganized Debtors and, to the extent such Unclaimed Distribution is New Visteon Common Stock, shall be deemed cancelled. Upon such revesting, the Claim of any holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary. The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Debtors, the Reorganized Debtors, or the Distribution Agent made pursuant to any indenture or Certificate (but only with respect to the initial distribution by the Servicer to holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized holders distribute), notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned, or unclaimed property law.

g.     Surrender of Cancelled Instruments or Securities

On the Effective Date or as soon as reasonably practicable thereafter, each holder of a Certificate, except holders of Class I Claims, shall surrender such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer). Such Certificate shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. No distribution of property pursuant to the Plan shall be made to or on behalf of any such holder unless and until such

Certificate is received by the Distribution Agent or the Servicer or the unavailability of such Certificate is reasonably established to the satisfaction of the Distribution Agent or the Servicer pursuant to the provisions of Article VI.M.3.h.  Any holder who fails to surrender or cause to be surrendered such Certificate or fails to execute and deliver an affidavit of loss and indemnity acceptable to the Distribution Agent or the Servicer prior to the first anniversary of the Effective Date, shall have its Claim discharged with no further action, be forever barred from asserting any such Claim against the relevant Reorganized Debtor or its property, be deemed to have forfeited all rights, and Claims with respect to such Certificate, and not participate in any distribution under the Plan; furthermore, all property with respect to such forfeited distributions, including any dividends or interest attributable thereto, shall revert to the Reorganized Debtors, notwithstanding any federal or state escheat, abandoned, or unclaimed property law to the contrary.  Notwithstanding the foregoing paragraph, this Article VI.M.3.g shall not apply to any Claims reinstated pursuant to the terms of the Plan.

h.       Lost, Stolen, Mutilated, or Destroyed Debt Securities

Any holder of Allowed Claims evidenced by a Certificate that has been lost, stolen, mutilated, or destroyed shall, in lieu of surrendering such Certificate, deliver to the Distribution Agent or Servicer, if applicable, an affidavit of loss acceptable to the Distribution Agent or Servicer setting forth the unavailability of the Certificate, and such additional indemnity as may be required reasonably by the Distribution Agent or Servicer to hold the Distribution Agent or Servicer harmless from any damages, liabilities, or costs incurred in treating such holder as a holder of an Allowed Claim or Interest.  Upon compliance with this procedure by a holder of an Allowed Claim evidenced by such a lost, stolen, mutilated, or destroyed Certificate, such holder shall, for all purposes pursuant to the Plan, be deemed to have surrendered such Certificate.

4.       Claims Paid or Payable by Third Parties

a.       Claims Paid by Third Parties

The Claims and Solicitation Agent shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  To the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

b.       Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by

a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Claims and Solicitation Agent without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

c.    Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

5.    Setoffs

Except as otherwise expressly provided for in the Plan or in an Accommodation Agreement, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any Claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such holder. In no event shall any holder of Claims be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtor or Reorganized Debtor, as applicable, unless such holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

6.    Allocation Between Principal and Accrued Interest

Except as otherwise provided in the Plan, the aggregate consideration paid to holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, accrued through the Effective Date.

**N.    Effect of Confirmation of the Plan**

1.    Discharge of Claims and Termination of Interests

**Except with respect to Claims, if any, held by Investors arising under the Equity Commitment Agreement or as otherwise provided in the Plan and effective as of the**

**Effective Date:** (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (b) the Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

2. <u>Subordinated Claims</u>

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

3. <u>Compromise and Settlement of Claims and Controversies</u>

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan or any distribution to be made on account of an Allowed Claim or Interest, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that any such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

4. <u>Releases by the Debtors</u>

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after the**

Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, their Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence, or as otherwise provided in the Plan.

5.      Releases by Holders of Claims and Interests

As of the Effective Date, the Releasing Parties are deemed to have released and discharged the Debtors, the Reorganized Debtors, their Estates, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Disclosure Statement, the Plan Supplement or Equity Commitment Agreement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any (a) post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) Claims held by Investors arising under the Equity Commitment Agreement.  For the avoidance of doubt, nothing in this paragraph shall in any way affect the operation of Article VI.N.1, pursuant to section 1141(d) of the Bankruptcy Code.

6. Exculpation

**The Exculpated Parties shall neither have, nor incur any liability to any Entity for any Exculpated Claim; provided, however, that the foregoing "exculpation" shall have no effect on the liability of (a) any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct or (b) any Debtor or Reorganized Debtor not exculpated pursuant to the Equity Commitment Agreement in connection with Claims arising under the Equity Commitment Agreement.**

**The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the New Visteon Common Stock pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violations of any applicable, law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

7. Injunction

**From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner, any suit, action, or other proceeding, on account of or respecting any Claim, demand, Lien, liability, obligation, debt, right, Cause of Action, Interest, or remedy released or to be released, exculpated, or to be exculpated pursuant to the Plan or the Confirmation Order.**

8. Protection Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom such Reorganized Debtors have been associated, solely because one of the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor is granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

9. Indemnification

Except as otherwise provided in the Plan, all indemnification provisions currently in place (whether in the by-laws, certificates of incorporation, articles of limited partnership, board resolutions, contracts, or otherwise) for the directors, officers, employees, attorneys, other professionals, and agents of the Debtors that served in such capacity from and after the Petition Date and such directors' and officers' respective affiliates, shall be reinstated (or assumed, as the case may be), and shall survive effectiveness of the Plan.

10. Recoupment

In no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

11. Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

12. Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent or (b) the relevant holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

O. **Conditions Precedent to Consummation of the Plan**

1. Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article VI.O.2 hereof:

    a.    the Confirmation Order shall have become a Final Order in form and substance reasonably acceptable to the Debtors and the Requisite Parties;

    b.    all guaranties (including by non-Debtors) in connection with obligations under the Term Loan Facility, and all other obligations being discharged under the Plan, shall have been released or otherwise addressed in a manner reasonably acceptable to the Debtors and the Requisite Parties, and all Liens or pledges securing obligations under the Term Loan Facility (or any guarantee thereof) shall have been released or otherwise addressed in a manner reasonably acceptable to the Debtors and the Requisite Parties;

K&E 17065163.9

c.     all actions, documents, Certificates, and agreements necessary to implement the Plan, shall have (a) all conditions precedent to such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements, (b) been tendered for delivery, (c) to the extent required, been filed with and approved by any applicable Governmental Units in accordance with applicable laws, and (d) been effected or executed;

d.     all matters relating to Ford Motor Company have been resolved to the reasonable satisfaction of the Requisite Parties, provided, upon resolution of such matters, Ford Motor Company shall be released from liability in connection therewith pursuant to Bankruptcy Rule 9019;

e.     under the Rights Offering Sub Plan, all conditions to the effectiveness of the Equity Commitment Agreement shall have been satisfied or waived in accordance with the terms thereof; and

f.     under the Rights Offering Sub Plan, the Debtors or Reorganized Debtors, as applicable, shall have entered into the Exit Financing and drawn an amount thereunder as of the Effective Date that together with the proceeds of the Rights Offering is sufficient to fund payment in full to holders of Allowed Term Loan Facility Claims pursuant to Article VI.F.5.c.

2.     Waiver of Conditions Precedent

Subject to the terms of the Equity Commitment Agreement, the Debtors and the Requisite Parties may jointly waive any of the conditions to the Effective Date set forth in Article VI.O.1 at any time without any notice to other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan.

3.     Effect of Non-Occurrence of Conditions to Consummation

If prior to Consummation, the Confirmation Order is vacated pursuant to a Final Order, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

## P.     **Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

o       allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

o       decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

o       resolve any matters related to Executory Contracts or Unexpired Leases, including: (1) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (2) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (3) the Reorganized Debtors' amendment, modification, or supplement, after the Effective Date, pursuant to 0, of the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (4) any dispute regarding whether a contract or lease is or was executory or expired;

o       ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

o       adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

o       adjudicate, decide, or resolve any and all matters related to Causes of Action;

o       adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

o       enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

o       enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

o       grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

K&E 17065163.9

- resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

- enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of all contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases;

- issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

- resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VI.N and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

- resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid pursuant to Article VI.M.3.b;

- enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

- determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

- enter an order or Final Decree concluding or closing the Chapter 11 Cases;

- consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

- determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

- hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

- hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

o        hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

o        hear and determine matters related to the Accommodation Agreements and related agreements;

o        enforce all orders previously entered by the Bankruptcy Court; and

o        hear any other matter not inconsistent with the Bankruptcy Code.

## Q.    Miscellaneous Provisions

### 1.    No Stay of Confirmation Order

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.

### 2.    Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in the Plan (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order, subject to, and in accordance with, the terms of each of the Plan Support Agreements, (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan with the consent of the Requisite Parties, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan, and (c) the Debtors reserve the right to modify the Plan, subject to, and in accordance with, the terms of each of the Plan Support Agreements, to implement the sale of all or substantially all of the assets of the Debtors pursuant to sections 363 and 1123(a)(5)(D) of the Bankruptcy Code.

### 3.    Revocation or Withdrawal of Plan

The Debtors reserve the right, subject to, and in accordance with, the terms of each of the Plan Support Agreements, to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then (a) the Plan will be null and void in all respects, (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects, and (b) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims, Interests, or Causes of Action, (ii) prejudice in any manner the rights of any Debtor or any other Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

4. Confirmation of the Plan

The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code. The Debtors reserve the right to amend the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

5. Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, subject to, and in accordance with, the terms of each of the Plan Support Agreements. The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

6. Payment of Statutory Fees

All fees payable pursuant to 28 U.S.C. §1930(a), as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

7. Dissolution of Creditors' Committee

On the Confirmation Date, the Creditors' Committee shall dissolve automatically, and its members shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases; provided, however, that the Creditors' Committee shall be deemed to remain in existence solely with respect to applications filed pursuant to sections 330 and 331 of the Bankruptcy Code.

8. Role of the Oversight Committee

The Oversight Committee shall have the right to monitor the manner and timing of the processing of the allowance and disallowance of Class H Claims and the manner and timing of distributions under the Plan to holders of Allowed Class H Claims, and to receive from the Reorganized Debtors upon reasonable request information, and be heard by the Bankruptcy Court, in connection with the foregoing. In addition, the Oversight Committee shall have the right to object and be heard by the Bankruptcy Court with respect to any reconciliation or resolution of any Disputed Claim that is a Class H Claim that has a face amount as filed of greater than or equal to $2.0 million, provided such Claim is not a Trade Claim, subject to the Reorganized Debtors' business judgment to reconcile or resolve any such Claim. The Oversight Committee shall automatically dissolve following the reconciliation or resolution and final distribution under the Plan on account of all Class H Claims.

The Oversight Committee may retain only those advisors that are retained on terms that are reasonably acceptable to the Reorganized Debtors or authorized to be retained by further order of the Bankruptcy Court and the Reorganized Debtors shall compensate such advisors in the ordinary course of business for reasonable fees and expenses incurred in rendering services to the Oversight Committee in connection with its exercise of the objection rights contemplated in this Article VI.Q.8.

