# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| VISTEON CORPORATION, et al.,[1] | Case No. 09-11786 (CSS) |
| Debtors. | Jointly Administered |

## DEBTORS' MOTION FOR AN ORDER AUTHORIZING THE DEBTORS TO (A) ENTER INTO AN EXIT FINANCING COMMITMENT LETTER AND RELATED FEE LETTERS, (B) INCUR AND PAY CERTAIN FEES AND COSTS IN CONNECTION THEREWITH, AND (C) FILE THE FEE LETTERS UNDER SEAL

The above-captioned debtors and debtors in possession (collectively, "Visteon" or the "Debtors"), by this motion (the "Motion"), seek entry of an order substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), authorizing the Debtors to: (a) enter into the exit financing commitment letter attached hereto as **Exhibit B** (the "Commitment Letter") and two related fee letters (the "Fee Letters")[2] with Morgan Stanley Senior Funding, Inc. and its affiliates (collectively, "Morgan Stanley"); (b) incur and pay fees, costs, and indemnities in connection with the Commitment Letter and the Fee Letters; and (c) file the Fee Letters under

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Visteon Corporation (9512); ARS, Inc. (3590); Fairlane Holdings, Inc. (8091); GCM/Visteon Automotive Leasing Systems, LLC (4060); GCM/Visteon Automotive Systems, LLC (7103); Infinitive Speech Systems Corp. (7099); MIG-Visteon Automotive Systems, LLC (5828); SunGlas, LLC (0711); The Visteon Fund (6029); Tyler Road Investments, LLC (9284); VC Aviation Services, LLC (2712); VC Regional Assembly & Manufacturing, LLC (3058); Visteon AC Holdings Corp. (9371); Visteon Asia Holdings, Inc. (0050); Visteon Automotive Holdings, LLC (8898); Visteon Caribbean, Inc. (7397); Visteon Climate Control Systems Limited (1946); Visteon Domestic Holdings, LLC (5664); Visteon Electronics Corporation (9060); Visteon European Holdings Corporation (5152); Visteon Financial Corporation (9834); Visteon Global Technologies, Inc. (9322); Visteon Global Treasury, Inc. (5591); Visteon Holdings, LLC (8897); Visteon International Business Development, Inc. (1875); Visteon International Holdings, Inc. (4928); Visteon LA Holdings Corp. (9369); Visteon Remanufacturing Incorporated (3237); Visteon Systems, LLC (1903); Visteon Technologies, LLC (5291). The location of the Debtors' corporate headquarters and the service address for all the Debtors is: One Village Center Drive, Van Buren Township, Michigan 48111.

[2] As set forth below, due to the confidential nature of the Fee Letters, the Debtors are seeking to file them under seal but intend to provide unredacted copies to the Court and the Limited Notice Parties (defined below).

seal. In support of this Motion, the Debtors submit the declaration of William G. Quigley, III, Chief Financial Officer and Executive Vice President of Visteon Corporation, attached hereto as **Exhibit C** (the "Quigley Declaration"). In further support of the Motion, the Debtors respectfully state as follows:

## Preliminary Statement

1.　　As the Court is aware, the Debtors are now prepared to move forward on August 31 with a confirmation hearing on their toggle plan, which all classes of claims and interests have voted to accept, and the junior capital infusion contemplated thereunder has largely been delivered. To consummate "toggle A" of the plan, the Debtors also have secured an exit financing commitment, for certain aspects of which they now seek this Court's approval.

2.　　Toggle A of the plan—as well as the Equity Commitment Agreement (as amended from time to time, the "ECA") approved by this Court on June 17, 2010[3] that is the backbone of toggle A—contemplates that the Reorganized Debtors (as defined below) will obtain at least $450 million in financed debt to help implement the plan. To fulfill that obligation, the Debtors have procured a commitment from Morgan Stanley for the Exit Facilities (as defined below) consisting of: a $500 million Term Loan Facility (as defined below) and a $200 million Revolving Loan Facility (as defined below). The Reorganized Debtors will use the former, along with the junior capital coming from the rights offering and direct purchase commitment under toggle A of the plan, to fund payments contemplated in connection with the plan's consummation. The latter, which the Debtors project will be undrawn upon their emergence from chapter 11 (subject to funding certain letters of credit and financing costs), will

---

[3]　See generally *Order Authorizing the Debtors to Enter into: (A) a Plan Support Agreement; (B) an Equity Commitment Agreement and to Pay Certain Fees in Connection Therewith; and (C) a Cash Recovery Backstop Agreement* [Docket No. 3427].

2

provide reorganized Visteon with an appropriate working capital facility to meet its liquidity needs post-chapter 11.

3.     The Debtors, their investment bankers at Rothschild, Inc. ("Rothschild"), and their restructuring advisors at Alvarez & Marsal North America, LLC ("A&M") engaged in an extensive process, which began in January 2010, to procure the exit financing commitment. After soliciting proposals from 13 institutions, the Debtors selected Morgan Stanley as the lead arranger and administrative agent for the Exit Facilities, given the favorable financing package Morgan Stanley offered compared to other institutions.   The Debtors have executed the Commitment Letter and Fee Letters with Morgan Stanley on favorable terms which, if approved by this Court, will ensure that the Debtors have in place the exit financing they require to emerge from chapter 11 as expeditiously as possible.   The Commitment Letter is subject to a 24-hour window in which Morgan Stanley can terminate the commitment if it is unable to syndicate the Term Loan Facility by this Friday, August 27.  However, Morgan Stanley and the Debtors expect a timely and successful syndication will be completed.[4]   The Debtors also have shared the Commitment Letter with the Lead Investors (as defined in the ECA), who have reasonable-consent rights under the ECA,[5] and they have provided their consent to the Exit Facilities.

4.     All of the borrowing obligations under the proposed Exit Facilities and the majority of the fees under the Commitment Letter and Fee Letters will be payable at closing in connection with consummation of the plan—and, hence, will not be costs incurred by the

---

[4]   Of course, if the syndication is not successful and Morgan Stanley exercises its termination right, the Debtors will withdraw the Motion and reserve the right take the position that none of the obligations under the Commitment Letter or the Fee Letters will be payable.  Morgan Stanley has told the Debtors that it also reserves its rights on this point.

[5]   Section 7.17 of the ECA requires that the Debtors obtain not less than $450 million in proceeds from financed debt on or prior to the Effective Date on then-prevailing market terms (and from financing sources) that are reasonably acceptable to the Lead Investors and Visteon after "Good Faith Consultation" with the Co-Investors (as defined in the ECA).

