**Exhibit B**

**Commitment Letter**

## MORGAN STANLEY SENIOR FUNDING, INC.
### 1585 Broadway
### New York, New York 10036

August 25, 2010

| | |
|---|---|
| Visteon Corporation | Rothschild, Inc. |
| One Village Center Drive | 1251 Avenue of the Americas |
| Van Buren Township, MI 48111 | New York, New York 10020 |
| Attn: Donald Stebbins, Chief Executive Officer | Attn: Todd Snyder, Managing Director |
| William Quigley, Chief Financial Officer | Ira Wolfson, Managing Director |
| Michael Lewis, Treasurer | Dustin Mondell, Director |
| Jennifer Pretzel, Associate Director | Michael Chung, Associate |

**Visteon Corporation**
**Commitment Letter**
**$200,000,000 Senior Secured Asset Based Revolving Loan Facility and**
**$500,000,000 Term Loan Facility**

Ladies and Gentlemen:

You have advised Morgan Stanley Senior Funding, Inc. and its affiliates (collectively, "**MSSF**," "**we**," "**us**" or the "**Commitment Parties**") that Visteon Corporation, a Delaware corporation and certain of its subsidiaries and affiliates (collectively, "**you**" or "**Visteon**") currently are debtors in possession in jointly-administered cases (the "**Cases**") under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). You have further advised us that Visteon is seeking exit financing to consummate the transactions described in Exhibit A and emerge from Chapter 11 protection pursuant to the Fourth Amended Joint Plan of Reorganization filed with the Bankruptcy Court on June 24, 2010 (such plan of reorganization, together with all exhibits, schedules, annexes and supplements thereto (including, without limitation, the Plan Supplement filed with the Bankruptcy Court on July 23, 2010 and all exhibits, schedules, annexes and supplements filed with the Equity Commitment Agreement), each in the form filed with Bankruptcy Court at any time on or before the date of this Commitment Letter, as the same may be amended, supplemented or otherwise modified from time to time with the consent of the Lead Arrangers (as defined below) with respect to any amendment, supplement or modification that is, in the reasonable judgment of the Lead Arrangers, adverse in any material respect to the rights or interests of the Lenders (as defined below), collectively, the "**Plan of Reorganization**") and related Fourth Amended Disclosure Statement for the Plan filed on June 24, 2010 (such disclosure statement, together with all exhibits, schedules, annexes and supplements thereto, the "**Disclosure Statement**") (collectively, the "**Transactions**"). All references to "**dollars**" or "**$**" in this Commitment Letter (as defined

below) are references to United States dollars. Capitalized terms used as defined terms herein and not otherwise defined shall have the meanings ascribed to such terms in the Plan of Reorganization.

1. **Commitments**.

(a) MSSF hereby commits to provide to Visteon 100% of a $200,000,000 revolving loan facility (the "**Revolving Loan Facility**") subject to and on the terms and conditions set forth herein and in the term sheet for the Revolving Loan Facility, as attached hereto as Exhibit B (the "**Revolving Loan Facility Term Sheet**"); and

(b) MSSF hereby commits to provide to Visteon $500,000,000 of term loans (the "**Term Loans**") under a secured term loan facility (the "**Term Loan Facility**") subject to and on the terms and conditions set forth herein and in the term sheet for the Term Loan Facility as attached hereto as Exhibit C (the "**Term Loan Term Sheet**").

The term financing described above is sometimes referred to herein as the "**Term Financing**"; and together with the Revolving Loan Facilities, the "**Facilities**". The Revolving Loan Facility Term Sheet and the Term Loan Term Sheet are collectively referred to herein as the "**Term Sheets**" and, together with this agreement, this "**Commitment Letter**".

It is agreed that MSSF or one of its affiliates shall act as lead arranger and bookrunner for (i) the Revolving Loan Facility (in such capacity, the "**Revolver Lead Arranger**") and (ii) the Term Loan Facility (in such capacity, the "**Term Lead Arranger**"); and, together with the Revolver Lead Arranger, the "**Lead Arrangers**"), MSSF or one of its affiliates shall act as syndication agent for the Revolving Loan Facility and Term Loan Facility and MSSF or one of its affiliates shall act as administrative agent for the Revolving Loan Facility (in such capacity, the "**Revolver Administrative Agent**") and the Term Loan Facility (in such capacity, the "**Term Administrative Agent**" and, together with the Revolver Administrative Agent, the "**Administrative Agents**"), in each case upon the terms and subject to the conditions set forth or referred to in this Commitment Letter and in the applicable Term Sheet. It is understood and agreed that MSSF and its affiliates will have "lead left" placement on all marketing materials relating to the Facilities and will perform the duties and exercise the authority customarily performed and exercised by them in such role, including acting as sole manager of the physical books. It is further agreed that no additional advisors, agents, co-agents, arrangers or bookmanagers will be appointed and no Lender (as defined below) will receive compensation with respect to any of the Facilities outside the terms contained in this Commitment Letter and the Term Loan Facility Fee Letter and the Revolving Loan Facility Fee Letter (collectively, the "**Fee Letter**") executed simultaneously herewith in order to obtain its commitment to participate in the Facilities, in each case, unless you and we so agree. Notwithstanding the foregoing, you shall have the right to appoint, prior to the date which is five business days from your execution of this Commitment Letter (but in any event not later than September 1, 2010), with up to economics and commitments with respect to $100,000,000 of Revolver 1 (as defined in the Revolving Loan Facility Term Sheet), up to three financial institutions, as additional co-arrangers or co-bookrunners (with the financial institutions, economics and commitments for each such financial institution to be agreed between you and us, including hold levels under Revolver 1 and Revolver 2 (as defined in the Revolving Loan Facility Term Sheet)); provided that (a) no such financial institution shall be allocated commitments and compensation in excess

of that allocated to MSSF, (b) such additional financial institution assumes the obligations of MSSF hereunder on a several, but not joint, basis pursuant to terms and documentation reasonably acceptable to MSSF and MSSF's commitments hereunder are reduced ratably by the aggregate amount of the commitments held by such additional financial institution, and (c) the Lead Arrangers shall hold the respective roles contemplated above with respect to the Facilities, including for league table purposes and for the purposes of "left" with respect to the Facilities.

The conditions precedent to the commitment of the Commitment Parties and the initial funding of the Facilities are limited to those set forth in this Commitment Letter, and all other terms of this commitment that are not covered or made clear in this Commitment Letter are subject to mutual agreement of the parties. The commitment and other obligations of the Commitment Parties hereunder are subject to the satisfaction of the conditions contained in the Revolving Loan Term Sheet, the Term Loan Term Sheet and the conditions set forth on Schedule 1 attached hereto, all in a manner reasonably acceptable to the Commitment Parties.

2. **Syndication**. The Lead Arrangers reserve the right, prior to or after execution of the Financing Documentation, to syndicate (in consultation with you) all or part of the Commitment Parties' commitment for the Facilities to one or more financial institutions or institutional lenders. Notwithstanding the Lead Arrangers' right to syndicate (in consultation with you) the Facilities and receive commitments with respect thereto, except as set forth in Section 1 above with respect to financial institutions appointed by you and made a "Commitment Party" hereunder, the initial Commitment Parties shall (i) retain exclusive control over all rights and obligations with respect to their commitments, including all rights with respect to consents, modifications and amendments, until the Closing Date has occurred, and (ii) not be relieved of all or any portion of their commitments hereunder unless and until any such assignee shall have funded the portion of the commitment so assigned on the Closing Date. Without limiting your obligations to assist with syndication efforts as set forth herein, the Commitment Parties agree that except as set forth in the Term Loan Facility Fee Letter neither completion of such syndication, nor achievement of a Successful Syndication (as defined in the Fee Letter), is a condition to its commitments hereunder.

The Lead Arrangers intend to commence syndication efforts promptly after the execution of this Commitment Letter by you and you agree to use your commercially reasonable efforts to assist the Lead Arrangers in achieving syndication in respect of the Facilities that is reasonably satisfactory to the Lead Arrangers until the earlier of (i) the date upon which a Successful Syndication (as defined in the Fee Letter) is achieved and (ii) the date that is 90 days after the Closing Date. Such syndication will be accomplished by a variety of means, including your using commercially reasonable efforts to cause direct contact during the syndication for the Facilities between senior management and advisors of Visteon, on the one hand, and the proposed syndicate members for the Facilities, on the other hand (such members in respect of the Revolving Loan Facility being referred to as the "**Revolver Lenders**", such members in respect of the Term Loan Facility being referred to as the "**Term Lenders**" and, collectively, the "**Lenders**") at mutually agreed upon times. The Lead Arrangers shall, in consultation with you, exclusively manage all aspects of the syndication, including the timing, scope and identity of potential lenders, any agency or other title designations or roles awarded to any potential lender, any compensation provided to each potential lender from the amount paid to the Lead Arrangers pursuant to this Commitment Letter and the Fee Letter and the final allocation of the commitments in respect of the Facilities among the Lenders.

To assist the Commitment Parties in their syndication efforts, you hereby covenant and agree:

(a)    to use your commercially reasonable efforts to provide the Lead Arrangers and the other relevant syndicate members upon request with all customary information with respect to you and your subsidiaries and the Transactions reasonably requested by the Lead Arrangers, including but not limited to the Projections (as defined below) and financial and other customary and reasonably available information, and marketing materials, prepared by, on behalf or at the direction of you or your subsidiaries used in connection with the syndication (other than confidential pricing and contract terms for customers);

(b)    to prepare one or more customary confidential information memoranda and other marketing materials as soon as reasonably practicable after the date hereof and to be delivered no later than the date that is 19 consecutive business days (which for the purposes of calculating such 19-business day period, shall exclude the days between (and including) August 23, 2010 through (and including) September 6, 2010, the "**Blackout Period**") prior to the Closing Date, in each case, in form and substance customary for transactions of this type and otherwise reasonably satisfactory to the Lead Arrangers, to be used in connection with the syndication of the Facilities;

(c)    to use your commercially reasonable efforts to ensure that the syndication efforts of the Lead Arrangers benefit materially from your existing lending and banking relationships;

(d)    there shall be no competing issues of debt securities or commercial bank or other debt facilities, mezzanine financing, securitizations (other than ordinary course indebtedness and the financings contemplated hereby) by Visteon or any of its subsidiaries being offered, placed or arranged (other than the Facilities), including renewals or refinancing of any existing debt (it being understood that this condition shall survive the Closing Date as a covenant until the earlier to occur of (i) a Successful Syndication (as defined in the Fee Letter) of the Facilities and (ii) the date that is 90 days after the Closing Date) without the prior written consent of the Lead Arrangers (not to be unreasonably withheld, delayed or conditioned) if such financing would have, in the reasonable good faith judgment of the Lead Arrangers, a materially detrimental effect upon such primary syndication; and

(e)    to make available your officers, and use your commercially reasonable efforts to make available your representatives and advisors, in each case from time to time and to attend and make presentations regarding the business and prospects of Visteon at one or more meetings of Lenders at times and locations to be mutually agreed as may be reasonably requested by Lead Arrangers.

3.    **Information**.  You represent and warrant that (a) all written information (other than the Projections referred to below and information of a general economic or industry nature) (the "**Information**") that has been or will hereafter be made available by or on behalf of you or by any of your agents or representatives in connection with the Transactions to the Commitment Parties or any of their affiliates, agents or representatives or to any Lender or any potential Lender is and will be when furnished and taken as a whole, correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material

fact necessary in order to make the statements contained therein not materially misleading in the light of the circumstances under which such statements were or are made (after giving effect to all supplements and updates thereto) and (b) all financial and business projections, all estimates, budgets and all other forward-looking information relating to you and the Transactions (the "**Projections**"), if any, that have been or will be prepared by you or on your behalf by any of your representatives and made available to the Commitment Parties or any of their affiliates, agents or representatives or to any Lender or any potential Lender in connection with the Transactions have been or will be prepared in good faith based upon assumptions believed by you to be reasonable at the time of preparation thereof (it being understood that such projections are subject to significant uncertainties and contingencies and that such Projections are not to be viewed as facts or as a guarantee of performance or achievement of any particular results and that no assurance can be given that any particular projections will be realized, that actual results may differ and that such differences may be material). You agree that, if at any time prior to the Closing Date and, if requested by us, until the earlier to occur of (i) a Successful Syndication (as defined in the Fee Letter) of the Facilities and (ii) the date that is 90 days after the Closing Date, any of the representations or warranties in the preceding sentence would be incorrect if the Information or Projections were being furnished, and such representations and warranties were being made, at such time, then you will promptly supplement, or cause to be supplemented, the Information and Projections so that such representations and warranties will be correct in all material respects at such time. You agree that, in issuing the commitments hereunder and in arranging and syndicating the Facilities, we will be entitled to use and rely on the Information and the Projections furnished by you or on your behalf without independent verification thereof.

You agree that the Lead Arrangers may make available any Information and Projections (collectively, the "**Company Materials**") to potential Lenders by posting the Company Materials on IntraLinks, the Internet or another similar secure electronic system (the "**Platform**"). You further agree to assist, at the request of the Lead Arrangers, in the preparation of a version of a confidential information memorandum and other marketing materials and presentations to be used in connection with the syndication of each Facility, that to your knowledge (after due inquiry) consists exclusively of information or documentation that is either (i) publicly available, or (ii) does not contain material non-public information with respect to the Borrower or its subsidiaries or any of its securities for purposes of United States federal and state securities laws (all such information and documentation being "**Public Lender Information**"). Any information and documentation that is not Public Lender Information is referred to herein as "**Private Lender Information**." You further agree that each document to be disseminated by the Lead Arrangers to any Lender or potential Lender in connection with the syndication of such Facility will be identified by you as either (i) containing Private Lender Information or (ii) containing solely Public Lender Information. You acknowledge that the following documents will contain solely Public Lender Information: (i) drafts and final definitive documentation with respect to each Facility; (ii) to the extent provided in advance to Visteon, administrative materials prepared by the Lead Arrangers for potential Lenders (e.g., a lender meeting invitation, allocation and/or funding and closing memoranda); and (iii) notification of changes in the terms of such Facility.

    **4.**    **Costs, Expenses and Fees.** You agree to pay or reimburse on the earlier of the Closing Date or within 20 days of written demand (together with reasonably detailed supporting documentation) the Lead Arrangers, the Administrative Agents and the Commitment Parties for all reasonable and documented out-of-pocket costs and expenses incurred by the Lead Arrangers,

the Administrative Agents and the Commitment Parties or their respective affiliates (whether incurred before or after the date hereof, and whether either one of the Facilities actually close) in connection with the Facilities and the preparation, negotiation, execution and delivery of this Commitment Letter and Fee Letter, the Financing Documentation and any security arrangements in connection therewith, including without limitation, reasonable and documented legal fees and out-of-pocket expenses of the Lead Arrangers, the Administrative Agents and the Commitment Parties, respectively, of not more than one counsel with respect to the Facilities plus, if necessary, one special regulatory counsel and one local counsel per material jurisdiction plus, in the case of a conflict of interest, one additional counsel for each affected party (except that if the Closing Date does not occur, such reimbursement obligation shall apply only to reasonable and documented out-of-pocket collateral audit and appraisal expenses and reasonable and documented out-of-pocket expenses of local and foreign counsel and the reasonable and documented fees and expenses of one primary counsel). Subject to the foregoing, you further agree to pay all reasonable and documented out-of-pocket costs and expenses of the Lead Arrangers, the Administrative Agents and the Commitment Parties and their respective affiliates (including, without limitation, reasonable fees and disbursements of not more than one counsel with respect to the Facilities plus, if necessary, one special regulatory counsel reasonably approved by you and one local counsel per material jurisdiction reasonably approved by you plus, in the case of a conflict of interest, one additional counsel per affected party) incurred in connection with the enforcement of any of its rights and remedies hereunder. In addition, subject to approval by the Bankruptcy Court, you hereby agree to pay when and as due the fees described in the Fee Letter. Once paid, such fees shall not be refundable under any circumstances. The terms of the Fee Letter are an integral part of the Commitment Parties' commitments hereunder and constitute part of this Commitment Letter for all purposes hereof.