9.     Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

10.     Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

11.     Service of Documents

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

K&E 17065163.9

| Debtors | Counsel to the Debtors |
|---|---|
| Visteon Corporation<br>One Village Center Drive<br>Van Buren Township, MI 48111<br>Attn.: Michael K. Sharnas, Esq. | Pachulski Stang Ziehl & Jones LLP<br>919 North Market Street, 17th Floor<br>Wilmington, DE 19899-8705<br>Attn.: Laura Davis Jones, Esq.<br>James E. O'Neill, Esq.<br>Timothy P. Cairns<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, IL 60654<br>Attn.: James H. M. Sprayregen, P.C.<br>James J. Mazza, Jr., Esq.<br>Sienna R. Singer, Esq.<br><br>601 Lexington Avenue<br>New York, NY 10022-4611<br>Attn.: Marc Kieselstein, P.C.<br>Brian S. Lennon, Esq. |
| **Counsel to the Investors** | |
| White & Case LLP<br>1155 Avenue of the Americas<br>New York, NY 10036<br>Attn.: Thomas E Lauria, Esq.<br>Gerard Uzzi, Esq.<br>Andrew C. Ambruoso, Esq.<br><br>Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>New York, NY 10036<br>Attn.: Michael Stamer, Esq.<br>Arik Preis, Esq. | Fox Rothschild LLP<br>919 North Market Street, Suite 1600<br>Wilmington, DE 19801<br>Attn: Jeffrey M. Schlerf, Esq.<br>Eric M. Sutty, Esq.<br>John H. Strock, Esq.<br><br>Blank Rome LLP<br>1201 Market Street, Suite 800<br>Wilmington, DE 19801<br>Attn.: Stanley Tarr, Esq. |

K&E 17065163.9

| Counsel to the Creditors' Committee | |
| --- | --- |
| Brown Rudnick LLP<br>Seven Times Square<br>New York, NY 10036<br>Attn.: Robert J. Stark, Esq.<br><br>Brown Rudnick LLP<br>One Financial Center<br>Boston, MA 02111<br>Attn.: Jeremy B. Coffey, Esq. | Brown Rudnick LLP<br>City Place I<br>Hartford, CT 06103<br>Attn.: Howard L. Siegel, Esq.<br><br>Ashby & Geddes, P.A.<br>500 Delaware Avenue, 8th Floor<br>Wilmington, DE 19801<br>Attn.: William P. Bowden, Esq.<br>Gregory A. Taylor, Esq. |
| **Counsel to the Term Loan Lenders** | **Counsel to DIP Facility Lenders** |
| Bingham McCutchen LLP<br>One Federal Street<br>Boston, MA 02110-1726<br>Attn.: Michael Reilly<br>Amy Kyle<br><br>One State Street<br>Hartford, CT 06103-3178<br>Attn.: Peter H. Bruhn | Bingham McCutchen LLP<br>One Federal Street<br>Boston, MA 02110-1726<br>Attn.: Michael Reilly<br>Amy Kyle<br><br>One State Street<br>Hartford, CT 06103-3178<br>Attn.: Peter H. Bruhn |
| **United States Trustee** | **Counsel to ABL Lender** |
| Office of the United States Trustee<br>for the District of Delaware<br>844 King Street, Suite 2207<br>Wilmington, DE 19801<br>Attn.: Jane M. Leamy, Esq. | McGuireWoods LLP<br>EQT plaza<br>625 Liberty Avenue, 23rd Floor<br>Pittsburgh, PA 15222-3142<br>Attn.: Mark E. Freedlander |

12. <u>Term of Injunctions or Stays</u>

**Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

13.    Entire Agreement

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

Notwithstanding anything to the contrary in the Plan (including any amendments, supplements, or modifications to the Plan) or the Confirmation Order (and any amendments, supplements, or modifications thereto) or an affirmative vote to accept the Plan submitted by any Investor, nothing contained in the Plan (including any amendments, supplements, or modifications thereto) shall alter, amend, or modify the rights of the Investors under the Equity Commitment Agreement.

14.    Plan Supplement Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from http://www.kccllc.net/Visteon or the Bankruptcy Court's website at www.deb.uscourts.gov. Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

15.    Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the Debtors' consent, and (c) nonseverable and mutually dependent.

## ARTICLE VII.
## SECURITIES LAW MATTERS

### A.    Securities Law Matters Under the Rights Offering Sub Plan

Under the Rights Offering Sub Plan, (1) shares of New Visteon Common Stock issued in connection with the Pro Rata distribution of 4.9% of New Visteon common stock to all Note Holders ("Pro Rata Common Stock") and (2) warrants to purchase shares of New Visteon

Common Stock issued to 12.25% Senior Notes Claims as consideration on account of the Domestic Subsidiary Guarantees ("<u>Senior Note Common Stock</u>") will, in each case, be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon the exemption set forth in section 1145(a)(1) of the Bankruptcy Code and may be resold by holders thereof without registration, unless the holder is an "underwriter" (as defined in section 1145(b)(1) of the Bankruptcy Code) with respect to such securities, subject to the terms thereof and applicable securities laws. Other than Pro Rata Common Stock and Senior Notes Common Stock, all shares of New Visteon Common Stock issued under the Rights Offering Plan ("<u>Rights Offering Stock</u>") will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 4(2) of the Securities Act or Regulation D promulgated thereunder. All shares of Rights Offering Stock issued pursuant to the exemption from registration set forth in section 4(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

**B.       Securities Law Matters Under the Claims Conversion Sub Plan**

Under the Claims Conversion Sub Plan, all shares of New Visteon Common Stock issued in connection with the Claims Conversion Sub Plan ("<u>Claims Conversion Common Stock</u>") will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon the exemption set forth in section 1145(a)(1) of the Bankruptcy Code and may be resold by holders thereof without registration, unless the holder is an "underwriter" (as defined in section 1145(b)(1) of the Bankruptcy Code) with respect to such securities, subject to the terms thereof and applicable securities laws. Pro Rata Common Stock, Senior Notes Common Stock and Claims Conversion Common Stock, together, are referred to herein as "1145 Securities".

**C.       Section 1145 of the Bankruptcy Code**

Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to a registration exemption under section 1145(a)(1) of the Bankruptcy Code are deemed to have been issued pursuant to a public offering. Therefore, the securities issued pursuant to the section 1145 exemption may generally be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by section 4(1) thereof, unless the holder is an "underwriter" with respect to such securities, as such term is defined in section 1145(b)(1) of the Bankruptcy Code. In addition, such securities generally may be resold by the recipients thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states. However, recipients of securities issued under the Plan are advised to consult with their own counsel as to the availability of any such exemption from registration under federal securities laws and any relevant state securities laws in any given instance and as to any applicable requirements or conditions to the availability thereof.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" for purposes of the Securities Act as one who, subject to certain exceptions, (1) purchases a claim with a view to distribution of any security to be received in exchange for such claim, or (2) offers to sell securities offered or sold under the plan for the holders of such securities, or (3) offers to buy

securities issued under the plan from the holders of such securities, if the offer to buy is made with a view to distribution of such securities, and if such offer is under an agreement made in connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan, or (4) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities.

The term "issuer," as used in section 2(a)(11) of the Securities Act, includes any person directly or indirectly controlling or controlled by, an issuer of securities, or any person under direct or indirect common control with such issuer. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a debtor or its successor under a plan of reorganization may be deemed to be "in control" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns at least ten percent (10%) of the voting securities of a reorganized debtor may be presumed to be a "control person."

To the extent that persons deemed "underwriters" receive securities under the Plan pursuant to the exemption from registration set forth in section 1145 of the Bankruptcy Code, resales of such securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Holders of such securities may, however, be able, at a future time and under certain conditions described below, to sell such securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act.

## D.      Section 4(2) of the Securities Act/Regulation D

Section 4(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering will be exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor promulgated by the United States Securities and Exchange Commission under the Securities Act.

The term "issuer," as used in section 4(2) of the Securities Act, means, among other things, a person who issues or proposes to issue any security. Securities issued pursuant to the exemption provided by section 4(2) of the Securities Act or Regulation D promulgated thereunder are considered "restricted securities." As a result, resales of such securities may not be exempt from the registration requirements of the Securities Act or other applicable law. Holders of such restricted securities may, however, be able, under certain conditions described below, to sell such restricted securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act.

## E.      Resales of New Common Stock/Rule 144 and Rule 144A

To the extent that persons who receive 1145 Securities are deemed to be "underwriters" (collectively, the "Restricted Holders"), resales of such securities by Restricted Holders would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities

K&E 17065163.9

Act or other applicable law. Restricted Holders would, however, be permitted to sell New Common Stock without registration if they are able to comply with the applicable provisions of Rule 144 under the Securities Act, as described further below, or if such securities are registered with the Securities and Exchange Commission. Any person who is an "underwriter" but not an "issuer" with respect to an issue of securities (other than a holder of restricted securities) is, in addition, entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b)(1) of the Bankruptcy Code.

Persons who purchase Rights Offering Stock pursuant to the exemption from registration set forth in section 4(2) of the Securities Act or Regulation D promulgated thereunder will hold "restricted securities." Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Holders of restricted securities would, however, be permitted to resell New Visteon Common Stock without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A under the Securities Act, as described further below, or if such securities are registered with the Securities and Exchange Commission.

Under certain circumstances, Restricted Holders and holders of restricted securities may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 provides that if certain conditions are met (e.g., that the availability of current public information with respect to the issuer, volume limitations, and notice and manner of sale requirements), specified persons who resell restricted securities or who resell securities which are not restricted but who are "affiliates" of the issuer of the securities sought to be resold, will not be deemed to be "underwriters" as defined in section 2(a)(11) of the Securities Act. Rule 144 provides that: (1) a non-affiliate who has not been an affiliate during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is current public information regarding the issuer and after a one year holding period if there is not current public information regarding the issuer at the time of the sale; and (2) an affiliate may sell restricted or other securities after a six-month holding period if at the time of the sale there is current public information regarding the issuer, and also may sell restricted or other securities after a one-year holding period whether or not current public information regarding the issuer at the time of the sale, provided that in each case the affiliate otherwise complies with the volume, manner of sale and notice requirements of Rule 144.

Rule 144A provides a non-exclusive safe harbor exemption from the registration requirements of the Securities Act for resales to certain "qualified institutional buyers" of securities that are "restricted securities" within the meaning of the Securities Act, irrespective of whether the seller of such securities purchased its securities with a view towards reselling such securities, if certain other conditions are met (e.g., the availability of information required by paragraph (d)(4) of Rule 144A and certain notice provisions). Under Rule 144A, a "qualified institutional buyer" is defined to include, among other persons, "dealers" registered as such pursuant to section 15 of the Exchange Act, and entities that purchase securities for their own account or for the account of another qualified institutional buyer and that, in the aggregate, own and invest on a discretionary basis at least $100 million in the securities of unaffiliated issuers. Subject to certain qualifications, Rule 144A does not exempt the offer or sale of securities that, at the time of their issuance, were securities of the same class of securities then listed on a national

K&E 17065163.9

securities exchange (registered as such pursuant to section 6 of the Exchange Act) or quoted in a United States automated inter-dealer quotation system.

Certificates evidencing 1145 Securities received by Restricted Holders and certificates evidencing securities issued pursuant to the exemption from registration set forth in section 4(2) of the Securities Act or Regulation D promulgated thereunder, will bear a legend substantially in the form below:

> "THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE I w"ACT"), OR APPLICABLE STATE SECURITIES LAWS ("STATE ACTS") AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR STATE ACTS COVERING SUCH SECURITIES OR THE SECURITIES ARE SOLD AND TRANSFERRED IN A TRANSACTION THAT IS EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT."

Any holder of a certificate evidencing shares of New Visteon Common Stock bearing such legend may present such certificate to the transfer agent for the share of New Visteon Common Stock for exchange for one or more new certificates not bearing such legend or for transfer to a new holder without such legend at such times as (a) such shares are sold pursuant to an effective registration statement under the Securities Act or (b) in the case of shares issued under the Plan pursuant to the exemption from registration set forth in section 1145 of the Bankruptcy Code, such holder delivers to Reorganized Visteon an opinion of counsel reasonably satisfactory to Reorganized Visteon to the effect that such shares are no longer subject to the restrictions applicable to "underwriters" under section 1145 of the Bankruptcy Code or (c) such holder delivers to Reorganized Visteon an opinion of counsel reasonably satisfactory to Reorganized Visteon to the effect that such shares are no longer subject to the restrictions pursuant to an exemption under the Securities Act and such shares may be sold without registration under the Securities Act, in which event the certificate issued to the transferee will not bear such legend.

WHETHER OR NOT ANY PARTICULAR PERSON WOULD BE DEEMED TO BE AN "UNDERWRITER" OF SECURITIES TO BE ISSUED PURSUANT TO THE PLAN OR AN "AFFILIATE" OF REORGANIZED VISTEON WOULD DEPEND UPON VARIOUS FACTS AND CIRCUMSTANCES APPLICABLE TO THAT PERSON. ACCORDINGLY, THE DEBTORS AND REORGANIZED VISTEON EXPRESS NO VIEW AS TO WHETHER ANY SUCH PERSON WOULD BE SUCH AN "UNDERWRITER" OR AN "AFFILIATE." IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE OF REORGANIZED VISTEON, THE DEBTORS AND REORGANIZED VISTEON MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES OF REORGANIZED VISTEON. ACCORDINGLY, IT IS RECOMMENDED THAT POTENTIAL RECIPIENTS OF ANY SECURITIES TO BE ISSUED PURSUANT TO

THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

## ARTICLE VIII.
## STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

The following is a brief summary of the Confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

### A.    The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code provides that the Bankruptcy Court, after notice, may conduct the Confirmation Hearing to consider Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

### B.    Confirmation Standards

Among the requirements for the Confirmation of the Plan are that the Plan is accepted by all Impaired Classes of Claims and Interests, or if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, is feasible, and is in the "best interests" of holders of Claims and Interests that are Impaired under the Plan. The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a plan of reorganization. The Debtors believe that the Plan fully complies with the statutory requirements for Confirmation of the Plan listed below.