3

Debtors prior to emergence. Indeed, prior to emergence, the Debtors' only obligations under the Commitment Letter and Fee Letters are to: (a) reimburse Morgan Stanley for reasonable, documented out-of-pocket costs in connection with finalizing the Exit Facilities; and (b) provide Morgan Stanley with (i) a $350,000 work deposit to be applied to those costs, (ii) certain customary indemnities, and (iii) the right to receive an Alternative Transaction Fee (as defined below) if one or both of the Exit Facilities are not consummated with Morgan Stanley.[6]

5.     Morgan Stanley has already committed substantial resources to completing its diligence process and negotiating and finalizing the Commitment Letter and the Fee Letters, and will continue to incur expenses and professional fees in connection with finalizing, documenting, and syndicating the Exit Facilities prior to the Debtors' emergence. Thus, the Debtors have filed this Motion to ensure that they have appropriate authority to commit to incurring and paying these limited pre-emergence obligations under the Commitment Letter and Fee Letters and that any claims which may arise under the Commitment Letter and the Fee Letters will be afforded administrative expense priority under section 503(b) of the Bankruptcy Code. For the reasons set forth below, the Debtors submit that entering into the Commitment Letter and the Fee Letters, including incurring and paying the limited fees, costs, and indemnities that may be incurred prior to emergence, are reasonable, appropriate, and in the best interest of the Debtors, their creditors, and their estates and should be approved.

---

[6]    As discussed below, the Alternative Transaction Fee only becomes payable in the unlikely event that the Debtors elect to pursue exit financing with a different lender in the 12 months after the Commitment Letter and Fee Letters are approved. Furthermore, the Alternative Transaction Fee is limited to payment of the commitment fees that would otherwise be payable with respect to closing of the Term Loan Facility or the Revolving Loan Facility in the event that either or both of the Exit Facilities is closed with a lead arranger or administrative agent other than Morgan Stanley. For the reasons set forth below, the Debtors submit that this fee is a reasonable and necessary cost that serves to protect the value of the estates by locking in Morgan Stanley's commitment to provide the Exit Facilities, ensuring the Debtors ability to consummate the plan as quickly as possible, if and when the plan is confirmed by the Court.

## Jurisdiction

6.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

7.     Venue is proper pursuant to 28 U.S.C. § 1408.

8.     The statutory bases for the relief requested herein are sections 105(a), 107(b), 363(b), and 503(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 6004 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Relief Requested

9.     By this Motion, the Debtors respectfully request that the Court enter an order substantially in the form of the Proposed Order authorizing the Debtors to: (a) enter into the Commitment Letter and the Fee Letters; (b) incur and pay fees, costs, and indemnities in connection with the Commitment Letter and the Fee Letters pursuant to sections 363 and 503(b) of the Bankruptcy Code; and (c) file the Fee Letters under seal pursuant to section 107(b) of the Bankruptcy Code.

## Background

### I.     The Plan of Reorganization

10.     On June 28, 2010, this Court entered an order[7] that, among other things, approved the Debtors disclosure statement (the "Disclosure Statement")[8] as containing adequate

---

[7]     *Order (A) Approving the Adequacy of the Debtors' Fourth Amended Disclosure Statement; (B) Approving Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Fourth Amended Plan of Reorganization; (C) Approving the Form of Various Ballots and Notices in Connection Therewith; and (D) Scheduling Certain Dates with Respect Thereto* [Docket No. 3491].

89462-001\DOCS_DE:163043.1

information and authorized the Debtors to solicit votes with respect to their plan of reorganization (as it may be modified, amended, and supplemented from time to time, the "Plan").[9] Voting on the Plan concluded on July 30, 2010, and each class of impaired claims and interests has accepted the Plan.[10] The confirmation hearing is scheduled to take place on August 31, 2010 (the "Confirmation Hearing").[11]

11.     As set forth in the Disclosure Statement, the Plan is comprised of two mutually exclusive sub plans—the Rights Offering Sub Plan (or "toggle A") and the Claims Conversion Sub Plan (or "toggle B").[12]     Consummation of either of the sub plans will allow Visteon to significantly deleverage its prepetition capital structure and right size its going forward balance sheet, positioning it to attract and retain customers as a reorganized entity, while providing general unsecured creditors up to a 50 percent recovery on the allowed amount of their claims.

12.     As this Court is well aware, toggle A of the Plan is premised on, among other things, a $1.25 billion junior capital infusion into Reorganized Visteon, comprised of a $950 million rights offering—pursuant to which the Debtors' prepetition note holders who are

---

[8]   *Debtors' Fourth Amended Disclosure Statement for the Fourth Amended Joint Plan of Reorganization of Visteon Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the United State Bankruptcy Code* [Docket No. 3519].

[9]   *Fourth Amended Joint Plan of Reorganization of Visteon Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 3471].

[10]   See generally *Affidavit of Christopher R. Schepper with Respect to the Tabulation of Votes on the Fourth Amended Joint Plan of Reorganization of Visteon Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 3934].

[11]   See *Order (A) Approving the Adequacy of the Debtors' Fourth Amended Disclosure Statement; (B) Approving Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Fourth Amended Plan of Reorganization; (C) Approving the Form of Various Ballots and Notices in Connection Therewith; and (D) Scheduling Certain Dates with Respect Thereto* [Docket No. 3491] ¶ 21; see also *Notice of Change of Hearing Date for Reserved Confirmation Hearing Date to August 31, 2010 at 9:30 A.M. Prevailing Eastern Time* [3709].

[12]   Capitalized terms used as defined terms herein and not defined shall have the meanings ascribed to them in the Plan.

6

accredited investors have subscribed to purchase New Visteon Common Stock—and a $300 million direct equity purchase commitment by the Investors under the ECA.[13] Toggle A is also premised on the consummation of the "Exit Financing," as defined in the ECA, in an amount not less than $450 million in proceeds from financed debt on or prior to the Effective Date on then-prevailing market terms (and from financing sources) that are reasonably acceptable to the Lead Investors and Visteon after "Good Faith Consultation," with the Co-Investors (as both such terms are defined in the ECA). See Plan, Art. III.A; ECA § 7.17.

13. To ensure that Debtors would be able to confirm and consummate toggle A as quickly as possible, the Debtors sought and obtained approval from this Court to conduct the Rights Offering on a parallel track with solicitation of the Plan.[14] The subscription period for the rights offering concluded on July 30, 2010, and Visteon's eligible unsecured note holders have delivered checks for more than $1.06 billion into escrow, thus exceeding the $950 million equity rights offering upon which toggle A is premised. The Investors under the ECA also have delivered funding certificates to the Debtors evidencing their commitment and wherewithal to deliver the $300 million direct purchase commitment.