     5.    **Indemnity**. You agree to indemnify and hold harmless each of the Lead Arrangers, the Administrative Agents and Lenders and their respective affiliates (including, without limitation, controlling persons) and each director, officer, employee, advisor, agent, affiliate, successor, partner, representative and assign of each of the forgoing (each an "**Indemnified Person**") from and against any and all actions, suits, investigation, inquiry, claims, losses, damages, liabilities, out-of-pocket expenses or proceedings of any kind or nature whatsoever which may be incurred by or asserted against or involve any such Indemnified Person as a result of or arising out of or in any way related to or resulting from this Commitment Letter, the Fee Letter, the Facilities, the use of proceeds thereof, the Transactions or the other transactions contemplated thereby (regardless of whether any such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or otherwise) (any of the foregoing, a "**Proceeding**"), and you agree to reimburse each Indemnified Person upon demand for any reasonable and documented legal or other reasonable and documented out-of-pocket expenses incurred in connection with investigating, defending, preparing to defend or participating in any such Proceeding limited to not more than one legal counsel for the group (and, solely in the case of an actual or potential conflict of interest, one additional legal counsel in each applicable jurisdiction to the affected Indemnified Persons, taken as a whole); **provided, however,** that no Indemnified Person will be indemnified for any such cost, expense or liability to the extent determined (in the cases of clause (x)) by a final, nonappealable judgment of a court of competent jurisdiction to have resulted from (x) the gross negligence, bad faith or willful misconduct of such Indemnified Person, its affiliates or any of their respective offices, directors, employees, advisors, agents, representatives and controlling persons or (y) any dispute solely among Indemnified Persons other than claims against MSSF in its capacity or in fulfilling its role

as an Administrative Agent or Lead Arranger or any other similar role under any Facility and other than any claims arising out of any act or omission on the part of you or your subsidiaries. In the case of any Proceeding to which the indemnity in this paragraph applies, such indemnity and reimbursement obligations shall be effective, whether or not such Proceeding is brought by you, any of your securityholders or creditors, an Indemnified Person or any other person, or an Indemnified Person is otherwise a party thereto and whether or not any aspect of this Commitment Letter, the Fee Letter, the Facilities or any of the Transactions is consummated. In case any Proceeding is instituted involving any Indemnified Person for which indemnification is to be sought hereunder by such Indemnified Person, then such Indemnified Person shall promptly notify you of the commencement of any Proceedings; **provided, however**, that the failure to so notify you shall not relieve you from any liability that you may have to such Indemnified Person pursuant to this "Indemnity" section or from any liability that you may have to such Indemnified Person other than pursuant to this "Indemnity" section, except to the extent that you are materially prejudiced by such failure. You shall not be liable for any settlement of any Proceedings effected without your consent (which consent shall not be unreasonably withheld), but if settled with your written consent or if there is a final judgment against an Indemnified Person in any such Proceedings, you agree to indemnify and hold harmless each Indemnified Person from and against any and all actual losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with this Section. Notwithstanding the above, following such notification, you may elect in writing to assume the defense of such Proceeding, and, upon such election, you shall not be liable for any legal costs subsequently incurred by such Indemnified Person (other than reasonable costs of investigation and providing evidence) in connection therewith, unless (i) you have failed to provide legal counsel reasonably satisfactory to such Indemnified Person in a timely manner, (ii) legal counsel provided by you reasonably determines that its representation of such Indemnified Person would present it with a conflict of interest or (iii) the Indemnified Person reasonably determines that there may be legal defenses available to it which are different from or in addition to those available to you. In the absence of an actual conflict of interest, or in the written opinion of counsel a potential conflict of interest, you will not be responsible for the fees and expenses of more than one separate legal counsel for all Indemnified Person and appropriate local legal counsel; provided in the absence of an actual conflict of interest, limited to one legal counsel per jurisdiction. Notwithstanding any other provision of this Commitment Letter, (i) no party hereto nor any Indemnified Person shall be, subject to the confidentiality requirements set forth herein, responsible or liable for damages arising from the unauthorized use by others of information or other materials obtained through internet, electronic, telecommunications or other information transmission and (ii) no party hereto nor any Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any other party or any of their securityholders or creditors arising out of, related to or in connection with this Commitment Letter, the Fee Letter, the Facilities or any of the Transactions or the other transactions contemplated thereby, except to the extent of direct (as opposed to special, indirect, exemplary, incidental, consequential or punitive (including, without limitation, any loss of profits, business or anticipated savings)) damages determined in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's gross negligence, bad faith or willful misconduct and it is further agreed that there are no third party beneficiaries to this Commitment Letter; provided, however, except as specifically set forth herein, this sentence shall not relieve you from your indemnification and expense reimbursement obligations required under this Commitment Letter and the Fee Letter.

You will not, without the prior written consent of the Indemnified Person, settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any Proceeding in respect of which indemnification may be sought hereunder (whether or not any Indemnified Person is a party thereto) unless such settlement, compromise, consent or termination (i) includes an unconditional release of each Indemnified Person from all liability arising out of such Proceeding and (ii) does not include a statement as to, or an admission of, fault, culpability, or a failure to act by or on behalf of such Indemnified Person.

6.  **Confidentiality**.  You agree that you will not disclose, directly or indirectly, this Commitment Letter, the Term Sheets, the Fee Letter or the contents of any of the foregoing to any person without our prior written consent (not to be unreasonably withheld), except that you may disclose (a) this Commitment Letter, the Term Sheets, the Fee Letter and the contents hereof and thereof (i) to your officers, directors, agents, employees, affiliates, agents, attorneys, accountants, representatives and advisors and (ii) as required by applicable law or compulsory legal or administrative process (in which case you agree to inform us promptly thereof to the extent lawfully permitted to do so), (b) the existence and contents of the Term Sheets to any rating agency in connection with the Transactions, (c) in protecting and enforcing your rights with respect to this Commitment Letter and (d) upon acceptance and execution by you of this Commitment Letter, this Commitment Letter and Term Sheets as may be reasonably required to obtain court approval in connection with any acts or obligations to be taken pursuant to this Commitment Letter or the transactions contemplated hereby ("**Court Approval**") which may be accomplished through the attachment or incorporation of this Commitment Letter, Term Sheets and the contents hereof and thereof to or into pleadings to be filed with any such court (in which case you agree to inform us and provide copies of such filings at least twenty four (24) hours prior to any such filing).  Notwithstanding anything to the contrary in the foregoing, in connection with obtaining Court Approval you shall be permitted to file the Fee Letter with Bankruptcy Court, under seal and provide an unredacted a copy of the Fee Letter to the Bankruptcy Court, the Office of the United States Trustee, the advisors to the official committee of unsecured creditors and the advisors to any other official committee, appointed in the Bankruptcy Cases (collectively, the "**Committees**"), so long as the disclosure to such advisors to the Committees is on a confidential "professionals only" basis and is reasonably necessary in obtaining the Commitment Letter Approval Order (defined below), and **provided** finally that, after this Commitment Letter has been accepted by you, you may (i) disclose this Commitment Letter (but not the Fee Letter) in any proxy, public filing, prospectus, offering memorandum or offering circular in connection with the Transactions or the financing thereof (with such disclosure limited to the existence of this Commitment Letter), (ii) disclose this Commitment Letter (but not the Fee Letter) to any rating agency in connection with the Transactions on a confidential basis and (iii) disclose this Commitment Letter and the Fee Letter to the Lead Investors (and their counsel) under the Equity Contribution Agreement in connection with obtaining their consent that the Commitment Letter is acceptable as the Exit Financing (as defined in the Equity Contribution Agreement).

The Commitment Parties shall use all nonpublic information received by it solely for the purposes of providing the services that are the subject of this Commitment Letter and shall treat confidentially all such information; **provided**, **however**, that nothing herein shall prevent the Commitment Parties from disclosing any such information (a) to rating agencies, (b) to any Lenders or participants or prospective Lenders or participants, (c) in any legal, judicial, administrative proceeding or other compulsory process or otherwise as required by applicable

law or regulations (in which case such Commitment Party shall promptly notify you, in advance, to the extent permitted by law), (d) upon the request or demand of any regulatory authority having jurisdiction over any Commitment Party or its affiliates (in which case such Commitment Party shall, except with respect to any audit or examination conducted by bank accountants or any governmental bank regulatory authority exercising examination or regulatory authority, promptly notify you, in advance, to the extent lawfully permitted to do so), (e) to the employees, legal counsel, independent auditors, professionals and other experts or agents of the Commitment Parties (collectively, **"Representatives"**) who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential and agree to comply with the provisions of this paragraph, in each case, on a need to know basis, (f) to any of its affiliates (provided that any such affiliate is advised of its obligation to retain such information as confidential, and each Commitment Party shall be responsible for its affiliates' compliance with this paragraph) solely in connection with the Transactions, (g) to the extent any such information becomes publicly available other than by reason of disclosure by any Commitment Party, its affiliates or Representatives in breach of this Commitment Letter and (h) for purposes of establishing a "due diligence" defense under the Securities Act of 1933, as amended (the **"Securities Act"**); **provided** that the disclosure of any such information to any Lenders or prospective Lenders or participants or prospective participants referred to above shall be made subject to the acknowledgment and acceptance by such Lender or prospective Lender or participant or prospective participant that such information is being disseminated on a confidential basis (on substantially the terms set forth in this paragraph or as is otherwise reasonably acceptable to you and the Commitment Parties, including, without limitation, as agreed in any confidential information memorandum or other marketing materials) in accordance with the standard syndication processes of the Commitment Parties or customary market standards for dissemination of such type of information; **provided** that, no such disclosure shall be made to any company engaged principally in the manufacture or sale of automotive parts or components or automotives or to any person identified in writing prior to the date of this Commitment Letter by Visteon to the Commitment Parties as a competitor party prior to the acceptance of this Commitment Letter by the Borrower (each such party, a **"Competitor Party"**). It is understood that if Visteon shall fail to provide a written listing of persons to be considered competitor parties prior to the execution of this Commitment Letter by us, then there shall be no "Competitor Parties" for purposes of this Commitment Letter. The provisions of this paragraph shall automatically terminate two years following the date of this Commitment Letter.

7.    **Patriot Act.** We hereby notify you that pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (October 26, 2001) (as amended, the **"Patriot Act"**), we and the other Lenders are required to obtain, verify and record information that identifies you and your subsidiaries, which information includes the name, address, tax identification number and other information regarding them that will allow any of us or such Lender to identify you and your subsidiaries in accordance with the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act and is effective on behalf of the Commitment Parties and each other Lender.

8.    **Governing Law, etc. This Commitment Letter and the Fee Letter shall be governed by, and construed in accordance with the laws of the State of New York. Any right to trial by jury with respect to any claim, action, suit or proceeding arising out of or contemplated by this Commitment Letter and/or the related Fee Letter is hereby waived.** Each of the parties hereto hereby irrevocably and unconditionally submit to the exclusive

jurisdiction of the federal and New York State courts located in the City of New York, Borough of Manhattan (and appellate courts thereof) in connection with any dispute related to this Commitment Letter or the Fee Letter or any matters contemplated hereby or thereby and agree that any service of process, summons, notice or document by registered mail addressed to you or the Commitment Parties shall be effective service of process for any suit, action or proceeding relating to any such dispute. Each of the parties hereto irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. A final judgment in any such suit, action or proceeding may be enforced in any jurisdiction by suit on the judgment or in any other manner provided by law. Nothing herein will affect the right of the Lead Arrangers, the Administrative Agents or the Commitment Parties to serve legal process in any other manner permitted by law.

9. **Other Activities; No Fiduciary Relationship; Other Terms**. As you know, MSSF is a full service securities firm engaged, either directly or indirectly through its affiliates in various activities, including securities trading, investment management, financing and brokerage activities and financial planning and benefits counseling for both companies and individuals. In the ordinary course of these activities, MSSF, or its affiliates, may actively trade the debt and equity securities (or related derivative securities) of the Borrower or other companies which may be the subject of the arrangements contemplated by this Commitment Letter for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities. MSSF or its affiliates may also co-invest with, make direct investments in, and invest or co-invest client monies in or with funds or other investment vehicles managed by other parties, and such funds or other investment vehicles may trade or make investments in securities or other debt obligations of the Borrower or other companies which may be the subject of the arrangements contemplated by this Commitment Letter.

The Lead Arrangers, the Administrative Agents and the Commitment Parties and their respective affiliates may have economic interests that conflict with yours and may provide financing or other services to parties whose interests conflict with yours. You agree that the Lead Arrangers, the Administrative Agents and the Commitment Parties will act under this agreement as an independent contractor and that nothing in this Commitment Letter or the Fee Letter or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the Lead Arranger, the Administrative Agents and the Commitment Parties, on the one hand, and Visteon, or its management, stockholders or affiliates on the other hand. You acknowledge and agree that (i) the transactions contemplated by this Commitment Letter and the Fee Letter are arm's-length commercial transactions between the Lead Arrangers, the Administrative Agents and the Commitment Parties, on the one hand, and you, on the other, (ii) in connection therewith and with the process leading to such transaction the Commitment Parties are acting solely as principals and not as fiduciaries of you, your management, stockholders, creditors or any other person, (iii) the Lead Arrangers, the Administrative Agents and the Commitment Parties have not assumed an advisory or fiduciary responsibility in favor of you with respect to the Transactions or the process leading thereto (irrespective of whether the Lead Arrangers, the Administrative Agents or the Commitment Parties or any of their respective affiliates had advised or is currently advising you on other matters) or any other obligation to you except the obligations expressly set forth in this Commitment Letter and the Fee Letter and (iv) you have consulted your own legal and financial advisors to the extent you or it deemed appropriate.

You further acknowledge and agree that you and your subsidiaries are responsible for making your own independent judgment with respect to the Transactions and the process leading thereto. In addition, please note that the Lead Arrangers, the Administrative Agents and the Commitment Parties and their respective affiliates do not provide accounting, tax or legal advice. You and your subsidiaries agree that you and they will not claim that the Lead Arrangers, the Administrative Agents or the Commitment Parties or any of their respective affiliates has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to you or your subsidiaries, in connection with the Transactions or the process leading thereto.

We reserve the right to employ the services of one or more of our respective affiliates in providing services contemplated by this Commitment Letter and to allocate, in whole or in part, to such affiliates certain fees payable to us in such manner as we and such affiliates may agree in our sole discretion. Subject to the second sentence of Section 2 of this Commitment Letter, you also agree that the Commitment Parties may at any time and from time to time assign all or any portion of its commitments hereunder to one or more of its affiliates. You acknowledge that the Commitment Parties may share with any of their affiliates (other than Competitor Parties), and such affiliates may share with the Commitment Parties, any information related to the Transactions, you, any of your subsidiaries or any of the matters contemplated hereby in connection with the Transactions. We agree to treat, and cause any of our affiliates to treat, all non-public information provided to us by you as confidential information in accordance with customary banking industry practices and subject to the confidentiality provisions of this Commitment Letter.

**10.    Acceptance, Termination, Amendment, etc.** Please indicate your acceptance of the terms of this Commitment Letter and the Fee Letter by returning to us (a) executed counterparts hereof and thereof by no later than 5:00 p.m., Eastern time, on August 25, 2010, (b) the Work Deposit (as defined in the Fee Letter) and other fees required to be paid upon execution hereof under the Fee Letter by no later than 5:00 p.m., Eastern time, on September 1, 2010, and (c) a copy of the written consent executed by the Lead Investors under the Equity Commitment Agreement (including, without limitation, by electronic mail correspondence from the Lead Investors) whereby such Lead Investors have approved the terms and conditions contained in this Commitment Letter and the Fee Letter as being acceptable as the Exit Financing under the Equity Commitment Agreement by no later than 5:00 p.m., Eastern time, on August 25, 2010 (it being understood that the failure to satisfy any of the conditions set forth in clauses (a), (b) or (c) above shall result in the automatic termination of the commitments and other obligations of each Commitment Party set forth in this Commitment Letter). Thereafter, the commitments and other obligations of each Commitment Party set forth in this Commitment Letter shall automatically terminate upon the earlier of (i) unless each of the Lenders shall in their discretion agree to an extension, on or before 5:00 p.m. (Eastern time) on November 1, 2010, if the Financing Documentation shall not have been executed and delivered by all such parties thereto, (ii) the dismissal or conversion to cases under Chapter 7 of the Bankruptcy Code of the Cases, or the appointment of a trustee or examiner with enlarged powers relating the operation of the business (powers beyond those set forth in Section 1106 of the Bankruptcy Code) in any of the Cases, (iii) a material breach by you, or a failure of a condition set forth in Schedule 1 hereto that cannot be satisfied prior to November 1, 2010, (iv) August 31, 2010, if the Commitment Letter Approval Order has not been entered on or before such date, (v) the date upon which the Commitment Letter Approval Order has been reversed, vacated, amended, supplemented or modified in a

manner which is materially and adverse to the Lenders, as determined by the Lead Arrangers without the consent of the Lead Arrangers, and (vi) the date upon which Visteon elects to withdraw or not proceed with the confirmation or consummation of the Plan of Reorganization, including, without limitation, any determination by Visteon to sell all or a material portion of its assets. The "Commitment Letter Approval Order" shall mean that certain order in form and substance reasonably satisfactory to the Lead Arrangers approving the acceptance and entry by Visteon into this Commitment Letter and the payment of all fees and expenses in the Fee Letter, which fees and expenses thereunder being deemed entitled to priority as administrative expense claims under Sections 503(b)(1) and 507(a)(1) of the Bankruptcy Code, whether or not the Facilities are entered into or funded, junior only to any superpriority and administrative claims arising under Visteon's existing debtor-in-possession facility ("DIP Financing") and any "carve-out" provided in the final financing order related to such DIP Financing.

This Commitment Letter and the Fee Letter constitute the entire agreement and understanding between you and your subsidiaries and affiliates and the Commitment Parties with respect to the Facilities and supersede all prior written or oral agreements and understandings relating to the specific matters hereof and thereof. No individual has been authorized by the Commitment Parties or any of their affiliates to make any oral or written statements that are inconsistent with this Commitment Letter or the Fee Letter.

Headings are for convenience of reference only and shall not affect the construction of, or be taken into consideration when interpreting, this Commitment Letter. Delivery of an executed counterpart of a signature page to this Commitment Letter and the Fee Letter by facsimile or other electronic transmission (e.g., "pdf" or "tif" files) shall be effective as delivery of a manually executed counterpart of this Commitment Letter and the Fee Letter. This Commitment Letter and the Fee Letter may be executed in any number of counterparts, and by the different parties hereto on separate counterparts, each of which counterpart shall be an original, but all of which shall together constitute one and the same instrument. The provisions of Sections 2, 4, 5, 6, 8, 9, and this Section 10 shall survive termination of this Commitment Letter, **provided** that Section 2 shall survive only if the Closing Date occurs. This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by the parties hereto. This Commitment Letter shall not be assignable by you without our prior written consent and any purported assignment without such consent shall be null and void. This Commitment Letter is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto (and any Indemnified Persons).