1.    The proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code.

2.    The Plan has been proposed in good faith and not by any means forbidden by law.

3.    Any payment made or to be made by the proponent, by the Debtor, or by a person issuing securities or acquiring property under a Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

4.    The proponent of the Plan has disclosed the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an Affiliate of the Debtor participating in a joint Plan with the Debtor or a successor to the Debtor under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of Creditors and holders of Interests and with public policies.

5.    The proponent of the Plan has disclosed the identity of any Insider that will be employed or retained by the Reorganized Debtors and the nature of any compensation for such Insider.

6. With respect to each holder within an Impaired Class of Claims or Interests, each such holder (a) has accepted the Plan, or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

7. With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan, or (b) is Unimpaired under the Plan (subject to the "cram-down" provisions discussed below).

8. Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that:

   o with respect to a Claim of a kind specified in sections 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the Effective Date of the Plan, the holder of the Claim will receive on account of such Claim Cash equal to the Allowed amount of such Claim, unless otherwise agreed;

   o with respect to a Class of Claim of the kind specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each holder of a Claim of such Class will receive (a) if such Class has accepted the Plan, deferred Cash payments of a value, on the Effective Date of the Plan, equal to the Allowed amount of such Claim; or (b) if such Class has not accepted the Plan, Cash on the Effective Date of the Plan equal to the Allowed amount of such Claim; and

   o with respect to a priority tax claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of such Claim will receive on account of such Claim deferred Cash payments, over a period not exceeding six years after the date of assessment of such Claim, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim.

9. If a Class of Claims is Impaired under the Plan, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider.

10. Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

11. All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on Confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

## C.    Liquidation Analyses

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each holder of an Impaired Claim or Interest either (1) accept the Plan or (2) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The Liquidation Analyses, attached hereto as **Exhibit D**, were prepared in connection with the March 15, 2010 plan of reorganization but have been updated to reflect a new Effective Date and other assumptions impacted by timing.    Based on the Liquidation Analyses, the Debtors believe that the value of any distributions if the Debtors' Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be no greater than the value of distributions under each Sub Plan.    As a result, the Debtors believe holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of Confirmation of the Plan as they would recover through a hypothetical chapter 7 liquidation.

## D.    Valuation Analysis

Because certain distributions contemplated by each of the Sub Plans are composed of equity in the Reorganized Debtors, the Debtors determined it was necessary to estimate the reorganized value of their businesses.    Accordingly, Rothschild has performed an analysis of the estimated value of the Reorganized Debtors on a going-concern basis.    The Valuation Analysis should be considered in conjunction with the discussion of the risk factors contained in Article VIII.    The Valuation Analysis is dated as of April 28, 2010 and is based on data and information as of that date.    Rothschild makes no representations as to changes to such data and information that may have occurred since April 28, 2010.

In preparing the Valuation Analysis, Rothschild has, among other things: (1) reviewed certain recent available financial results of the Debtors; (2) reviewed certain internal financial and operating data of the Debtors, including the business projections prepared and provided by the Debtors' management to Rothschild on April 9, 2010 relating to their businesses and their prospects; (3) discussed with certain senior executives the current operations and prospects of the Debtors; (4) reviewed certain operating and financial forecasts prepared by the Debtors, including the financial projections attached hereto as **Exhibit C** (the "Financial Projections"); (5) discussed with certain senior executives of the Debtors key assumptions related to the Financial Projections; (6) prepared discounted cash flow analyses based on the Financial Projections, utilizing various discount rates; (7) considered the market value of certain publicly-traded companies in businesses reasonably comparable to the operating business of the Debtors; (8) considered the value assigned to certain precedent change-in-control transactions for businesses similar to the Debtors; (9) conducted such other analyses as Rothschild deemed necessary and/or appropriate under the circumstances; and (10) considered a range of potential risk factors.

Rothschild assumed, without independent verification, the accuracy, completeness, and fairness of all of the financial and other information available to it from public sources or as provided to Rothschild by the Debtors or their representatives.    Rothschild also assumed that the Financial Projections have been reasonably prepared on a basis reflecting the Debtors' best estimates and good faith judgment as to future operating and financial performance.    To the

extent the valuation is dependent upon the Reorganized Debtors' achievement of the Financial Projections, the Valuation Analysis must be considered speculative. Rothschild does not make any representation or warranty as to the fairness of the terms of the Plan. In addition to the foregoing, Rothschild relied upon the following assumptions in preparing the Valuation Analysis:

- o     the Reorganized Debtors are able to maintain adequate liquidity to operate in accordance with the Financial Projections;

- o     the Reorganized Debtors operate consistently with the levels specified in the Financial Projections;

- o     the Plan will become effective on June 30, 2010 (the "<u>Assumed Effective Date</u>");

- o     future values were discounted to June 30, 2010;

- o     the Debtors shall have availability of an undrawn revolving facility up to $300.0 million as of the Effective Date;

- o     general financial and market conditions as of the Assumed Effective Date will not differ materially from those conditions prevailing as of the date of the Valuation Analysis of April 28, 2010 (the "<u>Valuation Date</u>");

- o     Rothschild has not considered the impact of a prolonged bankruptcy case and has assumed operations will continue in the ordinary course consistent with the Projections; and

- o     Rothschild did not provide a valuation or other potential outcomes under alternative scenarios such as a prolonged bankruptcy case or a partial or full break-up and sale of the various businesses of the Debtors.

1.     <u>Valuation Methodologies</u>

The following is a summary of certain financial analyses performed by Rothschild to arrive at its range of estimated values. Rothschild's valuation analysis must be considered as a whole. Rothschild has assigned an equal weighting to each methodology to arrive at its value range.

a.     <u>Discounted Cash Flow Analysis</u>

The discounted cash flow analysis ("the <u>DCF</u>") estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. The DCF discounts the expected cash flows by a theoretical or observed discount rate. This approach has three components: (i) calculating the present value of the projected unlevered after-tax free cash flows for a determined period of time, (ii) adding the present value of the terminal value of the cash flows and (iii) subtracting present value of the forecasted pension expense through 2017 (at which time current actuarial forecast indicates no excess cash contribution required).

The DCF calculations were performed on unlevered after-tax free cash flows for the period beginning July 1, 2010 through December 31, 2013, discounted to the Assumed Effective Date (the "Projection Period"). Rothschild utilized the Financial Projections for performing these calculations.

In performing the DCF calculations, Rothschild made assumptions for (x) the weighted average cost of capital (the "Discount Rate"), which is used to calculate the present value of future cash flows and (y) a perpetuity growth rate for the future cash flows, which is used to determine the value of the Reorganized Debtors represented by the time period beyond the Projection Period. Rothschild calculated the Discount Rate with a traditional cost of equity capital calculation using the "capital asset pricing model." Based on this methodology, Rothschild used a Discount Rate range of 14.0% to 16.0% for the Reorganized Debtors, which reflects a number of Visteon and market-specific factors, and is calculated based on the cost of capital for companies that Rothschild deemed comparable. The DCF utilized the perpetuity growth method and thus terminal value is estimated using a long-run growth rate for the period beyond the Projection Period (beyond 2013). The Valuation Analysis uses a perpetuity growth rate for free cash flow of 0.0% - 2.0%. The discount rate range was calculated based on assumed cost of debt and the Capital Asset Pricing Model ("CAPM") using the companies identified for the Comparable Companies Analysis as benchmarks. Projected cash pension payments were discounted on a similar basis at the overall DCF discount rate range of 14.0% - 16.0%

b.    Comparable Companies Analysis

The comparable companies analysis (the "Comparable Companies Analysis") estimates the value of a company based on a comparison of such company's financial statistics with the financial statistics of publicly-traded companies with similar characteristics. Criteria for selecting comparable companies for this analysis include, among other relevant characteristics, similar lines of business, geographic presence, business risks, growth prospects, maturity of businesses, market presence, size and scale of operations. Companies used in the Comparable Companies Analysis include: Calsonic Kansei Corporation, Clarion Co. Ltd., Continental AG, Denso Corporation, Faurecia S.A., Harman International Industries, Inc., Hyundai Mobis, JCI, Sanden Corporation, and Valeo S.A.. The Comparable Companies Analysis establishes benchmarks for valuation by deriving financial multiples and ratios for the comparable companies, standardized using common metrics such as (i) EBITDAP (Earnings Before Interest, Depreciation, Amortization and Pension Expense) and (ii) EBITDAP minus capital expenditures. Because the multiples derived exclude pension expense, Rothschild deducted the total underfunded status of the pension plans in order to calculate equity value.

c.    Precedent Transactions Analysis

The precedent transactions analysis (the "Precedent Transactions Analysis") is based on the enterprise values of companies involved in public or private merger and acquisition transactions that have operating and financial characteristics similar to the Debtors. Under this methodology, the enterprise value of such companies is determined by an analysis of the consideration paid and the debt assumed in the merger, acquisition or restructuring transaction. As in a comparable company valuation analysis, the analysis establishes benchmarks for valuation by deriving financial multiples and ratios, standardized using common variables such

as revenue or EBITDA. Rothschild was unable to utilize an EBITDAP metric for the Precedent Transactions Analysis due to the unavailability of pension expense information for the merger transactions analyzed. Therefore Rothschild relied on the derived EBITDA multiples and then applied these to the Debtors' operating statistics to determine enterprise value. Different than the Comparable Companies Analysis in that the EBITDA metric is already burdened by pension expense (as applicable), Rothschild did not need to separately deduct pension underfunding in order to calculate equity value. Transactions used in the Precedent Transactions Analysis include:

| Target | Acquiror |
| --- | --- |
| Hyundai Autonet (from Continental) | Hyundai Mobis |
| Peguform Gmbh | Polytec Holding |
| Acme Radiator & Air Conditioning | Mobile Climate Control Industries |
| Bosch Corp. | Robert Bosch Gmbh |
| Concentric plc | Haldex AB |
| Fawer Automotive Parts Company | Ningbo Huaxing Electronic Co. |
| Valeo SA – Connective Systems Unit | Leoni AG |
| Trico Products | Kohlberg & Company |
| Dana (Fluid Products Hose & Tubing Business) | Orhan Holding |
| Spectra Premium Industries | Management |
| Maxima Technologies | Actuant Corp. |
| Metair Investments Ltd. | Coronation Capital |
| Lear Corp – Interiors Division | International Automotive Components |
| Motorola – Automotive Electronics Division | Continental AG |
| ITT Industries Inc. – Fluid Handling Systems | Cooper-Standard Automotive |

Unlike the Comparable Company Analysis, the enterprise valuation derived using this methodology reflects a "control" premium, or a premium paid to purchase a majority or controlling position in the assets of a company, for merger and acquisition transactions. Thus, this methodology generally produces higher valuations than the comparable public company analysis. In addition, other factors not directly related to a company's business operations can affect a valuation based on precedent transactions, including (i) circumstances surrounding a merger transaction may introduce other motivations for higher premiums (e.g., a buyer may pay an additional premium for reasons not solely related to competitive bidding), (ii) the market environment is not identical for transactions occurring at different periods of time; and (iii) circumstances pertaining to the financial position of the company may impact the resulting purchase price (e.g., a company is in financial distress and may receive a lower price due to weaker negotiating leverage).

The summary set forth above does not purport to be a complete description of the analyses performed by Rothschild. The preparation of an estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily susceptible to summary description. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. As a result, the estimates set forth herein are not necessarily indicative of actual outcomes, which may be

K&E 17065163.9

significantly more or less favorable than those set forth herein. In addition, such estimates do not purport to be appraisals, nor do they necessarily reflect the values that might be realized if assets were sold. The estimates prepared by Rothschild assume that Reorganized Debtors will continue as the owner and operator of their businesses and assets and that such assets will be operated in accordance with the Debtors' business plan. Depending on the results of the Debtors' operations or changes in the financial markets, Rothschild's valuation analysis as of the Effective Date may differ from that disclosed herein.

2. Variances in the Distributable Equity Value
of Reorganized Visteon Under Each Sub Plan

The distributable equity value of Reorganized Visteon (the "Distributable Equity Value") is calculated by adjusting the total enterprise value calculated under the DCF, Precedent Transactions Analysis, and Comparable Companies Analysis for factors that would impact Reorganized Visteon's Cash and/or debt levels. For example, the Distributable Equity Value includes the value of the Debtors' non-consolidated joint ventures, which is estimated at $195 million. This value is calculated using a discounted cash flow analysis of the dividends projected to be received from these operations and also includes a terminal value based on the perpetuity growth method, where the dividend is assumed to continue into perpetuity at an assumed growth rate. This discounted cash flow analysis utilized a discount rate based on the cost of equity range of 13.0% - 21.0% and a perpetuity growth rate after 2013 of 2.0% - 4.0%. The value of the Debtors' consolidated Entities is already included in the calculation of the Debtors' total enterprise value. For example, the Debtors calculate the value of Halla Korea as a consolidated part of the Debtors' climate business.