14. Over the past several months, the Debtors have also engaged in a process to obtain a commitment for the Exit Financing. The Debtors have now concluded that process and obtained the consent of the Lead Investors, after Good Faith Consultation with the Co-Investors, to the Debtors' entry into the Commitment Letter and Fee Letters with Morgan Stanley, which are subject to this Court's approval. As discussed in greater detail below, the Commitment

---

[13]   The Investors have also agreed to allow certain of the Debtors prepetition equity holders to participate in the direct purchase commitment.

[14]   See generally *Order Approving Certain Rights Offering Procedures and Form in Connection Therewith* [3490].

Letter and Fee Letters are the result of a thorough marketing and negotiating process to obtain the Exit Financing on the best terms currently available.

## II.     The Debtors' Exit Financing Process

15.     In January 2010, the Debtors, with the assistance of Rothschild and A&M, launched their process to obtain the Exit Financing. Rothschild and the Debtors formulated a list of approximately 13 potential lenders. Rothschild then contacted each of the potential lenders to describe the opportunity in general terms and assess overall interest. All 13 potential lenders signed confidentiality agreements and were immediately provided access to the Debtors' online data room so that they could begin their diligence.[15] Ultimately six of them submitted non-binding letters of intent ("LOIs").

16.     Given the favorable terms available to the Debtors in the current debt markets, the Debtors determined, with the assistance of Rothschild and A&M, that it would be prudent to "lock in" additional financing, above the $450 million minimum required under the ECA. Thus, the Debtors determined to obtain (a) $500 million in either senior unsecured notes, a senior secured term facility, or a combination of the two, which would be used as part of the funding for the Plan, and (b) $200 million in a senior secured asset-based revolving credit facility, which would remain undrawn at exit (subject to funding certain letters of credit and certain financing costs) and available to finance post-emergence capital needs. Based on the competitiveness of the terms set forth in the LOIs that the Debtors received, as well as execution risk, level of interest in the diligence process, and other qualitative factors such as management's previous transaction experience with the six remaining potential lenders, the Debtors narrowed the list down to the top three candidates. Accordingly, in mid-July 2010 the Debtors circulated an exit

---

[15]     Rothschild, A&M, and the Debtors also participated in diligence calls and meetings with certain parties upon request.

8

financing structure and term sheet to the remaining three groups of potential lenders and requested that they respond with commitment proposals.

17.     By the end of the first week of August 2010, the Debtors received exit commitment proposals from all three groups of potential lenders. After several rounds of review with their advisors, circulation of revised draft commitment proposals, and further negotiations with the potential lenders, the Debtors concluded that Morgan Stanley's proposal presented the best available option. Thereafter, the Debtors continued to negotiate with Morgan Stanley to finalize the terms of the commitment, executing the final drafts of the documents on August 25, 2010. With Morgan Stanley's consent, the Debtors shared the Commitment Letter with the Lead Investors and obtained their acknowledgement that the proposed commitment was reasonably acceptable to them after Good Faith Consultation with the Co-Investors.

<u>**The Exit Financing Commitment**</u>

18.     The Commitment Letter represents a commitment by Morgan Stanley to provide the Reorganized Debtors with the proposed Exit Financing, which will consist of a $200 million senior secured asset-based revolving credit facility (the "<u>Revolving Loan Facility</u>") and a $500 million senior secured term loan facility (the "<u>Term Loan Facility</u>" and, together with the Revolving Loan Facility, the "<u>Exit Facilities</u>"). The terms of the Revolving Loan Facility are set forth in the term sheet attached to the Commitment Letter as <u>Exhibit B</u> (the "<u>Revolving Loan Term Sheet</u>"), and the terms of the Term Loan Facility are set forth in the term sheet attached to the Commitment Letter as <u>Exhibit C</u> (the "<u>Term Loan Term Sheet</u>," together with the Revolving Loan Term Sheet, the "<u>Term Sheets</u>" and, together with the Commitment Letter and the Fee Letters, the "<u>Commitment Papers</u>"). The Commitment Papers are subject to a termination right by Morgan Stanley if it is unable to syndicate the Term Loan Facility by 5:00 p.m. prevailing Eastern Time on Friday, August 27. In that event, Morgan Stanley will have the right, until 5:00

9

p.m. prevailing Eastern Time on Saturday, August 28, to elect to terminate the Commitment Letter—after which time the termination right expires if not exercised. Both Morgan Stanley and the Debtors expect that the syndication will be successfully completed. However, if the syndication is not successful and Morgan Stanley exercises its termination right, the Debtors will withdraw the Motion and reserve the right to take the position that none of the obligations under the Commitment Papers will be payable.[16] In any event, this issue will be resolved by the time of the Confirmation Hearing.

19. A summary of the Term Sheets and the fees, costs, and indemnities to be incurred and paid in connection with the Exit Facilities is provided below. To be clear, however, the Debtors are not seeking authority to enter into the Term Loan Facility or the Revolving Loan Facility or incur borrowing obligations prior to emergence from chapter 11. Nor are the Debtors seeking authority to pay the Exit Facility Fees (as defined below) prior to their emergence. Instead, if the Court approves the Commitment Papers and confirms the Plan, the Exit Facilities will be entered into—and the borrowing obligations will be incurred, and the Exit Facility Fees paid—by the Reorganized Debtors upon the Effective Date. By this Motion, the Debtors seek authority to enter into the Commitment Papers and incur and pay related fees, costs, and indemnity obligations *only* to the extent that they are due and payable before consummation of the Plan, as described below. The Debtors are, however, seeking authority—to the extent it is required—for the Reorganized Debtors to consummate the Exit Facilities, including paying all fees, costs, and indemnities thereunder upon consummation of the Plan, if and when confirmed by the Court. Thus, the Debtors believe that a fulsome disclosure of the terms of the Reorganized Debtors' proposed Exit Facilities, as set forth below, is appropriate.

---

[16] Morgan Stanley has told the Debtors that it also reserves its rights on this point.