[Remainder of page intentionally left blank]

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transactions.

Very truly yours,

MORGAN STANLEY SENIOR FUNDING, INC.

By: _____
     Name:  Ron Kusick
     Title:   Authorized Signatory

Agreed to and accepted as of
the date first written above:

VISTEON CORPORATION

By:_____
    Name:
    Title:

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transactions.

Very truly yours,

MORGAN STANLEY SENIOR FUNDING, INC.

By: _____
     Name:
     Title:    Authorized Signatory

Agreed to and accepted as of
the date first written above:

VISTEON CORPORATION

By: _____
    Name: Michael Lewis
    Title: Vice President, Treasurer

SCHEDULE 1

Conditions Precedent

The availability of the Revolving Loan Facility and the Term Loan Facility, in addition to the conditions set forth in the Term Sheets, shall be subject to the satisfaction of the following additional conditions set forth below.

1.   **Documentation for the Facilities.**  The negotiation, execution and delivery of definitive loan documentation for the Revolving Loan Facility (the "**Revolving Loan Facility Documentation**") and for the Term Loan Facility (the "**Term Loan Facility Documentation**" and, together with the Revolving Loan Facility Documentation, the "**Financing Documentation**"), in each case, in form and substance reasonably satisfactory to the Commitment Parties and the Borrowers consistent with the terms of this Commitment Letter and the Term Sheets, including, without limitation, credit agreements, security agreements, guaranties, officer's certificates, borrowing base certificates, solvency certificates, customary legal opinions, (including all information and documentation required under applicable "know-your customer" and anti-money laundering regulations, including without limitation, the Patriot Act at least 3 Business Days prior to the Closing Date), shall have been delivered and reviewed to the reasonable satisfaction of the Lead Arrangers.  Notwithstanding the foregoing and anything to the contrary contained in this Commitment Letter and Term Sheets, with respect to the Facilities, all documents and instruments required to perfect the Administrative Agent's or Collateral Agent's security interests in the ABL Collateral and the Term Loan Collateral shall have been authorized, executed and delivered and, if applicable, be in proper form for filing; **provided, however**, that with respect to any collateral the security interest in which may not be perfected by either (i) filing of a UCC financing statement or (ii) in the case of the pledge of capital stock or other equity interests in a subsidiary, delivery of certificates (to the extent certificated or required to be certificated and to the extent such certificates may leave the jurisdiction of such subsidiary under applicable law) representing such shares of capital stock or other equity interests, if the perfection of the Administrative Agent's or the Collateral Agent's security interest in such collateral may not be accomplished prior to the Closing Date after the Borrower and its subsidiaries use commercially reasonable efforts to do so, then the delivery of the documents and instruments for perfection of such security interest shall not constitute a condition precedent to the initial borrowings under the Facilities so long as the Borrower agrees to deliver or cause to be delivered such documents and instruments, and take or cause to be taken, such other actions as may be required to perfect such security interests within 45 days following the Closing Date (or such later date as the Administrative Agent may agree); **provided, further**, assets of the Borrower and Guarantors shall only be included in the Borrowing Base to the extent the Administrative Agent or Collateral Agent has a valid first priority perfected lien on such assets, in each case in form and substance reasonably satisfactory to the Administrative Agent and Collateral Agent;

2.   **Material Adverse Effect.**  There shall not have been a material adverse change, individually or in the aggregate, in, or affecting, (a) since December 31, 2009, the business, financial condition, operations, performance or properties of the Visteon and its

subsidiaries, taken as a whole, after giving effect to the Transactions, (b) the ability of Visteon or its subsidiaries to perform their obligations under the Financing Documentation when due and (c) the validity or enforceability of any of the Financing Documentation or the rights and remedies of the Administrative Agents and the Lenders under any of the Financing Documentation (each, a "**Material Adverse Effect**"); provided, however for purposes of the closing and initial funding of the Facilities, (i) nothing as disclosed in (1) Visteon's Annual Report on Form 10-K for the year ended December 31, 2009, (2) Quarterly Report on Form 10-Q for each quarter ended since December 31, 2009, as filed prior to the date of this Commitment Letter, and/or (3) the Disclosure Statement filed in connection with the Plan of Reorganization prior to the date of this Commitment Letter, in each case, based solely on facts as disclosed therein (without giving effect to any developments not disclosed therein), (ii) any change in general economic or political conditions or conditions generally affecting the industries in which Visteon and its subsidiaries operate (including those resulting from acts of terrorism or war (whether or not declared) or other calamity, crisis or geopolitical event) and any adverse change since the date of this Commitment Letter in the loan syndication, financial or capital markets generally, (iii) any change or prospective change in any law or GAAP, or any interpretation thereof, (iv) any change in currency, exchange or interest rates or the financial or securities markets generally, (v) any change in the market price or trading volume of the common stock of Visteon; provided, that any event that caused or contributed to such change in market price or trading volume shall not be excluded, (vi) any change to the extent resulting from the announcement or pendency of the transactions contemplated by this Commitment Letter and/or (vii) any change resulting from actions of Visteon or its subsidiaries expressly agreed to or requested in writing by the Lead Arrangers, except in the cases of (ii) and (iii) to the extent such change or event is disproportionately adverse with respect to Visteon and its subsidiaries when compared to other companies in the industry in which Visteon and its subsidiaries operate, shall, in any case, in and of itself be deemed to constitute a Material Adverse Effect;

3. **Diligence**. The Commitment Parties' completion of all collateral audits, appraisals, lien searches and other diligence reasonably required in connection with the calculation and confirmation of the Borrowing Base (including, without limitation, determination of eligibility standards and any required reserves);

4. **Fee Letter and Fees**. Visteon shall have paid the Fees and expenses required to be paid on or prior to the Closing Date under the Fee Letter and otherwise complied with the covenants, obligations and agreements under the Fee Letter. The Bankruptcy Court shall have entered a final order (which order may be the confirmation order) approving the Facilities and all related documentation, in form and substance satisfactory to the Lead Arrangers.

5. **Disclosure Statement and Plan of Reorganization**. The Disclosure Statement and Plan of Reorganization (together with all exhibits and other attachments thereto, as any of the foregoing has been amended, modified or supplemented prior to the date hereof (the "**Plan Documents**") shall not have been amended, modified or supplemented or any of the terms and conditions thereof waived, in each case in a manner materially adverse to the Lenders without the consent of the Lead Arrangers. The Bankruptcy Court shall have

entered a final order, in form and substance reasonably acceptable to the Administrative Agents, approving the Disclosure Statement and confirming the Plan of Reorganization, and all conditions precedent to the effectiveness of the Plan of Reorganization shall have been satisfied (or waived with the consent of the Lead Arrangers with respect to any waiver that is, in the reasonable judgment of the Lead Arrangers, adverse in any material respect to the rights or interests of the Lenders). No motion, action or proceeding shall be pending against any Loan Party or any of their subsidiaries by any creditor or other party in interest which materially and adversely affects or may reasonably be expected to materially and adversely affect the Plan of Reorganization or the Facilities.

6. **Capital Structure**.  The Lead Arrangers shall have received satisfactory evidence that the loans under the Visteon's existing pre-petition secured credit facility and debtor-in-possession credit facility shall have been repaid in full in cash, all commitments relating to the foregoing shall have been terminated and all liens and security interests related thereto shall have been terminated or released.

7. **Financial Information**.  The Lead Arrangers shall have received and be satisfied with (a) the audited financial statements of Visteon and its subsidiaries for the fiscal period(s) ending December 31, 2009, (b) interim unaudited quarterly financial statements of Visteon and its subsidiaries for each subsequent fiscal quarter ended thirty (30) days prior to the Closing Date, (c) to the extent available, interim unaudited consolidated monthly financial statements of Visteon and its subsidiaries for each month ended after the most recent fiscal quarter for which financial statements were received by the Lead Arrangers pursuant to clause (b), (d) a pro forma income statement and consolidated balance sheet of Visteon and its subsidiaries as of the Closing Date after giving effect to the Facilities and the other transactions contemplated thereby of the type required by Regulation S-X and (e) a business plan for each of Visteon and its subsidiaries prepared by management which shall include a financial forecast on a monthly basis for the first twelve (12) months after the Closing Date and on an annual basis thereafter through the applicable Maturity Date;

8. **Solvency**.  The Lead Arrangers shall be reasonably satisfied, based on financial statements (actual and pro forma), projections and other evidence provided by Visteon and its subsidiaries, or requested by the Lead Arrangers, including a certificate (which shall be reasonably satisfactory to the Lead Arrangers) from the chief financial officer of Visteon certifying as to the solvency, ability to satisfy obligations as they mature in the ordinary course and adequate capitalization of Visteon and its subsidiaries, on a consolidated basis, on the Closing Date, after giving effect to the Facilities and the incurrence of indebtedness thereunder.

9. **Minimum EBITDA**.  After giving effect to the transactions contemplated by the Plan of Reorganization to occur on the Closing Date, the Consolidated EBITDA (to be defined) of Visteon and its subsidiaries for the four fiscal quarters ending on such date shall be equal to or at least an amount equal to $400,000,000.

10. **Closing Date Availability**.  On the Closing Date no more than (a) $25,000,000 (plus issued Letters of Credit in an amount to be agreed upon), plus (b) amounts necessary to

fund original issue discount or up-front facility fees used in connection with the Revolving Loan Facility and Term Financing, if any, plus (c) other amounts as may be mutually agreed, shall be drawn under the Revolving Loan Facility. The Revolver Administrative Agent shall have received (a) a Borrowing Base (as defined in Exhibit B to this Commitment Letter) certificate for the most recently ended month prior to the Closing Date, certified by the chief financial officer (or other authorized financial officer reasonably acceptable to the Administrative Agent) of Visteon, which demonstrates that (i) Availability (as defined in Exhibit B to this Commitment Letter) under the Revolving Loan Facility, after giving effect to the loans to be made and any Letters of Credit to be issued under the Revolving Loan Facility on the Closing Date, is at least $140,000,000 or (ii) Excess Availability (as defined in Exhibit B to this Commitment Letter, **provided, however,** for the purposes of this closing condition without regard to establishing "control" over deposit accounts that are identified and as to which Borrower has a post-closing obligation to deliver a deposit account control agreement) under the Revolving Loan Facility, after giving effect to the loans to be made and any Letters of Credit to be issued under the Revolving Loan Facility on the Closing Date, is at least $225,000,000, and (b) Projections demonstrating that Availability under the Revolving Loan Facility during the twelve (12) month period following the Closing Date will not at any time be less than an amount to be determined.

11.     **Term Loan Closing**. It shall be a condition to closing the Revolving Loan Facility that 100% of the Term Loan Facility shall have closed and funded.

12.     **Rights Offering.** Visteon shall have received minimum aggregate gross proceeds of $1.250 billion in cash pursuant to the Rights Offering (as defined in the Plan), on terms and conditions set forth in the Equity Commitment Agreement.

## EXHIBIT A

### Transaction Description

Capitalized terms used but not defined in this Exhibit A shall have the meanings set forth in this Commitment Letter and the other Exhibits to this Commitment Letter to which this Exhibit A is attached. In the case of any such capitalized term that is subject to multiple and differing definitions, the appropriate meaning thereof in this Exhibit A shall be determined by reference to the context in which it is used.

Visteon intends to undertake the transactions described below in order to implement and consummate the Plan of Reorganization consistent with the terms and conditions thereof (including the disclosure statement filed in connection therewith, the "**Disclosure Statement**") and in conjunction with its emergence from Chapter 11 protection.

In connection with the foregoing, it is intended that:

(a)     Visteon shall obtain $200 million in a senior secured asset-based revolving credit facility described in Exhibit B to this Commitment Letter (the "**Revolving Loan Facility**").

(b)     Visteon shall obtain $500 million in senior secured term loans described in Exhibit C to this Commitment Letter (the "**Term Loans**").

(c)     Visteon shall make distributions on Allowed Claims (as defined in the Plan of Reorganization and consistent with the terms and conditions thereof, including the Disclosure Statement) and the other payments required pursuant to Plan of Reorganization, including repayment in full of certain indebtedness of Visteon and its subsidiaries in existence before the Closing Date (the "**Refinancing**").

(d)     Costs, fees and expenses incurred in connection with the foregoing transactions and Visteon' emergence from the Cases (including debt prepayment premiums, if any) will be paid (the "**Transaction Costs**").

The transactions described above are collectively referred to herein as the "**Transactions**".

EXHIBIT B

**Visteon Corporation**
**$200,000,000 Senior Secured Plan-of-Reorganization Revolving Loan Facility**

**Summary of Certain Terms and Conditions**

Capitalized terms used but not defined in this Exhibit B shall have the meanings set forth in the Commitment Letter (as defined below) and the other Exhibits attached to the Commitment Letter to which this Exhibit B is attached (the "Commitment Letter"). In the case of any such capitalized term that is subject to multiple and differing definitions, the appropriate meaning thereof in this Exhibit B shall be determined by reference to the context in which it is used. The following is intended to summarize the material terms and conditions of the Revolving Loan Facility. No one shall, except as required by law, use the name of Morgan Stanley or any of its affiliates, in any advertisement or disclosure made in connection with the Revolving Loan Facility without the prior written consent of Morgan Stanley.

| | |
|---|---|
| **Borrower:** | **Reorganized Visteon Corporation** and certain of its direct and indirect domestic subsidiaries, including, without limitation, Visteon Electronics Corporation, a Delaware corporation ("VEC"), as the reorganized debtors under that certain Fourth Amended Joint Plan of Reorganization of Visteon Corporation and its debtor affiliates, in form and substance reasonably satisfactory to the Administrative Agent (as defined below) (the "Plan of Reorganization") filed in the Chapter 11 Case (individually, and jointly and severally, the "Borrower"). |
| **Transactions:** | As set forth in Exhibit A to the Commitment Letter. |
| **Sole Lead Arranger and Sole Bookrunner:** | Morgan Stanley Senior Funding, Inc. or its affiliates ("Morgan Stanley") in its capacities as Sole Lead Arranger and Sole Bookrunner (the "Arranger"). |
| **Administrative Agent and Syndication Agent:** | Morgan Stanley in its capacity as administrative agent (the "Administrative Agent") and in its capacity as syndication agent (the "Syndication Agent"). |
| **Collateral Agent:** | Morgan Stanley and/or other financial institutions selected by Administrative Agent (collectively, the "Collateral Agent"). |
| **Lenders:** | Morgan Stanley and/or other financial institutions selected by Morgan Stanley in consultation with the Borrower (each, a "Lender" and, collectively, the "Lenders"). The Lenders under the Revolving Loan Facility shall be referred to herein as the "Revolver Lenders". |
| **Guarantors:** | Each existing and subsequently acquired or organized domestic |

subsidiary of the Borrower (other than (a) each foreign stock holding company (to be defined as mutually agreed, but in any event consistent with the definition of such term in the prepetition term loan agreement of the Borrower), (b) unrestricted subsidiaries, (c) immaterial subsidiaries to be agreed upon, (d) any direct or indirect U.S. subsidiary of a direct or indirect non-U.S. subsidiary of the Borrower to the extent such guarantee would, in the good faith judgment of the Borrower, result in a material adverse tax consequences to the Borrower or its subsidiaries (provided, however, utilization of the NOLs of the Borrower and its subsidiaries shall be excluded from the Borrower's determination of whether such guarantee would result in material adverse tax consequences to the Borrower or any of its subsidiaries), (e) captive insurance subsidiaries, if any, (f) non-profit subsidiaries, if any, (g) joint ventures not more than 50% owned by the Borrower or its subsidiaries subject to further review and diligence by the Administrative Agent and (h) existing joint ventures to the extent applicable law or the terms of such entities' organizational or other governing documents prohibit such entities from becoming guarantors), in each case, to the extent permitted by applicable law and subject to exceptions and limitations to be mutually agreed upon) (each, a "Guarantor" and, collectively, the "Guarantors") shall guaranty all obligations (including, without limitation, any exposure in respect of any Secured Hedging Arrangements as defined below) of the Borrower under the Revolving Loan Facility (the "Guaranty"). The Revolving Loan Facility shall not be guaranteed by any direct or indirect foreign subsidiary of the Borrower.

The Borrower and the Guarantors shall be referred to herein individually as a "Loan Party" and collectively as the "Loan Parties".

**Unrestricted Subsidiaries:** The Revolving Loan Facility Documentation will contain customary provisions pursuant to which the Borrower will be permitted to designate any existing or subsequently acquired or organized subsidiary as an "unrestricted subsidiary" and subsequently re-designate any such unrestricted subsidiary as a restricted subsidiary so long as immediately after giving effect to such designation (which designation shall be treated as an investment in an amount equal to the fair market value of all assets of such unrestricted subsidiary at the time of such designation), (i) the Borrower shall be in compliance with the investment covenants, (ii) there shall be no default or event of default under the Revolving Loan Facility, (iii) the Borrower shall have delivered evidence reasonably satisfactory to the Administrative Agent that the Borrower is in pro forma

LEGAL_US_E # 88932992.17

compliance with all covenants and has Excess Availability (as defined below) of not less than $75,000,000 and (iv) the aggregate amount of EBITDA (such definition to be mutually agreed upon) of all unrestricted subsidiaries shall not at any time exceed 10% of the EBITDA of the Borrower and its subsidiaries on a consolidated basis. Unrestricted subsidiaries will not be subject to the representations and warranties, covenants, events of default or other provisions of the Revolving Loan Facility Documentation, and the results of operations and indebtedness of unrestricted subsidiaries will not be taken into account for purposes of calculating any financial ratios, if any, contained in the Revolving Loan Facility Documentation.