To calculate the value of non-controlling minority interests in entities in which the Debtors hold a majority interest, which the Debtors estimate at $424.0 million, the Debtors relied on the closing prices of the publicly-traded stock in Halla Korea and Duck Yang Industry Co. Ltd. ("Duck Yang") as of April 28, 2010 and converted such prices into U.S. dollars at the exchange rate as of April 28, 2010. The values represent 30.0% of Halla Korea's common stock and 49.0% of Duck Yang's common stock which are not owned by the Debtors.

To calculate "excess Cash," Rothschild incorporated the Debtors' projected global Cash balances, deducted Cash amounts that will be used under the Plan (as many of the Creditor Classes are to be paid in Cash) and then made an adjustment for the $397.0 million minimum level of Cash required to maintain operations at local levels as identified by the Debtors' management, $126.0 million of which is the minimum Cash level for Halla entities. The pro forma equity value includes the full stated amount of the remaining Cash, estimated at approximately $213.0 million to $282.0 million (depending on which Sub Plan is executed and the amount of Allowed Class H Claims). The pro forma equity value includes the full stated amount of the remaining Cash, estimated at approximately $213.0 million to $282.0 million (depending on which Sub Plan is executed and the amount of Allowed Class H Claims).

The calculation of Distributable Equity Value does not specifically account for the value of the Debtors' NOLs or other tax credits, which the Debtors estimate total approximately $1.658 billion as of December 31, 2009. The Debtors expect to utilize a significant portion of their NOLs to shield Visteon from paying tax for the cancellation of debt income ("COD Income")

that would otherwise be payable upon emergence from bankruptcy. If the Debtors' NOLs were not available to prevent this tax, the Debtors' cash balance would be lowered by a corresponding amount which would directly translate into reduced Distributable Equity Value.[54]

As described above, recoveries under the Plan are calculated assuming a low and high-end estimate for the total amount of Allowed General Unsecured Claims. Increases in the amount of Allowed General Unsecured Claims will decrease Cash balances of Reorganized Visteon, thus decreasing Distributable Equity Value. Entry into the Exit Financing Facility under the Rights Offering Sub Plan will increase debt levels, thus decreasing Distributable Equity Value. If the Debtors seek to reinstate the Term Loan Facility, the Debtors shall have the option to reduce the Exit Financing Facility dollar-for-dollar by the amount of the Term Loan Facility permanently reinstated under the Plan. Accordingly, the charts below illustrate the Distributable Equity Value of Reorganized Visteon under four constructs: (a) the Rights Offering Sub Plan assuming a low-end Claims estimate for Class H General Unsecured Claims; (b) the Rights Offering Sub Plan assuming a high-end Claims estimate for Class H General Unsecured Claims; (c) the Claims Conversion Sub Plan assuming a low-end Claims estimate for Class H General Unsecured Claims; and (d) the Claims Conversion Sub Plan assuming a high-end Claims estimate for Class H General Unsecured Claims. Under both the Rights Offering Sub Plan and the Claims Conversion Sub Plan, the low-end range of Class H General Unsecured Claims is $107.96 million and the high-end range of Class H General Unsecured Claims is $166.76 million.

a.    Rights Offering Sub Plan – Low-End of Estimated Claims Range

| (In Millions) | DCF | Precedent Transactions Analysis | Comparable Companies Analysis |
|---|---|---|---|
| **Total Enterprise Value** | **$1,990.0** | **$1,980.0** | **$2,345.0** |
| Plus: Value of Interest in Unconsolidated Joint Ventures | 195 | 195 | 195 |
| Less: Minority Interest | (424) | (424) | (424) |
| Less: Halla Net Debt | (82) | (82) | (82) |
| Less: Assumed Pension Underfunding | - | - | (455) |
| Less: Visteon Foreign Debt | (54) | (54) | (54) |
| Less: Exit Financing | (400) | (400) | (400) |
| Plus: Excess Cash | 242 | 242 | 242 |
| **Implied Equity Value** | **$1,465.0** | **$1,455.0** | **$1,370.0** |
| **Distributable Equity Value** | | **$1,430.0** | |

b.    Rights Offering Sub Plan –High-End of Estimated Claims Range

| (In Millions) | DCF | Precedent Transactions | Comparable Companies |
|---|---|---|---|

---

[54]  The Financial Projections do not forecast taxable income in the United States in the foreseeable future. As a consequence, any remaining NOLs offer no tax benefit to the Reorganized Debtors. Conversely, in the foreign jurisdictions where Visteon does project to generate profits, Visteon forecasts paying taxes as it does not benefit from NOLs usable in those regions.

| | | Analysis | Analysis |
|---|---|---|---|
| Total Enterprise Value | $1,990.0 | $1,980.0 | $2,345.0 |
| Plus: Value of Interest in Unconsolidated Joint Ventures | 195 | 195 | 195 |
| Less: Minority Interest | (424) | (424) | (424) |
| Less: Halla Net Debt | (82) | (82) | (82) |
| Less: Assumed Pension Underfunding | - | - | (455) |
| Less: Visteon Foreign Debt | (54) | (54) | (54) |
| Less: Exit Financing | (400) | (400) | (400) |
| Plus: Excess Cash | 213 | 213 | 213 |
| **Implied Equity Value** | **$1,440.0** | **$1,430.0** | **$1,340.0** |
| **Distributable Equity Value** | | **$1,405.0** | |

### c.    Claims Conversion Sub Plan Low-End of Estimated Claims Range

| (In Millions) | DCF | Precedent Transactions Analysis | Comparable Companies Analysis |
|---|---|---|---|
| Total Enterprise Value | $1,990.0 | $1,980.0 | $2,345.0 |
| Plus: Value of Interest in Unconsolidated Joint Ventures | 195 | 195 | 195 |
| Less: Minority Interest | (424) | (424) | (424) |
| Less: Halla Net Debt | (34) | (34) | (34) |
| Less: Assumed Pension Underfunding | - | - | (455) |
| Less: Visteon Foreign Debt | (54) | (54) | (54) |
| Plus: Excess Cash | 282 | 282 | 282 |
| **Implied Equity Value** | **$1,955.0** | **$1,945.0** | **$1,855.0** |
| **Distributable Equity Value** | | **$1,920.0** | |

### d.    Claims Conversion Sub Plan - High-End of Estimated Claims Range

| (In Millions) | DCF | Precedent Transactions Analysis | Comparable Companies Analysis |
|---|---|---|---|
| Total Enterprise Value | $1,990.0 | $1,980.0 | $2,345.0 |
| Plus: Value of Interest in Unconsolidated Joint Ventures | 195 | 195 | 195 |
| Less: Minority Interest | (424) | (424) | (424) |
| Less: Halla Net Debt | (34) | (34) | (34) |
| Less: Assumed Pension Underfunding | - | - | (455) |
| Less: Visteon Foreign Debt | (54) | (54) | (54) |
| Plus: Excess Cash | 253 | 253 | 253 |
| **Implied Equity Value** | **$1,925.0** | **$1,915.0** | **$1,825.0** |
| **Distributable Equity Value** | | **$1,890.0** | |

K&E 17065163.9

These estimated ranges of values are based on a hypothetical value that reflects the estimated intrinsic value of the Debtors derived through the application of various valuation methodologies. The implied reorganized equity value ascribed in this analysis does not purport to be an estimate of any post-reorganization market trading value. Any such trading value may be materially different from the Distributable Equity Value ranges associated with Rothschild's valuation analysis. Rothschild's estimate is based on economic, market, financial, and other conditions as they exist on, and on the information made available as of, the Valuation Date. It should be understood that, although subsequent developments may affect Rothschild's conclusions, before or after the Confirmation Hearing, Rothschild does not have any obligation to update, revise or reaffirm its estimate.

In addition, the valuation of newly issued securities, such as the New Visteon Common Stock, is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the anticipated initial securities held by Creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis, and other factors that generally influence the prices of securities. Actual market prices of such securities also may be affected by other factors not possible to predict. Accordingly, the values estimated by Rothschild do not necessarily reflect, and should not be construed as reflecting, values that will be attained in the public or private markets.

THE FOREGOING VALUATION IS BASED UPON A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR THE REORGANIZED DEBTORS. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RANGES REFLECTED IN THE VALUATION WOULD BE REALIZED IF THE PLAN WERE TO BECOME EFFECTIVE, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HEREIN.

THE ESTIMATED CALCULATION OF ENTERPRISE VALUE IS HIGHLY DEPENDENT UPON ACHIEVING THE FUTURE FINANCIAL RESULTS AS SET FORTH IN THE DEBTORS' FINANCIAL PROJECTIONS, AS WELL AS THE REALIZATION OF CERTAIN OTHER ASSUMPTIONS, NONE OF WHICH ARE GUARANTEED AND MANY OF WHICH ARE OUTSIDE OF THE DEBTORS' CONTROL, AS FURTHER DISCUSSED IN ARTICLE IX OF THE DISCLOSURE STATEMENT.

THE CALCULATIONS OF VALUE SET FORTH HEREIN REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE EQUITY VALUE STATED HEREIN DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE. SUCH VALUE, IF ANY, MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZED EQUITY VALUE RANGES ASSOCIATED WITH THIS VALUATION ANALYSIS. THE VALUATION ANALYSES IS BASED ON DATA AND INFORMATION AS OF THE VALUATION DATE. NO RESPONSIBILITY IS TAKEN FOR CHANGES IN MARKET CONDITIONS THAT MAY HAVE OCCURRED SINCE THE VALUATION DATE AND NO OBLIGATION IS

ASSUMED TO REVISE THIS CALCULATION OF THE REORGANIZED DEBTORS' VALUE TO REFLECT EVENTS OR CONDITIONS THAT SUBSEQUENTLY OCCUR. THE CALCULATIONS OF VALUE DO NOT CONFORM TO THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE OF THE APPRAISAL FOUNDATION.

**E.      Financial Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under each of the Sub Plans.  As part of this analysis, the Debtors have prepared certain Financial Projections.  These Financial Projections and the assumptions upon which they are based, are attached hereto as **Exhibit C**. Based on these Financial Projections, the Debtors believe that given the deleveraging contemplated by both of the Sub Plans, they will be able to make all payments required pursuant to the Plan and, therefore, that Confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

**F.      Acceptance by Impaired Classes**

The Bankruptcy Code also requires, as a condition to Confirmation, that each Class of Claims or Interests that is Impaired but still receives distributions under the Plan vote to accept the Plan, unless the Debtors can "cram-down" such Classes, as described below.  A Class that is Unimpaired is presumed to have accepted the Plan and, therefore, solicitation of acceptances with respect to such Class is not required.  A Class is Impaired unless the Plan leaves unaltered the legal, equitable, and contractual rights to which the Claim or Interest entitles the holder of such Claim or Interest to, or the Debtors cure any default and reinstate the original terms of the obligation.

Pursuant to sections 1126(c) and 1126(d) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code: (1) an Impaired Class of Claims has accepted the Plan if the holders of at least two-thirds in dollar amount and more than half in number of the voting Allowed Claims have voted to accept the Plan and (2) an Impaired Class of Interests has accepted the Plan the holders of at least two-thirds in amount of the Allowed interests of such Class actually voting have voted to accept the plan.

**G.      Confirmation Without Acceptance By All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm the Plan, even if the Plan has not been accepted by all Impaired Classes entitled to vote on the Plan, so long as the Plan has been accepted by at least one Impaired Class, excluding any Insider Classes, entitled to vote.  Section 1129(b) of the Bankruptcy Code permits the Debtors to confirm the Plan, notwithstanding the failure of any Impaired Class to accept the Plan, in a procedure commonly known as "cram-down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired Class of Claims or Interests that voted to reject the plan.

1. <u>No Unfair Discrimination</u>

The test to determine whether the Plan unfairly discriminates applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests. The Debtors believe the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfies the foregoing requirements for nonconsensual Confirmation.