## I.     The Term Loan Facility

20.     Along with the proceeds from the rights offering and certain available cash, the Reorganized Debtors intend to use the proceeds from the Term Loan Facility to satisfy their cash payment obligations under the Plan, including their prepetition secured credit facilities, other secured claims, administrative and priority claims, and cash distributions to general unsecured creditors, and to pay the costs and expenses associated with closing the Exit Facilities.  The following summarizes the key terms of the Term Loan Facility:[17]

| Overview of Term Loan Facility | |
|---|---|
| **Provision** | **Summary of Provision** |
| **Borrower:** | Reorganized Visteon Corporation |
| **Lead Arranger, Sole Bookrunner, and Administrative Agent:** | Morgan Stanley |
| **Collateral Agent:** | Morgan Stanley or another Lender or institution acceptable to the Administrative Agent and reasonably acceptable to the Borrower. |
| **Lenders:** | Morgan Stanley and a syndicate of financial institutions and institutional lenders arranged by the Lead Arranger in consultation with the Borrower. |
| **Guarantors:** | Each of the existing and future direct and indirect U.S. subsidiaries of the Borrower other than (a) foreign stock holding companies, (b) unrestricted subsidiaries, (c) immaterial subsidiaries to be agreed upon, (d) any direct or indirect U.S. subsidiary of a direct or indirect non-U.S. subsidiary of the Borrower to the extent such guarantee would result in material adverse tax consequences to the Borrower or its subsidiaries, (e) captive insurance subsidiaries, if any, (f) non-profit subsidiaries, if any, (g) joint ventures not more than 50 percent owned by the Borrower or its subsidiaries, and (h) existing joint ventures to the extent applicable law or the terms of such entities' organizational or other governing documents prohibit such entities from becoming guarantors. |
| **Facility:** | Senior secured term loan facility in the aggregate principal amount of $500 million. |
| **Issue Price:** | 98 percent (i.e., 2 percent original issuance discount). |
| **Maturity:** | Seven years from the Closing Date. |

---

[17]     This summary of the Term Loan Term Sheet is provided for the benefit of the Court and other parties in interest.  To the extent that there are any conflicts between this summary and the Term Loan Term Sheet or the other Commitment Papers, the terms of the Commitment Papers shall govern.  Capitalized terms used in the following summary and not otherwise defined therein shall have the meanings set forth in the Commitment Papers.

| | |
|---|---|
| **Collateral:** | First priority security interest in any and all of the following Collateral: (a) all Investment Property (including equity interests in subsidiaries); (b) all Documents; (c) all General Intangibles; (d) all Intellectual Property; (e) all Equipment; (f) all real property (including both fee and leasehold interests) and fixtures; (g) all Instruments; (h) all insurance; (i) all Letter of Credit Rights; (j) all Commercial Tort Claims; (k) all other Collateral not constituting ABL Collateral; (l) all books and records related to the foregoing; and (m) all Proceeds, including insurance Proceeds, of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing. Second priority security interest in all of the ABL Collateral. Notwithstanding the foregoing, "Term Loan Collateral" shall not include any property or assets included in clause (e), (f) or (h) of the definition of "ABL Collateral", and shall be subject to certain exclusions. |
| **Interest:** | At Visteon's election, the Term Loan Facility will bear interest at one of the following rates:<br><br>• the higher of (i) the Federal Funds Rate published by the Federal Reserve Bank of New York from time to time plus 0.5 percent, (ii) the rate that Morgan Stanley announces from time to time as its prime or base commercial lending rate, and (iii) the one-month LIBOR Rate plus 1 percent; provided that the minimum interest rate will be deemed to be not less than 2.75 percent per annum; plus 5.25 percent; and<br><br>• the annual LIBOR Rate, for the applicable interest period selected by Visteon, for the corresponding deposits of U.S. dollars; provided that the minimum LIBOR Rate will be deemed to be not less than 1.75 percent per annum; plus 6.25 percent. |
| **Default Interest:** | Upon a payment or bankruptcy event of default or an event of default related to the Financial Covenants, default interest shall be applied at 2 percent above the rate otherwise applicable thereto. |
| **Events of Default:** | Usual and customary events of default for facilities of this type, including failure to pay principal, interest, unused commitment and letter of credit fees or any other amount when due, after a grace period. |
| **Covenants** | Customary affirmative and negative covenants. Financial covenants limited to maintenance of (i) a Total Net Coverage Ratio not to exceed 2.50 to 1.00 and (ii) a minimum cash interest coverage ratio (i.e., EBITDA to cash interest expense). |

## II. The Revolving Loan Facility

21. The Revolving Loan Facility will remain undrawn as of the Effective Date (subject to funding certain letters of credit and financing costs)[18] and will be used following the

---

[18] The Revolving Loan Term Sheet provides that the Reorganized Debtors shall be permitted to borrow at closing up to $25 million, plus amounts necessary to fund the original issue discount or up-front facility fees in connection with the Exit Facilities and other amounts to be agreed.

Debtors' emergence from chapter 11 to finance ongoing operations and capital needs of the Reorganized Debtors. The following summarizes the key terms of the Revolving Loan Facility:[19]

| Overview of Revolving Loan Facility | |
|---|---|
| **Provision** | **Summary of Provision** |
| **Borrower:** | Reorganized Visteon Corporation and certain of its direct and indirect domestic subsidiaries. |
| **Sole Lead Arranger and Sole Bookrunner:** | Morgan Stanley |
| **Administrative Agent and Syndication Agent:** | Morgan Stanley |
| **Collateral Agent:** | Morgan Stanley and/or other financial institutions selected by the Administrative Agent. |
| **Lenders:** | Morgan Stanley and/or other financial institutions selected by Morgan Stanley in consultation with the Borrower |
| **Guarantors:** | Each of the existing and subsequently acquired or organized U.S. subsidiaries of the Borrower other than (a) foreign stock holding companies, (b) unrestricted subsidiaries, (c) immaterial subsidiaries to be agreed upon, (d) any direct or indirect U.S. subsidiary of a direct or indirect non-U.S. subsidiary of the Borrower to the extent such guarantee would result in material adverse tax consequences to the Borrower or its subsidiaries, (e) captive insurance subsidiaries, if any, (f) non-profit subsidiaries, if any, (g) joint ventures not more than 50 percent owned by the Borrower or its subsidiaries, and (h) existing joint ventures to the extent applicable law or the terms of such entities' organizational or other governing documents prohibit such entities from becoming guarantors. |
| **Facility:** | $200 million senior secured asset-based revolving loan facility, with $20 million available as swing line loans and $75 million available for the issuance of standby letters of credit. |
| **Maturity:** | Five years from the Closing Date. |
| **Security:** | First priority security interest in any and all of the following Collateral: (a) all Accounts (other than Accounts arising under contracts for the sale of Term Loan Collateral) and related Records; (b) all Chattel Paper; (c) all Deposit Accounts and all checks and other negotiable instruments, funds and other evidences of payment held therein (but not any identifiable Proceeds of Term Loan Collateral); (d) all Inventory; (e) all eligible real property and corporate aircraft included in the Borrowing Base; (f) |

---

[19] This summary of the Revolving Loan Term Sheet is provided for the benefit of the Court and other parties in interest. To the extent that there are any conflicts between this summary and the Revolving Loan Term Sheet or the other Commitment Papers, the terms of the Commitment Papers shall govern. Capitalized terms used in the following summary and not otherwise defined therein shall have the meanings set forth in the Commitment Papers.