**Closing Date:**

A date (the "Closing Date") mutually agreed upon between the Borrower, the Arranger, the Bookrunner and the Administrative Agent, but in any event not to occur until all of the conditions set forth on Schedule 1 to the Commitment Letter and in the Commitment Letter have been satisfied.

**Purpose/Use of Proceeds:**

Amounts available under the Revolving Loan Facility shall be used (a) to consummate the Transactions, including the payment of Transaction Costs, on the Closing Date, (b) to provide working capital from time to time for the Borrower and its subsidiaries and (c) for other general corporate purposes. The Borrower shall be permitted to borrow under the Revolving Loan Facility on the Closing Date in an amount not to exceed (a) $25,000,000, plus (b) amounts necessary to fund original issue discount or up-front facility fees used in connection with the Revolving Loan Facility and the Term Loan Facility, if any, plus (c) other amounts to be agreed. Letters of Credit (as defined below) will be used to support the Borrower's and the Guarantors' payment and other obligations incurred consistent with past practices.

**Amount of Facility:**

$200,000,000 senior secured asset based revolving loan credit facility that will be available to the Borrower in U.S. Dollars and, solely with respect to Revolver 2 (as defined below) in Euros with sublimits for Euros to be mutually agreed (the "Revolving Loan Facility"). $155,000,000 of the Revolving Loan Facility shall be allocated to availability under the Revolver 1 Borrowing Base (as defined below) ("Revolver 1") and $45,000,000 of the Revolving Loan Facility shall be allocated to availability under the Revolver 2 Borrowing Base ("Revolver 2").

**Swing Line Loans:**

At the Borrower's option, a portion of the Revolving Loan Facility in an aggregate amount not exceeding $20,000,000 shall be available as swing line loans in U.S. Dollars by Morgan

B - 3

Stanley (in such capacity, the "Swing Line Lender") or another Lender acceptable to the Borrower and the Administrative Agent. Any such swing line borrowings (each, a "Swing Line Loan") will reduce availability under the Revolving Loan Facility on a dollar-for-dollar basis and will count as usage of the Revolving Loan Facility for the purpose of the unused commitment fee. Upon notice from the Swing Line Lender, the Lenders will be unconditionally obligated to purchase participations in any Swing Line Loan pro rata based upon their commitments under Revolving Loan Facility. Swing Line Loans will be available on a same day basis.

**Availability:**

(a) Revolving Loan Facility: Subject to the terms and conditions hereof, amounts available for borrowing under the Revolving Loan Facility as of any date of determination shall be limited to the lesser of (a) the maximum commitments under the Revolving Loan Facility and (b) the Borrowing Base (as defined below) as of such date less all outstanding loans under the Revolving Loan Facility (including Swing Line Loans) and Letters of Credit ("Availability"). So long as the Borrower meets the conditions set forth below (a) under the Section entitled "Conditions Precedent to Initial Borrowing" with respect to the initial advance and (b) under the Section entitled "Conditions to All Borrowings" and other customary conditions to be set forth in the Revolving Loan Facility Documentation with respect to subsequent advances, amounts available under the Revolving Loan Facility may be borrowed, repaid and re-borrowed on and after the Closing Date until the Revolver Maturity Date (as defined below). All borrowings under the Revolving Loan Facility shall be made on a pro rata basis between Revolver 1 and Revolver 2.

(b) LC Facility: At the Borrower's option and subject to the terms and conditions hereof, a portion of the Revolving Loan Facility not in excess of $75,000,000 shall be made available for the issuance of standby and trade letters of credit ("Letters of Credit") by Morgan Stanley or another Revolver Lender acceptable to Morgan Stanley (in such capacity, the "Issuing Bank"). Each Letter of Credit shall expire no later than the date which is the earlier of (i) twelve (12) months after issuance (provided that any Letter of Credit with a one-year tenor may provide for the automatic renewal thereof for additional one-year periods (which shall not extend beyond the date referred to in clause (ii) below)) (ii) the 5th day prior to the Revolver Maturity Date. Each Letter of Credit will be denominated in U.S. Dollars or, solely with respect to Revolver 2, Euros and other currencies to be mutually agreed,

B - 4

with sublimits to be mutually agreed.

Drawings under any Letter of Credit shall be reimbursed by the Borrower (with the proceeds of loans under the Revolving Loan Facility and if not so reimbursed then with its own funds) on the Business Day on which the Borrower receives notice of a drawing on a Letter of Credit if such notice is received prior to a time to be mutually agreed, otherwise on the immediately succeeding Business Day. To the extent that the Borrower does not so reimburse the applicable Issuing Bank on such date, the Lenders under the Revolving Loan Facility shall be irrevocably and unconditionally obligated to reimburse the applicable Issuing Bank on a pro rata basis.

**Borrowing Base:** Amounts available under the Revolving Loan Facility will be subject to a borrowing base, equal to the sum of the following:

Revolver 1 Borrowing Base:

(a) 85% of the Borrower's and Guarantors' eligible accounts receivable located in the United States and Canada (subject to a concentration sublimit of 30% for eligible accounts receivable including with respect to Ford Motor Company and its controlled affiliates); plus

(b) the lesser of (i) 65% of the Borrower's and Guarantors' eligible inventory (including raw materials, work in progress, and finished goods), in each case, valued at the lower of cost (FIFO) or market and (ii) the product of 85% of the NOLV (as defined below) percentage identified in the most recent inventory appraisal ordered by the Administrative Agent multiplied by the Borrower's and Guarantors' eligible inventory (valued at the lower of cost (FIFO) or market); plus

(c) 50% of the appraised value of Borrower's and Guarantors' eligible real estate (based on an appraisal in form and substance reasonably acceptable to the Administrative Agent); plus

(d) 75% of the appraised value of Borrower's and Guarantors' eligible corporate aircraft (based on an appraisal in form and substance reasonably acceptable to the Administrative Agent); less

(e) reasonable reserves established by the Collateral Agent in the initial Borrowing Base (as defined below).

Availability from items (c) and (d) above shall be capped at an amount to be determined upon completion of due diligence and appraisals, but in any event not to exceed 25% of the Borrowing Base (as defined below) at any time. Eligible real estate and eligible aircraft shall each be subject to straight line amortization over 10 years, in each case applied quarterly; provided, that the Borrower may elect to have the eligible real estate and eligible aircraft reappraised, in which case the amortization schedule will be reset (any such appraisal conducted by Borrower shall be at its own cost and shall not reduce the number of appraisals permitted to be conducted by the Collateral Agent).

Revolver 2 Borrowing Base:

(a) 85% of the Borrower's and Guarantors' eligible accounts receivable for Ford Motor Company and certain of its controlled affiliates located in the United States and Canada that are not included in the Borrowing Base for Revolver 1 (subject to a concentration sublimit of 60%); less

(b) reasonable reserves established by the Administrative Agent in the initial Borrowing Base (as defined below).

The Revolver 1 Borrowing Base and the Revolver 2 Borrowing Base are collectively referred to herein as the "Borrowing Base".

The Collateral Agent shall retain the right, in its reasonable credit judgment, to adjust and establish, from time to time, standards of eligibility (which shall be initially set on the Closing Date based on results of field exams and appraisals and thereafter shall be substantially the same as the eligibility criteria contained in the Closing Date Borrowing Base certificate except with respect to Changed Circumstances (as defined below)) and reserves against the Borrowing Base in its Permitted Discretion; provided, however, no reserves shall be established with respect to Secured Hedging Arrangements (as defined below). All audits and appraisals shall be from appraisers acceptable to the Administrative Agent. Notwithstanding anything to the contrary contained herein, determinations of Borrowing Base eligibility and reserves with respect to Revolver 2 shall be determined solely by the Administrative Agent.

"NOLV" means an amount equal to the orderly liquidation value (net of all costs and expenses incurred in connection with liquidation) as reasonably determined from time to time by reference to the most recent appraisal received by the Administrative Agent conducted by an independent appraiser

B - 6

reasonably satisfactory to the Administrative Agent.

The Borrowing Base shall be computed on a monthly basis pursuant to a monthly (or, if (a) Excess Availability (as defined below) is less than $65 million or (b) an event of default has occurred and is continuing, weekly) borrowing base certificate to be delivered by the Borrower to the Collateral Agent.

Subsequent to the Closing Date, the Collateral Agent shall have the ability to establish reserves in connection with the Borrowing Base, in connection with a good faith determination in its commercially reasonable credit judgment from the perspective of a secured asset based lender upon not less than three Business Days prior notice to the Borrower ("Permitted Discretion"); provided, that, notwithstanding the obligation of the Administrative Agent to provide notice of such reserves to the Borrower, for the purposes of calculating borrowing availability for any requested borrowing after such notice has been issued by the Administrative Agent, such reserves shall be deemed to be immediately in effect. No decreases in the advance rates will be permitted.

If the Collateral Agent, in its Permitted Discretion, establishes or increases reserves subsequent to the Closing Date, and the implementation or increase of such reserves directly results in an overadvance, the Borrower shall have three Business Days from the date of notice of such establishment or increase to eliminate such overadvance.

With respect to the assets of unrestricted subsidiaries and restricted subsidiaries being included in the calculation of the Borrowing Base, (a) if a restricted subsidiary is designated by the Borrower as an unrestricted subsidiary during the term of the Revolving Loan Facility, the assets of such subsidiary shall immediately be excluded from the Borrowing Base, and (b) if an unrestricted subsidiary is designated by the Borrower as a restricted subsidiary during the term of the Revolving Loan Facility, then the assets of such subsidiary shall not be included in the calculation of the Borrowing Base until (i) the Administrative Agent and the Collateral Agent consent (such consent not to be unreasonably withheld) to such inclusion (except to the extent such subsidiary's assets were previously included in the Borrowing Base) and (ii) the Administrative Agent or the Collateral Agent has received satisfactory appraisals and field exams with respect to such assets, if applicable, as reasonably required by the Administrative Agent or the Collateral Agent.

B - 7

The definitions of "eligible accounts receivable", "eligible inventory", "eligible real estate" and "eligible aircraft" will be mutually agreed between the Administrative Agent and the Borrower.

The ineligible categories included in the loan documentation as of the Closing Date will include, without limitation, those set forth below (in each case, subject to such thresholds, materiality and exceptions as mutually agreed):

"Ineligible Accounts Receivable" shall mean (i) accounts which remain unpaid 60 days after the due date or 90 days after the invoice date (or accounts which remain unpaid 60 days after the due date or 105 days after the invoice date, with respect to accounts to be set forth on a schedule, acceptable to the Administrative Agent, and subject to a maximum amount to be determined) or which have been written off the books of the Borrower or any Guarantor or otherwise designated as uncollectible; (ii) accounts owing by an account debtor as to which 50% or more of the dollar amount of all accounts owing by such account debtor are ineligible pursuant to clause (i) above; (iii) accounts to any one account debtor or group of affiliated account debtors that are in excess of 25% (or, with respect to Ford Motor Company and certain of its controlled affiliates, 60%) of total eligible accounts to the extent of such excess; (iv) accounts which do not arise from the sale of goods or performance of services in the ordinary course of the Borrower's business; (v) accounts owing by a director, officer, employee or affiliate of the Borrower; (vi) federal government accounts which do not comply with the Assignment of Claims Act; (vii) accounts owing by an account debtor outside of the United States, Canada, the United Kingdom, Germany, Spain and Italy and certain other jurisdictions as mutually agreed (except to the extent secured by a letter of credit or reasonable credit insurance acceptable to the Administrative Agent); (viii) accounts that are payable in any currency other than U.S. dollars, Pounds Sterling or Euros and certain other currencies as may be mutually agreed; (ix) potential contra accounts; (x) accounts which are the subject of a bill-and-hold, guaranteed sale, sale and return, sale on approval, consignment, or other repurchase or return basis; (xi) accounts for which the goods have not been shipped or for which the services giving rise to such account have not been performed or if such account was invoiced more than once with respect to such goods or services; (xii) accounts which represent a progress billing, that are contingent upon a Borrower's completion of any further performance or relate to payments of interest or which are restricted proceeds of inventory subject to a title retention

B - 8

arrangement; (xiii) accounts with respect to which an invoice has not been sent to the applicable account debtor; (xiv) accounts which are not subject to a first priority perfected security interest in favor of the Administrative Agent (including any necessary or commercially reasonable actions required by the Administrative Agent in its reasonable discretion under applicable foreign laws of the applicable account debtor with respect to the collection and enforcement of the Administrative Agent's liens); (xv) accounts which are subject to liens other than a lien in favor of the Administrative Agent and permitted encumbrances which do not have priority over the lien in favor of the Administrative Agent; (xvi) accounts with respect to which any applicable covenant, representation, or warranty contained in the Revolving Loan Facility Documentation has been breached or is not true, in each case in any material respect; (xvii) accounts owed by an insolvent or bankrupt debtor or a debtor who has ceased operations (other than post-petition accounts payable of an account debtor that is a debtor-in-possession with debtor-in-possession financing in place under the Bankruptcy Code and reasonably acceptable to the Collateral Agent); (xviii) accounts which are subject to any counterclaim, deduction, defense, setoff or dispute but only to the extent of any such counterclaim, deduction, defense, setoff or dispute; and (xix) accounts which the Collateral Agent determines in its Permitted Discretion may not be paid by reason of the account debtor's inability to pay determined in the Collateral Agent's Permitted Discretion based upon any Changed Circumstances. "Changed Circumstances" means any material facts or circumstances which arise after the Closing Date or which otherwise first become known to the Collateral Agent after the Closing Date.

"Ineligible Inventory" shall mean (i) inventory which is slow moving (provided that inventory shall not be considered to be "slow moving" solely due to planned shutdowns or strikes, so long as the Borrower accounts and reserves for such inventory in accordance with its established policy (and so long as such policy is reasonable)), obsolete, defective or unfit for sale; (ii) bill-and-hold goods or returned inventory (other than returned inventory that otherwise is eligible inventory that the Collateral Agent in its Permitted Discretion allows); (iii) inventory outside the United States and Mexico; (iv) inventory in transit outside, or to or from a point outside, North America except to the extent such inventory is in transit with a common carrier from vendors or suppliers, in each case, on terms and conditions, and subject to documentation acceptable to the Collateral Agent; (v) inventory in excess of an amount to be mutually agreed located at leased

properties or with bailees for which either (i) appropriate lien releases and waivers (or subordination agreements) have not been obtained or (ii) the Collateral Agent has established a rent reserve of not more than three months rent; (vi) inventory that is subject to a third party's trademark or other proprietary right, unless the Collateral Agent is reasonably satisfied that it could sell such inventory on reasonably satisfactory terms without infringing on any licensor's rights or violating any licensor contract; (vii) inventory which is not owned by the Borrower or a Guarantor; (viii) inventory on consignment (other than inventory consigned by the Borrower or a Guarantor to a maquiladora and with respect to which the Borrower or such Guarantor has perfected its interest and the Administrative Agent has a first priority perfected security interest); (ix) inventory which consists of display items or packing or shipping materials, manufacturing supplies (other than raw materials) or replacement parts (other than after market parts available for sale in the ordinary course of business); (x) inventory which is not of a type held for sale in the ordinary course of the Borrower's business; (xi) inventory which is not subject to a first priority perfected security interest in favor of the Administrative Agent (subject to certain permitted liens); (xii) inventory which is subject to liens other than a lien in favor of the Administrative Agent and permitted encumbrances which do not have priority over the lien in favor of the Administrative Agent or which is subject to a title retention arrangement; (xiii) inventory with respect to which any applicable covenant, representation, or warranty contained in the Revolving Loan Facility Documentation has been breached or is not true, in each case in any material respect; and (xiv) inventory which the Collateral Agent otherwise determines in its Permitted Discretion is unacceptable for any reason whatsoever based upon any Changed Circumstances. "Eligible Inventory" shall include, without limitation, finished goods, work-in-progress and raw materials inventory as to which the Administrative Agent has a first priority perfected security interest.

"Excess Availability" shall mean, at any time, the remainder of (a) the sum of (i) the lesser of (A) the aggregate commitments under the Revolving Loan Facility at such time or (B) the Borrowing Base as then in effect, plus (ii) Available Liquid Cash (as defined below), less (b) the sum of (i) aggregate principal amount of all Revolving Loans and Swing Line Loans then outstanding, and (ii) all Letter of Credit outstandings (except to the extent cash collateralized) at such time.

"Available Liquid Cash" shall mean unrestricted and available cash and cash equivalents of the Borrower and the Guarantors that

is (i) in accounts located in the United States and certain other jurisdictions mutually agreed between the Administrative Agent and the Borrower and (ii) subject to account control agreements in favor of the Administrative Agent and in form and substance satisfactory to the Administrative Agent.

**Secured Hedging Arrangements:**

The obligations for any exposure in respect of any cash management transactions, interest rate protection, currency and other hedging obligations incurred on behalf of the Borrower or any Guarantor with any Lender or Term Lender (or their affiliates) (collectively, the "Secured Hedging Obligations") will be secured on a pro rata basis under the Term Loan Facility.