2. <u>Fair and Equitable Treatment</u>

The test to determine whether the Plan affords fair and equitable treatment applies to Classes of different priority and status (e.g., Secured Claims versus General Unsecured Claims) and includes the general requirement that no Class of Claims receive more than 100% of the amount of the Allowed Claims in such Class. As to a dissenting Class, the test sets different standards depending on the type of Claims or Interests in such Class. Specifically, in order to demonstrate that the Plan is fair and equitable, the Debtors must demonstrate that:

o    Each holder of a Secured Claim either (a) retains its Liens on the property, to the extent of the Allowed amount of its Secured Claim and receives deferred Cash payments having a value, as of the effective date of the chapter 11 plan, of at least the Allowed amount of such Claim, (b) has the right to credit bid the amount of its Claim if its property is sold and retains its Liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (c) receives the "indubitable equivalent" of its Allowed Secured Claim.

o    Either (a) each holder of an Impaired General Unsecured Claim receives or retains under the Plan property of a value equal to the amount of its Allowed Claim or (b) the holders of Claims and Interests that are junior to the Claims of the rejecting Classes will not receive any property under the Plan.

o    Either (a) each holder of an Interest will receive or retain under the Plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the Interest or (b) the holder of an Interest that is junior to the rejecting Class will not receive or retain any property under the Plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement notwithstanding that Classes J and L are not receiving a distribution because there is no Class of equal priority receiving more favorable treatment and no junior Classes to Classes J and L that will receive or retain any property on account of the Claims or Interests in such Class.

K&E 17065163.9

**ARTICLE IX.**
**PLAN-RELATED RISK FACTORS AND ALTERNATIVES**
**TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE OF THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH IN THIS ARTICLE IX AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.

**A.     General**

The following provides a summary of important considerations and risk factors associated with the Plan.  However, it is not exhaustive.  In considering whether to vote for or against the Plan, holders of Claims and Interests that are Impaired and entitled to vote should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement, including the various risks and other factors described in  Visteon's Annual Report on Form 10-K for the fiscal year ended December 31, 2008, and Visteon's Annual Report on Form 10-K for the fiscal year ended December 31, 2009, the entirety of which are publicly available at the Securities and Exchange Commission's Electronic Data Gathering, Analysis, and Retrieval (EDGAR) system, located at http://www.sec.gov/edgar.shtml.

**B.     Certain Bankruptcy Law Considerations**

1.     Undue Delay in Confirmation May
         Significantly Disrupt the Operations of the Debtors

The continuation of the Chapter 11 Cases, particularly if the Plan is not approved or confirmed in the time frame currently contemplated, could adversely affect the Debtors' operations and relationships with the Debtors' customers, vendors, and employees.   If Confirmation and Consummation do not occur expeditiously, the Chapter 11 Cases could result in, among other things, increased Administrative Claims or Professional Claims, and similar expenses.  Prolonged Chapter 11 Cases may also make it more difficult to retain and attract management and other key personnel, and would require senior management to spend a significant amount of time and effort dealing with the Debtors' financial reorganization instead of focusing on the operation of the Debtors' business.

2.     Debtors May Not Be Able to Secure Confirmation or Consummation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for Confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) Confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (b) the value of distributions to non-accepting holders of Claims and Interests within a particular Class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

Furthermore, under section 1129(b)(2)(A) of the Bankruptcy Code, the Plan must provide a Class of Secured Claims that votes to reject the Plan with: (a) retention of Liens securing the Secured Claim to the extent of the Allowed amount of such Claims, whether the property subject to those Liens is retained by the Debtor or transferred to another Entity, and deferred Cash payments having a present value, as of the Effective Date of the plan of reorganization, at least equal to the value of such holder's interest in the Estate's interest in such property; or (b) the realization of the "indubitable equivalent" of its Allowed Secured Claim; or (c) the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the Liens securing the Claims included in the rejecting Class, free and clear of such Liens, with such Liens to attach to the proceeds of the sale and the treatment of such Liens on proceeds in accordance with clause (a) or (b) of this paragraph. To meet this standard, the Debtors would either have to cash out the Term Loan Facility Claims at 100% recovery plus postpetition interest, or provide the indubitable equivalent of the $1.629 billion Term Loan Facility Claims. The Rights Offering Sub Plan contemplates paying the Term Loan Facility Claims in full (including postpetition interest) in Cash or reinstating the Term Loan Facility and paying off a portion of the Term Loan Facility Claims in Cash—thus leaving the Term Loan Lenders Unimpaired.

However, in the event that (i) the representations and warranties made by the Debtors in connection with the Equity Commitment Agreement fail to be true and correct so as to be reasonably expected to result in a Material Adverse Effect, as such term is defined in the Equity Commitment Agreement, or (b) the Debtors fail to materially perform or comply with any covenants contained in the Equity Commitment Agreement, the Consenting Note Holders may terminate the Plan Support Agreement and may challenge the Plan on any grounds, including the findings of the Debtors' Valuation Analysis. Other parties in interest may also challenge either the adequacy of this Disclosure Statement or whether the Solicitation Procedures and voting results satisfy the requirements of the Bankruptcy Code or Federal Rules of Bankruptcy Procedure. Even if the Bankruptcy Court determined that this Disclosure Statement, the Solicitation Procedures, and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met. Confirmation of the Plan is also subject to certain conditions as described in Article XI.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in a less favorable treatment of any rejecting Class, as well as of any Classes junior to such rejecting Class, than the treatment currently provided in the Plan. Any less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

3.    Parties in Interest May Object to Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a Claim or an Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such Class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or

Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

4.     <u>Nonconsensual Confirmation</u>

In the event that any Impaired Class of Claims or Interests does not accept a chapter 11 plan of reorganization, a Bankruptcy Court may nevertheless confirm such a plan at the proponent's request if at least one Impaired Class has accepted the plan (with such acceptance being determined without including the vote of any Insider in such Class), and, as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the rejecting Impaired Classes. In the event that any Impaired Class of Claims or Interests does not accept a chapter 11 plan of reorganization, the Debtors will request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will find the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

5.     <u>Debtors May Object to Claims Before or After the Effective Date</u>

Except as otherwise provided in the Plan, the Debtors and the Reorganized Debtors reserve the right to object to the amount or priority status of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim. Any holder of a Claim that is or becomes subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

6.     <u>Risk of Non-Occurrence of the Effective Date</u>

Although the Debtors believe that the Effective Date may occur shortly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

7.     <u>The Debtors May Not Be Able to Resolve Ford Related Matters</u>

The Plan is conditioned upon the resolution of all matters related to Ford to the reasonable satisfaction of the Requisite Investors under the Rights Offering Sub Plan and the Requisite Term Loan Holders under the Claims Conversion Sub Plan. The Debtors cannot predict nor guarantee the outcome of negotiations with Ford or whether such resolution will be deemed reasonably acceptable to the Requisite Parties. The failure to either reach resolution of the matters with Ford or obtain approval of such resolution from the Requisite Parties could prevent Consummation of the Plan and delay the Debtors' exit from chapter 11 bankruptcy.

**C.** **Risk Factors That May Affect the Value
of the Securities to Be Issued Under the Plan**

      1.      Debtors Cannot Guarantee What Recovery
                Will Be Available to Holders of Allowed Claims in Voting Classes

No less than three unknown factors make certainty in Creditor recoveries impossible: (a) how much money will remain after paying all Allowed Claims that are senior to the Allowed Claims in Voting Classes or unclassified Allowed Claims; (b) the number or amount of Claims in Voting Classes that will ultimately be Allowed; and (c) the number or size of Claims senior to the Claims in the Voting Classes or unclassified Claims that will ultimately be Allowed.

      2.      Actual Amounts of Allowed Claims May Differ from the Estimated
                Claims and Adversely Affect the Percentage Recovery on Allowed Claims

The Claims estimates set forth in Article II.C above are based on various assumptions. The actual amounts of General Unsecured Claims may differ significantly from those estimates should one or more underlying assumptions prove to be incorrect. The amount of Allowed General Unsecured Claims will impact the Cash availability of the Debtors and, in turn, the value of the New Visteon Common Stock to be distributed to the Note Holders under the Rights Offering Sub Plan and the Note Holders and Term Loan Lenders under the Claims Conversion Sub Plan.

      3.      A Liquid Trading Market for the New Visteon Common Stock

There can be no assurances that liquid trading markets for New Visteon Common Stock will develop. The liquidity of any market for the New Visteon Common Stock will depend, among other things, upon the number of holders of New Visteon Common Stock, Reorganized Visteon's financial performance and the market for similar securities, none of which can be determined or predicted. Therefore, the Debtors cannot provide assurances that an active trading market will develop, or if a market develops, what the liquidity or pricing characteristics of that market will be.

      4.      The Reorganized Debtors May Not Achieve Projected Financial
                Results or Meet Post-Reorganization Debt Obligations and Finance
                All Operating Expenses, Working Capital Needs, and Capital Expenditures

The Reorganized Debtors may not be able to meet their projected financial results. To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due or may not be able to meet their operational needs. Any one of these failures may preclude the Reorganized Debtors from, among other things: (a) enhancing their current customer offerings; (b) taking advantage of future opportunities; (c) growing their business; or (d) responding to competitive pressures. Further, a failure of the Reorganized Debtors to meet their projected financial results or achieve their projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require the Reorganized Debtors to seek additional working capital. The Reorganized Debtors may not be

able to obtain such working capital when it is required.  Further, even if the Reorganized Debtors were able to obtain additional working capital, it may only be available on unreasonable terms. For example, the Reorganized Debtors may be required to take on additional debt, the interest costs of which could adversely affect the results of the operations and financial condition of the Reorganized Debtors.  If any such required capital is obtained in the form of equity, the interests of the holders of the then-outstanding New Visteon Common Stock (and options or other rights to acquire New Visteon Common Stock) could be diluted.  While the Debtors' Financial Projections represent management's view based on current known facts and assumptions about the future operations of the Reorganized Debtors, there is no guarantee that the Financial Projections will be realized.

     5.      Estimated Valuation of the Reorganized Debtors
and the New Visteon Common Stock and the Estimated
Recoveries to Holders of Allowed Claims Are Not Intended
<u>to Represent the Private Sale Values of the New Visteon Common Stock</u>

The Debtors' estimated recoveries to holders of Allowed Claims are not intended to represent the private sale values of the Reorganized Debtors' securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which is beyond the control of the Reorganized Debtors), including, without limitation: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; and (e) the assumption that capital and equity markets remain consistent with current conditions.

     6.      <u>The Reorganized Debtors May Be Controlled By a Small Number of Holders</u>

Consummation of the Plan may result in a small number of holders owning a significant percentage of the outstanding shares of New Visteon Common Stock.  These holders may, among other things, exercise a controlling influence over the business and affairs of the Reorganized Debtors and have the power to elect directors and approve significant mergers, acquisitions, divestures, and other material corporate transactions, including the sale of the Reorganized Debtors.  The Debtors can make no assurances regarding the future actions of the holders of New Visteon Common Stock and the impact such actions may have on the value of the New Visteon Common Stock.

     7.      Certain Tax Implications of the Debtors' Bankruptcy
<u>and Reorganization May Increase the Tax Liability of the Reorganized Debtors</u>

Holders of Allowed Claims should carefully review Article X herein, "Certain Federal Income Tax Consequences," to determine how the tax implications of the Plan and these Chapter 11 Cases may adversely affect the Reorganized Debtors.

     8.      <u>Impact of Interest Rates</u>

Changes in interest rates and foreign exchange rates may affect the fair market value of the Debtors' assets.  Specifically, decreases in interest rates will positively impact the value of

the Debtors' assets and the strengthening of the dollar will negatively impact the value of their net foreign assets.

## D.    Risk Factors That Could Negatively Impact the Debtors' Business

### 1.    The Debtors Are Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' operations and the Debtors' ability to execute their business strategy will be subject to the risks and uncertainties associated with bankruptcy. These risks include:

o     the Debtors' ability to obtain approval of the Bankruptcy Court with respect to motions filed in the Chapter 11 Cases from time to time;

o     the Debtors' ability to obtain and maintain normal trade terms with suppliers and service providers and maintain contracts that are critical to their operations;

o     the Debtors' ability to attract, motivate, and retain key employees;

o     the Debtors' ability to attract and retain customers;

o     the Debtors' ability to fund and execute their business plan; and

o     the Debtors' ability to obtain Creditor and Bankruptcy Court approval for, and then to consummate, a Plan to emerge from bankruptcy.

The Debtors will also be subject to risks and uncertainties with respect to the actions and decisions of the Creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' restructuring and business goals.

These risks and uncertainties could affect the Debtors' business and operations in various ways. For example, negative events or publicity associated with the Chapter 11 Cases could adversely affect the Debtors' sales and relationships with their customers, as well as with their suppliers and employees, which in turn could adversely affect the Debtors' operations and financial condition. In addition, pursuant to the Bankruptcy Code, the Debtors need approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit their ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot predict or quantify the ultimate impact that events occurring during the reorganization process will have on their business, financial condition, and results of operations.