13

| | |
|---|---|
| | solely to the extent evidencing, governing, securing or otherwise related to the items referred to in the preceding clauses (a), (b), (c), (d) and (e), all Documents, General Intangibles, Instruments, Investment Property and Letter of Credit Rights; (g) all books and records related to the foregoing; and (h) all Proceeds, including insurance Proceeds, of any and all of the foregoing and all collateral, security and guarantees given by any Person with respect to any of the foregoing. Second priority security interest in the Term Loan Collateral. Notwithstanding clause (h) above, "ABL Collateral" shall not include any assets referred to in clauses (a) through (j) and (l) of the definition of "Term Loan Collateral" that are not included in clause (f) above, and shall be subject to certain exclusions. |
| **Interest:** | At Visteon's election, the Revolving Loan Facility will bear interest at one of the following rates:<br><br>• a floating rate of interest per annum equal to the greatest of (i) the rate that Morgan Stanley announces from time to time as its prime or based commercial lending rate, (ii) the one-month LIBOR Rate plus 1 percent, and (iii) the Federal Funds Rate published by the Federal Reserve Bank of New York from time to time plus 0.5 percent; plus (a) as to Revolver 1, 2 percent if the Monthly Average Availability is greater than or equal to $50 million, or else 2.25 percent and (b) as to Revolver 2, 2.5 percent if the Monthly Average Availability is greater than or equal to $50 million, or else 2.75 percent; or<br><br>• the rate of interest appearing on Reuters Screen LIBOR01 Page as the London interbank offered rate for deposits in U.S. dollars for a term comparable to the applicable period of three months, and in each case subject to the reserve percentage prescribed by governmental authorities; plus (a) as to Revolver 1, 3 percent if the Monthly Average Availability is greater than or equal to $50 million, or else 3.25 percent and (b) as to Revolver 2, 3.5 percent if the Monthly Average Availability is greater than or equal to $50 million, or else 3.75 percent. |
| **Default Interest:** | Upon a payment or bankruptcy event of default or an event of default related to the Financial Covenants, default interest and letter of credit fees shall be applied at 2 percent above the rate otherwise applicable thereto. |
| **Revolving Loan Facility Commitment Fees:** | Per annum Revolving Loan Facility availability fees as determined in accordance with Schedule I to the Revolving Loan Term Sheet. |
| **Letters of Credit Fees:** | Fees equal to (i) the Applicable LIBOR Margin then in effect for the Revolving Loan Facility, times (ii) the average daily maximum aggregate amount available to be drawn under all Letters of Credit. In addition, a fronting fee equal to 0.25 percent will be payable to the Issuing Bank, as well as certain customary fees of the Issuing Bank. |
| **Events of Default:** | Usual and customary events of default for facilities of this type, including failure to pay principal, interest, or unused commitment and letter of credit fees, or any other amount when due, after a grace period. |
| **Covenants** | Customary affirmative and negative covenants. Financial covenants including a covenant to maintain minimum Excess Availability at all times in an aggregate amount not less than $40 million. |

89462-001\DOCS_DE:163043.1

**III.    Fees, Costs, and Indemnities to Be Incurred Under the Commitment Papers.**

22.    Entry into the Commitment Papers obligates the Debtors to incur and pay certain fees, costs, and indemnities in connection with the Exit Facilities, as set forth in the Commitment Letter and the Fee Letters.    At this time, the Debtors seek authority to incur and pay the following obligations as they come due (the "Pre-Emergence Exit Facility Obligations"):[20]

(a)    Reimbursement of Costs and Expenses: As more fully set forth in the Commitment Letter, the Debtors are required to pay or reimburse Morgan Stanley, the lead arrangers, and the administrative agents for the Exit Facilities (collectively, the "Reimbursement Parties") for all reasonable and documented out-of-pocket costs and expenses incurred in connection with the Exit Facilities and the preparation, negotiation, execution, and delivery of the Commitment Papers, the Financing Documentation (as defined in the Commitment Letter), and any security arrangements in connection therewith. If the Exit Facilities are not consummated, however, the reimbursement obligation is limited to reasonable and documented out-of-pocket collateral audit and appraisal expenses and certain counsel fees. The Commitment Letter also obligates the Debtors to pay all reasonable and documented out-of-pocket costs and expenses of the Reimbursement Parties incurred in connection with the enforcement of any of their rights and remedies under the Commitment Papers.

(b)    Work Deposit: In connection with the reasonable, documented out-of-pocket costs and expenses of the Reimbursement Parties for which Visteon is obligated under the Commitment Letter, the Fee Letters contemplates that upon approval of the Commitment Papers Visteon will pay Morgan Stanley a work deposit in the amount of $350,000 (as defined in the Fee Letters, the "Work Deposit"). The Work Deposit will be applied against the Reimbursement Parties' costs and expenses required to continue their due diligence and review with respect to the Exit Facilities and to prepare the required documentation in connection with the Exit Facilities. Additionally, if at any time prior to the closing of the Exit Facilities the Work Deposit is equal to or less than $50,000, Visteon shall provide Morgan Stanley with an additional amount of $150,000. Any unused amounts will be applied against the fees payable in connection with the Exit Facilities, with the remainder refunded to the Reorganized Debtors.

(c)    Indemnification: As more fully set forth in the Commitment Letter, the Debtors are required to indemnify and hold harmless the lead arrangers, the administrative agents, and the lenders under the Exit Facilities, along with their respective

---

[20]    This summary of the Commitment Letter and Fee Letters obligations is provided for the benefit of the Court and other parties in interest. To the extent that there are any conflicts between this summary and the Commitment Letter or the other Commitment Papers, the terms of the Commitment Papers shall govern. Capitalized terms used in the following summary and not otherwise defined therein shall have the meanings set forth in the Commitment Papers.

affiliates and each of their directors, officers, employees, advisors, agents, affiliates, successors, partners, representatives, and assigns (as defined in the Commitment Letter, each an "Indemnified Person"), from and against any and all actions, suits, investigation, inquiry, claims, losses, damages, liabilities, out-of-pocket expenses or proceedings of any kind or nature whatsoever which may be incurred by or asserted against or involve any Indemnified Person as a result of or arising out of or in any way related to or resulting from the Commitment Papers, the Exit Facilities, the use of proceeds thereof, the Transactions (as defined in the Commitment Letter), or the other transactions contemplated thereby (any of the foregoing, as defined in the Commitment Letter, a "Proceeding"). The Debtors are required, within certain limitations, to reimburse each Indemnified Person upon demand for any reasonable and documented legal or other reasonable and documented out-of-pocket expenses incurred in connection with investigating, defending, preparing to defend or participating in any such Proceeding; provided, however, that no Indemnified Person will be indemnified for costs, expenses, or liability resulting from (i) gross negligence, bad faith, or willful misconduct by such Indemnified Person, or (ii) any dispute solely among Indemnified Persons, other than claims against Morgan Stanley in its capacity or in filling its role as an administrative agent, lead arranger, or any other similar role under the Exit Facilities, and other than claims arising out of any act or omission on the part of the Debtors or their subsidiaries.