**Uncommitted Incremental Revolving Loan Facility:**

After 90 days following the Closing Date and subject to the terms and conditions hereof, provided that there is no default or event of default then existing or would arise therefrom, the Borrower will have the right to solicit the Lenders and other existing or prospective Lenders reasonably acceptable to the Administrative Agent (and without the consent of any Lender other than any Lender participating in such increase), to request from time to time that the Revolving Loan Facility be increased by an amount not to exceed $50 million in the aggregate and in a minimum amount of $20 million (and $5 million increments thereof or the balance of the incremental revolving facility) (any such increase, an "Incremental Revolving Loan Facility"). The terms of each Incremental Revolving Loan Facility shall be identical to the terms of the Revolving Loan Facility and each Incremental Revolving Loan Facility shall upon its effectiveness, be added to (and be made a part of) the Revolving Loan Facility; provided, however, any Incremental Revolving Loan Facility may be added to either Revolver 1 or Revolver 2, and the applicable Borrowing Base for either Revolver 1 or Revolver 2, as the case may be, may be amended to include additional eligible assets subject to the approval by the Borrower, the Administrative Agent and each affected Lender. The Incremental Revolving Loan Facility shall not initially be effective but may be activated at any time or from time to time (without amendment to the loan documentation other than technical and similar amendments necessary to effectuate the increase, in each case without the consent of the Lenders, and additions of eligible assets to the Borrowing Base with the consent of affected Lenders) during the life of the Revolving Loan Facility; provided that (i) no default or event of default shall have occurred and be continuing or would result therefrom and (ii) all representations and warranties shall be true and correct in all material respects immediately prior to, and immediately after giving effect to, the incurrence of the Incremental Revolving Loan Facility. The Revolving Loan Facility Documentation shall

B - 11

contain "most favored nation" provisions substantially similar to those described in the Term Loan Term Sheet.

Existing Lenders may, but shall not be obligated without their prior written consent to, provide a commitment and/or make any loans pursuant to any Incremental Revolving Loan Facility, and nothing contained herein or in the Commitment Letter constitutes, or shall be deemed to constitute, a commitment with respect to any Incremental Revolving Loan Facility. If the existing Lenders are unwilling to increase their applicable commitments by an amount equal to the requested increase, the Administrative Agent, in consultation with the Borrower, shall use its commercially reasonable efforts, on terms and conditions mutually agreed to by the parties and for fees, including, without limitation, arrangement fees with respect to such engagement, to obtain one or more financial institutions which are not then Lenders (which any such financial institution may be suggested by the Borrower) to become a party to the Revolving Loan Facility and to provide a commitment to the extent necessary to satisfy the Borrower's requested increase in the Incremental Revolving Loan Facility.

| | |
|---|---|
| **Maturity Date:** | "Revolver Maturity Date" shall mean the date occurring five (5) years after the Closing Date. |
| **Conditions Precedent to Initial Borrowing** | The several obligations of the Lenders to make, or cause one of their respective affiliates to make, loans under the Revolving Loan Facility will be conditioned upon satisfaction (or waiver) of the conditions precedent listed on Schedule 1 to the Commitment Letter and the conditions set forth in the Commitment Letter. |
| **Conditions to All Borrowings:** | The conditions to all subsequent borrowings under the Revolving Loan Facility will be condition upon satisfaction (or waiver) of the following conditions precedent: prior written notice of borrowing the form of a customary notice of borrowing, the accuracy of representations and warranties in all material respects, compliance with Borrowing Base after giving effect to such borrowing and no default or event of default shall have occurred and be continuing. |
| **Closing Date:** | The date on which all of the conditions set forth in Schedule 1 to the Commitment Letter are satisfied or waived (the "Closing Date"). |
| **Interest Rates:** | At the Borrower's option, interest will be payable at a rate per annum equal to the LIBOR Rate or the Base Rate plus the applicable margins set forth on Schedule I hereto. |

LEGAL_US_E # 88932992.17

To the extent that the all-in yield (including interest rate and upfront fees) equated to an increase in interest rates (based on an assumed 4-year average life and in a manner as reasonably determined by the Administrative Agent) for the Incremental Revolving Loan Facility is greater than or equal to 50 basis points higher than the yield of the Revolving Loan Facility, the yield (including interest and fees) on the Revolving Loan Facility shall be increased to the same yield applicable to the Incremental Revolving Loan Facility.

**Interest Payments:** Interest shall be payable as follows: (i) at the end of every month with respect to loans bearing interest with respect to the Base Rate (as defined below), (ii) on the last day of selected interest periods (which shall be one, two, three or six months and, if available to all Revolver Lenders, 9 and 12 months and 1 and 2 weeks) for loans bearing interest with reference to the LIBOR Rate (as defined below) (and at the end of every three months, in the case of interest periods of longer than three months); and (iii) upon prepayment, in each case payable in arrears and computed on the basis of a 360 day year with respect to the LIBOR Rate and the basis of a 365 day year with respect to the Base Rate.

As used herein:

"Base Rate" means a floating rate of interest per annum equal to the greatest of (a) the rate announced by Morgan Stanley as its prime or base commercial lending rate, (b) the one-month LIBOR Rate plus 1.00% and (c) the federal funds rate published by the Federal Reserve Bank of New York plus 0.50%.

"LIBOR Rate" means the rate of interest (rounded upwards, if necessary, to the nearest 1/100th) appearing on Reuters Screen LIBOR01 Page (or on any successor or substitute page of such service, or any successor to or substitute for such service as determined by the Administrative Agent) as the London interbank offered rate for deposits in U.S. Dollars for a term comparable to the applicable period of three months (but if more than one rate is specified on such page, the rate will be an arithmetic average of all such rates), and in each case subject to the reserve percentage prescribed by governmental authorities.

LIBOR borrowings will require three business days' prior notice and will be in minimum amounts to be agreed upon.

**Default Rate:** Upon any payment or bankruptcy event of default or event of default related to the financial covenants, default interest and letter of credit fees shall be applied at 2% above the rate

otherwise applicable thereto.

| | |
|---|---|
| **Revolving Loan Facility Commitment Fees:** | A per annum fee in the amount determined in accordance with the grid attached hereto as Schedule I, payable on the average daily unused portion of the available amounts under the Revolving Loan Facility shall accrue from the Closing Date and shall be payable monthly in arrears on each interest payment date, on the date of any reduction of the commitments under the Revolving Loan Facility and on the Revolver Maturity Date. |
| **Letters of Credit Fees:** | A fee equal to (i) the Applicable LIBOR Margin (as defined below) then in effect for the Revolving Loan Facility, times (ii) the average daily maximum aggregate amount available to be drawn under all Letters of Credit, will be payable to the lenders under the Revolving Loan Facility. In addition, a fronting fee equal to 0.25% will be payable to the Issuing Bank, as well as certain customary fees of the Issuing Bank asserted thereby. |
| **Voluntary Prepayments and Reductions in Commitments:** | The Borrower may repay all or part of the Revolving Loan Facility without premium or penalty; provided that such prepayments are accompanied by any accrued interest on the amount prepaid to the date of prepayment and any breakage costs, if any, in connection with any voluntary prepayments of LIBOR Rate loans. |
| | Voluntary permanent reductions of the unutilized portion of the Revolving Loan Facility commitments will be permitted at any time, in minimum principal amounts to be mutually agreed upon, without premium or penalty, subject to notice requirements to be mutually agreed and reimbursement of the Lenders' redeployment costs in the case of a prepayment of LIBOR Rate loans prior to the last day of the relevant interest period. |
| **Mandatory Prepayments:** | The Borrower shall make the following mandatory prepayments (subject to certain basket amounts to be agreed upon in the Revolving Loan Facility Documentation and the terms of the Intercreditor Agreement (as defined below)): |
| | (a) <u>Borrowing Base</u>: If at any time the sum of the outstandings under the Revolving Loan Facility (including the Letter of Credit outstandings and the Swing Line Loans thereunder) exceeds the lesser of (i) the Borrowing Base as in effect at such time and (ii) the aggregate commitments under the Revolving Loan Facility as in effect at such time, prepayments of Revolving Loans and/or Swing Line Loans (and/or the cash collateralization (at not more than 103% of face amount) of Letters of Credit) shall be required in an |

B - 14

amount equal to such excess.

    (b) <u>Other Mandatory Prepayments</u>: As specified under the caption "Mandatory Prepayments" in the Term Loan Facility Term Sheet.

    (c) <u>Dispositions</u>: Prepayments (without any reduction to the commitment under the Revolving Loan Facility) in an amount equal to 100% of the net cash proceeds from the sale or other disposition of any ABL Collateral (including as a result of casualty or condemnation), except for the sale of inventory in the ordinary course and certain exceptions to be agreed upon.

There will be no prepayment penalties (except LIBOR breakage costs, if any) for mandatory prepayments.

**Application of Payments:** All mandatory prepayments (except for prepayments related to the obligations under the Revolving Loan Facility in excess of the Borrowing Base or maximum Revolving Loan Facility commitments and net proceeds from ABL Collateral) will be applied without penalty or premium (except for breakage costs, if any) and without any reduction to the commitment under the Revolving Loan Facility and will be applied, <u>first</u>, to the Term Loan Facility; and, <u>second,</u> to outstanding loans under the Revolving Loan Facility in amounts to be determined based upon the allocated value of the primary collateral securing each facility.

All payments during an event of default shall be applied (a) with respect to proceeds from the ABL Collateral, <u>first</u>, to the outstanding loans under the Revolving Loan Facility (including cash collateralizing all Letters of Credit) and accrued and unpaid interest, expenses, costs and fees thereon and thereafter to the Term Loan Facility and (b) with respect to the proceeds from the Term Loan Collateral, <u>first</u>, to the outstanding Term Loan Facility and accrued and unpaid interest, expenses, costs and fees thereon and thereafter to the Revolving Loan Facility.

**Security:** The Revolving Loan Facility and each guarantee made by a Guarantor in connection therewith will be secured by (i) valid and perfected first priority security interests in and liens upon the ABL Collateral and (ii) valid and perfected security interests in and liens upon the Term Loan Collateral junior to liens on the Term Loan Collateral securing the indebtedness and other obligations under the Term Loan Facility (the "<u>Collateral</u>").

"<u>ABL Collateral</u>" means any and all of the following Collateral: (a) all Accounts (other than Accounts arising under contracts for

the sale of Term Loan Collateral) and related Records; (b) all Chattel Paper; (c) all Deposit Accounts and all checks and other negotiable instruments, funds and other evidences of payment held therein (but not any identifiable Proceeds of Term Loan Collateral); (d) all Inventory; (e) all eligible real property and corporate aircraft included in the Borrowing Base; (f) solely to the extent evidencing, governing, securing or otherwise related to the items referred to in the preceding clauses (a), (b), (c), (d) and (e), all Documents, General Intangibles, Instruments, Investment Property and Letter of Credit Rights; (g) all books and records related to the foregoing; and (h) all Proceeds, including insurance Proceeds, of any and all of the foregoing and all collateral, security and guarantees given by any Person with respect to any of the foregoing. Notwithstanding clause (h) of the immediately preceding sentence, "ABL Collateral" shall not include any assets referred to in clauses (a) through (j) and (l) of the definition of "Term Loan Collateral" that are not included in clause (f) above, and shall be subject to certain exclusions. All capitalized terms used in this definition and not defined elsewhere in this Agreement have the meanings assigned to them in the UCC as in effect in the State of New York.

"Term Loan Collateral" means any and all of the following Collateral: (a) all Investment Property (including equity interests in subsidiaries); (b) all Documents; (c) all General Intangibles; (d) all Intellectual Property; (e) all Equipment; (f) all real property (including both fee and leasehold interests) and fixtures; (g) all Instruments; (h) all insurance; (i) all Letter of Credit Rights; (j) all Commercial Tort Claims; (k) all other Collateral not constituting ABL Collateral; (l) all books and records related to the foregoing; and (m) all Proceeds, including insurance Proceeds, of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing. Notwithstanding the foregoing, "Term Loan Collateral" shall not include any property or assets included in clause (e), (f) or (h) of the definition of "ABL Collateral", and shall be subject to certain exclusions. All capitalized terms used in this definition and not defined elsewhere in this Agreement have the meanings assigned to them in the UCC as in effect in the State of New York.

Notwithstanding anything to the contrary, the Collateral shall exclude the following: (i) any fee owned real property with a value of less than an amount to be agreed (with any required mortgages on properties with a value greater than such amount being permitted to be delivered post-closing within forty-five (45) days) and all leasehold interests (including any requirement to obtain landlord waivers, estoppels and consents, except to the

LEGAL_US_E # 88932992.17

extent required by the eligibility definitions of the Borrowing Base); (ii) motor vehicles and other assets subject to certificates of title (other than aircrafts included in the Borrowing Base), letter of credit rights and certain commercial tort claims; (iii) pledges and security interests prohibited by law and permitted agreements (including permitted liens, leases and licenses) or would impair the value thereof pursuant to its terms and/or prohibited by the terms of such entity's organizational documents or related agreements existing on the Closing Date (in each case, to the extent such prohibitions are enforceable under applicable law); (iv) stock in and the assets of unrestricted subsidiaries; (v) assets to the extent a security interest in such assets would, in the good faith judgment of the Borrower, result in a material adverse tax consequences (it being understood and agreed that utilization of the NOLs of the Borrower and its subsidiaries shall be excluded from the Borrower's determination of whether the grantor of such security interest would result in materially adverse tax consequences to the Borrower or any of its subsidiaries) to the Borrower or its subsidiaries (it being understood that the Lenders shall not require the Borrower or any Guarantor to enter into any security agreements or pledge agreements governed under foreign law except to the extent necessary to perfect the Collateral Agent's security interest in the Collateral included in the Borrowing Base); and (vi) those assets as to which it is mutually determined that the burden or cost of obtaining such a security interest or perfection thereof outweighs the benefit to the Lenders of the security to be afforded thereby. The foregoing described in clauses (i), (ii), (iii), (iv), (v) and (vi) are, collectively, the "Excluded Assets".

Subject to the immediately succeeding sentence, all the above-described pledges, security interests and liens on the ABL Collateral shall be created on terms and pursuant to documentation reasonably satisfactory to the Administrative Agent, and none of the Collateral shall be subject to any other pledges, security interests or liens, subject to permitted liens and other exceptions to be agreed upon; provided that junior liens will be permitted on the ABL Collateral to secure the Term Loan Facility.

An intercreditor agreement (the "Intercreditor Agreement") will establish the rights of the holders of the first priority liens and the holders of the junior liens on the ABL Collateral and the Term Loan Collateral. Pursuant to the Intercreditor Agreement, the junior liens may not be enforced at any time when obligations secured by first priority liens are outstanding, except in any insolvency or liquidation proceeding as necessary to file a claim

or statement of interest with respect to the obligations secured by junior liens. Any release or subordination of first priority liens on any collateral approved by holders of such first priority liens will also release or subordinate, as applicable, the junior liens on the same collateral, subject to certain exceptions. The holders of the first priority liens will receive all proceeds from any realization on the collateral subject to such first priority liens until the obligations secured by the first priority liens are paid in full, the commitments with respect thereto are terminated and there are no outstanding letters of credit or similar instruments issued under the applicable facility.

**Cash Management**

Subject to the immediately succeeding paragraph, the Borrower will direct all of its customers whose accounts constitute ABL Collateral to remit all payments to deposit accounts that are the subject of control agreements among the Loan Parties, the Administrative Agent, and the applicable depository bank and will be required to promptly remit any payments received by them to these accounts. In the event Excess Availability falls below $50,000,000 for three consecutive business days or upon the occurrence of any material event of default to be mutually agreed upon (the "Cash Dominion Trigger"), all proceeds from the controlled deposit accounts shall be swept to the Administrative Agent and applied to the obligations under the Revolving Loan Facility or to provide cash collateral for the Letters of Credit until such time as Excess Availability exceeds $50,000,000 for 20 consecutive days. The Administrative Agent shall be obligated to release cash control upon the termination (or waiver) of any Cash Dominion period. The Loan Parties shall have 60 days (as may be extended from time to time by the Administrative Agent in its reasonable discretion) after the Closing Date to have such account control agreements executed (plus, in the event that any depositary refuses to execute such agreement, an additional period of time to be determined to move such account to a depositary institution which shall execute such agreement).

Notwithstanding the immediately preceding paragraph and the section of this Term Sheet entitled "Security", the Borrower and the Guarantors shall not be required to provide control agreements with respect to (a) payroll, trust, currency exchange and tax accounts and certain header accounts of VEC set forth on a schedule to be mutually agreed, (b) certain other accounts to be agreed upon (excluding any VEC collection accounts) and (c) other accounts having balances not, individually and in the aggregate, in excess of amounts to be determined.

**Representations and**

The Revolving Loan Facility Documentation will contain solely

**Warranties:**  the following representations and warranties applicable to the Loan Parties (with customary materiality qualifiers, exceptions and qualifications to be mutually agreed upon): financial statements (including pro forma financial statements); absence of undisclosed liabilities and/or litigation; no material adverse change or any material litigation; valid existence; compliance with law; requisite power and due authority; execution, delivery and enforceability of Revolving Loan Facility Documentation; no conflict with organizational documents, law or contractual obligations; no default; no government, regulatory or third party approvals required, other than approvals in effect; ownership of property; liens and priority of the Revolving Loan Facility; intellectual property; inapplicability of Investment Company Act; no burdensome restrictions; taxes; ERISA; subsidiaries and joint ventures; environmental matters; solvency; labor matters; accuracy of financial statements and other information; margin regulations; absence of Material Adverse Change (to be mutually defined); insurance (including flood insurance, if applicable); use of proceeds; brokers' and transaction fees; status of Revolving Loan Facility as senior debt; jurisdiction of organization; chief executive office; location of inventory, equipment and books and records; deposit accounts and other accounts; government contracts; customer and trade relations; foreign assets control regulations and anti-money laundering; Patriot Act and "know your customer" matters; creation, perfection and priority of security interests; material agreements; bonding and licenses; compliance with Regulation H; holding company status; intercreditor agreement; and substantial consummation of the Plan of Reorganization and related agreements.