As a result of the Chapter 11 Cases, the realization of assets and the satisfaction of liabilities are subject to uncertainty. While operating as debtors in possession, and subject to approval of the Bankruptcy Court, or otherwise as permitted in the normal course of business or Bankruptcy Court order, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the condensed consolidated financial statements included in the Form 10-K for the year ended that December 31, 2009. Further, the

Plan could materially change the amounts and classifications of assets and liabilities reported in the historical consolidated financial statements. The historical consolidated financial statements do not include any adjustments to the reported amounts of assets or liabilities that might be necessary as a result of Confirmation of a Plan.

2. Continued Decline in the Production Levels of the Debtors' Major Customers Could Reduce the Debtors' Sales and Harm the Debtors' Profitability

Demand for the Debtors' products is directly related to the automotive vehicle production of the Debtors' major customers. Automotive sales and production can be affected by general economic or industry conditions, labor relations issues, fuel prices, regulatory requirements, government initiatives, trade agreements, and other factors. Automotive industry conditions in North America and Europe have been and continue to be extremely challenging. In North America, the industry is characterized by significant overcapacity, fierce competition and rapidly declining sales. In Europe, the market structure is more fragmented with significant overcapacity and declining sales. Visteon's business in 2008 and 2009 has been severely affected by the turmoil in the global credit markets, significant reductions in new housing construction, volatile fuel prices and recessionary trends in the U.S. and global economies. These conditions had a dramatic impact on consumer vehicle demand in 2008 and 2009, resulting in the lowest per capita sales rates in the United States in half a century and lower global automotive production following six years of steady growth.

3. The Financial Distress of the Debtors' Major Customers and Within the Supply Base Could Significantly Affect Their Operating Performance

During 2009, automotive OEMs, particularly those with substantial sales in the United States, experienced decreased demand for their products, which resulted in lower production levels on several of the Debtors' key platforms, particularly light truck platforms. In addition, these customers have experienced declining market shares in North America and are continuing to restructure their North American operations in an effort to improve profitability. The domestic automotive manufacturers are also burdened with substantial structural costs, such as pension and healthcare costs that have impacted their profitability and labor relations. Several other global automotive manufacturers are also experiencing operating and profitability issues and labor concerns. In this environment, it is difficult to forecast future customer production schedules, the potential for labor disputes or the success or sustainability of any strategies undertaken by any of the Debtors' major customers in response to the current industry environment. This environment may also put additional pricing pressure on suppliers to OEMs, such as the Debtors, which would reduce such suppliers' (including the Debtors') margins. In addition, cuts in production schedules are also sometimes announced by customers with little advance notice, making it difficult for suppliers to respond with corresponding cost reductions.

Given the difficult environment in the automotive industry, there is an increased risk of bankruptcies or similar events among the Debtors' customers. Both GM and Chrysler have sought bankruptcy protection and obtained funding support from the U.S. federal government. While the operations of Chrysler and GM have been sold to a third-party, the financial prospects of certain of the Debtors' significant customers remain highly uncertain. The Debtors' supply base has also been adversely affected by industry conditions. Lower production levels for the

global automotive OEMs and increases in certain raw material, commodity, and energy costs during 2009 have resulted in severe financial distress among many companies within the automotive supply base. Several large suppliers have filed for bankruptcy protection or ceased operations. Unfavorable industry conditions have also resulted in financial distress within the Debtors' supply base, an increase in commercial disputes and other risks of supply disruption. In addition, the current adverse industry environment has required the Debtors to provide financial support to distressed suppliers or take other measures to ensure uninterrupted production. While the Debtors have taken certain actions to mitigate these factors, those actions have offset only a portion of the overall impact on the Debtors' operating results. The continuation or worsening of these industry conditions would adversely affect the Debtors' profitability, operating results, and cash flow.

4.      The Debtors are Highly Dependent on Ford and
        Hyundai and Decreases in Such Customers' Vehicle
        <u>Production Volumes Would Adversely Affect the Debtors</u>

Ford is the Debtors' largest customer and accounted for approximately 28% of total product sales in 2009, 34% of total product sales in 2008, and 39% of total product sales in 2007. Additionally, Hyundai has rapidly become another one of the Debtors' largest customers—accounting for 27% of the Debtors' total product sales in 2009, and such percentage is expected to increase in the future. Any change in Ford's and/or Hyundai's vehicle production volumes will have a significant impact on the Debtors' sales volume and reorganization efforts.

Furthermore, the Creditors' Committee, in connection with the investigatory period provided under the ABL cash collateral order, is investigating potential Claims against Ford and/or ACH in connection with, among other events, the Debtors' spin-off from Ford in 2000 and the ACH Transactions in 2005. The Debtors believe that Ford's continued support as a key customer is critical to their business plan and the company's emergence from bankruptcy. Protracted litigation against Ford, including litigation by the Creditors' Committee seeking derivative standing to pursue claims of uncertain merit, could delay or prevent the Debtors' emergence from bankruptcy and put at risk future revenue from the company's relationship with Ford.

5.      The Discontinuation of, Loss of Business, or Lack
        of Commercial Success, with Respect to a Particular
        Vehicle Model for Which the Debtors are a Significant Supplier
        <u>Could Reduce the Debtors' Sales and Harm the Debtors' Profitability</u>

Although the Debtors have purchase orders from many of their customers, these purchase orders generally provide for the supply of a customer's annual requirements for a particular vehicle model and assembly plant, or in some cases, for the supply of a customer's requirements for the life of a particular vehicle model, rather than for the purchase of a specific quantity of products. In addition, it is possible that customers could elect to manufacture components internally that are currently produced by outside suppliers, such as the Debtors. The discontinuation of, the loss of business with respect to or a lack of commercial success of a particular vehicle model for which the Debtors are a significant supplier could reduce the Debtors' sales and harm the Debtors' profitability, thereby making it more difficult for the

Debtors to make payments under the Debtors' indebtedness or resulting in a decline in the value of the New Visteon Common Stock.

6.    The Debtors' Substantial International Operations Make Them
Vulnerable to Risks Associated with Doing Business in Foreign Countries

As a result of the Debtors' global presence, a significant portion of the Debtors' revenues and expenses are denominated in currencies other than the U.S. dollar. In addition, the Debtors have manufacturing and distribution facilities in many foreign countries, including countries in Europe, Central and South America, and Asia. International operations are subject to certain risks inherent in doing business abroad, including:

o    exposure to local economic conditions, expropriation and nationalization, foreign exchange rate fluctuations and currency controls;

o    withholding and other taxes on remittances and other payments by subsidiaries;

o    investment restrictions or requirements;

o    export and import restrictions; and

o    increases in working capital requirements related to long supply chains.

Expanding the Debtors' business in Asia and Europe and enhancing the Debtors' business relationships with Asian and European automotive manufacturers worldwide are important elements of the Debtors' long-term business strategy. In addition, the Debtors have invested significantly in joint ventures with other parties to conduct business in South Korea, China, and elsewhere in Asia. The Debtors' ability to repatriate funds from these joint ventures depends not only upon their uncertain cash flows and profits, but also upon the terms of particular agreements with the Debtors' joint venture partners and maintenance of the legal and political status quo. As a result, the Debtors' exposure to the risks described above is substantial. The likelihood of such occurrences and their potential effect on the Debtors vary from country to country and are unpredictable. However, any such occurrences could be harmful to the Debtors' business and the Debtors' profitability, thereby making it more difficult for the Debtors to make payments under the Debtors' indebtedness or resulting in a decline in the value of the New Visteon Common Stock.

7.    Escalating Price Pressures From
Customers May Adversely Affect the Debtors' Business

Downward pricing pressures by automotive manufacturers is a characteristic of the automotive industry. Virtually all automakers have implemented aggressive price reduction initiatives and objectives each year with their suppliers, and such actions are expected to continue in the future. In addition, estimating such amounts is subject to risk and uncertainties because any price reductions are a result of negotiations and other factors. Accordingly, suppliers must be able to reduce their operating costs in order to maintain profitability. The Debtors have taken steps to reduce their operating costs and other actions to offset customer price reductions; however, price reductions have impacted the Debtors' sales and profit margins

and are expected to continue to do so in the future.  If the Debtors are unable to offset customer price reductions in the future through improved operating efficiencies, new manufacturing processes, sourcing alternatives and other cost reduction initiatives, the Debtors' results of operations and financial condition will likely be adversely affected.

8.  Inflation May Adversely Affect the Debtors' Profitability
    and the Profitability of the Debtors' Tier 2 and Tier 3 Supply Base

The automotive supply industry has experienced significant inflationary pressures, primarily in ferrous and non-ferrous metals and petroleum-based commodities, such as resins. These inflationary pressures have placed significant operational and financial burdens on automotive suppliers at all levels, and are expected to continue for the foreseeable future. Generally, it has been difficult to pass on, in total, the increased costs of raw materials and components used in the manufacture of the Debtors' products to their customers.  In addition, the Debtors' need to maintain a continuing supply of raw materials and/or components has made it difficult to resist price increases and surcharges imposed by their suppliers.

Further, this inflationary pressure, combined with other factors, has adversely impacted the financial condition of several domestic automotive suppliers, and resulting in several significant supplier bankruptcies.  Because the Debtors purchase various types of equipment, raw materials, and component parts from suppliers, the Debtors may be materially and adversely affected by the failure of those suppliers to perform as expected. This non-performance may consist of delivery delays, failures caused by production issues, or delivery of non-conforming products, or supplier insolvency or bankruptcy.  Consequently, the Debtors' efforts to continue to mitigate the effects of these inflationary pressures may be insufficient if conditions worsen, thereby negatively impacting the Debtors' financial results.

9.  The Debtors Could Be Negatively Impacted by Supplier Shortages

In an effort to manage and reduce the costs of purchased goods and services, the Debtors, like many suppliers and automakers, have been consolidating their supply base.  As a result, the Debtors are dependent on single or limited sources of supply for certain components used in the manufacture of their products.  The Debtors select their suppliers based on total value (including price, delivery and quality), taking into consideration their production capacities and financial condition.  However, there can be no assurance that strong demand, capacity limitations or other problems experienced by the Debtors' suppliers will not result in occasional shortages or delays in their supply of components.  If the Debtors were to experience a significant or prolonged shortage of critical components from any of their suppliers, particularly those who are sole sources, and could not procure the components from other sources, the Debtors would be unable to meet their production schedules for some of their key products or to ship such products to their customers in timely fashion, which would adversely affect sales, margins, and customer relations.

K&E 17065163.9

10. Work Stoppages and Similar Events
   Could Significantly Disrupt the Debtors' Business

Because the automotive industry relies heavily on just-in-time delivery of components during the assembly and manufacture of vehicles, a work stoppage at one or more of the Debtors' manufacturing and assembly facilities could have material adverse effects on the business. Similarly, if one or more of the Debtors' customers were to experience a work stoppage, that customer would likely halt or limit purchases of the Debtors' products, which could result in the shut down of the related manufacturing facilities. A significant disruption in the supply of a key component due to a work stoppage at one of the Debtors' suppliers or any other supplier could have the same consequences, and accordingly, have a material adverse effect on the Debtors' financial results.

11. Impairment Charges Relating to the Debtors' Assets
   and Possible Increases to Their Valuation Allowances May
   Have a Material Adverse Effect on Their Earnings and Results of Operations

The Debtors recorded asset impairment charges of $9.0 million, $234.0 million and $95.0 million in 2009, 2008 and 2007, respectively, to adjust the carrying value of certain assets to their estimated fair value. Additional asset impairment charges in the future may result in the Debtors' failure to achieve their internal financial plans, and such charges could materially affect the Debtors' results of operations and financial condition in the period(s) recognized. In addition, the Debtors cannot provide assurance that they will be able to recover remaining net deferred tax assets, which are dependent upon achieving future taxable income in certain foreign jurisdictions. Failure to achieve its taxable income targets may change the Debtors' assessment of the recoverability of their remaining net deferred tax assets and would likely result in an increase in the valuation allowance in the applicable period. Any increase in the valuation allowance would result in additional income tax expense, which could have a significant impact on the company's future results of operations.