(d) Alternative Transaction Fee: The Fee Letters contemplate that in the event the Debtors or Reorganized Debtors consummate the transactions contemplated under the Commitment Papers without Morgan Stanley acting, on an exclusive basis, as lead arrangers and bookrunning managers, or bookrunners, as applicable, for any credit facility, high-yield facility, or other facility (as defined in the Fee Letters, an "Alternate Transaction"), Visteon would be required to pay Morgan Stanley the amount of the commitment fees on either or both of the Revolving Loan Facility and the Term Loan Facility, each as applicable, that would have been payable upon the closing of the Exit Facilities (as defined in the Fee Letters, the "Alternative Transaction Fee").

23.    In addition to obligations noted above, the Commitment Letter and Fee Letters obligate Visteon to pay certain fees in connection with the Exit Facilities upon closing, including certain commitment, agency, and "upfront" fees with respect to the Exit Facilities as set forth in the Fee Letters (collectively, the "Exit Facility Fees"). However, none of the Exit Facility Fees will be payable prior to the closing of the Exit Facilities. Instead, these amounts will be paid by the Reorganized Debtors in connection with consummation of the Plan and the Exit Financing on the Effective Date.

89462-001\DOCS_DE:163043.1

## IV. Confidentiality of the Fee Letters

24. The terms of the Fee Letters, including the calculation of the Exit Facility Fees, constitute sensitive commercial information, the public disclosure of which would negatively affect Morgan Stanley and the Debtors. Furthermore, the confidentiality provisions of the Commitment Papers require that the Debtors maintain the confidentiality of the Fee Letters, including with respect to seeking Court approval for the Commitment Papers. See Commitment Letter § 6. Thus, the Debtors have not attached the Fee Letters to the Motion.

25. However, in order to provide the Court and key parties in interest with full disclosure with respect to the Commitment Papers and all of the related fees, the Debtors respectfully request that the order entered by the Court on this Motion: (a) authorize the Debtors to file unredacted versions of the Fee Letters under seal pursuant to section 107(b) of the Bankruptcy Code; (b) direct that the Fee Letters shall remain under seal and confidential and shall not be made available to anyone, without the written consent of the Debtors and Morgan Stanley, other than to (i) the Court and (ii) on an attorney's eyes-only basis, counsel to the official committee of unsecured creditors (the "Creditors' Committee") and any other official committee appointed in these chapter 11 cases, counsel for the Lead Investors, counsel for the Co-Investors, the United States Trustee, and such other parties as may be agreed to by the Debtors and Morgan Stanley (collectively, the "Limited Notice Parties"); and (c) find that service of this Motion and exhibits hereto, without transmittal of the unredacted Fee Letters to parties entitled to receive notice in these chapter 11 cases other than the Limited Notice Parties, constitutes sufficient notice under the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

89462-001\DOCS_DE:163043.1

**Basis for Relief**

I.     **The Pre-Emergence Exit Facility Obligations Should Constitute Allowed Administrative Expenses Pursuant to Section 503(b) of the Bankruptcy Code.**

26.     As noted above, the Commitment Papers obligate the Debtors to incur and pay the Pre-Emergence Exit Facility Obligations, consisting of: (a) reimbursement of Morgan Stanley for reasonable, documented out-of-pocket costs in connection with finalizing the Exit Facilities; (b) the $350,000 Work Deposit to be applied to those costs, (c) certain customary indemnities, and (c) the Alternative Transaction Fee, in certain circumstances. These Pre-Emergence Exit Facility Obligations constitute "necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A).

27.     <u>First</u>, without the payment of the relevant reimbursable expenses and agreement to indemnify each of the Indemnified Persons, the Debtors would be unable to secure the Morgan Stanley's commitment to provide the Exit Facilities. This would jeopardize the Debtors' ability to consummate the Plan and seek an expedited emergence from chapter 11, thereby impairing the value of their business to the detriment of their stakeholders. These obligations, therefore, should be awarded administrative expense status under section 503(b)(1) of the Bankruptcy Code.

28.     <u>Second</u>, the Alternative Transaction Fee should be approved under section 503(b) of the Bankruptcy Code as necessary to preserve the value of the Debtors' estates. The legal standard governing the award of "break-up fees" and similar fees in the Third Circuit was established in <u>Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)</u>, 181 F.3d 527 (3d Cir. 1999); <u>see also</u> <u>In re Reliant Energy Channelview, LP</u>, 403 B.R. 308, 311 (D. Del. 2009) (citing <u>O'Brien</u> as outlining relevant legal standard governing break-up fees in the Third Circuit). In <u>O'Brien</u>, the Third Circuit surveyed different approaches to break-up fees and

18

concluded that none of the different approaches taken by other courts "offer[ed] a compelling justification for treating an application for break-up fees and expenses under § 503(b) differently from other applications for administrative expenses under the same provision." Id. at 535. The Third Circuit went on to state:

> We therefore conclude that the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were *actually necessary to preserve the value of the estate*. Therefore, we conclude that the business judgment rule should not be applied as such in the bankruptcy context. Nonetheless, the considerations that underlie the debtor's judgment may be relevant to the Bankruptcy Court's determination on a request for break-up fees and expenses.

Id. (emphasis added).

29.     The Commitment Papers represent the best financing available to the Debtors under current market conditions and are critical to the consummation of toggle A. Importantly, the Commitment Papers ensure that the Debtors have the necessary financing to consummate the Plan, if approved, and emerge expeditiously from chapter 11 with a de-levered balance sheet.[21] The ability to lock in a commitment for their Exit Financing provides a tremendous benefit to the Debtors' estates. Furthermore, the Alternative Transaction Fee is limited to the commitment fees that would otherwise be payable under the Exit Facilities. Similar "break-up" fees were included in the other proposals that the Debtors received, and the Alternative Transaction Fee was the subject of the Debtors' and Morgan Stanley's extensive negotiation process.

30.     Furthermore, the proposed Alternative Transaction Fee is well within the acceptable range. The "rule of thumb" is that permissible "break-up" type fees and expense

---

[21] See Hr'g Tr. 45:1-3, Aug. 17, 2010 (the Court noting, "I have grave concerns about keeping the company in bankruptcy longer than absolutely necessary").