**Affirmative Covenants:**  The Revolving Loan Facility Documentation will include the following affirmative covenants by the Borrower and each of the Guarantors (which shall be subject to customary materiality qualifiers, exceptions and limitations to be mutually agreed upon): delivery of certified (with carve-outs from GAAP compliance noted) monthly, quarterly and annual financial statements; monthly (or weekly as provided herein) borrowing base certificates; annual projections within 30 days after the end of the preceding fiscal year; accountants' letters; reports; notices of defaults; litigation and other material events and other information requested by the Lenders or the Administrative Agent; officers' certificates; payment of taxes and other obligations; continuation of business and maintenance of existence and material rights and privileges; OFAC; Patriot Act compliance; ERISA; compliance with laws and material contractual obligations; maintenance of property and insurance;

B - 19

maintenance of books and records; the right of the Lenders to inspect property and books and records; third party audit and appraisal rights with respect to ABL Collateral (subject to frequency and cost reimbursement limitation as set forth herein); environmental matters; use of proceeds; provision of additional collateral, guarantees and mortgages; interest rate protection; credit rating; cash management systems; supplemental disclosure; intellectual property; post closing matters; holding of foreign subsidiaries; further assurances and delivery of landlord and bailee waivers to the extent required in the eligibility definitions of the Borrowing Base.

**Negative Covenants:** The Revolving Loan Facility Documentation will include solely the following negative covenants by the Borrower and each of the Guarantors (in each case, with materiality qualifiers, exceptions and baskets to be agreed and consistent with (or better than) those contained in the Borrower's existing loan facilities):

1. Limitations on asset dispositions, including, without limitation, the issuance and sale of capital stock of subsidiaries (with carve-outs for, among other things, (i) the sale of inventory in the ordinary course, (ii) the sale or issuance of the Borrower's stock to employees (and, as required by law, the Borrower's or a subsidiary's issuance of equity to qualify officers and directors) under employee and other compensation plans, (iii) obsolete, no longer used or useful, surplus, uneconomic or worn-out assets (including the abandonment of intellectual property), (iv) any individual transaction or series of related transactions pursuant to which the Borrower or any of its subsidiaries dispose of assets resulting in aggregate net proceeds not in excess of $350,000 (each a "Small Asset Sale"), (v) dispositions of accounts receivable not included in ABL Collateral for cash, for fair market value and on a non-recourse basis by non-Loan Parties pursuant to factoring and/or securitization arrangements so long as the book value of all such accounts receivable subject to a factoring arrangement at any one time do not exceed $100 million (without regard to adverse changes in the exchange rate) in the aggregate plus an additional $50 million (without regard to adverse changes in the exchange rate) in the aggregate if the assets of [**VSI Spain**][1] are excluded from the Borrowing Base, (vi) the sale of assets with a fair market value not to exceed $175 million (net of taxes, expenses, indebtedness, pension or OPEB liabilities paid or reserved for in connection with any such sale)

---

[1] Borrower to provide specific legal entities.

LEGAL_US_E # 88932992.17

(the "General Asset Sale Basket"), (vii) sales of certain designated assets that are scheduled as of the Closing Date and are acceptable to the Administrative Agent (the "Specified Assets"), (viii) sales of assets up to 15% of EBITDA (to be defined) in any fiscal year (but not to exceed 25% of EBITDA in the aggregate) so long as such proceeds are used to repay the Obligations (subject to reinvestment baskets), (ix) permitted restructuring transactions that are scheduled as of the Closing Date and are acceptable to the Administrative Agent; (x) dispositions of the assets of any foreign subsidiary which is an Immaterial Subsidiary (to be defined) in connection with the liquidation or dissolution of such subsidiary, (xi) dispositions of accounts receivable in connection with compromise, write down or collection thereof in the ordinary course of business and consistent with past practice, (xii) the sale, distribution, dividend or other transfer of Visteon S.A. (Argentina) on aged intercompany payables to the Borrower from other Visteon subsidiaries so long as any such sale, distribution, dividend or other transfer is a non-cash transaction, and (xiii) leases, subleases, licenses or sublicenses of property in the ordinary course of business consistent with past practices in an aggregate amount to be mutually agreed upon.

2.    Limitations on mergers, liquidations, consolidations, dissolutions and other fundamental changes with customary exceptions and other scheduled transactions to be mutually agreed upon.

3.  Limitations on cash dividends, distributions, redemptions and repurchases with respect to capital stock, except to the extent no event of default then exists or would arise therefrom subject to the Borrower's having pro forma Excess Availability of at least $100 million); provided, however, that Halla Climate Control Corporation and its subsidiaries (collectively, "Halla") shall be permitted to redeem or repurchase (including, without limitation, for cash) equity interests from Halla's exiting equity-holders so long as the Borrower and its subsidiaries, as a whole, continue to own not less than 51% of the equity interests of Halla and continue to control same ratio (or better) of board seats of Halla as it does on the Closing Date after any such transaction.

4.  Limitations on debt and guarantees with exceptions to include (i) the Term Loan Facility, (ii) existing debt of the Borrower and its direct or indirect subsidiaries satisfactory to the Lenders and any refinancings, refundings, renewals, reallocations or extensions thereof provided that the original aggregate principal amount of Indebtedness is not increased, (iii) hedging

B - 21

arrangements not for speculative purposes, (iv) local working capital lines of credit for foreign subsidiaries (other than Halla and its subsidiaries) secured by assets of such foreign subsidiaries, not in excess of $100 million at any one time outstanding and indebtedness under letters of credit issues on behalf of foreign subsidiaries not in excess of $35 million, (v) guarantees of Indebtedness of joint ventures (i) which are subsidiaries in an amount not exceeding $75 million and (ii) which are not subsidiaries in an amount not exceeding $50 million, (vi) capital leases and purchase money debt not exceeding $40 million, (vii) cash pooling, netting and cash management arrangements among the Borrower and its subsidiaries reasonably satisfactory to the Administrative Agent and subject to limitations to be mutually agreed, (viii) indebtedness in respect of factoring facilities of subsidiaries that are not Guarantors (with or without recourse to such subsidiaries and which may be secured by the accounts receivable subject to such factoring arrangement) in amounts to be agreed, (ix) intercompany debt, (x) indebtedness of Halla in an amount not to exceed $350 million (inclusive of amounts existing as of the Closing Date) at any one time outstanding, (xi) preferred stock which is not disqualified equity (to be mutually defined), unless such disqualified equity is treated as debt for borrowed money for all purposes of the Revolving Loan Facility Documentation, and is otherwise permitted to be issued thereunder, (xii) indebtedness incurred in connection with Permitted Acquisitions (to be mutually defined) so long as (on a pro forma basis as of the last day of the most recent determination period, after giving effect to such indebtedness and other customary and appropriate pro forma adjustments, including any acquisitions or dispositions or repayment of indebtedness after the beginning of the relevant determination period but prior to or simultaneous with the incurrence of such indebtedness and any synergies, operating expense reductions and other operating improvements and cost savings as certified by the Borrower as having been determined in good faith to be reasonably anticipated to be realizable within 18 months following any such acquisition or disposition or operational change) the Borrower is in compliance with the financial covenants and (xiii) additional unsecured debt of subsidiaries that are not Guarantors subject to parameters and caps to be determined. Notwithstanding anything to the contrary in the foregoing, the amount of the direct debt obligation and the amount of the guarantee of such obligation shall not be double counted for the purposes of determining compliance with any covenant.

5. Limitations on loans, investments and acquisitions (with a carve-out for (i) permitted acquisitions so long as (A) no default exists or would result therefrom and the Borrower is in pro forma compliance with its Financial Covenants, (B) pro forma Availability after giving effect to such acquisition is at least $100 million, (C) the acquired company or assets are in the same or substantially similar, ancillary or related line of business as the Borrower and its direct or indirect subsidiaries and (D) the acquired company and its subsidiaries will become Guarantors and pledge their assets as Collateral to the Administrative Agent to the same extent as the existing Guarantors; provided, however, notwithstanding this clause (D) the Borrower and its subsidiaries may make permitted acquisitions of entities organized in a jurisdiction other than the United States which shall not be required to become Guarantors, (ii) investments in Halla and joint ventures in an amount not exceeding an amount to be agreed upon at any one time outstanding, (iii) loans and advances to employees in the ordinary course of business (including for travel, entertainment and relocation expenses) in an aggregate amount not to exceed $2,000,000 at any one time outstanding, (iv) intercompany investments by and among subsidiaries which are loan parties and intercompany investments by and among subsidiaries which are non-loan parties, (v) so long as Excess Availability is greater than $75 million, intercompany loans in subsidiaries which are not loan parties (e.g., foreign subsidiaries/unrestricted subsidiaries, if any) in an aggregate outstanding amount not to exceed the sum (A) $150 million, (B) intercompany loans or cash dividends from Subsidiaries which are not loan parties received by loan parties and repayment in cash by Subsidiaries which are not Loan Parties of intercompany loans owing to any loan party and (C) 50% of the net cash proceeds received by any loan party from certain asset sales that are scheduled as of the Closing Date and acceptable to the Administrative Agent, (vi) investments (excluding permitted acquisitions) in an aggregate outstanding amount (including assumed Indebtedness) not to exceed the sum (such sum, the "Investment Basket") of (A) $100 million, in the aggregate, (B) intercompany loans or cash dividends from non-Loan Parties and repayment in cash by non-Loan Parties after the Closing Date, (C) 50% of the net cash proceeds received by any Loan Party after the Closing Date from certain asset sales that are scheduled as of the Closing Date and acceptable to the Administrative Agent and (D) an amount equal to the greater of (1) 50% of adjusted EBITDA after the Closing Date (it being understood that (a) the calculation of the amount of investments permitted pursuant to this clause (D) shall be made at the time the relevant investment is made and

include a deduction for any other outstanding investments made in reliance on this clause (D), but no default or event of default shall occur solely as a result of a decrease in adjusted EBITDA after the consummation of any such investment and (b) if adjusted EBITDA is negative, no adjustment shall be made under this clause (D)) and (2) the amount of excess cash flow retained by the Borrower after the Closing Date, (vii) investments existing as of the Closing Date as set forth on a schedule and any modification, replacement, reallocation, renewal or extension thereof provided that the original amount of such investments are not increased, (viii) investments in the ordinary course of business consisting of endorsements of instruments for collection or deposit, (ix) investments received in connection with the bankruptcy or reorganization of any Person or in settlement of obligations of, or disputes with, any Person arising in the ordinary course of business and upon foreclosure with respect to any secured investment or other transfer of title with respect to any secured investment, (x) other investments in non-loan parties in an amount not exceeding an amount to be determined at any one time outstanding, (xi) non-cash investments resulting from (A) the write-down of an intercompany loan existing on the Closing Date made by the Borrower or its subsidiaries to Visteon Brazil Trading Co. LTD and (B) the transfer of Visteon S.A. (Argentina) on aged intercompany payables to the Borrower from other Visteon subsidiaries and the subsequent write-off of those aged intercompany payables, (xii) investments in or acquisition of the VASI IES Business through one or more asset transfers, purchases and/or sales that will be not less than cash-neutral to the Loan Parties (which shall not be subject to a mandatory repayment) and (xiii) other baskets to be agreed).

6.   Limitations on liens (other than permitted liens, including, without limitation, liens securing (i) the Term Loan Facility, (ii) local working capital lines of credit of foreign subsidiaries permitted under the "indebtedness" covenant referred to above, subject to limitations to be agreed (covering only the assets of such foreign subsidiaries and any foreign subsidiary which is a guarantor thereof), (iii) non-recourse indebtedness of consolidated and non-consolidated joint ventures permitted under the "indebtedness" covenant referred to above in an amount not to exceed an amount to be determined (covering only the assets of such joint ventures) and (iv) liens in connection with the financing of insurance premiums).

7.   Limitations on transactions with affiliates.

8.   Limitations on payments and modifications of subordinated

and other debt instruments.

9. Limitations on changes in fiscal year.

10. Limitations on negative pledge clauses restricting subsidiary distributions.

11. Limitations on cancellation of debt and prepayments, redemptions and repurchases of debt (other than permitted refinancing debt and other exceptions to be agreed).

12. Limitations on changes in the business, accounting treatment and capital structure of Borrower and its subsidiaries.

13. Limitations on amendment of constituent documents and material debt agreements and other material agreements to be agreed, except for modifications that could not reasonably be expected to materially and adversely affect the interests of the Lenders.

14. Limitations on speculative hedging transactions.

15. Limitations regarding margin stock and use of proceeds.

16. Limitations on contingent obligations.

17. Limitations on sale-leasebacks.

18. No impairment of intercompany transfers.

19. Holding company/foreign subsidiary operations.

20. Limitations on restrictions affecting subsidiaries.

| | |
|---|---|
| **Financial Covenants:** | The Revolving Loan Facility Documentation will include a minimum Excess Availability covenant to be maintained at all times in an aggregate amount not less than $40,000,000. |
| **Events of Default:** | The Revolving Loan Facility Documentation will include solely the following events of default (with certain customary grace periods, materiality and thresholds to be agreed upon), including, without limitation: failure to make payments of principal when due, interest or unused commitment and letter of credit fees within three (3) Business Days after the same becomes due, or any other amount within ten (10) days after the same becomes due; material inaccuracy of representations and warranties; violations of covenants, where customary and appropriate, within thirty (30) days after occurrence of such violation; cross-default |

to the Term Loan Facility and other material indebtedness to be agreed, including, without limitation, certain foreign debt; material judgments in excess of an amount to be agreed (to the extent not covered by insurance or third party indemnity); actual or asserted invalidity of any guarantee or security document (excluding impairment to liens or first priority status due to a failure of the Administrative Agent to have a first priority perfected lien in the Collateral to the extent (a) such failure arises from the failure of the Administrative Agent to take or refrain from taking any action under its sole control or (b) such failure results from the Administrative Agent's loss of possessory Collateral); subordination provisions or security interest; bankruptcy/insolvency events (with sixty (60) days grace period for involuntary proceedings); material ERISA events; environmental events; material contracts; and a change of ownership or control.

**Fees:**   To be set forth in a separate Fee Letter.

**Voting:**   Amendments and waivers of the Revolving Loan Facility Documentation will require the approval of the Administrative Agent, Collateral Agent and Lenders holding more than 50% of the aggregate amount of loans and commitments under the Revolving Loan Facility (the "Requisite Lenders"), except that (among other exceptions to be set forth in the Revolving Loan Facility Documentation) the consent of (a) each affected Lender shall be required with respect to, among other things, (i) increases in commitments of such Lender (other than for the Incremental Revolving Loan Facility), (ii) reductions of principal, interest or fees payable to such Lender (provided, that waiver of a default, event of default or default interest shall not constitute a reduction of interest for this purpose), and (iii) extensions of final scheduled maturity or times for payment of interest or fees owing to such Lender (provided that waiver of a default, event of default or default interest shall not constitute a reduction of interest for this purpose), (b) all Lenders shall be required with respect to releases of all or substantially all of the Guarantors or all or substantially all of the ABL Collateral, (c) the Administrative Agent, Collateral Agent and 66 2/3% of Lenders shall be required with respect to increases in any advance rate above the advance rates set on the Closing Date in the Revolver 1 Borrowing Base; provided, however, only the Administrative Agent's consent shall be required with respect to increases in any advance rate above the advance rates set on the Closing Date in the Revolver 2 Borrowing Base, and (d) the Administrative Agent and Collateral Agent may discontinue reserves without the consent of any

B - 26

Lender.

**Defaulting Lenders:** The Revolving Loan Facility Documentation shall contain customary provisions relating to "defaulting" Lenders (including provisions relating to providing cash collateral to support swing line loans or Letters of Credit, the suspension of voting rights, rights to receive certain fees, and the required assignment or termination of commitments or loans of such Lenders). The Revolving Loan Facility Documentation will also contain customary provisions relating to the replacement of "defaulting" Lenders, non-consenting Lenders, Lenders requiring payments of increased costs, withholding tax gross-up or similar amounts, and similar provisions.

**Field Exams and Appraisals:** Field examinations will be conducted on an ongoing basis at regular intervals at the discretion of the Administrative Agent and the Collateral Agent at the reasonable cost of the Borrower to ensure the adequacy of ABL Collateral and related reporting and control systems. Up to two field examinations per year will be at the Borrower's cost; provided that there shall be no limitation on the number or frequency of field examinations at the Borrower's cost if a Cash Dominion Trigger or an event of default shall have occurred and be continuing.

Inventory, and to the extent included in the Borrowing Base, real estate, aircraft and property plant and equipment appraisals will be conducted on an annual basis (including one full appraisal and one "desktop" appraisal) at the discretion of the Administrative Agent and the Collateral Agent at the reasonable cost of the Borrower; provided that there shall be no limitation on the number or frequency of inventory appraisals at the Borrower's cost if a Cash Dominion Trigger or an event of default shall have occurred and be continuing. Each such real estate appraisal shall be FIRREA compliant.