12. The Debtors' Expected Annual Effective Tax Rate Could be Volatile and
   Materially Change as a Result of Changes in Mix of Earnings and Other Factors

Changes in the Debtors' debt and capital structure, among other items, may impact their effective tax rate. The Debtors' overall effective tax rate is equal to consolidated tax expense as a percentage of consolidated earnings before tax. However, tax expenses and benefits are not recognized on a global basis but rather on a jurisdictional basis. Further, the Debtors are in a position whereby losses incurred in certain tax jurisdictions generally provide no current financial statement benefit. In addition, certain jurisdictions have statutory rates greater than or less than the United States statutory rate. As such, changes in the mix and source of earnings between jurisdictions could have a significant impact on the Debtors' overall effective tax rate in future periods. Changes in tax law and rates, changes in rules related to accounting for income taxes, or adverse outcomes from tax audits that regularly are in process in any of the jurisdictions in which the Debtors operate could also have a significant impact on the Debtors' overall effective rate in future periods.

13. The Debtors' Ability to Effectively Operate
    Could be Hindered if They Fail to Attract and Retain Key Personnel

The Debtors' ability to operate their business and implement their strategies effectively depends, in part, on the efforts of their executive officers and other key employees.  In addition, the Debtors' future success will depend on, among other factors, the ability to attract and retain qualified personnel, particularly engineers and other employees with critical expertise and skills that support key customers and products.  The loss of the services of any key employees or the failure to attract or retain other qualified personnel could have a material adverse effect on the Debtors' business.

14. Warranty Claims, Product Liability Claims,
    and Product Recalls Could Harm the Debtors'
    Business, Results of Operations, and Financial Condition The Debtors face the inherent business risk of exposure to warranty and product liability Claims in the event that their products fail to perform as expected or such failure results, or is alleged to result, in bodily injury or property damage (or both).  In addition, if any of the Debtors' designed products are defective or are alleged to be defective, the Debtors may be required to participate in a recall campaign. As suppliers become more integrally  involved in the vehicle design process and assume more of the vehicle assembly functions, automakers are increasingly expecting them to warrant their products and are increasingly looking to suppliers for contributions when faced with product liability claims or recalls.  A successful warranty or product liability claim against the Debtors in excess of their available insurance coverage and established reserves, or a requirement that the Debtors participate in a product recall campaign, could have materially adverse effects on the Debtors' business, results of operations, and financial condition.

15. The Debtors' Business Could be Affected Adversely by Terrorism

Terrorist-sponsored attacks, both foreign and domestic, could have adverse effects on the Debtors' business and results of operations.  These attacks could accelerate or exacerbate other automotive industry risks such as those described above and also have the potential to interfere with the Debtors' business by disrupting supply chains and the delivery of products to customers.

16. The Debtors are Involved From Time to
    Time in Legal Proceedings and Commercial or
    Contractual Disputes, Which Could Have an Adverse
    Effect on Their Business, Results of Operations and Financial Position

The Debtors are involved in legal proceedings and commercial or contractual disputes that, from time to time, are significant.  These are typically Claims that arise in the normal course of business including, without limitation, commercial or contractual disputes (including disputes with suppliers), intellectual property matters, personal injury Claims, and employment matters. No assurances can be given that such proceedings and Claims will not have a material adverse impact on the Debtors' profitability and financial position.

K&E 17065163.9

17. Litigation Related to Foreign Affiliates'
Pension Plans Could Impact the Debtors' Business

As noted above, on October 15, 2009, the Visteon UK Pension Trustees Limited, in its capacity as trustee of the VUK Pension Plan and on behalf of the beneficiaries of the VUK Pension Plan filed Proofs of Claim against each of the Debtors asserting contingent and unliquidated Claims pursuant to the UK Pensions Act 2004 and the UK Pensions Act 1995 for liabilities related to a funding deficiency of the VUK Pension Plan. According to the Proofs of Claim, the VUK Pension Plan had a funding deficiency of approximately $555.0 million as of March 31, 2009.

Visteon Engineering Services Pension Trustees Limited, trustee of the VES Pension Plan also submitted Proofs of Claim against each of the Debtors asserting contingent and unliquidated claims pursuant to the UK Pensions Act 2004 and the UK Pensions Act 1995 for liabilities related to an alleged funding deficiency of the VES Pension Plan. According to the VES' Proofs of Claim, the UK Pensions Regulator has advised the trustee for the VES Pension Plan that it has begun investigating funding issues related to the VES Pension Plan. As of March 31, 2009, the VES Pension Plan was underfunded by an amount of approximately $118.1 million according to the VES Proofs of Claim.

While the Visteon UK Pension Trustees Limited has withdrawn with prejudice all Claims asserted against the Debtors [Docket No. 3089], if the Pensions Regulator were to issue a financial support direction or contribution notice against any affiliate of the Debtors with respect to the VUK Pension Plan and/or the VES Pension Plan, certain of the Debtors' non-Debtor Affiliates may be required to satisfy such Claims, which may have a material adverse impact on the Debtors' business going forward to the extent any liability is established against any of the Debtors' non-Debtor Affiliates.

In addition, there are currently several pending civil actions against non-Debtor Affiliate Visteon Deutschland GmbH ("Visteon Germany") seeking damages for the alleged violation of German pension laws that prohibit the use of pension benefit formulas that differ for salaried and hourly employees without adequate justification. Several of these actions have been joined as pilot cases. In a written decision issued on or about April 6, 2010, the Federal Labor Court issued a declaratory judgment in favor of the plaintiffs in the pilot cases. To date, more than 200 current and former employees have filed similar actions, and an additional 1,100 current and former employees who are similarly situated to the plaintiffs participate in the pension plan that is the subject of the declaratory judgment. Visteon Corporation and Visteon Germany have reserved certain amounts relating to the potential actions against Visteon Germany based on their best estimate as to the potential damages that could be awarded to parties in connection with the civil actions.

K&E 17065163.9

18.     The Debtors' Funding Levels of Pension
        Plans Could Materially Deteriorate or the Debtors
        May Be Unable to Generate Sufficient Excess Cash
        Flow to Meet Increased Pension or OPEB Obligations

Substantially all of the Debtors' employees participate in defined benefit pension plans or retirement/termination indemnity plans. Visteon also sponsors OPEB plans in the United States and Canada. Visteon's worldwide pension and OPEB obligations exposed the company to approximately $574.0 million in unfunded liabilities as of December 31, 2009, of which approximately $388.0 million and $120.0 million was attributable to unfunded U.S. and non-U.S. pension obligations, respectively, and $66.0 million was attributable to unfunded OPEB obligations. Visteon has previously experienced declines in interest rates and pension asset values. Future declines in interest rates or the market values of the securities held by the plans, or certain other changes, could materially deteriorate the funded status of Visteon's plans and affect the level and timing of required contributions in 2010 and beyond. Additionally, a material deterioration in the funded status of the plans could significantly increase pension expenses and reduce the company's profitability. While the Bankruptcy Court approved termination of Visteon's OPEB obligations, there is a risk that the decision may be overturned on appeal, as described further in Article V.F.1 herein. Visteon funds its OPEB obligations on a pay-as-you-go basis; accordingly, the related plans have no assets. Visteon is subject to increased OPEB cash outlays and costs due to, among other factors, rising health care costs. Increases in the expected cost of health care in excess of current assumptions could increase actuarially determined liabilities and related OPEB expenses along with future cash outlays. Visteon's assumptions used to calculate pension and OPEB obligations as of the annual measurement date directly impact the expense to be recognized in future periods. While Visteon's management believes that these assumptions are appropriate, significant differences in actual experience or significant changes in these assumptions may materially affect the company's pension and OPEB obligations and future expense. Visteon's ability to generate sufficient cash to satisfy its obligations may be impacted by the factors discussed herein.

19.     The Debtors Could be Adversely
        Impacted by Environmental Laws and Regulations

The Debtors' operations are subject to U.S. and foreign environmental laws and regulations governing emissions to air; discharges to water; the generation, handling, storage, transportation, treatment and disposal of waste materials; and the cleanup of contaminated properties. Currently, environmental costs with respect to former, existing or subsequently acquired operations are not material, but there is no assurance that the Debtors will not be adversely impacted by such costs, liabilities or Claims in the future either under present laws and regulations or those that may be adopted or imposed in the future.

20.     Developments or Assertions by or Against the Debtors
        Relating to Intellectual Property Rights Could Materially Impact Their Business

The Debtors own significant intellectual property, including a large number of patents, trademarks, copyrights and trade secrets, and are involved in numerous licensing arrangements. The Debtors' intellectual property plays an important role in maintaining their competitive

position in a number of the markets served. Developments or assertions by or against the Debtors relating to intellectual property rights could materially impact the Debtors' business. Significant technological developments by others also could materially and adversely affect the Debtors' business and results of operations and financial condition.

**E.**     **Risks Associated with Forward Looking Statements**

1.     Financial Information Is Based on the Debtors' Books and
Records and, Unless Otherwise Stated, No Audit Was Performed

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects, in all material respects, the financial results of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

2.     Financial Projections and Other Forward Looking
Statements Are Not Assured, Are Subject to Inherent
Uncertainty Due to Numerous Assumptions Upon Which
They Are Based and, as a Result, Actual Results May Vary

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Financial Projections that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future financial results of the Reorganized Debtors may turn out to be different from the Financial Projections. The Financial Projections do not reflect emergence adjustments, including the impact of "fresh start" accounting.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning: (a) the magnitude of the potential adverse impacts of the filing of the Chapter 11 Cases on the Debtors' business, financial condition, or results of operations, including the Debtors' ability to maintain contracts, trade credit and other customer and vendor relationships that are critical to their business and the actions and decisions of their Creditors and other third parties with interests in the Chapter 11 Cases; (b) the Debtors' ability to obtain approval of Bankruptcy Court with respect to motions in the Chapter 11 Cases prosecuted from time to time and to develop, prosecute, confirm, and consummate one or more plans of reorganization with respect to the Chapter 11 Cases and to consummate all of the transactions contemplated by one or more such plans or upon which consummation of such plans may be conditioned; (c) the timing of Confirmation and Consummation of one or more plans of reorganization in accordance with its terms; (d) the anticipated future performance of Reorganized Visteon, including, without limitation, the Debtors' ability to maintain or increase revenue and gross margins, control future

operating expenses or make necessary capital expenditures; (e) general economic conditions in the markets in which the Debtors operate, including changes in interest rates or currency exchange rates; (f) the financial condition of the Debtors' customers or suppliers; (g) changes in actual industry vehicle production levels from the Debtors' current estimates; (h) fluctuations in the production of vehicles for which the Debtors are a supplier; (i) the loss of business with respect to, or the lack of commercial success of, a vehicle model for which the Debtors are a significant supplier, including further declines in sales of full-size pickup trucks and large sport utility vehicles; (j) disruptions in the relationships with the Debtors' suppliers; (k) labor disputes involving the Debtors or their significant customers or suppliers, or other labor disputes that otherwise affect the Debtors; (l) the Debtors' ability to achieve cost reductions that offset or exceed customer-mandated selling price reductions; (m) the outcome of customer negotiations; (n) the impact and timing of program launch costs; (o) the costs, timing, and success of restructuring actions; (p) increases in the Debtors' warranty or product liability costs; (q) risks associated with conducting business in foreign countries; (r) competitive conditions impacting the Debtors' key customers and suppliers; (s) the cost and availability of raw materials and energy; (t) the Debtors' ability to mitigate increases in raw material, energy, and commodity costs; (u) the outcome of legal or regulatory proceedings to which the Debtors are or may become parties; (v) unanticipated changes in Cash flow, including the Debtors' ability to align vendor payment terms with those of their customers; (w) further impairment charges initiated by adverse industry or market developments; (x) the impact and duration of domestic and foreign government initiatives designed to assist the automotive industry; and (y) other risks described herein and from time to time in Visteon Corporation's Securities and Exchange Commission filings. Future operating results will be based on various factors, including actual industry production volumes, commodity prices, and the Debtors' success in implementing their operating strategy.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will not be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.

### F.  Disclosure Statement Disclaimer

1.  This Disclosure Statement Was Not
Approved by the Securities and Exchange Commission

This Disclosure Statement was not filed with the Commission under the Securities Act or applicable state securities laws. Neither the Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

2.  Reliance on Exemptions from Registration Under the Securities Act

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure and is not necessarily in accordance with federal or state securities laws or other similar laws. The offer of New Visteon

Common Stock to holders of certain Classes of Claims has not been registered under the Securities Act or similar state securities or "blue sky" laws. To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable nonbankruptcy law, the issuance of the New Visteon Common Stock (including the shares reserved for issuance under the Management Equity Incentive Program) will be exempt from registration under the Securities Act by virtue of Section 1145 of the Bankruptcy Code, section 4(2) of the Securities Act, or Regulation D promulgated thereunder, Rule 701 of the Securities Act or a "no sale" under the Securities Act as described herein.