19

reimbursements should not exceed more than 3 to 5 percent of the proposed deal value.[22] Here, the proposed Alternative Transaction Fee is, at most, approximately 2.1 percent of the overall commitment (if neither of the Exit Facilities are consummated with Morgan Stanley), and the Work Deposit is only an additional 0.05 percent (the original $350,000 Work Deposit) to 0.07 percent (if Morgan Stanley requests the additional $150,000 to replenish the Work Deposit) of the overall commitment. Because Morgan Stanley requires the Alternative Transaction Fee to enter into the Commitment Papers, and because the Exit Facilities are essential to the Debtors' ability to consummate toggle A, the Alternative Transaction Fee is "necessary to preserve the value of the estate[s]," O'Brien, 181 F.3d at 535, and the Debtors should be authorized to effectuate the Commitment Papers.

## II.     Entering into the Commitment Papers and Incurring and Paying Fees, Costs, and Indemnities Thereunder Is a Sound Exercise of the Debtors' Business Judgment.

31.     Visteon's entry into the Commitment Papers, including incurring and paying the fees, costs, and indemnities contemplated thereby, is a sound exercise of the Debtors' business judgment and should be approved.

32.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b)(1) of the Bankruptcy Code,

---

[22]     See, e.g., In re Muzak Holdings LLC, Case No. 09-10422 (KJC) (Bankr. D. Del. Dec. 21, 2009) (Docket No. 732) (approving a 3.5 percent break-up fee and an undisclosed expense reimbursement); In re The Fairchild Corp., Case No. 09-10899 (CSS) (Bankr. D. Del. Apr. 17, 2009) (Docket No. 169) (approving a combined 4.5 percent break-up and expense reimbursement, including a 1.5 percent expense reimbursement); In re Tallygenicom, L.P., Case No. 09-10266 (CSS) (Bankr. D. Del. Feb. 19, 2009) (Docket No. 130) (approving a combined 4.1 percent break-up fee and expense reimbursement, including a 2.0 percent expense reimbursement); In re Monaco Coach Corp., Case No. 09-10750 (KJC) (Bankr. D. Del. Apr. 20, 2009) (Docket No. 240) (approving a combined 5.8 percent break-up fee and expense reimbursement, including a 2.4 percent expense reimbursement); In re Nortel Networks Inc., Case No. 09-10138 (Bankr. D. Del. Feb. 27, 2009) (Docket No. 386) (approving an combined 5.9 percent break-up fee and expense reimbursement, including a 2.3 percent expense reimbursement); In re Hines Horticulture Inc., Case No. 08-11922 (KJC) (Bankr. D. Del. Dec. 9, 2008) (Docket No. 355) (approving a combined 3.9 percent break-up fee and expense reimbursement, including a 1.3 percent expense reimbursement).

a court generally should approve a non-ordinary course transaction if the proposed use of estate assets is within the debtor's reasonable business judgment. See, e.g., In re Martin, 91 F.3d 389, 395 (3d Cir. 1996) (stating that the court generally defers to the trustee's judgment so long as there is a legitimate business justification); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999) (noting that courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)); In re Del. & Hudson R.R. Co., 124 B.R. 169, 175-76 (D. Del. 1991) (same).

33.    Once the debtor has articulated a valid business purpose for use of estate property, a presumption arises that the debtor's decision is made on an informed basis, in good faith, and in the honest belief that the action is in the best interest of the company. See In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) ("Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity."); Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)), appeal dismissed, 3 F.3d 49 (2d Cir. 1993); In re Johns-Manville Corp., 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

34.    Here, there is ample justification for the Debtors' entry into, and performance under, the Commitment Papers. First, the Debtors, with the assistance of their professionals, have performed an in-depth review of their post-emergence capital needs and have determined that a sizable exit facility is necessary for the Debtors to emerge from chapter 11. Indeed,

securing such exit financing is a necessary condition to effectuate the terms of the Plan that each of the Debtors' creditor and shareholder classes support.

35.     Second, the terms of the Exit Facilities are the result of a thorough market search conducted by the Debtors and Rothschild to identify parties capable of delivering the substantial level of financing the Reorganized Debtors will require, at market terms and with minimal execution risk.  Furthermore, the Commitment Papers represent the opportunity to lock in the Revolving Loan Facility (which will remain undrawn at exit subject to certain obligations discussed above) at favorable terms.  The Commitment Papers were the subject of extensive arm's length negotiations among the Debtors' and Morgan Stanley's principals and advisors. Accordingly, the terms of the Exit Facilities as reflected in the Commitment Papers are reasonable and the best available to the Debtors at this time and were finalized after thorough consideration of numerous financing alternatives.

36.     Third, the Exit Facility Fees and the Pre-Emergence Exit Facility Obligations are reasonable and customary and are the result of extensive, arm's-length negotiations.[23]

37.     Absent authorization to satisfy their obligations under the Commitment Papers, the Debtors' prospects with respect to consummation of toggle A are uncertain.  Thus, the Debtors respectfully submit that it is in the best interest of the Debtors' estates, their creditors and other parties in interest for the Court to authorize entry into the Commitment Papers and to finalize the Exit Facilities in connection with consummation of the Plan, if and when confirmed by the Court.

---

[23]     Additionally, the Exit Facility Fees will not be paid by the Debtors prior to emergence.  Instead, because these fees are payable upon closing the Exit Facilities, they will be paid by the Reorganized Debtors in connection with confirmation of the Plan and finalizing the Exit Facilities.  Therefore, the commitment to pay these fees upon closing the Exit Financing is not a burden being placed upon the Debtors' estates.

89462-001\DOCS_DE:163043.1

### III. Ample Authority Exists to Allow the Debtors to File the Fee Letters Under Seal.

38. Section 107(b) of the Bankruptcy Code provides bankruptcy courts with authority to issue orders that will protect entities from potential harm that may result from the disclosure of certain confidential information:

> On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may: (1) protect an entity with respect to a trade secret or confidential research, development, or commercial information; or (2) protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title.

11 U.S.C. § 107(b). Bankruptcy Rule 9018 defines the procedures by which a party may move for relief under section 107(b) of the Bankruptcy Code:

> On motion or on its own initiative, with or without notice, the court may make any order which justice requires (1) to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information . . . .

Fed. R. Bankr. P. 9018. Additionally, Local Rule 9018-1(b) provides, in relevant part, that "[a]ny party who seeks to file documents under seal must file a motion to that effect with the Clerk." Del. Bankr. L.R. 9018 1(b).