**Taxes, Reserve Requirements and Indemnities:** The Revolving Loan Facility will provide that all payments are to be made free and clear of any taxes (other than franchise taxes and taxes on overall net income), imposts, assessments, withholdings or other deductions whatsoever. Foreign Lenders shall furnish to the Administrative Agent appropriate certificates or other evidence of exemption from U.S. federal tax withholding.

The Borrower will indemnify the Lenders against all increased costs of capital resulting from reserved requirements or otherwise imposed, in each case, subject to customary increased costs, capital adequacy and similar provisions to the extent not taken into account in the calculation of the Base Rate or the reserve

adjusted LIBOR Rate. The Facilities shall include customary protective provisions for such matters as capital adequacy, increased costs, reserves, funding losses, illegality and withholding taxes. The Borrower shall have the right to replace any Lender that charges an amount in excess of that being charged by the other Lenders with respect to contingencies described in the preceding sentences.

**Indemnity and Expenses:**   The Borrower shall pay all of the Administrative Agent's and the Arranger's reasonable and documented out-of-pocket expenses incurred by the Administrative Agent or the Arranger (including the reasonable fees and out-of-pocket expenses of one primary counsel designated by the Administrative Agent (and appropriate local counsel in applicable foreign and local jurisdictions, but limited to one local counsel in each such jurisdiction) for the Arranger and the Administrative Agent), as well as all reasonable documented out-of-pocket expenses of the Administrative Agent in connection with the administration of the loan documentation after the Closing Date. The Borrower shall also pay the documented out-of-pocket expenses of the Administrative Agent, the Arranger and the Lenders in connection with the enforcement of any of the loan documentation; provided, however, that reimbursement of legal fees and legal expenses shall be limited to the reasonable fees and out-of-pocket expenses of one counsel for the group (which shall be designated by the Administrative Agent) in the absence of conflicts and appropriate local counsel.

The Loan Parties will indemnify and hold harmless the Administrative Agent, the Arranger, each Lender and each of their affiliates and their officers, directors, employees, agents and advisors (each an "Indemnified Person") from claims and losses relating to the Revolving Loan Facility, and from and against any and all actions, suits, proceedings (including any investigations or inquiries), claims, losses, damages, liabilities or expenses of any kind or nature whatsoever which may be incurred by or asserted against or involve any such Indemnified Person as a result of or arising out of or resulting from this financing, the extension or syndication of the Revolving Loan Facility contemplated by this term sheet, or in any way arise from any use or intended use of the Commitment Letter or the proceeds of the Revolving Loan Facility contemplated by this term sheet, and the Borrower shall agree to reimburse each Indemnified Person promptly upon written demand (together with customary backup documentation supporting such reimbursement request) for any reasonable legal or other reasonable and documented out-of-pocket expenses incurred in connection with investigating, defending or preparing to defend any such action, suit, proceeding (including any inquiry

or investigation) or claim (whether or not any Indemnified Person is a party to any action or proceeding out of which any such expenses arise); provided, however, that the Borrower shall not have to (a) indemnify any Indemnified Person against any loss, claim, damage, expense or liability to the extent determined by a court of competent jurisdiction to have resulted from the gross negligence, bad faith or willful misconduct of any Indemnified Person, (b) indemnify any Indemnified Person against any loss, claim, damage, expense or liability to the extent such actual loss, claim, damage, expense or liability arises from any action solely among Indemnified Persons other than any such actions that arise from an act or an omission of the Borrower (provided that notwithstanding the foregoing provisions of this clause (b), the Administrative Agent, acting in such capacity, shall be indemnified (subject to the limitations set forth in clause (a) above)) or (c) reimburse the reasonable legal fees and reasonable documented out-of-pocket expenses of more than one outside counsel for all Indemnified Per-sons with respect to any matter for which indemnification is sought unless representation of all such Indemnified Persons would create a conflict of interest plus appropriate local counsel. No party hereto shall be responsible or liable to any other party hereto or any other person for consequential or punitive damages.

|                              |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                |
|------------------------------|----|
| **Assignments and Participations:** | The Lenders will have the right to assign loans and commitments to their affiliates, other Lenders (and affiliates of such other Lenders) and to any Federal Reserve Bank without restriction, and to other financial institutions with the consent, not to be unreasonably withheld, of the Administrative Agent and the Borrower (except that no such consent of the Borrower need be obtained in connection with the primary syndication (subject to the terms of the Commitment Letter) or if any payment or bankruptcy event of default has occurred and is continuing or any breach of any financial covenant) and no assignments may be made to Excluded Parties (to be defined). Minimum aggregate assignment level (which shall not be applicable to assignments to affiliates of the assigning Lenders and other Lenders and their affiliates) of $5 million and increments of $1 million in excess thereof shall apply. The parties to the assignment (other than the Borrower) shall pay to the Administrative Agent an administrative fee of $3,500. |

Each Lender will have the right to sell participations in its rights and obligations under the loan documents, subject to customary restrictions on the participants' voting rights.

**Governing Law and Jurisdiction:**  The Revolving Loan Facility Documentation shall be governed by New York law (other than with respect to choice of law provisions).

**Counsel to the Arranger and the Administrative Agent:**  Paul, Hastings, Janofsky & Walker LLP

LEGAL_US_E # 88932992.17

**SCHEDULE I**
**to**
**Exhibit B**

**Applicable Margin**

Revolver 1:

| Tier | Monthly Average Availability | Applicable LIBOR Margin | Applicable Base Rate Margin | Commitment Fees |
|---|---|---|---|---|
| 1 | Greater than or equal to $50,000,000 | 3.00% | 2.00% | 0.75% |
| 2 | Less than $50,000,000 | 3.25% | 2.25% | 0.50% |

Revolver 2:

| Tier | Monthly Average Availability | Applicable LIBOR Margin | Applicable Base Rate Margin | Commitment Fees |
|---|---|---|---|---|
| 1 | Greater than or equal to $50,000,000 | 3.50% | 2.50% | 0.75% |
| 2 | Less than $50,000,000 | 3.75% | 2.75% | 0.50% |

EXHIBIT C

Exhibit C

**Visteon Corporation**
**$500,000,000 Senior Secured Plan-of-Reorganization Term Loan Facility**

**Summary of Certain Terms and Conditions**

Capitalized terms used but not defined in this Exhibit C shall have the meanings set forth in the Commitment Letter (as defined below) and the other Exhibits attached to the Commitment Letter to which this Exhibit C is attached (the "<u>Commitment Letter</u>"). In the case of any such capitalized term that is subject to multiple and differing definitions, the appropriate meaning thereof in this Exhibit C shall be determined by reference to the context in which it is used.

| | |
|---|---|
| **Borrower:** | Reorganized Visteon Corporation (the "**Borrower**"). |
| **Transactions:** | As set forth in Exhibit A to the Commitment Letter. |
| **Lead Arranger, Sole Bookrunner and Administrative Agent:** | Morgan Stanley Senior Funding, Inc. ("**MSSF**", the "**Lead Arranger**", "**Bookrunner**" or the "**Administrative Agent**") |
| **Collateral Agent:** | MSSF or any of its affiliates, or another Lender or institution acceptable to the Administrative Agent and reasonably acceptable to the Borrower (such acceptance not to be unreasonably withheld or delayed) (the "**Collateral Agent**"). |
| **Lenders:** | MSSF and a syndicate of financial institutions and institutional lenders arranged by the Lead Arranger in consultation with the Borrower (the "**Lenders**"). |
| **Guarantors:** | All obligations under the Term Loan Facility (as defined below) and under any interest rate protection or other hedging arrangements and cash management arrangements, entered into with the Administrative Agent, any Lender, or any affiliates of the foregoing shall be fully and unconditionally guaranteed by each of the existing and future direct and indirect U.S. subsidiaries of the Borrower (other than (a) each foreign stock holding company (to be defined as mutually agreed and consistent with the definition of such term in the prepetition term loan agreement of the Borrower), (b) unrestricted subsidiaries, (c) immaterial subsidiaries to be agreed upon, (d) any direct or indirect U.S. subsidiary of a direct or indirect non-U.S. subsidiary of the Borrower to the extent such guarantee would, in the good faith judgment of the Borrower, result in |

material adverse tax consequences to the Borrower or its subsidiaries (provided, however, utilization of the NOLs of the Borrower and its subsidiaries shall be excluded from the Borrower's determination of whether such guarantee would result in material adverse tax consequences to the Borrower or any of its subsidiaries), (e) captive insurance subsidiaries, if any, (f) non-profit subsidiaries, if any, (g) joint ventures not more than 50% owned by the Borrower or its subsidiaries, subject to further review and diligence by the Administrative Agent, and (h) existing joint ventures to the extent applicable law or the terms of such entities' organizational or other governing documents prohibit such entities from becoming guarantors, in each case, to the extent permitted by applicable law and subject to exceptions and limitations to be mutually agreed upon) (the "**Guarantors**"). The Borrower and the Guarantors are hereinafter sometimes referred to collectively as the "**Loan Parties.**"

**Facility:**

A senior secured term loan credit facility (the "**Term Loan Facility**") in an aggregate principal amount in U.S. Dollars $500,000,000.

All references to "**$**" or to "**U.S. Dollars**" herein are to the lawful currency of the United States of America.

**Issue Price:**

98 (i.e. 2.00% OID).

**Closing Date:**

A date (the "**Closing Date**") mutually agreed upon between the Borrower, the Lead Arranger, the Bookrunner and the Administrative Agent, but in any event not to occur until all of the conditions set forth on Schedule 1 to the Commitment Letter and in the Commitment Letter have been satisfied.

"**Term Loan Documentation**" means the definitive loan documentation for the Term Loan Facility, including without limitation credit agreements, intercreditor agreements, security agreements, guaranties and other documentation reflecting, among other things, the terms and conditions set forth herein. Notwithstanding the foregoing, the requirements of the collateral documents shall be, as of the Closing Date, subject to the funds certain provisions set forth in paragraph 1 of Schedule 1 to the Commitment Letter to which this Exhibit C is attached.

C-2

| **Maturity and Amortization:** | The Term Loan Facility shall mature on the seventh anniversary of the Closing Date (the "**Term Loan Maturity Date**"). The loans under the Term Loan Facility (the "**Term Loans**") shall amortize in equal quarterly installments in annual amounts equal to 1.0% of the original principal amount of the Term Loan Facility, with the final installment payable on the Term Loan Maturity Date. |
| --- | --- |
| **Unrestricted Subsidiaries:** | The Term Loan Documentation will contain customary provisions pursuant to which the Borrower will be permitted to designate any existing or subsequently acquired or organized subsidiary as an "unrestricted subsidiary" and subsequently re-designate any such unrestricted subsidiary as a restricted subsidiary so long as immediately after giving effect to such designation (which designation shall be treated as an investment in an amount equal to the fair market value of all assets of such unrestricted subsidiary at the time of such designation), (i) the Borrower shall be in compliance with the investments covenant, (ii) there shall be no default or event of default under the Term Loan Facility, (iii) the Borrower shall have delivered evidence reasonably satisfactory to the Administrative Agent that the Borrower is in pro forma compliance with all covenants and (iv) the aggregate amount of EBITDA (such definition to be mutually agreed upon) of all unrestricted subsidiaries shall not at any time exceed 10% of the EBITDA of the Borrower and its subsidiaries on a consolidated basis. Unrestricted subsidiaries will not be subject to the representations and warranties, covenants, events of default or other provisions of the Term Loan Documentation, and the results of operations and indebtedness of unrestricted subsidiaries will not be taken into account for purposes of calculating any financial ratios, if any, contained in the Term Loan Documentation. |
| **Uncommitted Incremental Term Facility:** | The Term Loan Documentation shall provide for an incremental term facility (the "**Incremental Term Facility**") in an aggregate principal amount of $100 million under the Term Loan Facility; *provided* that the average life to maturity of any Incremental Term Facility will be no shorter than the remaining average life to maturity of the Term Loan Facility. Subject to the next succeeding paragraph, the Incremental Term Facility will rank pari passu in right of payment and security with the Term Loan |

Facility and will mature at the final maturity of the Term Loan Facility.

The Incremental Term Facility shall not initially be effective but may be activated at any time after 90 days following the Closing Date and from time to time (without amendment to the Term Loan Documentation) during the life of the Term Loan Facility at the request of the Borrower with consent required only from those Lenders (including new Lenders that are reasonably acceptable to the Administrative Agent and the Borrower) that agree, in their sole discretion, to participate in such Incremental Term Facility provided all representations and warranties shall be true and correct in all material respects immediately prior to, and immediately after giving effect to, the incurrence of such Incremental Term Facility; provided that (i) no event of default exists or would exist after giving effect thereto, (ii) any such Incremental Term Facility shall benefit from the same guarantees as, and, except as provided otherwise in clause (iv) below, be secured on a pari passu basis by the same Collateral (as defined below) securing, the initial Term Loan Facility, (iii) the Borrower is in pro forma compliance with each of the Financial Covenants (as defined below), in each case as of the most recently ended fiscal quarter for which financial statements are available (determined after giving effect to the full utilization of the commitments provided under such Incremental Term Facility), and (iv) loans to be made under an Incremental Term Facility (each, an "**Incremental Term Loan**"), shall be subject to the same terms as the Term Loans (including voluntary and mandatory prepayment provisions), except that, unless such Incremental Term Loans are made a part of the Term Loan Facility (in which case all terms thereof shall be identical to those of the Term Loan Facility), (a) the "effective margin" applicable to the respective Incremental Term Loans (which, for such purposes only, shall be deemed to include all upfront or similar fees or original issue discount (amortized over the shorter of (1) the weighted average life to maturity of such loans and (2) four years) payable to all Lenders providing such Incremental Term Loans or the imposition of an interest rate floor, but exclusive of any arrangement, structuring or other fees payable in connection therewith that are not shared with all Lenders providing such Incremental Term Loans) determined as of the initial funding date for such Incremental Term Loans,

LEGAL_US_E # 88933514.17

may exceed the "effective margin" applicable to any Term Loans or any other Incremental Term Loans (determined on the same basis as provided in the preceding parenthetical) by up to 0.50% (after giving effect to any increase to the pricing applicable to the loans under the Term Loan Facility and any other Incremental Term Facility as described in the definition of "Applicable Margin" below), (b) the final stated maturity date for such Incremental Term Loans may be later (but not sooner) than the final stated maturity date applicable to the Term Loans, (c) the amortization requirements for such Incremental Term Loans may differ, so long as the average weighted life to maturity of such Incremental Term Loans is no shorter than the average weighted life to maturity applicable to the then outstanding Term Loans, (d) (other than as set forth in clause (a) above) any minimum LIBOR Rate or Base Rate applicable to such Incremental Term Loans may exceed the minimum LIBOR Rate and Base Rate set forth under the heading "Interest Rates" below if such minimum LIBOR Rate and/or Base Rate applicable to all then outstanding Term Loans is increased to match such minimum LIBOR Rate and/or Base Rate applicable to such Incremental Term Loans, (e) Incremental Term Loans may rank junior in right of security with the other Term Loans made on the Closing Date or be unsecured, in which case, the Incremental Term Facility pursuant to which such Incremental Term Loans are extended will be established as a separate facility from the then existing Term Loan Facility and (f) other terms may differ if reasonably satisfactory to the Administrative Agent, the Borrower and Lenders providing such Incremental Term Loans.

Existing Lenders may, but shall not be obligated without their prior written consent to, provide a commitment and/or make any loans pursuant to any Incremental Term Facility, and nothing contained herein or in the Commitment Letter constitutes, or shall be deemed to constitute, a commitment with respect to any Incremental Term Facility. If the existing Lenders are unwilling to increase their applicable commitments by an amount equal to the requested increase, the Administrative Agent, in consultation with the Borrower, will use its commercially reasonable efforts to obtain one or more financial institutions which are not then lenders (which financial institution may be suggested by the Borrower) to become party to the Term Loan Documentation and to provide a commitment to the extent

necessary to satisfy the Borrower's requested increase in the Incremental Term Loan Facility; provided, however, compensation for any such assistance by the Administrative Agent shall be mutually agreed by the Administrative Agent and the Borrower.

**Use of Proceeds:**

Proceeds from the Term Loan Facility will be used (a) to finance a portion of the aggregate amount required to consummate the Transactions, including the payment of Transaction Costs (b) to provide working capital from time to time for the Borrower and its subsidiaries and (c) for other general corporate purposes.

**Collateral:**

The Term Loan Facility, each guarantee made by a Guarantor in connection therewith and any cash management and/or hedging obligations of the Borrower owed to a Lender or any affiliates are secured by (i) valid and perfected first priority security interests in and liens upon the Term Loan Collateral (as defined in the Revolving Loan Term Sheet) and (ii) valid and perfected security interests in and liens upon the ABL Collateral (as defined in the Revolving Loan Term Sheet) junior to the liens on the ABL Collateral securing indebtedness and other obligations under the Revolving Loan Facility (the "**Collateral**").

All the above-described pledges, security interests and liens on the Term Loan Collateral shall be created on terms and pursuant to documentation satisfactory to the Administrative Agent, and none of the Collateral shall be subject to any other pledges, security interests or liens, subject to exceptions to be agreed upon; provided the junior liens will be permitted on the Term Loan Collateral to secure the Revolving Loan Facility. Notwithstanding the foregoing, the requirements of this "Collateral" section shall be, as of the Closing Date, subject to the funds certain provisions set forth in paragraph 1 of Schedule 1 to the Commitment Letter to which this Exhibit C is attached.