3.     <u>This Disclosure Statement May Contain Forward Looking Statements</u>

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The Liquidation Analyses, distribution projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates, or recovery projections may or may not turn out to be accurate.

4.     <u>No Legal or Tax Advice Is Provided to You by this Disclosure Statement</u>

This Disclosure Statement is not legal advice to you. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

5.     <u>No Admissions Made</u>

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, holders of Allowed Claims or Interests, or any other parties in interest.

6.     <u>Failure to Identify Litigation Claims or Projected Objections</u>

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Reorganized Debtors may seek to investigate, file, and prosecute Claims and Interests and may object to Claims after the Confirmation or Effective Date of the

Plan irrespective of whether this Disclosure Statement identifies such Claims or Objections to Claims.

7.  No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors (or any party in interest, as the case may be) to object to that holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

8.  Information Was Provided by the Debtors
    and Was Relied Upon by the Debtors' Advisors

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

9.  Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

10.  No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel for the Debtors, the counsel for the Creditors Committee and the United States Trustee.

## G.  Liquidation Under Chapter 7

If no plan can be Confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation

would have on the recoveries of holders of Claims and the Debtors' Liquidation Analyses is described herein and attached hereto as **Exhibit D**.

## ARTICLE X.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following is a summary of certain United States federal income tax consequences of the Plan to the Debtors and certain holders of Claims. This summary is based on the Internal Revenue Code, Treasury Regulations thereunder ("Treasury Regulations") and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the Internal Revenue Service as to any of the tax consequences of the Plan discussed below. There can be no assurance that the Internal Revenue Service will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to holders of Claims that are not United States Persons (as such term is defined in the Internal Revenue Code) or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through Entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, employees, persons who received their Claims or Interests pursuant to the exercise of an employee stock option or otherwise as compensation, persons holding Claims or Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction and regulated investment companies). The following discussion assumes that holders of Allowed Claims hold such Claims as "capital assets" within the meaning of section 1221 of the Internal Revenue Code. Moreover, this summary does not purport to cover all aspects of United States federal income taxation that may apply to the Debtors and holders of Allowed Claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local or foreign tax law.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED,

AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE PROMOTION AND MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.      **Consequences to Holders of Allowed Class E Term Loan Facility Claims, Class F 7.00% Senior Notes Claims and 8.25% Senior Notes Claims, and Class G 12.25% Senior Notes Claims**

Pursuant to the Plan, Allowed Class E Term Loan Facility Claims will be exchanged for New Visteon Common Stock or Cash, while Class F 7.00% Senior Notes Claims and 8.25% Senior Notes Claims and Class G 12.25% Senior Notes Claims will be exchanged for New Visteon Common Stock and, under the Rights Offering Sub Plan, Subscription Rights.

To the extent that the Allowed Term Loan Facility Claims, 7.00% Senior Notes Claims, 8.25% Senior Notes Claims and 12.25% Senior Notes Claims are treated as securities of Visteon, then the exchange of such Allowed Claims so treated for New Visteon Common Stock and/or Subscription Rights pursuant to the Plan should be treated as a recapitalization and, therefore, a tax-free reorganization. In such case, each holder of such Allowed Claims should not recognize any gain or loss on the exchange, except to the extent that a portion of the consideration received in exchange for the Allowed Claims is allocable to Accrued but Untaxed Interest, the holder may recognize ordinary income (as discussed in greater detail herein, "Accrued but Untaxed Interest"). Such holder should obtain a tax basis in the New Visteon Common Stock and Subscription Rights received equal to the tax basis of the Allowed Claims surrendered and should have a holding period for the New Visteon Common Stock that includes the holding period for the Allowed Claims exchanged therefore, provided, however, that the tax basis of any New Visteon Common Stock (or portion thereof) treated as received in satisfaction of accrued interest should equal the amount of such accrued interest, and the holding period for such New Visteon Common Stock (or portion thereof) should not include the holding period of the Allowed Claims exchanged therefor.

To the extent that the Allowed Term Loan Facility Claims, 7.00% Senior Notes Claims, 8.25% Senior Notes Claims and 12.25% Senior Notes Claims are not treated as securities of Visteon, a holder of such Allowed Claims will be treated as exchanging its Allowed Claims for New Visteon Common Stock and/or Subscription Rights in a taxable exchange under section 1001 of the Internal Revenue Code. Accordingly, each holder of such Allowed Claims should recognize capital gain or loss equal to the difference between: (a) the fair market value of the New Visteon Common Stock (as of the date it is distributed to the holder) received in exchange for the Allowed Claims and (b) the holder's adjusted basis, if any, in the Allowed Claims. Such gain or loss should be (subject to the "market discount" rules described below) long-term capital gain or loss if the holder has a holding period for Allowed Claims of more than one year. The deductibility of capital losses is subject to limitations. To the extent that a portion of the consideration received in exchange for the Allowed Claims is allocable to Accrued but Untaxed Interest, the holder may recognize ordinary income (as discussed in greater detail

herein, Accrued but Untaxed Interest). A holder's tax basis in the shares of New Visteon Common Stock should equal their fair market value as of the date they are distributed to the holder. A holder's holding period for New Visteon Common Stock should begin on the day following the Effective Date.

If, pursuant to the Rights Offering Sub Plan, a holder of Allowed Term Loan Facility Claims exchanges its Allowed Claim for Cash, such holder should recognize capital gain or loss equal to the difference between (a) the amount of Cash that is not allocable to accrued interest and (b) the holder's tax basis in the Allowed Claims surrendered therefor by the holder. Such gain or loss should be (subject to the "market discount" rules described below) long-term capital gain or loss if the holder has a holding period for Allowed Claims of more than one year. To the extent that a portion of the Cash received in exchange for the Allowed Claims is allocable to Accrued but Untaxed Interest, the holder may recognize ordinary income (as discussed in greater detail in Article X herein, Accrued but Untaxed Interest).

    1.      Consequences to Holders of Allowed Class A ABL
                Claims, Class C Other Secured Claims, Class D Other
                <u>Priority Claims, and Class H General Unsecured Claims</u>

Pursuant to the Plan, Allowed Class A ABL Claims, Class C Other Secured Claims, Class D Other Priority Claims, and Class H General Unsecured Claims will be exchanged for Cash or, in the case of certain Secured Claims, the collateral securing such Claims. A holder who receives Cash or collateral should recognize capital gain or loss equal to the difference between (a) the amount of Cash and/or the fair market value of any collateral received that is not allocable to accrued interest and (b) the holder's tax basis in the Allowed Claims surrendered therefor by the holder. Such gain or loss should be (subject to the "market discount" rules described below) long-term capital gain or loss if the holder has a holding period for Allowed Claims of more than one year. To the extent that a portion of the Cash and/or collateral received in exchange for the Allowed Claims is allocable to Accrued but Untaxed Interest, the holder may recognize ordinary income (as discussed in greater detail in Article X herein, Accrued but Untaxed Interest).

    2.      <u>Accrued but Untaxed Interest</u>

A portion of the consideration received by holders of Claims may be attributable to Accrued but Untaxed Interest on such Claims. Such amount should be taxable to that holder as interest income if such accrued interest has not been previously included in the holder's gross income for United States federal income tax purposes. Conversely, holders of Claims may be able to recognize a deductible loss to the extent any accrued interest on the Claims was previously included in the holder's gross income but was not paid in full by the Debtors.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to Accrued but Untaxed Interest is unclear. Under the Plan, the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as

between principal and interest provided in a chapter 11 plan of reorganization is binding for United States federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The Internal Revenue Service could take the position that the consideration received by the holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

3.    Market Discount

Holders who exchange Allowed Claims for New Visteon Common Stock and/or Subscription Rights may be affected by the "market discount" provisions of sections 1276 through 1278 of the Internal Revenue Code. Under these provisions, some or all of the gain realized by a holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on such Allowed Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the Internal Revenue Code, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation is not a "market discount bond" if the excess is less than a statutory de minimis amount (equal to 0.25% of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with original issue discount, multiplied by the number of complete years remaining until maturity at the time of the acquisition).

Any gain recognized by a holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the holder (unless the holder elected to include market discount in income as it accrued). To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property (as may occur here), any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property is treated as ordinary income to the extent of such accrued, but not recognized, market discount.

4.    Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup

withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided, however, that the required information is timely provided to the Internal Revenue Service.

The Debtors will, through the Distribution Agent, withhold all amounts required by law to be withheld from payments of interest. The Debtors will comply with all applicable reporting requirements of the Internal Revenue Service.

THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

**B.      Certain United States Federal Income
         Tax Consequences to the Reorganized Debtors**

1.      Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted Issue Price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, and (ii) the fair market value of any new consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to the rule discussed in the preceding sentence. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business and minimum tax credit carryovers; (c) capital loss carryovers; (d) tax basis in assets; and (e) foreign tax credit carryovers. A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Internal Revenue Code. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. Any excess COD Income over the amount of available tax attributes is not subject to United States federal income tax and has no other United States federal income tax impact.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations. Under these regulations, the tax attributes of

each member of an affiliated group of corporations that is excluding COD Income is first subject to reduction. To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member. If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to the reduction of certain remaining consolidated tax attributes of the affiliated group. Because the Plan provides that holders of certain Allowed Claims will receive New Visteon Common Stock, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend on the fair market value of the New Visteon Common Stock exchanged therefor. This value cannot be known with certainty until after the Effective Date. However, as a result of Consummation, the Debtors expect that there could be material reductions in NOLs, NOL carryforwards, or other tax attributes including the Reorganized Debtors' tax basis in their assets.

## 2. Limitation of NOL Carry Forwards and Other Tax Attributes

The Reorganized Debtors may have NOL carryovers and other tax attributes at emergence. The amount of such NOL carryovers that will be available to the Reorganized Debtors at emergence is based on a number of factors and is impossible to calculate at this time. Some of the factors that will impact the amount of available NOLs include: (a) the amount of tax losses incurred by the Debtors in 2010; (b) the value of the New Visteon Common Stock; and (c) the amount of COD Income incurred by the Debtors in connection with Consummation. The Debtors anticipate that subsequent utilization of any losses and NOL carryovers remaining and possibly certain other tax attributes may be restricted as a result of and upon Consummation.

Following Consummation, the Debtors anticipate that any remaining NOL carryover, capital loss carryover, tax credit carryovers and, possibly, certain other tax attributes (such as losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, the "Pre-Change Losses") may be subject to limitation under sections 382 and 383 of the Internal Revenue Code as a result of an "ownership change" of the Reorganized Debtors by reason of the transactions pursuant to the Plan.

Under sections 382 and 383 of the Internal Revenue Code, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. As discussed in greater detail herein, the Debtors anticipate that the issuance of the New Visteon Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Debtors' use of their NOL carryovers and other Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Internal Revenue Code applies.

## 3. General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted Federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar

month in which the "ownership change" occurs). Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

### 4. Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their Claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions Claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after Consummation, then the Reorganized Debtors' Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it, the debtor corporation is not required to reduce their NOLs by the amount of interest deductions Claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without triggering the elimination of its NOLs.

While it is not certain, it is doubtful at this point that the Debtors will elect to utilize the 382(l)(5) Exception. In the event that the Debtors do not use the 382(l)(5) Exception, the Debtors expect that their use of any remaining NOLs after the Effective Date will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception. Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the Internal Revenue Code were to occur after the Effective Date. With respect to any ownership change after the Effective Date, NOLs and other tax attributes attributable to the period prior to the Effective Date are treated as Pre-Change Losses for the latter ownership change as well, with the result that such NOLs will be subject to the smaller of the earlier annual limitation and any later annual limitations.

5.    Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in 2001 and 2002, which can offset 100% of a corporation's AMTI, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. The effect of this rule could cause Reorganized Visteon to owe a modest amount of federal and state income tax on taxable income in future years even if NOL carryforwards are available to offset that taxable income. Additionally, under section 56(g)(4)(G) of the Internal Revenue Code, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under section 382(h) of the Internal Revenue Code, immediately before the ownership change, the effect of which may increase the amount of AMT owed by the Reorganized Debtors.

## ARTICLE XI.
## RECOMMENDATION

The Debtors recommend the Plan because it provides for greater distributions to the holders of Claims and Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to the holders of Claims. **Accordingly, the Debtors recommend that holders of Claims and Interests entitled to vote on the Plan support Confirmation and vote to accept the Plan.**

Respectfully submitted,

Van Buren Township, Michigan
Dated:  June 28, 2010

By:_____
Name:  William G. Quigley, III
Title:  Executive Vice President and Chief Financial Officer
VISTEON CORPORATION (for itself and all other Debtors)

161