39. Confidential commercial information is information which, if disclosed, would result in "an unfair advantage to competitors by providing them information as to the commercial operations of the debtor." In re Alterra Healthcare Corp., 353 B.R. 66, 75 (Bankr. D. Del. 2006) (citing Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.), 21 F.3d 24, 27 (2d Cir. 1994)). Commercial information, however, need not rise to the level of a trade secret to be protected under section 107(b) of the Bankruptcy Code. Orion Pictures, 21 F.3d at 28 (holding that a license agreement authorizing a licensee to "reproduce, manufacture, distribute, and sell videocassettes of three films" contained confidential commercial information

and that protection of such information under section 107(b) was justified); In re Barney's, Inc., 201 B.R. 703, 708-09 (Bankr. S.D.N.Y. 1996) (concluding that for a retailer, confidential commercial "information might include, without limitation, pricing formulae, short and long term marketing strategies and the terms of agreements with suppliers).

40.     Unlike its counterpart in Rule 26(c) of the Federal Rules of Civil Procedure, section 107(b) of the Bankruptcy Code does not require an entity seeking such protection to demonstrate "good cause." See, e.g., Orion Pictures, 21 F.3d at 28; Phar Mor, Inc. v. Defendants Named Under Seal (In re Phar Mor, Inc.), 191 B.R. 675, 679 (Bankr. N.D. Ohio 1995). Rather, once the bankruptcy court determines that a party in interest is seeking protection of information that falls within one of the categories enumerated in section 107(b) of the Bankruptcy Code, "the court is required to protect a requesting interested party and has no discretion to deny the application." Orion Pictures, 21 F.3d at 27.

41.     Under the plain language of section 107(b) of the Bankruptcy Code and Bankruptcy Rule 9018, and in light of the Court's broad equitable powers under section 105(a) of the Bankruptcy Code to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," the Debtors respectfully submit that the requested relief should be granted. Specifically, the Fee Letters contain detailed proprietary information with respect to calculation of the Exit Facility Fees and other commercial terms that are considered by Morgan Stanley and other similarly-situated banks to be highly sensitive, confidential information not typically disclosed to the public or made available to competing financial institutions. Given the highly competitive nature of the investment banking and finance lending industries, it is of the utmost importance to Morgan Stanley that the details of the Fee Letters

24

remain confidential, so that their competitors may not use the information contained in the Fee Letters to gain a strategic advantage in the marketplace.

42.     Moreover, the Fee Letters also contain certain terms with respect to Morgan Stanley's ability, within a narrow band, to adjust or "flex" the pricing for the Exit Facilities and certain financial covenants to assist with syndication. Because of the extremely sensitive nature of this information, and to prevent any flex from becoming a self-fulfilling prophecy at the Debtors' expense, it is also in the Debtors' interest to keep the Fee Letters confidential.

43.     Thus, in accordance with the interests of Morgan Stanley and the Debtors—and the confidentiality terms of the Commitment Papers—the Debtors respectfully request that the Court allow the Debtors to file the Fee Letters under seal and limit their disclosure to the Court and the Limited Notice Parties. The Limited Notice Parties have the greatest interest in the Fee Letters, so limiting notice and disclosure to these entities will subject the Fee Letters to sufficient scrutiny on their merits while, at the same time, minimizing the impact of disclosure on Morgan Stanley and the Debtors.

## Relief Under Bankruptcy Rule 6004(h) Is Appropriate.

44.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." A court may reduce or waive the stay period, however, "when there is a sufficient business need to close the transaction." In re Boscov's, Inc., 2008 WL 4975882 at *2 (Bankr. D. Del. Nov. 21, 2008). In this case, the Debtors request that the Proposed Order authorizing Visteon's entry into the Commitment Papers be effective immediately to bring certainty to the transactions.

45.     There is no reason to delay the effectiveness of the Proposed Order. The Commitment Papers contain a very limited set of obligations which the Debtors seek to incur and

25

pay at this time, specifically the Pre-Emergence Exit Facility Obligations, which include reimbursing Morgan Stanley's out-of-pocket expenses and paying the related Work Deposit, providing Morgan Stanley with certain customary indemnities, and agreeing to pay the Alternative Transaction Fee in limited circumstances (which are not likely to arise in any event). Working in good faith with the Debtors, Morgan Stanley has already incurred certain diligence and professional expenses with respect to negotiating the Commitment Papers and now has directed its appraisers to begin conducting field audits and other final diligence. Furthermore, Morgan Stanley will incur further pre-Effective Date expenses and professional fees in finalizing the documentation for, and syndicating, the Exit Facilities—all of which is necessary to allow the Debtors to emerge as expeditiously as possible. Thus, it is important that the Pre-Emergence Exit Facility Obligations become effective immediately to give Morgan Stanley the certainty that it can move forward with its processes, assured that it will be compensated for incurring the related costs. This will allow the parties to focus on completing the definitive documentation for both of the Exit Facilities and help ensure the Debtors' expeditious exit from chapter 11. Accordingly, waiver of the 14-day stay period under Bankruptcy Rule 6004(h) is appropriate.

### Notice

46. Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the United States Trustee; (b) the Creditors' Committee; (c) counsel to the ad hoc group of lenders for the Debtors' prepetition senior secured term loan facility; (d) counsel for the administrative agent for the Debtors' prepetition senior secured term loan facility; (e) counsel for the administrative agent for the Debtors' debtor-in-possession credit facility; (f) counsel for the administrative agent for the Debtors' prepetition revolving senior secured credit facility; (g) the indenture trustee for each of the Debtors' outstanding unsecured bond issuances; (h) counsel to the working group of the informal note holder committee; (i)

26

counsel to the informal note holder committee; (j) counsel to Morgan Stanley; and (k) those parties who have requested notice pursuant to Bankruptcy Rule 2002. In addition, as described above, unredacted copies of the Fee Letters have been provided to the Limited Notice Parties and the Court. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

47. No prior motion for the relief requested herein has been made to this or any other court.

89462-001\DOCS_DE:163043.1

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court enter an order, substantially in the form of the Proposed Order attached hereto as Exhibit A: (a) authorizing the Debtors to (i) enter into the Commitment Papers, (ii) incur and pay fees, costs, and indemnities in connection with the Commitment Papers, and (iii) file the Fee Letters under seal; and (b) granting such other and further relief as is just and proper.

Dated: August 25, 2010

**PACHULSKI STANG ZIEHL & JONES LLP**

Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, Delaware 19899-8705
Telephone:      (302) 652-4100
Facsimile:       (302) 652-4400
E-mail:           ljones@pszjlaw.com
                       joneill@pszjlaw.com
                       tcairns@pszjlaw.com

- and -

**KIRKLAND & ELLIS LLP**
James H. M. Sprayregen, P.C. (IL 6190206)
Marc Kieselstein, P.C. (IL 6199255)
James J. Mazza, Jr. (IL 6275474)
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:       (312) 862-2200
E-mail:           james.sprayregen@kirkland.com
                       marc.kieselstein@kirkland.com
                       james.mazza@kirkland.com

*Attorneys for the Debtors and Debtors in Possession*

89462-001\DOCS_DE:163043.1