**Secured Hedging Arrangements:**

The obligations under the Term Loan Facility shall include exposure in respect of any cash management transactions, interest rate protection, currency and other hedging obligations incurred on behalf of the Borrower or any Guarantor entered into with any Lender or Revolver Lender (or their affiliates), the Administrative Agent, the Arranger or any affiliate of any of the foregoing and shall be secured

LEGAL_US_E # 88933514.17

on a pro rata basis from any proceeds from the Term Loan Collateral.

**Intercreditor Agreement:** An intercreditor agreement (the "**Intercreditor Agreement**") will establish the rights of the holders of the first priority liens and the holders of the junior liens on the ABL Collateral and the Term Loan Collateral. Pursuant to the Intercreditor Agreement, the junior liens may not be enforced at any time when obligations secured by first priority liens are outstanding, except in any insolvency or liquidation proceeding as necessary to file a claim or statement of interest with respect to the obligations secured by junior liens. Any release or subordination of first priority liens on any collateral approved by holders of such first priority liens will also release or subordinate, as applicable, the junior liens on the same collateral, subject to certain exceptions. The holders of the first priority liens will receive all proceeds from any realization on the collateral subject to such first priority liens until the obligations secured by the first priority liens are paid in full, the commitments with respect thereto are terminated and there are no outstanding letters of credit or similar instruments issued under the applicable facility.

**Interest:** The Borrower may elect that the Term Loans bear interest at a rate per annum equal to (a) the Base Rate (as defined below) plus the Applicable Margin (as defined below) or (b) LIBOR (as defined below) plus the Applicable Margin. Interest rates shall be calculated and established once every three months, effective as of the first day of the month of such three month period and shall remain in effect until adjusted thereafter at the end of the next three month period.

A. <u>Base Rate Option</u>

"**Base Rate**" means the higher of (i) the Federal Funds Rate published by the Federal Reserve Bank of New York from time to time plus ½ of 1%, (ii) the rate that the MSSF announces from time to time as its prime or base commercial lending rate, as in effect from time to time and (iii) LIBOR for an interest period of one-month beginning on such day plus 1%; provided that the Base Rate shall be deemed to be not less than 2.75% per annum.

B. <u>LIBOR Option</u>

Interest will be determined for periods to be selected by the Borrower (**"Interest Periods"**) of one, two, three or six months (and if available to all Lenders, nine and twelve months) and will be at an annual rate equal to the London Interbank Offered Rate ("LIBOR") for the corresponding deposits of U.S. dollars, plus the Applicable Margin; provided that LIBOR shall be deemed to be not less than 1.75% per annum. LIBOR will be determined by the Administrative Agent at the start of each Interest Period and will be fixed through such period. Interest will be paid at the end of each Interest Period or, in the case of Interest Periods longer than three months, quarterly, and will be calculated on the basis of the actual number of days elapsed in a year of 360 days. LIBOR will be adjusted for maximum statutory reserve requirements (if any).

LIBOR borrowings will require three business days' prior notice and will be in minimum amounts to be agreed upon.

**"LIBOR"** means the rate of interest (rounded upwards, if necessary, to the nearest 1/100th) appearing on Reuters Screen LIBOR01 Page (or on any successor or substitute page of such service, or any successor to or substitute for such service as determined by the Administrative Agent) as the London interbank offered rate for deposits in U.S. Dollars for a term comparable to the applicable period of three months (but if more than one rate is specified on such page, the rate will be an arithmetic average of all such rates), and in each case subject to the reserve percentage prescribed by governmental authorities.

C.    Interest Margins

**"Applicable Margin"** means, at any time, (a) as to Term Loans for which interest is calculated based on the Base Rate, 5.25% and (b) as to Term Loans for which interest is calculated based on LIBOR, 6.25%.

**Default Interest:**

Upon a payment or bankruptcy event of default or an event of default related to the Financial Covenants, default interest shall be applied at 2.00% above the rate otherwise applicable thereto.

**Fees:**

To be set forth in a separate Fee Letter.

**Optional Prepayments:**

The Borrower may, without premium or penalty, prepay, in whole or in part, the Term Loan Facility, together with any

accrued and unpaid interest, with prior notice and in minimum amounts to be agreed.

**Mandatory Prepayments:**

The Term Loan Facility shall be prepaid in an amount equal to: (a) 100% of the net cash proceeds in excess of $3,000,000 per fiscal year from the sale or other disposition of all or any part of the assets of the Borrower or any of its subsidiaries after the Closing Date other than sales of inventory in the ordinary course of business, Small Asset Sales and other exceptions to be agreed and other than 100% of such proceeds that are reinvested or committed to be reinvested within 365 days of such sale or disposition (and, if committed to be reinvested within 365 days of such sale or disposition (and, if committed to be reinvested, are actually reinvested within 180 days of the end of such 365-day period), (b) 100% of all casualty and condemnation proceeds received by the Borrower or any of its subsidiaries, subject to reinvestment or commitment to be reinvested within 365 days of such casualty or condemnation (and, if committed to be reinvested, are actually reinvested within 180 days after the end of such 365-day period), (c) 100% of the net cash proceeds received by the Borrower or any of its subsidiaries from the issuance of debt or preferred stock after the Closing Date, other than debt permitted by the Term Loan Documentation and (d) for each fiscal year of Borrower ending on or after December 31, 2011, 50% of excess cash flow (such definition to be mutually agreed) of the Borrower and its subsidiaries (to be defined in a manner to be agreed), subject to a step-down to 25% and 0% if the Total Net Leverage Ratio (as defined below) is less than an amount to be agreed upon. The definition of excess cash flow shall provide for a deduction from excess cash flow, without duplication, of funds used (or to be used in a manner to be agreed): (x) to fund permitted acquisitions made during such period, (y) to repay borrowings of Revolving Loans made to account for any additional original issue discount or upfront fees that are implemented pursuant to the Fee Letter or (z) to make permitted restricted payments, except to the extent that the source of such funds is from proceeds of debt or equity. Further, the excess cash flow of any company acquired in a Permitted Acquisition shall only include the period from the closing date of such acquisition through the end of the fiscal year). The Borrower shall receive dollar-for-dollar credit against such excess cash flow mandatory prepayments for voluntary prepayments of the Term Loan Facility and voluntary prepayments of the

C-9

Revolving Loan Facility so long as commitments in respect of the Revolving Loan Facility are permanently reduced thereby.

All prepayments referred to above are subject to permissibility under (i) local law (e.g., financial assistance, corporate benefit, restrictions on upstreaming of cash intra-group and the fiduciary and statutory duties of the directors of the relevant subsidiaries) and (ii) material constituent document restrictions (including as a result of minority ownership). Further, there will be no requirement to make any prepayment whereby doing so the Borrower and its subsidiaries or any of their affiliates can demonstrate to the Lenders that it would incur a material tax liability, including a deemed dividend pursuant to Section 956 of the Internal Revenue Code; provided, further, utilization of the NOLs of the Borrower and its subsidiaries shall be excluded from the Borrower's determination of whether such prepayment would result in material adverse tax liabilities to the Borrower or any of its subsidiaries. The non-application of any prepayment amounts as a consequence of the foregoing provisions will not, for the avoidance of doubt, constitute an event of default, and such amounts shall be available for working capital purposes of the Borrower and its subsidiaries so long as not required to be prepaid in accordance with the following provisions. The Borrower and its subsidiaries will use commercially reasonable efforts to overcome or eliminate any such restrictions and/or minimize any such costs of prepayment and/or use the other cash resources of the Borrower and its subsidiaries (subject to the considerations above) to make the relevant payment; provided, however, such efforts shall not include the application or use of the NOLs of the Borrower and its subsidiaries. If at any time within one year of a prepayment being forgiven due to such restrictions, such restrictions are removed, any relevant proceeds will at the end of the then current interest period be applied in prepayment of the Senior Secured Facilities. Notwithstanding the foregoing, any prepayments required after application of the above provision shall be net of any costs, expenses or taxes incurred by the Borrower and its subsidiaries or any of its affiliates and arising exclusively as a result of compliance with the preceding sentence, and the Borrower and its subsidiaries shall be permitted to make, directly or indirectly, a dividend or distribution to its affiliates in an amount sufficient to cover such tax liability, costs or expenses.

C-10

Each Lender may decline any mandatory prepayment required above. Such amounts declined by a Lender shall be offered to the other Lenders under the Term Loan Facility. Any unapplied amounts thereafter may be retained by the Borrower and applied to any other obligations or liabilities of the Borrower and its Subsidiaries as determined by the Borrower, up to amounts to be mutually agreed on.

"Total Net Leverage Ratio" shall mean the ratio of (a) the sum of (i) Consolidated Debt (to be mutually agreed upon) of the Borrower and its restricted subsidiaries, *less* (ii) all unrestricted cash and cash equivalents to (b) Consolidated EBITDA (to be defined).

**Application of Payments:**

All mandatory prepayments (except for prepayments related to the obligations under the Revolving Loan Facility in excess of the Borrowing Base or maximum Revolving Loan Facility commitments from the net proceeds of ABL Collateral) will be applied without penalty or premium (except for breakage costs, if any) and will be applied, first, to the Term Loan Facility; and, second, to outstanding loans under the Revolving Loan Facility (without a permanent reduction to the commitment under the Revolving Loan Facility) in amounts to be determined based upon the allocated value of the primary collateral securing each facility. Within the Term Loan Facility, prepayments will be applied to scheduled amortization payments (i) in the case of optional prepayments, as directed by Borrower and (ii) in the case of mandatory prepayments, on a pro rata basis.

All payments during an event of default shall be applied (a) with respect to proceeds from the ABL Collateral, first, to the outstanding loans under the Revolving Loan Facility (including cash collateralizing all Letters of Credit) and accrued and unpaid interest, expenses, costs and fees thereon and thereafter to the Term Loan Facility and (b) with respect to the proceeds from the Term Loan Collateral, first, to the outstanding Term Loan Facility and accrued and unpaid interest, expenses, costs and fees thereon and thereafter to the Revolving Loan Facility.

C-11

**Conditions Precedent
to All Extensions of Credit:** As specified under the caption "Conditions Precedent to All Extensions of Credit" in the Revolving Loan Facility Term Sheet and those set forth on Schedule 1 to the Commitment Letter.

**Representations and
Warranties:** As specified under the caption "Representations and Warranties" in the Revolving Loan Facility Term Sheet, with appropriate modifications for the Term Loan Facility.

**Affirmative Covenants:** As specified under the caption "Affirmative Covenants" in the Revolving Loan Facility Term Sheet, with appropriate modifications for the Term Loan Facility.

**Negative Covenants:** As specified under the caption "Negative Covenants" in the Revolving Loan Facility Term Sheet, with appropriate modifications for the Term Loan Facility; provided, however, (a) with respect to limitations on cash dividends, distributions, redemptions and repurchases with respect to capital stock, the following exceptions shall apply in lieu of the exceptions set forth in the Revolving Loan Facility Term Sheet, the Borrower may pay dividends so long as (i) no default or event of default then exists or would result therefrom and (ii) the aggregate amount of dividends paid does not exceed the sum of $250 million *plus* 25% (or minus 100% in the case of a loss) of the Borrower's consolidated net income for the period commencing on the Closing Date and ending on the last day of the fiscal quarter most recently ended for which financial statements are available *plus* 100% of the net cash proceeds received by the Borrower after the Closing Date from the issuance of its common equity which are not otherwise applied; provided, however, that Halla Climate Control Corporation ("**Halla**") and its subsidiaries shall be permitted to redeem or repurchase (including, without limitation, for cash) equity interests from Halla's existing equity-holders so long as the Borrower and its subsidiaries, taken as a whole, continue to own not less than 51% of the equity interests of Halla and continue to control the same ratio (or better) of board seats of Halla as they do on the Closing Date after any such transaction, (b) the Term Loan Documentation will include a capital expenditure covenant which will permit carryforwards and carrybacks in an amount to be agreed upon, (c) permitted acquisitions and debt incurred to finance permitted acquisitions will each be capped at $400

C-12

million under the Term Loan Documentation and (d) clause (D) under the Investment Basket (as defined in the Revolving Loan Facility Term Sheet) shall be in an amount to be mutually agreed.

**Financial Covenants:** The following financial covenants (the "**Financial Covenants**"), applicable to the Borrower and its subsidiaries (in each case, to be defined as mutually agreed):

- maintenance of a Total Net Leverage Ratio not to exceed 2.50 to 1.00; and
- maintenance of a minimum cash interest coverage ratio (EBITDA to cash interest expense).

**Events of Default:** As specified under the caption "Events of Default" in the Revolving Loan Facility Term Sheet, with appropriate modifications for the Term Loan Facility, including, without limitation, a cross default to the Revolving Loan Facility.

**Credit Ratings:** The Borrower shall to use commercially reasonable efforts to obtain within 60 days following the Closing Date public corporate credit and family ratings of Visteon after giving effect to the Transactions and public credit ratings for the Term Loan Facility from Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc. ("S&P").

**Interest Hedge Requirement:** The Borrower shall be required to hedge fifty percent (50%) of the Term Loan Facility for a period of three (3) years (which may be successive one year hedging instruments), on terms and conditions reasonably acceptable to the Administrative Agent.

**Voting/ Waivers and Amendments:** Amendments and waivers of the Term Loan Documentation will require the approval of Lenders holding more than 50% of the aggregate amount of loans and commitments under the Term Loan Facility (the "**Required Lenders**"), except that the consent of (a) each affected Lender shall be required with respect to (i) increases in commitments of such Lender, (ii) reductions of principal, interest or fees payable to such Lender (*provided* that waiver of a default, event of default or default interest shall not constitute a reduction of interest

C-13

for this purpose) and (iii) extensions of final scheduled maturity or any scheduled date of amortization or times for payment of interest or fees owing to such Lender (provided that waiver of a default, event of default or default interest shall not constitute a reduction of interest for this purpose), and (b) subject to the Intercreditor Agreement, all Lenders shall be required with respect to releases of all or substantially all of the Guarantors or all or substantially all of the Term Loan Collateral.

In connection with any proposed amendment, modification, waiver or termination (a "**Proposed Change**") requiring the consent of all Lenders or all affected Lenders, if the consent to such Proposed Change of other Lenders whose consent is required is not obtained but the consent of the Required Lenders is obtained (any such Lender whose consent is not obtained being referred to as a "**Non-Consenting Lender**"), then the Borrower may, at its sole expense and effort, upon notice to such Non-Consenting Lender and the Administrative Agent, require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with and subject to customary restrictions on assignment), all its interests, rights and obligations under the Term Loan Documentation to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that such Non-Consenting Lender shall have received payment of an amount equal to the outstanding principal of its loans, accrued interest thereon, accrued fees and all other amounts then due and owing to it under the Term Loan Documentation from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts).

Notwithstanding the foregoing, the Term Loan Facility shall contain "amend and extend" provisions (on terms to be mutually agreed by the Administrative Agent and the Borrower) pursuant to which the Borrower may extend commitments and/or outstandings pursuant to one or more tranches with only the consent of the respective extending Lenders; it being understood that any such amend and extend will be subject to a most favored nation provision based on yield on terms to be mutually agreed by the Lead Arranger and the Borrower and that each Lender under the applicable tranche or tranches that are being extended shall have the opportunity to participate in such extension on the same terms and conditions as each other Lender in such

tranche or tranches; provided that it is understood that no existing Lender will have any obligation to commit to any such extension.

In addition, the Term Loan Documentation shall provide for the amendment (or amendment and restatement) of the Term Loan Documentation to provide for term loans replacing all or a portion of the Term Loans, subject to customary limitations, with the consent of the Administrative Agent, the Borrower and the Lenders providing such replacement term loans and, in connection with any of the foregoing, the right of the Borrower to require to the applicable Lenders to assign their Term Loans to the providers of any replacement credit facility or loans.

**Cost and Yield Protection:** Same as set forth in the Revolving Loan Facility Term Sheet.

**Assignments and Participations:** The Lenders will have the right to assign loans and commitments to their affiliates, other Lenders (and affiliates of such other Lenders) and to any Federal Reserve Bank without restriction, and to other financial institutions with the consent, not to be unreasonably withheld, of the Administrative Agent and the Borrower (except that no such consent of the Borrower need be obtained in connection with the primary syndication (subject to the terms of the Commitment Letter) or if any payment or bankruptcy event of default has occurred and is continuing or any breach of any Financial covenant has occurred and no assignments may be made to Excluded Parties (to be defined). Minimum aggregate assignment level (which shall not be applicable to assignments to affiliates of the assigning Lenders and other Lenders and their affiliates) of $1 million and increments of $1 million in excess thereof shall apply. The parties to the assignment (other than the Borrowers) shall pay to the Administrative Agent an administrative fee of $3,500.

Each Lender will have the right to sell participations in its rights and obligations under the loan documents, subject to customary restrictions on the participants' voting rights.

**Taxes, Expenses and Indemnity:** Same as set forth in the Revolving Loan Facility Term Sheet.

C-15

**Governing Law:**                    The State of New York, except as to real estate and certain other collateral documents required to be governed by local law. Each party to the Term Loan Documentation will waive the right to trial by jury and will consent to the exclusive jurisdiction of the state and federal courts located in The Borough of Manhattan, The City of New York.

**Counsel to the Lead Arranger:**     Paul, Hastings, Janofsky & Walker LLP

LEGAL_US_E # 88933514.17